1          UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2

3

   UNITED STATES OF AMERICA          )
4                                    )
   vs.                               )  Criminal Action
5                                    )
   HERZZON SANDOVAL,                 )  No. 15-10338-FDS
6  EDWIN GUZMAN,                     )
   CESAR MARTINEZ,                   )
7  ERICK ARGUETA LARIOS,             )
                Defendants           )
8

9

   BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
10

11

                    JURY TRIAL DAY 3
12

13

14

           John Joseph Moakley United States Courthouse
15                  Courtroom No. 2
                    1 Courthouse Way
16                  Boston, MA 02210

17                  February 1, 2018
                     9:00 a.m.
18

19

20

21

22              Valerie A. O'Hara
                Official Court Reporter
23   John Joseph Moakley United States Courthouse
            1 Courthouse Way, Room 3204
24              Boston, MA 02210
            E-mail: vaohara@gmail.com
25

1    APPEARANCES:

2    For The United States:

3         United States Attorney's Office, by CHRISTOPHER J. POHL,
     ASSISTANT UNITED STATES ATTORNEY, and KELLY BEGG LAWRENCE,
4    ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200,
     Boston, Massachusetts 02110;
5

6    For the Defendant Herzzon Sandoval:

7         Foley Hoag LLP, by MARTIN F. MURPHY, ESQ. and
     MADELEINE K. RODRIGUEZ, ATTORNEY,
8    155 Seaport Boulevard, Boston, Massachusetts 02210;

9    For the Defendant Edwin Guzman:

10        Lawson & Weitzen, by SCOTT P. LOPEZ, ESQ.,
     88 Black Falcon Avenue, Suite 345, Boston, Massachusetts 02210
11

12   For the Defendant Erick Argueta Larios:

13        THOMAS J. IOVIENO, ESQ., 345 Neponset Street
     Canton, MA 02021;
14

15   For the Defendant Cesar Martinez:

16        Stanley W. Norkunas, 11 Kearney Square,
     Howe Building, Suite 202, Lowell, Massachusetts 01852.

17

18

19

20

21

22

23

24

25

1                              I N D E X

2    WITNESS                    DIRECT  CROSS  REDIRECT  RECROSS

3    RICHARD DALEY
       By Mr. Pohl                4               38
4      By Mr. Murphy                     33
     JEFFREY ELLIOT WOOD, JR.
5
       By Mr. Pohl               40
6

7
     EXHIBITS                          FOR I.D.   IN EVIDENCE
8
       1.1, 1.2 and 1.3                               65
9        91                                            4
       93.1 through 93.4                               9
10     94                                             12
       95                                             11
11     96                                             16

12     96.2                                           19

13     97                                             20
       98                                             21
14     99                                             22
       101.2 through 101.5                            23
15     102                                            25

16

17

18

19

20

21

22

23

24

25

1                          TESTIMONY ONLY

2              THE COURT:  All right.  Is the government ready to

3      call its first witness?

4              MR. POHL:  Yes, your Honor.  We call Richard Daley.

5              RICHARD DALEY, having been duly sworn by the Clerk,

6      testified as follows:

7              MR. POHL:  Your Honor, before I begin my direct

8      examination, the parties have a stipulation concerning the

9      admissibility of Exhibit Number 91, which is a 9-1-1 tape.

11:05AM 10              THE COURT:  All right.  Ladies and gentlemen, a

11      stipulation is kind of a fancy lawyer word for an agreement.

12      It means the parties have agreed that something is true.  In

13      this case, I think it's that this 9-1-1 tape is authentic.

14              MR. POHL:  Yes.  Your Honor, I'd offer Exhibit 91, and

15      I'd ask permission to play it.

16              MR. MURPHY:  Your Honor, may we have an objection for

17      relevance?

18              THE COURT:  Yes, overruled.

19              (Video played.)

20              (Exhibit No. 91 received into evidence.)

21              RICHARD DALEY, having been duly sworn by the Clerk,

22      testified as follows:

23                        DIRECT EXAMINATION

24      BY MR. POHL:

25      Q.   Good morning.

1    A.    Good morning.

2    Q.    Can you please introduce yourself to the ladies and

3    gentlemen of the jury.

4    A.    My name is Richard Daley, D-a-l-e-y.  I'm a sergeant

5    detective with the Boston Police Homicide Unit.

6    Q.    Sergeant Daley, how long have you been a police officer?

7    A.    Thirty-four years.

8    Q.    How long have you been on the homicide unit?

9    A.    Thirteen years.

11:10AM 10    Q.    And your rank, Sergeant Detective, am I correct that that

11    means that you investigate homicides and supervise a team of

12    detectives that work for you?

13    A.    Yes.

14    Q.    Can you tell the jury about that.

15    A.    Yes.  I'm one squad of a night squads.  I work 3 p.m.

16    to -- excuse me, 5 p.m. to 3 a.m.  Twice a week we're on call

17    for those hours.  It's myself.  I supervise three other

18    detectives, and relative to this incident, it was myself,

19    Detective John Callahan, Detective David O'Sullivan and

11:11AM 20    Detective Todd Harron.  We respond to any callouts of death

21    investigations, people that have serious injuries that could

22    lead to death, motor vehicle fatalities, sometimes sudden

23    deaths, if the person's identification is unknown, and any

24    investigation that the Suffolk County D.A., any death

25    investigation that the Suffolk D.A.'s office wants us to

1    investigate.

2    Q.   Thank you.  Given the schedule you mentioned suggests an

3    answer.  How do you and your squad get assigned to particular

4    cases to investigate?

5    A.   Like I sort of previously described, our first two nights

6    we're on call, and any of those incidents we get called out to,

7    usually the sergeant on the street at an incident will call the

8    operations division, and operations division will notify us,

9    and we'll gear up and go to the scene and deal with the

11:12AM 10   situation.

11   Q.   Sergeant, do you recall whether you were working on

12   Sunday, September 20th, 2015?

13   A.   Yes, I was.

14   Q.   And I direct your attention to late in the afternoon on

15   that particular day.  Did you receive a call to go somewhere?

16   A.   Yes, at approximately 5:35 p.m., Operations notified

17   Homicide, that is my squad and I, to respond to 72 Trenton

18   Street in East Boston for a person stabbed.

19   Q.   You've been doing this for many years.  You might be

11:13AM 20   familiar with all the neighborhoods of the City of Boston.  Can

21   you tell the ladies and gentlemen of the jury what 72 Trenton

22   Street looks like, what kind of neighborhood is it?

23   A.   It's a densely populated residential neighborhood,

24   traditional three-story, two and a half story residential homes

25   with some neighboring stores and commercial businesses in the

1    area but mainly residential.

2         THE COURT:  East Boston?

3         THE WITNESS:  East Boston, yes.

4    Q.   When you got that call, Sergeant Detective Daley, what did

5    you and your squad do?

6    A.   I directed Detective Callahan to go to the Mass. General

7    Hospital to check on the condition and identity of the victim

8    and myself, Detective Halloran and Detective Sullivan responded

9    to 72 Trenton Street.

11:14AM 10   Q.   Detective Callahan went to the hospital, correct?

11   A.   Correct.

12   Q.   And through that learned the identity of an individual who

13   had been transported there, correct?

14   A.   Yes.

15   Q.   And who was that?

16   A.   Irvin De Paz.

17   Q.   You went to the scene?

18   A.   Yes.

19   Q.   Of 72 Trenton Street.  When you got to 72 Trenton Street,

11:14AM 20   what did you see?

21   A.   An area cordoned off with yellow crime scene tape.

22   Uniformed police officers, well, the detectives on the scene,

23   the street is a one-way street, so they were able to block off

24   the whole street.  Officers were protecting an area that had

25   some evidence in the street, and I was briefed by the sergeant

1    on the scene what they had.

2    Q.    Okay.  Is it standard practice for the Boston Police

3    Department to photograph crime scenes, particularly scenes

4    involving serious events like homicides?

5    A.    Yes.

6    Q.    Are you aware through the course of your duties as a

7    Boston police officer whether there were photographs taken of

8    the crime scene in this case?

9    A.    There were.

11:15AM 10    Q.    And you've had an opportunity to review those prior to

11    your testimony here today; is that correct?

12    A.    Yes, I have.

13          MR. POHL:  Can you pull up 93 for the witness.

14    Q.    I will just quickly click through these, Sergeant

15    Detective Daley.  Do you have a screen in front of you?  Is it

16    working?

17          Sergeant, can you see it now?

18    A.    I have the photo in front of me now, yes.

19    Q.    I think there's a series of pictures.  Why don't I quickly

11:16AM 20    click through them.  Do you recognize this scene?

21    A.    Yes.

22    Q.    How do you recognize these?

23    A.    That's the scene at 72 Trenton Street where Irvin De Paz

24    was killed.

25    Q.    Okay.  Do these photographs fairly and accurately capture

1    how the scene looked when you arrived late in the afternoon of

2    September 20th, 2015?

3    A.    Minus the cones, but, yes, later on identifying cones were

4    put next to the evidence, but, yes.

5            MR. POHL:  Your Honor, I would offer Exhibits

6    Number 93.1 through 4 into evidence and ask for permission to

7    publish them to the jury.

8            MR. IOVIENO:  Objection, relevance.

9            THE COURT:  They're admitted, 93.1 through 93.4.

11:17AM 10           (Exhibit No. 93.1 through 93.4 received into

11    evidence.)

12           THE COURT:  What we were doing, we were showing it to

13    the witness first, then when I admit it, you can see it.  It's

14    kind of a two-step process.

15           THE COURT:  Go ahead.

16           MR. POHL:  Thank you very much, your Honor.

17   Q.    Sergeant Detective Daley, this is Exhibit 93.1.  Can you

18   tell the ladies and gentlemen of the jury what we're looking at

19   here?

11:18AM 20   A.    This is the end location where Irvin dropped to the ground

21   opposite 72 Trenton Street.

22   Q.    Okay.  So we've got the -- there are two cars, correct?

23   A.    Yes, there are two parked cars, correct.

24   Q.    There are two red objects on the ground.  Do you know what

25   those are?

1   A.    Yes, these are red Chicago Bulls hat underneath first the

2   white car in front, to the left, I should say, and there's a

3   red T-shirt on the ground in front of the second car with some

4   blood smearing on the front bumper of the second car.

5           MR. POHL:  Next photograph, 93.2.  Thank you.

6   Q.    That's what?

7   A.    That's the red hat I just spoke of underneath the car.

8   Now it's labeled with Cone 6.

9   Q.    And 93.3.

11:19AM 10   A.    That's the red T-shirt on the ground that was later

11   identified as Cone 7.

12   Q.    And through the course of your investigation, were you

13   able to identify that that was the shirt that Irvin De Paz was

14   wearing when he was killed?

15   A.    Yes.

16   Q.    Why is it still at the scene?

17   A.    Because we process the scene as is, and once everything is

18   documented, photographed, measured, then it's collected.

19   Q.    Irvin De Paz, an ambulance responded to take Irvin De Paz

11:19AM 20   to the hospital, correct?

21   A.    Yes.

22   Q.    And is it your understanding that the shirt was cut off

23   Mr. De Paz prior to him being taken to the hospital?

24   A.    Yes, it appears after seeing it later, it was cut for

25   removal, correct.

1          MR. POHL:  93.4.

2     Q.    What are we looking at here, Sergeant Detective?

3     A.    That's blood smears and dripping blood on the car, the

4     second car.

5     Q.    All right.  You processed that, you and the detectives

6     that you worked with collect the evidence at that scene,

7     correct?

8     A.    Yes, we identified it, marked it, collected it, yes.

9          MR. POHL:  Your Honor, with your permission, I'd ask

11:20AM 10    Sergeant Detective Daley to get down from the witness stand and

11    join me in the well.

12    Q.    Sergeant, I'm going to hand you Exhibit 95.  Do you

13    recognize that?

14    A.    Yes, this is the red hat in the photographs underneath the

15    car scene.

16    Q.    Okay.  The pictures that we just looked at a moment ago?

17    A.    Correct.

18         MR. POHL:  I'd offer 95 into evidence.

19         MR. IOVIENO:  Objection.  Relevance.

11:21AM 20        THE COURT:  Overruled.  It's admitted, 95.

21         (Exhibit No. 95 received into evidence.)

22    Q.    All right.  I hold up for you, Sergeant Detective Daley,

23    what's been marked Exhibit Number 94 and ask if you recognize

24    this?

25    A.    Yes, that's the red T-shirt that Irvin De Paz was wearing,

1    and it was found on the street opposite 72 Trenton Street, and

2    we collected it that evening.

3    Q.    Would I be correct that the shirt has been mounted so that

4    the jurors can look at it prior to your testimony here today,

5    correct?

6    A.    Yes, I asked Boston Police Crime Laboratory to mount it

7    for presentation.

8    Q.    All right.  So I'm going to draw your attention to a

9    couple different markings on the shirt.  First of all, your

11:22AM 10   Honor, I'd offer 94 into evidence.

11            MR. IOVIENO:  Same objection.

12            THE COURT:  Overruled.  It's admitted, 94.

13            (Exhibit No. 94 received into evidence.)

14   Q.    Sergeant, let's start with the front of the shirt.

15   There's markings labeled cut 1 and cut 2?

16   A.    Yes.

17   Q.    And there's a sort of discolored or different color on the

18   left-hand side of the shirt.  What is that?

19   A.    Those are stab wounds, and the result of the stab wounds

11:22AM 20   is the blood in the area of them.

21            MR. NORKUNAS:  Judge, if I might, perhaps we could see

22   what Mr. Pohl is laying out as well, both the jury and we can

23   see that.

24            THE COURT:  Why don't we have Sergeant Daley take the

25   stand again.

1    Q.   Sergeant, there's something in the back, correct?

2    A.   Yes, it's labeled Number 3.  It appears to be an apparent

3    hole in the shirt corresponding to a stab wound on

4    Irvin De Paz.

5    Q.   And there's writing on the front of the shirt?

6    A.   Yes, something relative, it all started with a mouse, some

7    kind of Disney, it appears to say, "It all started by a mouse"

8    with "Walt Disney" written underneath.

9    Q.   Sergeant Detective Daley, how -- after you collected the

11:24AM 10   evidence from the crime scene, how did you begin to conduct

11   your investigation into who was responsible for murdering

12   Irvin De Paz?

13   A.   On arrival at the crime scene, after getting some

14   preliminary information, I organized a line search down

15   Trenton Street towards Brook, which includes 6 to 8 officers

16   line up in a line and go down the street looking for any

17   evidence, so that was done.

18        We also did a canvass, knocking on doors, see if

19   there's any other witnesses that may have saw something as well

11:24AM 20   as we did a video canvass looking for any residential homes or

21   commercial homes that may have cameras in the area that may

22   have captioned a portion of the incident.  That was all done

23   that evening.  The video canvass also followed up the several

24   days afterwards, and we collected from several residences

25   personal cameras that people have in their residences.

1    Q.    Is that, at least in 21st Century America, is that

2    standard practice in the Boston Police Department?

3    A.    Yes, it is now, yes.

4    Q.    And it's fair to say that that's often a useful technique

5    to try to determine who had committed a particular crime?

6    A.    Yes.

7    Q.    All right.  You were able to be do that in this case --

8    A.    Yes.

9    Q.    -- from a number of different neighborhood-mounted

11:25AM 10   cameras?

11    A.    Yes.

12    Q.    Let me put up for the witness Exhibit Number 96.

13    Sergeant Detective Daley, can you see that?

14    A.    Yes.

15    Q.    Do you recognize it?

16    A.    Yes, it's a residential camera at 90 Trenton Street

17    mounted on the back of the house, the side rear of the house,

18    and it faces out towards Trenton Street where the top of it

19    captures a portion of Trenton Street.

11:26AM 20   Q.    Okay.  And I should maybe before I ask you any other

21    questions about the video surveillance recordings that you

22    attained, everybody has cameras, cell phones, clocks on phones,

23    clocks on their DVRs, hardly any of them match.  Did you

24    encounter that problem in this case?

25              MR. MURPHY:  Objection, your Honor.

```
 1              THE COURT:  I'll sustain it as to the leading.
 2              MR. POHL:  Thank you.
 3    Q.   Did you collect video surveillance in this case?
 4    A.   Yes.
 5    Q.   Is one of the things that you do when you collect video
 6    surveillance evidence to put the times on the video recording
 7    devices that you obtain?
 8    A.   Yes.
 9    Q.   And when you obtain them from different locations, is one
10    of the things that you try to do to determine how those videos
11    sync up?
12    A.   Yes, the DVRs to each residence, they usually don't set
13    the correct, time so we have to synchronize to the DVR.  They
14    don't care about the time as long as they record it, so we have
15    to synchronize the DVR time to real time.
16    Q.   And in the course of this, you gathered video surveillance
17    from several different locations, correct?
18    A.   Yes.
19    Q.   And each time that you got video surveillance recordings,
20    what kind of things did you do to make sure that you knew sort
21    of the timing of what you were looking at?
22    A.   Well, I have a technician that comes with me, and in his
23    presence, I see him, he takes a picture of the DVR with his
24    cell phone, so it captures the time on the DVR to the time on
25    his cell phone, and it shows the difference then, and then he
```

1   documents it on a form, and that's how we know to make the

2   adjustments to get the realtime on the video.

3   Q.   I see.  All right.  So there's a date on this particular

4   recording, correct?

5   A.   Yes.

6   Q.   That date is September 20th, 2015?

7   A.   Yes, it is.

8   Q.   For this video and some of the other videos that we're

9   going to show thereafter, were you able to determine about what

11:28AM 10   time the video clips I'm about to show you took place?

11   A.   Yes, at approximately 5:10 p.m. on the afternoon of the

12   20th.

13   Q.   Okay.  All right.  This is one of the video surveillance

14   recordings that you collected in the aftermath of the

15   Irvin De Paz murder?

16   A.   Yes.

17        MR. POHL:  Your Honor, I would admit, move to admit

18   96, and I'd ask permission to publish it for the jury.

19        MR. IOVIENO:  Same objection.

11:29AM 20        THE COURT:  Overruled.  96 is admitted.

21        (Exhibit No. 96 received into evidence.)

22   Q.   Sergeant Detective Daley, now that everyone on the jury

23   has it, can you tell the jury what they're going to see when we

24   press play here?  What can you tell the jury to be looking for

25   as they view this particular video recording?

A.   The top portion of the screen, you'll see the opposite

side of Trenton Street, which is the odd numbered side.  You'll

see a person with a red shirt go running by later identified as

the victim De Paz, he goes running by, and this person with the

white T-shirt right behind him chasing him, and a couple of

seconds later, you'll see a third individual with a white

T-shirt closest to the camera on the even side jogging by as

well, all heading left to right on your screen.

Q.   All right.  Thank you.  Let me pause it right there.  So

you've been to the neighborhood.  This is 90 Trenton Street?

A.   Yes.

Q.   And if you're looking at this camera and everybody is

running to the right, is that in the direction of

72 Trenton Street?

A.   Yes, it is.

Q.   How far away is 90 Trenton Street and 72 Trenton Street?

A.   I would estimate 25 yards.

Q.   Okay.  So before I press play again, what are you going to

see in the video recordings once we unclick the pause button

and allow it to play?

A.   On the same location on the screen, now on the even side

closest to the camera, you'll see two people running by in

white T-shirts, one in front of the other.

Q.   Okay.  And I paused it, so the realtime calculation

probably isn't going to be picked up now, but about how much

1    time passes between the time they run from left to right on the

2    camera, the clip we just saw, and the time the men in the white

3    shirts run back?

4    A.    Approximately 15 seconds.

5          (Video played)

6          MR. POHL:  All right.  Thank you.

7          Could I have Exhibit 96.2 for the witness.

8    Q.    Sergeant Detective Daley, do you have that in front of

9    you?

11:32AM 10   A.    Yes.

11   Q.    96.2, this is another video clip; is that correct?

12   A.    Yes, it is.

13   Q.    What are we looking at here?

14   A.    It's the same recording system of 90 Trenton Street.  This

15   view is from the front door looking down the stairs from the

16   front door, and it captures a portion of the sidewalk in front

17   of 90 Trenton.

18   Q.    Okay.  Same house, different location?

19   A.    Different location.

11:33AM 20   Q.    All right.

21         MR. POHL:  I'd offer this, your Honor, as

22   Exhibit Number 96.2.

23         MR. IOVIENO:  Objection.

24         THE COURT:  The objection is overruled.  I'll give the

25   same objection as to all the videos.

1          MR. IOVIENO:  Yes, your Honor.

2          THE COURT:  I'll give you a standing objection to all

3     the videos.

4          MR. IOVIENO:  Thank you.

5          THE COURT:  It's admitted, 96.2.

6          (Exhibit No. 96.2 received into evidence.)

7          MR. POHL:  Thank you.

8     Q.   Before I press play, can you tell the ladies and gentlemen

9     of the jury what they're going to see here?

11:33AM 10   A.   On the top left corner of the screen, you're going to see

11    somebody run by going left to right, and then approximately 15

12    minutes later, you'll see two people running by right to left.

13    Q.   All right.

14         THE COURT:  15 minutes or 15 seconds?

15         THE WITNESS:  15 seconds, I apologize.

16    Q.   The video we watched a minute ago had captured both sides

17    of the street, there's the far side and the near side?

18    A.   Correct.

19    Q.   Would it be fair to say this is the near side of

11:34AM 20   90 Trenton Street?

21    A.   Yes.

22    Q.   So the person that just jogged by would be the person in

23    96.1 that was in the lower half the screen; is that right?

24    A.   Correct.

25    Q.   Then as this video continues to roll, Sergeant Detective

1    Daley, what are we going to see in a few more seconds?

2    A.   You're going to see two bodies run by going right to left.

3    Q.   All right.  Thank you.

4         MR. POHL:  For the witness.

5    Q.   Sergeant Detective Daley, I'm putting up Exhibit 97.  Do

6    you recognize that?

7    A.   Yes, that's a still from the video we just watched of the

8    two gentlemen going from right to left.  The first person

9    appears to have a knife in his left hand.

11:35AM 10        MR. POHL:  I'd offer Exhibit 97 and ask permission to

11   publish it.

12        THE COURT:  It's admitted, 97.

13        (Exhibit No. 97 received into evidence.)

14   Q.   Sergeant Detective Daley, what do you see here?

15   A.   This is the same -- I'm sorry, the top left corner, it's a

16   still photograph, a snippet taken from the video that you just

17   saw of the first person running by with a knife in his left

18   hand.

19   Q.   All right.  Thank you.  You gathered additional

11:35AM 20   surveillance video in the neighborhood of that particular

21   murder; is that correct?

22   A.   Yes.

23   Q.   Sergeant Detective Daley, as I put up Exhibit Number 98,

24   do you recognize that?

25   A.   Yes, this is a video captured from the residence at 94

1    Trenton Street.

2    Q.   Okay.  So, 90 Trenton Street is me, and 72 Trenton Street

3    would be that way, 94 would be to my left, your right?

4    A.   Yes.

5    Q.   Okay.  94 Trenton Street --

6         MR. POHL:  Your Honor I'd offer Exhibit Number 98 and

7    ask permission to play it.

8         THE COURT:  All right.  It's admitted.

9         (Exhibit No. 98 received into evidence.)

11:36AM 10    Q.   Sergeant Detective Daley, what are we going to see on the

11    video recording before we press play?

12    A.   You're going to see one male running left to right, and

13    then approximately 15 seconds later, you're going to see two

14    males running right to left, one in front of the other.

15    Q.   As the 15 seconds go by, as the two men in the white

16    shirts come back, okay, what do you see?

17    A.   It appears as if the first male is with a knife wiping off

18    a knife as he's running.

19         MR. POHL:  99 for the witness.

11:38AM 20    Q.   Do you recognize that, Sergeant Detective Daley?

21    A.   Yes, this is a still snippet from the video I just watched

22    from 94 Trenton Street, and it shows the first person running

23    down, running/walking down the sidewalk with a knife in his

24    hand and some kind of white cloth in his right hand.

25         MR. POHL:  I'd offer Number 99, your Honor.

1          THE COURT:  It's admitted, 99.

2          (Exhibit No. 99 received into evidence.)

3   Q.   Now for the jury, Sergeant Detective Daley.

4   A.   This is a snippet from the earlier, the video that we just

5   watched from 94 Trenton Street, and it captures the first

6   individual going down the sidewalk right to left, appears to

7   have a knife in his hand with some kind of white cloth in the

8   other hand.

9   Q.   Sergeant, I think you testified earlier that one of the

11:39AM 10  members of your squad, Detective Callahan, went to the hospital

11  to check on the condition of Irvin De Paz, correct?

12  A.   Yes.

13  Q.   And while at the hospital learned that Mr. De Paz had

14  died, correct?

15  A.   Yes.

16  Q.   Was Mr. De Paz' body taken to the office of the chief

17  medical examiner at that time?

18  A.   Yes.

19  Q.   And an autopsy was performed, correct?

11:39AM 20  A.   Yes, sir.

21  Q.   And that determined how Mr. De Paz died?

22  A.   Yes.

23  Q.   All right.

24          MR. POHL:  Can we pull up 101.2.

25  Q.   Sergeant Detective Daley, I'm going to click through a

1    couple of pictures for you only.  These are Exhibits 101.2

2    through 5.  Do you recognize those?

3    A.   Yes.

4    Q.   All right.  How do you recognize those as?

5    A.   These are isolated photographs of the stab wounds that

6    Irvin De Paz suffered.

7         MR. POHL:  I'd offer these, your Honor.

8         MR. IOVIENO:  Objection, your Honor.

9         THE COURT:  Overruled.  They're admitted 101.2 through

11:40AM 10    101.5.

11         (Exhibit No. 101.2 through 101.5 received into

12    evidence.)

13    Q.   Sergeant Detective Daley, I'm showing you Exhibit 101.2.

14    A.   Yes.

15    Q.   What are we looking at here?

16    A.    It's a stab wound with the letter B next to it, some

17    numbers down below and a ruler, and it's stab wound B, and I

18    know it to be the stab wound to his left torso.

19         MR. POHL:  Next.

11:41AM 20    Q.   This is 101.3.  What are we looking at here,

21    Sergeant Detective Daley?

22    A.   These are also two close-ups of stab wounds to

23    Mr. De Paz's left arm indicated by the letters C and D with a

24    ruler and some numbers down below.

25    Q.   And where is that on Mr. De Paz' body?

24

```
          1    A.    It's at the elbow area but on the inside elbow area of his
          2    body, left arm.
          3    Q.    And would they be close to the stab wound for B that we
          4    saw a moment ago?
          5    A.    Yeah, it appears that B, C and D are corresponding to each
          6    other.
          7    Q.    In the arm, out the arm into the torso?
          8    A.    Correct.
          9          MR. POHL:  Next.
11:42AM  10    Q.    What's this?  What are we looking at here,
         11    Sergeant Detective Daley?
         12    A.    It appears to be a vertical stab wound to the left back of
         13    Irvin De Paz labeled by the letter E, as in echo with a ruling
         14    and some numbers underneath it.
         15    Q.    And the next photograph is 101.5.
         16    A.    That's a close-up of the stab wound that I just described,
         17    stab wound E in the back.
         18    Q.    So I hold up Exhibit Number 94 for you again.  Stab wounds
         19    on the left-hand side of the shirt, correct?
11:42AM  20    A.    Yes.
         21    Q.    Stab holes in the left-hand side of the shirt?
         22    A.    Yes.
         23    Q.    And a hole on the back of the shirt?
         24    A.    Yes.
         25    Q.    All right.  They appear to you to correspond to the
```

1    photographs that were just discussed?

2    A.    Yes, to his injuries, yes.

3          MR. POHL:  Pull up for the witness Exhibit 102.

4    Q.    Do you recognize that, Sergeant Detective Daley?

5    A.    Yes.

6    Q.    Is it a death certificate in the case of Irvin De Paz?

7    A.    Yes, yes, it appears to be a certified death certificate

8    created by the Commonwealth of Massachusetts, Department of

9    Public Health of Irvin De Paz.

11:43AM 10    Q.    I ask you to point out, it has two different parts of the

11   death certificate.

12          MR. POHL:  Excuse me, your Honor, I'd offer

13   Exhibit 102.

14          THE COURT:  All right.  It's admitted, 102.

15          MR. MURPHY:  Objection, relevance, your Honor.

16          THE COURT:  Overruled.  It's admitted.

17          (Exhibit No. 102 received into evidence.)

18   Q.    So, for the jury, this is the death certificate we were

19   referencing earlier, correct?

11:44AM 20    A.    Yes.

21   Q.    And I'd point out two different parts of the death

22   certificate.  First, it discusses the cause of death; is that

23   correct?

24   A.    Yes.

25   Q.    And the death certificate issued after examination by the

1    medical examiner was what?

2    A.    Stab wounds of torso and upper extremity.

3    Q.    Thank you.  And the manner of death?

4    A.    Homicide.

5    Q.    All right.  Sergeant Detective Daley, what steps did you

6    take to investigate who had committed this homicide?

7    A.    Later on that evening, we were made aware that Irvin's

8    family, his mother and I believe a girlfriend, had responded to

9    the Mass. General Hospital, so myself and Detective Callahan

11:45AM 10    responded back to the Mass. General Hospital where we

11    introduced ourselves to Irvin's mother and some aunts who had

12    arrived at the hospital, and we tried to get some background on

13    Irvin, who he was with, where he was coming from.

14         We were able to speak to Irvin's girlfriend, a woman

15    by the name of Daisy, and she had some information who he may

16    have been with, and after some telephone calls, we were able to

17    identify a gentlemen named Dennis Perdomo, who he was with

18    prior to him getting stabbed.

19         Relative to finding that information out, we

11:46AM 20    contacted, we got a phone number for Dennis Perdomo, called him

21    that evening, and we sat down with him about 12:30 that night

22    and took a statement from Dennis Perdomo.

23    Q.    And based on that interview with Mr. Perdomo, would it be

24    fair to say that you and the detectives that you work with

25    generated a photo array?

1    A.    Yes.

2    Q.    And did you show the photo array to Mr. Perdomo to see if

3    he could identify -- well, did you gather any sort of

4    surveillance evidence or video evidence concerning Mr. Perdomo

5    that corroborated the information that you had received that he

6    had been in the area with Irvin De Paz on the day that

7    Irvin De Paz was killed?

8    A.    Yes, some of the information he put on the table was

9    corroborated by some video that we had captured at a laundromat

11:47AM 10    at the end of Trenton and Brooks Street.  Mr. Perdomo was with

11    Irvin as they ran down the street.  Mr. Perdomo dived into a

12    laundromat and hid behind some machines in the laundromat.

13    Irvin took a right off Trenton Street, and from that

14    separation, that was all corroborated from the video and from

15    what Dennis Perdomo told us, so it gave us a little direction

16    on what was happening before Irvin got stabbed.

17    Q.    So, at -- you interviewed Mr. Perdomo, correct?

18    A.    Yes.

19    Q.    And attempted to put together an array of pictures that

11:47AM 20    might have led to an identification of the person that

21    committed the murder; is that correct?

22    A.    Yes, relative to these conversations a name was generated

23    from these conversations with Mr. Perdomo and Irvin's

24    girlfriend.  We put that person's photo in a photo array, and I

25    believe like four days later, we arranged to have that array

1    shown to Mr. Perdomo again, I mean, we met him a second time

2    and showed the array to Mr. Perdomo trying to help putting the

3    investigation, and the results were negative, no I.D. was made.

4    Q.    And the name of the person that Mr. Perdomo had said he

5    heard or might have thought might have been involved in this

6    was what?

7              MR. LOPEZ:  Objection.

8              THE COURT:  I'll allow it as evidence that it was

9    said, not as proof that this person did anything.  In other

10   words, ladies and gentlemen, you may consider this only for the

11   fact that this was actually said to the detective.  It's not

12   proof that this person did anything at all.

13   A.    The name Ochoa was put on the table.  We were able to

14   cobble together the idea of a Carlos Ochoa, and that's the

15   person's photograph we put in the array.

16   Q.    And did you determine whether Carlos Ochoa had another

17   name?

18   A.    I believe Melara.

19   Q.    All right.  You put together a photo array or photo spread

20   that had Carlos Ochoa or Carlos Melara in it, correct?

21   A.    Yes.

22   Q.    You showed it Dennis Perdomo, correct?

23   A.    Yes.

24   Q.    He didn't pick Ochoa or anybody else out of the array,

25   correct?

1    A.   No, he did not.

2    Q.   Would I be correct that for the weeks after Irvin De Paz'

3    murder, this was still an active, ongoing investigation by the

4    Boston Police Department, correct?

5    A.   Yes.

6    Q.   But you continued to investigate who had committed the

7    murder?

8    A.   We did.

9    Q.   After sort of the negative photo array, did you receive

11:50AM 10   information from another law enforcement agency about this

11   murder?

12   A.   Yes, the Massachusetts State Police.

13   Q.   Okay.  And what can you tell the jury about that?

14        MR. MURPHY:  Objection, your Honor, as to when.

15        THE COURT:  Can you put a time frame on that?

16   Q.   How long -- the photo array was in a few days after the

17   murder, correct?

18   A.   Yes.

19   Q.   And you spoke to police officers with the Massachusetts

11:50AM 20   State Police about the murder, correct?

21   A.   Yes.

22   Q.   I think what counsel and the Court is asking, do you

23   remember now around what time of year, approximately month, day

24   those conversations took place?

25   A.   Definitively, no, but I would guess approximately October,

1    late October, early November.

2    Q.    All right.  And you were contacted by the State Police.

3    What happened after you got a call from the State Police about

4    the murder?

5    A.    We had some communication, both in person and over the

6    phone, and I was told that our investigation, they had some

7    information on our homicide on Trenton Street, and my office in

8    conjunction with the Suffolk County D.A.'s Office, who has

9    jurisdiction over our homicides, discussions were made, and at

11:51AM 10  some point, the decision was made that our case was a smaller

11   portion of a larger federal investigation, and decisions were

12   made for us to work in conjunction with them, but at some point

13   I made a copy of my whole investigation and handed it off to

14   the U.S. Attorney's Office.

15   Q.    Maybe I can do this by bounding the time frame we're

16   talking about.  You were advised that or a series of arrest

17   warrants were going to be executed in connection with that

18   federal case?

19          MR. MURPHY:  Objection, your Honor, leading.

11:52AM 20          THE COURT:  Sustained as to the leading.

21   Q.    Well, let me put it this way.  Were you advised -- were

22   you advised -- well, do you recall working on January 29th,

23   2016?

24   A.    Yes.

25   Q.    Okay.  Do you remember where you were on January 29th,

1    2016?

2    A.    Eventually I ended up at the Chelsea police station.

3    Q.    Why did you go to the Chelsea police station?

4    A.    There was an operational take-down date of this operation,

5    and I wanted to try and speak to somebody.

6    Q.    Okay.  Who was that?

7    A.    Joel Martinez.

8    Q.    And why did you want to speak with Joel Martinez?

9    A.    Because I was made aware that he had been identified as

11:53AM 10    being involved in the Irvin De Paz murder.

11    Q.    Okay.  And just so that we're absolutely clear,

12    Sergeant Detective Daley, you met Joel Martinez that morning,

13    correct?

14    A.    Briefly, yes.

15    Q.    Okay.  And Joel Martinez is not in this courtroom, he's

16    not one of the four defendants here, correct?

17    A.    No.

18    Q.    So, would I be correct that sort of between the time of

19    the murder, right, September 20th, 2015, and that date when you

11:54AM 20    first met Joel Martinez, that's the time frame that we're

21    talking about, that you were coordinating your investigation

22    with the State Police and the U.S. Attorney's Office?

23            MR. MURPHY:  Objection, your Honor, leading.

24            THE COURT:  Sustained.

25    A.    We were in communications.

```
          1              THE COURT:  Hold on.

          2      Q.   I'll ask you, Sergeant Detective Daley, that's fine.

          3   Would I be correct that -- well --

          4              THE COURT:  Let's put a question.

          5              MR. POHL:  Thank you.

          6      Q.   Sergeant, you met Irvin De Paz' family, correct?

          7      A.   Yes.

          8      Q.   And you reviewed the death certificate, correct?

          9      A.   Yes.

11:55AM  10      Q.   All right.  How old was Irvin De Paz?

         11      A.   I'm sorry, I didn't hear.

         12      Q.   How old was Irvin De Paz when he was killed?

         13      A.   He was 15 years old.

         14              MR. POHL:  Can I have one moment, your Honor.  Thank

         15   you very much.

         16              THE COURT:  We might as well take our 12:00 break now.

         17              THE CLERK:  All rise.

         18              (A recess was taken.)

         19              THE CLERK:  All rise for the jury.

12:10PM  20              (JURORS ENTERED THE COURTROOM.)

         21              THE CLERK:  Court is back in seated.  You may be

         22   seated.  Cross-examination.

         23              MR. MURPHY:  Thank you, your Honor.

         24

         25
```

CROSS-EXAMINATION

1

2  BY MR. MURPHY:

3  Q.   Good afternoon, your Honor, Sergeant Detective Daley.

4  Might we see Exhibit 97.  So, Sergeant Detective Daley, you

5  responded to the scene of this on Trenton Street?

6  A.   Yes.

7  Q.   And you were the leader of the squad that was

8  investigating that stabbing for the Boston Police Department,

9  correct?

12:11PM 10  A.   Yes.

11  Q.   And you organized neighborhood canvasses, right?

12  A.   Yes.

13  Q.   Searches of the neighborhood?

14  A.   Yes.

15  Q.   You collected video from neighbors?

16  A.   Yes.

17  Q.   And you interviewed as many neighbors as you could to find

18  out what happened, correct?

19  A.   Yes.

12:11PM 20  Q.   And is it fair to say, Sergeant Detective, that your main

21  objective was to try to identify who that was in Exhibit 97 who

22  was holding the knife?

23  A.   Yes, that would be the main objective.

24  Q.   And, secondarily, to figure out who the second guy was

25  with the white shirt who was running with him, right?

34

A.    Yes.

Q.    And the reason that you wanted to identify the person in the white shirt holding the knife that you can see in Exhibit 97 is that if you came to the conclusion that there was grounds to believe that he was the person who had stabbed Mr. De Paz, you'd want to arrest him, correct?

A.    Yes.

Q.    That would be standard Boston Police Department protocol, right?

12:12PM A.    Yes.

Q.    And the reason you wanted to arrest him, all things being considered, the Boston Police Department does not want people running out the street of East Boston or anywhere stabbing people, correct?

A.    That's correct.

Q.    And you said that you mentioned that your folks from your squad and you personally had spoken to Mr. De Paz' family, correct?

A.    Yes, that evening, yes.

12:12PM Q.    And the other reason you want to make an arrest or another reason you want to make an arrest is that you want to tell the family of a victim of a stabbing like this what happened and who did it?

A.    Eventually, sure.

Q.    So, you responded on September 20th to the scene, as I

1    heard your testimony on direct, you were working the case, you

2    and your squad in the last week of September and the first week

3    of October, through October, until at some point you received a

4    call from someone from the Massachusetts Police in either late

5    October or early November; is that right?

6    A.    That would be my guesstimate, correct.

7    Q.    Okay.  And would it be fair to say, sir, that the basic

8    message of the call you received was we'd like you to stand

9    down?

12:13PM 10   A.    No.

11   Q.    Okay.  Is it fair to say that you were asked to turn your

12   investigatory file over to the State Police and the FBI?

13   A.    Initially, no.

14   Q.    Okay.  When did that happen?

15   A.    After a series of communications between myself, my

16   supervisors and the District Attorney's Office.  When it

17   happened, I mean, we had a sit-down at the District Attorney's

18   Office in mid-November, so it was in the planning stages that I

19   was going to turn over my investigation.

12:14PM 20   Q.    So, between the time that you received that call from the

21   state trooper in late October, early November and mid-December,

22   you continued the investigation to try to figure out who had

23   stabbed De Paz, correct?

24   A.    No, I had started transferring the investigation to them.

25   Q.    And is it fair to say, sir, that during the entire period

1   between the time that you began investigating the case on

2   September 20th and that call from the state trooper in late

3   October or early November, you were not told by another law

4   enforcement agency that the FBI already knew who the person

5   with the knife that's depicted in Exhibit 97 is?

6   A.   No, until I started getting communications from them, I

7   did not know.

8   Q.   So you continued to work on the homicide because nobody

9   told you that the FBI had already determined who did it,

12:15PM 10   correct?

11   A.   No, my first communications with the State Police, they

12   laid out that they had a witness that could help the

13   investigation --

14   Q.   And that was in you said late October?

15        THE COURT:   Hold on, let him finish.

16   A.   I'm guessing mid to late October.  I don't have a

17   definitive date.

18   Q.   Fair enough.  And it was after that call that you stopped

19   working the case actively and began to transfer your file, is

12:15PM 20   that correct, Sergeant Detective Daley?

21   A.   That's fair to say.

22   Q.   And you testified on direct examination that you heard

23   that there was a series of arrests that were going to be made

24   on January 26, 2015; is that correct?

25   A.   At some point, I was made aware of that.  When, maybe

37

1   early January.  I wasn't part of that decision-making process,

2   I was kind of removed from all of that, but at some point I was

3   made aware that there was going to be a take-down date, and I

4   wanted to be a part, if I could, be a part of it, and they

5   allowed me to.

6   Q.    And one of the people that was being taken down on that

7   take-down was Joel Martinez, correct?

8   A.    That was what I was told, correct.

9   Q.    And it was on January 26th, 2015 that you went and sought

12:16PM 10  to speak with Mr. Murphy?

11  A.    29th.

12  Q.    29th, pardon me, it was January 29th, 2015 that you went

13  to speak with Mr. Martinez, correct?

14  A.    2016.

15  Q.    2016?

16  A.    Yes, the early morning of the hours of that day I went to

17  Chelsea police station, correct.

18  Q.    And it was your understanding that Mr. Martinez had been

19  arrested that day or the previous?

12:17PM 20  A.    I'm not sure what information I had the night before.  I'm

21  not sure.  All I know, I was told that he may be there, and I

22  went, and he had been taken into custody.

23  Q.    So, by that day, he had been taken into custody, correct?

24  A.    By the time I got there, he was already in custody, yes.

25  Q.    And so if I can do the math, that was from September to

38

1   October to November to December to January, more than four

2   months after Mr. De Paz' stabbing?

3   A.    That's correct, yes.

4           MR. MURPHY:  May I have a moment, your Honor.  Nothing

5   further, your Honor, thank you.

6           THE COURT:  Mr. Lopez.

7           MR. LOPEZ:  Nothing, your Honor.

8           THE COURT:  Redirect.

9                     REDIRECT EXAMINATION

10  BY MR. POHL:

11  Q.    Sergeant Detective Daley, you've been a police officer for

12  a long time.  Have you ever investigated murders that involved

13  more than one party?

14  A.    Yes.

15  Q.    All right.  And prior to your assignment in the homicide

16  unit, where did you work in the Boston Police Department before

17  that?

18  A.    I was the supervisor for seven years in the drug control

19  unit.

12:18PM 20  Q.    And in your capacity either in the drug unit or in

21  multi-defendant or multi-party homicides, have you had to

22  evaluate when and how to make particular arrests?

23  A.    Yes.

24  Q.    What are some of the kinds of considerations that you take

25  into account when and whether to make an arrest in the case?

1          MR. LOPEZ:  Objection, your Honor.

2          THE COURT:  Overruled.

3  A.    Every investigation is different.  Every amount of targets

4  or defendants is different, but you have to take into

5  consideration, do some intelligence on them, where they are,

6  who they are with, you know, to do some logistics with other

7  agencies, other units within the structure that you'll need for

8  the take-down, and you've got to consider personal safety as

9  well for any witnesses or family members, so all those things

12:19PM 10  have to be talked about, discussed and planned, so hopefully

11  everything goes as planned, so it takes a little thought

12  involved.

13          MR. POHL:  Thank you.

14          THE COURT:  Recross.

15          MR. MURPHY:  No, your Honor, thank you.

16          THE COURT:  Thank you.  You may step down.

17          MR. POHL:  Jeffrey Wood.

18          JEFFREY ELLIOT WOOD, JR., having been duly sworn by

19  the Clerk, testified as follows:

12:20PM 20          THE CLERK:  Please state your name spelling your last

21  for the record.

22          THE WITNESS:  Jeffrey Elliot Wood, Jr., W-o-o-d.

23          MR. POHL:  May I, your Honor?

24          THE COURT:  Yes.

25

DIRECT EXAMINATION

1

2    BY MR. POHL:

3    Q.    Good afternoon.

4    A.    Good afternoon, sir.

5    Q.    Mr. Wood, where do you work?

6    A.    I work for the FBI.

7    Q.    How long have you worked for the FBI?

8    A.    Over 18 years.

9    Q.    And what is your current assignment at the FBI?

12:20PM 10    A.    I'm the supervisory special agent for the gang squad.

11    Q.    Okay.  And what kind of agents or agencies are comprised

12    within the gang squad at the FBI?

13    A.    We have the FBI, we work with other federal law

14    enforcement agencies, we've worked with ATF, we've worked with

15    Homeland Security, we work with our local and state law

16    enforcement partners, we work with the Massachusetts State

17    Police, the Massachusetts Department of Corrections, our local

18    police departments include the Lynn Police Department, the

19    Lawrence Police Department, Chelsea, Revere and Boston Police

12:21PM 20    Departments, and we also work with some of our county law

21    enforcement partners, which include at this time the

22    Suffolk County and the Essex County Sheriff's Department.

23    Q.    You've been an FBI agent for 18 years.  How long during

24    the period in which you've been an FBI agent have you been

25    assigned to investigate gangs or gang activity in

```
 1    Massachusetts?

 2    A.   I began conducting gang investigations in 2002.  In 2007,

 3    I went to Afghanistan for approximately four months.  I then

 4    spent the next 14 months assigned to the FBI headquarters

 5    working at the safe street gang unit and the National Gang

 6    Intelligence and Coordination Center, and then upon my return

 7    in 2009, I again returned to the gang squad here and have

 8    stayed there ever since.

 9    Q.   Okay.  So would I be correct from the bulk of that time,

12:22PM 10  from 2010 until fairly recently, you were a special agent

11    assigned to that unit, correct?

12    A.   Yes, that is correct.

13    Q.   And what kinds of duties would a special agent do in the

14    FBI assigned to the gang squad?

15    A.   As an agent, we conduct criminal enterprise investigations

16    targeting violent street gangs that have a negative impact.

17    I've worked in Lawrence, Haverhill, Lowell, Lynn, Chelsea,

18    Boston, Chelsea and Revere is my primary areas of

19    responsibility, and we with our local, state and federal law

12:23PM 20  enforcement partners would target criminal gangs that sell

21    drugs, commit violent crimes, a myriad of violent crimes.

22    Q.   In addition to being a special agent, is it fair to say

23    that you recently took on supervisory responsibilities for that

24    squad of the FBI in Boston?

25    A.   Yes, I've been a supervisor now for approximately a year
```

1      and a half, maybe a little longer.

2      Q.    Special Agent Wood, during your work on the FBI's Boston

3      gang squad, were you a part of an investigation into La Mara

4      Salvatrucha or MS-13 in Massachusetts?

5      A.    Yes, I was.

6      Q.    All right.  And would it be fair to say that during that

7      investigation, your role grew?

8      A.    Yes.

9      Q.    Okay.  So, let's start at the beginning.  When did you

12:24PM 10    first -- well, start at the very beginning.  You started

11      working gangs in 2002.  When is the first time that you heard

12      or came into contact with MS-13 in Massachusetts?

13      A.    In August --

14            MR. MURPHY:  Objection.

15            THE COURT:  Overruled.

16      A.    I first started looking into MS-13 in August of 2002 when

17      I joined the gang unit.

18      Q.    And why was that?

19      A.    Well, Somerville had just experienced a rape of two women,

12:24PM 20    one being in a wheelchair, and those rapes were committed by

21      MS-13 gang members.

22            MR. MURPHY:  Objection, your Honor.  Motion to strike.

23            THE COURT:  I'm going to strike that and instruct the

24      jury to disregard the facts of that specific crime.  Go ahead.

25      Q.    Did you begin -- you began to -- is it fair to say that

1    you tried to learn about MS-13 recently in your arrival in the

2    gang squad in 2002?

3    A.    Yes, immediately I began talking to my local and state law

4    enforcement partners, the State Police, the Boston Police to

5    learn more about MS-13.  I coordinated a training coordination

6    meeting outside of Philadelphia, Pennsylvania for the State

7    Police and the Boston Police and myself to attend in 2003 for

8    us to learn even more about MS-13 and ongoing investigations

9    throughout the country at that point.

12:25PM 10    Q.    All right.  In the course of your duties as an FBI

11    special agent, did you ever travel to El Salvador?

12    A.    Yes, I did.

13    Q.    How many times have you traveled to El Salvador?

14    A.    I have been to El Salvador on two occasions.

15    Q.    When was the first time that you went to El Salvador,

16    Special Agent Wood?

17    A.    I believe it was either 2005 or 2006.

18    Q.    Okay.  What was the purpose of you going to El Salvador?

19    A.    It was for the second annual MS-13 coordination

12:26PM 20    training/meeting conducted by federal, state and local law

21    enforcement agencies within the United States and our Central

22    American counterparts.  We had law enforcement officers from

23    El Salvador, Guatemala, Honduras, Mexico and other Central

24    America countries, and it was our second meeting that was held

25    in El Salvador to discuss and learn more about the problems

1    with MS-13.

2    Q.    I think you testified a moment ago that for a period of

3    time you were deployed to Afghanistan and then you worked in

4    Washington.   When you came back to Boston, did you continue to

5    try to learn about MS-13?

6    A.    Yes.

7    Q.    All right.   How did you do that?

8    A.    Well, we would talk about MS-13 amongst yourselves trying

9    to learn everything we could.   We would -- I would read any

12:27PM 10   kind of intelligence projects that the FBI would disseminate

11   from ongoing criminal enterprise investigations throughout the

12   United States.   I would attend different gang training as far

13   as where MS-13 would be discussed, and then in 2012 one of my

14   partners initiated a criminal enterprise investigation

15   targeting MS-13, and at that point I would participate and

16   provide help and assistance.   I would give opinions and

17   direction to my partners, and I would just keep myself up to

18   speed on the investigation until I was named as a case agent.

19   Q.    Okay.  So you mentioned around 2012 that the FBI's Boston

12:28PM 20   office commenced an investigation into MS-13.   Would I be

21   correct that there were earlier attempts to investigate MS-13

22   while you worked in the FBI's Boston office?

23   A.    That is right, yes.

24   Q.    But I think what we're going to talk about here today and

25   tomorrow is about sort of this case, and this case commenced

1    around 2012.  Would that be correct?

2    A.    That is correct, yes.

3    Q.    Okay.  Special Agent Wood, in going -- as part of working

4    in and commencing this investigation, you said you traveled to

5    El Salvador in 2005 or 6, correct?

6    A.    Yes, I traveled the first time in 2005 or 6, and I

7    traveled again in 2013.

8    Q.    And you had met with people who had investigated MS-13

9    previously, correct?

12:29PM 10    A.    Yes.

11    Q.    And you had spoken to police officers in the course of

12    your duties, correct?

13          MR. MURPHY:  Objection.  Leading, your Honor.

14          THE COURT:  I'll allow leading for this kind of

15    background information.

16          MR. POHL:  Thank you.

17          THE COURT:  Go ahead.

18    Q.    You had spoken to police officers, correct?

19    A.    I have, yes.

12:29PM 20    Q.    Encountered MS-13 members, correct?

21    A.    Yes.

22    Q.    And when you were in El Salvador the first time, anyway,

23    what kind of information did you receive about MS-13 while you

24    were there?

25          MR. LOPEZ:  Objection.

1           THE COURT:  I'll allow it in general terms, not

2    specifics, in other words, just sort of an overview, not

3    specific details.

4    A.    The formation of the gang, the history of the gang,

5    current investigations throughout Central America and the

6    United States, an overview of how the gang was changing from

7    when it was first formed to what we were experiencing in 2005

8    throughout the United States and Central America, a general

9    overview of just the gang and its methods of operation.

12:30PM 10   Q.    And the kind of people that you spoke to at that meeting

11   were who?  Who are we talking about?

12   A.    We spent time with the El Salvadorian police officers who

13   were at the conference, and we socialized with them and had

14   meetings during the day, and at night, we just talked typical

15   law enforcement police officer talk between federal law

16   enforcement officers.

17          We also had FBI agents and police officers from around

18   the country that we were all together, and we would all talk

19   about what we had seen, what we had learned, and just passed on

12:30PM 20   that information to one another.

21   Q.    So, through the course of those conversations, through the

22   course of you reading about MS-13, in the course of your

23   reading, briefings from other FBI offices throughout the

24   country, in the course of speaking to officers that were

25   encountering MS-13 members on the streets, did you learn about

1    how the gang was formed?

2    A.    Yes.

3    Q.    Okay.  What can you tell the jury about how MS-13 was

4    initially formed?

5              MR. MURPHY:  Objection, your Honor, hearsay.

6              THE COURT:  Overruled.

7    A.    The gang was initially formed in 1979.  You had a lot of

8    El Salvadorian immigrants fleeing El Salvador from the civil

9    war there, and when they arrived, they were -- the immigrants

12:31PM 10   were picked on by other gangs.  You had a group of

11   El Salvadorians who liked rock and roll music, they liked to

12   smoked pot and get high, and they initially called themselves

13   you know, Mara Salvatrucha, and that was the initiation of the

14   gang, and at that point that's how it started, and then it has

15   spread since then.

16   Q.    How?  How has it spread?

17             MR. MURPHY:  Your Honor, may I have a standing

18   objection to this line of questioning?

19             THE COURT:  Yes.

12:32PM 20             MR. MURPHY:  Thank you.

21             THE COURT:  Go ahead.

22   A.    Well, as more El Salvadorian immigrants came into the

23   country, as gangs became more prevalent in the '80s, and as

24   gang members started getting arrested, and they would go into

25   jail, you had a lot of MS-13 gang members in jail, and back

48

1    then they were called MS, Mara Salvatrucha, but the gang in the

2    prison systems in California, you have the Norteños, which is

3    for Northern California and the Sureños, which is Southern

4    California, and the Sureños throw a lot of their allegiance to

5    the Mexican Mafia.

6            The Mexican prison gang runs the prisons, and so they

7    made the MS-13 gang form an alliance with them and fall under

8    the rules, and as a response, MS became MS-13 because 13 is the

9    number that is associated with the Mexican Mafia, and that's

12:33PM 10    how they threw their allegiance to MS-13, so initially mostly

11    MS-13 was in California, and then as immigrants started to

12    spread, you started seeing MS cliques forming in other cities,

13    however, upon their release from prison, a lot of MS-13 gang

14    members were deported back to El Salvador, and once they got

15    deported back to El Salvador for the violent crimes they

16    committed in the United States, they then started morphing

17    their gang into more of an El Salvadorian gang, so --

18            THE COURT:  Let's pause there and put another

19    question.

12:33PM 20            MR. POHL:  Thank you, your Honor.

21    Q.   So this sort of early iteration, it started in California,

22    I think you said the people were then deported back into

23    El Salvador, correct, and the first time you went to

24    El Salvador in 2005, you were sort of receiving information

25    about the gang current activities in the United States,

1    correct?

2    A.    Yes.

3    Q.    And would I be correct that you spoke to El Salvador

4    Police, other law enforcement officers that you spoke to in

5    2005, the meeting in El Salvador, about sort of what they were

6    learning about how the gang had come from California to

7    El Salvador and then back to the U.S.?

8    A.    Yes.

9    Q.    And what did you learn?

12:34PM 10    A.    Well --

11            MR. LOPEZ:  Objection, your Honor.  What he learned

12    from others who would not testify?

13            THE COURT:  Yes, it's in the nature of expert

14    testimony.  Overruled.

15    A.    Well, the gang was morphing.  It used to be strictly an

16    American-type gang, something that most Americans would

17    understand, but as they moved into El Salvador, the gang was

18    starting to initiate their leadership and base it in

19    El Salvador, so the gang started morphing in the early part of

12:35PM 20    the century, and it's morphed into what we know where the

21    leadership structure is based in El Salvador, the head leaders

22    are all in prison and run the gang from inside the prison, they

23    send their instructions from inside the prison out to the

24    leaders out in El Salvador, who then send those orders back to

25    their cliques in El Salvador, Honduras, Guatemala and back into

1    the United States.

2    Q.    Okay.  So, let me -- that's 2005.  Let's pick back up

3    again.  I don't think we need to go year by year by year, but

4    would it be fair to say that beginning in 2005 and continuing

5    until the point in time at which sort of the FBI began its

6    investigation into MS-13 in Massachusetts, you continued to

7    have the kinds of discussions that you've discussed a moment

8    ago, correct?

9              MR. MURPHY:  Objection, your Honor, leading.

12:36PM 10              THE COURT:  I'll allow that one.  Overruled.

11    A.    Yes.

12    Q.    All right.  So, and those discussions -- as a result of

13    those discussions, have you become familiar with the structure

14    and the organizational structure of MS-13?

15    A.    I have, yes.

16    Q.    And when I say the organizational structure, I mean sort

17    of in the time frame that we're talking about, from 2012

18    forward?

19    A.    I have, yes.

12:36PM 20    Q.    Okay.  You said a moment ago about sort of incarcerated

21    leaders in El Salvador; is that correct?

22    A.    Yes.

23    Q.    And that the gang has sent people into the United States,

24    correct?

25    A.    Yes.

1    Q.   All right.  What can you tell the jury about what you've

2    learned about how MS-13 is organized in the United States?

3    A.   In the United States, an individual clique is what we

4    would call a chapter, a group of MS-13 gang members, so there's

5    many cliques.  Each clique will be led by either the first word

6    or the runner, and most cliques will have the second word, the

7    second runner, so that's the leader in the immediate second in

8    command.

9         Some cliques may actually have a treasurer, but you

12:37PM 10   have the first word, the second word, then the homeboys, which

11   are full-fledged gang members, and then they'll have chequeos

12   and paros, who are the recruits, the new up and coming gang

13   members.

14   Q.   Are there particular colors that MS-13 members sometimes

15   use to identify themselves?

16   A.   Yes, their primary color is blue and white, we'd say

17   Dallas Cowboys is one of the colors, but we'll see them wearing

18   blue clothes.  They like white with that.  At times, they'll

19   wear neutral colors, beige as a color just to kind of avoid law

12:38PM 20   enforcement attention because they know now that we --

21        MR. MURPHY:  Objection, your Honor.

22        THE COURT:  We'll stop it there.  Put another question

23   to him.

24        MR. POHL:  Thank you.

25   Q.   -- know those colors.  Do MS-13 members typically or

1    oftentimes bear tattoos?

2    A.    It's changed, but, yes, we have many MS-13 members that

3    have tattoos, but it's been changing.

4    Q.    Okay.  Are there particular signs or symbols that an MS-13

5    member would utilize to identify himself as an MS-13 member?

6    A.    Yes.

7    Q.    Can you give the jury an example of what one of those

8    signs would look like.

9    A.    They like the devil's horns, so you'll see them flash

12:39PM 10    signs like this where you have your two outside fingers

11    pointing up.  (Indicating)  That's the devil's horns.  They

12    like MS, they like MS-13.  Their rosary beads would be blue and

13    white or blue.  They'll have bandanas that are blue, again,

14    signifying who they are.  Those are the predominant signs.

15    Q.    So, during the time frame in which you were conducting

16    your investigation -- well, I should have asked this question a

17    moment ago.  So before I move on, let me jump back one.  You

18    talked about tattoos and the fact that they often had tattoos.

19    The kinds of tattoos they had included MS or MS-13, correct?

12:39PM 20    A.    Yes.

21    Q.    What about tattoos denoting the particular cliques that

22    members belong to?

23    A.    They would have tattoos that have their clique initials on

24    it.  They could spell it out.  Sometimes they just go MS-13,

25    sometimes they'd say MS, sometimes they actually spell out

1    La Mara Salvatrucha.  I've seen tattoos where sometimes they'll

2    throw the Salvadorian flag, they'll throw 503, which is the

3    country code for El Salvador for a tattoo, so there's a lot of

4    different types of tattoos, but, again, tattoos are changing.

5    Q.   So, through your work on the FBI investigation into MS-13,

6    through the conversations you've had with law enforcement

7    agents throughout the country, the conversations you've had

8    with officers in El Salvador, what can you tell the jury about

9    sort of the mission, the goal of MS-13?

12:40PM 10           MR. MURPHY:  Objection, your Honor.

11           THE COURT:  Overruled.

12    A.   MS-13 is about controlling their testimony, MS-13 is about

13    being in control, letting -- being in charge of that territory,

14    being the predominant, if not the only gang in that territory.

15    Like all gangs, there are some rival gangs that are more of an

16    enemy, mortal enemy to that gang, but with MS, we don't see

17    them forming alliances with other street gangs that we've seen

18    with other gangs that we've investigated.  This gang is about

19    they are there, they're in charge, and they don't want any kind

12:41PM 20    of rivals, any kind of competition in their neighborhoods, in

21    their streets.

22    Q.   You mentioned a moment ago gang rivals.  Are there

23    particular groups or gangs that have been identified by you and

24    the officers you work with as being the principal rivals of

25    MS-13?

1    A.    Yes, yes, we have.

2    Q.    And who, is there a particular gang, is there one gang in

3    particular that's sort of a significant rival to MS-13?

4    A.    Yes.

5    Q.    And what is that gang called?

6    A.    18th Street.

7    Q.    And would I be correct that 18th Street identifies itself

8    through particular colors?

9    A.    Yes, they do.

12:42PM 10    Q.    And what colors are those?

11    A.    They like red, so they would predominantly wear red.

12    Q.    Have you -- you mentioned a moment ago the sort of

13    different levels or ranks that are frequently seen in MS-13,

14    correct?

15    A.    Yes.

16    Q.    Aside from the leadership, the first word or second word,

17    there were homeboys was a full member, correct?

18    A.    Yes.

19    Q.    And the other words you used were called a paro?

12:43PM 20    A.    Paro, yes.

21    Q.    And chequeo?

22    A.    And chequeo, yes.

23    Q.    Have you in the course of your conversations with other

24    investigators being in El Salvador, working on this case, have

25    you sort of -- can you describe for the jury the ways in which

1    an MS-13, someone who wants to join MS-13 would be promoted and

2    included in the gang?

3              MR. MURPHY:  Your Honor, may we be heard, please?

4              THE COURT:  All right.

5              (THE FOLLOWING OCCURRED AT SIDEBAR:)

6              THE COURT:  Yes.

7              MR. MURPHY:  Thank you, your Honor.  My objection is

8    this does get into core viable principle and methods testimony

9    because I think what he's going to say, and this is what I am

10   particularly concerned about, is that in order to become a

11   full-fledged homeboy, one has to commit a murder, and I think

12   there's testimony in his prior testimony that that has changed

13   over time.  I think they'll be people who are witnesses in this

14   case who are alleged to be full-fledged homeboys who don't have

15   murders, so it's really a question of I think outside the

16   presence of the jury establishing that he has enough data to be

17   able to show that some particular percentage of people who get

18   promoted to homeboy have killed someone because I think there's

19   going to be significant evidence that our guys are homeboys,

20   but there's not going to be any particular evidence suggesting

21   that they committed particular murders, and so I think it's

22   extraordinarily prejudicial if this guy says everybody who is a

23   homeboy has killed somebody.

24             THE COURT:  What do you expect the testimony to be?

25             MR. POHL:  I actually expect the testimony to be more

1    along the lines of what Mr. Murphy suggested, that by the later

2    part of this investigation, it was more true that you had to

3    have committed a murder to be considered for homeboy status,

4    but I don't think he's going to say that was a requirement

5    throughout the existence of MS-13.

6           THE COURT:  In other words, that it changed over time?

7           MR. POHL:  Yes, exactly.

8           MS. LAWRENCE:  And El Salvador also has requirements.

9           MR. LOPEZ:  Do you have to establish that progression

12:45PM 10   during your questioning?

11          MR. POHL:  I don't think so.

12          THE COURT:  I'm going to allow it, but I'm going to

13   give you a small allowance of latitude to make sure this is

14   phrased exactly correctly.

15          MR. POHL:  Thank you very much.

16          (SIDEBAR CONFERENCE WAS CONCLUDED)

17          THE COURT:  All right, sir.  The objection is

18   overruled.  Go ahead, Mr. Pohl.

19          MR. POHL:  Thank you very much, your Honor.

12:46PM 20   Q.   I'm going to ask you a couple questions about what we just

21   talked about.  Would I be correct that during the time period

22   in which you've been learning about, educating yourself about

23   and then finally investigating MS-13, that the requirements

24   that the gang imposed to become a homeboy changed over time?

25   A.   Yes.

1    Q.    Would I be correct that during your career, conversations

2    with agents in other parts of the country and in El Salvador

3    and during this investigation and also during the investigation

4    that you conducted itself, that the requirements for becoming a

5    homeboy grew?

6    A.    Yes, you would.

7    Q.    Okay.  All right.  I think I'm going to jump back and ask

8    you some non-yes or no questions now.  During your -- would I

9    be correct though that in order to become a member of MS-13, a

12:47PM 10    member would have -- well, what kinds of things would somebody

11    have to do in order to become a full member of MS-13?

12              MR. MURPHY:  Objection.

13              MR. LOPEZ:  Time frame.

14              THE COURT:  Now, the last couple years?

15              MR. POHL:  Let's bound it to this investigation.

16    Q.    Your investigation started in 2012, thereabouts, right?

17    A.    Yes.

18    Q.    So let's say during 2012, right, and sort of the early

19    stages of your investigation, what would you -- what kind of

12:48PM 20    information were you receiving about the kinds of things

21    somebody would have to do to become a homeboy in MS-13?

22    A.    The gang members would commit violent crimes against

23    rivals, suspected law enforcement cooperators that would either

24    a serious assault or even the killing of someone to become a

25    homeboy.

1    Q.    Okay.  During the investigation, would you say that the

2    requirements to become a homeboy became more stringent?

3    A.    Yes.

4    Q.    All right.  Such that by the tail end of your

5    investigation in 2015, 2016, what kinds of requirements were

6    you seeing being imposed on somebody becoming a member of

7    MS-13?

8    A.    The successful killing of a rival gang member or a

9    suspected law enforcement cooperator.

12:48PM 10    Q.    Okay.  You indicated a moment ago that in order to become

11    in the gang, you had to commit, sort of even at the beginning

12    of your investigation and before that, you had to commit some

13    kind of significant violent crime to be committed in the gang?

14        MR. MURPHY:  Objection, your Honor.

15        THE COURT:  Overruled.

16    Q.    And --

17        THE COURT:  I guess we need the beginning of the

18    investigation, meaning 2012.

19        MR. POHL:  Yes.

12:49PM 20        THE COURT:  Okay.

21    A.    Yes.

22    Q.    And would the violent crimes you said, I think you

23    mentioned two kind of violent crimes in particular, right, one

24    was a gang rival, correct?

25    A.    Yes.

1    Q.    And the other was a police informant, someone who is an

2    informant?

3    A.    Yes.

4    Q.    I'd like to talk about that for a minute.  What have you

5    learned in the course of your investigation into MS-13

6    concerning MS-13's position with members that it believes are

7    providing information to the police?

8              MR. LOPEZ:  Objection, your Honor.  This investigation

9    starting in 2012.

12:50PM 10          THE COURT:  I thought it was a generalized question

11    concerning MS-13 and during the period of time of roughly 2012.

12              MR. LOPEZ:  Well, I ask for a clarification.

13    Q.    Well, I mean, let's back up.  Starting in 2005, when you

14    first went to El Salvador, did you learn whether or not MS-13

15    had a particular position concerning members that might provide

16    information to the police?

17    A.    Yes.

18    Q.    All right.  And would it be fair to say that that position

19    has not changed during the course of your time when you've been

12:50PM 20    investigating the gang?

21    A.    I would say that over the course of the investigation

22    since I started looking at MS-13 that the punishments have

23    become even more severe than when I knew about it in 2005.

24    Q.    And specifically what is MS-13, what is an MS-13 member

25    required to do if he learns or believes that a member of the

```
 1        gang is providing information to the police?
 2        A.    They'll do several steps.  If they have very, very good
 3        proof, they would try and kill that suspected cooperator right
 4        away.  If they just have suspicions, they will present their
 5        evidence through their chain of command, which will go all the
 6        way back to El Salvador, and then the leadership in El Salvador
 7        will either approve a green light or say we don't have enough
 8        evidence yet, and if they approve the green light, they will do
 9        everything they can to kill that cooperator, and if they're
12:51PM 10  unable to locate the cooperator, they will kill their family
11        members.
12        Q.    Let's talk about this investigation specifically.  How did
13        the investigation into MS-13 in Massachusetts begin?
14        A.    We developed a cooperating witness through the help of the
15        TAG.
16        Q.    What's the TAG?
17        A.    The TAG is the transnational anti-gang unit.  We have a
18        TAG in El Salvador, Guatemala and Honduras.  It's comprised of
19        law enforcement from the local police officers from each
12:52PM 20  country that are selected to work with the FBI on MS-13 and
21        18th Street gang investigations in those countries.
22        Q.    And how did your sort of connection to or work with the
23        TAG lead you to be in a position to begin this investigation
24        here in Massachusetts?
25        A.    The TAG had developed a cooperating witness that was
```

1    providing information to the TAG in El Salvador, and that

2    individual had been in the United States, had spent time in

3    prison here in the Boston area while awaiting deportation, and

4    the TAG reached out to a task force officer and said we have

5    someone that might be able to help you with your MS-13 problem

6    in Massachusetts.

7    Q.   Okay.  And what was sort of -- would I be correct that

8    eventually the FBI worked to bring this cooperating witness

9    back into the United States?

12:53PM 10    A.   We did, yes.

11    Q.   All right.  And what kinds of things -- well, was the

12    witness interviewed in El Salvador prior to that?

13    A.   The cooperating witness was interviewed in two locations

14    by the task force in El Salvador, the first time by the TFO,

15    and then the second time an FBI agent and a couple of TFOs,

16    which are task force officers, they flew down to El Salvador

17    and interviewed him again.

18    Q.   And would I be correct -- when did the cooperating witness

19    first get brought back into the United States from El Salvador?

12:54PM 20    A.   2012 to 2013.  That very early part of 2013 is when we

21    finally got him back, 2012.

22    Q.   And can you tell the jury sort of how the FBI began to

23    sort of set up and establish the cooperating witness and review

24    his ability to access members of MS-13?

25    A.   We interviewed the cooperating witness and decided that we

1    would take the opportunity to bring him back into the Boston

2    area and would have him post as a drug dealer and attempt to

3    purchase illegal narcotics from MS-13 gang members, and then

4    also we directed the CW to create a scenario where he would

5    seek volunteers from the gang to help protect a cartel's drug

6    shipments between Massachusetts and New Hampshire with

7    different drug traffickers.

8    Q.    Well, I think I suspect, given the hour, we're going to

9    talk more about this tomorrow, but let me ask you a couple

12:55PM 10   questions about that now.  The cooperating witness sort of

11   first made contact with a particular, with members of a

12   particular clique in Massachusetts, correct?

13           MR. MURPHY:  Objection, your Honor.  Leading.

14           THE COURT:  Sustained.

15   Q.    I can ask another question.  At some point during your

16   investigation, did the cooperating witness -- well, what steps,

17   you said posing as a drug dealer, correct, through the

18   cooperating witness posing as a drug dealer.  What kinds of

19   investigative techniques with the cooperating witness did you

12:56PM 20   do to begin to identify people who may be in MS-13?

21   A.    We would have the cooperating witness in Chelsea, East

22   Boston areas where MS-13 had territory and attempt to start

23   meeting fellow El Salvadorians, and as he did, he would start

24   to gather evidence or not evidence, intelligence who they were

25   and try and determine whether they were, in fact, members of

1    MS-13 or not, so if they were MS-13, we would identify them as

2    members, homeboys.  If not, maybe they were just drug dealers,

3    so we would gather intelligence against the people he would be

4    talking to to determine what kind of people he was running into

5    and meeting.

6    Q.   What were the kinds of investigative steps that you would

7    take with the cooperating witness to sort of document or

8    corroborate the information that the cooperating witness was

9    providing to you and the other agency that you worked with?

12:57PM 10   A.   Well, once the cooperating witness met with people in

11   Chelsea, he'd come back and say, oh, I met so and so, and he's

12   claiming to be MS-13, so at that point, then we go in Chelsea,

13   we have a Chelsea detective, and he would either know the

14   person himself or he would go back into the Chelsea Police

15   Department and look up the records and say have we ever done

16   any kind of investigation, have we ever done a field

17   investigation, a field identification of this person, and if

18   they had, they would have information on whether that person

19   was, in fact, a MS-13 gang member or not, and at that point

12:57PM 20   that corroborates what the cooperating witness was telling us.

21   Q.   But in addition to that, would I be correct that the FBI

22   attempted when possible to record conversations that the

23   cooperating witness had?

24          MR. MURPHY:  Objection.

25          THE COURT:  It is leading.  Sustained.

1    Q.    Aside from those kind of field interviews that you talked

2    about, what other kinds of investigative steps did you take to

3    corroborate the information that the cooperating witness

4    provided you?

5    A.    Once we identified targets for our investigation, 1, we

6    placed a consensual T3, which is a -- we were allowed to

7    intercept every phone call and text message that the

8    cooperating witness had with targets of the investigation.  We

9    would provide the cooperating witness with a recorder which

12:58PM 10    would enable him to consensually record either audio and/or

11    audio and video recordings with the subjects of our

12    investigation.

13    Q.    And were some of those consensual recordings?

14          MR. POHL:  Can I have Exhibit 1 for the witness.  This

15    is for the witness, Mr. Clerk.

16    Q.    Special Agent Wood, we're going to click through three

17    pictures quickly, Exhibits 1.1, 1.2 and 1.3.  Do you recognize

18    the pictures I have in front of you?

19    A.    I do.

12:59PM 20    Q.    How do you recognize them, sir?

21    A.    That's the garage in Everett where the Eastside

22    Locos Salvatrucha clique would meet and hold their meetings,

23    and they would meet inside the garage, and, yes, we would place

24    a recorder on our cooperating witness, and he would record

25    those meetings.

```
 1   Q.    Okay.  And how do you personally know that?

 2   A.    Well, I would be parked somewhere near there with my

 3   partners, and we would be -- we would surround the best we

 4   could and be in a position to be near that garage, so I've seen

 5   the garage.  I actually did some work on the garage to see if

 6   we could actually do a Title III and place a bug in the garage.

 7             MR. POHL:  I'd offer Exhibit 1, your Honor.

 8             THE COURT:  The three photographs?

 9             MR. POHL:  Yes, 1.1 through 1.3.

01:00PM 10             THE COURT:  All right.  They're admitted.

11             MR. POHL:  Thank you.

12             (Exhibit Nos. 1.1, 1.2 and 1.3 received into

13   evidence.)

14   Q.    Special Agent Wood, let me quickly go through these for

15   the jury.  1.1, what are we looking here?

16   A.    This is the garage off to the left, and this is the road

17   that the garage is on in Everett.

18   Q.    We've blown up that section.  Is that the area we're

19   looking at?

01:00PM 20   A.    Yes.

21   Q.    That's the garage?

22   A.    Yes.

23   Q.    Where the meetings occurred?

24   A.    Yes.

25   Q.    Thank you.  Next photograph, 1.2.
```

66

1    A.   This is one of the bays of the garage where a car would

2    pull in and they could do their work on the car inside the

3    garage.

4    Q.   And you said that the clique would meet at this -- the

5    Eastside clique would meet at this garage?

6    A.   They would meet inside the garage.

7    Q.   Inside this bay area, is that where the meetings would

8    take place?

9    A.   Yes.

01:01PM 10    Q.   1.3.

11    A.   This is from a different location of the garage.

12              THE COURT:  Is this a good place to break?

13              MR. POHL:  I think this would be a good time to break.

14              THE COURT:  All right.  We'll break there for the day,

15    ladies and gentlemen.  Remember my instructions particularly

16    not to discuss the matters with yourselves or anyone else, and

17    let's try to get started at 9:00 tomorrow morning on the dot.

18    Thank you.

19              THE CLERK:  All rise for the jury.

20              (JURORS EXITED THE COURTROOM.)

21

22

23

24

25

1          (Whereupon, the hearing was adjourned at

2     1:01 p.m.)

3                    C E R T I F I C A T E

4

5     UNITED STATES DISTRICT COURT )

6     DISTRICT OF MASSACHUSETTS ) ss.

7     CITY OF BOSTON )

8

9          I do hereby certify that the foregoing transcript,

10    Pages 1 through 66 inclusive, was recorded by me

11    stenographically at the time and place aforesaid in Criminal

12    Action No. 15-10338-FDS, UNITED STATES vs. HERZZON SANDOVAL,

13    et al., and thereafter by me reduced to typewriting and is a

14    true and accurate record of the proceedings.

15         Dated this 1st day of February, 2018.

16                   s/s Valerie A. O'Hara

17         _____

18              VALERIE A. O'HARA

19              OFFICIAL COURT REPORTER

20

21

22

23

24

25