1                     UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2


3

UNITED STATES OF AMERICA          )
4                                 )
vs.                               )  Criminal Action
5                                 )
HERZZON SANDOVAL,                 )  No. 15-10338-FDS
6  EDWIN GUZMAN,                   )
CESAR MARTINEZ,                   )
7  ERICK ARGUETA LARIOS,          )
                   Defendants     )
8


9

BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
10


11
                        JURY TRIAL DAY 3
12


13


14
             John Joseph Moakley United States Courthouse
15                      Courtroom No. 2
                      1 Courthouse Way
16                    Boston, MA 02210

17                    February 1, 2018
                        8:35 a.m.
18


19


20


21


22                      Valerie A. O'Hara
                      Official Court Reporter
23          John Joseph Moakley United States Courthouse
                 1 Courthouse Way, Room 3204
24                    Boston, MA 02210
                 E-mail: vaohara@gmail.com
25

1   APPEARANCES:

2   For The United States:

3       United States Attorney's Office, by CHRISTOPHER J. POHL,
    ASSISTANT UNITED STATES ATTORNEY, and KELLY BEGG LAWRENCE,
4   ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200,
    Boston, Massachusetts 02110;
5
    For the Defendant Herzzon Sandoval:
6
        Foley Hoag LLP, by MARTIN F. MURPHY, ESQ. and
7   MADELEINE K. RODRIGUEZ, ATTORNEY,
    155 Seaport Boulevard, Boston, Massachusetts 02210;
8
    For the Defendant Edwin Guzman:
9
        Lawson & Weitzen, by SCOTT P. LOPEZ, ESQ.,
10  88 Black Falcon Avenue, Suite 345, Boston, Massachusetts 02210

11  For the Defendant Erick Argueta Larios:

12      THOMAS J. IOVIENO, ESQ., 345 Neponset Street
    Canton, MA 02021;
13
    For the Defendant Cesar Martinez:
14
        STANLEY W. NORKUNAS, ESQ., 11 Kearney Square,
15  Howe Building, Suite 202, Lowell, Massachusetts 01852.

16      ROBERT M. SALTZMAN, ESQ., 1 Central Street, Suite 5,
    Stoneham, Massachusetts 02180.
17
    ALSO PRESENT:  Gabriel Haddad, Spanish Interpreter
18                 Carrie Lilley, Spanish Interpreter

19

20

21

22

23

24

25

1                           I N D E X

2     OPENING STATEMENT

3       By Ms. Lawrence                                    35
        By Mr. Iovieno                                     50
4       By Mr. Murphy                                      57
        By Mr. Lopez                                       65
5       By Mr. Norkunas                                    75

6     WITNESS                    DIRECT   CROSS   REDIRECT   RECROSS

7     RICHARD DALEY
        By Mr. Pohl                82               116
8       By Mr. Murphy                      110
      JEFFREY ELLIOTT WOOD, JR.
9
        By Mr. Pohl               117
10


11

      EXHIBITS                             FOR I.D.   IN EVIDENCE
12
        1.1, 1.2 and 1.3                                 143
13      91                                                82
        93.1 through 93.4                                 87
14      94                                                90
        95                                                89
15      96                                                94

16      96.2                                              96

17      97                                                98
        98                                                99
18      99                                                99
        101.2 through 101.5                              101
19      102                                              103

20

21

22

23

24

25

PROCEEDINGS

THE CLERK:  All rise.  Thank you.  You may be seated.
Court is now back in session.

THE COURT:  Good morning, everyone.  I have a motion
filed by Mr. Barron on behalf of Jose' Fernandez Miguel, which
I want to take up.  I guess I'll take it up first.  I've read
the papers quickly.  Who wants to be heard in opposition to the
motion?

MR. LOPEZ:  That would be me, your Honor, I'm the one
that served the subpoena.

THE COURT:  So, your Honor, last Friday, we received
an e-mail from the government telling us that in preparation
for trial, Mr. Jose' Hernandez-Miguel changed some of his
proposed testimony or what he had said previously, specifically
in a prior proffer, there was a report, and I forget the date
because I didn't bring it with me, that Pelon, CW-1,
participated in an attempted murder on May 12th, 2015, and in
the earlier proffer, Mr. Hernandez-Miguel related, according to
this report, that Pelon knocked down the alleged victim and
held him down while Jose' Hernandez-Miguel stabbed him.

Subsequently, Mr. Pelon kind of tried to minimize his
behavior when he spoke to the agent about it, and that's kind
of besides the point.  In this latest disclosure, he now claims
that he never said that, so to the extent Mr. Barron was there
and Mr. Barron was taking notes of that proffer and his notes

1    are consistent with the report and inconsistent with

2    Mr. Hernandez Miguel's now memory, I think that that's

3    relevant, evidentiary and important to the case.

4         THE COURT:  But what's the end game here, are you

5    going to call Mr. Barron to testify against his own client?

6         MR. LOPEZ:  Well, the first case, I'd like to see the

7    notes to see whether or not there is an inconsistent statement.

8    If there is no inconsistent statement --

9         THE COURT:  But you've been told, I think, by the

08:38AM 10   government that there's an inconsistent statement, right, so

11   you know that, or at least the government says there's an

12   inconsistent statement.  Attorney notes are -- I mean, that's

13   the definition of work product, right?

14        MR. LOPEZ:  Not when they're at a proffer session, and

15   it's not attorney-client privilege.

16        THE COURT:  Work product.

17        MR. LOPEZ:  What's that?

18        THE COURT:  It's not that the statements were

19   privileged but that they're work product.  I mean, that's what

08:39AM 20   attorney work product, quintessential attorney work product is

21   an attorney's notes of a witness interview.

22        MR. LOPEZ:  With all due respect, your Honor, being a

23   note-taker at a proffer is not a work product.  There's no --

24        THE COURT:  So if someone subpoenaed your notes for

25   all your witness interviews, you wouldn't raise a work product

1    defense?  I mean that seems odd to me.  Again, it's work

2    product.  It doesn't mean it can't be overcome.  Work product

3    is not nights like a privilege.

4         MR. LOPEZ:  Well, your Honor, the work product has to

5    have some legal thought process that goes into it.  This is

6    simply taking notes of what his client said when he's in the

7    presence of numerous agents and assistant U.S. attorneys.

8         I'm not looking -- if there's a note there that shows

9    his mental impressions or opinions about that statement, I'm

08:40AM 10  not interested in that, I'm just interested in what did his

11   client say at that proffer session?

12        THE COURT:  But suppose the notes are consistent with

13   what the government has told you, what then?

14        MR. LOPEZ:  Then I won't call him as a witness.

15        THE COURT:  And if they're inconsistent, meaning, you

16   know, he's right, he never did say that, then what happens?

17        MR. LOPEZ:  Then I would call him as a witness.

18        THE COURT:  Call Kevin Barron as a witness?

19        MR. LOPEZ:  Yes.

08:40AM 20  THE COURT:  Against his own client?

21        MR. LOPEZ:  Yes.

22        THE COURT:  To show -- I guess I'm not following this.

23        MR. LOPEZ:  He was a witness to the statement and to

24   testify that on a prior occasion, Mr. Miguel Fernandez did in

25   fact say -- the position that Mr. Miguel Fernandez is now

1    taking is that the agent -- well, really two things.  The

2    interpreter interpreted incorrectly, and the agent took it down

3    incorrectly, and to the extent that Mr. Barron was there as a

4    note-taker, and the notes reflect a consistency with the

5    agent's notes, it's more likely than not that

6    Mr. Miguel-Hernandez is mistaken about what he said that day as

7    opposed to his position now saying I never said that.

8              THE COURT:  I guess, okay, if it's consistent with the

9    agent's notes, you've learned nothing, but if it's inconsistent

08:41AM 10    with the agent's notes, it would support --

11              MR. LOPEZ:  Then I won't be calling him.

12              THE COURT:  Mr. Hernandez-Miguel, so I'm not sure

13    either way how you call him.  You know what I'm saying, either

14    it's consistent or inconsistent.  If it's consistent with the

15    agent's notes, you can just call the agent; if it's

16    inconsistent, then inconsistent with the agent's notes, that

17    means it's consistent with the client's testimony, and you can

18    cross-examine the client.  How do you call Barron -- what do

19    you get from Barron that you can't get from the agent or the

08:42AM 20    witness?

21              MR. LOPEZ:  Obviously, your Honor, evidence that his

22    own attorney took down the same information that the agent did

23    is more powerful and more persuasive and more compelling than

24    the agent, which he can just dismissedly say, well, the agent

25    made a mistake, and I'm pretty sure the government is not going

1    to put the agent on to say, oh, no, no, I didn't make a

2    mistake.

3            THE COURT:  All right.  Is Mr. Barron here?

4            MR. BARRON:  Yes, I am.  I'm taking the liberty of

5    standing over here.  I don't think that anything Mr. Lopez has

6    said takes him outside the rule of the *LaRouche Campaign* and

7    it's referenced to Nixon.  I've discussed that on page 4 of the

8    memorandum.  In reality, this is all information that can be

9    gained from the agent's reports.

08:43AM 10           Nothing further unless your Honor has any questions

11    about my memorandum.  In other words, it doesn't make it past

12    the showing of evidentiary need.

13           THE COURT:  Does the government have a position on

14    this?

15           MR. POHL:  Mr. Barron alerted me to the fact that the

16    subpoena was issued yesterday.  I've just had a chance briefly

17    to look at his papers this morning, but I think your Honor's

18    assessment is entirely correct.

19           Since it's going to come up, I can tell your Honor

08:43AM 20    that the sequence of events since we made that disclosure, so

21    there's a proffer.  The proffer report of Mr. Hernandez-Miguel

22    from I think the middle of 2016 states -- that the report

23    itself states that the cooperating witness held down an 18th

24    Street gang member while Hernandez-Miguel stabbed him.

25           During pretrial preparation, Mr. Hernandez-Miguel said

1    I never said he held him down.  We disclosed that because it

2    was obviously inconsistent with the proffer report.  Mr. Lopez

3    then requested, and the government provided the agent notes of

4    that proffer, and the agent notes of the proffer, in my view

5    support Mr. Hernandez Miguel's statement that he never said it.

6         In other words, holding the witness down, the

7    cooperating witness holding him down is not in the notes, all

8    right, so how that's all going to play out, that's all classic

9    fought over cross-examination, but I think I can't imagine

08:44AM 10    there's going to be anything that's going to be -- from those

11    notes that you can't get from the sort of state of the evidence

12    as it is now, and, you know, I think I'm not sure Mr. Lopez'

13    brethren in the criminal defense bar would appreciate granting

14    a motion like this for a future defendant.  For sound policy

15    reasons --

16         THE COURT:  I'm not worried about their feelings.

17         MR. POHL:  No, I understand that, but I think on the

18    state of the evidence as it is now, I think Mr. Barron is

19    right, there's nothing in those notes that can't be gotten

08:45AM 20    through other means.  Thank you.

21         THE COURT:  All right.  I'm going to grant the motion

22    to quash.  All right.  I'm doing this at fairly high speed, but

23    it seems to me that it is problematic within the meaning of or

24    as set forth in U.S. vs. *LaRouche Campaign*, that there is an

25    insufficient need for the evidence balanced against the

1   problems that it raises.

2          I think the information, you know, is arguably

3   relevant to cross-examination, but that's about as far as it

4   goes.  Information can be procured from other sources.  At a

5   minimum, the agent and the witness themselves are also

6   translators and a translator in the room presumably could

7   testify.

8          I have grave concerns about the attorney-client

9   relationship and how this may be affected here, in particular,

08:46AM 10   the possibility that Mr. Barron could be called as a witness

11   against his own client to impeach his own client or that his

12   notes could be used to impeach his own client.

13          There may be circumstances in which that would be

14   required when there's no realistic alternative, but I don't see

15   this as such a case, and so I'm going to grant the motion to

16   quash and will also grant the emergency motion to seal.

17          I'm granting the motion to seal because I don't have

18   time to parse through what in here actually needs to be sealed

19   and what does not, and I'd ask Mr. Barron, for you to take a

08:47AM 20   further look at it, and if it can be either -- and, obviously,

21   we've talked about some things in open court.  If a redacted

22   public version can be filed, I'm going to direct you to do that

23   because, obviously, in criminal cases, there is a strong

24   presumption in openness, but at least as a temporary matter,

25   I'm going to grant the motion to seal pending further

1    determination of whether it, in fact, needs to be sealed.

2           All right.  What else do we have to talk about?

3           MR. BARRON:  Thank you, your Honor.

4           THE COURT:  Mr. Murphy.

5           MR. MURPHY:  Yes, your Honor, a moment ago, the

6    government flashed on the screen a series of slides that it

7    intends to use in the ongoing.

8           THE COURT:  Yes.

9           MR. MURPHY:  We previously received notice of

08:48AM 10   disclosure that they wanted to use one of these slides, the

11   chart showing the photographs of the defendant and others.  The

12   thing that was just flashed on the screen also included a

13   series of excerpts from the transcripts, which the government

14   sought to admit.

15          To be clear, all of those excerpts have been

16   previously produced to the defense.  We hadn't seen them in the

17   government's opening presentation, so I would lodge the

18   objection that I lodged before about the linking of the names

19   to those transcripts before there is any testimony about them,

08:48AM 20   and I think calling them out in this way in the opening

21   statement before there is that testimony is prejudicial, and I

22   would object to the chart.

23          THE COURT:  All right.  First, to the extent it's part

24   of your general objection, that piece of it is preserved.

25   Second, all opening statements discuss evidence that has not

1      yet come in, and it's always on the assumption the evidence

2      will come in.

3          I don't know that I need to give the jury a caution in

4      the middle of the government's opening statement, but I will

5      see what they present, and if I think it requires a cautionary

6      instruction, I'll give it, but, again, all opening statements

7      talk about things that the jury has not yet heard, and I do

8      expect that the government will be able to lay the foundation

9      for putting the names on the transcript.

08:49AM 10         If the government can't do that, it's risking a

11     mistrial, as with anything anyone says in an opening statement,

12     you're always running that risk, so I'm not sure I view this as

13     being a terribly different situation, so I will overrule the

14     objection, but I will see what the government says and consider

15     at the time whether I need to say anything at that point or at

16     the conclusion of the government's opening.

17         MR. MURPHY:  May I bring one other practical question

18     to the Court assuming evidence does start today?

19         THE COURT:  Yes, I assume so.

08:50AM 20         MR. MURPHY:  The Court has previously ruled that an

21     objection by one defendant is an objection by all --

22         THE COURT:  Yes.

23         MR. MURPHY:  -- to the testimony.  I think the Court

24     is likely aware of the First Circuit's case in *Gordon,* ruling

25     in *Gordon,* which essentially said that the failure to describe

1   the reason for the objection would subject the objection to

2   plain error analysis, so I simply want to alert the Court that

3   there may be occasions when Mr. Norkunas says hearsay and I say

4   relevance.  I think it's not ideal from the presentation of the

5   case to the jury, but I don't think that will be on this side

6   of the --

7            THE COURT:  In fairness, Mr. Norkunas may want to

8   overrule your reasoning, Mr. Murphy it may go both ways.

9   That's a fair point, and just to be clear, when objections are

08:51AM 10  made, I want no argument in front of the jury other than maybe

11  a simple word like, "hearsay," "leading," "relevance,"

12  something like that.  Everything else should occur at sidebar.

13            Mr. Pohl.

14            MR. POHL:  Your Honor, thank you.  I do hope and

15  expect that we'll get to evidence today, and the first witness

16  for the government would be Sergeant Detective Daley from the

17  Boston Police Department, who was one of the homicide

18  detectives who responded to the crime scene at Trenton Street,

19  which is where one of the murders that we'll be talking about

08:51AM 20  today occurred, and I want to flag a couple of things for the

21  Court.

22            I had a very, I think, productive discussion with

23  counsel, particularly with Mr. Murphy about sort of how to

24  present this type of evidence in this case in a way that I

25  think streamlines the case but doesn't, and, you know, makes

1  clear that why this evidence is being presented, but it also

2  makes clear that these defendants are not the parties that

3  actually physically committed the murder, and so to that end, I

4  think we will be presenting evidence through the detective

5  concerning the murder, and he will be identifying some

6  photographs of the victim, including the wounds.

7  That testimony, you know, if Mr. Martinez were still

8  in the case and we were having to prove that part of the case

9  to the jury, you know, we'd be doing the full presentation with

08:52AM 10  the medical examiner and all that, and I don't think that's

11  necessary in this case.

12  I think to the extent though that there are, you know,

13  403 or other kinds of objections to that evidence, I thought it

14  might make sense to take it up now, otherwise I think we'd be

15  in a position to roll through that testimony now, and, you

16  know, I think, I hope we'll be able to conclude that part of

17  the case today.

18  THE COURT:  Am I correct, this is a murder that was

19  allegedly committed by murders of the clique but not these four

08:53AM 20  members of the clique essentially?

21  MR. POHL:  Yes, that's essentially correct.  The

22  person who committed the murder was part of another clique but

23  then was jumped into this clique for the murder.  That would be

24  the government's contention, and so just for the Court's

25  edification, I think you have an exhibit binder in front of

1   you, your Honor.  The exhibits that we're talking about would

2   be at 93.  There would be a 9-1-1 call.

3        Oh, I should start, we have a stipulation as to the

4   admissibility of a 9-1-1 call that's Exhibit Number 91.  I'll

5   be playing that first.  The exhibits that we're talking about

6   are at 93, 94, 95.  There's some surveillance videos that the

7   detective himself will be able to authenticate, and then at 101

8   are autopsy photographs of Mr. De Paz.

9        I think those are the items that are most likely to

08:54AM 10   draw a relevance objection, and I think it would make the most

11   sense to sort of resolve that now.

12        THE COURT:  Okay.  Mr. Murphy.

13        MR. MURPHY:  Yes, your Honor, so Mr. Pohl is right

14   that we did have a discussion.  I don't think any of the

15   defendants are going to be lodging proffer in the *Melendez-Diaz*

16   testimony -- objections to this testimony generally.  I think

17   we do object, Number 1, to the entire line of testimony as to

18   its relevance.  We should preserve that objection once the

19   detective takes the stand because we don't think that any of

08:54AM 20   this evidence is relative to the charges here.

21        As Mr. Pohl said, this is a homicide that I think it's

22   undisputed none of these defendants had anything to do with,

23   and Mr. Martinez was not a member of their clique at the time

24   of the homicide.

25        With respect to the autopsy photographs, your Honor,

1   we would also object to those, again, on relevance grounds but

2   also on irrelevance grounds because, again, there's no evidence

3   that any of the defendants here knew anything about the

4   injuries other than what Mr. Martinez may have said to certain

5   of them at certain occasions, so they weren't there, they

6   didn't see the injuries, and I don't think, there's not going

7   to be any dispute that Mr. Martinez committed this homicide or

8   any dispute about the cause, and I think that under the

9   circumstances, it would be eventually more prejudicial than

08:55AM 10   probative to show the autopsy photographs to the jury,

11   particularly those, and I don't know which ones the government

12   finally chose to use.  I don't have that with me, but the ones

13   that show Mr. De Paz featured on the autopsy table.

14          THE COURT:  All right.  Mr. Pohl.

15          MR. POHL:  Thank you, your Honor.  So, you know, I

16   think by way of proffer, one of the things that the government

17   is going to show is that there was significant amount of

18   surveillance video that was obtained by the Boston Police

19   Department in the immediate aftermath of the homicide and that

08:56AM 20   one of the surveillance videos actually shows Joel Martinez

21   wiping a bloody knife as he walks away from the crime scene, so

22   the fact that the wounds are stab wounds and are consistent

23   with the video I think makes it relevant even just as a

24   stand-alone point, but, obviously, the nature of MS-13, the

25   fact that committing a violent crime is often the necessary

1    component to inclusion in the gang and promotion within the

2    gang is, you know, one of the facts that I expect several

3    witnesses will testify to during the trial, and I think we took

4    pains to sort of essentially only put in, as you can imagine,

5    there were dozens, hundreds, frankly, of photographs.

6         We took pains really to try to limit the photographs

7    to only those that would link Mr. Martinez to the video, link

8    Mr. Martinez to another recording where he admits to doing the

9    murder and actually makes sort of a thrusting motion, the

08:57AM 10   recordings are in Spanish, there's a transcript of it, but he

11   makes a thrusting motion on the video that's consistent with

12   him describing how he committed the murder, and I think for

13   those reasons, it is both relevant and admissible.  Thank you.

14        THE COURT:  All right.  Let me do this.  I'm sorry,

15   Mr. Iovieno.

16        MR. IOVIENO:  Yes, your Honor, thank you.  Just

17   briefly, just so we're clear, this occurred in September of

18   2015.  Mr. Martinez was not beaten in, if you will, until

19   January of 2016, so no member of this so-called clique

08:58AM 20   participated in this, and also there's a death certificate that

21   lists the cause of death, and I think the photographs are 403,

22   certainly prejudicial given there's four of them, and the issue

23   of how the cause of death is really not disputed.

24        THE COURT:  Okay.  Let me do this.  Let me -- we have

25   at least some period of time before we're going to get to this,

1    so let me think about that, and I'll make a ruling before the

2    witness testifies.

3         We're one juror short.  I'll say it's not clear to me

4    that we need his face, which is 101.1, which doesn't seem to me

5    to move the ball forward particularly unless there's an issue

6    about his identification, but let me think about it.

7         All right.  Anything else we can take up quickly while

8    we're waiting for our last juror?

9         MR. NORKUNAS:  Judge, just on behalf of Mr. Martinez,

08:59AM 10    as Mr. Murphy used the term, and I would ask that any witness

11    to it, murder is a degree of culpability, it was a homicide,

12    and he's a homicide detective.

13         Murder implies certain things that a jury has to find

14    beyond a reasonable doubt, so any discussion of this, rather

15    than term it as a murder, that it's an unlawful killing, it's a

16    homicide, and I think that would be appropriate in the

17    circumstances that's being presented.

18         THE COURT:  Mr. Pohl.

19         MR. POHL:  I think -- I think it's really a

08:59AM 20    distinction without a difference in the context of this case,

21    Judge.  I think, frankly, the natural way to describe this is

22    that it was a murder, and I don't think they'll be much dispute

23    about that from the recordings themselves.  The video

24    recordings show two people chasing somebody down and then

25    wiping a knife afterwards, so I think the death certificate

1    says "homicide." That will be in, but I think it's appropriate

2    to call it a murder, and I think the detective would describe

3    it as such.

4          THE COURT: All right. Murder, of course, remind me,

5    under Massachusetts law, it encompasses multiple levels, in

6    other words, that doesn't necessarily mean first-degree murder?

7          MR. POHL: Correct.

8          THE COURT: I guess I'm not troubled in this context

9    by the use of the word "murder," but because these are

09:00AM 10    technical terms, and to the extent that there's a genuine

11    dispute, you know, if there are other homicides that arguably

12    are manslaughter or something lesser, I think we ought to try

13    to be more technical, and "homicide" is certainly the safer

14    word to use.

15          We're going to line up the jurors and bring them in.

16          THE CLERK: All rise for the jury.

17          (JURORS ENTERED THE COURTROOM.)

18          THE CLERK: Thank you. Be seated. Court is in

19    session.

09:06AM 20          THE COURT: All right. Ladies and gentlemen, welcome

21    back. Thank you again for your patience and cooperation.

22    You'll recall that at the end of yesterday, I said that I had a

23    few preliminary instructions or remarks that I wanted to give

24    that I would normally have given you right then and said I'm

25    going to do it now before the opening statements, and I want to

1   start by talking about your duties as jurors and also giving

2   you some preliminary, very brief, very summary preliminary

3   instructions on the law.

4        At the end of the trial, I'm going to give you

5   complete and detailed instructions on the law that you are to

6   follow.  Those instructions will be in writing.  Each one of

7   you will have your own copy.  I'm going to read them aloud to

8   you, and you can follow along with me and take notes as you

9   choose and take them with you into the jury room.

09:07AM 10        The reason I'm giving you some instructions now

11   instead of waiting until the end of the trial is to try to give

12   you a bit of a framework for considering the evidence and to

13   help you understand the evidence and what you're going to be

14   asked to decide.

15        I don't want you to think that these are preliminary

16   instructions are the only ones that matter or that they're

17   somehow more important than the ones that come later.  You must

18   apply the instructions that I give you at the end of the trial

19   as a whole.

09:07AM 20        All right.  As the jury, it's your duty to decide from

21   the evidence what the facts are.  You and you alone are the

22   judges of the facts.  You'll hear the evidence, decide what the

23   facts are, and then apply those facts to the law as I give it

24   to you.  You must follow the law as I explain it to you,

25   whether you agree with it or not.

1          Sometimes jurors are curious about what I think.  For

2     example, whether I think a defendant is guilty or not, or

3     whether a particular witness is believable or not.  My opinion,

4     if I have one, and I certainly do not have one now is not

5     relevant.  It is your role, not mine, to decide those issues,

6     and you should not interpret anything I might say or do during

7     the trial as indicating what I think about a witness or what I

8     think your verdict ought to be.

9          As I said to you multiple times in the impanelment

09:08AM 10     process, your verdict must be based only on the evidence

11     presented in this courtroom.  You must disregard anything you

12     may have read in a newspaper or on the Internet or seen on

13     television or heard on the radio.  It's very important that you

14     decide this case only on the evidence presented in this

15     courtroom, and, again, any information outside the Court, the

16     lawyers don't have an opportunity to respond to it, to correct

17     it, to contradict it, or otherwise explain it, so you must

18     decide the case based solely on the evidence presented in the

19     courtroom.

09:08AM 20          Again, this is a criminal case.  I'll sometimes refer

21     to the government as the prosecution.  All four defendants are

22     charged with one particular crime.  It's conspiracy to conduct

23     or participate in the affairs of an enterprise through a

24     pattern of racketeering activity.  We'll call that

25     "racketeering conspiracy" as a shorthand way of describing it.

1       Two defendants are also charged with conspiracy to

2   possess cocaine with intent to distribute it and to distribute

3   cocaine.  The charges presented against the defendant are

4   called an indictment.  An indictment is simply a description of

5   the charges against them.  It's an accusation.  It's not

6   evidence of anything.  All four defendants have pleaded not

7   guilty to those charges.

8       They're presumed innocent.  The government must prove

9   their guilt beyond a reasonable doubt.  The defendants do not

09:09AM 10   have to prove their innocence.  They do not have to put on any

11   evidence, they do not have to testify, they don't have to do

12   anything at all.  Those rights are guaranteed by the United

13   States Constitution.

14       At the end of the trial, you'll be asked to render a

15   verdict of guilty or not guilty.  Your verdict will have to be

16   unanimous, that is, as to each count and each defendant.  You

17   may convict each defendant only if every one of you agrees that

18   he is guilty of that crime beyond a reasonable doubt.

19       All right.  Although the defendants are being tried

09:10AM 20   together, you must take care to give separate consideration to

21   each defendant.  You'll have to consider each count and each

22   defendant's involvement in that count separately.

23       Again, it's really six decisions you'll have to make.

24   We have four defendants all charged with one crime of

25   racketeering conspiracy and two defendants charged with drug

1  conspiracy, and you'll be asked to return a separate verdict as

2  to each defendant for each count.

3       I'm going to give you the barest thumbnail sketch of

4  what the defendants are charged with.  Unfortunately, the crime

5  of conspiracy to commit racketeering is somewhat complex.  It

6  involves terms that have technical meanings.  I'm going to give

7  you the briefest overview now so you're not hearing the terms

8  for the first time at the end of the trial, but, again, at the

9  end of the trial, you will have instructions in writing.  I'll

09:11AM 10  go through this carefully, and I'll hopefully explain to you

11  everything you need to know.

12       Every crime has certain things that we call elements.

13  They are things that the government has to prove beyond a

14  reasonable doubt to convict someone of that crime.  The crime

15  of racketeering conspiracy has basically three elements.  The

16  first is that there was an agreement among two or more persons

17  to participate in an enterprise affecting interstate commerce

18  through a pattern of racketeering activity.

19       The second is that the defendant knowingly and

09:11AM 20  willfully became a member of that agreement, and the third is

21  that the defendant agreed that some member or members of the

22  conspiracy agreed to commit two racketeering acts.

23       Let me just briefly touch on some of those concepts.

24  I talked about an agreement.  Basically a "conspiracy" is an

25  agreement among two or more persons to commit a crime or to

achieve an unlawful object.  An "enterprise" is a group of

people who have associated together for a common purpose of

engaging in a course of conduct over a period of time.

Here, the alleged enterprise is a gang.  The

government says that the enterprise is a gang called MS-13.

Again, some member or members of the conspiracy have to commit

two racketeering acts or agree to commit two racketeering acts.

The indictment charges that the racketeering acts are separate

crimes of murder, attempted murder, robbery and drug

trafficking.

Again, these are very technical terms.  What I've said

to you is not precise.  I don't want you to rely on it at the

end of the day, you can rely on my instructions.  I'm just

trying to give you the basic outline of what this charge is,

and, again, Defendants Martinez and Larios are also charged

with essentially a drug trafficking conspiracy.  That as well

has elements.  The first element is that there was a conspiracy

to possess cocaine with intent to distribute it and to

distribute it.

The second element is that the defendant in question

knew of the conspiracy.  The third is that the defendant

knowingly and voluntarily joined, participated in the

conspiracy.  And, fourth, that it was reasonably foreseeable to

the defendant that the conspiracy would involve the

distribution of certain amount of cocaine.

1        And, again, that's only the barest outline of what it

2    is the government has to prove, and at the end of the trial,

3    I'll give you final instructions on those matters.  Those

4    instructions will govern your deliberations, and if I say

5    anything that's inconsistent with that, those instructions are

6    what will control.

7        All right.  I've talked about the word "evidence."

8    The evidence in this case will probably include the testimony

9    of witnesses.  It will include documents.  It may include

09:13AM 10  objects that come into evidence as exhibits and any facts that

11   the parties may have agreed on.

12       The evidence consists of all the testimony, both on

13   direct and cross-examination and all of the exhibits regardless

14   of who introduced them.

15       There are rules that control what you may consider as

16   evidence.  If a lawyer asks a question or offers something into

17   evidence and the other side thinks it's not permitted, the

18   lawyer may object.  It may be necessary for me to have a

19   discussion with the lawyers outside of your hearing at a

09:14AM 20  conference at sidebar.

21       The purpose of those conferences is so I can make a

22   decision.  I don't keep things from you just to frustrate you,

23   but, of course, it's important sometimes for me to discuss

24   things outside of your earshot.

25       I'll do what I can to keep those conferences to a

1   minimum.  Certain things are not evidence.  Statements and

2   arguments by lawyers are not evidence.  The lawyers are not the

3   witnesses.  A question by a lawyer standing alone is not

4   evidence.  Again, the lawyer is not the witness.  You have to

5   take the question and the answer together.

6        Objections are not evidence.  Lawyers have a duty to

7   object if they think something is improper, and if I sustain an

8   objection, if I keep something out, you should ignore the

9   question or ignore the exhibit and not try to guess or

09:15AM 10   speculate what the answer might have been or the object or

11   exhibit might have included.

12        I hope this doesn't happen, but if I have to tell you

13   to disregard something, it's not evidence and you can't

14   consider it as part of your evidence.  Again, anything you see

15   or hear outside the courtroom is not evidence.

16        Then, finally, sometimes a particular piece of

17   evidence might be received for a limited purpose only.  In

18   other words, I might tell you you can use it for purpose X but

19   not for any other purpose, and I'll do that, I'll instruct you

09:15AM 20   if that happens and give instructions as we go along.

21        Deciding what the facts are.  You may have to decide

22   what testimony you believe and what testimony you do not

23   believe.  You may believe everything a witness says or part of

24   it or none of it.  It is entirely up to you.

25        Now, many people watch television shows or movies

1       about courts or lawyers of the criminal justice system, and

2       often people are affected by that when they serve as jurors.

3       Television shows and movies can create false expectations about

4       real life, for example, how a trial is going to proceed or what

5       evidence might look like.

6               You must decide this case on the evidence in the Court

7       and the law as I give it to you, and do not decide this case

8       even in part based on something you saw on TV or in a movie.

9       It's improper and it's unfair.

09:16AM 10      All right.  Let me turn next to the subject of how

11      you're going to conduct yourselves during the trial.  I've

12      touched on some of this already, but I'm going to remind you.

13      The first rule is that you should not talk among yourselves

14      about the case until the end when you go to the jury room to

15      decide the case.  You should feel free to get to know one

16      another, but you should talk about the weather or the Patriots

17      or your families or anything other than this case.

18              What's particularly important is that you not start to

19      pair up and have side discussions about the case outside the

09:17AM 20      hearing of others.  Again, whether you intend to or not, you're

21      going to start to influence each other, and it's important that

22      you wait until the end and that you not influence each other

23      outside of everyone else's earshot, so wait until the end and

24      make sure everyone hears everything that anyone has to say

25      about this case.

1          The second rule is not to make up your mind about what

2     the verdict should be until you've gone to the jury room to

3     decide the case.  The evidence has to be heard in some order,

4     something has to be first, and something has to be last, and it

5     could be that the last question on the last day is the most

6     important thing in the case, and it's important that you keep

7     an open mind until the end.  There's no really other way to do

8     it, and you just have to wait and listen patiently before

9     making up your mind.

09:17AM 10          Next, and I talked about this the other day, don't

11     talk with anyone else about this case until I've discharged you

12     as jurors.  Once I discharge you, you're free to talk as you

13     may wish, but during the trial, don't talk with anyone else,

14     and that includes members of your family, your friends, your

15     loved ones.  Again, it's the most natural thing in the world

16     for your family members and friends to ask you about the case,

17     what you think or to tell you something that they saw on TV or

18     they read about something.

19          And, again, I'm instructing you, you cannot have that

09:18AM 20     conversation.  Again, your friends and your loved ones are

21     going to influence you whether they're trying to or not,

22     whether you want them to or not, they don't mean any harm, but

23     they're not here, they haven't licensed to the evidence, they

24     haven't seen the evidence, and they haven't listened to my

25     instructions.

1          Go ahead and blame me, if you want, that's fine, you

2     can say the Judge ordered you not to talk about it, but it's a

3     very important rule.

4          Next, do not mention or discuss this case in any way,

5     shape or form on any social network or in any other electronic

6     form.  This is very important.  As I'm sure you know, in the

7     modern world, a lot of people talk about every single they do

8     on Facebook or they tweet about it, and you cannot do that

9     here.  If you do it and I find out about it, I may have to

09:19AM 10  declare a mistrial.  We may have to start all over again, which

11    will be a huge waste of time and resources, so please do not do

12    it.

13         Next, don't let anyone talk to you about the case.  If

14    they persist, please report that to me as soon as you can.

15         Next, please don't talk with any of the parties or the

16    lawyers or the witnesses or anyone involved with the case.  You

17    shouldn't really say hello to them.  It's important that you do

18    justice but you give the appearance of doing justice, so let's

19    say someone saw you waiting for the elevator and you began

09:20AM 20  chatting with one of the lawyers, and what you were talking

21    about was Rob Gronkowski's concussion, not about the case.

22    Other people may not know that.  If we hear about it, I'll have

23    to hold a hearing, I'll have to find out what the conversation

24    was about, so please don't do it.  Don't even say hello to

25    people, frankly, and if they're not saying hello to you,

1    they're not being rude, they're following my instructions as

2    well.

3            Again, let me remind you one more time, don't read any

4    news stories or articles about the case or anyone having to do

5    with it.

6            Next, don't do your own research about anything.  No

7    matter how minor it is.  Don't look up anything on the

8    Internet.  If you think some piece of information is missing,

9    or you're curious, you're not allowed to find it out on your

09:20AM 10    own.  That's true even if you think it's harmless, even if

11    you're just curious, even if you think it doesn't matter or

12    you're frustrated, you have to wait until the end of the trial.

13    You cannot do your own research.  Please be respectful of the

14    Court.  Please don't bring food or drink into the courtroom,

15    please don't chew gum during the trial, and try to dress

16    appropriately.

17            During the course of the trial, if you have a problem

18    of some kind, I'll try to take care of it.  Sometimes a lawyer

19    mumbles or they are facing the wrong way and you can't hear the

09:21AM 20    question, please raise your hand and we'll have it repeated.

21    If you need a glass of water or a Kleenex, let us know, we'll

22    try to give you one.

23            If you need a short break for any reason, we'll try to

24    take a short break, we'll do the best we can to make sure that

25    you're comfortable and accommodated.  If you need to

1  communicate with me and we're not in court, please give a

2  signed note to the Court security officer to give to me.

3  Again, these rules are important.  They're intended to make

4  sure the trial is fair, and I instruct you to obey them.

5       All right.  I'm going to do permit you to take notes

6  in this case.  You should have note pads and a pencil or a pen,

7  and there should be a number on the cover of the notebook that

8  will be your juror seat number.

9       I want to give you a couple cautions about taking

09:22AM 10  notes.  The first caution is don't allow note-taking to

11  distract you.  You need to listen carefully to the testimony.

12  It's important that you observe the witnesses and listen to

13  them.  If you'd rather not take notes at all, that's fine.

14  Some people take copious notes, some take none at all, some

15  people only write down a few things.  It's entirely up to you.

16       Please remember that not everything you write down or

17  that is written down is necessarily what was said.  Don't

18  assume when you get back to the jury room that just because

19  something is in someone's notes that it necessarily happened.

09:22AM 20       What people often do is they write down the question

21  and not the answer because they don't have time to get the

22  whole thing written down, so notes are an aid to recollection.

23  That's all they are, and the fact that it's written down

24  doesn't necessarily mean that it's true.  It could be true but

25  it doesn't necessarily mean that.

1          You should take your notebooks with you to the jury

2     room at every recess.  You can't take your notes home.  You

3     can't take them outside the courtroom or the jury room.  The

4     clerk will collect them at the end of every day and place them

5     in the vault.  They'll be returned to you the next morning, and

6     when the case is over, the notes will be destroyed.  No one but

7     you will ever look at them.

8          Now, as you can see, we have a court reporter who's

9     creating a record of everything that happens in this trial.

09:23AM 10     Sometimes jurors think they will have a transcript when they go

11     back to the jury room, and that is not true.  You will not have

12     a transcript.  There are a number of reasons for that, but one

13     of them is strictly practical.  There's usually not time to

14     prepare one.

15          The Court reporter has a very difficult job.  It's

16     very time consuming to create a raw record and turn it into a

17     final transcript, so you won't have a transcript, and you

18     should listen very carefully and take whatever notes you think

19     you may need to help you remember.

09:23AM 20          All right.  Let me quickly outline the trial.  When

21     I'm done speaking, which will be in a couple minutes, we will

22     begin with the opening statements.  The government in its

23     opening statement will tell you about the evidence that it

24     expects to introduce.  The opening statement is not itself

25     evidence.  Again, the lawyers aren't witnesses.  Its purpose is

1     to help you understand what the evidence is likely to be.

2          The defense attorneys will then open for each of their

3     clients.  The government's evidence will come next.  Of course,

4     the defendants are permitted to cross-examine any of the

5     government witnesses, and at the close of the government's

6     evidence, the defendants may present evidence if they choose.

7     Again, they're not required to do so, and, again, they are

8     presumed innocent.  The government must prove their guilt

9     beyond a reasonable doubt.  The defendants do not have to prove

09:24AM 10    their innocence, do not have to testify, and do not have to put

11    on any evidence.

12          Once the evidence is closed, the government and the

13    defense will each be given time for closing arguments, and I

14    will then instruct you on the law, and you will leave the

15    courtroom together to deliberate and render your verdict.  You

16    will never have to reveal your deliberations or explain your

17    verdict to anyone.

18          All right.  As I indicated, our normal trial day will

19    be from nine in the morning until one afternoon.  You might

09:25AM 20    wonder why we do it that way rather than going all day and

21    trying to get the case over with sooner.

22          One of the things we found over the years is the cases

23    don't really move much faster or any faster at all if we try to

24    go all day.  There's lots of reasons for that.  One of them is

25    that I have other work to do, sometimes on this case, sometimes

1    on other cases, and what happens is the jurors wind up sitting

2    around waiting while I attend to other business, which can be

3    very frustrating.

4         The lawyers know that jurors are tired and not paying

5    much attention in the afternoon often, and so they sometimes

6    will pad the case with witnesses that don't matter for late

7    afternoon because they know everyone just wants to get out of

8    there.  The cases tend to drag in the afternoon, so we're going

9    to go from 9 to 1, but to make this work, we have to be

09:26AM 10   disciplined about it.  We have to keep to a tight schedule.

11        I want to try to begin every day at 9:00 sharp, which

12   means, again, you say need to be here before that to make sure

13   we start on time.  We'll take a break at about 10:30, we'll

14   take another break at about noon.  Those will be as short as

15   possible to let you use the facilities and stretch your legs,

16   hopefully about five or ten minutes, and we'll go until one

17   o'clock.

18        If it looks like we're falling behind, I might require

19   an afternoon session or start a little earlier or go a little

09:26AM 20   later.  I won't do that without asking you to make sure you can

21   do it.  I understand that one of the advantages of quitting

22   every day at one, it's easier on jurors, it's easier for

23   parents of school-aged children, it's easier for people who

24   need to check in at their office at work, you may have made

25   other plans, so I'll check with you, but it's at least possible

1    we may need to do that.

2            When the time comes for you to deliberate, you'll meet

3    all day until you reach a decision.  It may not take that long,

4    but you should plan for that possibility when the time comes.

5            All right.  I have one final instruction before I turn

6    it over to the government for their opening.  Under our

7    Constitution, all persons are equal before the law.  Everyone

8    accused of a crime is entitled to a fair trial.  You should not

9    hesitate to convict if you believe that the government has met

09:27AM 10    its burden of proof.  You should not hesitate to acquit if you

11    think it has not, but you must be completely and scrupulously

12    open-minded, honest and fair.  That is your duty as jurors, and

13    that's your duty as citizens of the United States, so, again,

14    thank you for your patience and for your jury service, and we

15    will now hear from the government for its opening statement.

16            All right, Ms. Lawrence.

17                        OPENING STATEMENT

18            MS. LAWRENCE:  Good morning.  This case is about

19    MS-13, La Mara Salvatrucha.  You will hear that the four

09:29AM 20    defendants on trial, those four men seated at the tables behind

21    me are members of MS-13.  Understanding what MS-13 is about is

22    critical to understanding what this trial is about.  Put

23    simply, MS-13 is about violence, violence against rivals,

24    violence against snitches, violence against those who don't

25    respect MS-13 and the Mara.  MS-13 uses violence to eliminate

rivals, instill fear and control turf.

MS-13 is a criminal street gang with origins in Los Angeles and El Salvador and thousands of members spread across Central America, United States and here in Massachusetts.

Those members are organized into local subgroups called cliques.  You will hear that all four defendants are members of the Eastside Loco Salvatruchas or ESLS clique of MS-13.  Each clique has its own leaders called the first word and word or runners.  The leaders run clique meetings, collect dues from members, issue orders, take reports of violence committed by clique members, promote new members and mete out punishments.

You will hear that Herzzon Sandoval was the first word, and Edwin Guzman was the second word for ESLS, and Cesar Martinez and Erick Argueta Larios were full members or homeboys of the clique.

Each clique operates more or less independently under the larger MS-13 umbrella.  They make periodic reports to MS-13 in El Salvador and communicate with other cliques locally and regionally in the United States.  In many ways, the MS-13 clique is like a local McDonald's Restaurant independently owned and operated but part of a larger corporate enterprise, and like McDonald's markets itself with recognizable colors, logos and food names, MS-13 markets itself with colors,

numbers, hand signs, tattoos and gang names reflecting the

gang's purpose, origins and mission.

MS-13 members wear the colors blue and white

representing the country flags of El Salvador, Honduras and

Guatemala.  They use the number 13 representing M, the 13th

letter of the alphabet and the number 503, the area code for

El Salvador.

They flash the gang's hand signs representing the

letters M and S and the number 13 and the devil's horn to greet

each other and make themselves known to rivals, and many

literally brand themselves with MS-13 tattoos.

MS-13 members also take new names when they join the

gang, and you will hear those gang names used throughout this

trial.  Herzzon Sandoval is Casper.  Edwin Guzman is Playa.

Cesar Martinez is Checha.  Edwin Guzman is Lobo.

MS-13 also has rules, and those rules reflect its

violent purpose, attack and kill rivals on sight, kill

informants, beat or kill members who disobey or disrespect the

gang.  You will hear evidence in this trial that MS-13 members

did in fact attack and kill rival gang members, that they

wanted to kill informants, and that they did beat members who

broke MS-13 rules.

In other words, these rules were not mere talking

points, they were calls to action for all MS-13 members.  MS-13

demands absolute commitment and loyalty from its members.  A

1    person doesn't just casually join MS-13 and show up at the club

2    whenever he feels like it.  No, joining MS-13 is a commitment.

3    It's a process with prospective members moving up the ranks by

4    proving that they are all in for the gang, meaning that they

5    are ready, willing and able to take action and fulfill the

6    gang's violent purpose.

7          MS-13 rewards those who prove themselves worthy with

8    violence.  The gang initiates new members with the 13-second

9    beating by members of its own clique.  It also punishes those

09:33AM 10   who break gang rules by beating them for 13 seconds.  During

11   the trial, you will see a recording of an MS-13 initiation

12   ceremony, which they call a jump-in or a beat-in that took

13   place at an Eastside or ESLS clique meeting.  Casper, Playa,

14   Checha, and Lobo were all at that meeting.

15         Casper, the clique's leader, decided which homeboys

16   present would do the beating, while Playa counted out loud to

17   13.  You will also hear recordings of MS-13 members being

18   punished at clique meetings with 13-second beatings, and,

19   again, some or all of the defendants were present at those

09:34AM 20   meetings.

21         These and other recordings made by a cooperating

22   witness who infiltrated MS-13 will give you a front row seat to

23   the inner workings of the gang and the violence that was

24   committed and glorified on behalf of MS-13.

25         My name is Kelly Lawrence.  Seated at counsel table is

1     Christopher Pohl.  We represent the government in this case.

2     I'm here now just to give you an overview of the evidence

3     you'll hear at the trial so that you'll better understand the

4     facts and evidence that you'll have in light of the law that

5     the Judge will give you at the end of the case.

6          I said before that this trial is about MS-13, and it

7     is because MS-13 is a criminal enterprise engaged in

8     racketeering, and all four of these defendants on trial agreed

9     to be part of it, so you'll be hearing a lot about MS-13, the

09:35AM 10     Eastside clique, other local cliques and MS-13 members during

11     the coming weeks.

12          You'll also be hearing, of course, a lot about these

13     four defendants, what they did and what they said.  In fact,

14     you'll actually get to see what they did and hear what they

15     said because it was caught on tape.  The defendants' own words

16     and actions captioned on tape when they thought no one else was

17     listening.  Those recordings are in Spanish, but you'll have

18     English transcripts to read, and you'll also get to see some

19     video clips as well.

09:35AM 20          The recordings were made by what is called a

21     cooperating witness.  During this investigation, the FBI

22     identified an individual that it believed could infiltrate

23     MS-13 and collect evidence of the gang 's criminal activities.

24     For that to work, the individual had to make the gang believe

25     that he was one of them, that he was ready, willing and able to

1    commit to the gang and its violent mission, and it worked.

2         The cooperating witness succeeded in earning the trust

3    and the respect of the MS-13 members, and they felt comfortable

4    enough with him to talk freely about the gang and its criminal

5    activities.  He was so successful, in fact, that these

6    defendants jumped him into their clique.  They made him an

7    Eastside homeboy.  That gave the cooperating witness an

8    all-access back stage pass to the MS-13 criminal enterprise.

9    Those recordings made by the cooperating witness capture the

09:36AM 10    inner workings of MS-13, and they will leave you with no doubt

11    that all four of these defendants are guilty of the charged

12    racketeering conspiracy.

13         I've already told you a little bit about MS-13, the

14    gang, the enterprise, and now I want to focus on these four

15    defendants, Casper, Playa, Checha, and Lobo and their clique,

16    ESLS.

17         You'll hear that ESLS was a mature clique.  It had

18    been around for awhile, and its leaders, Casper and Playa, and

19    its members, Checha, Lobo and others were old.  Typically, with

09:37AM 20    maturity comes age, with maturity and age comes respect.  These

21    defendants thought so.  They thought they had earned respect

22    from MS-13 for the killings and violence that they had

23    committed in the past.

24         At an ELS clique meeting in October, 2015, Casper told

25    the members present, "There are many of us here who have

1   killed, homie, and we deserve their respect, and not to have

2   them trying to pilot us," but you will hear that MS-13 doesn't

3   rest on its laurels, it demands action that its members

4   continue to hunt down, kill and attack rivals, that it continue

5   to ferret out informants, keep members in line and protect

6   MS-13 turf.

7           The defendants knew this because they were told by

8   leaders in El Salvador that ESLS had to get with the program

9   literally, that they had to follow the rules and orders of the

09:38AM 10   regional East Coast Program, that they had to keep committing

11   violence and keep paying money to support the mission of MS-13,

12   and if they didn't, the MS-13 leadership would issue what's

13   called a green light in order to kill every member of the ESLS

14   clique.

15           Again, this is Casper speaking at the October 24, 2015

16   meeting.  What they said is that yes, they might actually

17   decide to give the green light for the clique, but, bullshit,

18   you can't do that because the clique here is already

19   established, homeboy.

09:38AM 20           In other recordings, you'll hear the defendants talk

21   about how they should respond to El Salvador's demands, tough

22   talk about quitting the East Coast Program, joining another

23   program or starting their own, but what you won't hear is any

24   talk about quitting MS-13.  Instead, you'll hear that the

25   defendants were fully committed to MS-13.

1          The recording made on December 6, 2015, "It's the same

2     barrio, MS-13.  The dude is going to the MS-13 barrio, homeboy,

3     and we belong to the MS-13."  Feeling their age and pressure

4     from El Salvador, the defendants ramped up their recruiting

5     efforts for the Eastside clique.

6          In December, 2015, a young member of the Everett Loco

7     Salvatrucha clique named Animal brutally murdered a rival gang

8     member in broad daylight on the streets of East Boston.  When

9     the defendants heard that Animal was unhappy with its own

09:39AM 10     clique because it had refused to promote him to homeboy for the

11     murder, ESLS scooped him up.

12          In early, December, 2015, Casper invited Animal and a

13     few of his young friends to come check out ESLS.  "As I was

14     explaining, homie, come by this area, homie, you'll meet all of

15     us, you know, you'll find out what we think as a group, homie,

16     and if your way of thinking coordinates with ours, then it's

17     great and everything will be solid, and we'll see what

18     decisions we will make because it's not only my decision, they

19     all have to check you out, too, you know."

09:40AM 20          During the next several weekends, Animals and his pals

21     checked out ESLS, and ESLS checked out them.  Eastside homeboys

22     Tigre and Brujo -- their pictures are on the chart -- took

23     these young guys out on missions hunting for rivals to attack

24     and kill.  By MS-13 standards, these missions were widely

25     successful, Animal and his crew committed two attempted murders

1    during his evaluation period, and he bragged about both of them

2    on tape, and Brujo and Tigre reported these violent acts to

3    Casper to make sure that Animal and young friends would get

4    credit for what they had done.

5        Casper, Playa, Checha and Lobo were also present for

6    the next Eastside meeting in early January, 2016.  The primary

7    topic of that meeting was Animal.  This meeting, like many

8    others, was recorded on audio and video, so you'll get a

9    transcript of what was said, and you'll see clips, video clips

09:41AM 10   of what they did.

11       You'll hear that the defendants all wanted Animal to

12   join ESLS so they could take credit for his murder.  As I

13   explained earlier, the murder of a rival gang member is like

14   the MS-13 golden ticket.  It earns the killer and his clique

15   respect from other MS-13 homeboys and cliques, and it proves

16   that you are solid with the gang.

17       Remember, before the defendants brought Animal into

18   the Eastside clique, ESLS was on shaky ground.  The leaders in

19   El Salvador were unhappy with Casper's leadership and the

09:42AM 20   clique's failure to pay dues and report violence, so much so

21   that they were thinking of issuing a green light or an order to

22   kill the entire clique.

23       Animal was the answer to that problem, and all of the

24   Eastside homeboys knew it.  Jumping Animal into the clique,

25   taking credit for his murder and recruiting the young friends

1   who were hungry to prove themselves on the street with acts of

2   violence would breathe new life into ESLS.

3        At that January meeting, Casper spoke to the assembled

4   members there, "now, look, I'm going to tell you something,

5   homie, we need the new generation of Eastside, and thanks for

6   the wisdom that we have gained over the years, homie, we have

7   to pass it along, dude, so that the new Eastside clique can

8   come and not think badly that we're going to fuck them over

9   because, shit, we are the Maras, and the fuckers here will fuck

09:42AM 10   it up, but what I am trying to say, that you guys are going to

11   be the next generation, that's what he's talking about, the

12   next generation of ESLS."

13        During this January clique meeting, you'll hear

14   Casper, Playa, Lobo and other Eastside homeboys strategizing

15   ways to hide Animal from the police.  They planned to rent him

16   a room in a safer neighborhood that didn't have as much police

17   heat on it investigating the murder he had committed, they

18   planned to bring him food so he could avoid being out on the

19   streets.  They told him to keep a low profile and deny his

09:43AM 20   MS-13 membership and the murder to any civilians or police that

21   he talked to, but if anyone from MS-13 asked, he was to say

22   that he did the murder, take credit for the murder, and, more

23   importantly, say that he did it for the Eastsides.

24        The gang also talked of getting Animal a job so he

25   could pay his own way and of smoothing things over with the

1    Everett clique, who was none too happy about having Animal

2    taken away from them.

3           Finally, at the end of the clique meeting, Casper

4    ordered Animal jumped in to the clique with a 13-second

5    beating.  Casper identified which homeboys would do the

6    beating, and Playa counted to 13.  You will see a video of that

7    beating later in the trial.

8           During the coming weeks, you'll hear more evidence of

9    the defendant's MS-13 membership and activities.  You'll hear

09:44AM 10   about other murders and attempted murders committed by ESLS

11   homeboys and other MS-13 members.  You'll hear about clique

12   guns that members used on missions to attack rivals and to

13   defend themselves from rival attacks.

14          You'll hear about Eastside members paying dues and

15   using money to pay human smugglers or coyotes to bring deported

16   clique members back to the United States.  Some of this

17   evidence, as we've already talked about, will be video clips

18   and transcripts of the defendant's own words recorded by the

19   informant who infiltrated the gang.  Some of it will be

09:45AM 20   physical evidence, like guns and pictures of crime scenes.

21   Some of it will be testimony from a witness who has expertise

22   and experience investigating MS-13, and he can tell you about

23   the gang's history, purpose, its operation, structure, symbols,

24   leadership and the like.

25          Some of it will be testimony from witnesses who

1    participated in the investigation of the gang's criminal

2    activities, and they can tell you about the steps they took to

3    identify these individuals and gather evidence of their

4    criminal activities, and some of it will be testimony from

5    MS-13 members who belonged to the defendant's own clique, who

6    committed violent crimes and who have pled guilty and admitted

7    responsibility for those crimes.

8         These cooperating witnesses were established Eastside

9    clique members.  They were homeboys, just like the defendants

09:45AM 10   in this case.  They knew the defendants for years.  They knew

11   who they are, they will tell you who they are, what they belong

12   to, and what they did.

13        Now, these witnesses, these MS-13 members, they

14   committed violent crimes, and one of them engaged in drug

15   trafficking.  Their records are far from pristine, but they

16   will tell you about what they did, they will tell you who they

17   did it with, and they will tell you why.  In short, they will

18   give you a view of MS-13 from the inside, and you will see that

19   their testimony matches up with the other evidence you'll hear,

09:46AM 20   the recordings, the physical evidence, and the testimony of

21   other witnesses.

22        I want to switch gears for a minute and talk to you

23   about the charges in this case.  The Judge explained to you

24   earlier, and I will not repeat it word for word but just a

25   quick summary of all four defendants.  Casper, Playa, Casper,

1   and Lobo are charged with conspiracy.  Two defendants, Checha

2   and Lobo, are also charged with conspiracy to distribute

3   cocaine.  The Judge will give you the law at the end of the

4   case, but I want to talk just about a few key terms that help

5   you evaluate all of the evidence you are about to hear.

6           First, "Conspiracy."  Conspiracy is just an agreement

7   to commit a crime.  In this case, all four defendants agreed to

8   join MS-13 and commit the crime of racketeering.  By there

9   agreeing to commit the crime of racketeering, the defendants

09:47AM 10  simply agreed that some member or some members of the MS-13

11  conspiracy would commit two or more racketeering acts.  The

12  defendants themselves did not actually have to murder or

13  attempt to murder or distribute drugs to be guilty of this

14  conspiracy.

15          "An Enterprise."  An enterprise is essentially an

16  organized group of people working together over time to a

17  common goal.  MS-13 is an enterprise.  It has an organized

18  structure, membership that changes a bit from time to time but

19  has with leadership, it has rules and it has a mission.

09:47AM 20      "Interstate Commerce."  The activities of MS-13

21  affected interstate commerce.  That is an essential element of

22  this crime.  You'll hear that the defendant made phone calls to

23  MS-13 members in El Salvador to discuss gang business and

24  activities.  You'll hear that the defendants collected money

25  from clique members to pay human smugglers to bring deported

 1   clique members back to the United States.  You'll also hear

 2   evidence of guns that were manufactured in other states and

 3   countries that ended up in the hands of the defendants and

 4   other ESLS members here in Massachusetts.

 5        "Racketeering."  There are a number of different

 6   activities that can be included in racketeering.  The ones

 7   you'll hear about in this trial primarily are murder, attempted

 8   murder and drug trafficking.

 9        You'll hear that members of MS-13 committed at least

09:48AM 10   two acts of murder, attempted murder and drug trafficking or a

11   combination of those on behalf of the MS-13 enterprise.

12   Separate from the racketeering conspiracy, Checha and Lobo are

13   charged with a drug distribution conspiracy.  This means that

14   they agreed with one or more other people to distribute

15   cocaine, and they took some affirmative step to make that

16   happen.

17        In this case, the FBI used an investigative technique

18   called a drug protection detail.  Essentially the FBI through

19   its cooperating witness offered the defendants an

09:49AM 20   opportunity -- sorry, the defendants and other members of

21   MS-13, as you'll hear, the opportunity to get paid for

22   protecting kilogram-size shipments of cocaine.

23        The evidence will show on separate occasions Checha

24   and Lobo both jumped at this opportunity.  They thought they

25   were being paid $500 to protect the delivery of kilograms of

1    cocaine from a source in Massachusetts to a buyer in

2    New Hampshire.

3         In fact, the FBI was in control of the entire

4    operation from start to finish.  You will hear that both of the

5    defendants on tape in the days leading up to the drug deals

6    confirming that they were ready, willing and able to commit

7    this crime.  Checha agreed to and did distribute 1 kilogram of

8    cocaine in February of 2014 and Lobo agreed to and did

9    distribute 5 kilograms of cocaine in December of 2014.

09:50AM 10        You'll also hear that other Eastside homeboys,

11   including one of those cooperating witnesses I talked about

12   earlier and other MS-13 members from different local cliques

13   participated in these drug protection details.  They agreed to

14   do the deal, they got paid to do the deal, and they

15   participated in the deal.  Those are the charges.

16        I talked about some of the evidence that relates to

17   those charges, and you will hear that and more during the

18   trial.  That evidence will prove that Checha and Lobo agreed to

19   distribute kilogram quantities of cocaine, and that evidence

09:50AM 20   will prove that Casper, Playa, Checha, and Lobo were members of

21   MS-13, that MS-13 was a criminal enterprise, and that all four

22   defendants agreed that some member or members of that MS-13

23   conspiracy would commit two or more racketeering acts.

24        At the end of this trial, my colleague is going to

25   stand before you, and he's going to ask you to return the only

1    verdict that is consistent with the evidence and the law, the

2    evidence you're about to hear and the law you'll be given by

3    the Judge, and that verdict is guilty.  Thank you.

4         THE COURT:  All right.  Thank you.

5                         OPENING STATEMENT

6         MR. IOVIENO:  Yes, Judge thank you.  Good morning,

7    ladies and gentlemen.  You just heard a theory, the

8    government's theory of the case, and with any theory, there's

9    always two sides to a story.

09:51AM 10    My name is Thomas Iovieno, and I represent

11   Mr. Erick Argueta Larios.  Mr. Larios is 33 years old.  He's

12   from El Salvador.  He has a family.  He has three children.

13   His mother still lives in El Salvador.  He has a son.  He's a

14   father.  He has a sister who lives in Massachusetts.  He lives

15   and works in the community of Everett.

16        Mr. Larios worked for a company picking up trash,

17   Russell Disposal, and he also worked for a landscaping company,

18   and Mr. Larios is from El Salvador, and Mr. Larios came over

19   here when he was 13 years old, and when you are 13 years old

09:52AM 20   and you come from a foreign country and you don't speak

21   English, you have a tendency, and it's only normal, that you

22   hang around with people your own age from your own culture who

23   share your own interests, and that's what Mr. Larios did.

24        He's 13 years old.  He speaks very little English, and

25   he finds himself on the streets of Everett and Chelsea, and he

1    hangs around with people his own age in this group, and this

2    group, the government called them Eastside, and I'm not going

3    to dispute that, there are a group of young men, this is like

4    in the year 2000, and they do things.  They smoke marijuana,

5    they drink, they walk around as a group because they feel a

6    little bit more empowered acting as a group together, and they

7    get in fights.

8         They get in fist fights with other rivals, and they

9    protect their so-called neighborhoods, and that's what they did

09:53AM 10   as teenagers, and as time goes on, these men grow up, they have

11   families, they have children of their own, they own houses,

12   they work in the community.

13        And now in 2012, 2013, 2015, they're 30, 40 years old,

14   and they're established in our community, and they still hang

15   out together, they're still friendly.  They drink, they smoke,

16   they go to bars, they get in fights, but these group of men,

17   and, in particular, Erick is preoccupied with living his life

18   with his children and his family.

19        You're going to hear that Erick is not around that

09:54AM 20   much during these so-called meetings, that, in fact, people are

21   wondering where Erick is.  Erick is busy with his family, he's

22   busy working.  Does he show up to some meetings?  Sure, he

23   does.  They hang around in the garage.  The government calls

24   them meetings.  They hang around, they smoke marijuana, they

25   play cards.  They're older men.

1          So, is there MS-13 around in the United States?

2     Absolutely.  Okay.  And the government was concerned about

3     MS-13 around 2012, maybe a little bit earlier, they start

4     focusing because MS-13 is throughout the entire country.  It's

5     around here in Massachusetts, but with these group of men, with

6     Erick, in particular, as he's gotten older, as he's aged and

7     taken care of his family and working in the community, they're

8     resisting all this outside pressure.  They're resisting,

9     they're not joining, they're not following orders, they're not

09:55AM 10    following rules.

11          They're older, and they want to separate themselves

12    and disassociate themselves from what's going on, the violence

13    that they hear about, and you're going to hear a lot in this

14    case, a lot of talk about after the fact things.

15          For instance, you read in the newspaper and you hear

16    about something, you may talk about it at work or at school,

17    not unlike what these gentlemen did.  They hear about things on

18    the street, and they talk about it.  It's only normal to talk

19    about things, and that's what they did.  They talked a lot

09:56AM 20    about things, but there's always a major problem around this

21    period of time is that these men from El Salvador, the

22    government paints everybody from El Salvador with a broad

23    brush, all these men from El Salvador must be MS-13.

24          But what they're doing is hanging out as a group,

25    talking about what's going on in their community, and part of

1    that is murders that occurred, part of that is stabbings, part

2    of that is violence on the streets, and they talk about it, but

3    what you're going to hear, it's all after the fact with these

4    gentlemen, and what is going on is they're trying to

5    disassociate themselves from the violence that they're hearing,

6    but there's a fine line in doing that.

7          In order to do that, you have to embellish a lot, you

8    have to exaggerate, you have to appear to be in the loop and

9    understand what's going on in the community, but what these men

09:57AM 10   didn't do and Mr. Larios didn't do was participate in it, okay.

11         Then in 2012 is a critical time because the

12   government, FBI, what they decide to do is to recruit some of

13   them to come up and infiltrate in Massachusetts MS-13, so they

14   find a guy.  His name is Pelon, Cooperating Witness Number 1.

15   You'll hear that throughout this trial.  Pelon is a convicted

16   drug dealer from Miami.  He's deported back to El Salvador.

17   While he's back in El Salvador, the FBI recruits him, we need

18   you to come up and infiltrate MS-13 in Massachusetts.

19         So they give him an enormous amount of money, hundreds

09:58AM 20   of thousands of dollars in housing, hundreds of thousands of

21   dollars in immigration benefits for himself and his family

22   who's in El Salvador, and the government brings them here, too.

23   They set him up here, they give him a job, they buy him a car,

24   so Pelon comes up here, and he starts going into the

25   neighborhoods and trying to befriend people, certain people,

1    and there's other cliques that the government has talked about.

2    There's other cliques, the Everett clique, the East Boston

3    clique, Molinos, younger members that Pelon could not get

4    inside because they were just too young.

5         So what does he find?  He finds these men who are

6    hanging around a garage smoking marijuana, and he gets in

7    because he gives them drugs, okay, and befriends them, okay,

8    but he's also got a problem because he's got all this money

9    coming in.  His family is being supported, his family has been

09:59AM 10    delivered from El Salvador, he is living now in the

11    United States where he was deported from, okay.

12         But in 2012, he's talking with these men from

13    Eastside, and nothing is going on.  There's no real violent

14    crimes being occurred, so Pelon decides with the help of the

15    FBI, I've got to turn the heat up here.  We have to get these

16    men to do some things because this investigation started maybe

17    earlier than 2012, it went on for three or four years, so Pelon

18    goes out, and he goes to these other cliques, and he recruits

19    these other members, and you heard the reference to "Animal."

09:59AM 20         Animal is not a member of Eastside.  He doesn't hang

21    around the garage.  They don't even know him, and he goes out

22    with Animal, and he goes out with some other people, and they

23    participate along with the government informant in attempted

24    murders, in stabbings, in drug deals, in violent crimes, and

25    what you're going to hear is Pelon then comes back to the

1    garage during these meetings, and he's got a wire on, and he

2    has video on his hat, and he comes in because he wants these

3    men to talk about this stuff.  He wants to bring this crime

4    that he's out there participating in, he's out there doing this

5    stuff, too, okay.

6          And he participates in armed robberies of restaurant

7    delivery people during the investigation, and he brings that

8    back to these men in Eastside, and he talks about it, and

9    you're going to hear him talk about it, okay.

10:00AM 10    And over and over and over again in this case, the

11   common denominator that brings this crime back to these

12   gentlemen, these men in the garage smoking marijuana, getting

13   in some bar fights, is CW-1, Pelon, he's the one bringing it

14   all back because he's motivated, my whole family is here, my

15   ticket to freedom in the United States is I have to produce,

16   and he wasn't producing, so he went out and he created the

17   crimes.  He went out with the other members to the other

18   cliques and did things.

19          Then you're going to hear in this case, you're going

10:01AM 20   to hear from the government calls them cooperating witnesses,

21   other individuals, CW-7, who's a gentlemen called Tigre, CW-11

22   who is a gentlemen Muerto, and CW-2, who is someone called

23   Clacker.  Those are their names.

24          When you hear from them, consider their motivations

25   when they testify because these gentlemen were also given money

1    by the government, housing, and, most importantly, protection

2    and immigration benefits.  They don't have to go back to

3    El Salvador, they get to stay here, so consider when you hear

4    their testimony, and the government calls them confidential

5    witnesses and confidential informants, but there's another word

6    for them.  They're called rats, okay, and rats will say

7    whatever they want to say because they're getting benefits, so

8    consider what they say when you hear this case.

9           This is a case that's built on the backs of rats,

10:02AM 10   okay, and these are people who have infiltrated CW-1, where

11   these men hang out and got them to talk about things, and talk

12   in and of itself is not a crime, and you have to ask yourself

13   when you hear the evidence in this case, ask yourself with

14   respect to Mr. Larios, ask yourself what did he actually do?

15   Okay.  What did Mr. Larios actually commit, and did he actually

16   do any crimes in this case?

17          Then ask yourselves what did he know about fully,

18   fully know about prior to the acts the government is going to

19   talk to you and present evidence about?  What did Erick fully

10:03AM 20   know, not partially know, what did he fully know?

21          Then the other thing you are going to ask yourself

22   that will lead to the ultimate verdict in this case of not

23   guilty is what did he agree others would do?  And ask yourself

24   those three simple questions and think about those as the

25   evidence comes in.

1            At the end of this case, I'll have an opportunity to

2    address you again and address you and argue from the evidence

3    that comes in, and at the end of this case, I believe they'll

4    be no other conclusion that Mr. Larios is not guilty of these

5    crimes.  So I thank you in advance for your attention and your

6    service.  Thank you.

7            THE COURT:  Thank you.  Mr. Murphy.

8            MR. MURPHY:  Thank you, your Honor.

9                        OPENING STATEMENT

10:04AM 10       MR. MURPHY:  Good morning.  My name is Marty Murphy.

11   It's my privilege to represent Herzzon Sandoval, who's standing

12   here with my colleague Madeleine Rodriguez.

13           Let me start by putting up a list.  It's a list of 10

14   crimes.  We'll get it in focus here.  Trafficking in narcotics,

15   murder, assault with intent to murder, attempt to murder, armed

16   assault with intent to murder, conspiracy to commit murder,

17   armed robbery, armed assault with intent to rob, attempted

18   robbery, and conspiracy to rob, 10 crimes.

19           Why have I mentioned 10 crimes?  As you heard from

10:05AM 20   Judge Saylor, Mr. Sandoval is charged in this indictment with

21   only a single crime, but it's a complicated crime, the crime of

22   conspiracy to commit racketeering.  He's accused of agreeing to

23   participate in the conduct of the affairs of an enterprise

24   through a pattern of racketeering acts.  That's a mouthful.

25           I want to focus this morning on the last part, the

1　last five words in that definition, a pattern of racketeering

2　acts because, as you heard from the Judge, a pattern requires

3　proof of these crimes.

4　　　　Those are the crimes that are charged in the

5　indictment, crimes related to drug trafficking, crimes relating

6　to murder and attempted murder, crimes relating to robbery and

7　attempted robbery, and I respectfully suggest that when the

8　PowerPoint slides are over and the dust settles and you have an

9　opportunity to hear the evidence from live witnesses subject to

10:06AM 10　cross-examination, what you will see is that there is no

11　credible, believable evidence that Mr. Sandoval personally

12　committed in any of those crimes, drug trafficking, attempted

13　murder, robbery or attempted robbery, that there is no

14　credible, believable evidence after the dust settles, after the

15　cross-examination is done that Mr. Sandoval agreed to commit

16　any of those crimes and that there will be no credible,

17　believable evidence after the dust settles, after the

18　cross-examination is done that Mr. Sandoval agreed to

19　participate in a conspiracy, an agreement, where those crimes

10:07AM 20　would be committed.

21　　　　In fact, the evidence will show quite the opposite.

22　The evidence will show that in 2015 because Mr. Sandoval was

23　not with the program of MS-13 led by East Coast individuals in

24　Virginia and by others in El Salvador, those leaders said they

25　had enough, he wasn't doing what they wanted him to do, and so

they decided that he needed to be killed, to be killed.

You'll hear that the FBI thought that threat was quite credible enough that on September 3rd, 2015, they went to Mr. Sandoval and told him, "MS-13 wants to kill you."  Why? The evidence will show because he did not agree to commit the kind of acts that MS-13's leadership in El Salvador wanted him to commit.

You will hear that even after he was warned, even after the FBI explained what they thought would happen to him, he persisted in refusing to commit the kinds of crimes on the list that I read earlier.

And, again, in December, 2015, the leaders in El Salvador had had enough with this do nothing group, and, again, the evidence will show they ordered that he be killed.

You will hear that there were some things that Mr. Sandoval did agree to do, and there's some things you're not going to like, I'll tell you that in advance.

You'll hear, for example, that Mr. Sandoval agreed to help raise money to bring his fellow countrymen from El Salvador into the country illegally.  We concede that. There's no doubt about that at all, but it's not one of the crimes on the list of 10 crimes charged in the indictment, and when the dust settles, I respectfully suggest that there will be no evidence that Mr. Sandoval committed any of those crimes personally, agreed to commit any of those crimes or entered

1      into an agreement or a conspiracy that those crimes would be

2      committed.

3              Now, you will in the course of this case have an

4      opportunity to compare and contrast what the evidence shows

5      about what Mr. Sandoval did and agreed to do with what the

6      evidence showed that others agreed to do and did do, and that

7      will give you a case study in what the difference is between

8      someone who does not agree to enter into a conspiracy to commit

9      those 10 crimes and what someone, what the evidence looks like

10:10AM 10   when someone does.

11             The individuals that you see to agree to commit those

12     crimes, Mr. Iovieno mentioned some of them.  Let me put this

13     next list up.  We'll start with the man Mr. Iovieno began

14     talking about.

15             You know, sometimes the evidence that speaks the

16     loudest is the evidence that people don't mention, and the

17     government didn't say very much about CW-1, Pelon, or as the

18     government agents called him Mako during the course of opening

19     statement, and what you will hear about CW-1, Mr. Iovieno

10:11AM 20   mentioned some of this, in 2012, Pelon was living in

21     El Salvador.

22             He was there because he had been here in the

23     United States and had been convicted of drug trafficking and

24     been sentenced to a 10-year sentence and was deported back to

25     El Salvador, but you'll learn that the FBI was not content to

leave him there.  Instead, they went to El Salvador and brought him back to Boston.

In 2013, 2014, 2015, 2016, they paid him benefits amounting to $200,000.  They set him up with housing, they gave him a car, they helped him get a driver's license, and his job, his job was to try to collect evidence against MS-13 in Boston, East Boston, Chelsea, Revere, but there was a catch.

You'll hear that in order to get those benefits, Pelon promised, and this is something the government didn't tell you about, he promised that he would not commit any crimes.  That's the deal, we set you up, you collect evidence, but you can't commit any crimes without specific authorization from the FBI.

You will see what happened here, and when you see that, you will see what it looks like for there to be hard evidence of conspiracy to commit murder and conspiracy to rob.

Let me start with conspiracy to rob, and you're going to hear in this case about a second individual, Clacker. Clacker, you'll hear, is a young man from Chelsea.

Pelon, the government's informant, working for the FBI pulled the wool over the FBI's eyes completely.  The evidence will show they dropped their ball.  They had their head in the sand, and so while he was supported by the FBI, he recruits Clacker and other young men to go out and rob cab drivers in East Boston, Chelsea, Everett.

You'll hear that in the winter of 2014 and 2015, Pelon

3-62

and Clacker and other young men, not Mr. Sandoval or any of

these men here, robbed somewhere between 30 and 40 cab drivers.

This is the guy that's working for the FBI.

The average take, a good night, $1800 plus they would

steal the driver's cell phone and sell them and split the

money.  The FBI was asleep at the switch, the evidence will

show, and when you look at what Pelon did with Clacker, you'll

see what real evidence looks like of a conspiracy to commit

armed robbery.  These were robberies committed at knifepoint,

and you're going to hear at least one of them, one of the cab

drivers was stabbed.

If you want to see evidence of what conspiracy to

commit attempted murder is, one of the crimes on those 10

lists, you're going to hear about events that took place on

May 27th, 2015, again, none of these defendants and certainly

not Mr. Sandoval were anywhere near what happened on May 27th,

2015.

But you'll hear that there was a call, that there were

some members of a gang called 18th Street hanging around in

Highland Park in Chelsea, and the call to another one of the

men on the government's witness list, Muerto.

Muerto was with Pelon, the FBI's guy, the cooperating

witness.  Muerto said, "I don't know a lot of people over

there, I'm not sure that's a good idea."  Pelon, the

government's man says, "No, we're going."  He calls someone to

1    get a knife, and together three men, none of these defendants,

2    go to Highland Park in Chelsea, and you'll hear what happened

3    next.

4         Pelon, the government's man, knocks down an individual

5    named Minor Ochoa, Muerto stabs him, perhaps even while Pelon

6    is holding him down.  That's what evidence of a conspiracy to

7    attempt murder looks like, and it won't be evidence you hear

8    about Mr. Sandoval or these defendants, it will be evidence

9    about what the FBI's own agent did with the other individuals

10:17AM 10   who are going to be cooperating with the government in this

11   trial.

12        Then there's Animal, Joel Martinez.  You heard the

13   government talk about Animal, and, again, sometimes the

14   evidence that speaks the loudest is the evidence that someone

15   doesn't tell you about.

16        You will hear that on September 30th, 2015,

17   Joel Martinez did commit a homicide.  I think we may hear about

18   that later today.  What the government didn't tell you is that

19   in early October, less than two weeks after he committed that

10:17AM 20   crime, he told Pelon, the government's informant about it.

21        It's on videotape, and on October 22nd, 2015, less

22   than two weeks after the murder of Mr. De Paz, the victim in

23   that homicide, the FBI knew that Mr. Martinez was a dangerous

24   killer.

25        Did the FBI say, "Okay, let's arrest him?"  No, they

1    kept him on the street, and you will hear that even though the

2    FBI and Pelon knew where he was, they let him walk around, and

3    so you will see that on December 27, 2015, when Animal is out

4    walking around with another one of the government's witnesses,

5    CW-7, Tigre, they find a rival gang member, Animal, the man the

6    FBI has let walk around, stabs him, and Tigre helps.

7         That's what a conspiracy to commit murder looks like,

8    and it's not these men, it's not Mr. Sandoval, who are

9    responsible, it was Pelon, it was Joel Martinez, it was Muerto,

10:19AM 10    it was Tigre.

11         What the evidence in this case in the end will show is

12    that Mr. Sandoval did not agree to commit any of the crimes on

13    that list of 10, and he did not enter into a conspiracy, an

14    agreement that any of those crimes would be committed.  You'll

15    see the individuals who are guilty of those crimes.

16         You'll have an opportunity to evaluate their testimony

17    when they make accusations against other people, and you'll see

18    that what happened here is the FBI brought a man back from

19    El Salvador, they paid him $200,000 in benefits during the

10:20AM 20    three years that he was working for them.  After, after they

21    found out that he had committed these robberies, did they say

22    we made a deal, you didn't keep your part, we're prosecuting

23    you for those armed robberies?  No, they kept him on the

24    street.

25         And, in fact, you'll hear that in 2017 alone, the FBI

1    and the government spent $300,000 in addition to the 200,000

2    they had already spent to relocate him and 18 family members,

3    18 of his family members that they brought from El Salvador.

4         CW-1, Pelon is the great instigator in this case.  He

5    is the central figure in this case, and when you hear the

6    evidence, I'll ask you to focus on his actions, and I'll ask

7    you to bear in mind the central question from Mr. Sandoval's

8    perspective that I'd ask you to focus on, where is the evidence

9    that he participated in any of these crimes?  Where is the

10:21AM 10   evidence that he agreed to participate in any of these crimes,

11   and where is the evidence that he agreed to join a conspiracy

12   where these crimes would be committed?  I suggest to you that

13   in the end, I'll be able to return to you and ask you to render

14   a verdict of not guilty.  Thank you very much.

15        THE COURT:  All right.  Thank you.  Let's do one more,

16   and then we'll take our break.  Mr. Lopez.

17                      OPENING STATEMENT

18        MR. LOPEZ:  May it please the Court, ladies and

19   gentlemen of the jury, this is Edwin Guzman.  In the eyes of

10:22AM 20   the law, Mr. Guzman is presumed innocent because he is

21   innocent.

22        I saw the looks on your faces when you heard the words

23   "RICO conspiracy," and it's true that Mr. Guzman is accused of

24   conspiring to commit racketeering acts.  Specifically the

25   indictment alleges that each defendant agreed that a

1      conspirator would commit at least two racketeering activities.

2            What the Court has told you that Mr. Guzman is

3      presumed innocent of this single charge, and the evidence will

4      show that Mr. Guzman is innocent of this single charge.  The

5      evidence will show that Mr. Guzman never agreed to commit any

6      racketeering act.  The evidence will show that Mr. Guzman never

7      agreed with anyone else that they would commit racketeering

8      acts.  The evidence will show that Mr. Guzman is innocent of

9      the charge in the indictment.

10:24AM 10            Now, we've all heard the maxim, "Actions speak louder

11      than words."  This general truth means that what you do is more

12      important than what you say because the things you do show your

13      true intentions, and that's what this trial is all about,

14      ladies and gentlemen, a search for the truth, a search for

15      Mr. Guzman's true intentions.

16            As you listen to the evidence in this case, I ask you

17      to keep an open mind until you've heard all of the evidence in

18      this case.  I ask you to pay particular attention to the

19      evidence that concerns Mr. Guzman.

10:24AM 20            Mr. Guzman is tried here as an individual.  Your job

21      is to find the truth as it relates to him.  You will hear a lot

22      of evidence in this case about what other people did and what

23      other people said.  Mr. Guzman is not responsible for anything

24      that anyone else did or anything else someone said unless the

25      government convinces you beyond a reasonable doubt that he

1      agreed to be a member of the conspiracy.

2              As you listen to the evidence, I want you to pay

3      particular attention to what Mr. Guzman does.  Now, I'm not

4      asking you to ignore what he says, rather, I'm suggesting to

5      you that to find the truth in this case, you need to focus on

6      what he does.

7              What he does will give you a window into his state of

8      mind.  For example, you'll hear that he refused to go on those

9      drug protection details.  You'll hear that he refused to buy

10     illegal guns.  You'll hear that he refused to go out looking

11     for rival gang members, and the evidence will show that

12     Mr. Guzman resisted Pelon's pressure.

13             Now, who is Mr. Guzman?  Mr. Guzman is an American

14     citizen.  He's a good son.  He's a good husband.  In May of

15     2015, he married Evelyn Torres.  In 2006, he became a father

16     for the first time.  In 2013, he became a father for the second

17     time.  He has two girls, age 12 and 4, and his family is here

18     today.  Could you please stand up.  That's his wife Evelyn and

19     his daughter.

20             Now, Mr. Guzman is a good family man.  He's hard

21     working.  He has a great work ethic.  In fact, in 2015, he made

22     over $70,000 driving a commercial vehicle.  He owns two homes

23     in Revere.  In one home, he lives with his mother, his children

24     and his wife.  The second home he owns, he rents out.

25             Prior to the indictment in this case, Mr. Guzman was

1    building a wonderful American life.  He was living the American

2    dream.  In this case, the government has alleged that

3    Mr. Guzman agreed to be a member of this conspiracy.

4         Well, what is a conspiracy?  A conspiracy is an

5    agreement, an agreement to do something illegal.  But what is

6    an agreement?  Boiled down to its essence, an agreement is a

7    promise, a promise to do something.

8         For example, if I promise with you to commit a bank

9    robbery, I've entered into a conspiracy with you, but what is a

10:27AM 10    promise?  A promise is a communication.  It can be verbal or it

11    can be in writing, but the communication should be clear and

12    unambiguous.  The words that are used when we make a promise

13    are very important.  A promise also tells us about our

14    intentions.  Well, what's intent?  Intent is a state of mind

15    that represents a commitment to do something, and when we say

16    that when someone does something to achieve a particular goal,

17    his behavior was intentional.

18         So, what intentions are communicated when someone

19    makes a promise?  The words we use in a promise communicate two

10:28AM 20    intentions.  First, the speaker communicates an obligation to

21    do something in the future, assuming he's telling the truth,

22    and, second, the speaker communicates to the listener that he

23    is placing himself under an obligation to do something in the

24    future.

25         Now, with these concepts in mind, what will the

1    evidence show in this case?  Well, first off, you will not hear

2    a single shred of evidence, of direct evidence, that Mr. Guzman

3    agreed to do any racketeering acts.

4         Let me repeat that.  You will not hear any direct

5    evidence that Mr. Guzman agreed to do any racketeering acts.

6    In other words, the government's not going to put a witness up

7    on the stand who's going to say on a certain date, I sat down

8    with Mr. Guzman, and we agreed together that we were going to

9    go out and commit racketeering acts.  You're not going to hear

10   any of that.

11        In fact, you will not hear any evidence that

12   Mr. Guzman promised to commit murder or attempted murder or

13   armed assault or any other racketeering act, and Mr. Guzman is

14   not charged in the conspiracy to traffic in drugs.

15        So what will you hear?  You will hear that the

16   government manufactured a sting operation to gather

17   incriminating evidence on Mr. Guzman.  Well, how did they do

18   that?  Well, Mr. Murphy has already gone into great detail

19   about that, so I won't repeat that and waste our time, but who

20   is Pelon?

21        Everyone is familiar with the story of original sin in

22   the bible.  That's the one where Adam and Eve are in the garden

23   of Eve, and God says to Adam and Eve they can eat from any tree

24   in the garden except for one, and then a serpent comes along

25   and tricks Eve into eating from the forbidden tree, eating the

1  forbidden fruit, and then she shares them with Adam, and

2  together they both disobey God's law.

3      Well, ladies and gentlemen, Mr. Pelon, CW-1, is a

4  serpent in this case.  Over a period of two years, CW-1 tried

5  to get Mr. Guzman to commit racketeering acts.  He tried to

6  pressure him into committing racketeering acts.  For two years,

7  Mr. Guzman resisted Pelon's lies and pressure.

8      Now, you've already heard from the government that

9  CW-7, Mauricio Sanchez and CW-7, Jose Hernandez-Miguel, were

10:31AM 10  not so strong, they gave into CW-1's lies, they gave into his

11  pressure.  They committed some of the racketeering acts alleged

12  in this indictment and, you know, that they say a leopard can't

13  change his stripes, neither could Pelon, and, again, Mr. Murphy

14  has gone into the different acts and crimes that he committed

15  while he was working for the government, while he had promised

16  the government that he would not be committing criminal acts.

17      And even when he wasn't prosecuted for these

18  robberies, he was put into the witness protection program and

19  everyone then he couldn't resist a life of crime.  He violated

10:31AM 20  the terms of the witness protection program and was kicked out.

21      Now, the government will ask you to you focus on what

22  other people did and said.  The government will present

23  evidence that other people, people other than Mr. Guzman

24  committed racketeering acts, but keep in mind that what other

25  people did and said was in response to Pelon's lies and also

1    keep in mind the Court's instruction that associating with bad

2    people is not a crime.

3         Now, you'll also hear some evidence that Mr. Guzman

4    has a tattoo that says MS-13, but the government will not

5    present you with any evidence about this tattoo.  You will not

6    hear the circumstances under which he received this tattoo.

7         Most importantly, you will not hear any evidence from

8    the government about what promises, if any, Mr. Guzman made

9    when he got this tattoo.  The context is important, ladies and

10:32AM 10   gentlemen.  Why Mr. Guzman has a tattoo is important, and it's

11   the government's burden, not Mr. Guzman's, to explain why he

12   has a tattoo.

13        As you listen to the evidence in this case, ask

14   yourself what did Mr. Guzman know and when did he know it?

15   When did Mr. Guzman learn that others had committed

16   racketeering acts?  Also, listen to the evidence and please

17   focus on the evidence as it relates to Mr. Guzman.  In short,

18   listen to the evidence and ask yourself what promises did

19   Mr. Guzman actually make?  What did he know, when did he know

10:33AM 20   it, and, most importantly, what did he actually do?

21        At the conclusion of this trial, I'm going to ask you

22   to save Mr. Guzman from the single charge against him by

23   finding facts and applying the law, by upholding the most

24   fundamental constitutional protection we have, the presumption

25   of innocence, which you have taken an oath to do.  This is the

1    great calling of an American jury, to find the truth, to speak

2    the truth, to do justice, to find an innocent man not guilty.

3         THE COURT:  All right.  Thank you, Mr. Lopez.  Ladies

4    and gentlemen, we're going to take a break.  Again, my plan

5    every day is to take two breaks.  The shorter the breaks, the

6    faster this trial will go.  I know there's 16 of you.  We have

7    to get you up the stairs and in and out of whatever facilities

8    you need to use, but I'll ask you let's make this as quick and

9    efficient as we can to keep the trial moving every day, so we

10:34AM 10   will take a break.

11        THE CLERK:  All rise.

12        (A recess was taken.)

13        THE CLERK:  All rise.

14        THE COURT:  I already have a note from a juror.  It's

15   from JH.  I forget who she is but, the note reads as follows:

16   "One of the defendants, Erick Argueta, works for the Russell

17   Disposal Company that comes to my house.  I'm always walking at

18   the time of removal.  JH, Wilmington."  She is the juror in

19   seat 11, 54.

10:47AM 20        What I would propose to do is call her to sidebar.  I

21   obviously don't want to say that the defendant is detained but

22   simply say he is not working for the Russell Disposal Company.

23        MR. IOVIENO:  That's fine, your Honor.

24        THE COURT:  Does anyone have a different idea?

25        MR. MURPHY:  I think there are three of us who

1     represent individuals who work for Russell Disposal.

2          THE COURT:  Well, she asked about Argueta, I'll answer

3     that question.

4          MR. IOVIENO:  Yes.

5          THE COURT:  I'll mark her note as Exhibit A.

6          (Exhibit A marked for identification.)

7          THE CLERK:  All rise.

8          (JURORS ENTERED THE COURTROOM.)

9          THE COURT:  Ms. H, can I see you quickly at sidebar.

10:51AM 10     (THE FOLLOWING OCCURRED AT SIDEBAR:)

11          THE COURT:  You had passed me a note asking or

12    indicating that Defendant Argueta worked for Russell Disposal

13    Company.  He is not now working for the disposal company.  I'm

14    inferring if you wondered that you might see him or something.

15          THE JUROR:  Or may have.

16          THE COURT:  Or may have in the past, which I don't

17    think is an issue either, but, suffice to say, he is not now

18    working for the company.

19          THE JUROR:  I just wanted to make sure.  I knew from

10:51AM 20    prior.

21          THE COURT:  Okay.  Thank you.

22                         - - - -

23          THE COURT:  Do you need a ruling?

24          MR. POHL:  Sure.  I had a more practical question.

25    Can you tell the jurors that the screens pop up.  We didn't do

1    that.  I don't think we would want it for the stuff coming up,

2    if you have a ruling.

3            THE COURT:  My ruling is going to be I think the

4    picture of his face is not particularly relevant to anything,

5    unless there's an identification issue, so that's point 1.  So

6    the stab wounds I'm going to allow in.  It seems to me that in

7    this context, anyway, they're not unduly inflammatory even

8    though these defendants are not excused of a particular murder,

9    and I don't want the information unduly sanitized either at the

10:52AM 10   other extreme, so I think they should not be excluded under

11   Rule 403 but I will exclude it under 101.1.

12           MR. POHL:  Are you going to give a limiting

13   instruction that they are not alleging that any of these four

14   individuals participated?

15           THE COURT:  That's way too complicated to do, so I'm

16   not going to give that instruction.

17           MR. POHL:  Thank you, your Honor.

18           (SIDEBAR CONFERENCE WAS CONCLUDED.)

19           THE COURT:  Ladies and gentlemen, before I forget,

10:53AM 20   those of you in the back row also have screens.  They pop up in

21   between you.  One thing you all should know is sometimes one of

22   these screens or all of them will go blank for no reason.  You

23   know, it's government equipment, so just raise your hand, we'll

24   try to deal with it.  If necessary, we can move you around.

25           All right.  Mr. Norkunas.

OPENING STATEMENT

MR. NORKUNAS:  Thank you, your Honor.  Good morning, ladies and gentlemen.  I'm Stan Norkunas, and in these proceedings, I represent Cesar Martinez.

Cesar Martinez currently is age 37 years old.  He's a gentleman that came to this country in 1999 when there was a disaster in El Salvador and we were accepting refugees into this country.

He came in, he settled in, he settled into the Chelsea area.  He established work, a history for himself, he established a family for himself.  He was reporting on a yearly basis on appropriate forms to the immigration authorities an order under refugee status to be able to work, you have to obtain a social security number, and you have to obtain authorization to do so, and you will hear, I believe in this particular case, that each year he filed those appropriate forms, he obtained his work authorization each year, and then he went out and he did work and, he filed his taxes every year accordingly because, again, he had a social security number assigned to him and could do that.  It was an aspect that he did do.

At some point in time, he and his wife separated, but he obtained custody of their daughter Samantha.  Samantha at this point in time is 15 years old.

Now, Mr. Martinez took on work as a mechanic.  In this

1    particular case, you're going to hear about ESLS was meeting

2    after or starting approximately in 2014 in a garage in Everett.

3    Prior to that date, I believe the evidence is going to show you

4    they had met at several different locations.  They moved over,

5    a group of young men from El Salvador, decided that was an

6    appropriate place to do so.  He was still running or part of a

7    mechanical business that's in there.

8         One of the videos you're going to see and a witness

9    from here that will show you meeting of a group of young men

10:56AM 10   within there.  It's clearly identifiable as a functional and

11   working garage, tires for sale on one side, schedules you'll be

12   able to see when someone is having a discussion with someone

13   else, one of the big tool chests, the red chests, they're

14   moving it out of the way.  There's even a discussion at some

15   point in time prior to Animal coming in there, is this an

16   appropriate person that should be in there?

17        Now, there's a dispute as to -- there may be a dispute

18   as to who actually makes the statement, but CW-1, Mr. Pelon, is

19   telling the group we've had a problem here because Mr. Martinez

10:56AM 20   doesn't want us to bring this type of person into our shop

21   because it's going to affect his business, it's going to close

22   him down, he's going to go out of business itself, and,

23   further, you'll understand from what Pelon said, he had been

24   having that discussion for a couple days with Mr. Martinez

25   about being able to come into that shop under those

1   circumstances and further says Mr. Martinez has been having a

2   problem with us bringing us in these young kids who are wild

3   and doing crimes.

4        This is the type of individuals that Mr. Martinez is.

5   You're also going to find out, he can stand up today, but I'm

6   not going to have him do that, he has no tattoos, and, again,

7   he's five foot four.  His physical stature is not substantial.

8        The evidence the government will ask you to believe in

9   this particular case is basically audio recordings, and you're

10:57AM 10  going to hear they were very difficult to translate.  They're

11  all in Spanish, and, again, any group of individuals, whether

12  they be male, female, old, young, you put them in an enclosed

13  environment, and everybody starts talking.

14        There's conversation from here, from here, from here.

15  You're going to hear it's the government trying to come up with

16  a package, a transcription of this.  It was an evolution

17  because, as you would expect, young men, limited education

18  coming up from a foreign country, they're going to have a

19  particular dialect.

10:58AM 20       If we're all from Massachusetts, we go down to

21  Georgia, we go down to North Carolina, they're going to say,

22  oh, you speak funny, you're different.  Every place has a

23  little bit of slang, a little bit of difference.  You send

24  those out to a linguist in San Diego or Tampa, Florida, they're

25  going to have some difficulties, some problems, but, more

1    importantly, is going to be how the identifications come about

2    of my client and what maybe they're saying is attributable to

3    him.

4        Part of that is going to be is he on any of the videos

5    that you're going to see?  If a person is not on the video, and

6    there's this multiplicity of voices, who's identifying that

7    voice and saying, particularly if it's a short phrase, oh, I

8    know who that was.

9        One of the issues that will rise in that is once the

10:59AM 10   government says, oh, we can identify someone in this particular

11   case, you'll hear my client had a nickname, Cheche.  As the

12   transcriptions evolve, that isn't the name that is being

13   attributed to him, it's a different name, Checha, and I'm going

14   to submit to you I expect you're going to hear there's a

15   different Spanish pronunciation when you put an A on the end of

16   the name versus an E on the end of the name, and if you're not

17   seeing the person that's doing it and say, oh, I think it's

18   so-and-so but it's a different abbreviation or a different

19   nickname within the group of young men that got together and

10:59AM 20   there were different individuals at different times, a number

21   of them had similar sounding nicknames.

22       So the question is going to become how is it that you

23   attribute that to this person and want him to be held

24   accountable for that?  As Mr. Lopez had said a few minutes ago,

25   the issue is your actions, not your words.  And what you're

1    going to see in this particular case is there are not those

2    actions of Mr. Martinez.

3           Now, Mr. Martinez is one of two individuals that's

4    charged separately with a drug conspiracy here, and, again,

5    this is going to be a situation where there's going to be audio

6    but not audio that anybody can say that's Mr. Martinez.

7           A car is going north is what you're going to hear, and

8    in that is Mr. Pelon and Muerto in that car.  Pelon is a

9    cooperating witness at that time.  They set up a sting with the

11:00AM 10    FBI, again, more of a television performance perhaps knowing a

11    jury would see it at some time than any type of reality to it.

12           They're telling what they say is Mr. Martinez, we're

13    going to have you follow behind us, and if police try to stop

14    us, perhaps you'll start to speed up, and the police would be

15    more likely to go for you than they necessarily would go for

16    us, whatever sense that makes, but in the context of that then,

17    you'll hear they put up this elaborate pretext that they're

18    going to have a SWAT team available, they're going to go out

19    and get actual drugs, and they're going to put them in the car

11:01AM 20    with the two people who aren't even going to look at the drugs

21    and deliver them to someone that they know is an uncover State

22    Police officer itself, that the charge against Mr. Martinez is

23    not that he is in a conspiracy with those two people in the

24    car, one is Pelon who's a government agent, Mr. Muerto becomes

25    a government agent.

1          They say he's not in that conspiracy with them, he's

2     in the conspiracy with the others where they run some other

3     scam and sting in October and December of 2014, however, what

4     you're going to hear is no connection ever arises from

5     Mr. Martinez to whatever allegations they've made about

6     whomever may be involved or not involved in October, in

7     December, and, more importantly, the two people in the car are

8     upset with what they say is Mr. Martinez, and they say we're

9     never using him again, he's out.

11:02AM 10          But yet the government says he somehow is involved in

11     what takes place later on.  It will be your responsibility to

12     determine whether he is or he isn't.  I would submit to you

13     there will be no evidence that he is involved in the charged

14     conspiracy that the government is presenting to you.

15          And I think when you listen to the evidence, what's

16     important to that is they don't have anything for a

17     racketeering aspect for Mr. Martinez.  Again, the group is

18     meeting in his garage.  He's still working.  You'll hear he

19     also starts up a tow business, and he has a fancy tow truck

11:03AM 20     that he has.  Besides the mechanical work is the tow work, but

21     they don't have any other aspect to put him into this

22     conspiracy which Mr. Murphy had so clearly defined for you what

23     it takes to have.

24          So now the FBI comes up with we've got to have some

25     sort of drug activity because that's the predicate, let's set

1   thi up with Mr. Martinez and see if we can get him to

2   participate or not participate.

3        The other aspect of that is when they're having a

4   discussion with what they say is Mr. Martinez, they say, All

5   right, we're going to go whatever the date is.  He shows up at

6   a rental car with a buddy, and Mr. Pelon and Mr. Muerto are

7   very upset because this is supposed to be serious, we're

8   setting you up, it's a drug sting.

9        He obviously shows up because it's going to be a ride

11:04AM 10   from Massachusetts to New Hampshire, and he's got his buddies,

11   and they're just going to enjoy themselves, not treating it as

12   the issue that Pelon and the setup of the sting would like to

13   occur.

14        Ladies and gentlemen, when this trial is over, I will

15   have the opportunity to come back here in front of you, address

16   the evidence to you and argue to you why conclusively in this

17   case there will be proof beyond a reasonable doubt, and that

18   will be that my client is not guilty of the charges that the

19   government has brought against him in this matter.  Thank you.

11:04AM 20        THE COURT:  All right.  Thank you, Mr. Norkunas.

21        All right.  Is the government ready to call its first

22   witness.

23        MR. POHL:  Yes, your Honor.  We call Richard Daley.

24        RICHARD DALEY, having been duly sworn by the Clerk,

25   testified as follows:

1          MR. POHL:  Your Honor, before I begin my direct

2     examination, the parties have a stipulation concerning the

3     admissibility of Exhibit Number 91, which is a 9-1-1 tape.

4          THE COURT:  All right.  Ladies and gentlemen, a

5     stipulation is kind of a fancy lawyer word for an agreement.

6     It means the parties have agreed that something is true.  In

7     this case, I think it's that this 9-1-1 tape is authentic.

8          MR. POHL:  Yes.  Your Honor, I'd offer Exhibit 91, and

9     I'd ask permission to play it.

11:06AM 10          MR. MURPHY:  Your Honor, may we have an objection for

11     relevance?

12          THE COURT:  Yes, overruled.

13          (Video played.)

14          (Exhibit No. 91 received into evidence.)

15          RICHARD DALEY, having been duly sworn by the Clerk,

16     testified as follows:

17                         DIRECT EXAMINATION

18     BY MR. POHL:

19     Q.   Good morning.

11:10AM 20     A.   Good morning.

21     Q.   Can you please introduce yourself to the ladies and

22     gentlemen of the jury.

23     A.    My name is Richard Daley, D-a-l-e-y.  I'm a sergeant

24     detective with the Boston Police Homicide Unit.

25     Q.   Sergeant Daley, how long have you been a police officer?

1    A.    Thirty-four years.

2    Q.    How long have you been on the homicide unit?

3    A.    Thirteen years.

4    Q.    And your rank, Sergeant Detective, am I correct that that

5    means that you investigate homicides and supervise a team of

6    detectives that work for you?

7    A.    Yes.

8    Q.    Can you tell the jury about that.

9    A.    Yes.  I'm one squad of a night squads.  I work 3 p.m.

11:11AM 10   to -- excuse me, 5 p.m. to 3 a.m.  Twice a week we're on call

11   for those hours.  It's myself.  I supervise three other

12   detectives, and relative to this incident, it was myself,

13   Detective John Callahan, Detective David O'Sullivan and

14   Detective Todd Harron.  We respond to any callouts of death

15   investigations, people that have serious injuries that could

16   lead to death, motor vehicle fatalities, sometimes sudden

17   deaths, if the person's identification is unknown, and any

18   investigation that the Suffolk County D.A., any death

19   investigation that the Suffolk D.A.'s office wants us to

11:12AM 20   investigate.

21   Q.    Thank you.  Given the schedule you mentioned suggests an

22   answer.  How do you and your squad get assigned to particular

23   cases to investigate?

24   A.    Like I sort of previously described, our first two nights

25   we're on call, and any of those incidents we get called out to,

1    usually the sergeant on the street at an incident will call the

2    operations division, and operations division will notify us,

3    and we'll gear up and go to the scene and deal with the

4    situation.

5    Q.   Sergeant, do you recall whether you were working on

6    Sunday, September 20th, 2015?

7    A.   Yes, I was.

8    Q.   And I direct your attention to late in the afternoon on

9    that particular day.  Did you receive a call to go somewhere?

11:13AM 10    A.   Yes, at approximately 5:35 p.m., Operations notified

11   Homicide, that is my squad and I, to respond to 72 Trenton

12   Street in East Boston for a person stabbed.

13   Q.   You've been doing this for many years.  You might be

14   familiar with all the neighborhoods of the City of Boston.  Can

15   you tell the ladies and gentlemen of the jury what 72 Trenton

16   Street looks like, what kind of neighborhood is it?

17   A.   It's a densely populated residential neighborhood,

18   traditional three-story, two and a half story residential homes

19   with some neighboring stores and commercial businesses in the

11:13AM 20   area but mainly residential.

21        THE COURT:  East Boston?

22        THE WITNESS:  East Boston, yes.

23   Q.   When you got that call, Sergeant Detective Daley, what did

24   you and your squad do?

25   A.   I directed Detective Callahan to go to the Mass. General

 1    Hospital to check on the condition and identity of the victim

 2    and myself, Detective Halloran and Detective Sullivan responded

 3    to 72 Trenton Street.

 4    Q.    Detective Callahan went to the hospital, correct?

 5    A.    Correct.

 6    Q.    And through that learned the identity of an individual who

 7    had been transported there, correct?

 8    A.    Yes.

 9    Q.    And who was that?

11:14AM 10    A.    Irvin De Paz.

11    Q.    You went to the scene?

12    A.    Yes.

13    Q.    Of 72 Trenton Street.  When you got to 72 Trenton Street,

14    what did you see?

15    A.    An area cordoned off with yellow crime scene tape.

16    Uniformed police officers, well, the detectives on the scene,

17    the street is a one-way street, so they were able to block off

18    the whole street.  Officers were protecting an area that had

19    some evidence in the street, and I was briefed by the sergeant

11:14AM 20    on the scene what they had.

21    Q.    Okay.  Is it standard practice for the Boston Police

22    Department to photograph crime scenes, particularly scenes

23    involving serious events like homicides?

24    A.    Yes.

25    Q.    Are you aware through the course of your duties as a

1    Boston police officer whether there were photographs taken of

2    the crime scene in this case?

3    A.    There were.

4    Q.    And you've had an opportunity to review those prior to

5    your testimony here today; is that correct?

6    A.    Yes, I have.

7         MR. POHL:  Can you pull up 93 for the witness.

8    Q.    I will just quickly click through these, Sergeant

9    Detective Daley.  Do you have a screen in front of you?  Is it

11:15AM 10    working?

11         Sergeant, can you see it now?

12    A.    I have the photo in front of me now, yes.

13    Q.    I think there's a series of pictures.  Why don't I quickly

14    click through them.  Do you recognize this scene?

15    A.    Yes.

16    Q.    How do you recognize these?

17    A.    That's the scene at 72 Trenton Street where Irvin De Paz

18    was killed.

19    Q.    Okay.  Do these photographs fairly and accurately capture

11:16AM 20    how the scene looked when you arrived late in the afternoon of

21    September 20th, 2015?

22    A.    Minus the cones, but, yes, later on identifying cones were

23    put next to the evidence, but, yes.

24         MR. POHL:  Your Honor, I would offer Exhibits

25    Number 93.1 through 4 into evidence and ask for permission to

1    publish them to the jury.

2         MR. IOVIENO:  Objection, relevance.

3         THE COURT:  They're admitted, 93.1 through 93.4.

4         (Exhibit No. 93.1 through 93.4 received into

5    evidence.)

6         THE COURT:  What we were doing, we were showing it to

7    the witness first, then when I admit it, you can see it.  It's

8    kind of a two-step process.

9         THE COURT:  Go ahead.

11:17AM 10         MR. POHL:  Thank you very much, your Honor.

11    Q.   Sergeant Detective Daley, this is Exhibit 93.1.  Can you

12    tell the ladies and gentlemen of the jury what we're looking at

13    here?

14    A.   This is the end location where Irvin dropped to the ground

15    opposite 72 Trenton Street.

16    Q.   Okay.  So we've got the -- there are two cars, correct?

17    A.   Yes, there are two parked cars, correct.

18    Q.   There are two red objects on the ground.  Do you know what

19    those are?

11:18AM 20    A.   Yes, these are red Chicago Bulls hat underneath first the

21    white car in front, to the left, I should say, and there's a

22    red T-shirt on the ground in front of the second car with some

23    blood smearing on the front bumper of the second car.

24         MR. POHL:  Next photograph, 93.2.  Thank you.

25    Q.   That's what?

1    A.    That's the red hat I just spoke of underneath the car.

2    Now it's labeled with Cone 6.

3    Q.    And 93.3.

4    A.    That's the red T-shirt on the ground that was later

5    identified as Cone 7.

6    Q.    And through the course of your investigation, were you

7    able to identify that that was the shirt that Irvin De Paz was

8    wearing when he was killed?

9    A.    Yes.

11:19AM 10    Q.    Why is it still at the scene?

11    A.    Because we process the scene as is, and once everything is

12    documented, photographed, measured, then it's collected.

13    Q.    Irvin De Paz, an ambulance responded to take Irvin De Paz

14    to the hospital, correct?

15    A.    Yes.

16    Q.    And is it your understanding that the shirt was cut off

17    Mr. De Paz prior to him being taken to the hospital?

18    A.    Yes, it appears after seeing it later, it was cut for

19    removal, correct.

11:19AM 20         MR. POHL:  93.4.

21    Q.    What are we looking at here, Sergeant Detective?

22    A.    That's blood smears and dripping blood on the car, the

23    second car.

24    Q.    All right.  You processed that, you and the detectives

25    that you worked with collect the evidence at that scene,

1    correct?

2    A.   Yes, we identified it, marked it, collected it, yes.

3         MR. POHL:  Your Honor, with your permission, I'd ask

4    Sergeant Detective Daley to get down from the witness stand and

5    join me in the well.

6    Q.   Sergeant, I'm going to hand you Exhibit 95.  Do you

7    recognize that?

8    A.   Yes, this is the red hat in the photographs underneath the

9    car scene.

11:21AM 10   Q.   Okay.  The pictures that we just looked at a moment ago?

11   A.   Correct.

12        MR. POHL:  I'd offer 95 into evidence.

13        MR. IOVIENO:  Objection.  Relevance.

14        THE COURT:  Overruled.  It's admitted, 95.

15        (Exhibit No. 95 received into evidence.)

16   Q.   All right.  I hold up for you, Sergeant Detective Daley,

17   what's been marked Exhibit Number 94 and ask if you recognize

18   this?

19   A.   Yes, that's the red T-shirt that Irvin De Paz was wearing,

11:21AM 20   and it was found on the street opposite 72 Trenton Street, and

21   we collected it that evening.

22   Q.   Would I be correct that the shirt has been mounted so that

23   the jurors can look at it prior to your testimony here today,

24   correct?

25   A.   Yes, I asked Boston Police Crime Laboratory to mount it

1    for presentation.

2    Q.   All right.  So I'm going to draw your attention to a

3    couple different markings on the shirt.  First of all, your

4    Honor, I'd offer 94 into evidence.

5         MR. IOVIENO:  Same objection.

6         THE COURT:  Overruled.  It's admitted, 94.

7         (Exhibit No. 94 received into evidence.)

8    Q.   Sergeant, let's start with the front of the shirt.

9    There's markings labeled cut 1 and cut 2?

11:22AM 10   A.   Yes.

11   Q.   And there's a sort of discolored or different color on the

12   left-hand side of the shirt.  What is that?

13   A.   Those are stab wounds, and the result of the stab wounds

14   is the blood in the area of them.

15        MR. NORKUNAS:  Judge, if I might, perhaps we could see

16   what Mr. Pohl is laying out as well, both the jury and we can

17   see that.

18        THE COURT:  Why don't we have Sergeant Daley take the

19   stand again.

11:23AM 20   Q.   Sergeant, there's something in the back, correct?

21   A.   Yes, it's labeled Number 3.  It appears to be an apparent

22   hole in the shirt corresponding to a stab wound on

23   Irvin De Paz.

24   Q.   And there's writing on the front of the shirt?

25   A.   Yes, something relative, it all started with a mouse, some

1    kind of Disney, it appears to say, "It all started by a mouse"

2    with "Walt Disney" written underneath.

3    Q.   Sergeant Detective Daley, how -- after you collected the

4    evidence from the crime scene, how did you begin to conduct

5    your investigation into who was responsible for murdering

6    Irvin De Paz?

7    A.   On arrival at the crime scene, after getting some

8    preliminary information, I organized a line search down

9    Trenton Street towards Brook, which includes 6 to 8 officers

11:24AM 10   line up in a line and go down the street looking for any

11   evidence, so that was done.

12        We also did a canvass, knocking on doors, see if

13   there's any other witnesses that may have saw something as well

14   as we did a video canvass looking for any residential homes or

15   commercial homes that may have cameras in the area that may

16   have captioned a portion of the incident.  That was all done

17   that evening.  The video canvass also followed up the several

18   days afterwards, and we collected from several residences

19   personal cameras that people have in their residences.

11:25AM 20   Q.   Is that, at least in 21st Century America, is that

21   standard practice in the Boston Police Department?

22   A.   Yes, it is now, yes.

23   Q.   And it's fair to say that that's often a useful technique

24   to try to determine who had committed a particular crime?

25   A.   Yes.

1    Q.    All right.  You were able to be do that in this case --

2    A.    Yes.

3    Q.    -- from a number of different neighborhood-mounted

4    cameras?

5    A.    Yes.

6    Q.    Let me put up for the witness Exhibit Number 96.

7    Sergeant Detective Daley, can you see that?

8    A.    Yes.

9    Q.    Do you recognize it?

11:26AM 10  A.    Yes, it's a residential camera at 90 Trenton Street

11   mounted on the back of the house, the side rear of the house,

12   and it faces out towards Trenton Street where the top of it

13   captures a portion of Trenton Street.

14   Q.    Okay.  And I should maybe before I ask you any other

15   questions about the video surveillance recordings that you

16   attained, everybody has cameras, cell phones, clocks on phones,

17   clocks on their DVRs, hardly any of them match.  Did you

18   encounter that problem in this case?

19         MR. MURPHY:  Objection, your Honor.

11:26AM 20        THE COURT:  I'll sustain it as to the leading.

21         MR. POHL:  Thank you.

22   Q.    Did you collect video surveillance in this case?

23   A.    Yes.

24   Q.    Is one of the things that you do when you collect video

25   surveillance evidence to put the times on the video recording

1    devices that you obtain?

2    A.   Yes.

3    Q.   And when you obtain them from different locations, is one

4    of the things that you try to do to determine how those videos

5    sync up?

6    A.   Yes, the DVRs to each residence, they usually don't set

7    the correct, time so we have to synchronize to the DVR.  They

8    don't care about the time as long as they record it, so we have

9    to synchronize the DVR time to real time.

11:27AM 10   Q.   And in the course of this, you gathered video surveillance

11   from several different locations, correct?

12   A.   Yes.

13   Q.   And each time that you got video surveillance recordings,

14   what kind of things did you do to make sure that you knew sort

15   of the timing of what you were looking at?

16   A.   Well, I have a technician that comes with me, and in his

17   presence, I see him, he takes a picture of the DVR with his

18   cell phone, so it captures the time on the DVR to the time on

19   his cell phone, and it shows the difference then, and then he

11:28AM 20   documents it on a form, and that's how we know to make the

21   adjustments to get the realtime on the video.

22   Q.   I see.  All right.  So there's a date on this particular

23   recording, correct?

24   A.   Yes.

25   Q.   That date is September 20th, 2015?

1    A.   Yes, it is.

2    Q.   For this video and some of the other videos that we're

3    going to show thereafter, were you able to determine about what

4    time the video clips I'm about to show you took place?

5    A.   Yes, at approximately 5:10 p.m. on the afternoon of the

6    20th.

7    Q.   Okay.  All right.  This is one of the video surveillance

8    recordings that you collected in the aftermath of the

9    Irvin De Paz murder?

11:29AM 10    A.   Yes.

11         MR. POHL:  Your Honor, I would admit, move to admit

12   96, and I'd ask permission to publish it for the jury.

13         MR. IOVIENO:  Same objection.

14         THE COURT:  Overruled.  96 is admitted.

15         (Exhibit No. 96 received into evidence.)

16   Q.   Sergeant Detective Daley, now that everyone on the jury

17   has it, can you tell the jury what they're going to see when we

18   press play here?  What can you tell the jury to be looking for

19   as they view this particular video recording?

11:29AM 20    A.   The top portion of the screen, you'll see the opposite

21   side of Trenton Street, which is the odd numbered side.  You'll

22   see a person with a red shirt go running by later identified as

23   the victim De Paz, he goes running by, and this person with the

24   white T-shirt right behind him chasing him, and a couple of

25   seconds later, you'll see a third individual with a white

1    T-shirt closest to the camera on the even side jogging by as

2    well, all heading left to right on your screen.

3    Q.   All right.  Thank you.  Let me pause it right there.  So

4    you've been to the neighborhood.  This is 90 Trenton Street?

5    A.   Yes.

6    Q.   And if you're looking at this camera and everybody is

7    running to the right, is that in the direction of

8    72 Trenton Street?

9    A.   Yes, it is.

11:30AM 10    Q.   How far away is 90 Trenton Street and 72 Trenton Street?

11    A.   I would estimate 25 yards.

12    Q.   Okay.  So before I press play again, what are you going to

13    see in the video recordings once we unclick the pause button

14    and allow it to play?

15    A.   On the same location on the screen, now on the even side

16    closest to the camera, you'll see two people running by in

17    white T-shirts, one in front of the other.

18    Q.   Okay.  And I paused it, so the realtime calculation

19    probably isn't going to be picked up now, but about how much

11:31AM 20    time passes between the time they run from left to right on the

21    camera, the clip we just saw, and the time the men in the white

22    shirts run back?

23    A.   Approximately 15 seconds.

24         (Video played)

25         MR. POHL:  All right.  Thank you.

1              Could I have Exhibit 96.2 for the witness.

2    Q.   Sergeant Detective Daley, do you have that in front of

3    you?

4    A.   Yes.

5    Q.   96.2, this is another video clip; is that correct?

6    A.   Yes, it is.

7    Q.   What are we looking at here?

8    A.    It's the same recording system of 90 Trenton Street.  This

9    view is from the front door looking down the stairs from the

11:33AM 10  front door, and it captures a portion of the sidewalk in front

11   of 90 Trenton.

12   Q.   Okay.  Same house, different location?

13   A.    Different location.

14   Q.   All right.

15              MR. POHL:  I'd offer this, your Honor, as

16   Exhibit Number 96.2.

17              MR. IOVIENO:  Objection.

18              THE COURT:  The objection is overruled.  I'll give the

19   same objection as to all the videos.

11:33AM 20              MR. IOVIENO:  Yes, your Honor.

21              THE COURT:  I'll give you a standing objection to all

22   the videos.

23              MR. IOVIENO:  Thank you.

24              THE COURT:  It's admitted, 96.2.

25              (Exhibit No. 96.2 received into evidence.)

1        MR. POHL:  Thank you.

2   Q.   Before I press play, can you tell the ladies and gentlemen

3   of the jury what they're going to see here?

4   A.   On the top left corner of the screen, you're going to see

5   somebody run by going left to right, and then approximately 15

6   minutes later, you'll see two people running by right to left.

7   Q.   All right.

8        THE COURT:  15 minutes or 15 seconds?

9        THE WITNESS:  15 seconds, I apologize.

11:34AM 10   Q.   The video we watched a minute ago had captured both sides

11   of the street, there's the far side and the near side?

12   A.   Correct.

13   Q.   Would it be fair to say this is the near side of

14   90 Trenton Street?

15   A.   Yes.

16   Q.   So the person that just jogged by would be the person in

17   96.1 that was in the lower half the screen; is that right?

18   A.   Correct.

19   Q.   Then as this video continues to roll, Sergeant Detective

11:34AM 20   Daley, what are we going to see in a few more seconds?

21   A.   You're going to see two bodies run by going right to left.

22   Q.   All right.  Thank you.

23        MR. POHL:  For the witness.

24   Q.   Sergeant Detective Daley, I'm putting up Exhibit 97.  Do

25   you recognize that?

1    A.   Yes, that's a still from the video we just watched of the

2    two gentlemen going from right to left.  The first person

3    appears to have a knife in his left hand.

4         MR. POHL:  I'd offer Exhibit 97 and ask permission to

5    publish it.

6         THE COURT:  It's admitted, 97.

7         (Exhibit No. 97 received into evidence.)

8    Q.   Sergeant Detective Daley, what do you see here?

9    A.   This is the same -- I'm sorry, the top left corner, it's a

11:35AM 10    still photograph, a snippet taken from the video that you just

11    saw of the first person running by with a knife in his left

12    hand.

13    Q.   All right.  Thank you.  You gathered additional

14    surveillance video in the neighborhood of that particular

15    murder; is that correct?

16    A.   Yes.

17    Q.   Sergeant Detective Daley, as I put up Exhibit Number 98,

18    do you recognize that?

19    A.   Yes, this is a video captured from the residence at 94

11:36AM 20    Trenton Street.

21    Q.   Okay.  So, 90 Trenton Street is me, and 72 Trenton Street

22    would be that way, 94 would be to my left, your right?

23    A.   Yes.

24    Q.   Okay.  94 Trenton Street --

25         MR. POHL:  Your Honor I'd offer Exhibit Number 98 and

1     ask permission to play it.

2               THE COURT:  All right.  It's admitted.

3               (Exhibit No. 98 received into evidence.)

4     Q.   Sergeant Detective Daley, what are we going to see on the

5     video recording before we press play?

6     A.   You're going to see one male running left to right, and

7     then approximately 15 seconds later, you're going to see two

8     males running right to left, one in front of the other.

9     Q.   As the 15 seconds go by, as the two men in the white

11:37AM 10    shirts come back, okay, what do you see?

11    A.   It appears as if the first male is with a knife wiping off

12    a knife as he's running.

13               MR. POHL:  99 for the witness.

14    Q.   Do you recognize that, Sergeant Detective Daley?

15    A.   Yes, this is a still snippet from the video I just watched

16    from 94 Trenton Street, and it shows the first person running

17    down, running/walking down the sidewalk with a knife in his

18    hand and some kind of white cloth in his right hand.

19               MR. POHL:  I'd offer Number 99, your Honor.

11:38AM 20               THE COURT:  It's admitted, 99.

21               (Exhibit No. 99 received into evidence.)

22    Q.   Now for the jury, Sergeant Detective Daley.

23    A.   This is a snippet from the earlier, the video that we just

24    watched from 94 Trenton Street, and it captures the first

25    individual going down the sidewalk right to left, appears to

1   have a knife in his hand with some kind of white cloth in the

2   other hand.

3   Q.   Sergeant, I think you testified earlier that one of the

4   members of your squad, Detective Callahan, went to the hospital

5   to check on the condition of Irvin De Paz, correct?

6   A.   Yes.

7   Q.   And while at the hospital learned that Mr. De Paz had

8   died, correct?

9   A.   Yes.

11:39AM 10   Q.   Was Mr. De Paz' body taken to the office of the chief

11   medical examiner at that time?

12   A.   Yes.

13   Q.   And an autopsy was performed, correct?

14   A.   Yes, sir.

15   Q.   And that determined how Mr. De Paz died?

16   A.   Yes.

17   Q.   All right.

18        MR. POHL:  Can we pull up 101.2.

19   Q.   Sergeant Detective Daley, I'm going to click through a

11:39AM 20   couple of pictures for you only.  These are Exhibits 101.2

21   through 5.  Do you recognize those?

22   A.   Yes.

23   Q.   All right.  How do you recognize those as?

24   A.   These are isolated photographs of the stab wounds that

25   Irvin De Paz suffered.

 1              MR. POHL:  I'd offer these, your Honor.

 2              MR. IOVIENO:  Objection, your Honor.

 3              THE COURT:  Overruled.  They're admitted 101.2 through

 4     101.5.

 5              (Exhibit No. 101.2 through 101.5 received into

 6     evidence.)

 7     Q.   Sergeant Detective Daley, I'm showing you Exhibit 101.2.

 8     A.   Yes.

 9     Q.   What are we looking at here?

11:40AM 10   A.   It's a stab wound with the letter B next to it, some

11     numbers down below and a ruler, and it's stab wound B, and I

12     know it to be the stab wound to his left torso.

13              MR. POHL:  Next.

14     Q.   This is 101.3.  What are we looking at here,

15     Sergeant Detective Daley?

16     A.   These are also two close-ups of stab wounds to

17     Mr. De Paz's left arm indicated by the letters C and D with a

18     ruler and some numbers down below.

19     Q.   And where is that on Mr. De Paz' body?

11:41AM 20   A.   It's at the elbow area but on the inside elbow area of his

21     body, left arm.

22     Q.   And would they be close to the stab wound for B that we

23     saw a moment ago?

24     A.   Yeah, it appears that B, C and D are corresponding to each

25     other.

1    Q.   In the arm, out the arm into the torso?

2    A.   Correct.

3         MR. POHL:  Next.

4    Q.   What's this?  What are we looking at here,

5    Sergeant Detective Daley?

6    A.   It appears to be a vertical stab wound to the left back of

7    Irvin De Paz labeled by the letter E, as in echo with a ruling

8    and some numbers underneath it.

9    Q.   And the next photograph is 101.5.

11:42AM 10   A.   That's a close-up of the stab wound that I just described,

11   stab wound E in the back.

12   Q.   So I hold up Exhibit Number 94 for you again.  Stab wounds

13   on the left-hand side of the shirt, correct?

14   A.   Yes.

15   Q.   Stab holes in the left-hand side of the shirt?

16   A.   Yes.

17   Q.   And a hole on the back of the shirt?

18   A.   Yes.

19   Q.   All right.  They appear to you to correspond to the

11:43AM 20   photographs that were just discussed?

21   A.   Yes, to his injuries, yes.

22        MR. POHL:  Pull up for the witness Exhibit 102.

23   Q.   Do you recognize that, Sergeant Detective Daley?

24   A.   Yes.

25   Q.   Is it a death certificate in the case of Irvin De Paz?

1    A.    Yes, yes, it appears to be a certified death certificate

2    created by the Commonwealth of Massachusetts, Department of

3    Public Health of Irvin De Paz.

4    Q.    I ask you to point out, it has two different parts of the

5    death certificate.

6            MR. POHL:  Excuse me, your Honor, I'd offer

7    Exhibit 102.

8            THE COURT:  All right.  It's admitted, 102.

9            MR. MURPHY:  Objection, relevance, your Honor.

11:44AM 10            THE COURT:  Overruled.  It's admitted.

11            (Exhibit No. 102 received into evidence.)

12   Q.    So, for the jury, this is the death certificate we were

13   referencing earlier, correct?

14   A.    Yes.

15   Q.    And I'd point out two different parts of the death

16   certificate.  First, it discusses the cause of death; is that

17   correct?

18   A.    Yes.

19   Q.    And the death certificate issued after examination by the

11:44AM 20   medical examiner was what?

21   A.    Stab wounds of torso and upper extremity.

22   Q.    Thank you.  And the manner of death?

23   A.    Homicide.

24   Q.    All right.  Sergeant Detective Daley, what steps did you

25   take to investigate who had committed this homicide?

1    A.   Later on that evening, we were made aware that Irvin's

2    family, his mother and I believe a girlfriend, had responded to

3    the Mass. General Hospital, so myself and Detective Callahan

4    responded back to the Mass. General Hospital where we

5    introduced ourselves to Irvin's mother and some aunts who had

6    arrived at the hospital, and we tried to get some background on

7    Irvin, who he was with, where he was coming from.

8         We were able to speak to Irvin's girlfriend, a woman

9    by the name of Daisy, and she had some information who he may

11:45AM 10    have been with, and after some telephone calls, we were able to

11    identify a gentlemen named Dennis Perdomo, who he was with

12    prior to him getting stabbed.

13        Relative to finding that information out, we

14    contacted, we got a phone number for Dennis Perdomo, called him

15    that evening, and we sat down with him about 12:30 that night

16    and took a statement from Dennis Perdomo.

17    Q.   And based on that interview with Mr. Perdomo, would it be

18    fair to say that you and the detectives that you work with

19    generated a photo array?

11:46AM 20    A.   Yes.

21    Q.   And did you show the photo array to Mr. Perdomo to see if

22    he could identify -- well, did you gather any sort of

23    surveillance evidence or video evidence concerning Mr. Perdomo

24    that corroborated the information that you had received that he

25    had been in the area with Irvin De Paz on the day that

1       Irvin De Paz was killed?

2       A.   Yes, some of the information he put on the table was

3       corroborated by some video that we had captured at a laundromat

4       at the end of Trenton and Brooks Street.  Mr. Perdomo was with

5       Irvin as they ran down the street.  Mr. Perdomo dived into a

6       laundromat and hid behind some machines in the laundromat.

7       Irvin took a right off Trenton Street, and from that

8       separation, that was all corroborated from the video and from

9       what Dennis Perdomo told us, so it gave us a little direction

11:47AM 10   on what was happening before Irvin got stabbed.

11      Q.   So, at -- you interviewed Mr. Perdomo, correct?

12      A.   Yes.

13      Q.   And attempted to put together an array of pictures that

14      might have led to an identification of the person that

15      committed the murder; is that correct?

16      A.   Yes, relative to these conversations a name was generated

17      from these conversations with Mr. Perdomo and Irvin's

18      girlfriend.  We put that person's photo in a photo array, and I

19      believe like four days later, we arranged to have that array

11:48AM 20   shown to Mr. Perdomo again, I mean, we met him a second time

21      and showed the array to Mr. Perdomo trying to help putting the

22      investigation, and the results were negative, no I.D. was made.

23      Q.   And the name of the person that Mr. Perdomo had said he

24      heard or might have thought might have been involved in this

25      was what?

1          MR. LOPEZ:  Objection.

2          THE COURT:  I'll allow it as evidence that it was

3     said, not as proof that this person did anything.  In other

4     words, ladies and gentlemen, you may consider this only for the

5     fact that this was actually said to the detective.  It's not

6     proof that this person did anything at all.

7     A.    The name Ochoa was put on the table.  We were able to

8     cobble together the idea of a Carlos Ochoa, and that's the

9     person's photograph we put in the array.

11:49AM 10     Q.    And did you determine whether Carlos Ochoa had another

11     name?

12     A.    I believe Melara.

13     Q.    All right.  You put together a photo array or photo spread

14     that had Carlos Ochoa or Carlos Melara in it, correct?

15     A.    Yes.

16     Q.    You showed it Dennis Perdomo, correct?

17     A.    Yes.

18     Q.    He didn't pick Ochoa or anybody else out of the array,

19     correct?

11:49AM 20     A.    No, he did not.

21     Q.    Would I be correct that for the weeks after Irvin De Paz'

22     murder, this was still an active, ongoing investigation by the

23     Boston Police Department, correct?

24     A.    Yes.

25     Q.    But you continued to investigate who had committed the

1    murder?

2    A.    We did.

3    Q.    After sort of the negative photo array, did you receive

4    information from another law enforcement agency about this

5    murder?

6    A.    Yes, the Massachusetts State Police.

7    Q.    Okay.  And what can you tell the jury about that?

8              MR. MURPHY:  Objection, your Honor, as to when.

9              THE COURT:  Can you put a time frame on that?

11:50AM 10   Q.    How long -- the photo array was in a few days after the

11   murder, correct?

12   A.    Yes.

13   Q.    And you spoke to police officers with the Massachusetts

14   State Police about the murder, correct?

15   A.    Yes.

16   Q.    I think what counsel and the Court is asking, do you

17   remember now around what time of year, approximately month, day

18   those conversations took place?

19   A.    Definitively, no, but I would guess approximately October,

11:50AM 20   late October, early November.

21   Q.    All right.  And you were contacted by the State Police.

22   What happened after you got a call from the State Police about

23   the murder?

24   A.    We had some communication, both in person and over the

25   phone, and I was told that our investigation, they had some

1    information on our homicide on Trenton Street, and my office in

2    conjunction with the Suffolk County D.A.'s Office, who has

3    jurisdiction over our homicides, discussions were made, and at

4    some point, the decision was made that our case was a smaller

5    portion of a larger federal investigation, and decisions were

6    made for us to work in conjunction with them, but at some point

7    I made a copy of my whole investigation and handed it off to

8    the U.S. Attorney's Office.

9    Q.   Maybe I can do this by bounding the time frame we're

11:52AM 10   talking about.  You were advised that or a series of arrest

11   warrants were going to be executed in connection with that

12   federal case?

13          MR. MURPHY:  Objection, your Honor, leading.

14          THE COURT:  Sustained as to the leading.

15   Q.   Well, let me put it this way.  Were you advised -- were

16   you advised -- well, do you recall working on January 29th,

17   2016?

18   A.   Yes.

19   Q.   Okay.  Do you remember where you were on January 29th,

11:52AM 20   2016?

21   A.   Eventually I ended up at the Chelsea police station.

22   Q.   Why did you go to the Chelsea police station?

23   A.   There was an operational take-down date of this operation,

24   and I wanted to try and speak to somebody.

25   Q.   Okay.  Who was that?

1    A.    Joel Martinez.

2    Q.    And why did you want to speak with Joel Martinez?

3    A.    Because I was made aware that he had been identified as

4    being involved in the Irvin De Paz murder.

5    Q.    Okay.  And just so that we're absolutely clear,

6    Sergeant Detective Daley, you met Joel Martinez that morning,

7    correct?

8    A.    Briefly, yes.

9    Q.    Okay.  And Joel Martinez is not in this courtroom, he's

11:53AM 10    not one of the four defendants here, correct?

11    A.    No.

12    Q.    So, would I be correct that sort of between the time of

13    the murder, right, September 20th, 2015, and that date when you

14    first met Joel Martinez, that's the time frame that we're

15    talking about, that you were coordinating your investigation

16    with the State Police and the U.S. Attorney's Office?

17          MR. MURPHY:  Objection, your Honor, leading.

18          THE COURT:  Sustained.

19    A.    We were in communications.

11:54AM 20          THE COURT:  Hold on.

21    Q.    I'll ask you, Sergeant Detective Daley, that's fine.

22    Would I be correct that -- well --

23          THE COURT:  Let's put a question.

24          MR. POHL:  Thank you.

25    Q.    Sergeant, you met Irvin De Paz' family, correct?

1    A.   Yes.

2    Q.   And you reviewed the death certificate, correct?

3    A.   Yes.

4    Q.   All right.  How old was Irvin De Paz?

5    A.   I'm sorry, I didn't hear.

6    Q.   How old was Irvin De Paz when he was killed?

7    A.   He was 15 years old.

8         MR. POHL:  Can I have one moment, your Honor.  Thank

9    you very much.

11:55AM 10     THE COURT:  We might as well take our 12:00 break now.

11        THE CLERK:  All rise.

12        (A recess was taken.)

13        THE CLERK:  All rise for the jury.

14        (JURORS ENTERED THE COURTROOM.)

15        THE CLERK:  Court is back in seated.  You may be

16   seated.  Cross-examination.

17        MR. MURPHY:  Thank you, your Honor.

18                    CROSS-EXAMINATION

19   BY MR. MURPHY:

12:10PM 20   Q.   Good afternoon, your Honor, Sergeant Detective Daley.

21   Might we see Exhibit 97.  So, Sergeant Detective Daley, you

22   responded to the scene of this on Trenton Street?

23   A.   Yes.

24   Q.   And you were the leader of the squad that was

25   investigating that stabbing for the Boston Police Department,

1    correct?

2    A.   Yes.

3    Q.   And you organized neighborhood canvasses, right?

4    A.   Yes.

5    Q.   Searches of the neighborhood?

6    A.   Yes.

7    Q.   You collected video from neighbors?

8    A.   Yes.

9    Q.   And you interviewed as many neighbors as you could to find

12:11PM 10    out what happened, correct?

11    A.   Yes.

12    Q.   And is it fair to say, Sergeant Detective, that your main

13    objective was to try to identify who that was in Exhibit 97 who

14    was holding the knife?

15    A.   Yes, that would be the main objective.

16    Q.   And, secondarily, to figure out who the second guy was

17    with the white shirt who was running with him, right?

18    A.   Yes.

19    Q.   And the reason that you wanted to identify the person in

12:11PM 20    the white shirt holding the knife that you can see in

21    Exhibit 97 is that if you came to the conclusion that there was

22    grounds to believe that he was the person who had stabbed

23    Mr. De Paz, you'd want to arrest him, correct?

24    A.   Yes.

25    Q.   That would be standard Boston Police Department protocol,

```
 1    right?
 2    A.    Yes.
 3    Q.    And the reason you wanted to arrest him, all things being
 4    considered, the Boston Police Department does not want people
 5    running out the street of East Boston or anywhere stabbing
 6    people, correct?
 7    A.    That's correct.
 8    Q.    And you said that you mentioned that your folks from your
 9    squad and you personally had spoken to Mr. De Paz' family,
10    correct?
11    A.    Yes, that evening, yes.
12    Q.    And the other reason you want to make an arrest or another
13    reason you want to make an arrest is that you want to tell the
14    family of a victim of a stabbing like this what happened and
15    who did it?
16    A.    Eventually, sure.
17    Q.    So, you responded on September 20th to the scene, as I
18    heard your testimony on direct, you were working the case, you
19    and your squad in the last week of September and the first week
20    of October, through October, until at some point you received a
21    call from someone from the Massachusetts Police in either late
22    October or early November; is that right?
23    A.    That would be my guesstimate, correct.
24    Q.    Okay.  And would it be fair to say, sir, that the basic
25    message of the call you received was we'd like you to stand
```

12:12PM
12:13PM

1   down?

2   A.   No.

3   Q.   Okay.  Is it fair to say that you were asked to turn your

4   investigatory file over to the State Police and the FBI?

5   A.   Initially, no.

6   Q.   Okay.  When did that happen?

7   A.   After a series of communications between myself, my

8   supervisors and the District Attorney's Office.  When it

9   happened, I mean, we had a sit-down at the District Attorney's

12:14PM 10   Office in mid-November, so it was in the planning stages that I

11   was going to turn over my investigation.

12   Q.   So, between the time that you received that call from the

13   state trooper in late October, early November and mid-December,

14   you continued the investigation to try to figure out who had

15   stabbed De Paz, correct?

16   A.   No, I had started transferring the investigation to them.

17   Q.   And is it fair to say, sir, that during the entire period

18   between the time that you began investigating the case on

19   September 20th and that call from the state trooper in late

12:14PM 20   October or early November, you were not told by another law

21   enforcement agency that the FBI already knew who the person

22   with the knife that's depicted in Exhibit 97 is?

23   A.   No, until I started getting communications from them, I

24   did not know.

25   Q.   So you continued to work on the homicide because nobody

1    told you that the FBI had already determined who did it,

2    correct?

3    A.    No, my first communications with the State Police, they

4    laid out that they had a witness that could help the

5    investigation --

6    Q.    And that was in you said late October?

7          THE COURT:  Hold on, let him finish.

8    A.    I'm guessing mid to late October.  I don't have a

9    definitive date.

12:15PM 10   Q.    Fair enough.  And it was after that call that you stopped

11   working the case actively and began to transfer your file, is

12   that correct, Sergeant Detective Daley?

13   A.    That's fair to say.

14   Q.    And you testified on direct examination that you heard

15   that there was a series of arrests that were going to be made

16   on January 26, 2015; is that correct?

17   A.    At some point, I was made aware of that.  When, maybe

18   early January.  I wasn't part of that decision-making process,

19   I was kind of removed from all of that, but at some point I was

12:16PM 20   made aware that there was going to be a take-down date, and I

21   wanted to be a part, if I could, be a part of it, and they

22   allowed me to.

23   Q.    And one of the people that was being taken down on that

24   take-down was Joel Martinez, correct?

25   A.    That was what I was told, correct.

1    Q.   And it was on January 26th, 2015 that you went and sought

2    to speak with Mr. Murphy?

3    A.   29th.

4    Q.   29th, pardon me, it was January 29th, 2015 that you went

5    to speak with Mr. Martinez, correct?

6    A.   2016.

7    Q.   2016?

8    A.   Yes, the early morning of the hours of that day I went to

9    Chelsea police station, correct.

12:16PM 10    Q.   And it was your understanding that Mr. Martinez had been

11    arrested that day or the previous?

12    A.   I'm not sure what information I had the night before.  I'm

13    not sure.  All I know, I was told that he may be there, and I

14    went, and he had been taken into custody.

15    Q.   So, by that day, he had been taken into custody, correct?

16    A.   By the time I got there, he was already in custody, yes.

17    Q.   And so if I can do the math, that was from September to

18    October to November to December to January, more than four

19    months after Mr. De Paz' stabbing?

12:17PM 20    A.   That's correct, yes.

21         MR. MURPHY:  May I have a moment, your Honor.  Nothing

22    further, your Honor, thank you.

23         THE COURT:  Mr. Lopez.

24         MR. LOPEZ:  Nothing, your Honor.

25         THE COURT:  Redirect.

REDIRECT EXAMINATION

BY MR. POHL:

Q.   Sergeant Detective Daley, you've been a police officer for
a long time.  Have you ever investigated murders that involved
more than one party?

A.   Yes.

Q.   All right.  And prior to your assignment in the homicide
unit, where did you work in the Boston Police Department before
that?

A.   I was the supervisor for seven years in the drug control
unit.

Q.   And in your capacity either in the drug unit or in
multi-defendant or multi-party homicides, have you had to
evaluate when and how to make particular arrests?

A.   Yes.

Q.   What are some of the kinds of considerations that you take
into account when and whether to make an arrest in the case?

          MR. LOPEZ:  Objection, your Honor.

          THE COURT:  Overruled.

A.   Every investigation is different.  Every amount of targets
or defendants is different, but you have to take into
consideration, do some intelligence on them, where they are,
who they are with, you know, to do some logistics with other
agencies, other units within the structure that you'll need for
the take-down, and you've got to consider personal safety as

1    well for any witnesses or family members, so all those things

2    have to be talked about, discussed and planned, so hopefully

3    everything goes as planned, so it takes a little thought

4    involved.

5              MR. POHL:  Thank you.

6              THE COURT:  Recross.

7              MR. MURPHY:  No, your Honor, thank you.

8              THE COURT:  Thank you.  You may step down.

9              MR. POHL:  Jeffrey Wood.

12:19PM 10            JEFFREY ELLIOTT WOOD, JR., having been duly sworn by

11   the Clerk, testified as follows:

12             THE CLERK:  Please state your name spelling your last

13   for the record.

14             THE WITNESS:  Jeffrey Elliot Wood, Jr., W-o-o-d.

15             MR. POHL:  May I, your Honor?

16             THE COURT:  Yes.

17                        DIRECT EXAMINATION

18   BY MR. POHL:

19   Q.   Good afternoon.

12:20PM 20   A.   Good afternoon, sir.

21   Q.   Mr. Wood, where do you work?

22   A.   I work for the FBI.

23   Q.   How long have you worked for the FBI?

24   A.   Over 18 years.

25   Q.   And what is your current assignment at the FBI?

1   A.   I'm the supervisory special agent for the gang squad.

2   Q.   Okay.  And what kind of agents or agencies are comprised

3   within the gang squad at the FBI?

4   A.   We have the FBI, we work with other federal law

5   enforcement agencies, we've worked with ATF, we've worked with

6   Homeland Security, we work with our local and state law

7   enforcement partners, we work with the Massachusetts State

8   Police, the Massachusetts Department of Corrections, our local

9   police departments include the Lynn Police Department, the

12:21PM 10   Lawrence Police Department, Chelsea, Revere and Boston Police

11   Departments, and we also work with some of our county law

12   enforcement partners, which include at this time the

13   Suffolk County and the Essex County Sheriff's Department.

14   Q.   You've been an FBI agent for 18 years.  How long during

15   the period in which you've been an FBI agent have you been

16   assigned to investigate gangs or gang activity in

17   Massachusetts?

18   A.   I began conducting gang investigations in 2002.  In 2007,

19   I went to Afghanistan for approximately four months.  I then

12:22PM 20   spent the next 14 months assigned to the FBI headquarters

21   working at the safe street gang unit and the National Gang

22   Intelligence and Coordination Center, and then upon my return

23   in 2009, I again returned to the gang squad here and have

24   stayed there ever since.

25   Q.   Okay.  So would I be correct from the bulk of that time,

1    from 2010 until fairly recently, you were a special agent

2    assigned to that unit, correct?

3    A.   Yes, that is correct.

4    Q.   And what kinds of duties would a special agent do in the

5    FBI assigned to the gang squad?

6    A.   As an agent, we conduct criminal enterprise investigations

7    targeting violent street gangs that have a negative impact.

8    I've worked in Lawrence, Haverhill, Lowell, Lynn, Chelsea,

9    Boston, Chelsea and Revere is my primary areas of

12:23PM 10    responsibility, and we with our local, state and federal law

11    enforcement partners would target criminal gangs that sell

12    drugs, commit violent crimes, a myriad of violent crimes.

13    Q.   In addition to being a special agent, is it fair to say

14    that you recently took on supervisory responsibilities for that

15    squad of the FBI in Boston?

16    A.   Yes, I've been a supervisor now for approximately a year

17    and a half, maybe a little longer.

18    Q.   Special Agent Wood, during your work on the FBI's Boston

19    gang squad, were you a part of an investigation into La Mara

12:23PM 20    Salvatrucha or MS-13 in Massachusetts?

21    A.   Yes, I was.

22    Q.   All right.  And would it be fair to say that during that

23    investigation, your role grew?

24    A.   Yes.

25    Q.   Okay.  So, let's start at the beginning.  When did you

1    first -- well, start at the very beginning.  You started

2    working gangs in 2002.  When is the first time that you heard

3    or came into contact with MS-13 in Massachusetts?

4    A.    In August --

5              MR. MURPHY:  Objection.

6              THE COURT:  Overruled.

7    A.    I first started looking into MS-13 in August of 2002 when

8    I joined the gang unit.

9    Q.    And why was that?

12:24PM 10   A.    Well, Somerville had just experienced a rape of two women,

11   one being in a wheelchair, and those rapes were committed by

12   MS-13 gang members.

13             MR. MURPHY:  Objection, your Honor.  Motion to strike.

14             THE COURT:  I'm going to strike that and instruct the

15   jury to disregard the facts of that specific crime.  Go ahead.

16   Q.    Did you begin -- you began to -- is it fair to say that

17   you tried to learn about MS-13 recently in your arrival in the

18   gang squad in 2002?

19   A.    Yes, immediately I began talking to my local and state law

12:25PM 20   enforcement partners, the State Police, the Boston Police to

21   learn more about MS-13.  I coordinated a training coordination

22   meeting outside of Philadelphia, Pennsylvania for the State

23   Police and the Boston Police and myself to attend in 2003 for

24   us to learn even more about MS-13 and ongoing investigations

25   throughout the country at that point.

1    Q.   All right.  In the course of your duties as an FBI

2    special agent, did you ever travel to El Salvador?

3    A.   Yes, I did.

4    Q.   How many times have you traveled to El Salvador?

5    A.   I have been to El Salvador on two occasions.

6    Q.   When was the first time that you went to El Salvador,

7    Special Agent Wood?

8    A.   I believe it was either 2005 or 2006.

9    Q.   Okay.  What was the purpose of you going to El Salvador?

12:26PM 10   A.   It was for the second annual MS-13 coordination

11   training/meeting conducted by federal, state and local law

12   enforcement agencies within the United States and our Central

13   American counterparts.  We had law enforcement officers from

14   El Salvador, Guatemala, Honduras, Mexico and other Central

15   America countries, and it was our second meeting that was held

16   in El Salvador to discuss and learn more about the problems

17   with MS-13.

18   Q.   I think you testified a moment ago that for a period of

19   time you were deployed to Afghanistan and then you worked in

12:26PM 20   Washington.  When you came back to Boston, did you continue to

21   try to learn about MS-13?

22   A.   Yes.

23   Q.   All right.  How did you do that?

24   A.   Well, we would talk about MS-13 amongst yourselves trying

25   to learn everything we could.  We would -- I would read any

1   kind of intelligence projects that the FBI would disseminate

2   from ongoing criminal enterprise investigations throughout the

3   United States.  I would attend different gang training as far

4   as where MS-13 would be discussed, and then in 2012 one of my

5   partners initiated a criminal enterprise investigation

6   targeting MS-13, and at that point I would participate and

7   provide help and assistance.  I would give opinions and

8   direction to my partners, and I would just keep myself up to

9   speed on the investigation until I was named as a case agent.

12:27PM 10   Q.   Okay.  So you mentioned around 2012 that the FBI's Boston

11   office commenced an investigation into MS-13.  Would I be

12   correct that there were earlier attempts to investigate MS-13

13   while you worked in the FBI's Boston office?

14   A.   That is right, yes.

15   Q.   But I think what we're going to talk about here today and

16   tomorrow is about sort of this case, and this case commenced

17   around 2012.  Would that be correct?

18   A.   That is correct, yes.

19   Q.   Okay.  Special Agent Wood, in going -- as part of working

12:28PM 20   in and commencing this investigation, you said you traveled to

21   El Salvador in 2005 or 6, correct?

22   A.   Yes, I traveled the first time in 2005 or 6, and I

23   traveled again in 2013.

24   Q.   And you had met with people who had investigated MS-13

25   previously, correct?

```
 1   A.   Yes.
 2   Q.   And you had spoken to police officers in the course of
 3   your duties, correct?
 4          MR. MURPHY:  Objection.  Leading, your Honor.
 5          THE COURT:  I'll allow leading for this kind of
 6   background information.
 7          MR. POHL:  Thank you.
 8          THE COURT:  Go ahead.
 9   Q.   You had spoken to police officers, correct?
10   A.   I have, yes.
11   Q.   Encountered MS-13 members, correct?
12   A.   Yes.
13   Q.   And when you were in El Salvador the first time, anyway,
14   what kind of information did you receive about MS-13 while you
15   were there?
16          MR. LOPEZ:  Objection.
17          THE COURT:  I'll allow it in general terms, not
18   specifics, in other words, just sort of an overview, not
19   specific details.
20   A.   The formation of the gang, the history of the gang,
21   current investigations throughout Central America and the
22   United States, an overview of how the gang was changing from
23   when it was first formed to what we were experiencing in 2005
24   throughout the United States and Central America, a general
25   overview of just the gang and its methods of operation.
```

1    Q.   And the kind of people that you spoke to at that meeting

2    were who?  Who are we talking about?

3    A.   We spent time with the El Salvadorian police officers who

4    were at the conference, and we socialized with them and had

5    meetings during the day, and at night, we just talked typical

6    law enforcement police officer talk between federal law

7    enforcement officers.

8         We also had FBI agents and police officers from around

9    the country that we were all together, and we would all talk

12:30PM 10  about what we had seen, what we had learned, and just passed on

11   that information to one another.

12   Q.   So, through the course of those conversations, through the

13   course of you reading about MS-13, in the course of your

14   reading, briefings from other FBI offices throughout the

15   country, in the course of speaking to officers that were

16   encountering MS-13 members on the streets, did you learn about

17   how the gang was formed?

18   A.   Yes.

19   Q.   Okay.  What can you tell the jury about how MS-13 was

12:31PM 20  initially formed?

21        MR. MURPHY:  Objection, your Honor, hearsay.

22        THE COURT:  Overruled.

23   A.   The gang was initially formed in 1979.  You had a lot of

24   El Salvadorian immigrants fleeing El Salvador from the civil

25   war there, and when they arrived, they were -- the immigrants

1   were picked on by other gangs.  You had a group of

2   El Salvadorians who liked rock and roll music, they liked to

3   smoked pot and get high, and they initially called themselves

4   you know, Mara Salvatrucha, and that was the initiation of the

5   gang, and at that point that's how it started, and then it has

6   spread since then.

7   Q.   How?  How has it spread?

8        MR. MURPHY:  Your Honor, may I have a standing

9   objection to this line of questioning?

12:32PM 10        THE COURT:  Yes.

11        MR. MURPHY:  Thank you.

12        THE COURT:  Go ahead.

13   A.   Well, as more El Salvadorian immigrants came into the

14   country, as gangs became more prevalent in the '80s, and as

15   gang members started getting arrested, and they would go into

16   jail, you had a lot of MS-13 gang members in jail, and back

17   then they were called MS, Mara Salvatrucha, but the gang in the

18   prison systems in California, you have the Norteños, which is

19   for Northern California and the Sureños, which is Southern

12:32PM 20   California, and the Sureños throw a lot of their allegiance to

21   the Mexican Mafia.

22        The Mexican prison gang runs the prisons, and so they

23   made the MS-13 gang form an alliance with them and fall under

24   the rules, and as a response, MS became MS-13 because 13 is the

25   number that is associated with the Mexican Mafia, and that's

1    how they threw their allegiance to MS-13, so initially mostly

2    MS-13 was in California, and then as immigrants started to

3    spread, you started seeing MS cliques forming in other cities,

4    however, upon their release from prison, a lot of MS-13 gang

5    members were deported back to El Salvador, and once they got

6    deported back to El Salvador for the violent crimes they

7    committed in the United States, they then started morphing

8    their gang into more of an El Salvadorian gang, so --

9         THE COURT:  Let's pause there and put another

10   question.

11        MR. POHL:  Thank you, your Honor.

12   Q.   So this sort of early iteration, it started in California,

13   I think you said the people were then deported back into

14   El Salvador, correct, and the first time you went to

15   El Salvador in 2005, you were sort of receiving information

16   about the gang current activities in the United States,

17   correct?

18   A.   Yes.

19   Q.   And would I be correct that you spoke to El Salvador

20   Police, other law enforcement officers that you spoke to in

21   2005, the meeting in El Salvador, about sort of what they were

22   learning about how the gang had come from California to

23   El Salvador and then back to the U.S.?

24   A.   Yes.

25   Q.   And what did you learn?

1   A.   Well --

2        MR. LOPEZ:  Objection, your Honor.  What he learned

3   from others who would not testify?

4        THE COURT:  Yes, it's in the nature of expert

5   testimony.  Overruled.

6   A.   Well, the gang was morphing.  It used to be strictly an

7   American-type gang, something that most Americans would

8   understand, but as they moved into El Salvador, the gang was

9   starting to initiate their leadership and base it in

12:35PM 10   El Salvador, so the gang started morphing in the early part of

11   the century, and it's morphed into what we know where the

12   leadership structure is based in El Salvador, the head leaders

13   are all in prison and run the gang from inside the prison, they

14   send their instructions from inside the prison out to the

15   leaders out in El Salvador, who then send those orders back to

16   their cliques in El Salvador, Honduras, Guatemala and back into

17   the United States.

18   Q.   Okay.  So, let me -- that's 2005.  Let's pick back up

19   again.  I don't think we need to go year by year by year, but

12:35PM 20   would it be fair to say that beginning in 2005 and continuing

21   until the point in time at which sort of the FBI began its

22   investigation into MS-13 in Massachusetts, you continued to

23   have the kinds of discussions that you've discussed a moment

24   ago, correct?

25        MR. MURPHY:  Objection, your Honor, leading.

1          THE COURT:  I'll allow that one.  Overruled.

2    A.   Yes.

3    Q.   All right.  So, and those discussions -- as a result of

4    those discussions, have you become familiar with the structure

5    and the organizational structure of MS-13?

6    A.   I have, yes.

7    Q.   And when I say the organizational structure, I mean sort

8    of in the time frame that we're talking about, from 2012

9    forward?

12:36PM 10    A.   I have, yes.

11    Q.   Okay.  You said a moment ago about sort of incarcerated

12    leaders in El Salvador; is that correct?

13    A.   Yes.

14    Q.   And that the gang has sent people into the United States,

15    correct?

16    A.   Yes.

17    Q.   All right.  What can you tell the jury about what you've

18    learned about how MS-13 is organized in the United States?

19    A.   In the United States, an individual clique is what we

12:37PM 20    would call a chapter, a group of MS-13 gang members, so there's

21    many cliques.  Each clique will be led by either the first word

22    or the runner, and most cliques will have the second word, the

23    second runner, so that's the leader in the immediate second in

24    command.

25          Some cliques may actually have a treasurer, but you

1   have the first word, the second word, then the homeboys, which

2   are full-fledged gang members, and then they'll have chequeos

3   and paros, who are the recruits, the new up and coming gang

4   members.

5   Q.   Are there particular colors that MS-13 members sometimes

6   use to identify themselves?

7   A.   Yes, their primary color is blue and white, we'd say

8   Dallas Cowboys is one of the colors, but we'll see them wearing

9   blue clothes.  They like white with that.  At times, they'll

12:38PM 10   wear neutral colors, beige as a color just to kind of avoid law

11   enforcement attention because they know now that we --

12           MR. MURPHY:  Objection, your Honor.

13           THE COURT:  We'll stop it there.  Put another question

14   to him.

15           MR. POHL:  Thank you.

16   Q.   -- know those colors.  Do MS-13 members typically or

17   oftentimes bear tattoos?

18   A.   It's changed, but, yes, we have many MS-13 members that

19   have tattoos, but it's been changing.

12:38PM 20   Q.   Okay.  Are there particular signs or symbols that an MS-13

21   member would utilize to identify himself as an MS-13 member?

22   A.   Yes.

23   Q.   Can you give the jury an example of what one of those

24   signs would look like.

25   A.   They like the devil's horns, so you'll see them flash

1   signs like this where you have your two outside fingers

2   pointing up.  (Indicating)  That's the devil's horns.  They

3   like MS, they like MS-13.  Their rosary beads would be blue and

4   white or blue.  They'll have bandanas that are blue, again,

5   signifying who they are.  Those are the predominant signs.

6   Q.   So, during the time frame in which you were conducting

7   your investigation -- well, I should have asked this question a

8   moment ago.  So before I move on, let me jump back one.  You

9   talked about tattoos and the fact that they often had tattoos.

10  The kinds of tattoos they had included MS or MS-13, correct?

11  A.   Yes.

12  Q.   What about tattoos denoting the particular cliques that

13  members belong to?

14  A.   They would have tattoos that have their clique initials on

15  it.  They could spell it out.  Sometimes they just go MS-13,

16  sometimes they'd say MS, sometimes they actually spell out

17  La Mara Salvatrucha.  I've seen tattoos where sometimes they'll

18  throw the Salvadorian flag, they'll throw 503, which is the

19  country code for El Salvador for a tattoo, so there's a lot of

20  different types of tattoos, but, again, tattoos are changing.

21  Q.   So, through your work on the FBI investigation into MS-13,

22  through the conversations you've had with law enforcement

23  agents throughout the country, the conversations you've had

24  with officers in El Salvador, what can you tell the jury about

25  sort of the mission, the goal of MS-13?

1          MR. MURPHY:  Objection, your Honor.

2          THE COURT:  Overruled.

3    A.   MS-13 is about controlling their testimony, MS-13 is about

4    being in control, letting -- being in charge of that territory,

5    being the predominant, if not the only gang in that territory.

6    Like all gangs, there are some rival gangs that are more of an

7    enemy, mortal enemy to that gang, but with MS, we don't see

8    them forming alliances with other street gangs that we've seen

9    with other gangs that we've investigated.  This gang is about

12:41PM 10  they are there, they're in charge, and they don't want any kind

11   of rivals, any kind of competition in their neighborhoods, in

12   their streets.

13   Q.   You mentioned a moment ago gang rivals.  Are there

14   particular groups or gangs that have been identified by you and

15   the officers you work with as being the principal rivals of

16   MS-13?

17   A.   Yes, yes, we have.

18   Q.   And who, is there a particular gang, is there one gang in

19   particular that's sort of a significant rival to MS-13?

12:42PM 20  A.   Yes.

21   Q.   And what is that gang called?

22   A.   18th Street.

23   Q.   And would I be correct that 18th Street identifies itself

24   through particular colors?

25   A.   Yes, they do.

1    Q.    And what colors are those?

2    A.    They like red, so they would predominantly wear red.

3    Q.    Have you -- you mentioned a moment ago the sort of

4    different levels or ranks that are frequently seen in MS-13,

5    correct?

6    A.    Yes.

7    Q.    Aside from the leadership, the first word or second word,

8    there were homeboys was a full member, correct?

9    A.    Yes.

12:43PM 10    Q.    And the other words you used were called a paro?

11    A.    Paro, yes.

12    Q.    And chequeo?

13    A.    And chequeo, yes.

14    Q.    Have you in the course of your conversations with other

15    investigators being in El Salvador, working on this case, have

16    you sort of -- can you describe for the jury the ways in which

17    an MS-13, someone who wants to join MS-13 would be promoted and

18    included in the gang?

19          MR. MURPHY:  Your Honor, may we be heard, please?

12:43PM 20          THE COURT:  All right.

21          (THE FOLLOWING OCCURRED AT SIDEBAR:)

22          THE COURT:  Yes.

23          MR. MURPHY:  Thank you, your Honor.  My objection is

24    this does get into core viable principle and methods testimony

25    because I think what he's going to say, and this is what I am

1    particularly concerned about, is that in order to become a

2    full-fledged homeboy, one has to commit a murder, and I think

3    there's testimony in his prior testimony that that has changed

4    over time.  I think they'll be people who are witnesses in this

5    case who are alleged to be full-fledged homeboys who don't have

6    murders, so it's really a question of I think outside the

7    presence of the jury establishing that he has enough data to be

8    able to show that some particular percentage of people who get

9    promoted to homeboy have killed someone because I think there's

12:44PM 10  going to be significant evidence that our guys are homeboys,

11   but there's not going to be any particular evidence suggesting

12   that they committed particular murders, and so I think it's

13   extraordinarily prejudicial if this guy says everybody who is a

14   homeboy has killed somebody.

15           THE COURT:  What do you expect the testimony to be?

16           MR. POHL:  I actually expect the testimony to be more

17   along the lines of what Mr. Murphy suggested, that by the later

18   part of this investigation, it was more true that you had to

19   have committed a murder to be considered for homeboy status,

12:45PM 20  but I don't think he's going to say that was a requirement

21   throughout the existence of MS-13.

22           THE COURT:  In other words, that it changed over time?

23           MR. POHL:  Yes, exactly.

24           MS. LAWRENCE:  And El Salvador also has requirements.

25           MR. LOPEZ:  Do you have to establish that progression

 1    during your questioning?

 2              MR. POHL:  I don't think so.

 3              THE COURT:  I'm going to allow it, but I'm going to

 4    give you a small allowance of latitude to make sure this is

 5    phrased exactly correctly.

 6              MR. POHL:  Thank you very much.

 7              (SIDEBAR CONFERENCE WAS CONCLUDED)

 8              THE COURT:  All right, sir.  The objection is

 9    overruled.  Go ahead, Mr. Pohl.

12:46PM 10         MR. POHL:  Thank you very much, your Honor.

11    Q.   I'm going to ask you a couple questions about what we just

12    talked about.  Would I be correct that during the time period

13    in which you've been learning about, educating yourself about

14    and then finally investigating MS-13, that the requirements

15    that the gang imposed to become a homeboy changed over time?

16    A.   Yes.

17    Q.   Would I be correct that during your career, conversations

18    with agents in other parts of the country and in El Salvador

19    and during this investigation and also during the investigation

12:47PM 20    that you conducted itself, that the requirements for becoming a

21    homeboy grew?

22    A.   Yes, you would.

23    Q.   Okay.  All right.  I think I'm going to jump back and ask

24    you some non-yes or no questions now.  During your -- would I

25    be correct though that in order to become a member of MS-13, a

1    member would have -- well, what kinds of things would somebody

2    have to do in order to become a full member of MS-13?

3             MR. MURPHY:  Objection.

4             MR. LOPEZ:  Time frame.

5             THE COURT:  Now, the last couple years?

6             MR. POHL:  Let's bound it to this investigation.

7    Q.   Your investigation started in 2012, thereabouts, right?

8    A.   Yes.

9    Q.   So let's say during 2012, right, and sort of the early

12:48PM 10   stages of your investigation, what would you -- what kind of

11   information were you receiving about the kinds of things

12   somebody would have to do to become a homeboy in MS-13?

13   A.   The gang members would commit violent crimes against

14   rivals, suspected law enforcement cooperators that would either

15   a serious assault or even the killing of someone to become a

16   homeboy.

17   Q.   Okay.  During the investigation, would you say that the

18   requirements to become a homeboy became more stringent?

19   A.   Yes.

12:48PM 20   Q.   All right.  Such that by the tail end of your

21   investigation in 2015, 2016, what kinds of requirements were

22   you seeing being imposed on somebody becoming a member of

23   MS-13?

24   A.   The successful killing of a rival gang member or a

25   suspected law enforcement cooperator.

1    Q.    Okay.  You indicated a moment ago that in order to become

2    in the gang, you had to commit, sort of even at the beginning

3    of your investigation and before that, you had to commit some

4    kind of significant violent crime to be committed in the gang?

5              MR. MURPHY:  Objection, your Honor.

6              THE COURT:  Overruled.

7    Q.    And --

8              THE COURT:  I guess we need the beginning of the

9    investigation, meaning 2012.

12:49PM 10          MR. POHL:  Yes.

11             THE COURT:  Okay.

12   A.    Yes.

13   Q.    And would the violent crimes you said, I think you

14   mentioned two kind of violent crimes in particular, right, one

15   was a gang rival, correct?

16   A.    Yes.

17   Q.    And the other was a police informant, someone who is an

18   informant?

19   A.    Yes.

12:49PM 20   Q.    I'd like to talk about that for a minute.  What have you

21   learned in the course of your investigation into MS-13

22   concerning MS-13's position with members that it believes are

23   providing information to the police?

24             MR. LOPEZ:  Objection, your Honor.  This investigation

25   starting in 2012.

1          THE COURT:  I thought it was a generalized question

2     concerning MS-13 and during the period of time of roughly 2012.

3          MR. LOPEZ:  Well, I ask for a clarification.

4     Q.   Well, I mean, let's back up.  Starting in 2005, when you

5     first went to El Salvador, did you learn whether or not MS-13

6     had a particular position concerning members that might provide

7     information to the police?

8     A.   Yes.

9     Q.   All right.  And would it be fair to say that that position

12:50PM 10    has not changed during the course of your time when you've been

11    investigating the gang?

12    A.   I would say that over the course of the investigation

13    since I started looking at MS-13 that the punishments have

14    become even more severe than when I knew about it in 2005.

15    Q.   And specifically what is MS-13, what is an MS-13 member

16    required to do if he learns or believes that a member of the

17    gang is providing information to the police?

18    A.   They'll do several steps.  If they have very, very good

19    proof, they would try and kill that suspected cooperator right

12:51PM 20    away.  If they just have suspicions, they will present their

21    evidence through their chain of command, which will go all the

22    way back to El Salvador, and then the leadership in El Salvador

23    will either approve a green light or say we don't have enough

24    evidence yet, and if they approve the green light, they will do

25    everything they can to kill that cooperator, and if they're

1    unable to locate the cooperator, they will kill their family

2    members.

3    Q.    Let's talk about this investigation specifically.  How did

4    the investigation into MS-13 in Massachusetts begin?

5    A.    We developed a cooperating witness through the help of the

6    TAG.

7    Q.    What's the TAG?

8    A.    The TAG is the transnational anti-gang unit.  We have a

9    TAG in El Salvador, Guatemala and Honduras.  It's comprised of

12:52PM 10   law enforcement from the local police officers from each

11   country that are selected to work with the FBI on MS-13 and

12   18th Street gang investigations in those countries.

13   Q.    And how did your sort of connection to or work with the

14   TAG lead you to be in a position to begin this investigation

15   here in Massachusetts?

16   A.    The TAG had developed a cooperating witness that was

17   providing information to the TAG in El Salvador, and that

18   individual had been in the United States, had spent time in

19   prison here in the Boston area while awaiting deportation, and

12:52PM 20   the TAG reached out to a task force officer and said we have

21   someone that might be able to help you with your MS-13 problem

22   in Massachusetts.

23   Q.    Okay.  And what was sort of -- would I be correct that

24   eventually the FBI worked to bring this cooperating witness

25   back into the United States?

1   A.   We did, yes.

2   Q.   All right.  And what kinds of things -- well, was the

3   witness interviewed in El Salvador prior to that?

4   A.   The cooperating witness was interviewed in two locations

5   by the task force in El Salvador, the first time by the TFO,

6   and then the second time an FBI agent and a couple of TFOs,

7   which are task force officers, they flew down to El Salvador

8   and interviewed him again.

9   Q.   And would I be correct -- when did the cooperating witness

12:54PM 10   first get brought back into the United States from El Salvador?

11   A.   2012 to 2013.  That very early part of 2013 is when we

12   finally got him back, 2012.

13   Q.   And can you tell the jury sort of how the FBI began to

14   sort of set up and establish the cooperating witness and review

15   his ability to access members of MS-13?

16   A.   We interviewed the cooperating witness and decided that we

17   would take the opportunity to bring him back into the Boston

18   area and would have him post as a drug dealer and attempt to

19   purchase illegal narcotics from MS-13 gang members, and then

12:54PM 20   also we directed the CW to create a scenario where he would

21   seek volunteers from the gang to help protect a cartel's drug

22   shipments between Massachusetts and New Hampshire with

23   different drug traffickers.

24   Q.   Well, I think I suspect, given the hour, we're going to

25   talk more about this tomorrow, but let me ask you a couple

1    questions about that now.  The cooperating witness sort of

2    first made contact with a particular, with members of a

3    particular clique in Massachusetts, correct?

4         MR. MURPHY:  Objection, your Honor.  Leading.

5         THE COURT:  Sustained.

6    Q.   I can ask another question.  At some point during your

7    investigation, did the cooperating witness -- well, what steps,

8    you said posing as a drug dealer, correct, through the

9    cooperating witness posing as a drug dealer.  What kinds of

12:55PM 10   investigative techniques with the cooperating witness did you

11   do to begin to identify people who may be in MS-13?

12   A.   We would have the cooperating witness in Chelsea, East

13   Boston areas where MS-13 had territory and attempt to start

14   meeting fellow El Salvadorians, and as he did, he would start

15   to gather evidence or not evidence, intelligence who they were

16   and try and determine whether they were, in fact, members of

17   MS-13 or not, so if they were MS-13, we would identify them as

18   members, homeboys.  If not, maybe they were just drug dealers,

19   so we would gather intelligence against the people he would be

12:56PM 20   talking to to determine what kind of people he was running into

21   and meeting.

22   Q.   What were the kinds of investigative steps that you would

23   take with the cooperating witness to sort of document or

24   corroborate the information that the cooperating witness was

25   providing to you and the other agency that you worked with?

1    A.   Well, once the cooperating witness met with people in

2    Chelsea, he'd come back and say, oh, I met so and so, and he's

3    claiming to be MS-13, so at that point, then we go in Chelsea,

4    we have a Chelsea detective, and he would either know the

5    person himself or he would go back into the Chelsea Police

6    Department and look up the records and say have we ever done

7    any kind of investigation, have we ever done a field

8    investigation, a field identification of this person, and if

9    they had, they would have information on whether that person

12:57PM 10    was, in fact, a MS-13 gang member or not, and at that point

11   that corroborates what the cooperating witness was telling us.

12   Q.   But in addition to that, would I be correct that the FBI

13   attempted when possible to record conversations that the

14   cooperating witness had?

15            MR. MURPHY:  Objection.

16            THE COURT:  It is leading.  Sustained.

17   Q.   Aside from those kind of field interviews that you talked

18   about, what other kinds of investigative steps did you take to

19   corroborate the information that the cooperating witness

12:58PM 20   provided you?

21   A.   Once we identified targets for our investigation, 1, we

22   placed a consensual T3, which is a -- we were allowed to

23   intercept every phone call and text message that the

24   cooperating witness had with targets of the investigation.  We

25   would provide the cooperating witness with a recorder which

1    would enable him to consensually record either audio and/or

2    audio and video recordings with the subjects of our

3    investigation.

4    Q.    And were some of those consensual recordings?

5          MR. POHL:  Can I have Exhibit 1 for the witness.  This

6    is for the witness, Mr. Clerk.

7    Q.    Special Agent Wood, we're going to click through three

8    pictures quickly, Exhibits 1.1, 1.2 and 1.3.  Do you recognize

9    the pictures I have in front of you?

12:59PM 10   A.    I do.

11   Q.    How do you recognize them, sir?

12   A.    That's the garage in Everett where the Eastside

13   Locos Salvatrucha clique would meet and hold their meetings,

14   and they would meet inside the garage, and, yes, we would place

15   a recorder on our cooperating witness, and he would record

16   those meetings.

17   Q.    Okay.  And how do you personally know that?

18   A.    Well, I would be parked somewhere near there with my

19   partners, and we would be -- we would surround the best we

01:00PM 20   could and be in a position to be near that garage, so I've seen

21   the garage.  I actually did some work on the garage to see if

22   we could actually do a Title III and place a bug in the garage.

23         MR. POHL:  I'd offer Exhibit 1, your Honor.

24         THE COURT:  The three photographs?

25         MR. POHL:  Yes, 1.1 through 1.3.

1              THE COURT:  All right.  They're admitted.

2              MR. POHL:  Thank you.

3              (Exhibit Nos. 1.1, 1.2 and 1.3 received into

4      evidence.)

5      Q.    Special Agent Wood, let me quickly go through these for

6      the jury.  1.1, what are we looking here?

7      A.    This is the garage off to the left, and this is the road

8      that the garage is on in Everett.

9      Q.    We've blown up that section.  Is that the area we're

01:00PM 10     looking at?

11     A.    Yes.

12     Q.    That's the garage?

13     A.    Yes.

14     Q.    Where the meetings occurred?

15     A.    Yes.

16     Q.    Thank you.  Next photograph, 1.2.

17     A.    This is one of the bays of the garage where a car would

18     pull in and they could do their work on the car inside the

19     garage.

01:01PM 20     Q.    And you said that the clique would meet at this -- the

21     Eastside clique would meet at this garage?

22     A.    They would meet inside the garage.

23     Q.    Inside this bay area, is that where the meetings would

24     take place?

25     A.    Yes.

```
 1    Q.    1.3.
 2    A.    This is from a different location of the garage.
 3               THE COURT:  Is this a good place to break?
 4               MR. POHL:  I think this would be a good time to break.
 5               THE COURT:  All right.  We'll break there for the day,
 6    ladies and gentlemen.  Remember my instructions particularly
 7    not to discuss the matters with yourselves or anyone else, and
 8    let's try to get started at 9:00 tomorrow morning on the dot.
 9    Thank you.
10               THE CLERK:  All rise for the jury.
11               (JURORS EXITED THE COURTROOM.)
12               (Whereupon, the hearing was adjourned at
13    1:01 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

01:01PM

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7              I do hereby certify that the foregoing transcript,

8    Pages 1 through 66 inclusive, was recorded by me

9    stenographically at the time and place aforesaid in Criminal

10   Action No. 15-10338-FDS, UNITED STATES vs. HERZZON SANDOVAL,

11   et al., and thereafter by me reduced to typewriting and is a

12   true and accurate record of the proceedings.

13              Dated this 7th day of June, 2018.

14                        s/s Valerie A. O'Hara

15              _____

16              VALERIE A. O'HARA

17              OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25