1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2


3

     UNITED STATES OF AMERICA          )
4                                      )
     vs.                               )  Criminal Action
5                                      )
     HERZZON SANDOVAL,                 )  No. 15-10338-FDS
6    EDWIN GUZMAN,                      )
     CESAR MARTINEZ,                    )
7    ERICK ARGUETA LARIOS,             )
                      Defendants       )
8


9

     BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
10


11
                          JURY TRIAL DAY 4
12


13


14

                 John Joseph Moakley United States Courthouse
15                         Courtroom No. 2
                           1 Courthouse Way
16                         Boston, MA 02210

17                         February 2, 2018
                             9:00 a.m.
18


19


20


21

22                         Valerie A. O'Hara
                          Official Court Reporter
23          John Joseph Moakley United States Courthouse
                    1 Courthouse Way, Room 3204
24                        Boston, MA 02210
                   E-mail: vaohara@gmail.com
25

1    APPEARANCES:

2    For The United States:

3         United States Attorney's Office, by CHRISTOPHER J. POHL,
     ASSISTANT UNITED STATES ATTORNEY, and KELLY BEGG LAWRENCE,
4    ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200,
     Boston, Massachusetts 02110;

5

6    For the Defendant Herzzon Sandoval:

7         Foley Hoag LLP, by MARTIN F. MURPHY, ESQ. and
     MADELEINE K. RODRIGUEZ, ATTORNEY,
     155 Seaport Boulevard, Boston, Massachusetts 02210;

8

9    For the Defendant Edwin Guzman:

10        Lawson & Weitzen, by SCOTT P. LOPEZ, ESQ.,
     88 Black Falcon Avenue, Suite 345, Boston, Massachusetts 02210

11   For the Defendant Erick Argueta Larios:

12        THOMAS J. IOVIENO, ESQ., 345 Neponset Street
     Canton, MA 02021;

13

14   For the Defendant Cesar Martinez:

15        Stanley W. Norkunas, 11 Kearney Square,
     Howe Building, Suite 202, Lowell, Massachusetts 01852.

16        ROBERT M. SALTZMAN, ESQ., 1 Central Street, Suite 5,
     Stoneham, Massachusetts 02180.

17

18   ALSO PRESENT:  Gabriel Haddad, Spanish Interpreter
                    Carrie Lilley, Spanish Interpreter

19

09:37AM 20

21

22

23

24

25

1                        I N D E X

2   WITNESS                    DIRECT  CROSS  REDIRECT  RECROSS

3    JEFFREY ELLIOT WOOD, JR.
     By Mr. Pohl                  19
4    By Mr. Iovieno                      91

5

6   EXHIBITS                          FOR I.D.   IN EVIDENCE

7     2 through 5                                    29
      6                                              24
8     32.2                                           90
      103 and 104                                    54
9     106 and 107                                    76
      108                                            73
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1

2          THE CLERK:  All rise.  Thank you.  You may be seated.

3    Court is now back in session.

4          THE COURT:  Good morning, everyone.

5          MR. POHL:  Good morning, your Honor.

6          THE COURT:  So I understand we're having some trouble

7    with the stenographic record.  We are making a record, but it

8    isn't the way it is supposed to.

9          Before I forget, Mr. Murphy, you did speak from the

09:38AM 10    middle of the courtroom yesterday, which can you make sure the

11    mic. is pointed to you so that the mic. picks up your words.

12    That apparently was an issue yesterday.

13          MR. MURPHY:  Yes, your Honor.

14          THE COURT:  What do we have to talk about,

15    Mr. Iovieno?

16          MR. IOVIENO:  Two issues arose last evening from an

17    e-mail from Mr. Pohl.  One of them, before we started this

18    trial, we were advised the number of murders that would be

19    sought to be introduced by the government, and last night the

09:39AM 20    government indicated that they were going to seek to introduce

21    photographs of some weapons, what I understand to be weapons

22    that were recovered by the FBI with the help of CW-1 in I think

23    it was January of 2016.

24          This was a Falcon Street murder that happened

25    January 10th, 2016, and the inference is that the CW-1 helped

1    the FBI.  He first helped hide these weapons in his capacity

2    acting as undercover informant.  He then, I guess, led the FBI

3    to the weapons, knives and shirts, and I think there was blood

4    on the knives and things of that nature.

5         You know, this murder, again, is irrelevant to these

6    defendants, and I think what the government is attempting to do

7    is to rehabilitate, if you will, a witness, CW-1, by somehow

8    inferring that this was around the time that he was accused of

9    the -- or the FBI became aware of his involvement with the

09:40AM 10   armed robberies and some other misdeeds, if you will, and at

11   that point, he has maybe a "Come to Jesus moment" and said, by

12   the way, there's some weapons in Deer Island that we used in a

13   murder.

14        I think this is a back door attempt -- CW-1 is not

15   going to be called by the government, he's not on the witness

16   list, a back door attempt to rehabilitate him as a witness

17   who's not going to be present.

18        That's one issue.  That's in the same e-mail the

19   government indicated that Agent Wood, they would object to

09:40AM 20   Agent Wood discussing or to be asked questions about CW-1's

21   termination and involvement with the witness protection

22   program.

23        This was disclosed to us, and I think all counsel

24   relied upon it in the 21-day letter that the amount of money

25   that the marshals had paid, I think it was some $300,000 for

1    living expenses, relocation and other benefits CW-1 and his

2    family received that was disclosed to us, and the reason for

3    his subsequent termination from the program was also disclosed

4    that he had been involved with some kind of assault and that he

5    had been discharged or terminated from the program.

6         My memory from reading the transcript of the first

7    trial is that the reason for his termination was not really

8    elicited, but all the other information was elicited, how much

9    money he had, the marshal, as much as had actually been spent,

09:41AM 10   how much in benefits were given to CW-1 and his family, and

11   that was elicited through the government.

12        Given at that point they say he's not authorized under

13   the statutes to disclose that, they've waived that first by

14   disclosing it and permitting him without objection in the first

15   trial to talk about that, so I think it's fair game in this

16   trial that we cross-examine Agent Wood on those issues.

17        THE COURT:  Why are we talking about impeaching

18   someone who is going to testify through another witness?  I

19   know as a practical matter, counsel wants to attack the FBI,

09:42AM 20   but that's not really, you know, a legitimate line of inquiry

21   or making the FBI look foolish is not really a legitimate line

22   of inquiry, but why do we get into this at all if CW-1 isn't

23   testifying?

24        MR. IOVIENO:  Well, it goes to CW-1's motives during

25   the course, what was his real motives, was his real motives to

4-7

1     line his own pockets, if you will, commit crimes that they

2     weren't aware of while under the guise that he's an undercover

3     informant being paid by the FBI to work for them when he wasn't

4     really working for them.

5          THE COURT:  Again, if CW-1 is not going to testify,

6     his only relevance, I think he physically was the person who

7     wore a wire or recorded the videos, and that's it, I think.  I

8     don't know how any other witness can testify about what CW-1

9     did or said.  I'm not following you.

09:43AM 10          MR. IOVIENO:  It's more than -- what CW-1 did in this

11     case was across clique lines, if you will, and reach out to

12     other members because he was unsuccessful with Eastside, and he

13     reached out to other cliques to -- the armed robberies he was

14     doing with CW-2, "Clacker," there were assaults with other

15     members of other cliques, so he's crossed over state lines, if

16     you will, and brought this back particularly with

17     Joel Martinez.

18          We heard graphic testimony, you know, about

19     Joel Martinez, what we're probably going to hear, Joel Martinez

09:43AM 20     was then brought in January into the clique by CW-1, so CW-1's

21     motives are at issue, and if subsequently he's given all this

22     money and benefits in return for how available he is to the FBI

23     and his value to the FBI is tied into the money he's getting,

24     and if he's subsequently terminated from the program, it's

25     relevant to the fact that he does not live up to his bargains,

1    if you will.

2          There's an agreement in this case, I understand from

3    the first trial, an agreement that was signed between the FBI

4    and CW-1, and that agreement, he breached it, and he was

5    confronted with it.  The fact he continued afterwards while in

6    the program to engage in criminal conduct is relevant.

7          THE COURT:  Mr. Murphy, you look like you want to say

8    something.

9          MR. MURPHY:  If I could add, the other reason why all

09:44AM 10    this should come in, I expect that Special Agent will say on

11    cross-examination that CW-1 was a significant -- first of all,

12    he will say that he was a source of the information

13    Special Agent Wood relied on when he gave expert testimony, so

14    given that, I believe he may well say that he was a significant

15    source, but I would be very surprised if he didn't say that he

16    was a source.

17          THE COURT:  Okay.  If he is a source to that extent,

18    is he a credible source?  Is it not extrinsic evidence?  Is it

19    not seeking to attack the credibility of -- well, anyway, let

09:45AM 20    me hear your second point.

21          MR. MURPHY:  I'm not sure -- as to that point -- I'm

22    not sure there is a second point.  As to that point, I think

23    the evidence will show that Special Agent Wood apparently did

24    file and said in court that he found CW-1, unbeknownst to him,

25    anything CW-1 was doing was all behind his back.

1          THE COURT:  Wood can't say --

2          MR. MURPHY:  In the first instance, your Honor, that

3     goes to the credibility of Special Agent Wood and the extent to

4     which he can sort out good information from bad information

5     when he testifies as an expert witness for the government.

6          THE COURT:  Mr. Pohl or Ms. Lawrence, do you want to

7     respond?

8          MR. IOVIENO:  My memory, and I think the expected

9     testimony is that Agent Wood would testify they don't trust

09:46AM 10    him, they need corroborating evidence, and that was from the

11    first trial he mentioned that, and if the evidence is contrary,

12    not corroborating what CW-1 is doing, I think it's relevant

13    that the jury hear that.

14         MR. LOPEZ:  Your Honor, I would add further before

15    Mr. Pohl gets up to the extent CW-1's statements provide a

16    context for explaining what the defendants did, which the

17    government will say by their own volition was done because they

18    were mislead by CW-1, I don't think you can tell the story of

19    this case without CW-1's involvement.

09:47AM 20         THE COURT:  There are two different issues here.  The

21    issue is not whether it's relevant.  You can call CW-1, he will

22    be made available to you.  The question is what can you get out

23    of Agent Wood is the question that is on the table right now,

24    so let me hear from the government.

25         MR. POHL:  Thank you, your Honor.

1          THE COURT:  Is this a charged murder in the

2     indictment?

3          MR. POHL:  Yes, it is.

4          THE COURT:  And the photographs were disclosed?

5          MR. POHL:  They were.

6          THE COURT:  Go ahead.

7          MR. POHL:  I think based on the tenor of the openings

8     yesterday that it's not an inference, it was stated four times

9     that CW-1 was the credible evidence of violence in this case

09:48AM 10    instead of somebody who was working with the FBI to be given

11    the nature of that sort of line of attack.

12          I do think it's appropriate, and I'm fully cognizant

13    we're here to try these four people, but given sort of the

14    tenor of the openings yesterday and what I expect that will

15    continue throughout the course of the trial, I do think it's

16    relevant that Special Agent Wood be able to testify that in

17    2015 the cooperating witness was in a position to record a

18    number of young MS-13 members that committed acts of violence,

19    including Joel Martinez, "Animal," and I expect we'll play the

09:49AM 20    recording of Joel Martinez' essentially confession tape today,

21    and that that was a sort of young MS-13 members that made

22    similar statements concerning the murders they committed, who

23    they committed it with, and, in addition, CW-1 both provided

24    information that saved Clacker's life, and also the point of

25    all that is it's fair to say CW-1, as was suggested repeatedly

1    in the openings, a rogue agent who was sort of out there

2    crossing clique lines and engaging in acts of violence.

3         He was acting at the direction of the FBI, and the FBI

4    utilized him to identify several other people who committed

5    murders and recovered the evidence and saved the life of a

6    person who was about to be killed.

7         THE COURT:  If a government is eliciting you wired up

8    CW-1, here's the recording, but to say CW-1 did good things,

9    provided value, is it not fair to permit cross-examination,

09:50AM 10   well, CW-1 also did bad things, right?  If you want to

11   rehabilitate or bolster CW-1, whatever the right word is,

12   aren't they allowed to do the opposite?

13        I have to say anything that came out in the first

14   trial, which I frankly don't remember the details of, but

15   anything concerning his position in the WITSEC that came out in

16   the first trial can come out.  There's no preservation as to

17   that.

18        MR. POHL:  I can jump to that.  I apologize if this

19   was unclear from the e-mail last night.  You know, I fully

09:51AM 20   expect that we will elicit testimony concerning the money that

21   CW-1 was paid, and we'll also elicit what that money went to,

22   which is frankly to protect all CW-1's family and why, but --

23   and that did come up in the November trial.

24        What my e-mail was meant to sort of flag and what I

25   sort of picked up after the Court started this morning is that

1    the reason CW-1's termination from the program are pure *Giglio*

2    as to CW-1, I don't think it can be elicited through

3    Special Agent Wood even separate and apart from the statute

4    that limits him to talk about WITSEC.

5            Let me just say this, if at some point the officer is

6    aware of this testimony today, if something comes up, they've

7    made it clear that they'd be available to discuss it with the

8    Court, and, you know, with me, so I don't mean to suggest that

9    this is going to be a situation in which Special Agent Wood is

09:52AM 10   going to stop at 9:45 and I can't do anything else without

11   talking to Washington.

12           We'll be able to work around this if something comes

13   up, but as you said, I don't think CW-1's termination from the

14   program and the nature of the reason why, absent CW-1's

15   testimony, so if it's the Court's view, that if the Court's

16   view is that the fact that CW-1 committed unauthorized illegal

17   activity, right, and if it's the Court's view none absent

18   CW-1's testimony, which I could certainly see that being the

19   case, you know, if that's true, then I think I'd be less

09:53AM 20   inclined to offer the Deer Island photos and try to put CW-1 in

21   a position, in the actions that he took throughout the sort of

22   summer and fall of 2015 into a more appropriate context than we

23   suggest in the openings.

24           So if that's the Court's view, I certainly would be

25   inclined to not offer them.  If he was confronted and

1     admittedly admitting to something of how that influenced his

2     mission into the witness protection program or it influenced

3     the agent's ability to protect his family and the run-up to the

4     takedown, then I think the government should be entitled to

5     elicit the significant amount of evidence from multiple parties

6     that CW-1 gathered concerning their murders in the tail end of

7     2015.

8          THE COURT:  What about the argument that CW-1 was a

9     source of Wood's expert testimony concerning --

09:54AM 10          MR. POHL:  I think that the proper response to that is

11    that CW-1, Special Agent Wood, relied on recordings that were

12    made by CW-1.  I'm sure there may well be -- I don't believe

13    that everything that CW-1 told and discussed with the agents

14    was recorded, but I think the Court has a fair sense of just

15    how much, how many recordings were made on the phone and

16    in-person meetings.

17          MR. IOVIENO:  I think in all the instances Mr. Murphy

18    and Ms. Rodriguez flagged in their motion that the government

19    stated that CW-1 was reliable, and I believe this was in

09:55AM 20    Ms. Lawrence's response last night, what was contained in that

21    sort of statement about CW-1's reliability is that they were

22    able to corroborate CW-1's information through the consensual

23    recordings what the agents we find CW-1 reliable because we

24    hear the recordings that CW-1 makes, and the recordings that

25    CW-1 makes are consistent with what CW-1 is disclosing, so I

1    don't think that -- I think that what Special Agent Wood would

2    say is that he relied on the evidence that was gathered from

3    CW-in learning about MS-13.  I don't know that he will

4    specifically say that he relied on sort of CW-1's

5    uncorroborated statements.  If what CW-1 is saying and is

6    relevant, what he's not disclosing and not recording, he

7    certainly didn't record any armed robberies.

8         THE COURT:  He's not a witness, he's not a witness in

9    the government's case in chief.  Of course, this is all

09:56AM 10   relevant if he testifies, but I'm assuming that he's not.  The

11   question is what can we get from Wood?

12        MR. IOVIENO:  Can I just go back one minute, whether

13   or not -- you mentioned that we have an opportunity to present

14   him as a witness, call him as a witness.  We don't have an

15   opportunity, your Honor.  It's an opportunity created by the

16   government, "We'll make him available, but you can't talk to

17   him beforehand, we're not going to tell you where he is."  It's

18   not an equal opportunity.  He can be produced here, according

19   to the government, for us to examine him, and that may well be

09:57AM 20   the case, but it's not an equal opportunity, and I just wanted

21   to put that on the record.

22        Normally you would have somebody speak to him, an

23   investigator go out, and there's strategy involved whether to

24   call someone, particularly someone who's involved, intricately

25   involved with this investigation.  These men are charged with

1    racketeering, and they were unsuccessful in getting these men

2    to go out and do these violent crimes.

3           CW-1 then goes out and solicits other people, he goes

4    out and commits these other armed robberies, other cliques,

5    because he was unsuccessful.  That is relevant to this case.

6           THE COURT:  Why does Wood -- why is Wood the right

7    person to put on that evidence?

8           MR. IOVIENO:  Because he's the chief investigator

9    during the course of this case.

09:57AM 10          THE COURT:  But it doesn't go to Wood's credibility,

11   does it?

12          MR. IOVIENO:  It goes to Wood's knowledge of what was

13   occurring and lack of knowledge what was occurring.

14          THE COURT:  He doesn't -- well.

15          MR. IOVIENO:  If he has no knowledge this stuff is

16   going to go on with CW-1.

17          THE COURT:  I'm struggling to see how it comes in

18   through Wood.

19          Mr. Lopez.

09:58AM 20          MR. LOPEZ:  Ben Wallace, who was the co-case agent

21   isn't on the government's witness list.  I mean, there's a

22   reason for that.  I don't know what it is.

23          THE COURT:  The reason is to keep the trial within

24   reasonable bounds so we aren't here the rest of our lives.

25          MR. POHL:  Or the availability to try the next one in

1    March, your Honor, yes.

2         THE COURT:  All right.  It's a couple minutes before

3    nine.  I'm not sure I'm in a position to make a final ruling,

4    but let me offer some observations.

5         Whether the testimony is relevant is not the only

6    driver here, it's whether Wood is a competent agent or witness

7    to testify about this.  That's in the abstract.  I'm having

8    trouble seeing why CW-1 can be impeached through Wood, however,

9    if the government wants to introduce evidence that talks or

09:59AM 10   about the value he provided or all the good things he did in

11   the course of this investigation, it seems to me that opens the

12   door to the defense saying, oh, no, he did bad things as well.

13        I'm particularly having trouble understanding the

14   reason for his termination is relevant because presumably once

15   he was terminated, he was not relied on again.  I mean, he was

16   terminated.

17        I will permit inquiry into what extent Wood relied on

18   CW-1 as a source of his expert opinion or comments or whatever

19   they were, and as to whether, you know, the knives found on

10:00AM 20   Deer Island are relevant or not, it's hard to say in context.

21        I mean, if it is charged murder, theoretically it is

22   relevant.  On the other hand, if it doesn't have anything to do

23   with this clique, if it's only done to bolster or rehabilitate

24   CW-1, then, again, I think it opens the door.

25        I'm not going to get into the details of the WITSEC

1    program without having a better understanding of what we're

2    doing there, and so the bottom line is I'm going to take it a

3    question at a time.

4         This is not CW-1, and I will permit the defense to

5    call Agent Wood for some reason, either I have made a mistake

6    in ruling or ruling with a misunderstanding of the evidence and

7    that evidence develops in a different way.  I'm not going to

8    make a final decision now.  I will permit a recall of the

9    witness should I think it appropriate and fair to do it down

10:01AM 10    the line, but we'll have to take it one question at a time.

11         MR. IOVIENO:  Judge, I expect today there will be a

12    *Petroziello* objection initially with the defendant having a

13    continuing objection throughout the course of the trial.

14         THE COURT:  I glanced at the government's *Petroziello*

15    filing.  I'm not sure it quite captured what I was doing.

16    Maybe I didn't read it carefully enough.  I think I need a

17    specific designation.

18         MS. LAWRENCE:  I can do that.  I'm sorry, I

19    misunderstood that statements weren't totally consumed with the

10:01AM 20    entire universe.

21         THE COURT:  I guess I wanted to know that, too.

22         MS. LAWRENCE:  I can designate those statements.

23         THE COURT:  The racketeering statements are A through

24    Z, and the drug conspiracy are K through M, and the drug

25    statements, I need to make a finding if there's other

1    statements, I obviously need to know that as well.

2              MR. POHL:  I apologize.  One logical issue before we

3    bring the jury out, I need one second to put transcript binders

4    out.

5              THE COURT:  We're lining them up anyway.

6              MR. MURPHY:  Your Honor, this is the motion in limine

7    I filed regarding the attempted murders.

8              THE COURT:  I'm sorry, motion in limine?

9              MR. LOPEZ:  To conclude any reference by any

10:02AM 10   government witnesses, my client's alleged involvement in

11   attempted murders in 2003 or 2004, it's not specified and some

12   other date of unknown origin.  Without some corroboration that

13   those murders occurred, I think it's highly prejudicial to

14   allow a witness who is now working for the government to raise

15   this evidence as if it's a fact.

16             MS. LAWRENCE:  Your Honor.

17             MR. LOPEZ:  Given its limited probative value.

18             THE COURT:  Ms. Lawrence.

19             MS. LAWRENCE:  Your Honor asked the government to

10:03AM 20   respond to that, and we do intend to do that.  We don't expect

21   to get into any witness -- that witness won't testify until

22   some time next week.

23             THE CLERK:  All rise.

24             (JURORS ENTERED THE COURTROOM.)

25             THE COURT:  Good morning, ladies and gentlemen.  We're

1   having a little bit of trouble here with the stenographer's

2   feed.  I think we're all right.  It's one of the reasons we're

3   starting a little late here.  We'll do the best we can.

4   All right.  We're ready to go.  You understand you're still

5   under oath?

6          THE WITNESS:  Yes, your Honor.

7          THE COURT:  Mr. Pohl, whenever you're ready.

8              JEFFREY ELLIOT WOOD, JR., RESUMED

9              DIRECT EXAMINATION, RESUMED

09:17AM 10  BY MR. POHL:

11  Q.   Good morning, Special Agent Wood.

12  A.   Good morning, sir.

13  Q.   We left off yesterday with you identifying some

14  photographs, a garage.  Do you recall that?

15  A.   Yes, sir.

16          MR. POHL:  All right.  And could I have Exhibit 1?

17          THE CLERK:  Yes.

18          MR. POHL:  Thank you.

19  Q.   All right.  Special Agent Wood, again, this is for the

09:17AM 20  record, Exhibits 1.1 through 1.3.  Can you remind us where we

21  left off yesterday, what are we looking at here?

22  A.   This is a garage in Everett where the Eastside

23  Locos Salvatrucha would have their meetings.

24  Q.   And the garage is on the left-hand side of this particular

25  picture; is that correct?

1   A.   Yes.

2   Q.   1.2.  What are we looking at, Special Agent Wood?

3   A.   That's the bay that you would drive in and a car would be

4   worked on, but that's inside the garage.

5        MR. POHL:  You can leave this picture up.  Thank you.

6   Q.   Would I be correct -- when did you begin conducting

7   surveillance at this location in your investigation?

8   A.   Personally I started in 2015.  The task force started in

9   2014.

09:17AM 10   Q.   All right.  So just for a few minutes, I'm going to talk

11   about the run up to 2014.  I think you testified yesterday that

12   CW-1 began working with the FBI and had been brought back from

13   El Salvador in 2013; is that correct?

14   A.   Yes.

15   Q.   All right.  And can you describe for the jury the kinds of

16   things that CW-1 did at the FBI's direction in 2013 in this

17   investigation?

18   A.   Well, in 2013, we were directing the CW, the cooperating

19   witness to meet with people and get to know them, find out are

09:17AM 20   these targets, are they MS-13 gang members, and he met drug

21   dealers, he met some MS-13 gang members, and at that point then

22   we started directing him to make controlled purchases of drugs

23   from drug dealers to start infiltrating himself and making

24   friends with those MS-13 that he had met.

25   Q.   So, you mentioned making drug purchases.  Are you familiar

1    with a term "controlled purchase"?

2    A.    Yes.

3    Q.    What is a controlled purchase?

4    A.    A controlled purchase, that's when we direct the

5    cooperating witness to purchase drugs from people who are

6    distributing them to the public.

7    Q.    And does the FBI utilize a specific set of procedures when

8    you make controlled purchases of evidence like drugs?

9    A.    Yes, we do.

09:17AM 10   Q.    What can you tell the jury about that?

11   A.    We will attempt to corroborate everything the cooperating

12   witness tells us, so he'll come and tell us Joe can sell me

13   drugs.  So, at that point, okay, he will make a consensually

14   recorded call to Joe with us and ask to purchase drugs, so we

15   record that telephone conversation.  At that point, we've

16   established a time and a place, an amount of drugs and the cost

17   of drugs.

18        We then search the cooperating witness' person and his

19   vehicle, if he has one, or her vehicle, make sure that they

09:17AM 20   don't have any drugs, any weapons, any money that they

21   shouldn't have on them.  We then provide the cooperating

22   witness with a recorder, a transmitter and the money to

23   purchase the drugs.

24        We establish surveillance in the area where the drug

25   purchase will take place.  We have law enforcement officers out

1    in the area.  We will follow the cooperating witness to that

2    location, we will do our best to see and listen through the

3    transmitter to the drug deal.

4          After the drug deal is complete, we follow the

5    cooperating witness back to a predetermined meeting location.

6    We'll retrieve the drugs, we'll retrieve any leftover money,

7    the recorder, the transmitter, then we will research the CW and

8    his or her vehicle for any drugs, money or anything that he

9    shouldn't have, and then we will debrief the source to get his

09:17AM 10   or her version of the events what occurred during that

11   controlled purchase of evidence.

12   Q.   And I think you said, I want to key on two things you

13   talked about.  The first is that whenever possible try to

14   record the meeting itself, correct?

15   A.   Yes.

16   Q.   All right.

17   A.   That's through the body recorder.

18   Q.   And I think the second thing you said you tried through

19   using a transmitter to be able to listen in realtime to events

09:17AM 20   as they're occurring, correct?

21   A.   That is right, yes.

22   Q.   And after you sort of walked us through calls, search, the

23   buy, post-buy, debriefing, after you debriefed the cooperating

24   witness, what do you do with the recorder?

25   A.   Well, we take the recorder back to our office, and we hook

1    it up to a computer, and we take that recording that's on that

2    device and put it onto a DVD or CD, and then we can watch it or

3    listen to it, depending on whether it's audio/video or just

4    audio recording.

5    Q.   In the earlier stages of this investigation, in 2013, you

6    used the cooperating witness, who we've called CW-1, who's also

7    called by MS-13 Pelon, to make controlled purchases of

8    evidence; is that correct?

9    A.   That's correct, we did.

09:17AM 10   Q.   And those controlled purchases of evidence included drugs,

11   correct?

12   A.   It included drugs and false documents, social security

13   cards, something that would make and appear as a legitimate

14   U.S. citizen.

15   Q.   All right.  So you purchased false documents from people

16   that were selling drugs?

17   A.   Yes.

18   Q.   In the course of those buys, Special Agent Wood, did the

19   FBI identify an MS-13 gang member who was present with CW-1

09:17AM 20   during some of those buys?

21   A.   Yes, we did.

22   Q.   Who was that?

23   A.   Muerto.

24        MR. POHL:  For the witness.

25   Q.   I've got a photograph in front of you, Special Agent Wood.

1    Who is that?

2    A.    That's Muerto.

3         MR. POHL:  Your Honor, this is Exhibit Number 6, and

4    I'd offer it.

5         THE COURT:  All right.  It's admitted, Exhibit 6.

6         (Exhibit No. 6 received into evidence.)

7         THE COURT:  Muerto or Muerto?

8         THE WITNESS:  Muerto.

9         THE COURT:  Muerto?

09:17AM 10    THE WITNESS:  Yes, your Honor.

11   Q.    Who is Muerto?

12   A.    He is a homeboy with Eastside Locos Salvatrucha.

13   Q.    And during the sort of controlled purchases of evidence

14   that you discussed in this phase of the investigation, what can

15   you tell the jury about CW-1 purchasing drugs with Muerto?

16   A.    Muerto introduced him to one of the drug dealers that we

17   purchased drugs from on one occasion.  Muerto helped with the

18   purchase of drugs and sold it right back to an undercover law

19   enforcement officer, and at that point he was becoming friendly

09:17AM 20   with the cooperating witness, and they would socialize

21   together.

22   Q.    All right.  It's fair to say that CW-1 and Muerto, Muerto

23   was present during several of the controlled purchases of the

24   drugs that you made at this phase of the investigation,

25   correct?

1   A.    Yes, he was present, yes.

2   Q.    And would I also be correct that CW-1, once you identified

3   Muerto as being a party to that, CW-1 also provided Muerto with

4   money being on the deals themselves?

5   A.    Yes, he did.

6   Q.    All right.  I think that that relationship between CW-1

7   and Muerto, those controlled buys occurred in 2013, and I think

8   through 2014, if my memory serves me.  What was the next event

9   concerning CW-1's introduction into the gang or into MS-13 that

09:17AM 10   you became familiar with?

11   A.    Well, Muerto introduced him to his clique.

12   Q.    And at some point did you become aware of the Eastside

13   Locos Salvatrucha clique?

14   A.    Yes, it was either late 2013 or 2014.

15   Q.    And after CW-1 became a member of the Eastside Loco

16   Salvatrucha clique in 2014, how did that further your

17   investigation into Eastside specifically and MS-13 generally?

18   A.    Well, once he became a member, it enabled us now to

19   actually have an informant, a cooperating witness who would be

09:17AM 20   able to gather intelligence and evidence of the criminal

21   activities conducted by the gang because he was now a member of

22   the gang, and he had inner knowledge of the gang, he had access

23   to the gang.

24   Q.    All right.  And let's go back.  Would I be correct, at

25   least in this phase of the investigation in 2014, at least a

1    significant part of your information that you were going to do

2    about the Eastside clique came from meetings that took place at

3    this garage in Everett?

4    A.    Yes, that is correct.

5    Q.    Can you tell the jury sort of something about the clique

6    meetings, how often they were scheduled and when they were

7    scheduled?

8    A.    They could be scheduled at any time.  Typically the

9    cooperating witness would receive a telephone call.  He would

09:18AM 10    call us and say, "Yeah, I've been ordered to a meeting, it's

11    going to occur tonight."  Sometimes it happened on a monthly

12    basis, sometimes it occurred every two weeks, you just never

13    knew, and they would gather at that point.  We'd meet the

14    source, we'd follow him to that location, and then he would go

15    inside the garage, and we would wait until he was done, and

16    then he'd call us and let us know when he was cleared, and we

17    would debrief him on the events that occurred inside the

18    garage.

19    Q.    All right.  So you talked about -- let me ask the question

09:18AM 20    this way.  How successful or how often were you able to record

21    clique meetings in 2014?

22    A.    I think we had one or two, maybe three, tops, in 2014.  We

23    did not have good recording equipment that we could secrete on

24    the witness' person, and so we were not very successful.

25    Q.    Would you -- what were the kinds of things you would do

1     when you were going to cover or conduct surveillance of a

2     clique meeting with CW-1?

3     A.   Well, the task force would establish surveillance as close

4     as we could to the garage, and typically we have a transmitter

5     on the cooperating witness and a recorder.  We could not put a

6     transmitter on the cooperating witness because it would be a

7     device that would be noticed during a search before the

8     meeting, and it would expose him resulting in his death.

9           MR. LOPEZ:  Objection, your Honor.  Motion to strike.

09:19AM 10          THE COURT:  Yes, that will be struck.  Go ahead.

11     A.   Well, we were never able to listen realtime to the

12     meetings, and when we were finally successful, we were able to

13     secrete a recorder so we could actually record audio and video

14     of the meetings.

15     Q.   But that was a process?

16     A.   Yes.

17     Q.   Took a long time for you to be in a position to be able to

18     do that?

19     A.   Yes.

09:20AM 20    Q.   And the fact that the meetings were called sometimes at

21     short notice, how did that impact your ability to record them?

22     A.   We would scramble, we'd have to move very quickly once we

23     had an order to meet him, get it on him and get him out to the

24     meetings.

25     Q.   Eventually in this phase of the meeting in 2014, CW-1 was

1       able to record and provide information concerning members of

2       the Eastside Locos Salvatrucha clique, correct?

3       A.    Yes, he did it at least I believe two times, if not three

4       times in 2014 and in 2015.  We were successful and recorded

5       several meetings.

6       Q.    All right.  So, through those recordings -- well, let me

7       ask this.  Did you personally conduct surveillance at the

8       garage in 2014?

9       A.    No.

09:21AM 10   Q.    Agents did, other agents that you worked with, did they

11      conduct surveillance in 2014?

12      A.    They did, yes.

13      Q.    Would I be correct that in 2015, you did conduct, you,

14      personally, did conduct surveillance of meetings that took

15      place in the garage?

16      A.    Yes, I did.

17      Q.    Would I also be correct that you have reviewed video and

18      audio recordings of clique meetings that CW-1 was able to

19      record inside the garage?

09:21AM 20   A.    Yes, I was.

21      Q.    Through those surveillance activities and through your

22      review of those recordings, have you been able to identify

23      members of the Eastside Locos Salvatrucha clique?

24      A.    Yes.

25            MR. POHL:  For the witness.

1    Q.   I'm going to show you a series of pictures for you first,

2    Special Agent Wood.  This picture, which is premarked as

3    Exhibit 2, do you recognize that?

4    A.   I do.

5    Q.   Who is that?

6    A.   That is Casper.

7    Q.   Pulling up Exhibit 3, who is that?

8    A.   That is Playa.

9    Q.   Putting up Exhibit 4, who is that?

09:22AM 10   A.   That is CheChe.

11   Q.   And putting up Exhibit 5, who is that?

12   A.   That is Lobo.

13   Q.   All right.

14        MR. POHL:  Your Honor, I'd move 2 through 5 in

15   evidence.

16        THE COURT:  All right, they're admitted, 2 through 5.

17        (Exhibit No. 2 through 5 received into evidence.)

18   Q.   Special Agent Wood --

19        MR. POHL:  Now for the jury.  Exhibit 2 is up.

09:22AM 20   Q.   Who is that?

21   A.   That is Casper.

22   Q.   Do you see Casper in court?

23   A.   I do.

24   Q.   In addition to surveillance and reviewing video recordings

25   concerning ESLS clique meetings, how do you know Casper?

1    A.    I met him in 2015.

2    Q.    Okay.  Could you stand up and point him out to the jury?

3    A.    Casper is sitting in the back row farthest away from you I

4    guess that's a pinkish-colored shirt.

5    Q.    Thank you.  All right.  Next, Exhibit 3.

6    A.    That's Playa.

7    Q.    Okay.  Do you see Playa in the courtroom?

8    A.    I do.

9    Q.    Could you point him out to the jury?

09:23AM 10    A.    Playa is again sitting in the back row.  He's wearing a

11    suit and a red striped tie.

12    Q.    Exhibit 4.

13    A.    That's CheChe.

14    Q.    Do you see CheChe in court?

15    A.    I do.

16    Q.    Point him out to the jury.

17    A.    CheChe is sitting in the row farthest from you, and he's

18    wearing a green plaid shirt.

19    Q.    And Exhibit 5.

09:23AM 20    A.    That's Lobo.

21    Q.    Do you see Lobo in the courtroom?

22    A.    I do.

23    Q.    Could you point him out to the jury.

24    A.    Lobo is sitting in the front seat closest to you, and he's

25    wearing a blue -- a dark-colored jacket.

1   Q.   Special Agent Wood, in 2014 and 2015, you were able to

2   record a number of clique meetings with the ESLS, correct?

3   A.   Yes.

4   Q.   And would it be fair to say that the recordings were

5   predominantly if not exclusively in the Spanish language?

6   A.   They were.

7   Q.   And you personally do not speak Spanish?

8   A.   I do not.

9   Q.   And reviewing what was said, you relied on transcripts

09:24AM 10   prepared of those meetings, correct?

11   A.   That and talking to my task force officer who speaks

12   Spanish.

13   Q.   Okay.  You anticipated my next question.  There are people

14   that you work with on this case that speak both Spanish and

15   English, correct?

16   A.   Yes.

17   Q.   So I want to talk not about what was being said but

18   essentially maybe what you saw when you watched sort of the

19   clique meetings.  In reviewing the clique meetings that were

09:25AM 20   videotaped, did they follow a particular pattern at the start?

21   A.   Yes.

22   Q.   What was that?

23   A.   Everyone would be together in the garage, and then Casper

24   would bring it to order.

25   Q.   How would he do that?

1          MR. MURPHY:  Objection, your Honor.

2          MR. IOVIENO:  Objection, your Honor.

3          THE COURT:  Is this a summary?  What is this exactly?

4  He wasn't there?

5          MR. POHL:  No, it would be that he reviewed the video

6  recordings of the events.

7          THE COURT:  With the understanding this is based on

8  his review of the video, I'll allow it.  Overruled.

9          MR. MURPHY:  I object specifically as to foundation

09:25AM 10  concerning his ability to speak Spanish, so limited to visual

11  observations.

12          THE COURT:  Well, I guess why don't you lay a

13  foundation that he looked at the videos and that he reviewed, I

14  assume he did, translations so he could understand those.

15          MR. POHL:  Of course.

16  Q.   Special Agent Wood, both through your conversations with

17  task force agents that do speak Spanish and your review of drug

18  transcripts of those recordings and your review of the

19  recordings themselves, were you able to sort of determine

09:26AM 20  a -- did the meetings sort of begin in a similar fashion?

21  A.   Yes.

22  Q.   All right.  And how would the meetings begin?

23  A.   Casper would call --

24          MR. IOVIENO:  Objection, your Honor.  May we be heard

25  at sidebar?

1          THE COURT:  All right.

2          (THE FOLLOWING OCCURRED AT SIDEBAR:)

3          MR. IOVIENO:  My objection is this gentleman does not

4     speak Spanish, and he's testifying to what someone called to

5     order based on his review of transcripts that were written on,

6     that were drafted by some other people.  There's a

7     confrontation issue.  Those other people need to testify as to

8     that, not this gentleman.  He's testifying as to what

9     Mr. Sandoval called a meeting to order.  That's an oral

09:27AM 10    representation, not a visual observation.

11         THE COURT:  Well, I guess I have two questions.  Is he

12    summarizing tapes that we are going to be watching or listening

13    to anyway, or they are not in evidence because they're

14    voluminous?

15         MR. POHL:  I think it's more the latter than the

16    former.  We will have clips of some of the meetings, and I do

17    think there's a clip of sort of the beginning of the meeting.

18         THE COURT:  We need to turn a square corner here.  He

19    needs to testify that he -- you know, let's say that there's 20

09:27AM 20    tapes and you are going to play clips of four of them, he needs

21    to say I looked at all 20 tapes, I followed along in some way,

22    in other words, with English translations, and I am summarizing

23    what happened in these 20 meetings, I'll permit it, but you do

24    have to lay a foundation.

25         MR. MURPHY:  Yes.  It's that following along with the

1   English translation that presents the problem here because he's

2   essentially testifying to the content of the meetings based on

3   evidence that has not yet been admitted.  He doesn't speak

4   Spanish.  We're not going to be able to cross for the meetings

5   which they're not going to offer tapes.  We're not going to be

6   able to cross.

7          THE COURT:  But you have all that evidence, you have

8   all that evidence.  I assumed the government produced tapes of

9   all these meetings, right?

09:28AM 10          MR. MURPHY:  That's right, your Honor, but this is

11   hearsay and a confrontation clause, not for him to testify

12   about what somebody else told him, people were talking about on

13   this tape.  We can't confront the witnesses translated videos

14   that aren't going to be offered into evidence.

15          THE COURT:  So your testimony is the only person who

16   could summarize it is someone who spoke Spanish because even if

17   someone like him reasonably relied on translations, as all of

18   us do, under these circumstances, he couldn't testify about it.

19   I mean --

09:29AM 20          MR. MURPHY:  I don't think he should be allowed to

21   testify as a summary witness at all on these issues because

22   he's summarizing facts.

23          THE COURT:  That's what a summary witness does, in

24   other words, the only alternative is to play all 20, I'm using

25   20, I don't know what the number is, but it's a substitute for

1    playing all 20 tapes.  That's the point of Rule 1006 is to

2    avoid that kind of thing where it's voluminous and it's

3    time-consuming.

4         MR. LOPEZ:  And, your Honor, it's overview evidence

5    that the First Circuit strenuously frowns upon for this

6    particular purpose of confrontation rights.

7         THE COURT:  The summary evidence is permitted,

8    overview evidence.

9         MR. LOPEZ:  Well, that's overview evidence, what went

09:30AM 10    on at these meetings based on what somebody else told him.

11         THE COURT:  Well, you are just characterizing it

12    differently.  I mean, it has to be a summary, it has to fit

13    within Rule 1006 or we are not going to do it, but Rule 1006

14    does permit summaries of voluminous transcripts, and, again, I

15    don't want to be here for the rest of our lives, you know,

16    forcing the government to play each and every clip of each and

17    every meeting seems to me to be a fruitless enterprise.  If

18    they can be summarized and you have the tapes and you can point

19    out the way the summary is not fair.

09:30AM 20         In terms of the translation issue, I think I guess

21    your concern is that if it was improperly translated that you

22    don't have a right to confront the translator, right, is that

23    the idea?

24         MR. LOPEZ:  Yes.

25         THE COURT:  Because that's the person that he is

1    relying on?

2            MR. MURPHY:  Right, it can't only be the summary, it

3    has to be based on inadmissible evidence under 1006, your

4    Honor.

5            THE COURT:  And the translation would be admissible if

6    it were offered, right?  In other words, if we did call whoever

7    translated.  I guess why don't we find out how these were

8    translated, whether it was done orally while he was watching,

9    or maybe you know.  Do you know the answer to that?

09:31AM 10            MR. POHL:  I think they were -- I think they were

11   reviewed by Spanish-speaking agents who were working on the

12   case, and then draft summaries were prepared, but those have

13   been worked on throughout the investigation and up until, you

14   know, shortly before the trial.

15            THE COURT:  So summaries -- so the government prepares

16   these, I forget what they're called but summaries or tapes?

17            MR. POHL:  Yes.

18            THE COURT:  As opposed to verbatim transcripts.  Who

19   prepared those?

09:32AM 20            MR. POHL:  I think it was typically a Spanish-speaking

21   agent who prepared a report that summarized the conversations,

22   then they proceeded to draft transcripts, which are typically

23   done by some FBI linguists, and the final transcripts were done

24   by either Spanish agents themselves or Ms. Huacuja.

25            THE COURT:  But has he reviewed final transcripts of

1     all these meetings?

2              MR. POHL:  I don't know if I could say that.

3              THE COURT:  Yes, go ahead.

4              MR. POHL:  I think what I'll do to make it easier, I

5     can save this for one of the Spanish-speaking agents who will

6     be able to do it realtime, which is going to be next week.

7     I'll just discuss what you can see on the recordings, which is

8     Casper essentially making motions to make people circle up and

9     having Playa collect money, which is frankly all I was trying

09:33AM 10    to get out.

11             THE COURT:  Lay the foundation, let's do that.

12             MR. POHL:  Thank you.

13             (SIDEBAR CONFERENCE WAS CONCLUDED)

14             THE COURT:  Thank you for your patience, ladies and

15    gentlemen.

16    Q.   All right.  Special Agent Wood, without going into what

17    was said, let's talk about what you see on the recordings, all

18    right.  Specifically I think you testified a moment ago that

19    Casper calls the meeting to order.  What specifically do you

09:33AM 20    see on the recordings that you've reviewed of the clique

21    meetings that sort of leads you to say that the meetings began

22    by Casper calling it to order?

23    A.   The group came together and formed a group, a true group.

24    Q.   When you say a group, what is it?  When you say formed,

25    what sort of did it form?

1    A.    A circle, instead of being in different little ones and

2    twos, they come together as a whole group.

3    Q.    And, again, without saying, without talking about what was

4    said, sort of as the group comes together and forms a circle,

5    in the review of the meetings that you have, is it possible to

6    identify who the person that begins to speak first?

7    A.    Yes.

8    Q.    And who is that?

9    A.    Casper.

09:34AM 10   Q.    All right.  Is there other activity that you see as the

11   clique begins to form a circle by any of the other members of

12   ESLS?

13   A.    Yes.

14   Q.    And what do you see beside sort of the circle forming and

15   Casper beginning to speak?

16   A.    When it works properly, you can see Playa collecting

17   money.

18   Q.    And when you say Playa collect money, what do you mean by

19   that?

09:34AM 20   A.    Each homeboy has to pay dues to the gang, and Playa would

21   collect the dues from the members.

22   Q.    All right.  So those kinds of meetings when you could

23   record them, when you had recording equipment that you thought

24   you could use safely with the cooperating witness, you were

25   able to record some of those meetings in 2014?

1   A.   Yes.

2   Q.   All right.  And I think you testified a moment ago that

3   you sort of used the same procedures and had more success and

4   recorded more meetings in 2015?

5   A.   Yes.

6   Q.   All right.  Before we move onto 2015, I want to talk about

7   another investigative technique that you used in 2014 in this

8   investigation.  Special Agent Wood, are you familiar with the

9   term "protection detail"?

09:35AM 10   A.   I am, yes.

11   Q.   How are you familiar with that term?

12   A.   It's an undercover operation technique that we utilize in

13   the FBI to determine if I believe criminals are willing to be

14   involved in the distribution of illegal narcotics.

15   Q.   Okay.  And have you used this kind of technique in other

16   cases?

17   A.   I have.

18   Q.   Can you describe for the jury, I'm sure every case is

19   different and every case has wrinkles, but did you utilize, did

09:36AM 20   the FBI utilize protection detail operations in this case?

21   A.   We did, yes.

22   Q.   All right.  And do you know from your work in the case how

23   many different times the FBI utilized or conducted surveillance

24   of protection detail operations in this case?

25   A.   I do, yes.

```
 1   Q.   How many?
 2   A.   Three.
 3   Q.   All right.  And of those three, how many were you
 4   personally -- did you conduct surveillance on any of those
 5   three?
 6   A.   I did.
 7   Q.   When was that?
 8   A.   That was in October of 2014.
 9   Q.   Can you tell the jury sort of the ballpark the three
10   protection details were committed or conducted?  When?
11   A.   In 2014.
12   Q.   By months?
13   A.   I know for sure it was October and December, 2014, and I
14   knew it was the springtime, late spring, I believe, in 2014.
15   Q.   Okay.  And so --
16        THE COURT:  Late spring, 2014?
17        THE WITNESS:  Yes, your Honor.
18   Q.   I'll make that clear in case it's not.  All three of the
19   protection details that were conducted in this case were in the
20   year 2014, correct?
21   A.   Yes, that is correct.
22   Q.   So you used it in other cases, and you used it here.  Can
23   you tell the jury exactly what it is that was done in this case
24   for protection detail?
25   A.   We directed the cooperating witness to ask if people
```

1    wanted to volunteer, and we paid for protecting drug shipments

2    that would initiate here in Massachusetts from a member of a

3    cartel who was sending his product to a drug trafficker in

4    New Hampshire.

5    Q.    All right.  I think you testified yesterday that

6    CW-1 essentially advertised himself as a drug dealer, correct?

7    A.    He did.

8    Q.    And the operation, you said that you directed CW-1 to ask

9    MS-13 gang members if they were willing to protect drug

09:38AM 10    shipments, correct?

11   A.    Yes.

12   Q.    And you said they were coming from a cartel, right, but in

13   point of fact, let's be clear, where did these drugs originate

14   from, and where did they start at and where did they go to?

15   A.    Well, the drugs were seized in previous cases that we have

16   in our evidence storage locker.  FBI agents will remove the

17   drugs, test the drugs to make sure that they still have the

18   presence of that illegal substance within them, it's not fake

19   product.  We then give it to an undercover officer, in this

09:39AM 20   case, the undercover officer then would provide it to the

21   cooperating witness.  The cooperating witness would drive to

22   New Hampshire with members of the MS-13 gang members that

23   volunteered with him and follow cars.  In New Hampshire, they'd

24   meet with another undercover officer.  The CW would then

25   provide that undercover officer with the drugs and obtain money

1  from that undercover officer.  They would return to

2  Massachusetts, and then the CW would take the money that the

3  undercover officer provided him and pay the MS-13 gang members

4  for their time for protecting that controlled drug delivery.

5  Q.  All right.  So, I mean, there's a lot going on there, and

6  I want to make sure everybody understands this.  Let's use the

7  one that you were personally on surveillance for in October of

8  2014, all right.  How does that protection detail start?

9  A.  We've already established that we're going to do a drug

10 detail.

11 Q.  And you establish that how?

12 A.  We've directed the cooperating witness to ask people that

13 he knows in the gang if they want to help him protect a drug

14 shipment and transport it from Massachusetts to New Hampshire.

15 Q.  And what kinds of quantities are we talking about,

16 Special Agent Wood?

17 A.  In the first one in the spring, the second one in

18 October --

19      MR. IOVIENO:  Objection to anything else other than

20 the October one, your Honor.

21      THE COURT:  Objection as to anything other than

22 October?

23      MR. IOVIENO:  Yes.

24      THE COURT:  All right.  Overruled.

25 A.  In October, we used one kilogram of cocaine.

1    Q.   All right.  How did the kilogram of cocaine get from the

2    FBI agents to agents that were preparing to run the protection

3    detail?

4    A.   I signed the drugs out of evidence.

5    Q.   And I think you testified earlier that it was your

6    standard practice to test the drugs to make sure that they are,

7    in fact, cocaine?

8    A.   Yes.

9    Q.   All right.  Was that done in this case?

09:41AM 10   A.   I did do that, yes.

11   Q.   You personally did that?

12   A.   I did.

13   Q.   How did you do that?

14   A.   I removed the FBI packaging, the kilogram of cocaine from

15   its packaging, I used a knife, cut into the packaging, took a

16   very, very small quantity out, and I put it into our cocaine

17   test kit, and that tests for the presence of cocaine.

18   Q.   And when you did that in this case, what was the result of

19   the field test?

09:41AM 20   A.   It tested positive for the presence of cocaine.

21   Q.   All right.  You take the kilogram of cocaine, correct?

22   A.   I do.

23   Q.   And where does that kilogram of cocaine go to?

24   A.   I took it to an undercover officer.

25   Q.   All right.  The other undercover officer, let's call him

1    Undercover Officer 1, okay, Undercover Officer 1 job in the

2    protection detail is what?

3    A.   The undercover officer will meet with the cooperating

4    witness and provide him with that cocaine.

5    Q.   Okay.  So, in other words, Undercover Officer 1 is I think

6    you said the word cartel, he's a big drug dealer who's giving a

7    kilogram of cocaine to CW-1?

8    A.   Yes.

9    Q.   At least as far as his story is concerned for the other

09:42AM 10   people that are present in the deal, correct?

11   A.   Yes.

12   Q.   So the undercover officer, and I know we talked about

13   procedures earlier, and I don't want to spend a lot of time on

14   that now, but would I be correct that this same kind of

15   procedures you used to make controlled purchases of evidence

16   that you described earlier in the case, you did all that again

17   in this case, correct?

18   A.   Yes, we did.

19   Q.   And through the use of protection details?

09:42AM 20   A.   We did.

21   Q.   Meaning -- well, you called -- well, what precisely does

22   that mean?

23   A.   Well, prior, leading up to the protection detail, the

24   cooperating witness made consensually recorded telephone calls,

25   text messages to the gang members who volunteered to do the

1    protection detail.  Prior to the detail, we met with the

2    cooperating witness, searched him and his vehicle for money,

3    contraband, weapons and outfitted him with a car that had a

4    hide in it, audio video recording in it and a kill switch on.

5    Q.   Why a kill switch?  First of all, what is a kill switch?

6    A.   We had the ability to shut the engine off in the vehicle.

7    Q.   Remotely?

8    A.   Yes.

9    Q.   Why do you have a kill switch in CW-1's car?

09:43AM 10   A.   Well, in case the gang members decide to steal the drugs

11   and they're going to try to flee with the drugs, we can try to

12   kill the car, and they won't get away.  The car is going to

13   stop right there in the road.

14   Q.   All right.  Drugs go from you at the FBI to the undercover

15   Officer Number 1, Undercover Number 1 then provides them with a

16   cooperating witness, correct?

17   A.   Yes.

18   Q.   All right.  And the MS-13 members, when the drugs are

19   there, where are the MS-13 members who are protecting the drug

09:44AM 20   shipments?

21   A.   Well, in October, when I was there, we had one in the car

22   and then two in a follow car.

23   Q.   Do you recall who was present in the car with CW-1 in

24   October, 2015?

25   A.   I did remember.  I can't remember right now.  It just

1    escaped my head, I'm sorry.

2    Q.    But would I be correct that there are -- you were

3    personally on the October one.  Are you also familiar with the

4    December production detail, December, 2014?

5    A.    I am.

6    Q.    And both of those, how are you familiar with that one?

7    A.    Well, for the December one, prior to the December one, I

8    was an acting supervisor for a month, and we had to do

9    a -- every six months, we have to renew our ability to do an

09:45AM 10    undercover operation, so I had to be the supervisor in that

11    meeting with my fellow supervisors and the executive management

12    to seek approval to obtain permission to do the October and

13    December controlled purchase, the delivery protection details.

14    Q.    All right.  So, in both the October and the

15    December protection detail, there were MS-13 gang members in

16    the car, correct?

17    A.    Yes.

18    Q.    And there were other cars as well?

19    A.    They had a follow car, yes.

09:45AM 20    Q.    Okay.  What's a follow car?

21    A.    They had a follow car that would follow the CW and the

22    drugs, and whoever is in that car, and they would be out there

23    conducting countersurveillance looking for police officers that

24    may spot the car or potential rivals that may try and steal the

25    drugs.

1  Q.   Special Agent Wood, shortly after the last protection

2  detail in December, 2014, did you become aware of a murder that

3  took place in Chelsea?

4  A.   I knew there were several murders in Chelsea, yes.

5  Q.   Okay.  Let me skip ahead.  Was I correct that you actively

6  begin to work as a co-case agent in this case in January of

7  2015?

8  A.   Yes.

9  Q.   So that prior to this time, you were involved in

09:47AM 10  surveillance of the investigation, but your role changed at the

11  beginning of that year?

12  A.   Yes.

13  Q.   All right.  How did the investigation with CW-1 sort of

14  progress during 2015?

15  A.   In 2015, he became a gypsy cab driver.  He had a vehicle,

16  and he started driving in Chelsea, and at that point because he

17  had a vehicle, he was able to meet other MS-13 gang members

18  from other cliques in New England.

19  Q.   All right.  So, I'm sure everybody probably knows what a

09:48AM 20  gypsy cab drive is, but to be 100 percent sure, what's a gypsy

21  cab driver?

22  A.   It's an unlicensed cab driver.  It's a common way of

23  transportation in East Boston, Chelsea, in the El Salvadorian

24  community where they don't have licenses but ladies and men

25  will have a vehicle, and they'll act as a taxicab driver.

1    Q.    So CW-1, you tasked CW-1 with essentially being a gypsy

2    cab driver?

3    A.    Yes.

4    Q.    And through that sort of step in the investigation, that

5    increased CW-1's ability to access both people in ESLS as well

6    as members of other cliques operating in Massachusetts?

7              MR. LOPEZ:  Objection.

8              THE COURT:  Sustained.  Rephrase.

9    Q.    Special Agent Wood, let's say beginning around the time

09:48AM 10   that CW-1 was sort of acting as a gypsy cab driver, how

11   many -- well, what kinds of -- how many different clique

12   members -- well, when CW-1 began acting as a gypsy cab driver,

13   what kinds of evidence would you be able to gather through the

14   use of CW-1 acting as a gypsy cab driver?

15   A.    We outfitted the vehicle with an audio/video recorder, and

16   he would be able to consensually record conversations with gang

17   members.

18   Q.    And so using the recordings, you said you outfitted the

19   car with a recording device that enabled you to see the people

09:49AM 20   that were in the car, correct?

21   A.    After downloading the recording equipment, we could see

22   and hear the people in the car having conversations with our

23   cooperating witness, yes.

24   Q.    All right.  And by recording those conversations with the

25   individuals that were in the car with CW-1, were you able to

1    identify them?

2    A.   Yes.

3    Q.   All right.  And in identifying them, were you able to

4    determine whether or not they were members of cliques other

5    than ESLS?

6    A.   Yes.

7    Q.   And point of fact, what kind of -- well, let me

8    specifically talk about one particular instance in which CW-1

9    provided a ride to an MS-13 gang member.  Are you familiar with

09:50AM 10   a murder that took place on September 20th, 2015 in East

11   Boston?

12   A.   Yes.

13   Q.   And how are you familiar with that?

14   A.   Our cooperating witness gave a ride to the individual who

15   committed that murder.

16   Q.   And in giving that ride to the person who committed that

17   murder, was the FBI able to record a conversation with that

18   person where he described the murder?

19   A.   Yes.

09:51AM 20   Q.   And where he admitted that he committed the murder?

21             MR. IOVIENO:  Objection, your Honor.

22             MR. MURPHY:  Objection, your Honor.

23             THE COURT:  Sustained.

24   Q.   Well, let's talk about the recording itself.

25             THE COURT:  Are you showing this to the jury?

```
 1              MR. POHL:  This is for the witness at this point, your
 2     Honor.  Just play a portion of it.
 3              (Video played for the witness)
 4     Q.   Before we go any further, Special Agent Wood, do you
 5     recognize the person in the front seat of that car?
 6     A.   I do.
 7     Q.   Who is that?
 8     A.   Animal.
 9     Q.   And who is Animal?
09:52AM 10    A.   Animal is an MS-13 gang member.  At that time he was a
11     paro for ESL -- ELS, Everett Loco Salvatrucha.
12     Q.   And the murder -- well, are you familiar with a murder
13     that took place on September 20th, 2015, correct?
14     A.   Yes.
15     Q.   And that was of Irvin De Paz?
16     A.   Yes.
17     Q.   Do you recall when this recording between CW-1 and Animal
18     was made?
19     A.   In October of 2015.
09:52AM 20    Q.   Now, you don't speak Spanish, correct?
21     A.   No.
22     Q.   But I'm correct that you reviewed this recording prior to
23     your testimony today, correct?
24     A.   Yes.
25     Q.   And you've also reviewed the -- am I correct that in the
```

1    portion of the video that we're going to watch here,

2    essentially the person who is speaking is the person in the

3    front seat, correct?

4    A.   Yes.

5    Q.   And that person is somebody that you know and have

6    identified as Animal?

7              MR. MURPHY:  Objection, your Honor.  Leading.

8              THE COURT:  Who is the person?

9              THE WITNESS:  This is Animal, your Honor.

09:53AM 10             THE COURT:  Thank you.

11             MR. POHL:  Thank you.

12             So, your Honor, I would offer 104, which is a clip of

13   the video recording from October, 2015, and I'd also ask

14   permission to read 103, which is a transcript of that

15   recording.

16             MR. IOVIENO:  Objection.

17             MR. MURPHY:  Objection, your Honor.

18             THE COURT:  All right.  Is this a renewal of the

19   earlier objection?

09:53AM 20             MR. MURPHY:  No, your Honor.

21             THE COURT:  All right.  Let me see you.

22             (THE FOLLOWING OCCURRED AT SIDEBAR:)

23             MR. MURPHY:  Your Honor, with the Court's permission,

24   if Ms. Rodriguez could address this.

25             THE COURT:  Ms. Rodriguez.

1          MS. RODRIGUEZ:  Your Honor, with regard to the

2    transcripts, I believe your Honor relied on *Diaz-Arias* in order

3    to primarily allow the government to identify the speakers.  In

4    that ruling specifically, the Court established that there are

5    certain steps that are needed to take place before the jury can

6    review a transcript, and Agent Wood, not speaking Spanish and

7    no one authenticating the transcription, those are missing at

8    this point in order for the jury to be able to follow along

9    with the English translation.

09:54AM 10          THE COURT:  Rather than interrupt this witness'

11    testimony, I'm going to admit this de bene subject to being

12    tied up and properly authenticated at the risk of the

13    government, it's a mistrial in case that isn't done, but I'm

14    doing this on the assumption that there will be someone who

15    will testify and describe the translation process and certify

16    that it's an accurate translation.

17          MR. POHL:  Thank you, your Honor.

18          MS. LAWRENCE:  I believe that based on part of our

19    conversations, our understanding is that you are not objecting?

09:55AM 20          THE COURT:  To the actual translation?

21          MR. MURPHY:  No.

22          MS. LAWRENCE:  Just to identify the speakers, and to

23    this extent, I think Mr. Pohl did ask if he could see the

24    person in the video, and that would be the basis for

25    identifying the person speaking in this particular video.

1          THE COURT:  I know you object to some of the speaker

2     designations and to the way they're designated on the

3     transcript.  Do you also object as to the accuracy of the

4     translations?

5          MS. RODRIGUEZ:  We may, your Honor, object in certain

6     instances to the accuracy of the translations.

7          THE COURT:  Well, still, I'm going to admit it

8     de bene.

9          MR. IOVIENO:  Your Honor, this will also be a

09:55AM 10     *Petroziello* objection as well.

11          THE COURT:  I think those are all preserved.

12          (SIDEBAR CONFERENCE WAS CONCLUDED)

13          THE COURT:  Ladies and gentlemen, let me explain

14     something here.  I expect we're going to be presented with a

15     number of video and audio recordings.  I think they're all

16     going to be in Spanish.  I expect that later on the government

17     will be able to establish through a witness or otherwise that

18     these were translated into English.  You're going to be

19     provided with transcripts I think now of the conversations to

09:56AM 20     be able to follow along.

21          There may be issues as to whether the translation is

22     accurate or whether the correct speaker is identified.  Those

23     are issues for you to decide.  You're going to have transcripts

24     where the government has put labels indicating the government's

25     belief as to who is speaking.  You can accept that or not;

1    depending on what your view of the evidence is.  You don't have

2    to accept any label at all.  You can conclude, for example,

3    that the government made a mistake or made a mistake as to some

4    people and not others or that it's not possible to tell, and

5    you also can conclude if there is evidence that the translation

6    is not accurate.

7              But, again, this is not the witness who translated the

8    conversation.  We are going to -- I'm going to permit the

9    playing of the video, which is in Spanish, the reading of the

09:57AM 10   transcript, which is in English, and, again, its accuracy and

11   who is speaking is up to you.

12             As a footnote to that, some of you may speak Spanish,

13   but we all have to be on the same page here, so the English

14   translation is what you need to work from, in other words, you

15   can't independently apply your own expertise in Spanish to

16   ascertain what's going on here.  We all have to be on the same

17   page in English, and there may be, again, competing testimony

18   from different translators if there's an objection about what

19   it actually means.

09:58AM 20             So with that, and subject to my comment at sidebar, I

21   will permit this, and, I'm sorry, do we have an exhibit?

22             MR. POHL:  The recording, your Honor, is 104.  I'd

23   offer that.  The transcript is 103.

24             THE COURT:  They're admitted, 103 and 104.

25             (Exhibit Nos. 103 and 104 received into evidence.)

1          MR. POHL:  Ladies and gentlemen, there are transcript

2     binders on your chairs.

3          THE COURT:  And I'll ask you those include things we

4     haven't gotten to yet, so only open when appropriate to the tab

5     marked, okay.  I'll ask you to not read ahead.  Go ahead.

6          MR. POHL:  Thank you.

7     Q.   Special Agent Wood, I think what I'll do the, first I'm

8     going to play with video with you and then we'll read the

9     transcript.  All right?

09:59AM 10    A.   Yes, sir.

11    Q.   So first before I press play on this recording, can you

12    tell the -- it's in Spanish, but can you tell the ladies and

13    gentlemen of the jury what they're going to see on this video

14    as they watch it?

15    A.   They're going to see a video that is focused in on the

16    passenger, the front passenger seat.  In that seat will be an

17    MS-13 paro by the name of Animal.  You may be able to see in

18    the back seat there are some MS-13 paros in the back seat and

19    the cooperating witness is the driver.  You can't see him.  You

09:59AM 20    may see his hand coming in and out but the camera is not

21    focused in that area.

22    Q.   Okay.  The clip goes 30 seconds or so, but is there

23    something on the video itself that Animal in the passenger seat

24    does?

25    A.   Yes, they actually exchange a gang sign, so you will see

1       the gang sign.

2            THE COURT:  Actually, let me give another instruction

3       to the jury before we go any farther with that.  Agent Wood has

4       testified thus far about MS-13, about things like the origin or

5       colors or gang signs, and he's also testified about this case

6       specifically, in other words, things that he saw or heard or

7       did.

8            It's up to you to determine the credibility of all

9       witnesses.  Some witnesses testify about what they saw or heard

10:00AM 10  or did.  That's usually the way this works, but other witnesses

11      have or say that they have particular knowledge or expertise

12      about a subject and are allowed to testify in that regard.

13           Here, Agent Wood has done both.  He says because of

14      his training and education, he knows certain things about

15      MS-13, and I permitted that testimony, and he's also testifying

16      about what he did in the course of this investigation.

17           At the end of the trial, I'm going to give you

18      instructions about how you evaluate the testimony of different

19      kinds of witnesses, but I want you to understand that he is

10:01AM 20  doing both.  He says that he knows things about MS-13 based on

21      his training and education, and you're to evaluate that based

22      on his credibility, the sources of the information that he

23      relies on, the accuracy of his conclusions and so on, and

24      you're also evaluating him, again, on what he says he saw,

25      heard and did, and those are at least slightly different ways

1    to evaluate a witness.

2           One, again, is testifying about his perceptions, and

3    the other about testifying about things that he learned, and,

4    again, it's entirely up to you to evaluate the credibility of

5    any witness.  You can believe everything they say, none of it,

6    some of it, it's completely up to you.

7           With that, Mr. Pohl.

8           MR. POHL:  Thank you very much, your Honor.

9    Q.   Special Agent Wood, we'll play the video now.  I'm sorry,

10:02AM 10  before I press play, you had said something about a hand sign

11   or gang sign at the end?

12   A.   You see the tapping of the horns, the MS-13 sign.

13   Q.   Is there anything, sort of anything on the recording that

14   you see concerning sort of a physical demonstration of the

15   murder itself?

16   A.   Yes.

17   Q.   What is that?

18   A.   You see Animal reach back and make a motion as if he was

19   stabbing in the back or stabbing yourself in the back.

10:02AM 20  Q.   All right.

21          (Video played in Spanish)

22   Q.   That motion at the end, is that what you were referring

23   to, the MS-13 gang sign?

24   A.   Yes.

25   Q.   What is that again?

1    A.    The horns.  (Indicating)

2    Q.    You have 103 in front of you, Special Agent Wood?

3    A.    I do.

4    Q.    Special Agent Wood, I think what I'll do, I believe this

5    is a two-party conversation in this portion with maybe one

6    other person's voice in the back seat at the end.  I'm going to

7    read the portion Animal, and I'll ask you to read the portion

8    that's dedicated to CW-1.

9    A.    Yes.

10:05AM 10           THE COURT:  Again, ladies and gentlemen, I'll just

11   remind you, it's up to you to decide whether or not at the end

12   of the day these translations are accurate and the designations

13   of the witness are accurate.  Go ahead.

14           MR. POHL:  Thank you, your Honor.

15   Q.    "Animal:  Yeah, perhaps when I was -- when I was a paro, I

16   used to hang around those areas."

17   A.    "CW-1:  Are you a homeboy now?"

18   Q.    "Animal:  The thing is, who knows what they will make me,

19   a chequeo or homeboy."

10:05AM 20   A.    "CW-1:  No, man, with the thing I heard you did, that's

21   bullshit.  No way, ask for it directly."

22   Q.    "Animal:"  There's an unintelligible passage.

23   A.    "CW-1:  Listen, I'm telling you, I'm a homeboy, I know

24   what I mean, I'm from the La Maras, and I'm telling you,

25   chequeo, bullshit.  No dude.  You know that when you pull

1    something off like that..."

2    Q.    "Animal:  You know it!"

3    A.    "CW-1:  And, hey, you just didn't take down just any

4    motherfucker, some idiot."

5    Q.    "Animal:  No, a major culero!"

6    A.    "CW-1:  A major culero.  I had already smashed his head,

7    dude.  Didn't they tell you?"

8    Q.    "Animal:  Yes, he couldn't stand to see me."

9    A.    "CW-1:  He couldn't stand to see you?"

10:06AM 10   Q.    "Animal:  He couldn't stand -- he couldn't see me without

11   running away from me."

12   A.    "CW-1:  Because he knew the beast was going to take him,

13   the son of a bitch."

14   Q.    "Animal:  I had beaten that culero several times before,

15   and he had never been able to stop me, dude."

16   A.    "CW-1:  No fucking way!"

17   Q.    "Animal:  He could never stop me, the culero, and whenever

18   he would see me, he would immediately run."

19   A.    "CW-1:  Scooby and I, ask Scoopy.  I gave him a fucking

10:06AM 20   beating with Snoopy."

21   Q.    "Animal:  That Scooby, the dude also has some good

22   stories, the doggie."

23   A.    "CW-1:  Yes, with me, ask that dude.  I speak for that

24   dude, man."

25   Q.    "Animal:  Well, yeah, we have done shit on the streets.  I

1    have gone with these kids there.  We have them on the ropes."

2    A.   "CW-1:  So how many times did you stab him?"

3    Q.   "Animal:  I stabbed the culero three times, but I stabbed

4    him with a thing like this."

5    A.   "CW-1:  Pretty."

6    Q.   Then, "David:  I have a knife here that's exactly the same

7    as his, dude."

8         Then, "Animal:  The thing is that culero..."

9    A.   "CW-1:  And where did you stab him, in the chest or in

10:07AM 10   the..."

11   Q.   "Animal:  The first one I stabbed him right here and he

12   was falling dead, right.  I reached him, then I was behind him,

13   dude, and I reached him.  He stared at me, and he asked me if I

14   was going to, if I was going to stab him.  I told him, "Yes,

15   the Mara rules you, chavala," I said to him."

16   A.   "CW-1:  And he still talked to you?"

17   Q.   "Animal:  Exactly, dude, the guy was down, but he still

18   managed to get up.  I was amazed when he stood up."

19   A.   "CW-1:  You know that damned guy was strong because I once

10:08AM 20   hit him on the head really with a bat and he stood up again,

21   too; imagine."

22   Q.   "Animal:  Well, you know, the culero got up and said to

23   me, "You're going to pay for this," he said to me.  I was

24   already across the street, but I knew what I had done, what I

25   had done to him.  I knew that he was going to drop dead."

1    A.    "CW-1:  You had already stabbed him in the back or not

2    yet?"

3    Q.    "Animal:  The thing is, precisely, I was already running.

4    I had already stabbed him and was running away thinking the guy

5    was finished, man, then the guy stood up."

6    A.    CW-1:  "No fucking way!  And he said that?"

7    Q.    "Animal:  He told me, "You'll pay for this," but he did

8    not have time to say who did it."

9    A.    "CW-1:  What the fuck?  Didn't you go back to hit him?"

10:09AM 10    Q.    "Animal:  Uh-huh.  But the problem is there was some woman

11    approaching doggie, and you know that that would have been a

12    problem."

13    A.    "CW-1:  So the guy got right up and he... after you

14    stabbed him, the son of a bitch stood up again?"

15    Q.    "Animal:  That culero, he would run a little bit and fall

16    over and over again, so I caught up to him again, and that's

17    when I finished him off, man."

18    A.    "CW-1:  Awesome, dude, fucking cool, man."

19    Q.    "Animal:  The thing was that the culero, you know, the

10:09AM 20    beast had to take him."

21         Special Agent Wood, I want to ask you about some of

22    the terms in that transcript.

23    A.    Yes.

24    Q.    I think you testified about this yesterday, so I don't

25    want to go over old ground, but the words "paro" and "chequeo,"

1    in the course of your work as an FBI agent and traveling to

2    El Salvador and working on the MS-13 investigation, are you

3    familiar with those terms?

4    A.   I am.

5    Q.   And what is a paro?

6    A.   Paro is a brand new recruit in the gang.  They're still

7    being observed, being tested to make sure that they would

8    become good homeboys within the gangs.

9    Q.   What's a chequeo?

10   A.   A chequeo, they've been already committing some kinds of

11   crimes with the gang, and they are now more up on a

12   probationary status.  They've already passed that first

13   observation phase, and now they are earning their bones to

14   become a full-blown homeboy with the gang.

15   Q.   All right.  And the term was used a couple times in the

16   transcript, culero.  Have you had heard that term?

17   A.   I have.

18   Q.   What is a culero?

19   A.   Basically asshole.

20   Q.   Is it frequently used to identify or describe gang rivals

21   by MS-13?

22   A.   Yes.

23   Q.   Special Agent Wood, in September and October, 2015, did

24   the status in the investigation change of MS-13?

25   A.   Yes.

1    Q.   All right.  And without going into specifics, would I be

2    correct that the case began to change from gathering evidence

3    to preparing the charge?

4    A.   Yes.

5    Q.   And as we began to prepare to -- well, let me sort of

6    bound the time that we're talking about.  When were the arrest

7    issues in this case?

8    A.   January of 2016.

9    Q.   So in that period of time, you began to --

10:12AM 10        MR. MURPHY:  I'm sorry, I'm waiting for the question

11   to finish, but I was going to object on the grounds it's

12   leading.

13   Q.   Special Agent Wood, when you -- what were the -- what

14   steps -- in order to charge this case, CW-1 was -- you were

15   continuing to have contact with CW-1 through the end of 2015,

16   correct?

17   A.   Yes.

18   Q.   Okay.  And in order to charge this case, were there any

19   steps that you needed to take concerning CW-1 or CW-1's family

10:13AM 20   before you could complete this phase of the investigation?

21   A.   Yes.

22   Q.   And what were those?

23   A.   I had to receive permission from Washington D.C. to

24   extract CW-1's family from El Salvador.

25   Q.   And why did you ask for permission to extract CW-1's

1    family from El Salvador?

2    A.    Because I knew from my investigation they would be killed.

3          MR. MURPHY:  Objection, your Honor.  Motion to strike.

4          THE COURT:  I'm going to strike it in that form.  I

5    think he can give his reasons, but no one can predict the

6    future.

7    Q.    I think in your testimony yesterday, Special Agent Wood,

8    you discussed your work on this MS-13 investigation, correct?

9    A.    Yes.

10:14AM 10   Q.    As well as conversations with agents in El Salvador,

11   correct?

12   A.    And throughout the United States.

13   Q.    And throughout the United States.  And point of fact, in

14   2015 -- well, did you -- I think during your testimony

15   yesterday, you talked about the fact that you went to

16   El Salvador twice?

17   A.    I did.

18   Q.    And once was 2005.  When did you go for the second time?

19   A.    2015.

10:14AM 20   Q.    So, I want to ask you some questions about 2015 and in

21   your time in El Salvador in 2015, but in your conversations

22   during your time in El Salvador with the El Salvadorian agents

23   and with agents that were working on other MS-13 cases, what,

24   if anything, did you learn concerning MS-13's position

25   concerning informants?

1          MR. MURPHY:  Objection, your Honor.

2          THE COURT:  Overruled.

3    A.    That they would kill the informants.

4    Q.    And I think you testified that that was something that you

5    learned early on in your sort of work in learning about MS-13.

6    Did you have conversations concerning that while you were in

7    El Salvador in 2015?

8    A.    Yes.

9    Q.    And did the fact that you believed that MS-13 would target

10:15AM 10   and kill informants lead you to make an investigative decisions

11   in this case concerning CW-1?

12   A.    Yes.

13   Q.    And what was that?

14   A.    That I would have to submit a proposal to have him placed

15   in the witness protection program.

16   Q.    Okay.  What about CW-1's family?

17   A.    I've learned from communicating with the El Salvador

18   police officers, FBI agents, and listening to conversations

19   that we recorded that they would, if they could not find the

10:16AM 20   CW, they would kill his family.

21          MR. MURPHY:  Objection, your Honor.  Motion to strike,

22   hearsay.

23          MR. IOVIENO:  Objection.

24          THE COURT:  Overruled.

25   Q.    So when you --

1          THE COURT:  Just to be clear, you're testifying as a

2    general proposition as opposed to these specific individuals,

3    in other words, you're testifying with your hat on and knowing,

4    having special knowledge, what you say is special knowledge

5    about the gang, in other words, this is their general practice

6    as opposed to having special knowledge about any individual on

7    trial here?

8          THE WITNESS:  Your Honor, I have a taped conversation

9    where the leader, the United States leader of the East Coast

10:17AM 10   Program said if you can't find the family, kill their families,

11   or if you can't find the cooperating witnesses, kill their

12   families.

13         THE COURT:  All right.  That's in part what you're

14   relying on, it's not a statement of anything?

15         THE WITNESS:  Yes, your Honor.

16         THE COURT:  Go ahead.

17   Q.   All right.  So, what did you -- prior to charging the

18   case, what did you -- what steps did you take to protect CW-1's

19   family in El Salvador?

10:17AM 20   A.   I applied to have them enter the country under a special

21   benefit parole package, and we had to fill out a Threat

22   Assessment.  At that point, we had our Homeland Security

23   investigation partners sign off on our request, then we sent it

24   to the FBI headquarters.  They sent it to his headquarters, and

25   once that is all approved, then we can bring the family into

1    the United States.

2    Q.    And you said that the arrest warrants were executed in

3    January, 2016.  Had that process been completed in January,

4    2016?

5    A.    No.

6    Q.    All right.  What steps did you take to keep CW-1's family

7    safe before or immediately after January, 2016 while the

8    process of admitting them into the United States legally was

9    underway?

10:18AM 10    A.    I directed the TAG, the FBI agents, and the El Salvadorian

11    police officers working together to enter the village that the

12    family lived in, remove them from the village and place them in

13    a hotel in an undisclosed location to keep them safe.

14    Q.    How long did they stay at that hotel?

15    A.    I believe approximately at least a month.

16    Q.    While you were in El Salvador in 2015, did you begin to

17    receive information about MS-13 attempting to impose, MS-13 in

18    El Salvador attempting to impose more order and control over

19    cliques operating in the United States?

10:19AM 20    A.    Yes.

21    Q.    And how?  And, again, those were through your

22    conversations with the El Salvadorian police, correct?

23    A.    Through conversations and through actual briefings, they

24    actually provided us with briefings on how MS-13 was morphined,

25    had been morphined, and they provided to me and my partners who

1    were down there at the same time.

2    Q.   And those briefings and in the conversations that you had

3    down there, what steps was MS-13 attempting to take from

4    El Salvador to control the actions of the cliques in the

5    United States?

6         MR. MURPHY:  Same objection, your Honor.

7         THE COURT:  All right.  I'll allow it.  Overruled.

8    Again, this is a general matter, correct?

9         MR. POHL:  Yes.

10:20AM 10    MR. MURPHY:  Can I have a continuing objection to

11    this, today's order?

12        THE COURT:  Yes.

13        MR. MURPHY:  Thank you.

14        THE COURT:  Just to be clear, I want both Mr. Pohl and

15    the witness to make clear when you're talking about general

16    terms, MS-13, and this specific group of people who are on

17    trial here.

18        MR. POHL:  Yes, your Honor.

19        THE COURT:  All right.  Go ahead.

10:20AM 20    A.   Yes, the MS-13 leadership wanted to take more control of

21    the smaller cliques that were operating within the

22    United States and within El Salvador, so they decided to create

23    programs and cliques that would fall under those programs.

24    Q.   And do you know from those conversations and briefings how

25    many programs are -- well, just generally, how many programs

1    exist with the MS-13 attempting to control actions of the

2    cliques in the United States?

3    A.    Several dozen programs.

4    Q.    And was one of those programs that you learned about while

5    you were in El Salvador something called the East Coast

6    Program?

7    A.    Yes.

8    Q.    And what is the East Coast Program?

9    A.    The East Coast Program focuses primarily on the East Coast

10:21AM 10   of the United States, but it can include cliques throughout the

11   entire United States and the world, but typically for

12   Massachusetts, New York, Rhode Island, New Jersey, Maryland,

13   Washington D.C., Northern Virginia, North Carolina, it's now in

14   Tennessee, but you have cliques that are all operating under

15   the East Coast Program, but we know they're in Columbus, we

16   know they're in Houston, we know that some of the -- there's

17   presence of cliques here in Massachusetts that are in Spain and

18   El Salvador.

19   Q.    So, again, in general terms, all right, the existence of a

10:22AM 20   program, let's use the East Coast Program as an example, the

21   point of the program from the MS-13 leadership in El Salvador

22   is to do what with cliques in the United States?

23   A.    It's to control the cliques and give them more guidance.

24   There had been a lot of uncontrolled violence, clique on clique

25   violence, and one of the objectives of creating the program was

1    to force the clique leaders to present evidence of wrongdoing

2    amongst other clique members before just going out on their own

3    to kill them, so that was one of the goals.

4         The other goal was to have money sent back to

5    El Salvador for that program where the cliques from that

6    program in El Salvador would be able to have some of that

7    money, and then, of course, all the way back up to the MS-13

8    leadership.  The MS-13 leadership is in control of all the

9    programs and all the cliques.

10:23AM 10   Q.   All right.  So that's what leaders in El Salvador want

11   from the cliques here in the United States.  What's the benefit

12   of an MS-13 clique or clique member in the United States?

13   Where is the benefit to that person in or that clique in

14   joining the East Coast Program or any program?

15        MR. IOVIENO:  Objection, your Honor.

16        THE COURT:  Overruled.

17   A.   Well, if a clique member gets deported to El Salvador,

18   because the cliques are sending money back to El Salvador, that

19   clique member now has the ability to have some money and

10:24AM 20   protection when he returns to El Salvador.  He's got a program

21   to fall under, a new clique to go to, and he has protection

22   from the rival gang, and he has the ability to get right back

23   into the gang and get on his feet.

24   Q.   Receiving that information from El Salvador, did that sort

25   of, when you returned to the United States, Massachusetts, and

1 continued this investigation, did that briefing impact your

2 investigation into MS-13 here?

3 A. Yes.

4 Q. All right.  And through CW-1, did you and the agents that

5 you work with begin to intercept discussions or communications

6 concerning the ESLS clique and the East Coast Program?

7 A. Yes.

8 Q. And as a result of the communications that you

9 intercepted, did you take any steps regarding any members of

10:25AM 10 the Eastside Locos Salvatrucha clique?

11 A. I did.

12 Q. And who was that?

13 A. Casper.

14 Q. And specifically what, can you tell the jury what you did?

15 A. Myself, two task force officers, Trooper Brian Estevez,

16 who speaks Spanish, and Detective Robert Impeba from the Revere

17 Police Department, we met Casper in Revere and warned him that

18 his life was in danger.

19 Q. And do you remember when that -- when you met with Casper

10:26AM 20 to deliver that warning?

21 A. It was in the summer of 2015, and we met in a parking lot.

22 Q. Special Agent Wood, after that conversation with Casper,

23 you continued to record conversations through CW-1 with a

24 variety of MS-13 gang members, including people from the

25 Eastside Locos Salvatrucha clique, correct?

1    A.    That is right, yes.

2    Q.    Were you able to record additional clique meetings of ESLS

3    at the garage that we've seen pictures of after you delivered

4    that warning to Casper?

5    A.    Yes, we did.

6    Q.    And after did some of those -- and did you record

7    conversations through CW-1 with Casper after you delivered,

8    personally after you delivered that warning?

9    A.    Yes, we did.

10:28AM 10         MR. POHL:  Can I have Exhibit 108 first for the

11   witness.

12   Q.    Special Agent Wood, one of the recordings that you had

13   with Casper, do you recall a recording that was made in this

14   investigation in December, early December of 2015?

15   A.    Yes.

16   Q.    December 6th, 2015?

17   A.    Yes.

18   Q.    All right.  Is this conversation similar to the video clip

19   we saw with Animal a few minutes ago?

10:28AM 20   A.    Yes.

21   Q.    In what way?

22   A.    We have an MS-13 gang member in the front seat of CW-1's

23   car.

24         MR. MURPHY:  Objection to this narrative summary.

25         THE COURT:  All right.  I will allow him to just

```
 1    generally describe what's on this without -- there is a person

 2    sitting in the car.  I'll strike "MS-13."  There's no

 3    foundation for that at this point.

 4    A.    There's an individual in the front seat of the CW's car,

 5    the recording equipment is turned on, and the CW and the

 6    individual has a conversation.

 7    Q.    Okay.  And there's a video recording of this conversation,

 8    correct?

 9    A.    Yes.

10    Q.    And I'm showing you a picture that is 108.  Do you

11    recognize that picture?

12    A.    I do.

13    Q.    Is that a still photo from the video itself?

14    A.    Yes.

15    Q.    And do you recognize the person that is depicted in the

16    front seat of CW-1's car?

17    A.    I do.

18    Q.    Who is that?

19    A.    Casper.

20          MR. POHL:  I'd offer 108, your Honor.

21          THE COURT:  It's admitted 108.

22          (Exhibit No. 108 received into evidence.)

23          MR. POHL:  For the jury.

24          THE COURT:  Is it time to take a break?

25          MR. POHL:  Sure.
```

10:29AM (line 10)
10:30AM (line 20)

1         THE CLERK:  All rise.

2         THE COURT:  Let me see counsel at sidebar.

3         (SEALED SIDEBAR DISCUSSION WAS HELD CONCERNING JUROR)

4         (SEALED SIDEBAR WAS CONCLUDED)

5         (A recess was taken.)

6         THE CLERK:  All rise.

7         MR. POHL:  Do you want Special Agent Wood here?

8         THE COURT:  Let's go to sidebar.

9         MR. POHL:  Thank you.

10:46AM 10   (SEALED SIDEBAR DISCUSSION WAS HELD CONCERNING JUROR)

11        THE CLERK:  All rise for the jury.

12        (JURORS ENTERED THE COURTROOM.)

13        (SEALED SIDEBAR DISCUSSION WAS HELD CONCERNING JUROR)

14        (SIDEBAR CONFERENCE WAS CONCLUDED)

15        (SEALED SIDEBAR DISCUSSION WAS HELD CONCERNING JUROR)

16        (SIDEBAR CONFERENCE WAS CONCLUDED)

17        THE COURT:  All right.  Mr. Pohl.

18        MR. POHL:  Thank you very much, your Honor.

19  Q.   All right.  So I think when we left off, Special Agent

10:54AM 20  Wood, we had admitted this photograph of 108, correct?

21  A.   Yes.

22  Q.   And the person seated in the front seat of CW's car is

23  who?

24  A.   Casper.

25  Q.   You've reviewed this video recording before your testimony

1    here today, correct?

2    A.    Yes.

3    Q.    And before I sort of offer my next exhibit, the video

4    portion of the recording is difficult to view, correct?

5    A.    Yes.

6    Q.    And why is that?

7    A.    The sun, some light burns out the camera.

8    Q.    All right.  So I'm going to pull up an audio recording

9    that goes with this clip.  You viewed that before your

10:55AM 10   testimony today?

11   A.    Yes.

12   Q.    And this is a conversation between who and who?

13   A.    It's Casper having a conversation with the CW and Animal

14   on the phone.  We got him to speak on the phone.

15   Q.    Okay.  So the people in the car are CW-1 and Casper?

16   A.    Yes.

17   Q.    And during the call there's a phone call made?

18   A.    Yes the.

19   Q.    And the person on the phone call, can you hear the phone

10:55AM 20   call?

21   A.    Yes.

22   Q.    Essentially it's on speaker phone?

23   A.    Yes.

24   Q.    And the person that's speaking is based on the review of

25   the recordings and the transcripts that the FBI has made is

1    Animal?

2    A.   Yes.

3            MR. MURPHY:  Objection, your Honor.  Same objection.

4            THE COURT:  All right.  Overruled.

5            MR. POHL:  Your Honor, I would offer 107, which is the

6    recording, and I would offer 106, which is the transcript of

7    the recording subject to discussion we had earlier today at

8    sidebar.

9            MR. IOVIENO:  Same objection.

10:56AM 10           THE COURT:  All right.  I'll give a standing objection

11    to defendants on the transcripts, and they're admitted 107 and

12    106, and, again, I'm not going to say this, but just to remind

13    you one more time, it's up to you at the end of the day whether

14    you accept the transcripts and translations that the government

15    has offered.

16            (Exhibit Nos. 106 and 107 received into evidence.)

17            (Video played in Spanish)

18    Q.   All right.  Special Agent Wood, now turning to

19    Exhibit 106, which is the transcript, I'd like to read the

11:00AM 20    transcript with you.  If you could read CW-1, I realize there

21    is besides CW-1 and Casper and Animal, if you could read CW-1,

22    I'll read Casper and Animal.  If you could begin, "CW-1 says."

23    A.   "CW-1:  Let's see what happens.  I want to mention

24    something to you.  Hey, they are... do you remember the hit

25    that the kid that was with the Everetts, the paro, the one that

1    did the hit over there," and something not understandable.

2    Q.    "Casper:  Oh, the one that went down on the beach."

3    A.    "CW-1:  No, man, the other one, the one at the beach was

4    done by the Molinos."

5    Q.    "Casper:  Yeah, the Molinos, right."

6    A.    "And they took some Everetts with them."

7    Q.    "Casper:  Uh-huh."

8    A.    CW-1:  "So over there."

9    Q.    "Casper:  Oh, you are talking to me about the other one,

11:01AM 10    the chavala."

11    A.    "CW-1:  The one the one that killed that chavala."

12    Q.    "Casper:  Yeah."

13    A.    "CW-1:  That kid, dude, was only a paro."

14    Q.    "Casper:  Uh-hum."

15    A.    "CW-1:  Crazy told him to post the photo to see if he

16    really wanted to be with MS."

17    Q.    "Casper:  Uh-huh."

18    A.    "CW-1:  And the kid went and did it.  Now that he did it,

19    he has been isolated, and now they only want to beat him up and

11:01AM 20    the group that was with him.  There were four or five with

21    him."

22    Q.    "Casper:  Uh-huh."

23    A.    "CW-1:  So it's now only beatings.  They just beat one of

24    them just because he was texting with a girl in California, and

25    the girl in California was also texting with ChuCho from the

1   Everetts.  So just because the two of them were texting with

2   that girl, they beat the kid, and that day they went to get him

3   from New Jersey.  I don't know if Muerto explained it to you."

4   Q.   "Casper:  He told me something about it more or less."

5   A.   "CW-1 just to come and beat the crap out of him because he

6   was not answering the phone at work."

7   Q.   "Casper:  Unintelligible."

8   A.   "CW-1:  They beat him up!  So then..."

9   Q.   "Casper:  So what are you saying that the kid wants to

11:02AM 10   roll with us?"

11   A.   "CW-1:  No, the kid told me that he... he said, "Fuck, I

12   like MS, doggie, with the Everett side," he said clearly.  "I

13   am up to here because they keep me on beating me up."  They

14   just want to beat him up, man."

15   Q.   "Casper:  Uh-huh."

16   A.   "CW-1:  Fuck, he says, "I am the dude that already posted

17   the picture up there solid, man."  Then he said, "Fuck, I want

18   to be in a side like yours, fuck, if you guys will take me,

19   talk to your cabezon, and I will leave immediately, and you can

11:03AM 20   check out my record, and I will tell you everything about my

21   screw-ups."

22   Q.   "Casper:  Yeah, man, it's better if he rolls with us over

23   here."

24   A.   "CW-1:  Right.  And he told me that he's in New Jersey and

25   that they beat him over there yesterday and broke his finger,

1    then he said that he called over here to check in to say, you

2    know, that they had beaten him up, so what do you think they

3    told him?  We are going to come get you right now to beat you

4    big time.  You better go into hiding.  Then he told me, "Hey,

5    dude, I can't take it anymore.  The only thing that is keeping

6    me here is that I owe them $300 from when I moved there, but as

7    soon as I am done paying, doggie, I will go there, and if you

8    guys will jump me in there, I will go to you guys so I wanted

9    to see," he told me.  "If you want, you talk, and I will

11:03AM 10   explain, if you want, we can call him right now and let him

11   tell you himself.""

12   Q.   "Casper:  No, that is not necessary, I believe your word,

13   understand?"

14   A.   "CW-1:  No, because we just spoke, dude, and the kid is

15   cool."

16   Q.   "Casper:  No, man, no problem, he doesn't need to see me,

17   but we have to move him along."

18   A.   "CW-1:  Uh-huh."

19   Q.   "Casper:  You have already explained to me, and as to the

11:04AM 20   kid, what we need to do now is to bring him over."

21   A.   "CW-1:  There are five of them."

22   Q.   "Casper:  There are five that we have to bring over here.

23   They have to have hang out with us for a while."

24   A.   "CW-1:  Unintelligible."

25   Q.   "Casper:  Not in the motherfucking garage either."

1    A.   "CW-1:  No."

2    Q.   "Casper:  Don't think that with all the problems and

3    everything, I'm going to go see the kid."

4    A.   "CW-1:  No, that's what I wanted tell you, understand?  If

5    he's going to come down here with us, doggie, it's better if I

6    tell him to wait.  I'm going to tell him that this evening

7    because, you know, I'm going to explain that to him directly,

8    you know, so that we can get past this, you know, and Muerto

9    should take him.  The kid has experience, doggie."

11:04AM 10    Q.   "Casper: No shit."

11    A.   "CW-1:  Yes, man; because like I'm telling you, I know

12    what's going on with the kid.  I already hung out with him here

13    before he did the murder, I used to see him.  So, fuck, they

14    have already killed, doggie, if they had not killed...speaking

15    clearly, fuck."

16    Q.   "Casper:  Yes."

17    A.   "CW-11:  Fuck, how do you see a kid that killed a good hit

18    like that, and he didn't just hit a culero; you know that he

19    didn't just hit any low level culero."

11:05AM 20    Q.   "Casper:  No."

21    A.   "CW-1:  So now he says that he's afraid if he hangs out

22    with us..."

23    Q.   "Animal:"  Oh, phone call ringing.  "What's up?"

24    A.   "CW-1:  Hey, doggie."

25    Q.   "Animal:  What's up, doggie?"

A.   "CW-1:  I'm here with cabezon."

Q.   "Animal:  Right on, doggie, that's awesome, doggie.  I am also on the line, dog."

A.   "CW-1:  Hey, hang up over there, doggie, and stay on the line with me."

Q.   "Animal:  Yes, doggie, keep talking.  I'm not on the line now, doggie."

A.   "CW-1:  Oh."

Q.   "Animal:  My woman was on the line, but I hung up."

11:06AM A.   "CW-1:  Okay, look, explain quickly to the doggie, he is here with me.  I told you that I was going to come to talk to him in person."

Q.   "Animal:  Oh, yes, put him on the phone."

A.   "CW-1:  Here he is."

Q.   "Casper:  What's up, dude?  How are you doing?"

     "Animal:  What's up, doggie?  We are all fine.  I was talking with the doggie to see if he could help me get a spot in your clique, dog.  I want to go over there to hang with your clique, dog, to see if you can also help me shelter the kids

11:06AM that I have over there, dog."

     "Casper:  Yeah, man, it would be awesome, but like I was explaining to this homie here, it would be good if you could drop by this area here to see how things work here and to explain a few things to, you know, then if you agree and everyone agrees..."

1          "Animal:  Yes, Pelon knows what's going on, dog.  I

2    have heart, unintelligible, the barrio, and I'm coming from the

3    heart, but I also don't like being marginalized like the side

4    is doing.  You know, doggie, they have me on ice.  I do what

5    they tell me, doggie, and later, they tell me the opposite.

6    Yes, I'm telling you straight out, doggie, I really want to

7    hang with your side, doggie."

8          "Casper:  Awesome.  As I was explaining, homie, come

9    by this area, homie, you will meet all of us, you know, you

11:07AM 10   will find out how we think as a group, homie, and if your way

11   of thinking coordinates with ours, then it's great, then

12   everything will be solid, and we will see what decisions we

13   will make because it's not only my decision, they all have to

14   check you out, too, you know."

15   A.    "CW-1:  That's what I told him."

16   Q.    "Animal:  That's what I'm saying.  That's what I'm saying.

17   The thing is that when I come over there, it would be to stay,

18   doggie, because..."

19   A.    "CW-1:  The Everetts have forbid him to be here."

11:08AM 20   Q.    "Animal:  Right now here I can't even go up there, doggie,

21   like you, because I am broke right now, doggie."

22          "Casper:  All right, dude, pay attention.  We have a

23   meeting now, and I'm going to bring this conversation up to the

24   table with the dogs here, understand?  When I talk to them,

25   Pelon will listen to everything and he can call you to tell you

1    what happens next."

2           "Animal:  Yes, that's great.  Unintelligible.  You

3    know, I have the past because I already have the past since I

4    already did big things, unintelligible."

5           "Casper:  Yes."

6           "Animal:  Because I'm broke, unintelligible, and doing

7    that.  I don't know if I can take off right now because I

8    am -- dude, I owe them $300, but, yes, I really want to do that

9    thing, but I don't want to hang with that side."

11:09AM 10      "Casper:  All right, dog, then there is no problem.

11   We are going to discuss that shit with these dudes, as I said,

12   and then, yes, we will be in touch.  This dude here will let

13   you know what decisions have been made in that regard.

14   Understand?"

15          "Animal:  All right, doggie, we are all set.  Call me

16   any time.  I will be here, doggie, I'm here.  Unintelligible."

17          "Casper:  All right.  Awesome, dog, take care of

18   yourself over there, dog."

19          "Animal:  All right, doggie, you got it."

11:09AM 20      "Casper:  You got it."

21   A.   "CW-1:  Yeah, that's what I told you, you know what I

22   mean, because they can't be calling me like this, but I wanted

23   you to know the kid, the bottom line is that what he wants is

24   to get away from the Everetts.  He said to me, "Shit, doggie,

25   if you guys take me in, do you think there will be a problem?"

1    I said, "No, once you're with us, they won't do anything to

2    you.""

3    Q.   "Casper:  Right.  What the fuck would they do to him?  But

4    we also have to talk to the Everetts, dude."

5         And then there's a new voice in the back seat, "Negro:

6    Yes, before we jump him in and all that shit."

7         "Casper:  Yes, we'll go see them, and we'll tell them

8    before jumping him over, look, this dude is going to hang with

9    us, so respect him, homies, to avoid any consequences or

11:10AM 10   problems, understand?"

11   A.   "CW-1:  But they have to accept, man."

12   Q.   "Casper:  For sure.  And why wouldn't they?  It's the same

13   barrio, MS-13."

14        There's an unidentified speaker:  "It's their call."

15        "Casper:  That's right."

16   A.   "CW-1:  That's right because they think they are superior,

17   dude, and what I don't want is..."

18   Q.   "Casper:  The dude is going to the MS-13 barrio, homeboy,

19   and we belong to the MS-13.  The dude is not going to another

11:10AM 20   barrio, and they have to accept it.  If they don't like it,

21   they can stuff it."

22   Q.   Special Agent Wood, during the meeting between the

23   cooperating witness and Casper was here in Massachusetts,

24   correct, during that recording?

25   A.   Yes.

1    Q.    Then the call with Animal, you can't tell from the phone

2    call where the person was, correct?

3    A.    Not from the phone call, no.

4    Q.    Were you in the course of this investigation able to

5    determine if where Animal was in early December of 2015?

6          MR. MURPHY:  Objection as to time frame, when the

7    determination was made.

8          THE COURT:  All right.

9    Q.    After the phone call was made, did you and the agents you

11:12AM 10  worked with take any steps to locate Animal?

11   A.    Actually we had done it before that in November.

12   Q.    Okay.  And how would you have done that?

13   A.    We surveilled the CW to New Jersey where he met with

14   Animal while we were surveilling him.

15   Q.    After that phone call, did CW-1 -- well, did you direct

16   CW-1 to do anything concerning Animal?

17   A.    Yes, we did.

18   Q.    And what was that?

19   A.    We directed the CW-1 to go down to New Jersey, pick up

11:12AM 20  Animal and bring him back to Massachusetts.

21   Q.    Okay.  And why did you do that?

22   A.    Because we wanted to have a better idea of the location of

23   where Animal would be.

24   Q.    And why would you want to have a better location of where

25   Animal would be?

1    A.    We were attempting to bring charges against MS-13 gang

2    members, and he was one of our targets.

3    Q.    So, Special Agent Wood, let me ask you a couple questions

4    about that.  Look, you had the tape of Animal in 2013, right?

5    A.    Yes.

6    Q.    It was pretty clear he did the Irvin De Paz murder from

7    the tape, correct?

8    A.    Yes.

9    Q.    Why didn't you go ahead and arrest him in 2013 once you

11:13AM 10    got the tape or got the translation of the tape?

11    A.    Because we had to take safety precautions of the CW and

12    his family before we could make an arrest.

13    Q.    What do you mean by that?  If you had arrested Animal for

14    the murder, why would that have put CW-1 and CW-1's family in

15    jeopardy?

16    A.    Because his identity would come out as the cooperating

17    witness, and we weren't -- the CW-1's identity would have been

18    known because during the arrest and the release of the tape to

19    show the evidence we had against Animal would have identified

11:14AM 20    the CW.

21    Q.    So, would it be fair to say that that was --

22          MR. MURPHY:  Leading, your Honor.

23          THE COURT:  Sustained.

24    Q.    All right.  I'll move on.  That would be the reason why

25    ultimately you didn't arrest Animal shortly after October,

| | |
|---|---|
| 1 | 2015? |
| 2 | MR. MURPHY:  Objection, leading. |
| 3 | THE COURT:  It is leading, but overruled. |
| 4 | A.   Yes. |
| 5 | Q.   Special Agent Wood, in the course of this investigation, |
| 6 | did you have -- did targets of the investigation in 2015 of |
| 7 | yours -- did you have evidence that targets of your |
| 8 | investigation went to New Jersey? |
| 9 | A.   Yes. |
| 11:14AM 10 | Q.   All right.  And did you have information that targets of |
| 11 | the investigation traveled between New Jersey and |
| 12 | Massachusetts? |
| 13 | MR. MURPHY:  Objection, your Honor. |
| 14 | THE COURT:  Overruled. |
| 15 | A.   Yes. |
| 16 | Q.   Just a few more questions, Special Agent Wood.  So you |
| 17 | gave the warning to Casper in sort of late summer or so of |
| 18 | 2015, correct? |
| 19 | A.   Yes, I did. |
| 11:15AM 20 | Q.   All right.  Animal recordings in October of 2015, correct? |
| 21 | A.   Yes. |
| 22 | Q.   All right.  Did you in the course of your investigation |
| 23 | record any clique meetings of ESLS after the murder and the |
| 24 | recording of Animal in October, 2015? |
| 25 | A.   Yes. |

1    Q.    All right.  And let me ask first about a recording from

2    October of 2015.  Do you recall that?

3    A.    There was many, but, yes.

4    Q.    Well, there was one in October, 2015?

5    A.    Yes.

6    Q.    And then after the conversation that you had that we just

7    played here between CW-1 and Casper and Animal, did the task

8    force succeed in recording a clique meeting of ESLS?

9    A.    Yes.

11:16AM 10    Q.    And specifically on January 8th of 2016?

11    A.    We did, yes.

12    Q.    And have you reviewed that video recording before your

13    testimony here today?

14    A.    I have.

15    Q.    And I'm going to pull up Exhibit 32.2 for the witness.

16    I'm just going to play a quick portion for the witness.

17            (Video played for the witness)

18    Q.    Do you recognize that, Special Agent Wood?

19    A.    I do.

11:17AM 20    Q.    How do you recognize it?

21    A.    I've reviewed this recording several times.

22    Q.    And this is an excerpt of a much longer recording; is that

23    correct?

24    A.    Yes.

25    Q.    All right.  And what is this a recording of?

1    A.    This is a recording of the jump-in promoting Animal into a

2    full homeboy as an MS-13 gang member.

3    Q.    What clique?

4    A.    ESLS.

5    Q.    All right.  And you reviewed the entire video recording,

6    correct?

7    A.    Yes.

8    Q.    And are you able through reviewing the entire video

9    recording to identify particular clique members who were

11:18AM 10   present at the clique meeting?

11    A.    Yes.

12    Q.    Were you able to -- let me ask you this.  Do you recall

13    whether the defendants that you've identified here, Casper,

14    Playa, CheChe and Lobo, were those individuals present for this

15    clique?

16    A.    Yes.

17    Q.    And the jump-in that you talked about yesterday, just to

18    be clear, based on your experience, conversations with other

19    agents, your work on this case, what is a jump-in ceremony in

11:18AM 20   the MS-13?

21    A.    When a gang member is being promoted to a homeboy, you're

22    a full-fledged member of the gang, they have anywhere from 2 to

23    4, 5 people who are already homeboys who will beat that person

24    for 13 seconds, typically, not all the time, but typically the

25    clique leader will count slowly from 1 to 13, and while they're

1    counting the other members start punching and kicking him for

2    the 13 seconds, then after the 13 seconds, the entire clique

3    will welcome that member into the gang, and they will welcome

4    him as a homeboy into the MS-13 gang.

5         MR. POHL:  Your Honor, I'd offer 32.2, and I'd ask

6    permission to play it.

7         THE COURT:  All right.  It's admitted.  32.2.

8         (Exhibit No. 32.2 received into evidence.)

9    Q.   Special Agent Wood, can you explain to the jury what it is

11:20AM 10  that they're going to be seeing here?

11   A.   Animal is going to be in the garage standing there,

12   they're going to say begin basically.  I can't -- then you

13   start hearing the counting.  You start seeing -- when the

14   camera can focus properly, you start seeing that he's getting

15   hit, kicked, he falls to the ground, they stand him up, they

16   continue on for 13 seconds, and then they all celebrate when

17   they're done and welcome him into the gang.

18        MR. POHL:  I'd ask permission to play now.

19        THE COURT:  Yes.

11:20AM 20       MR. POHL:  Thank you.

21        (Video played in Spanish)

22   Q.   The person in the center there is who?

23   A.   That's him.

24        (Video played in Spanish)

25   Q.   Special Agent Wood, there's at sort of the tail end of the

```
1   video recording concerning a hand motion.  Did you see that?

2   A.   I did.

3   Q.   And did you recognize that hand motion?

4   A.   I did.

5   Q.   And what was that hand motion?

6   A.   Once again, it was the hand sign of MS-13, the horns.

7            MR. POHL:  Thank you, sir.

8            THE COURT:  Cross-examination.

9                    CROSS-EXAMINATION

10  BY MR. IOVIENO:

11  Q.   Good morning, Agent Wood.

12  A.   Concerning, sir.

13  Q.   My name is Thomas Iovieno.  I represent Mr. Larios.

14  Directing your attention to the beginning of your investigation

15  when you became the supervisor, that was in 2015?

16  A.   The case agent, sir.

17  Q.   The case agent.  Were you supervisor of the investigation

18  at that time?

19  A.   I don't call it a supervisor, I call it a case agent.  I'm

20  a lead investigator.  I'm a supervisor now.

21  Q.   Were there other lead investigators involved in the

22  investigation at that time?

23  A.   Yes.

24  Q.   And you indicated you don't speak Spanish, correct?

25  A.   No.
```

1    Q.   And you were still involved in the investigation prior to

2    becoming the lead agent, correct?

3    A.   Yes.

4    Q.   And what was your involvement prior to becoming the lead

5    agent?

6    A.   I participated as a surveilling agent, I participated in

7    providing guidance to my law enforcement partners from the task

8    force.  That was my primary role at that point for the case.  I

9    had other cases that I was working on.

11:24AM 10    Q.   And you had other cases involving other gangs, correct?

11    A.   Yes.

12    Q.   And, in fact, you participated in an operation, Operation

13    Melting Pot?

14    A.   I have, yes.

15    Q.   And that involved another street gang in Massachusetts,

16    correct?

17    A.   Yes.

18    Q.   And it's fair to say there are a number of gangs in and

19    around Massachusetts besides MS-13, correct?

11:24AM 20    A.   Yes.

21    Q.   And in New England, there's approximately maybe over 125

22    separate street gangs; is that fair to say?

23    A.   Yes.

24    Q.   And so your attention during this period of time wasn't

25    devoted solely to this investigation, correct?

1    A.    At that point, no.

2    Q.    And when you became more involved with this investigation,

3    I think you testified that you regularly read reports,

4    transcripts of recordings to familiarize yourself with what was

5    going on, correct?

6    A.    Yes.

7    Q.    And even when you went back to El Salvador, you kept

8    abreast of what was happening with the investigation, right?

9    A.    Yes.

11:25AM 10    Q.    Okay.  And some of the recordings that you reviewed were

11    recordings that were in Spanish, and you don't speak Spanish,

12    and so you reviewed the transcript, correct?

13    A.    Yes.

14    Q.    So you were reviewing what other people had -- what they

15    thought the transcripts, the transcripts -- strike that.  You

16    were reviewing information in the form of transcripts that

17    other people had made?

18    A.    Yes.

19    Q.    And those were in English?

11:25AM 20    A.    Yes.

21    Q.    And you were relying on what they had put down in the

22    transcripts as the English version of what they had heard,

23    correct?

24    A.    Yes.

25    Q.    And you indicated that you identified a number of people,

1    you identified Mr. Larios from reports and photographs early on

2    in the investigation, correct?

3    A.    Yes.

4    Q.    And you identified those exhibits here today, correct?

5    A.    Yes.

6    Q.    And when you reviewed all the reports, did you learn of an

7    individual by the name of Jose Argueta Rodriguez?

8    A.    Do you know his street name?  I'm more familiar with the

9    street names of the gangs than the true names.

11:26AM 10    Q.    His street name was Lobo.

11    A.    Yes.

12    Q.    And this was another individual with a street name "Lobo,"

13    correct?

14    A.    Yes.

15    Q.    And, in fact, Pelon, CW-1, when he initially came up here

16    in late 2012, is that fair to say?

17    A.    Late 2012, early '13, yes.

18    Q.    And his job, you tell me if I'm wrong, was to get

19    intelligence and go out and meet some of the players that you

11:27AM 20    were investigating, right?

21    A.    Yes.

22    Q.    And he did that by selling drugs, setting up drug deals?

23    A.    He purchased drugs, yes.

24    Q.    And he actually lived with someone, correct?  Do you know

25    where he lived at that time early in the investigation?

1    A.   I don't.

2    Q.   You know he lived with Jose' Argueta Rodriguez, also known

3    as Lobo?

4    A.   I do not.

5    Q.   Had you reviewed a report that indicated he had lived with

6    this other Lobo?

7    A.   I have not reviewed that report, no.

8    Q.   But, in any event, you reviewed a number of reports in

9    this case, and you're familiar with an individual identified as

11:27AM 10    Lobo that's not Mr. Larios, correct?

11    A.   Yes, I know there was another Lobo, yes.

12    Q.   And, in fact, you made a photo array key as part of the

13    investigation, right?

14    A.   We did, yes.

15    Q.   And in that photo array key, you put down the key

16    identifies a name of an individual in what you think is a

17    photograph, right?

18    A.   We have the photographs of people and their names, yes.

19    Q.   And you put a photo array together of the Eastside clique,

11:28AM 20    right?

21    A.   Yes, we did.

22    Q.   And inside those photographs, you put a photograph of

23    Jose' Argueta Rodriguez, correct?

24    A.   Yes.

25    Q.   Okay.  And you identified in the key the street names of

1  all the individuals, and Mr. Rodriguez was identified in that

2  key, he was put down as one of the photos, correct?

3  A.   I believe so, yes.

4  Q.   And you also put down all the street names of the

5  individuals in that key, correct?

6  A.   Yes.

7  Q.   But you didn't put down the key name of Mr. Rodriguez, did

8  you?

9  A.   I'd have to review the key.

11:28AM 10  Q.   Do you have an independent memory of that?

11  A.   I don't.

12  Q.   But, in any event, you recall another individual by the

13  name of Lobo?

14  A.   Yes.

15  Q.   And you don't recall if CW-1, Pelon, lived with him at any

16  time, do you?

17  A.   I don't, no.

18  Q.   So you also indicated in your testimony that MS-13 members

19  generally have tattoos of MS-13?

11:29AM 20  A.   I said it changed, some do, some don't.

21  Q.   And you're not aware of any photograph of Mr. Larios with

22  an MS-13 tattoo, correct?

23  A.   I'm not, no.

24  Q.   And you indicated that -- you talked about becoming a

25  homeboy, and you talked about how later on in the

1    investigation, toward the end of it, that the requirements had

2    changed somewhat for someone to become a homeboy, correct?

3    A.    Yes.

4    Q.    And early on in the investigation, there wasn't any

5    requirement to become a homeboy involving a murder, correct?

6    A.    I said violent crime, serious assaults and up to murder,

7    yes.

8    Q.    So someone could become a homeboy by committing a series

9    of assaults, serious assaults?

11:30AM 10    A.    Yes.

11    Q.    Early on in say 2000, correct?

12    A.    Yes.

13    Q.    Up until 2015, that was still part of the requirement, if

14    you will?

15    A.    I would say it was changing before that.

16    Q.    It began to change toward the middle of the investigation,

17    2014?

18    A.    Yes.

19    Q.    All right.

11:30AM 20    A.    I would say that's more a generalization of it changing,

21    yes.

22    Q.    And there was an individual you identified as Muerto,

23    correct?

24    A.    Yes.

25    Q.    And Muerto, what's his full name?

```
1    A.    Again, I'd have to see it in front of me.

2    Q.    Jose' Hernandez?

3    A.    I believe that's correct.

4    Q.    And during the course of your investigation, Muerto became

5    a confidential witness, correct?

6    A.    I call that a cooperating defendant.

7    Q.    I'm sorry, a cooperating --

8    A.    A cooperating defendant.  A cooperating witness is before

9    indictment.

11:31AM 10    Q.    And he agreed to cooperate with the government, correct?

11    A.    He did.

12    Q.    And Muerto, you had conversations during the course of

13    your investigation with Muerto, correct?

14    A.    We did, yes.

15    Q.    And he became a cooperating witness, you had conversations

16    with him, correct?

17    A.    I have not personally, no, but law enforcement officers

18    assigned to the case have, yes.

19    Q.    And he provided you with information, correct?

11:31AM 20    A.    Yes, he did.

21    Q.    And as a result of the conversations you had with him, did

22    you learn when he became --

23         THE COURT:  I thought you said you didn't have any

24    conversations with him, did you?

25         THE WITNESS:  I did not have specific, but I've
```

1    reviewed a few of the reports, and I know that my law

2    enforcement partners have spoken to him during proffer

3    sessions, your Honor.

4    Q.    In your review of the reports, did you learn when Muerto

5    became a homeboy?

6              MR. POHL:  Objection.

7              THE COURT:  I'll allow it.

8    A.    I don't remember the exact time frame.  I'm somewhat

9    familiar of -- I wouldn't say the time frame, but I knew, I

11:32AM 10    remember reading about when he was recruited.

11    Q.    And that was when he was in Los Angeles?

12    A.    In high school, yes.

13    Q.    And he was a young man in Los Angeles, and is it your

14    understanding he became a homeboy because he was good at

15    fighting in the streets?

16    A.    I didn't read the particulars of that, I just knew that he

17    was recruited in high school and became a homeboy.

18    Q.    But there's no indication in your investigation that he

19    had committed a murder?

11:33AM 20    A.    That's correct.  We don't have any information right now,

21    no.

22    Q.    Well, you didn't have any information right now, you

23    didn't have any during the course of your investigation?

24    A.    No, we didn't have any information.

25    Q.    And he was alleged to be a homeboy?

1   A.   He was a homeboy.

2   Q.   Just because someone is a homeboy doesn't mean they have

3   committed a murder, correct?

4   A.   As I said earlier on, you didn't have to commit a murder.

5   Generally speaking, during the course of our investigation,

6   it's been more towards coming to the point of where you needed

7   to commit a murder, so it's morphed since I first started

8   learning about MS-13 in 2002 until the present.

9   Q.   But say prior to 2010, that wasn't a requirement, to

11:33AM 10  commit a murder to become a homeboy?

11  A.   No.

12  Q.   And you indicated that -- well, can you tell us the name

13  of the other cliques in and around the area you were

14  investigating, there's the East Boston?

15  A.   We have East Boston Loco Salvatrucha, we have the Everett

16  Loco Salvatrucha, we have TLS, we have the Psychos, we had

17  Hollywood, we had the Molinos, we had the Worcesters, we had

18  Chelsea, Eastside, and I'm forgetting one, but I would say we

19  had 10 cliques by the time of the indictment of MS-13 operating

11:34AM 20  here in the Greater Boston area.

21  Q.   And at some point the investigation began, and you went

22  down to El Salvador to speak with the TAG, task force.  Is it a

23  task force down there?

24  A.   It's the transnational anti-gang unit.  It could be

25  considered a task force, yes, easily.

1   Q.   And at that time they already had a source that they were

2   using or operating with, correct?

3   A.   In 2015, I'm sure they have many sources.

4   Q.   Well, a source with CW-1, correct?

5   A.   I went in 2015.  The source was already developed in 2012.

6   I never went down there to meet that source.  Other people did.

7   Q.   And it's Detective Millett and Detective Connolly,

8   correct?

9   A.   That would be Sergeant Millett and Detective Connolly.

11:35AM 10   Q.   Sergeant Millett?

11   A.   Yes.

12   Q.   And so they went down to El Salvador.  Did they have the

13   conversations with the TAG representatives?

14   A.   It started before that, sir.  Sergeant Millett was down in

15   El Salvador.  We sponsored him for a coordination-type meeting

16   that occurred here in the United States and in El Salvador, so

17   we had El Salvadorian, Honduran, Guatemalan police officers

18   that traveled to the United States.

19         One of the locations they came to was Massachusetts,

11:36AM 20   and Sergeant Millett was the key law enforcement officer from

21   this location that coordinated that meeting.  He and those

22   officers and other local and state law enforcement officers

23   from other around the country then traveled to Los Angeles, and

24   then from there they traveled to El Salvador.  While in

25   El Salvador, a special agent assigned to the TAG introduced

1    Sergeant Millett to the cooperating witness.

2    Q.    And that cooperating witness is CW-1, right?

3    A.    That is right.

4    Q.    And CW-1 had -- you are aware that he had served a prison

5    sentence in Florida, correct?

6    A.    Absolutely.

7    Q.    And he had been deported to El Salvador?

8    A.    Upon completing his prison sentence, yes.

9    Q.    And he then became a source with this TAG, correct?

11:36AM 10    A.    That's correct.

11    Q.    And the plan was for CW-1 to come up here, and you were

12    having problems with MS-13 in Massachusetts; fair to say?

13    A.    Yes.

14    Q.    And the plan was for him to come up and infiltrate MS-13

15    up here in Massachusetts, right?

16    A.    The way you phrased the question initially, I wouldn't say

17    we wanted him to be MS-13, we wanted him to pose something

18    different, but it morphed where he became a member of MS-13 and

19    then was able to actually infiltrate the clique, yes.

11:37AM 20    Q.    So initially it was for him to come up and gather

21    intelligence, if you will; is that fair to say?

22    A.    Gather intelligence and evidence, and, as I said, we

23    weren't planning on him becoming a full gang member.

24    Q.    So, in order to do that, you had an agreement with him,

25    right?

1    A.    We did have an agreement, yes.

2    Q.    And it was a written agreement, right?

3    A.    Yes.

4    Q.    And in that agreement, you agreed to provide him with

5    certain benefits, right?

6    A.    Yes.

7    Q.    In return for his working for you, correct?

8    A.    Yes.

9    Q.    And what was his responsibilities under that agreement?

11:38AM 10    A.    To -- he was volunteering to work with us.  He had to

11   provide truthful information to us that there would be no

12   promises or rewards but that he would be and could be

13   compensated for his cooperation with us.

14   Q.    And when you say compensated, you were going to pay him,

15   correct?

16   A.    Yes.

17   Q.    And how much money did the FBI pay CW-1?

18   A.    The government prior to entering witness protection paid

19   him slightly over $196,000, but it wasn't directly.  Not all of

11:38AM 20   that money was directly to him.

21   Q.    It was for his housing?

22   A.    Well, we had most of that money was expenses, so it was

23   for housing, food, bills, money that we provided him so that he

24   could socialize with targets of the investigation, and then

25   once we got -- we did have one or two service payments where

1    that would be more money for his cooperation in the sense that

2    he could do with what he saw fit with that money.

3          It wasn't for those bills, it wasn't actually, okay,

4    here's some money for your cooperation, you can spend it as you

5    see fit, and then a large portion of that money was also

6    provided to him and his family for housing and food while we

7    were keeping them protected waiting for the Office of

8    Enforcement Operations at Department of Justice headquarters to

9    approve our application to have him enter and his family enter

11:39AM 10   the witness protection program and then also motel that was

11   paid to the hotel and family members in El Salvador to keep

12   them safe until we could get them into the United States.

13   Q.   And that was offered by the FBI, correct?

14   A.   The FBI and Department of Justice.

15   Q.   That means Department of Justice?

16   A.   Yes.

17   Q.   All right.  In addition, when he entered witness

18   protection, he also received approximately $300,000; is that

19   fair to say?

11:40AM 20   A.   Yes, that is correct.

21   Q.   That was for the United States Marshals, correct?

22   A.   That is correct, yes.

23   Q.   And you say that money didn't go directly to him, but

24   would you agree with me that during the period of time during

25   the investigation he was working as a gypsy cab driver?

1    A.    Yes.

2    Q.    And living in the community?

3    A.    He did live in the community, yes.

4    Q.    And the money that you gave him, he didn't have to come up

5    with himself?

6    A.    No.  I would disagree with that statement the way it's

7    asked.  The money we provided him, he had to conduct work for

8    us, he had to gather evidence, and when he gathered evidence,

9    it was based at our direction, and once we corroborated what he

11:40AM 10    told us through the evidence gathered, then we made sure he did

11    receive the payments that we told him we would pay him to live

12    here in the United States.

13    Q.    Okay.  But he also had bills to pay, he had housing

14    expenses to pay?

15    A.    Yes.

16    Q.    Okay.  And he didn't have to come up with his own money to

17    do that?

18    A.    No.

19    Q.    The money you gave him from the government he could use

11:41AM 20    for those purposes?

21    A.    Well, we directed him to pay for his housing.

22    Q.    So the money he earned didn't have to come out of his own

23    pocket to pay his living expenses?

24    A.    That's correct.

25    Q.    So all his living expenses, rent, mortgage, lights,

1    utilities, he didn't have to come up with any of that?

2    A.    He did by working for us, yes.

3    Q.    So the money he gained working for you, as long as he

4    worked for you, he would be getting this money, almost $200

5    from the Federal Government?

6    A.    That's not how it broke down.  It broke down to where we

7    paid him I believe it was around $2,000 a month during the

8    investigation to pay his bills, as long as he followed our

9    rules, and then I would say that would take us to under

11:42AM 10    $100,000, and then to keep him and his family safe upon the

11    indictments, the rest of the money came in to pay for housing

12    and food and bills while we kept him protected until he entered

13    the witness protection program.

14    Q.    But you also brought his family members to the

15    United States, too?

16    A.    Yes.

17    Q.    During the course of the investigation?

18    A.    No, upon the indictment.

19    Q.    Only upon the indictment did you bring his family?

11:42AM 20    A.    That's correct.

21    Q.    You offered protection to them in El Salvador during the

22    course of the investigation?

23    A.    Not until we were indicting because we couldn't get them

24    out in time before we indicted, so while we were waiting to

25    receive permission to bring them into the United States, we put

1    them into a hotel and paid for their hotel rooms and paid for

2    their food, so at that point a large sum, I would say over

3    $30,000 was paid directly to the hotel and then food, the cost

4    of food was provided to them so that they could eat while we

5    had them in a hotel until we could get them into the

6    United States.

7    Q.   And that was about 18 members of his family; is that fair

8    to say?

9    A.   No, he already had some immediate members of the family

11:43AM 10   living here in the United States, so once we indicted, we made

11   sure the entire family, and I believe it was 16 or 18,

12   including him, we housed together until we could enter them

13   into the witness protection program.

14   Q.   And part of the benefits you gave him also was immigration

15   benefits, Court action?

16   A.   We provided -- we sought deferred action to keep them in

17   the country during the investigation, yes.

18   Q.   You said them.  Who is the "them" that you were referring

19   to?

11:43AM 20   A.   The CW and his family.

21   Q.   So there were family members that came from El Salvador?

22   A.   As I said, there was already family members here in the

23   United States before he was brought back, paroled back into the

24   country to work with us.

25   Q.   So that was, what, eight or ten of those?

1   A.   I think that was closer to six.

2   Q.   About six members that you provided immigration benefits

3   to deferred action?

4   A.   We provided the deferred action, yes.

5   Q.   And that was a benefit to his family, correct?

6   A.   Yes.

7   Q.   And these benefits would keep coming in, deferred action

8   is renewed every year?

9   A.   We did it every year, yes.

11:44AM 10   Q.   And that's something you have to get permission for and

11   renew it, every year it has to be renewed?

12   A.   Every year we filled out the paperwork, sent it to the

13   Homeland Investigations, they approved it and allowed them to

14   stay in the country.

15   Q.   As long as CW-1 was working with the FBI, working in the

16   investigation, he got these benefits for himself and his

17   family?

18   A.   Yes.

19   Q.   And the only part of the bargain that he had with you was

11:44AM 20   to be truthful?

21   A.   There was other things, yes.

22   Q.   Okay.  The main was to be honest and truthful with you?

23   A.   Yes.

24   Q.   And I think you indicated that he signed an actual written

25   agreement?

1    A.    Yes.

2    Q.    And this was new to you, signing a written agreement, this

3    is the first one that you had a cooperating witness sign an

4    actual cooperation agreement?

5    A.    This is the first one I had done, yes, but I wasn't the

6    case agent then.  It was the first time in my career here in

7    Boston that my unit had ever signed an agreement like this with

8    a cooperating witness.  I know it's been done throughout the

9    United States with the FBI in other informants, but this is the

11:45AM 10   first one I somehow had direct involvement with at some point

11   or another.

12   Q.    And after the investigation concluded, you testified that

13   he CW-1 went into the witness protection program, correct?

14   A.    Yes, he did.

15   Q.    And that's operated by the United States Marshals, not

16   your area, correct?

17   A.    That is absolutely true, yes.

18   Q.    And I think you testified they gave him approximately

19   $300,000 in benefits?

11:45AM 20   A.    Yes.

21   Q.    And they gave immigration benefits and jobs to his family

22   and to CW-1?

23   A.    Yes, the Marshals are designed to get the family members

24   working so that they're productive citizens.

25   Q.    And you testified you made the recommendation that CW-1

```
 1    and his family go into witness protection, there's a process

 2    involved with it, right?

 3    A.    Yes, it is.

 4    Q.    And part of it is you're filling out some kind of

 5    application, some kind of federal form recommending CW-1 as a

 6    good candidate for the witness protection?

 7    A.    Not just the CW-1 but his family.

 8    Q.    And you recommended -- well, let's talk about CW-1.  You

 9    recommended that CW-1 was a good candidate for witness

11:46AM 10    protection, correct?

11    A.    I did, yes.

12    Q.    And that he had been honest during your investigation.

13    Did you put that into your application?

14              MR. POHL:  Objection, your Honor.

15              THE COURT:  Let me see counsel at sidebar.

16              (THE FOLLOWING OCCURRED AT SIDEBAR:)

17              THE COURT:  What's the objection?

18              MR. POHL:  Your Honor, I think we're getting to the

19    area we talked about this morning prior to the jury coming in,

11:47AM 20    whether CW-1 is actually a witness at trial.  This line of

21    questioning is inappropriate and separate and apart from

22    conversations concerning, you know, sort of I think up until

23    this point, this is information that, you know, is a classic

24    promise, reward or inducement, and Special Agent Wood would be

25    authorized to talk about, but anything past that I think is
```

1    going to run afoul of the statute or the fact that you're

2    impeaching the CW-1 through Special Agent Wood.

3         THE COURT:  Mr. Iovieno.

4         MR. IOVIENO:  Your Honor, I believe on direct

5    examination this witness testified that he made a

6    recommendation to the witness protection program.  Part of that

7    recommendation is the character and fitness of the applicant,

8    that the door was open when that testimony was brought in.

9         There's also testimony from one of the transcripts

11:48AM 10    that CW-1, I think, indicates he smashed someone over the head

11    with a bat, which would bring into other bad acts that CW-1

12    participated and opens the door, I think the government opened

13    the door.

14         THE COURT:  Well, I don't remember that he testified

15    about character and fitness on direct, opening the door to

16    what?  Again, how is this not impeachment of CW-1 to a

17    third-party witness?  What is the goal here other than to make

18    the FBI look about bad?  What is the goal?

19         MR. IOVIENO:  The goal is to portray that he was not a

11:48AM 20    good candidate for witness protection and that he knew he was

21    not a good candidate for witness protection based on his past

22    conduct.

23         THE COURT:  And what does that show?  In other words,

24    how does that move the ball forward in this case?  How does

25    that -- how is that relevant to the defense of this case?

1      MR. IOVIENO:  It's showing that CW-1 was the

2  instigator of all the violent crime, particularly Animal being

3  brought over, and that he was untrustworthy, and that

4  his -- and that the FBI knew about it.

5      THE COURT:  Okay.  We keep going around in circles,

6  and the FBI knew about it, and, therefore, what, the FBI is

7  bad, the FBI is incompetent?

8      MR. IOVIENO:  That CW-1 is bad.

9      THE COURT:  I'll let you get in CW-1 is bad with the

11:49AM 10  right evidence, particularly calling CW-1, but just showing

11  that the FBI is bad or incompetent or asleep at the switch, I'm

12  not sure I follow how it --

13      MR. IOVIENO:  With respect to the robberies committed

14  by CW-1.

15      THE COURT:  Again, why?  Mr. Murphy, I'll hear you.

16      MR. MURPHY:  Number 1, I think, your Honor, as I said

17  before, it goes to the kind of evidence, the kind of

18  information, the quality of information that this agent was

19  relying on when he formed his opinions.  He was relying in part

11:50AM 20  that someone, the evidence will show, was lying to him.

21      THE COURT:  Okay.  There's no foundation for that.  He

22  can ask the questions how much he relied on what he learned

23  from CW-1, and maybe we can take it from there.

24      MR. MURPHY:  So that's point 1.  Point 2, your Honor,

25  is that he clearly testified on direct examination about the

1    Threat Assessment, and we have asked the government for the

2    Threat Assessment.  The threat assessment should be produced

3    because it's *Jencks*, and I would ask for an order that it be

4    produced now while I'm here.

5              THE COURT:  And what is the Threat Assessment?

6              MR. POHL:  Your Honor, I think the Threat Assessment

7    is a document that is prepared by the sponsoring agency to

8    provide information concerning the candidate's admission into

9    the witness protection program.

11:51AM 10         My understanding is Mr. Murphy asked for this in the

11   run-up to the trial.  I sort of conferred with colleagues in

12   the office that had this issue come up.  My understanding is

13   that those documents are not discoverable, and even if they

14   were discoverable, it would still be information about CW-1,

15   who's not testifying, all right, so it would include good and

16   bad things about CW-1, but the bad things would be inadmissible

17   anyway.

18             THE COURT:  Let's take this a step at a time.  As to

19   the question that is pending, I'm going to sustain the

11:51AM 20   objection.  You can ask about the foundations of his expert

21   testimony, and we'll see where that goes, and as to the Threat

22   Assessment, I'm going to deny it without prejudice because I

23   don't know what the document is precisely, and I don't know

24   what it bears on, and it can be taken up when the jury is not

25   waiting.

1    MR. LOPEZ:  Your Honor, can we ask you to review it in

2    camera?

3    THE COURT:  Maybe.  Again, I don't know what it is.

4    MR. POHL:  Thank you.

5    (SIDEBAR CONFERENCE WAS CONCLUDED)

6    Q.   Let's put another question to the witness.  During your

7    investigation, you relied on many factors, reports, we talked

8    about that, recordings, is that fair to say?

9    A.   Yes.

11:52AM 10    Q.   All right.  And you lied a lot about the confidential

11    informants, confidential informants who were providing

12    information to you, right?

13    A.   I don't agree with the way the question is asked.  I would

14    say that we listened to what the cooperating witnesses and

15    confidential informants tell us, and then we corroborate what

16    they tell us through recordings and the gathering of evidence.

17    We just don't take their word for it.

18    Q.   Because you don't trust the cooperating witnesses,

19    correct?

11:53AM 20    A.   I guess that would be somewhat of a fair type explanation,

21    but I just don't listen to one person and just say, okay, you

22    said that, and that's true, I have to have evidence to say it's

23    true.

24    Q.   Well, you testified at a prior hearing, correct?

25    A.   Yes.

1    Q.   And you testified that you don't trust your cooperating

2    witnesses; do you recall testifying to that?

3    A.   Yes, I mean, that's a fair thing that, yes, my witnesses

4    are criminals, so I have to go and prove what they tell me so

5    that I know what they're telling is the truth when they tell

6    me.

7    Q.   And you have to corroborate what they tell you, and you do

8    that by gathering other evidence, such as recordings?

9    A.   Yes.

11:54AM 10   Q.   In this case, CW-1, he was the only one recording meetings

11   of Eastside, correct?

12   A.   Yes.

13   Q.   All right.  And he was the only one recording

14   conversations inside cars, right?

15   A.   Yes.

16   Q.   And he was equipped with the recorder that you gave him

17   both on his person and it looks like he had maybe a camera in

18   his hat, something of that nature?

19   A.   We put it on his person, yes.

11:54AM 20   Q.   So you had the ability to listen, is it realtime

21   listening?

22   A.   It depended on what was going on.  There were times that

23   we could listen in realtime, there were times we could not.

24   Q.   And you also -- strike that.  CW-1 had the ability not to

25   record things, correct?

1    A.    Well, if he didn't have a recorder, yes, then he didn't

2    have the ability to record things.

3    Q.    And he had a lot of conversations that weren't recorded;

4    is that fair to say?

5    A.    Yes.

6    Q.    And because you couldn't record everything?

7    A.    That's correct.

8    Q.    And you had to rely on what he reported back to you as to

9    what was happening during various meetings, right?

11:55AM 10    A.    We didn't use anything he told us without a recording for

11    evidence to charge anyone.

12    Q.    That's not the question though.  The question is you had

13    to rely upon what he told you, what had happened at a various

14    meeting, you had to rely on him, right?

15    A.    Well, again, the way you're asking the question, I'm

16    trying to answer it to the best of my ability, but I listened

17    to what he has to say, but I don't take that as truth until I

18    have evidence that I would get through a recording.

19    Q.    But what he said to you was important into your

11:55AM 20    investigation when an incident wasn't recorded?

21    A.    We would write it down and put it in a report, yes, but,

22    as I said, we wouldn't rely on that until we had proof of it.

23    Q.    And, in particular, you couldn't rely on it with CW-1

24    because he was not truthful with you, right?

25              MR. POHL:  Objection.

1        THE COURT:  I'll allow that question.  Go ahead.

2   A.   I disagree.

3   Q.   You disagree that he was untruthful with you during your

4   investigation?

5   A.   No, I didn't say that.  I said I disagree that I don't

6   rely on things -- I don't rely that he was being untruthful

7   through the course of the investigation.

8   Q.   But on certain occasions, he was being untruthful?

9   A.   I would say he didn't tell us, just like I don't tell

11:56AM 10   everybody everything, so, yeah, I don't know if that's

11   untruthful.

12   Q.   He didn't disclose certain incidents that occurred during

13   the investigation?

14   A.   No.

15   Q.   You became aware of those later on in the investigation?

16   A.   Yes.

17   Q.   And you confronted CW-1 with those allegations?

18   A.   Yes.

19   Q.   When you confronted him, who was there?

11:57AM 20   A.   Myself and Assistant United States Attorney Peter Levitt.

21   Q.   And you meet regularly with or you've met regularly with

22   CW-1, correct, during the course of the investigation?

23   A.   Yes.

24   Q.   You had meetings where you admonished him, correct?

25   A.   Yes.

1    Q.   And those occurred how long?

2    A.   Admonishments occurred every year, criminal admonishments

3    occur every 90 days, which we call authorized illegal activity.

4    Q.   And those were occasions where you met specifically with

5    CW-1 with other agents or an agent, and the purpose of having

6    someone else there is to have a witness; is that fair to say?

7    A.   Yes.

8    Q.   And you admonished him about his work with you?

9    A.   We admonish him yearly on the -- well, it's an Attorney

11:58AM 10   General guideline, but every year, the FBI admonishes their

11   sources of what they can and can't do, and then if we grant the

12   ability for a cooperating witness to break the law, and that's

13   in a very controlled setting, it's as I described before, if we

14   authorize you to buy drugs, we authorize you to buy drugs when

15   we're with you, not when you're out on your own, but every 90

16   days, we will go over the instructions allowing them and

17   instructing them on how they can and can't break the law.

18   Q.   And you did that with CW-1 repeatedly during the

19   investigation?

11:58AM 20   A.   Every year he got admonishments, and every 90 days he got

21   his authorized illegal activity admonishments.

22   Q.   And specifically during the winter of 2014 and 2015, you

23   had these admonishment meetings, correct?

24   A.   I started in 2015.

25   Q.   But you were aware the investigation also had them prior

1    to you being involved?

2    A.    I know that they have to do it every 90 days, so it

3    started when he first got here, and once he was authorized to

4    break certain laws, he got it every 90 days.

5    Q.    And that would involve sitting down with CW-1, and he was

6    given admonishments, and he would acknowledge those

7    admonishments.  Did he have anything in writing or would he

8    just verbally tell you, yes, I understand?

9    A.    The yearly admonishments, he does not have to sign; the

11:59AM 10   every 90 days to break the law admonishments, he has to sign.

11   Q.    And he signed those every 90 days, correct?

12   A.    Yes, he did.

13   Q.    And during the period where he signed saying he had not

14   broken the law, had you become aware that he, in fact, violated

15   the law?

16        MR. POHL:  Objection.

17        THE COURT:  Let's take our 12:00 break.

18        THE CLERK:  All rise.

19        THE COURT:  Let me see counsel at sidebar.

12:00PM 20       (THE FOLLOWING OCCURRED AT SIDEBAR:)

21        THE COURT:  Remind me, in the first trial, there was

22   evidence that he committed robberies and was terminated; am I

23   right?  I can't remember what I learned at the first trial.

24        MR. POHL:  Let me see if I can do this quickly.

25   Shortly before the indictments were issued, agents interviewed

1    Clacker, CW-2.  He provided information that he -- and they

2    discussed all of his criminal activities with people in his

3    clique, with other MS-13 gang members, and one of the things he

4    disclosed was that he had done some street robberies with gypsy

5    cab drivers, and one of the people he identified as being

6    somehow involved in that was Pelon.

7         Pelon, the agents then -- and I think that was the

8    conversation that Mr. Iovieno just referenced.  Special Agent

9    Wood and AUSA Levitt confronted the cooperating witness about

12:01PM 10   it, he eventually acknowledged that he had done, and, you know,

11   there was a discussion about whether he should be charged, what

12   impact that charging decision would have on WITSEC, and

13   ultimately it was decided to provide that information to OEO

14   and factor that into the application, and then several months

15   after the case was charged, eventually he and his family were

16   admitted into WITSEC.

17        THE COURT:  One of the reasons I'm asking is for the

18   reasons I've indicated, I have concerns about going down this

19   path, but if it is already out, in other words, if he already

12:02PM 20   testified in open court and trial, then it's easy, I'll let him

21   do the same testimony.

22        MR. POHL:  Well, let me get there, I don't remember.

23   I mean, that's the story.  I don't remember --

24        THE COURT:  On that assumption, I'm going to allow him

25   to elicit that he participated in robberies and then was

1    terminated.

2             MR. POHL:  Oh, no, no, no.

3             MS. LAWRENCE:  No, he wasn't terminated, and it was in

4    a different context.

5             THE COURT:  There was a gap.

6             MS. LAWRENCE:  Clacker was part of that trial in a

7    different way that it would be here.

8             MR. POHL:  So, in other words --

9             THE COURT:  We'll take it a step at a time.

12:02PM 10        MR. LOPEZ:  Clacker testified there were 30 to 40

11   robberies.

12             MR. POHL:  Excuse me, understand, understand, Clacker

13   was a witness in the November trial.

14             THE COURT:  Right.

15             MR. POHL:  So Clacker's testimony about his own

16   criminal activity was a live issue at that trial, and

17   discussing in the context of CW-1 in that trial makes sense

18   because Clacker is going to say what he did, and that included

19   street robberies, and that would include CW-1.  None of that is

12:03PM 20   present here, all right.

21             Clacker is listed on our witness list, but we haven't

22   called him yet, and I don't know that we will call him, and,

23   respectfully, I don't think the fact that in a totally

24   different trial with totally different players and in a totally

25   different context that automatically means that evidence comes

1    in at this trial.

2         THE COURT:  Okay.  I thought there was a simple

3    answer, which there may not be.  Okay.  Let me go back then.

4    How is evidence that he participated in street robberies

5    relevant to Wood's testimony as opposed to confronting CW-1

6    himself?

7         MR. IOVIENO:  He was relying on information that was

8    provided through the course of the investigation, and he was

9    being lied to throughout the course of the investigation.  He

12:03PM 10   met every 90 days with this young man, and he was being lied

11   to.

12        MR. MURPHY:  Your Honor, the other thing I would add

13   is that there was testimony on direct examination:  We directed

14   him to do this, we directed him to do this.  It presents an

15   incomplete picture of the FBI's investigation if the jury isn't

16   allowed to know that this guy was also freelancing on the side.

17        There's been testimony without objection about his

18   cooperation agreement, and I would like to put a redacted copy

19   of that into evidence.  With that evidence and it's relevant,

12:04PM 20   the FBI and the Marshal Service and the Department of Justice

21   kept this from the parties despite the fact --

22        THE COURT:  Again, who are you impeaching with this?

23   You're impeaching CW-1?

24        MR. MURPHY:  It's not impeachment really, your Honor.

25        THE COURT:  What is it?

1          MR. MURPHY:  What it is, it's relevant evidence to

2     show that this witness' testimony about the investigation has

3     omitted critical facts, the omission being that the man that he

4     was using posing as a drug dealer, infiltrating MS-13 was also

5     committing crimes on his own behind the FBI's back.

6          THE COURT:  And, therefore, and therefore --

7          MR. MURPHY:  And, therefore --

8          THE COURT:  What is your legal conclusion or factual

9     conclusion that flows from that?

12:05PM 10          MR. MURPHY:  The legal conclusion is that the jury is

11     entitled to see a full picture of what the FBI's investigation

12     of this case was like and not a sanitized version.  The

13     government should not be allowed to say we directed this guy,

14     he shouldn't be allowed to testify, but there was a cooperation

15     agreement.  We aren't allowed to bring out the fact that he was

16     doing things behind their back.  It's essentially the idea,

17     your Honor, that having brought all of this testimony out

18     suggesting that the, you know, suggesting that this witness is

19     an MS-13 expert, the fact that --

12:06PM 20          THE COURT:  Well, there still will be no foundation

21     that he relied on anything CW-1 said.

22          MR. MURPHY:  But even if it didn't rely, and, you

23     know, we'll maybe try that again, but even if he didn't rely,

24     the fact that this MS-13 expert was running an informant, was

25     pulling the wool over his eyes for a year and a half goes

1    directly to his credibility.

2         How can he be an expert if the one guy that he's

3    dealing with to learn about MS-13, who's infiltrating MS-13, he

4    can't even keep track of what he's doing?

5         In addition, I would say the government brought out on

6    direct, you know, the reasons why Animal was not arrested when

7    he was arrested, we should be able to explore that as well.

8         MR. LOPEZ:  Your Honor, can I add?

9         THE COURT:  Yes.

12:06PM 10    MR. LOPEZ:  That my theory of the defense is that they

11   kept CW-1 active after knowing that he committed crimes, that

12   they kept Animal active and didn't arrest because they wanted

13   to manufacture and create that beat-in scene so they could

14   argue that these guys agreed to do murder, and, therefore, this

15   evidence goes to that agent's motivations and bias with respect

16   to this case, and it seems to me that we get to explore that.

17        THE COURT:  Well, I'm not sure about that theory, I

18   mean, my client committed a crime because you didn't arrest the

19   person who you were going to commit the crime with earlier, I'm

12:07PM 20   not sure I'd allow that.

21        MR. LOPEZ:  It's that there was no evidence out of my

22   guys, my client wasn't involved in any murders, any attempted

23   murders.

24        THE COURT:  We just heard a tape that said he agreed

25   to beat the guy in.  Anyway, we'll get to that, we'll get to it

1    later.

2              All right.  On this issue, suppose you're right,

3    Mr. Murphy, as to which I have serious doubts because I'm

4    having trouble fitting this into any legal or factual theory,

5    isn't it enough to say, "Isn't it true that he committed

6    robberies and didn't know about it?"  "Yes."

7              What more do you need beyond that?

8              MR. MURPHY:  I think not an enormous amount of

9    details.

12:08PM 10         THE COURT:  What else do you need beyond that?

11             MR. MURPHY:  Well, you also need to know that he

12   committed --

13             MR. LOPEZ:  Assault.

14             MR. MURPHY:  -- an assault, stabbings behind his back.

15             MR. LOPEZ:  And then lied about it.

16             THE COURT:  And, again, therefore, and therefore what,

17   in other words --

18             MR. IOVIENO:  That was his motivation to continue

19   working for the FBI was to keep the gravy train rolling for him

12:08PM 20   and his family, and that's what his motivation was.

21             MR. MURPHY:  And, therefore the --

22             THE COURT:  Which is all fair game with CW-1, again,

23   you're impeaching someone else with this testimony.  How are we

24   impeaching him?  That's what I'm trying to find out.

25             MR. IOVIENO:  It was his investigation.

1           MR. MURPHY:  It's his investigation, I will say that.

2      He has been portrayed as an MS-13 expert.

3           THE COURT:  Right.

4           MR. MURPHY:  He has been portrayed -- all law

5      enforcement methods have been discussed.  He's essentially

6      been, over our objection, allowed to testify about MS-13

7      generally, about the facts that he --

8           THE COURT:  Structural history, gang symbols, colors.

9      It's very basic stuff.

12:09PM 10           MR. MURPHY:  The purpose.  So if the person who -- if

11      his job as an FBI agent in this case beginning in 2015, I think

12      he will say part of his job was to run this CI, if he can't

13      even do that, then why should the jury trust the quality of the

14      opinions that he's rendering about what MS-13 is generally?

15           I think it goes to his -- I think it goes to his

16      credibility.  He's here as an -- he's here as -- it would be

17      like if you were calling an expert about driving, and, you

18      know --

19           THE COURT:  And his teenage son was a bad driver?

12:10PM 20           MR. MURPHY:  It's not his teenage son, your Honor,

21      because you don't have a deal with his teenage son, it wasn't

22      his job to monitor the activities.

23           THE COURT:  His job is not to monitor everything he

24      does, surely, that's absurd, you know, that he's supposed to

25      baby sit him 24-7.

1          All right.  Let's do this.  It's ten after twelve.

2     Let me chew on this for five, ten minutes while you all use the

3     facilities, and we'll come back.

4          MR. MURPHY:  Thank you, your Honor.

5          (SIDEBAR CONFERENCE WAS CONCLUDED.)

6          (A recess was taken.)

7          THE CLERK:  All rise.

8          THE COURT:  Let me see the lawyers at sidebar.

9          (THE FOLLOWING OCCURRED AT SIDEBAR:)

12:18PM 10          THE COURT:  All right.  To the extent this evidence is

11     offered to impeach CW-1, it's clearly irrelevant.  To the

12     extent the evidence is offered to impeach Wood's testimony as

13     an expert witness, no foundation has been laid that he relied

14     on it, and it seems doubtful under the circumstances given the

15     basic nature of his testimony that he did, but we'll see where

16     that goes, so the question is:  Is this evidence relevant to

17     impeach him as an FBI agent, that is, a case agent running this

18     case that shows somehow that he is not competent because he is

19     not supervising his cooperating witness somehow or is being

12:19PM 20     duped by him?  And that goes to his credibility.

21          I have grave doubts that that is relevant, however,

22     what I'm going to do is I'm going to permit you to elicit in

23     bare bones fashion that CW-1 committed serious crimes, if this

24     is what happened, during the time that he was a cooperating

25     witness and leave it at that, nothing further.

1              In other words, you are not aware he was committing

2     robberies or whatever, and that may open the door to the

3     government rehabilitating him maybe as to the good things CW-1

4     did, which may lead us to the knives at Deer Island, I don't

5     know, I haven't decided yet, but that's what I'm going to do,

6     and, frankly, I'm putting my thumb on the scale because it's a

7     criminal case, but I do think it's irrelevant, but I'm going to

8     permit it for prudence sake.  Okay.

9              MR. POHL:  Thank you, your Honor.

12:20PM 10              (SIDEBAR CONFERENCE WAS CONCLUDED)

11              THE CLERK:  All rise for the jury.

12              (JURORS ENTERED THE COURTROOM.)

13              THE CLERK:  Thank you.  You may be seated.

14              THE COURT:  Counsel, put a new question to the

15     witness.

16     Q.   You were talking about the admonishment sessions to CW-1?

17     A.   Yes.

18     Q.   And directing your attention to around December of 2015,

19     you become aware of information that CW-1 had committed some

12:23PM 20     serious violent crimes throughout the investigation?

21     A.   Yes.

22     Q.   And as a result of that, did you have a meeting with CW-1

23     I think in January of 2016?

24     A.   I had a meeting December of 2015.

25     Q.   I'm sorry, December?

1    A.   Yes.

2    Q.   Okay.  You had a meeting with him and you confronted him

3    about that, correct?

4    A.   Yes.

5    Q.   And he initially denied it, right?

6         MR. POHL:  Objection.

7         THE COURT:  I'll allow that, overruled.

8    A.   Yes.

9    Q.   And then I believe you testified that then subsequently

12:24PM 10  after the investigation was over, you recommended him for the

11   witness protection program, correct?

12   A.   I had already recommended him for the witness protection

13   program before it was over.  I started the process of the

14   paperwork in October, November of 2015 to enter him into

15   WITSEC.

16   Q.   You started the process to enter him into the witness

17   protection program before you became aware that he had

18   committed a violent crime?

19   A.   Yes.

12:24PM 20  Q.   Did you amend that application at all?

21   A.   Yes.

22   Q.   And at some point, CW-1 was admitted into the witness

23   protection program along with his family?

24   A.   Yes.

25   Q.   And at some point he was terminated?

1    A.    Yes.

2    Q.    How long after he entered was he terminated?

3    A.    Over a year.

4    Q.    And was it your understanding he was terminated because he

5    had committed a violent crime?

6          MR. POHL:  Objection.

7          THE COURT:  Sustained.

8    Q.    Let me go back a little bit and talk about when I first

9    started questioning you, you mentioned the gentleman by the

12:25PM 10   name of Jose' Argueta Rodriguez, correct?

11   A.    Yes, you mentioned him, yes.

12   Q.    He was also known as Lobo?

13   A.    Yes.

14   Q.    So there were two Lobos who were hanging around with

15   Eastside, correct?

16   A.    Yes.

17   Q.    And you indicated you didn't recall if he had lived with

18   Pelon; is that correct?

19   A.    That's correct.

12:25PM 20        MR. IOVIENO:  Can I have the document camera just for

21   the witness.

22   Q.    I'm going to show you a document and just direct your

23   attention to the -- just read that to yourself.

24   A.    Yes.

25   Q.    Does that refresh your recollection whether or not Pelon

1    had once lived with Jose' Argueta Rodriguez, also known as

2    Lobo?

3    A.   Reading it, that's what it says, but, again, as I said, I

4    was not involved in this part of the investigation at this

5    time, so this is the first time I'm reading it.

6    Q.   But it's fair to say that with any CW, particularly CW-1,

7    you wanted to protect him, correct?

8    A.   Yes.

9    Q.   And it was important to know who he resided with?

12:26PM 10   A.   Yes.

11   Q.   He never resided with Mr. Larios, correct?

12   A.   That's correct.

13   Q.   So the only other Lobo that you were aware of was this

14   Mr. Jose' Argueta Rodriguez?

15   A.   I knew there were two Lobos, so your client and the other

16   one.

17   Q.   And we talked about the photo array, the photo key, and

18   you indicated that you had not put the name "Lobo" down next to

19   the name "Jose' Argueta Rodriguez," correct?

12:26PM 20   A.   I didn't make the key itself, so, no, I did not put it

21   down.

22   Q.   Have you seen the key before?

23   A.   I have, yes.

24        MR. IOVIENO:  The document camera just for the

25   witness.

1  Q.   Can you tell us what that document is?

2  A.   That's the Eastside Locos Salvatrucha photo array key,

3  yes.

4  Q.   Can you tell the jury what a photo array key is?

5  A.   In this case, it wasn't a photo array, it was more of a

6  photo book, and the photo book contained photographs of members

7  and associates of Eastside Locos Salvatrucha.  We had books for

8  other cliques as well, and then when we would show the photo

9  book, just the book, to the witness or any witness, they just

12:27PM 10  see the photograph of a person, and we would have the key next

11  to us that when they would identify someone, they could say

12  this is who I know this to be, and we could mark our books,

13  and, okay, that's Number 1, they've identified this person, and

14  Number 4, they've identified this person, so the key matches up

15  in this case to the photo book that we had.

16  Q.   And with respect to Number 8, that was Jose' Argueta

17  Rodriguez, correct?

18  A.   Yes.

19  Q.   And he was photograph Number 8 in this photo book?

12:28PM 20  A.   Yes.

21  Q.   And on all the other names, you put the street names down

22  next to him, correct?

23  A.   The person who made this, yes.

24  Q.   The person who made this put all the street names next to

25  the individual who was purportedly in the picture, correct?

1   A.    Yes.

2   Q.    And no one put down "Lobo" next to Jose' Argueta

3   Rodriguez, correct?

4   A.    That's correct.

5   Q.    And it's fair to say it would be certainly confusing to

6   have two Lobos in an investigation when it's top heavy with

7   recordings?

8   A.    I would say it's confusing, but it's not the first time

9   we've seen multiple street names, the same street names for

12:28PM 10   people in the same gang.

11           MR. IOVIENO:  I would offer that as an exhibit, your

12   Honor.

13           THE CLERK:  It would be 224.

14           MR. POHL:  Objection to relevance.

15           THE COURT:  Sustained.

16   Q.    With respect to the two names in this case, it doesn't

17   necessarily mean when there's a reference to "Lobo" it refers

18   to Mr. Larios, correct?

19   A.    When we would look at and review the videotapes, we would

12:29PM 20   see who was on the videotapes and then make our decision on who

21   was who.

22   Q.    But when you didn't have a videotape, when it was an

23   audiotape of a phone call or audiotape inside the car, when

24   there's a reference to "Lobo," it doesn't necessarily mean

25   Mr. Larios, does it?

1    A.    I'd have to see the reports in question to see how it was

2    done or how that person wrote it, but typically once we have

3    identified someone and we're listening to the tapes, our

4    Spanish speakers in this case, a lot of our recordings were

5    reviewed by Trooper Jose' Depena and Trooper Brian Estevez, who

6    are Spanish speakers assigned to the task force, they become

7    familiar with the voices of who they're listening to over the

8    course of the investigation, and they'll know who they're

9    talking about on audio recordings, they'll know exactly which

12:30PM 10   person is talking when they hear the voice.

11   Q.    So they know exactly who's talking, whose voice they hear,

12   they know exactly who's talking?

13   A.    Once we've identified who it is and we've listened to the

14   voice, they'll recognize that voice.  If I'm having a phone

15   call with someone, they'll be able to recognize the person

16   because they've heard it over the course of three years that

17   voice, so they'll know whose voice is whose.

18   Q.    So, if someone is on a tape and they yell out, "Hey,

19   Lobo," it doesn't necessarily mean they're talking about

12:31PM 20   Mr. Larios?

21   A.    In that case, no, it could be the other Lobo.

22   Q.    Now, you testified a little bit about the morphine, if you

23   will, of MS-13?

24   A.    The morphine, yes.

25   Q.    And you indicated that the leader, if you will, in the

1     prison in El Salvador had runners that would send out

2     information, and he would send out orders?

3     A.    Yes, yes, the leader is L.D. Oblido, and he's in charge of

4     MS-13, and he has his 12 apostles, and that is the leadership,

5     the council of MS-13, and they're all in prison, and they

6     communicate from the jail to leaders outside of jail, and those

7     leaders will continue passing down orders all the way down to

8     clink leaders, who then pass those orders down to clique

9     members.

12:32PM 10   Q.    And I think you indicated that towards at some point

11    during the investigation, the issue of the East Coast Program

12    came up?

13    A.    Yes.

14    Q.    And the East Coast Program was an attempt by the

15    leadership to centralize certain cliques to have them answer to

16    one program, correct?

17    A.    They put cliques into programs, yes.

18    Q.    And there were other programs, there was a Hollywood

19    Program?

12:32PM 20   A.    There's the Hollywood Program, which it's such a large

21    clique, it became their own program, but Hollywood has cliques

22    around the country, and it's such a big clique that they've

23    become their own program, the Hollywood Program.

24    Q.    And it was designed so that the cliques would report to

25    the East Coast Program and the East Coast Program would then

```
 1    report to El Salvador; is that a simple way of putting it?

 2    A.   Simple, clique leaders would report to regional officers

 3    who would report to the East Coast program leader based in the

 4    United States who would report back to the East Coast leader in

 5    El Salvador who would report back to the Ranfla.

 6    Q.   And you're aware during the course of your investigation

 7    Eastside had refused to join the East Coast Program, correct?

 8    A.   They initially said no, then they said yes, then they said

 9    no, and then they contemplated joining, and they were working
```

10    out to join the Hollywood Program.

```
11    Q.   Okay.  Did you write an affidavit in this case?

12    A.   I did.

13    Q.   And it was used for the purposes of this case, and it was

14    drafted and you signed it February 9th, 2016 under oath?

15    A.   Yes, the detention affidavit.

16    Q.   And did you write in that affidavit that Herzzon Sandoval,

17    the leader of Eastside, refused to join the East Coast Program?

18    A.   Yes.

19    Q.   So he did refuse to join the program?
```

20    A.   After -- as I said, he initially said no with the clique,

```
21    then they said, okay, we will, and then they said no, and that

22    was the ultimate decision not to join the East Coast Program.

23         THE COURT:  I'm sorry, let me just explain what an

24    affidavit is.  An affidavit is just a sworn statement, it's

25    another lawyer word, it's a written statement that you swear to
```

1    under oath.  Go ahead.

2    Q.    And you swore to this under oath that when you wrote this

3    produced in this case February 9th, 2016, and you didn't write

4    in that affidavit that they first agreed, then they didn't

5    agree, and then they joined another program, you didn't write

6    that in the affidavit at all?

7    A.    No, I didn't.

8    Q.    You wrote that he refused?

9    A.    Yes.

12:34PM 10    Q.    And you testified on direct examination that you became

11    aware of information that a green light had been issued,

12    correct?

13    A.    Yes.

14    Q.    And that was a green light against Eastside, correct?

15    A.    No, I think I testified here in this case that the green

16    light was initially initiated against Casper and Playa, but in

17    the specific question that was asked me, it was Casper that I

18    warned because we didn't have -- that was a question posed to

19    me.

12:35PM 20    Q.    So a green light in order to kill was going to be issued

21    that you had information that an order to kill was issued

22    against Mr. Sandoval and Mr. Guzman?

23    A.    We received information that there were discussions they

24    were debating whether or not to green light Casper.  We had

25    conversations where they said remove the leaders, so that would

1    be Guzman as well, but the specific name that came up over and

2    over again was Casper, and we warned Casper that they were

3    looking to possibly kill him.

4    Q.    Kill him for refusing to join the East Coast Program?

5    A.    I didn't put it like that.

6    Q.    No, you said they refused to join the program?

7    A.    No, no, I said when I warned him, I warned him that the

8    gang was looking to kill him or could be possibly looking to

9    kill him, so I didn't give specifics of what I knew, but I did

12:36PM 10   my job of warning him that there was a good possibility that

11   his life was threatened.

12   Q.    Because he didn't want to join the East Coast Program?

13   A.    Well, that was the reason, yes.

14   Q.    You didn't tell him that?

15   A.    No, I didn't tell him the reason why he was being green

16   lighted.

17   Q.    They didn't want to follow the rules of the East Coast

18   Program?

19   A.    Not of the East Coast Program, no.

12:36PM 20   Q.    They didn't want to pay any dues to the East Coast

21   Program?

22   A.    They paid dues.

23   Q.    Not to the East Coast Program?

24   A.    I don't know if it went to the East Coast Program when

25   they paid dues.  When I had the source send money back to the

1    El Salvador, I thought at that point it was to the East Coast

2    Program, but I knew they were sending money back to

3    El Salvador.  I couldn't tell you what went.

4         Over the course of the investigation, I know that I

5    participated in having the CW who accepted money from Playa to

6    send to El Salvador, and I watched him take the money to a

7    Western Union type facility, and he wire transferred the money

8    back to El Salvador.

9    Q.   How many occasions did you observe him do that, how many

10   occasions?

11   A.   He was instructed to do that at least twice, and I was

12   with him on those two occasions.

13   Q.   In two occasions in a three-year investigation, you

14   observed CW-1 go to Western Union and send money back to

15   El Salvador?

16   A.   Yes, those were the times he was asked to do it.

17   Q.   How much money did he send back on each occasion?

18   A.   $50.

19   Q.   $50, so $100 in a three-year investigation --

20   A.   Yes.

21   Q.   -- he sent back to El Salvador?

22   A.   He did, yes.

23   Q.   And you realize people have relatives back in El Salvador?

24   A.   Yes.

25   Q.   And people send money back to El Salvador or any other

1    country they come from all the time?

2    A.    That does occur, yes.

3    Q.    And during the course of a three-year investigation, you

4    made observations of two transfers of $50?

5    A.    Yes.

6    Q.    From a member through CW-1, and CW-1 is the one who told

7    you what it was for?

8    A.    Yes.

9    Q.    And on one of those occasions, I think you indicated it

12:38PM 10   was Mr. Guzman who had sent the money on behalf?

11   A.    No, I said he accepted, he collected the dues, and on two

12   occasions he provided the money that needed to go back to

13   El Salvador to the CW, and then the CW came to us, and said

14   here's the money I need to send to El Salvador by the second

15   and command of Eastside, and we said, okay, let's go do it, and

16   we took him to the -- it wasn't a Western Union, but it was a

17   wire transfer place, and then he did it.

18   Q.    It was Mr. Guzman, right?

19   A.    It was Playa, yes.

12:39PM 20   Q.    You call him "Playa."  He has a name, "Mr. Guzman"?

21   A.    Yes.

22   Q.    And he sent the money down through CW-1 to El Salvador,

23   correct?

24   A.    Yes.

25   Q.    Who did he send it to?

1    A.   I can't remember his name.  I'd have to look at the

2    receipt.

3         MR. IOVIENO:  This is just for the witness.

4    A.   Yes.

5    Q.   Who did he send it to?

6    A.   Juan Fernando Flores Guzman.

7    Q.   Same last name as Mr. Guzman, right?

8    A.   Yes.

9    Q.   Now, you spoke about the time in which you warned

12:39PM 10  Mr. Sandoval that a green light had issued or was going to be

11   issued, and you obtained that information.  That information

12   came from a meeting that you recorded, correct?

13   A.   No, it came from many different sources.

14   Q.   One of those sources was a meeting you recorded?

15   A.   Yes.

16   Q.   That meeting was in Virginia?

17   A.   Yes.

18   Q.   And the only participant at that meeting from the Eastside

19   was CW-1?

12:40PM 20  A.   That is correct, yes.

21   Q.   And he had driven other members from other cliques down

22   there, right?

23   A.   He drove members from the Molinos clique down to Virginia,

24   yes.

25   Q.   And there was a meeting held in Richmond?

1    A.   The meeting was held in Richmond, yes.

2    Q.   And during that meeting, which was recorded, you learned

3    that --

4              MR. POHL:  Objection.

5              THE COURT:  Let me see counsel.

6              (THE FOLLOWING OCCURRED AT SIDEBAR:)

7              THE COURT:  What do you expect the answer to be?

8              MR. IOVIENO:  The answer to be that he learned that

9    the order to kill had originated, they talked about it down in

12:41PM 10   Virginia.

11             THE COURT:  Mr. Pohl.

12             MR. POHL:  I think Special Agent Wood is right, that

13   there were a series of recordings and that actually I think his

14   warning to Casper predated this tape.  The fact that it's also

15   talked about on the tape I don't think relates necessarily to

16   the threat or to the warning.

17             I also think to the extent it's admissible at all,

18   it's a co-conspirator statement from a tape that's not -- it's

19   co-conspirator statements, and it wouldn't be admissible

12:42PM 20   through Mr. Iovieno, and I don't believe that the tape or the

21   recording has been authenticated, in any event.

22             THE COURT:  Well, isn't it a statement against

23   interest, in other words, he's eliciting that another member of

24   MS-13 issued an offered to kill; isn't that the thrust of it?

25             MR. POHL:  Yes.

1      THE COURT:  I think I'll allow it.  Overruled.

2      (SIDEBAR CONFERENCE WAS CONCLUDED)

3      THE COURT:  Go ahead.

4  Q.   Sir, you learned from CW's attendance at that meeting in

5  Virginia and the recording that was made that you learned that

6  the order to kill or the green light, if you will, had

7  originated down in this meeting in Virginia, right?

8  A.   No, that's an incorrect statement.

9  Q.   That was part of the source that you had, correct?

12:42PM 10  A.   The source attended that meeting, and he was asked why

11  haven't they killed Casper yet, but no one had received an

12  official green light order at that time.  He was being asked.

13  Q.   And he was asked, "Why don't you kill him?"

14  A.   Yes.

15  Q.   Referring to Mr. Sandoval, Casper?

16  A.   Correct.

17  Q.   Because Mr. Sandoval and Eastside was not following the

18  rules of the Eastside Program, were they?

19  A.   They were not joining the clique of the East Coast

12:43PM 20  Program.

21  Q.   And by not joining the clique, they were not following the

22  rules?

23  A.   Well, no, they could have joined another clique, and they

24  were, as I said, discussing joining the Hollywood Program,

25  so...

1    Q.   They didn't join the East Coast Program?

2    A.   They did not join the East Coast Program.

3    Q.   They did not join the Hollywood Program?

4    A.   Well, we ended the case before they had an opportunity of

5    joining the Hollywood Program.

6              MR. MURPHY:  Objection.

7              THE COURT:  Overruled.  I'll let it stand.

8    Q.   So the answer to my question is they didn't join the

9    Hollywood Program?

12:43PM 10   A.   We didn't give them an opportunity, no.

11   Q.   And is it your testimony that you then warned Mr. Sandoval

12   after the Virginia meeting or was this before?

13   A.   No, I warned him in the summer of 2015.  That meeting

14   occurred in December, 2015.

15   Q.   This was afterwards, you had additional information in

16   December of 2015, you had warned him previously that a green

17   light was going to be issued against him?

18   A.   Yes.

19   Q.   And that wasn't as a result of the Virginia meeting?

12:44PM 20   A.   No, that was before.

21   Q.   So there was another green light that was issued before?

22   A.   No.  I told you earlier when I testified that there was

23   the possibility of a green light being issued, and at that

24   point, when we had received that information, we warned him

25   because that was information that wasn't coming from the CW.

1    Q.   So that was in the summer of 2015?

2    A.   Yes.

3    Q.   And, again, that was because Eastside had refused to join

4    the East Coast Program?

5    A.   Yes.

6    Q.   And, again, in December of 2015, the issue had still not

7    resolved itself, Eastside was still not joining any program,

8    and there was a meeting in Virginia when another green light

9    against Mr. Sandoval was discussed as well as Mr. Guzman?

12:45PM 10   A.   As I said, there was no green light issued in December.

11   The question was asked --

12           THE COURT:  Let him answer.  Let him answer.  Go

13   ahead.

14   A.   The question was asked of the CW, "Why don't they kill

15   him?"  There's a difference between saying we're ordering you

16   to kill him and why don't you kill him, so the green light had

17   not been issued yet.

18           As I said, in the summer, we heard information that

19   there could be a green light being issued, and we warned him.

12:45PM 20   There was no green light issued in that December meeting, it

21   was a discussion of the possibility of killing him.

22   Q.   Well, "Why haven't you killed him yet?"

23   A.   "Why haven't you killed him?"

24   Q.   Was from the leaders of the East Coast Program?

25   A.   It was from a leader of the East Coast Program, yes.

1    Q.   And what was his name?

2    A.   The East Coast Program leader in the United States,

3    Chucky.

4    Q.   And Chucky said, "Why haven't you killed him?"

5    A.   Yes.

6    Q.   And they didn't issue a green light, but they asked Pelon,

7    your informant, "Why haven't you killed Mr. Sandoval --"

8    A.   Yes.

9    Q.   "-- for not joining the program?"

12:46PM 10    A.   Correct.

11    Q.   You had had additional information in the summer of 2015

12    about this?

13    A.   Yes.

14    Q.   And that's what you warned him about?

15    A.   Yes.

16    Q.   So this issue had gone on for months?

17    A.   The issue occurred, it went away and then it reoccurred

18    because, as I told you earlier, initially they said no, then

19    there was a meeting that we recorded, and during the meeting,

12:46PM 20    Casper and Playa or specifically Casper wanted Pelon --

21    Q.   I'm not asking -- sir, just answer my question, please.

22    A.   I'm trying to answer your question, sir.

23    Q.   Specifically during the summer of 2015 through December of

24    2015, Eastside had not joined the East Coast Program?

25    A.   That's incorrect.  They said no, they joined, they

1    reneged, so at one point the threat went away because they had

2    joined the program, and then when they reneged, they left the

3    program.

4    Q.   According to you, they joined the program for how long a

5    period did they join?

6    A.   I don't know because at that point the threat went away,

7    we had helped direct to mitigate that threat, and then the

8    issue arose when they said, We're not going to join, we've

9    changed our minds, we're now going to think about and we're in

10   negotiations to join the Hollywood Program.

11   Q.   And they never joined any program?

12   A.   Well, no, because we arrested everyone.

13   Q.   You arrested everybody, and no one joined a program?

14   A.   Correct.

15   Q.   They never followed the rules of the East Coast Program?

16   A.   They did when they initially said we're joining the

17   program, and that's why the threat went away.

18   Q.   You wrote in your affidavit they refused to join the East

19   Coast Program?

20   A.   That is correct because --

21   Q.   You said in your affidavit --

22        THE COURT:  We're just going around in circles.  You

23   already covered this ground.

24   Q.   Now, on September 20th, 2015, Mr. De Paz was killed, and

25   it was by Joel Martinez, correct, Animal?

1    A.    Yes, that is correct.

2    Q.    And Mr. Martinez was not a member of the Everett clique,

3    right?  He wasn't a homeboy?

4    A.    He was not a homeboy, no.

5    Q.    He was a paro?

6    A.    He was a paro, yes.

7    Q.    So he was a member of the Everett clique?

8    A.    Yes.

9    Q.    September of 2015, he wasn't a member of Eastside?

12:48PM 10    A.    That is correct.

11    Q.    As far as you know, Mr. Larios did not know Mr. Martinez

12    in September of 2015?

13    A.    I have no idea.  I would agree with that statement.

14    Q.    And, subsequently, a couple weeks later, I think 12 days

15    later, October 2nd of 2015, you testified there was a

16    consensual recording inside the taxi with CW-1, Pelon, and

17    Mr. Martinez, right?

18    A.    That is correct.

19    Q.    You heard that or we read that English translation, and

12:49PM 20    when did you first hear that recording?

21    A.    When did I what?

22    Q.    When did you first hear it?

23    A.    After the recording was made, we downloaded it.  Well, he

24    debriefed us, the CW-debriefed us of the conversation, and we

25    downloaded the recording equipment, and immediately the

1   translator started listening to the conversation.

2   Q.   So, on October 2nd, about the same day you were aware that

3   Joel Martinez had basically confessed to the murder of

4   Mr. De Paz?

5   A.   Yes.

6   Q.   And you knew where Mr. Martinez was?

7   A.   We knew -- yes.

8   Q.   In fact, he had been taken to New Jersey?

9   A.   He did go to New Jersey, yes.

12:49PM 10   Q.   Who took him to New Jersey?

11   A.   I don't remember.

12   Q.   But you knew where he was in New Jersey because CW-1 had

13   told you?

14   A.   We didn't know where in New Jersey.  CW-1 told us he was

15   in New Jersey, and then in November, CW-1 went down to

16   New Jersey to talk to him so we could identify where he was

17   living, yes.

18   Q.   So you didn't know where he was in New Jersey around

19   October 2nd of 2015?

12:50PM 20   A.   We knew he was in the Newark area.

21   Q.   And this is a young man who had just confessed to a

22   murder?

23   A.   Correct.

24   Q.   And you had CW-1 go down in November?

25   A.   Yes.

1    Q.   And you also contacted the Boston Police Department

2    through the State Police, someone in your investigation?

3    A.   Absolutely.

4    Q.   And you knew they had an investigation going on about the

5    murder of Mr. De Paz?

6    A.   We knew that, yes.

7    Q.   And someone had a conversation with the detective in

8    charge of the investigation, right?

9    A.   We had the -- we had -- there was that discussion, and

12:50PM 10   then we had a meeting.

11   Q.   And you asked them to hold off on their investigation,

12   right?

13   A.   That's not how we phrased it, no.

14   Q.   How do you know phrase it?

15   A.   Well, we asked that due to the safety concerns that we had

16   for the CW and his family and that we were indicting people,

17   that they -- and that we could not expose the identity of the

18   CW at that time until we had the safety measures in place that

19   they don't make an arrest until we have all the safety measures

12:51PM 20   in place to keep people safe and alive.

21   Q.   Didn't you testify when Mr. Pohl was asking you some

22   questions that during this period of time, November of 2015,

23   the investigation was transforming into the indictment phase,

24   if you will?

25   A.   Yes, and in October, November, we said, okay, we've got to

1    end this because we just had I would say one -- I would say

2    five people admitted to different homicides that they had

3    committed, to two specific homicides, and we said we have to

4    take these people off the street as quickly as we can, but we

5    have to do it in a way that we can ensure the safety of the CW

6    and his family, so that process took a long time, longer than

7    we expected.

8         We initially wanted to arrest everyone in December.

9    We couldn't make that deadline, so we pushed it to February --

12:52PM 10    well, January, then February, then we were able to make it in

11    January.

12    Q.   You just testified that it was five murders?

13    A.   There was actually six murders that occurred in this

14    investigation.

15    Q.   And people had admitted to those, correct?

16    A.   Yes.

17    Q.   And none of those people were Mr. Larios?

18    A.   That is correct.

19    Q.   And you were in the phase where you were preparing

12:52PM 20    charges, right?

21    A.   Yes.

22    Q.   And even though Mr. Martinez had committed a violent

23    murder, you left him out in the street?

24    A.   Yes.

25    Q.   And you told the Boston Police, We want to protect other

1    people, don't move on him yet, basically?

2    A.    Basically for the safety of the CW and his family, we said

3    we have to get them into safety before we can make an arrest.

4    Q.    No other reason?

5    A.    No.

6    Q.    Did it have anything to do with having Joel Martinez come

7    up in January of 2016 to go to an Eastside meeting?

8    A.    No.

9    Q.    Had nothing to do with him getting beaten in?

12:53PM 10    A.    No.

11    Q.    Joining the Eastside gang, had nothing to do with that?

12    A.    Not at all.

13    Q.    It had only to do with the safety of CW-1 and his family?

14    A.    And the other witnesses in the case, their families.

15    Q.    What about the safety of the community in New Jersey, did

16    that come into your consideration?

17    A.    Absolutely.

18    Q.    But you didn't know where he was, he was in New Jersey

19    somewhere?

12:53PM 20    A.    We knew he was in New Jersey, and then in November, we

21    found out where he was.

22    Q.    What about the De Paz family, did you consider them?

23    A.    We considered everybody.

24    Q.    Do you think it was possible for the De Paz family, that

25    they maybe wanted to have closure and have somebody arrested in

1    this case?

2    A.    We knew that would occur.

3    Q.    But you let him go down to New Jersey, and you knew where

4    he was?

5    A.    We found out where he was, yes.

6    Q.    CW-1 told you where he was?

7    A.    He told us he was in New Jersey.

8    Q.    He actually went down and picked him up and brought him

9    back, right?

12:54PM 10    A.    Yes, he did.

11    Q.    So he drove him all the way back from New Jersey, and you

12    knew where he was inside the car?

13    A.    Yes.

14    Q.    And you could have arrested him at any time?

15    A.    And, again, that would have placed CW-1 and his family at

16    risk, and we weren't ready to do that yet.

17    Q.    It would have placed CW-1 at risk.  How would it have

18    placed CW-1 at risk or his family?

19    A.    Because we would have had to play the video that we had

12:54PM 20    showing the confession that Animal made, and at that point --

21    Q.    How would you play it if you arrested somebody?  How would

22    it be played anywhere?

23    A.    Because you'd have to charge him, and then you'd have your

24    probable cause hearing and your detention hearing.

25    Q.    That doesn't happen right away, does it?

1    A.    Probably cause hearings and detention hearings usually

2    occur within three days of the arrest.

3    Q.    That's in federal court.  This is a state court crime

4    being investigated by Boston Police.

5    A.    And they would have had our evidence to prove that case,

6    and we know that we were already having issues with other

7    homicides where we were able to make an arrest based on CW's

8    information partly, but we could make the arrest without his

9    information, but as they were getting closer to trial, his name

12:55PM 10   would have come out.

11   Q.    You've been an FBI agent for how long?

12   A.    Over 18 years.

13   Q.    And you're aware that there are ways in which identity of

14   informants can be protected in court proceedings, right?

15   A.    Yes.

16   Q.    It was done extensively in this case, wasn't it?

17   A.    Yes.

18   Q.    And names can be redacted and nondisclosed, it's normal?

19   A.    Voices would not have been disclosed when the video was

12:55PM 20   played.

21   Q.    And if someone is arrested, there's going to be a video

22   played?

23   A.    To show the probable cause.

24   Q.    And that's the only reason you didn't arrest Mr. Martinez,

25   that's the only reason?

1    A.   As I said, the reason why we did not arrest until we did

2    was we had families in El Salvador and Honduras that we had to

3    protect.  We spent a lot of money to keep them protected, and

4    we made the arrest as soon as we could when we had them secure.

5    Q.   How much money did you spend to protect them?

6    A.   I know we spent almost $100,000 for the family in

7    Honduras, and I know we spent at least $30,000 for the family

8    while they were in El Salvador, and then once we moved them

9    back to the United States and they were here in the

12:56PM 10   United States, the majority of that almost $200,000 was spent

11   on their security.  Then the U.S. Marshals spent almost

12   $300,000 to continue to make sure they were secure, they had a

13   place to live while they learned a skill so they could work and

14   be productive citizens and not rely on the United States

15   Government to pay for everything that they had.

16   Q.   So CW-1's family comes from El Salvador and now lives in

17   the United States, right?

18   A.   Yes.

19   Q.   And all the money that CW-1 was given, all the benefits he

12:57PM 20   was given was in return for him working for the FBI, right?

21   A.   And his safety and his family's safety.

22   Q.   And his value to you in the course of this investigation

23   was to obtain evidence against MS-13, right?

24   A.   We directed him to gather evidence of criminal activity

25   committed by MS-13 gang members, yes.

1    Q.   And as long as he continued to do that, those benefits

2    that you just disclosed and discussed with us would continue to

3    come, right?

4    A.   While he was working, yes, those benefits continued as he

5    continued to gather evidence at our direction.

6    Q.   During the investigation, if you terminated him and didn't

7    need him anymore, he wouldn't get those benefits anymore?

8    A.   If he gathered evidence and we made arrests, he'd get at

9    the benefits that we've already laid out, which occurred.

12:58PM 10    Q.   But if he didn't produce any -- he wasn't a value to you

11    anymore, those benefits would stop?

12    A.   I'm not sure I understand.

13    Q.   His family wouldn't get to come to the United States if

14    you didn't use him during the investigation, right?

15    A.   Well, if he wasn't successful in gathering evidence, then

16    we would have ended his cooperation, but he was successful, so

17    we didn't end his cooperation.

18    Q.   And he was successful with you in gathering information

19    during the course of this investigation that gave you

12:58PM 20    information, right?

21    A.   Well, he gave us intelligence, gave us evidence, and when

22    he spoke to us, when he gathered evidence because we provided

23    him the equipment to gather evidence so that we would not have

24    to rely on his word, we'd have audio and video evidence of the

25    criminal activities committed by MS-13 gang members.

1    Q.   It's fair to say you have thousands of hours of video and

2    audio recordings?

3    A.   We have thousands of hours of consensual T3 conversations,

4    text messages, we have audio recordings, audio/video

5    recordings, a lot of recordings, yes.

6    Q.   And you mentioned that CW-1 went down and picked up

7    Mr. Martinez and drove him back, and he stayed in the Boston

8    area, you knew where he was?

9    A.   Yes.

12:59PM 10    Q.   And he stayed there throughout November, December and into

11    January, right?

12    A.   No, we brought him back in December, and we brought him

13    back so that we would have a better chance of getting him

14    arrested when we had the arrest warrant.

15    Q.   And did you and the agents get together and decide a game

16    plan with respect to having CW-1 vouch for Animal?  Did you

17    come up with a plan?

18    A.   Yes, we directed the CW-1 that when we learned that Animal

19    was not happy with Everett, we said, hey, why don't you ask him

01:00PM 20    to see if he would be interested in joining Eastside.  He said

21    yes.  We then asked, go to the leaders and the homeboys in the

22    clique and see if they would be willing to welcome a paro from

23    another clique into their clique.  It happens all the time.

24    Q.   And you did that in November and December of 2015, right?

25    A.   We did that in December and January of 2015.

1    Q.    The period of time you were preparing the charges?

2    A.    Oh, yes.  It was the most stressful time of my entire

3    Federal Government experience, which is over 25 years.

4    Q.    So, correct me if I'm wrong, you were looking at how to

5    charge people?

6    A.    I was in the grand jury weekly.  My partners were in the

7    grand jurors weekly.  I was working 16, 17 hours a day from

8    November to the take-down.  As I said, I've been in

9    Afghanistan, I've been in Panama, I've been in Bosnia.  I've

01:01PM 10    never been as stressed in my life until that part of the

11    investigation.

12    Q.    With all the stress going on that you had going on in

13    December, 2015, you came up with a plan to have Joel Martinez

14    and CW-1 vouch for Joel Martinez to get into the Eastside?

15    A.    To bring him back, yes, absolutely because I wanted him

16    here so I could arrest him.

17    Q.    But he was here?

18    A.    In December, but while we were still getting the

19    indictments, we were working nonstop to get the indictments,

01:01PM 20    but I said if they will bring him into the program or into the

21    clique, make it happen.  I want you to see if that will happen.

22    Q.    If it happens, it's good for the charges, right?

23    A.    Well, I said make it happen in the sense of ask

24    permission.  I'm directing you, go ask permission.  The leaders

25    of the clique said yes, they had a meeting.  The initial

1    meeting was a phone call, come here and let us observe you,

2    which happened.  He went down, picked him up with Muerto, they

3    came back, and they hung out for a month, and during that

4    month, the clique said we'll accept him into the program.

5    Q.    Because you came up with a plan to do that?

6    A.    Absolutely.  I directed him to ask if that would be

7    acceptable, and the clique said yes.

8              MR. IOVIENO:  Is it a good time to stop, your Honor?

9              THE COURT:  Yes.  How much more do you have.

01:02PM 10              MR. IOVIENO:  Probably another 40 minutes.

11              THE COURT:  All right.  We will break there for the

12    day.

13              Ladies and gentlemen, four things:  Number 1, I'm a

14    little concerned about the pace that we're moving at because

15    the breaks had been longer than I had hoped with all the jurors

16    and we've been talking to the lawyers.  I may experiment next

17    week with taking one break in the middle of the day to make

18    sure we stay on track, but I want to talk to the lawyers but

19    just to warn you.  If I do that, I don't want anyone in a

01:02PM 20    position where because they have to go to the bathroom or they

21    are tired, they aren't paying attention.  I do want to make

22    sure you are focused.  I'm alerting you, I want to make sure we

23    move, Number 1.

24              Number 2, again, because it's winter, it's possible to

25    have some kind of snow event.  Remember to call the number and

1    check.

2          3, remember my cautions not discuss the case among

3    yourselves or with anyone else or to read anything about it.

4          And, Number 4, I hope we all have a smile on our face

5    Monday morning after a Patriots victory, so have a good

6    weekend, and I'll see you on Monday.

7          THE CLERK:  All rise.

8          (JURORS EXITED THE COURTROOM.)

9          THE COURT:  You heard what I had to say.  I'm

01:04PM 10   concerned about the pace.  I know we're only a couple days into

11   this.  I do want counsel to watch it.  It would help if the

12   questioning on direct was a little crisper and cleaner and if

13   the questioning on cross was less repetitive, but let's make

14   sure that we're moving along.

15         Mr. Pohl, are we behind in a serious way as far as you

16   can tell?

17         MR. POHL:  I don't think so, your Honor.

18         THE COURT:  All right.  I'm going to keep an eye on

19   that.  Is there anything we need to discuss or take up before

01:04PM 20   8:30 Monday morning?  Mr. Murphy.

21         MR. MURPHY:  Your Honor, I believe that our proposed

22   jury instructions or our comments on your prior jury

23   instructions are due Monday?

24         THE COURT:  Yes.

25         MR. MURPHY:  In light of the likely distractions, I

1    wonder if we could have an extra day or two to do that?

2            THE COURT:  I am happy to make sure Ms. Rodriguez'

3    weekend is not ruined and give you that extra day.

4            MR. MURPHY:  Thank you, your Honor.

5            THE COURT:  Obviously, it's some ways away.  I don't

6    want anyone to -- well, I'll give you the extra 24 hours and we

7    will see where we are at that point.  Okay.  Otherwise, have a

8    good weekend, all, and I will see you 8:30 Monday morning.

9            THE CLERK:  All rise.

10           (Whereupon, the hearing was adjourned at 1:05 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7            I do hereby certify that the foregoing transcript was

8    recorded by me stenographically at the time and place aforesaid

9    in Criminal Action No. 15-10338-FDS, UNITED STATES vs. HERZZON

10   SANDOVAL, et al., and thereafter by me reduced to typewriting

11   and is a true and accurate record of the proceedings.

12           Dated this 3rd day of February, 2018.

13                    s/s Valerie A. O'Hara

14           _____

15                    VALERIE A. O'HARA

16                    OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25