1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2


3

UNITED STATES OF AMERICA            )
4                                    )
   vs.                               )  Criminal Action
5                                    )
   HERZZON SANDOVAL,                 )  No. 15-10338-FDS
6  EDWIN GUZMAN,                      )
   CESAR MARTINEZ,                    )
7  ERICK ARGUETA LARIOS,             )
                     Defendants      )
8


9

   BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
10


11

                      JURY TRIAL DAY 5
12


13


14          John Joseph Moakley United States Courthouse
                      Courtroom No. 2
15                    1 Courthouse Way
                      Boston, MA 02210
16
                      February 5, 2018
17                    9:00 a.m.

18


19


20


21


22


23                    Valerie A. O'Hara
                      Official Court Reporter
24       John Joseph Moakley United States Courthouse
                1 Courthouse Way, Room 3204
25                    Boston, MA 02210
                E-mail: vaohara@gmail.com

APPEARANCES:

For The United States:

    United States Attorney's Office, by CHRISTOPHER J. POHL,
ASSISTANT UNITED STATES ATTORNEY, and KELLY BEGG LAWRENCE,
ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200,
Boston, Massachusetts 02110;

For the Defendant Herzzon Sandoval:

    Foley Hoag LLP, by MARTIN F. MURPHY, ESQ. and
MADELEINE K. RODRIGUEZ, ATTORNEY,
155 Seaport Boulevard, Boston, Massachusetts 02210;

For the Defendant Edwin Guzman:

    Lawson & Weitzen, by SCOTT P. LOPEZ, ESQ.,
88 Black Falcon Avenue, Suite 345, Boston, Massachusetts 02210

For the Defendant Erick Argueta Larios:

    THOMAS J. IOVIENO, ESQ., 345 Neponset Street
Canton, MA 02021;

For the Defendant Cesar Martinez:

    Stanley W. Norkunas, 11 Kearney Square,
Howe Building, Suite 202, Lowell, Massachusetts 01852.

    ROBERT M. SALTZMAN, ESQ., 1 Central Street, Suite 5,
Stoneham, Massachusetts 02180.

ALSO PRESENT:  Gabriel Haddad, Spanish Interpreter
                 Carrie Lilley, Spanish Interpreter

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JEFFREY ELLIOT WOOD, JR. | | | | |
| By Mr. Iovieno | | 13 | | |
| By Mr. Norkunas | | 20 | | |
| By Mr. Murphy | | 38 | | |
| By Mr. Lopez | | 108 | | |
| By Mr. Pohl | | | 139 | |
| By Mr. Murphy | | | | 153 |

| EXHIBITS | FOR I.D. | IN EVIDENCE |
|---|---|---|
| 224 | | 18 |
| 225 | 80 | |
| 226 | | 81 |

1                        PROCEEDINGS

2          THE CLERK:  All rise.  Thank you.  Please be seated.

3          THE COURT:  All right.  Good morning, everyone.  The

4    government has filed a supplemental notice, I guess it is,

5    under *Petroziello*, Document 1928, which concerns the drug

6    conspiracy.  I guess it was filed on Saturday.  Is this

7    coextensive with the earlier *Petroziello* notice, in other

8    words, is this entirely a subset of that notice?

9          MS. LAWRENCE:  Yes, it is, your Honor.

10         THE COURT:  Okay.  And, obviously, I'm being

11   hypertechnical here, but my plan is to make a *Petroziello*

12   finding as to these statements as against these two defendants

13   for this conspiracy.

14         Do counsel want to be heard on that?  Do you want an

15   opportunity to respond in writing?  Mr. Iovieno.

16         MR. IOVIENO:  No, your Honor.  Briefly, I think

17   there's two statements that relate to my client and his

18   history, if you will, of selling drugs, a source of his supply,

19   and I think there's a statement from one of the CW-s, CW-7,

20   that he was selling cocaine with Muerto.

21         My understanding from the disclosures given last week

22   or the week before from the government following a session of

23   CW-7 was that he said that my client sold cocaine before he

24   joined MS-13, and I took that to mean before my client joined

25   MS-13, so I don't think it's within the scope of the

1    conspiracy.  That's what was disclosed to me.

2         MS. LAWRENCE:  Your Honor, I think the testimony from

3    CW-1, sorry, CW-7, we expect it to be is that it was prior to

4    CW-7's entry into MS-13, not necessarily Defendant Argueta

5    Larios' membership in MS-13.  That's what we understand the

6    testimony will be.

7         THE COURT:  Okay.  Based on that representation and,

8    obviously, conceivably it could change, I will make the

9    necessary finding as to the statements set forth in Document

08:33AM 10    1928, that is, I find by a preponderance of the evidence that

11    the drug conspiracy existed, the defendants were members of the

12    conspiracy, that is, the two relevant defendants who are

13    Martinez and Argueta Larios, and that the statements were made

14    during and in furtherance of that conspiracy.

15         All right.  What else, if anything, do we have to talk

16    about?  Mr. Iovieno.

17         MR. IOVIENO:  Yes, your Honor, I don't expect to be

18    too long with Agent Wood.  I also spoke to the government, and

19    I was going to attempt to put in the cooperation agreement in a

08:34AM 20    redacted form between the government and CW-1, and I believe

21    the government is willing to stipulate that it's certainly an

22    authentic agreement.  I just wanted to raise the issue with the

23    Court concerning, I think an objection on relevancy grounds.

24         MR. POHL:  First of all, I appreciate Mr. Iovieno

25    doing it in this fashion.  CW-1 is not a witness.  There's been

1   a sort of general discussion about, you know, the fact that

2   there was an agreement, but I don't think unless and until CW-1

3   becomes a witness, I don't think the document itself is

4   relevant.  It's certainly authentic, it is the right agreement,

5   it's the right document that was discussed during cross on

6   Friday, but I think unless and until CW-1 testifies, it's not

7   relevant.

8         THE COURT:  All right.  Well, I think it's somewhere

9   between marginally relevant and irrelevant, but I will admit it

08:35AM 10   nonetheless.

11         MR. IOVIENO:  Thank you.

12         THE COURT:  Before I forget, in terms of the schedule,

13   today I'm going to do our two normal breaks.  I guess I

14   threatened I'll have only one break because I want to see how

15   this unfolds, but let's have two breaks today.

16         On Wednesday, we're going to have to start at 9:30.  I

17   have a very early medical procedure that I can't delay, and I

18   might make it here by 9:00, I might not.  We'll call it 9:30,

19   and that day we'll take one break.

08:35AM 20         All right.  Anything else?

21         MR. NORKUNAS:  We're going to change the order just

22   today briefly, after Mr. Iovieno, I'll go only about half an

23   hour followed by Mr. Murphy and Ms. Rodriguez.

24         THE COURT:  Only half an hour.  I'm indifferent to the

25   order that defendants cross.  It's up to you all unless you

1    want me to make a ruling.

2         Mr. Lopez.

3         MR. LOPEZ:  Your Honor, I want to bring to your

4    attention that I'm going to try to ask the witness about this

5    ethnographic study of MS-13.  It's a book entitled, *Gangsters*

6    *Without Borders*.  I'd like to offer it as a learned treatise

7    and use it that way during my cross-examination.

8         THE COURT:  All right.  I'm not sure the whole thing

9    will come in, but conceivably portions of it will come in.

08:36AM 10   Have you had a chance to see this, Mr. Pohl?

11        MR. POHL:  No, your Honor.

12        THE COURT:  All right.  I think you need to show it to

13   the government if you're going to use it, you need to show him

14   the passages that you're going to use.  You can't just hand

15   somebody a book.

16        Mr. Pohl.

17        MR. POHL:  If there's nothing else, your Honor, I did

18   want to sort of flag one issue this morning.  I don't think it

19   will be a live issue today since I expect that the bulk of

08:36AM 20   today's testimony will involve law enforcement witnesses.

21        THE COURT:  Yes.

22        MR. POHL:  But I think it's likely that tomorrow the

23   government would put on one of the cooperating witnesses, who

24   is a Spanish speaker, and, you know, I think, we're a couple

25   days into the trial now, and I think both Ms. Lawrence and I

were a little surprised on Friday at sidebar when there was a

suggestion that there was the possibility that there would be

an objection not only as to who some of the speakers might be

in these multi-party conversations but to the transcripts

themselves because to date, I think we've only received one

competing transcript.

And in the run-up to the trial, I think our linguists

and Mr. Iovieno's transcript have essentially merged to the

point where I don't think that's going to be a live issue

08:37AM anymore, and so I just want to alert the Court that we

are -- because we, I think, had I think several conversations

in court where it appeared to us, anyway, it was clear there

was no dispute as to the transcripts themselves, simply as to

some of the speakers and the multi-party conversations, and

that we don't have any sort of competing type transcripts at

this stage.

Our plan tomorrow is to use Ms. Huacuja as our

interpreter for the cooperating witness who will testify, and,

you know, she's also the party that prepared the transcripts,

08:38AM but, you know, I think at this stage, we had every right to

expect that that would be an appropriate sort of way to

proceed, and I just want to alert the Court that that's what

we're doing, and as of this morning, I think that's still an

accurate state of play in terms of the transcripts.

THE COURT:  All right.  I guess my initial reaction if

1    there is a competing translation issue, that that's in the

2    nature of expert testimony and will require disclosure

3    beforehand.  Let's see how it plays out.

4         Mr. Murphy.

5         MR. MURPHY:  Yes, your Honor, I think from our

6    perspective, this is a question of the government turning

7    square corners.  I think we've been clear from the beginning

8    that we had concerns with these transcripts and that we

9    expected the government to go through the process that the case

08:39AM 10   law requires, which would require them to put on a witness, who

11   we would have the opportunity to cross-examine about the way

12   that the transcripts were prepared.

13        I understand that's going to be Ms. Huacuja.  We have,

14   I think, been clear with the government since January 18th that

15   we objected to Ms. Huacuja serving both as the government's

16   expert translator and as essentially a Court-sanctioned

17   interpreter as well because I think that sends as mixed message

18   and a message that's prejudicial to the defendants for the

19   jury.

08:40AM 20        MR. POHL:  I'd say that's most certainly or we're

21   certainly aware of the fact that we have to proceed to

22   authenticate recordings and transcripts, as the case law

23   directs, and as the Court directs, but that most certainly has

24   not been clear.

25        In fact, all of the conversations to date have been

1  that in some of the conversations, I think really the chief

2  issue are the sort of clique meetings where they are long,

3  there's multiple parties speaking, and that it's been the case

4  that drafts over time have undergone changes in terms of who

5  the speakers are.

6          We've had no notice, none, written, and there's been

7  no competing transcripts that would have sort of flagged for us

8  that there is an issue concerning the actual translations

9  themselves that would sort of give the government a notice that

08:41AM 10  they, anyone on the defense team, any of the defendants

11  contested the transcripts.

12          The speakers in the multi-party conversations, that's

13  certainly been flagged, and we certainly know that that's an

14  issue for tomorrow, and we're certainly prepared to meet that,

15  but at this stage, I do not believe Ms. Huacuja should end up

16  being a witness in this trial because there's been no notice

17  whatsoever there's anything wrong with the translations.

18          The most that's been raised fairly I think in court is

19  that some of the defendants object to the fact that the

08:41AM 20  speakers are assigned certain portions of the transcripts, not

21  that there's anything inaccurate about the transcripts

22  themselves.

23          THE COURT:  Well, I think I hear Mr. Murphy saying

24  that what they expect is that she will take the stand and say,

25  I did the final translation in this and I speak Spanish and

1   English fluently, and I went through them, and this is how I

2   think it ought to be translated, and Mr. Murphy says, well, we,

3   you know, ought to be able to cross-examine her.

4        I guess it's a question of degree.  If they have an

5   entire competing transcript that has not been disclosed, that's

6   problematic.  On the other hand, if they say, well, isn't it

7   true that word X has two meanings, you know, meaning A and

8   meaning B, it seems to me that's fair cross-examination, so to

9   some extent, it's a question of degree.  You know, if the

08:42AM 10   defense drops something on the government that I think is

11   unfair or that they haven't had, you know, appropriate notice

12   of under the circumstances, I may exclude it.

13        You know, as far as her serving as both a translator

14   and an expert witness, I, frankly, have lost track, has she

15   been -- I thought it was Ms. Lilley and Mr. Haddad were the

16   actual translators at the trial.

17        MR. POHL:  I think they are, your Honor.  In the

18   November trial, Ms. Lilley and Mr. Haddad were the translators

19   for the in court proceedings.

08:43AM 20        THE COURT:  Right.

21        MR. POHL:  Though Ms. Huacuja, I believe, was the

22   translator at the witness stand for the Spanish-speaking

23   witness, and that's certainly what we intended to do.

24        THE COURT:  And that's what you expect to do?

25        MR. POHL:  Correct.  I think that's the issue that I'm

1    concerned about and I think Mr. Murphy is raising now.

2              THE COURT:  Okay.

3              MR. POHL:  Which is I certainly have no concern about

4    calling Ms. Huacuja.  She'll accurately, I'm sure, describe the

5    manner and means by which she prepared the transcripts, but

6    since we had no reason to think that there was a problem with

7    the transcripts, we have her as the linguist who will be

8    translating for the witness.

9              THE COURT:  She's not an official court translator, I

08:44AM 10   mean, in the sense the jury isn't going to be told I, the

11   Judge, has selected her as a translator?

12             MR. POHL:  Oh, no.

13             THE COURT:  She is the government's selection of the

14   person to do the translation, so I guess I don't have a problem

15   with that.

16             Mr. Iovieno, did you want to say something?  I saw you

17   were starting to rise.

18             MR. IOVIENO:  I did.  I just want to clarify from my

19   perspective, my client's perspective, I don't want to speak for

08:44AM 20   everybody else, I'm less concerned about the actual

21   interpretation of the transcripts and more with the

22   identification of the speakers, which I believe is the

23   testimonial, so that's my concern.

24             THE COURT:  That's been flagged.  All right.  We'll

25   take it as it goes.  All right.  Unless there's anything else,

1   Lisa, how are we on jurors?

2          THE CLERK:  We have 10 right now, Judge.

3          THE COURT:  So as soon as we have a full complement of

4   jurors, we'll get going.

5          THE CLERK:  All rise for the jury.

6          (JURORS ENTERED THE COURTROOM.)

7          THE CLERK:  Thank you.  Court is now back in session.

8          THE COURT:  Good morning, ladies and gentlemen.

9   Welcome back.  For the record, it was a very disappointing but

08:59AM 10   exciting game yesterday.

11          I had suggested on Friday that we might go with only

12   one break.  We're going to try sticking with the two break

13   system for a while here and see whether or not we're falling

14   behind.  And just for your planning purposes, Wednesday morning

15   of this week, I have a medical procedure early in the morning

16   that I'm not confident I can be here at 9:00, so we're going to

17   make it 9:30, and we'll take one break that day to make sure

18   we'll get a full day.

19          All right.  You understand you're still under oath?

08:59AM 20          THE WITNESS:  Yes, sir.

21          THE COURT:  Okay.

22              JEFFREY ELLIOT WOOD, JR., RESUMED

23                   CROSS-EXAMINATION

24   BY MR. IOVIENO:

25   Q.   Good morning, Agent Wood.

1    A.    Good morning, sir.

2    Q.    Let's talk a little bit about the protection details.  I

3    have a few questions on that.  You indicated that this was a

4    tactic used by the investigation?

5    A.    Yes.

6    Q.    And it was CW-1, Pelon, who was the individual who went

7    out and solicited and communicated with the individuals that

8    subsequently became involved in the protection details?

9    A.    Yes, sir.

09:00AM 10   Q.    Okay.  And I think you indicated that you personally

11   conducted the surveillance of the October, 2014 protection

12   detail?

13   A.    I was one of many on surveillance that day, yes, sir.

14   Q.    How many officers or agents were involved with that?

15   A.    You've got two SWAT teams, the State Police SWAT team.  I

16   don't know how many people they brought.  The FBI SWAT team.

17   You had the North Shore Gang Task Force.  You had an FBI

18   airplane up.

19   Q.    So there was constant surveillance over the entire

09:00AM 20   operation?

21   A.    Yes.

22   Q.    And is it fair to say that Mr. Larios was not a member or

23   participated in that October 2014 protection detail?

24   A.    Not in October, no, he was not.

25   Q.    And I think you indicated that you personally went to the

1    evidence room and took out a package?

2    A.    I did, sir, yes.

3    Q.    And when you do that, when you work for the FBI, it's

4    pretty common you have to fill out some documents to do that,

5    you just can't go take evidence and take it out without some

6    kind of documentation?

7    A.    No.  We had a chain of custody form.

8    Q.    And you filled that chain of custody form out?

9    A.    I did.

09:01AM 10    Q.    And you also indicated that you field tested the

11    substance?

12    A.    I did, yes.

13    Q.    And did you also make a report about that field test?

14    A.    Yes, I did.

15    Q.    And did you put down on that report what the brand and how

16    you went about conducting that field test?

17    A.    No, I just say I conducted the field test.

18    Q.    You just concluded that I went and conducted a field test,

19    that was it?

09:01AM 20    A.    Well, I said I conducted a field test testing for the

21    presence of cocaine and the field test tested positive for the

22    presence of cocaine.

23    Q.    And when you did that, you -- I think you testified that

24    you used a knife and you cut into the package and took out some

25    of the substance?

1    A.    I don't use the knife to take the cocaine out.  The test

2    kit has a little device that you go and you take a little bit

3    out, but I had to cut the packaging material to be able to get

4    into it.

5    Q.    So you cut the material, you just didn't cut into it and

6    pull out -- you cut into the package and took out some of the

7    substance and then tested it?

8    A.    Correct.

9    Q.    And you didn't weigh the substance?

09:02AM 10    A.    That I tested or --

11    Q.    No, you didn't weigh the substance?

12    A.    Not what I took out of the cocaine package, no.

13    Q.    But you didn't weigh the package either?

14    A.    No, I did.  It's in my report.

15    Q.    Okay, but you said you field tested it, you didn't say you

16    weighed it?

17    A.    I said I tested the cocaine, which I tested.

18    Q.    Right, that's what you field tested?

19    A.    Correct.  You just take a very small amount out.  I'm not

09:02AM 20    going to -- once you take a little bit out, there's -- we're

21    not going to weigh it, because if I weigh it, I'm going to

22    spill it all over the place and make a hazmat.

23    Q.    Okay.  When you test it, when you take a substance out,

24    would you agree with me that the package would weigh a little

25    bit less than it did before you took the substance out?

1    A.    The total kilogram?

2    Q.    Well, you didn't weigh the --

3    A.    I weighed the entire kilogram, and I put that, how much

4    that weighed down in the report.

5    Q.    You wrote that in your report?

6    A.    Yes, I did.

7    Q.    Along with the field test?

8          THE COURT:  Hold on.

9    A.    So before I field test it, I weigh it, and then after the

09:03AM 10   field test, I weighed it, and it's in my report.

11   Q.    It's in your report that you weighed it and field tested

12   it or just field tested it?

13   A.    Both.

14   Q.    And when did you write that report?

15   A.    I wrote that either that day or the following day.  I'd

16   have to go and see the report to see the exact dates, but I

17   remember it's on the form.

18   Q.    And with respect to any other drug protection detail, did

19   you personally do a field test and personally weigh the

09:04AM 20   substance on any of those other occasions?

21   A.    On the other two, I was not present, so, no.  I didn't do

22   that.

23   Q.    And you spoke a little bit during your testimony about

24   your agreement, if you will, with CW-1.  Again, that was a

25   written agreement?

Case 1:15-cr-10338-FDS Document 2554 Filed 06/22/18 Page 18 of 161

1    A.   Yes, Special Agent John Kelley had the informant sign that

2    agreement.

3            MR. IOVIENO:  And if I could have the document camera

4    just for the witness, your Honor.

5    Q.   I'm going to show you a document --

6            MR. IOVIENO:  And I believe, your Honor, there's an

7    agreement that this is a true and accurate copy of that

8    agreement?

9            MR. POHL:  That's correct, your Honor.

09:04AM 10   Q.   And this is a copy of your agreement you had with CW-1?

11   A.   Yes, I remember reviewing that document.  I remember

12   seeing that, yes.

13   Q.   And it details his obligations to the government and your

14   objections to him; is that fair to say?

15   A.   Yes.

16           MR. IOVIENO:  I would offer that, your Honor.

17           THE COURT:  All right.  It needs a number -- what --

18           THE CLERK:  224.

19           THE COURT:  224.  It's admitted, Exhibit 224.

09:05AM 20       (Exhibit No. 224 received into evidence.)

21   Q.   And there is a specific section in this exhibit for the

22   compensation that was going to be paid to CW-1 during this

23   investigation, correct?

24   A.   Yes, that is correct.

25   Q.   And, sir, during your investigation, I assume you were

1    concerned about protecting CW-1?

2    A.    Yes.

3    Q.    All right.  And you were aware of the people that

4    surrounded him in his every day life; is that fair to say?

5    A.    I'm not sure what you mean by --

6    Q.    Well, when he was out in the street for the three-year

7    period, if you will, you wanted to make sure that the people he

8    was surrounding -- his inner circle, if you will,

9    girlfriends -- well, he had a girlfriend, correct?

09:06AM 10  A.    He did have a girlfriend, yes.

11    Q.    And her name was Margarita?

12         MR. POHL:  Objection.

13         THE COURT:  Sustained.

14    Q.    He had a girlfriend?

15    A.    He did.

16    Q.    Okay.  Did you know the history of that young woman?

17         MR. POHL:  Objection.

18         THE COURT:  Sustained.

19         MR. IOVIENO:  May I approach, your Honor?

09:06AM 20       THE COURT:  No, put another question.

21    Q.    Were you aware that the individual that was CW-1's

22    girlfriend was Mr. Larios's former girlfriend?

23         MR. POHL:  Objection.

24         THE COURT:  Sustained.

25    Q.    But CW-1 had a girlfriend, correct?

1    A.    Yes.

2    Q.    Did he end up marrying that girlfriend?

3          MR. POHL:  Objection.

4          THE COURT:  Sustained.

5          MR. IOVIENO:  I have no further questions, your Honor.

6          THE COURT:  Okay.  Mr. Norkunas.

7          MR. NORKUNAS:  Thank you, Judge.

8                        CROSS-EXAMINATION

9    BY MR. NORKUNAS:

09:07AM 10   Q.    Good morning, Mr. Wood.

11   A.    Good morning, sir.

12   Q.    I'm Stanley Norkunas, and I represent Cesar Martinez in

13   these proceedings.

14   A.    Yes, sir.

15   Q.    And I have a few questions for you.  If I can see

16   Exhibit 32.1, please.  I'd like to show you, again, the exhibit

17   that was shown by the government to you, 32.1, which was the

18   fight in the garage.

19   A.    The video?

09:07AM 20   Q.    The video, right.  It might be 32.2.

21          (Video was played in Spanish)

22   Q.    Once that was shown the first time, Mr. Pohl had asked you

23   a question, did you see these defendants depicted in that, and

24   you had said yes.  Is it fair to say none of these individuals

25   were shown in that specific exhibit; is that correct?

1    A.   I don't -- when I first watched this video, it was two

2    years ago, and that's when my law enforcement partners pointed

3    out everyone to me.  I haven't reviewed it enough to have it

4    refresh my memory exactly who was where, so I don't know if I

5    can answer that question right now.  I'd have to sit down and

6    review it with my partners again that helped me identify people

7    last time.

8    Q.   As you looked at it here today, it's fair to say you had

9    no recognition of any of those individuals being any of these

09:09AM 10    four individuals here in court, correct, as you just saw it on

11    the screen?

12    A.   No, I thought -- I believe I identified or saw Playa,

13    which is Edwin Guzman in there.  I can't --

14    Q.   But you're not sure?

15    A.   No.

16    Q.   Okay.  And that's the best that you could say, right?

17    A.   Yes.

18    Q.   You may have seen someone, one person.  Now, in relation

19    to --

09:10AM 20         MR. NORKUNAS:  Could I have Exhibit 1.1, please.

21         THE COURT:  I'm sorry.

22         THE CLERK:  What exhibit is this?

23         MR. NORKUNAS:  1.1.

24    Q.   You had indicated that this is a photograph of the garage

25    where you believe the ESLS was holding meetings; is that

1    correct?

2    A.   No, I know this is where they were holding meetings.

3    Q.   At one of the sites, though.  There was also a second

4    site, correct, in Cambridge?

5    A.   Yes.

6    Q.   And that was a parking garage, correct?

7    A.   That is right.

8    Q.   A public parking garage?

9    A.   Yes, that is correct.

09:10AM 10   Q.   And in relation to that particular location in Cambridge,

11   did you do any type of videotaping of the individuals going to

12   that location or coming from that location?

13   A.   When I joined the investigation --

14   Q.   That would be a yes or no answer.

15   A.   Oh, personally, no, I did not.

16   Q.   And in relation to this particular location, this was, in

17   fact, a working garage, right?

18   A.   It was a working garage, yes.

19   Q.   And the -- shown in some of the videos, there's tires on

09:11AM 20   the side, there's tool cases, all of the things, there's lists

21   of cars, correct?

22   A.   Yes, this is a working garage, yes, sir.

23   Q.   Okay.  And in relation, therefore, to the working garage,

24   the individuals who worked in there did not want any disruption

25   to their activities, so any individuals that came in to hold

1    any type of group meeting would have to do it after the garage

2    had closed for the day, correct?

3    A.    Yes, all the meetings I attended and were involved in in

4    surveillance took place after business hours.

5    Q.    And in relation to the individuals that worked there, did

6    you become aware that Mr. Martinez also was doing mechanical

7    work in that garage?

8    A.    Yes.

9    Q.    And additionally he also had a tow truck, right?

09:12AM 10    A.    I wasn't aware of the tow truck, but if you say he had a

11    tow truck, I'll --

12            THE COURT:  Well, hold on.  He's the lawyer, you're

13    the witness.  If you don't know, you don't know.

14            THE WITNESS:  I don't know.

15    Q.    Did you ever see kind of a fancy tow truck pulling up to

16    that garage with "CM Towing" on the side?

17    A.    No.

18    Q.    Did you ever have pole cameras situated outside of that so

19    you could monitor the activity that was coming and going?

09:12AM 20    A.    I don't believe we did.

21    Q.    Now, and in relation to the garage itself, did you ever do

22    any monitoring during what would be considered normal work

23    hours for the garage?

24    A.    I drove by the garage on a couple of occasions during work

25    hours just to get a lay of the garage surveillance on it, but

1   we did not, as far as I know, do any constant surveillance

2   during working business hours.

3   Q.    But, again, you became aware that Mr. Martinez did

4   mechanical work out of that garage?

5   A.    Yes.

6   Q.    And in terms of whether this was 40 hours a week, 80 hours

7   a week, that's not something you had monitored?

8   A.    No, I didn't pay attention to his work hours there.

9   Q.    In relation to the investigation itself, would it be fair

09:13AM 10   to say that one of the principles of conducting any long-term

11   investigation is to find out as much as you can about the

12   people that are under investigation?

13   A.    Yes.

14   Q.    So if Mr. Martinez is a person under investigation, you

15   want to know is he working, right?

16   A.    We knew that the majority of people we were investigating

17   were working.

18   Q.    You'd want to know are they paying taxes, right?

19   A.    I'm not -- in this case, we weren't really paying

09:14AM 20   attention to whether they were paying taxes or not.

21   Q.    Well, you indicated you had a multiplicity of governmental

22   agencies assisting you, right?

23   A.    Yes.

24   Q.    Through those various agencies, through the various

25   procedures that Congress has implemented, you can obtain a

1    great deal of records about someone that is under

2    investigation, correct?

3    A.   Yes.

4    Q.   And if you want to, you can find out -- because ICE was

5    working with you, you could find out through ICE what the

6    person's status is, correct?

7    A.   Yes.

8    Q.   And if you wanted to find out about financial information

9    on people, various things such as the Patriot Act or something

09:14AM 10   else, you can get financial records on people, correct?

11         MR. POHL:  I'm going to object.

12         THE COURT:  Sustained.  You're asking, in part, a

13   legal question.  I guess I'll caution the jury that tax records

14   have elaborate procedures to protect them and law enforcement

15   agencies other than the IRS normally do not have access to

16   those records.  Go ahead.

17   Q.   You can get bank records?

18   A.   I can, yes.

19   Q.   Okay.  Did any of that -- was any of that information

09:15AM 20   collected against Mr. Martinez in this case?

21   A.   I don't think we did, no.

22   Q.   And you also established where he lived and which home in

23   Chelsea, correct?

24   A.   Yes.

25   Q.   And you went over at some point in time and monitored that

1    residence, right?

2    A.    Personally me, no.

3    Q.    Someone from the task force, right?

4    A.    I'm sure we did, yes.

5    Q.    And you found out that he had a daughter living with him,

6    right?

7          MR. POHL:  Objection.

8          THE COURT:  Sustained.

9    Q.    And in the context of doing that as part of the

09:16AM 10   investigation, did you determine if there was anyone else

11   living there with him?

12   A.    I don't remember what we determined, who was living there

13   besides him.

14   Q.    Now, I mentioned a moment ago about the types of

15   investigative tools that you could use and are available to

16   you.  In this particular case relative to the phone calls or

17   phone records, you did implement some procedures, correct?  You

18   had toll records and you had pen registers, right?

19   A.    We did have toll records, we had pen registers, yes.

09:16AM 20   Q.    And when I say "we," I'm talking about the task force as a

21   whole, correct?

22   A.    Yes.

23   Q.    And if you needed to, there was also the availability of

24   GPS monitoring for cars, correct?

25   A.    Yes.

1    Q.   And what that does for you, if you want to know where a

2    car goes, how often it goes, you can monitor it through that

3    system, correct?

4    A.   Yes.

5    Q.   And, again, you didn't use pole cameras, but that would

6    have been available to you, correct?

7    A.   Yes.

8    Q.   In terms of what was available to you, in 2013 I believe

9    is when you said CW-1 was brought up to the United States, is

09:17AM 10   that correct, or was it the end of 2012?

11   A.   It was either the end of 2012 or early 2013.  I wasn't the

12   case agent at that point, so I wasn't as familiar with the CWs

13   comings and goings at that point.

14   Q.   Would it be fair to say that from your knowledge as a

15   special agent of the FBI and in terms of the other gang

16   investigations you had done, there was quite an availability of

17   sophisticated electronic equipment available if you wanted to

18   monitor something, like a meeting?

19   A.   It depends.  That's a very hard question to fully answer

09:18AM 20   because --

21   Q.   Let me see if I can give you something a little bit

22   easier.  2012, there are things, micro miniature cameras, I

23   think some of them are called "Go Cameras," correct?

24   A.   I don't know Go Cameras.  I know our recording equipment.

25   Q.   Ultimately with CW-1, you end up having him use a small

1    camera that's placed on the bill of a baseball cap, correct?

2    A.    I don't think we used the baseball hat with him.  I know

3    we used different recording equipment, so I don't remember

4    every place we hid the recording equipment.  We had many

5    different locations that we hid the recording equipment.

6    Q.    But you don't -- your position was you don't believe you

7    had the sophisticated enough equipment to place on him until

8    some time in 2014 to go into these meetings, correct?

9    A.    That is correct, yes.

09:19AM 10   Q.    Now, once the meetings were done, there was -- CW-1

11   himself is not carrying -- or is he, he's not carrying a

12   monitor so that he would have the recorded information on his

13   body, correct?  He's transmitting it outside to someone else?

14   A.    No, that's incorrect.

15   Q.    Whatever he was wearing would actually record both audio

16   and video?

17   A.    Sometimes just audio, sometimes audio and video.

18   Q.    But the equipment was on his body that was doing it or

19   clothing he's wearing as well, right?

09:19AM 20   A.    That is correct.

21   Q.    So once that comes out, you now have to take that, do

22   something with it so that it becomes some sort of a usable

23   product for you, right?

24   A.    That is correct, yes.

25   Q.    And everything that you were initially handling was in

1    Spanish, correct?

2    A.   Yes, that is correct.

3    Q.   And as a result of that, you have to send those out to get

4    them translated, correct?

5    A.   Most stayed within the FBI Boston division or within the

6    task force, but there was a few that once we had some drafts on

7    for the finalization would be sent out to translators who have

8    already worked on the case that were initially brought into the

9    Boston Division, then went back to their field offices and then

09:20AM 10   we'd send the information back there for them to finish.

11         MR. NORKUNAS:  Could I have the Elmo just for the

12   witness, please.

13   Q.   I'm showing you a document.  Do you recognize what

14   that -- to yourself, just yes or no, do you recognize what that

15   depicts?

16   A.   Yes.

17   Q.   And that deals with the translation of a particular

18   recording, correct?  It's a cover sheet for it, right?

19   A.   Yes, sir.

09:21AM 20   Q.   And that indicates that it was done out of the Tampa

21   Division in Tampa, Florida, correct?

22   A.   Yes.

23   Q.   And also were recordings sent to other divisions?  Showing

24   you another one, do you recognize what that depicts?

25   A.   Yes.

1    Q.    And was that sent to -- it says an L and an A.  Would that

2    be Los Angeles?

3    A.    I think the office is Houston from the HO.

4    Q.    And this one would show that a tape was sent where?

5    A.    I believe that's for the -- I could be wrong, but I

6    believe OC stands for Oklahoma City for Oklahoma City office.

7    Q.    All right.  Oklahoma.  And this one would show you the

8    tapes were sent to Houston, Texas?

9    A.    Yes, sir.

09:22AM 10    Q.    Now, and then within the Boston Field Office, there were

11    numerous individuals who also did transcribing, correct?

12    A.    Yes, sir.

13    Q.    And it would it be fair to say when these folks were doing

14    their transcriptions, they were doing the Spanish to the

15    English, right?

16    A.    Yes, sir.

17    Q.    And it would also be fair to say when they're doing their

18    transcriptions, you didn't have any of your cooperating

19    witnesses flying to Houston, Tampa, Florida, Oklahoma City to

09:23AM 20    do any type of assistance with those?

21    A.    Well, as I mentioned previously --

22          THE COURT:  Let him answer.

23    A.    We brought people here, and at that point that's when our

24    CW helped listen.  We also had most of all of our recordings

25    were also reviewed by Trooper Estevez and Trooper Depena.  And

1  then once we had rough drafts and everything, we sent them back

2  to people who had already worked on them when they were here,

3  so I would say when they were shipped out, we had already had

4  that initial review done before they went back out to the other

5  field offices.

6  Q.   It's fair to say as you had looked at where there was a

7  video or had listened to the audio, on all of these it was a

8  multiplicity of voices speaking, most of the time together,

9  right?  People would cut each other off, people would step in,

09:24AM 10  correct?

11       MR. POHL:  Objection.

12       THE COURT:  Well, I assume he's seen the video.  I'll

13  let him answer, go ahead.

14  A.   There are times where people -- there are people talking

15  and sometimes they cut over one another, yes.

16  Q.   And when the videos were sent out to -- for the initial

17  translation, they're sent out to people that have no awareness

18  of who anybody in a room may be, correct?

19  A.   Well, no, that's incorrect because we didn't do that.  I

09:24AM 20  just testified to the fact that Trooper Depena and

21  Trooper Estevez typically reviewed everything before anyone

22  else got it just to get an overview of what happened.  And then

23  we also would start work here and we brought people from all

24  those other field divisions to Boston, and they would review it

25  here, and then once we needed to start getting more of a

1   draft -- from the draft to a formalized version, then we sent

2   it back to those people who had already worked on it, so they

3   were already familiar with it.

4   Q.   So, again, the individual that would work on it out of

5   Oklahoma City prepares a cover sheet that says, "Oklahoma

6   City."  That task was actually done in Oklahoma City?

7   A.   It says name and office of linguist.

8   Q.   Right.

9   A.   So, name and office of linguist.  If she's assigned to

09:25AM 10   Oklahoma, whether she's sitting here, she's still listing her

11   office, because it says name and office of linguist.  So,

12   again, we brought linguists here to Boston to help us, and then

13   once we got done the initial, here are our drafts, they were

14   not finalized versions, they were very draft oriented, they

15   went back to their field offices, and then when we said, oh, we

16   need this done more, we sent it back to the person who already

17   worked on it and sent it to that field office.

18   Q.   So you flew in everybody, a myriad of translators,

19   linguists from the FBI to Boston?

09:26AM 20   A.   Yes, we did.  From October to January, we had several

21   linguists from around the country sitting here going over all

22   our video and audio recordings.

23   Q.   Now, was there ever a collective meeting, to your

24   knowledge, of the linguists where somebody is saying I think

25   that was Fred, somebody saying I think that was John and

1    somebody is correcting them?

2    A.    I don't ever remember a group of linguists sitting

3    together.  Each linguist got a recording, and during that

4    timeframe we brought the CW in with Trooper Brian Estevez and

5    Trooper Jose Depena, and they would sit down with the linguists

6    going over everything, so that they would make sure that they

7    could ensure that the linguists knew who was talking, knew what

8    was being said because in Spanish even though you may be from

9    Spain, you have a different dialect in Puerto Rico and

09:27AM 10   Puerto Rico to Chile, and there's all these different dialects.

11          So we had some people that came in that were very

12   knowledgeable of the El Salvadoran dialect, others that

13   weren't, and so Trooper Depena, Trooper Estevez, who had been

14   listening to these recordings for a while now, had very

15   distinct knowledge of those, that dialect.  The CW knowledge of

16   that dialect would be able to explain the nuances of each

17   conversation that was going on.

18   Q.    A lot of the conversation that was taking place with these

19   gentlemen was slang incident only to El Salvador, correct,

09:28AM 20   street slang?

21   A.    Which is what I just said, yes.

22   Q.    Now, in context of your position as the case agent in this

23   particular case, would it be fair to say that it's appropriate,

24   on occasion, to look at preceding reports, such as if you took

25   over in 2015 as the case agent, you would still go back on

1    occasion and look at 2012 or 2013 reports of other members of

2    the task force, correct?

3    A.    Yes, we can do that.  Yes.

4    Q.    And you've testified in this case on numerous occasions,

5    correct?  You, yourself, have testified in relation to the

6    overall context of MS-13 on numerous occasions?

7    A.    Well, we've only had one trial before this one, so that

8    would be twice for testifying in this case.

9    Q.    Well, you prepared affidavits under oath, right?

09:29AM 10   A.    Yes, sir.

11   Q.    You testified before a grand jury on many occasions,

12   correct?

13   A.    Yes, sir.

14   Q.    And in each and every one of those occasions when you used

15   a nickname for my client, that was C-h-e-C-h-e, correct?

16   A.    CheChe, yes.

17   Q.    And when you looked at the reports of other individuals in

18   this particular case, it's also fair to say that the agents

19   associated with the case were using that same CheChe,

09:29AM 20   C-h-e-C-h-e, correct?

21   A.    I believe so.

22   Q.    And including right up to the time of the arrest of

23   Mr. Martinez, the name referenced in the reports is CheChe,

24   C-h-e-C-h-e, correct?

25   A.    I believe that's correct.

1   Q.   Now, are you familiar with, I'm showing you a report

2   that's dated from November of 2015 about an October of 2015

3   meeting, and in the context of that I'm going to flip the page.

4   There had been references to an outside meeting in Everett, and

5   there had been someone who had participated in that and came

6   out to you at some point in time and indicated to some agent, I

7   think you are listed, and talked about the people that were

8   there.  Is your memory refreshed about that?

9   A.   Yes.

09:31AM 10   Q.   And within that, he indicated there was someone he did not

11   know their full name and when you don't know someone's full

12   name, is there an abbreviation that's consistently used?

13   A.   Yes.

14   Q.   What is that?

15   A.   First name unknown, last name unknown and once I've

16   spelled it out at point, then I say FNU/LNU.

17   Q.   FNU/LNU is the common symbolism for that, right?

18   A.   Yes.

19   Q.   And that means first name, as you said, unknown, last name

09:31AM 20   unknown?

21   A.   Correct.

22   Q.   And he said there was a person in there, he didn't know

23   who that was, but he knew -- he claims he knew other people

24   present, but that person who he didn't know had the name of

25   CheCha, correct?

1    A.    I see that, yes.

2    Q.    Okay.  And that was in October of 2015, correct?

3    A.    Yes.

4    Q.    Now, I believe that you have talked to Mr. Pohl and

5    Mr. Iovieno about the purpose of the protection details, and

6    basically the purpose of that was people that would not be

7    selling drugs, but you're looking to see if you can somehow get

8    them involved in drugs was the purpose of putting together by

9    the FBI protection details around the country, right?

09:32AM 10    A.    We've done that around the country where we used

11    protection details, yes.

12    Q.    Within that concept, right?  You come to me, you're not

13    going to be able to make a buy, I'm not doing drugs, but you

14    may be able to lure me into a protection detail involving

15    drugs, correct?

16    A.    I wouldn't say "lure," I would say -- I would ask if you

17    would volunteer to help me protect my drug shipment.

18    Q.    And finally in regard to your testimony in this particular

19    case, let me just go back for one extra question for you in

09:33AM 20    response to that.  You didn't participate -- your participation

21    was October, December of 2014 in protection details, correct?

22    Actual participation.

23    A.    Actual participation for surveillance or something

24    involved was in October.  In December, I was helping -- for the

25    December one, I had helped at the -- what we call the -- we say

1    Curoc (ph), but it's just an undercover meeting where we get

2    supervisors in the Bureau and the executive management of the

3    Bureau to agree to this kind of -- to agree to an undercover

4    operation, so I was the supervisor for the squad when we had to

5    get that approval.

6    Q.   Okay.  And the ones in October and December, Mr. Martinez

7    was not involved with those, correct?

8    A.   No, he was involved in the first one.

9    Q.   Well, that was one back in when?

09:34AM 10   A.   That was in the earlier part of 2014.

11   Q.   And you were not involved with that, correct?

12   A.   That's correct.

13   Q.   Now, were there any rules or were there rules in place

14   that you were aware of for the group that using drugs

15   recreationally, you would be punished?

16   A.   I knew the rules saying that you weren't allowed to be

17   publicly intoxicated or high because if you brought something

18   bad onto the clique, that was a punishable offense.

19   Q.   And if you missed meetings, you would get punished?

09:35AM 20   A.   Yes, you could be punished for missing meetings.

21            MR. NORKUNAS:  Thank you, I have nothing further.

22            THE COURT:  Mr. Murphy.

23            MR. MURPHY:  Thank you, your Honor.

24

25

1                       CROSS-EXAMINATION

2      BY MR. MURPHY:

3      Q.   Good morning, Agent Wood.

4      A.   Good morning, sir.

5      Q.   My name is Marty Murphy, and I represent Herzzon Sandoval.

6      He's the person you've identified as Casper, correct?

7      A.   Yes, sir.

8      Q.   Now, you testified on direct examination about the origins

9      of MS-13, correct?

10     A.   Yes.

11     Q.   And as you understand it, MS-13 started in Los Angeles?

12     A.   Yes.

13     Q.   And it was started by immigrants from El Salvador who'd

14     fled El Salvador's civil war, correct?

15     A.   Yes, sir.

16     Q.   And oftentimes their legal status in the United States was

17     uncertain, correct?

18     A.   Yes, sir.

19     Q.   And oftentimes you've learned that they joined MS-13

20     because they faced risks from other gangs in the Los Angeles

21     area, correct?

22     A.   Yes.

23     Q.   Now, you've identified Mr. Sandoval as one of the leaders

24     of ESLS, correct?

25     A.   He was the first word, yes, sir.

Q.   And that was the group of men that you testified met in
that Norman Street garage we've seen photos of, correct?

A.   Yes, sir.

Q.   Now, is it fair to say that you don't know when
Mr. Sandoval first became affiliated with ESLS?

A.   I don't know, no.

Q.   And you don't know anything about the circumstances that
led him to do that, correct?

A.   That is correct.

Q.   And you don't know, for example, to the extent
Mr. Sandoval has tattoos, you don't know when he got those,
correct?

A.   I don't know when he got tattoos, no.

Q.   Or what the circumstances were that led him to get those
tattoos, correct?

A.   No.

Q.   Now, you testified -- let me ask you.  In 2013 and 2014
and 2015, I think you said, that's when CW-1, the person who
was known as Pelon, was recording conversations in that Norman
Street garage, correct?

A.   Yes, sir.

Q.   And also some in 2016, correct?

A.   I think we only had one, we may have had two in 2016.  I
don't remember the exact amount right off the top of my head.

Q.   But before 2014 and 2015 and 2016, as early as before he

1    began recording those meetings, you sent or the FBI sent Pelon,

2    CW-1, out to gather intelligence about the activities of

3    cliques in the Boston area, correct?

4    A.    Yes.

5    Q.    And one of his objectives was to ingratiate himself with

6    clique members in the Boston area, correct?

7    A.    To get to know them, yes.

8    Q.    Well, was his job to ingratiate himself?

9    A.    My first recollection is that he was there to meet MS-13

09:38AM 10  clique members and pose as a drug dealer and start to

11   infiltrate them.

12   Q.    You testified that even though you were not the case agent

13   in 2014 and 2013, you did monitor the reports that were

14   written, correct?

15   A.    I didn't read the reports, all of them, but I did talk to

16   the case agents, both federal and state and local members of

17   the task force to keep myself apprised of the on-goings of the

18   case, yes.

19   Q.    So you knew the major things that were going on, correct?

09:39AM 20  A.    Yes.

21   Q.    After you became the case agent, I think you testified in

22   response to Mr. Norkunas' questions, you did go back and look

23   at the reports that had been done?

24   A.    I said that I could have and I reviewed a couple, but I

25   didn't go and read every single report that was written before

1    I became the case agent.

2    Q.   So your testimony then about what happened in 2013 and

3    2014 is based on what you learned from the folks that you were

4    working with, sort of your office mates?

5    A.   Well, some from reviewing the reports and some from my

6    conversations with Sergeant Millett, Special Agents Ben

7    Wallace, Dave Cederleaf, John Kelley and Detective Scott

8    Connolly.

9    Q.   And all those people during that period were writing

09:40AM 10   reports, correct?

11   A.   Well, not every single person in that group wrote reports,

12   but some of them did, yes.

13        MR. MURPHY:   If I could have the document camera for

14   the witness only, please.

15   Q.   Showing you a document dated October 16, 2013, do you

16   recall reading this report, sir?

17   A.   I did not read that report, no.

18   Q.   Do you recall, sir, that as part of the effort to get to

19   know other clique members in the Boston area, the FBI gave

09:40AM 20   CW-1, Pelon, cigarettes, women's handbags, and sunglasses to

21   give out?

22   A.   I did not know that until I just read that document.

23   Q.   Now, there were many meetings that Pelon CW-1 went to that

24   he did not record, correct?

25   A.   Yes, sir.

1   Q.   And whether he recorded the meetings or not, it was

2   typical, wasn't it, for agents to sit down with Pelon and brief

3   him afterwards, correct?

4   A.   I would say debrief him afterwards.

5   Q.   Fair enough.  So they would debrief him.  That is, he

6   would give them an account of what was going on?

7   A.   That is correct, yes.

8   Q.   And that provided useful intelligence to the agents

9   conducting the investigation about what was happening in the

09:41AM 10   field, correct?

11   A.   I would say yes.

12   Q.   And it was part of the intelligence that you were hearing

13   about as you were paying attention to what was going on in your

14   office relating to this investigation, correct?

15   A.   Yes.

16   Q.   And even after there are transcripts done of reports --

17   let me ask the question a different way.  The investigation was

18   moving pretty quickly, correct, in 2013, 2014?  Things were

19   happening on a day-to-day basis?

09:42AM 20   A.   I knew that there would be times when things didn't happen

21   quickly.  I knew that when I became the co-case agent in 2015

22   that things moved quickly constantly.  I couldn't tell you how

23   things were playing out on a day-to-day basis in '13 or '14.

24   Q.   Is it fair to say, though, that these debriefings that you

25   were getting from Pelon, the FBI would proceed and make

1     strategic decisions about what to do next based on these

2     debriefings because the investigation was generally moving

3     faster than the ability to get formal translations of any tapes

4     you recorded?

5     A.    I don't -- I wouldn't be able to answer that the way

6     you're phrasing it because, again, I wasn't a part, and if I

7     remember correctly, things didn't move as quickly as they did

8     in 2015.

9     Q.    These debriefings that the agents conducted of Pelon,

09:43AM 10    CW-1, the agents typically wrote reports to document what Pelon

11    had said in them, correct?

12    A.    Yes.

13    Q.    And this was part of the information that the agents

14    working on the case then found valuable in understanding what

15    was happening in the cliques in the Boston area, correct?

16    A.    I would imagine so.

17    Q.    And, sir, when you were describing the kind of

18    intelligence that gets shared by law enforcement agencies about

19    MS-13, intelligence reports like that form a significant part

09:43AM 20    of the basis that leads to law enforcement's understanding of

21    what MS-13 is and what it's doing, correct?

22    A.    I think you're trying to put too much into one question.

23    I can -- I would say before we released an intelligent document

24    that goes out around the country, we've corroborated

25    everything, so if we have an uncorroborated report, we're not

1       going to release that information --

2       Q.   Okay.

3       A.   -- because we haven't corroborated it.

4       Q.   So an uncorroborated report.  What's an uncorroborated

5       report, sir?

6       A.   Well, if our CW comes and tells us something, we listen to

7       it, we look at it, we evaluate it, but I'm not going to let the

8       entire law enforcement community throughout the United States

9       know that this is gospel for MS-13.  I'm going to wait and see,

09:44AM 10      oh, do we have a recording of it.  Then I can review the

11      recording, compare it to what he said, and if they match, now I

12      have it corroborated, because it's -- we have evidence that

13      what he's saying is truthful.  Just because he told us

14      something, we want to make sure we have other ways to back that

15      up.

16      Q.   Right.  And you recognize, sir, that you wouldn't rely on

17      something a cooperating witness told you without that kind of

18      corroboration, correct?

19      A.   Correct.

09:45AM 20      Q.   So if a corroborating witness tells you something and

21      there's no tape of it, that's not something that in your

22      judgment should be viewed as worth relying on, correct?

23      A.   I wouldn't say that the way you just phrased it, sir.  I

24      would say I would look at it, but I'm not going to bring that

25      into court as evidence, based -- unless I have, oh, here, it's

1    on tape.

2            If you look at our case, everything we have that we're

3    charging is on tape, so I'm not going to say it's worthless,

4    it's just I'm not going to use that as my evidence unless I

5    have somebody else saying it or, as I said, on tape.

6    Q.   Fair enough.  Now, you testified that in 2015 you went to

7    El Salvador, correct?

8    A.   I did.

9    Q.   And when you were in El Salvador, you learned that the

09:45AM 10   leaders of MS-13 in El Salvador were trying to implement

11   stricter rules about how the cliques in the United States

12   should operate, correct?

13   A.   Yes.

14   Q.   And they wanted the cliques in the United States to

15   operate, essentially, more like the organization operated in

16   El Salvador, right?

17   A.   That is correct.

18   Q.   El Salvador is, unfortunately, a very violent place, you

19   would agree?

09:46AM 20   A.   Yes.

21   Q.   It has one of the highest murder rates in the world?

22   A.   I believe it has the highest murder rate in the world.

23   Q.   And it's been that way since the civil war that you talked

24   about, correct?

25   A.   I can't testify going all the way back to the '70s and

'80s.

Q.    Okay.  But MS-13 in El Salvador is also in what's known as

the rent collection business, correct?

A.    Yes.

Q.    And could you explain to the members of the jury what the

rent collection business is?

A.    In an MS-13 controlled neighborhood, the MS-13 gang

members extort every business, whether it's trucks coming in to

deliver supplies, goods, the bodegas, the taxicab drivers.  So

everyone has to pay money to MS-13, and they collect that

money.

Q.    And, in addition, you learned in 2015 that MS-13 wanted to

make sure that the cliques in the United States were sending

money to MS-13 gang members in prisons in El Salvador, correct?

A.    Well, they were already doing that before 2015, but they

wanted to set it up in a different process than before.

Q.    They wanted to centralize it, correct?

A.    Well, they wanted to go through the programs.

Q.    To make it more like it was in El Salvador?

A.    Yes.

Q.    Now, you learned about -- you say you learned about these

efforts in 2015?

A.    Yes.

Q.    Do you recall, sir, learning that CW-1 was telling task

force agents about the leadership in El Salvador's efforts to

1    centralize control as early as 2013?

2    A.    I'm not aware of that, no.

3    Q.    Do you recall, sir, learning that the leaders in

4    El Salvador, learning that Pelon was telling agents as early as

5    2013 that the leaders in El Salvador wanted to impose the same

6    rules on the cliques here as were imposed on MS-13 members in

7    El Salvador?

8    A.    Again, as I just said, I didn't learn about the programs

9    until 2015.

09:48AM 10    Q.    Well, my question, sir, was about whether the leaders in

11    El Salvador, as early as 2013, whether you learned that they

12    wanted to apply El Salvador rules to cliques in the Boston

13    area?

14    A.    I wasn't that involved in the investigation to know the

15    extent of what was being told and what was said.  I knew I

16    heard from my partner once about East Coast Program.  I didn't

17    really know what he meant until I went to El Salvador and then

18    I fully understood what the programs were.

19    Q.    Do you recall learning in 2013 that Pelon told agents that

09:49AM 20    MS-13 in El Salvador wants the same rules applied to cliques in

21    the U.S. as they are in El Salvador?

22         MR. POHL:  Objection.

23         THE COURT:  I think you've asked that three times now,

24    Mr. Murphy.

25         MR. MURPHY:  Thank you, your Honor.

1    Q.   Did you learn in 2013 whether Mr. Sandoval had a

2    particular point of view about that?

3            MR. POHL:  Objection.

4            THE COURT:  Particular -- you'll have to rephrase.

5    Sustained.

6    Q.   Did you learn from the agents you were working with that

7    Pelon had collected information about Mr. Sandoval's views

8    about the orders that were being issued by El Salvador?

9            MR. POHL:  Objection.

09:50AM 10           THE COURT:  Overruled.

11   A.   I didn't know anything until 2015.

12   Q.   So --

13           MR. MURPHY:  Could I have this just for the witness,

14   please, on the document camera.

15   Q.   If I show you a document dated February 17th -- I'm sorry,

16   February 7, 2014, is that a document you recall reading in

17   connection with this investigation?

18   A.   I did not read that document, no.

19   Q.   And that's a report written by one of your fellow agents,

09:50AM 20   sir?

21   A.   That was written by -- I'd have to see the bottom of the

22   document to see who actually wrote it, but there were two

23   agents there.  That was written by David Cederleaf, a

24   Special Agent with the FBI.

25   Q.   So that's not a document that you've seen before today; is

1      that correct?

2      A.   That's correct.

3      Q.   Do you recall learning anything about efforts in 2014 by

4      El Salvador to require cliques here to send money to

5      El Salvador for people in prison?

6      A.   I knew that money was being sent back to El Salvador all

7      along.  I've known that for a while.

8      Q.   Do you recall learning in 2014 that that was something

9      that Mr. Sandoval did not want to do?

09:51AM 10   A.   I wasn't aware of anything in 2014 along those lines.

11     Q.   So if I were to show you --

12          MR. MURPHY:  If we could have this just for the

13     witness, please.

14     Q.   -- a report dated February 12, 2014?

15     A.   I didn't read that report, no.

16     Q.   And who was that report written by?

17     A.   Special Agent David Cedarleaf.

18     Q.   And is it a report about something that -- one of his

19     debriefings with Pelon?

09:52AM 20   A.   Correct.

21     Q.   But did you recall learning in February 2014 that

22     Mr. Sandoval had told Pelon that he didn't want things in the

23     cliques in the Boston area to be run the way they were in

24     El Salvador?

25     A.   No.

Q.   And if I were to show you -- for the witness only,
please -- a report dated February 13, 2014.  Do you see that,
sir?

A.   I'm reading it right now.  I didn't read that report, but
there were a few items that I had been be briefed about, but
that was it.

Q.   So you did not read -- this is another report that was
written by -- let me turn the page over -- by Special Agent
Cedarleaf?

A.   That's correct.

Q.   And that's not a report that you read before today?

A.   That is correct.

Q.   Now, did the task force investigate a shooting that
occurred in April 2014?  April 2014, pardon me.

A.   We -- I wasn't a part of the investigation then.  I knew
there was some brawls going on in Chelsea.  I'd have to be more
specific of what shooting because there were lots of shootings,
stabbings that occurred.

Q.   Do you recall learning in April 2014 that Mr. Sandoval
told Pelon, CW-1, that he thought Tremendo -- and who's
Tremendo?

A.   Another MS-13 gang member.

Q.   That he was angry with Tremendo for acting like he's in
El Salvador, correct?

A.   I wasn't aware of that conversation, no.

1  Q.   And if I show you a -- on the document camera, a report

2  with the date of April 29, 2014, did you read that report

3  before you came here last week to testify?

4  A.   No, sir.

5  Q.   Isn't your name on the bottom left-hand corner of that,

6  sir?

7  A.   Yes.

8  Q.   And that's an electronic signature, correct?

9  A.   Yes.

09:55AM 10  Q.   But you didn't read it before you signed it?

11  A.   No, I don't remember -- I did read it, but I wasn't paying

12  attention like I am now.  So I see my signature, yes, I know I

13  would have read it, but I wasn't paying attention to it at that

14  point to remember that I read it.

15  Q.   Okay.  So Agent Cedarleaf -- and this report was also

16  written by Agent Cedarleaf, correct?

17  A.   Yes.

18  Q.   And you said there was a period of time when you were the

19  acting supervisor, correct?

09:55AM 20  A.   Yes, but I wasn't acting at that point.

21  Q.   Okay.  What led you to be the second signature on that

22  report, sir?

23  A.   I have the ability -- I had the ability back then to sign

24  reports for agents when the boss was in meetings, the boss was

25  out.  There's several agents who have that ability, so when the

1    in box got full, we'd go in and just try to sign them out for

2    the agents trying to get them into the file.

3    Q.    Doesn't the second signature, isn't that supposed to

4    signify that someone has actually reviewed the report?

5    A.    Right.  As I said, I reviewed it, but I just read it to

6    make sure, okay, there's information in there and there's

7    nothing wrong.  I wasn't the supervisor, so it wasn't my job to

8    delve down, as I do now as a supervisor, where I actually

9    scrutinize everything that I sign.

09:56AM 10   Q.    Okay.  So you just read it -- you read it, you signed it,

11   but you didn't really pay attention to what was going on?

12   A.    Correct.

13   Q.    Now, CW-1, Pelon, had a direct open line of communication

14   to MS-13 leadership in El Salvador, correct?

15   A.    He earned that down the road, yes.

16   Q.    Isn't it fair to say that as early as May of 2013, Pelon,

17   that is CW-1, was participating in a teleconference call from a

18   prison in El Salvador where the El Salvadorian leadership of

19   MS-13 is housed?

09:57AM 20   A.    Again, I wasn't aware of that.  I didn't start recording

21   conversations or having reports on conversations with

22   leadership of El Salvador until several months after I became a

23   case agent in 2015.

24   Q.    So if I could ask you to look at the document that's on

25   the screen.  That's a report dated May 29, 2013?

1    A.    The report is dated May 29, 2013, yes.

2    Q.    And it was written, if we turn over to the back side, by

3    Agent Freestone, did I get that, correct?

4    A.    That may be a problem with the -- can you flip it over

5    again for me for a second?

6    Q.    Is there a person named Blaine Freestone?

7    A.    I don't know who Blaine Freestone is.

8    Q.    The case agent's name is listed as Chad Blackwood,

9    correct?

09:58AM 10    A.    That is correct.

11    Q.    Do you know who he is?

12    A.    I do know who he is.

13    Q.    And there's a list of all persons present, including

14    yourself, do not include the CHS, correct?

15    A.    That is correct.

16    Q.    And in that space -- and this isn't -- we're looking at an

17    official FBI report.  You'll give me that, correct?

18    A.    Yes, that's -- oh, that's correct, yes.

19    Q.    And it relates to this investigation, correct?

09:59AM 20    A.    Correct.

21    Q.    And there's a person named Blaine Freestone who apparently

22    wrote the report that you don't know who that person is, right?

23    A.    That's correct.  He's not assigned to the Boston Division.

24    Q.    Man, woman, you don't know?

25    A.    I have no idea.

1    Q.    Okay.  And is it fair to say that until you are seeing

2    this document here today, you did not know that CW-1 was

3    participating in conference calls with the leadership of

4    El Salvador's MS-13 from a prison in El Salvador as early as

5    2013?

6    A.    That is correct.

7    Q.    Now, El Salvador's leadership in -- MS-13's leadership,

8    pardon me, in El Salvador, many of them have been in prison,

9    correct?

10:00AM 10    A.    I know that L. Diablito and his council are all in prison.

11    Q.    And they're all in a single prison, right?

12    A.    No, they're in different prisons.

13    Q.    And is there one prison where many of them are?

14    A.    They're spread out.

15    Q.    All right.  By 2015, you were directly involved in this

16    investigation, correct?

17    A.    Yes, sir.

18    Q.    And do you recall that on May 29, 2015, Pelon, that is

19    CW-1, engaged in a drug transaction with an individual named

10:00AM 20    Flaco?

21    A.    I am aware that there were many drug buys in 2015.  I

22    imagine there was one in May.

23    Q.    Do you recall, sir, an occasion when, during a drug buy,

24    Flaco got a call from an individual named Bandito?

25    A.    I believe I remember that drug buy, yes.

1    Q.    Who's Bandito?

2    A.    I believe he was a leader of MS-13 down in El Salvador.

3    Q.    And let me ask you whether this is a report.  Do you

4    recall what that conversation was between Bandito and Flaco

5    during that drug transaction on May 29, 2015?

6    A.    If I remember correctly -- and, again, I'd have to review

7    my report or my partner's report, but I believe I was present

8    during that drug deal.  We were doing a controlled purchase of

9    drugs from Flaco, and he was saying this is good, I'm going to

10:01AM 10    have you talking to leaders down in El Salvador because Flaco

11    was the leader of the East Boston clique.

12    Q.    Let me show you, if I may, a document dated September 29,

13    2015.  Do you see that, sir?

14    A.    Yes.

15    Q.    And that -- although it's dated September 29th, it refers

16    to an event on May 29, 2015, correct?

17    A.    Correct.

18    Q.    And this does concern a controlled purchase, a purchase of

19    drugs with an individual named Flaco by CW-1, correct?

10:02AM 20    A.    Yes, sir.

21    Q.    Who is Flaco again, by the way?

22    A.    He's the leader of the East Boston Loco Salvatruchas

23    clique.

24    Q.    Not ESLS?

25    A.    No, that's EBLS.

1   Q.   And is it fair to say, sir, that CW-1 briefed agents about

2   what Bandito had said during the call that he made to Flaco?

3   A.   Yes.

4   Q.   And later that was recorded, correct?  That was recorded

5   at the time, I should say, correct?

6   A.   Well, the conversation between Flaco and the CW were

7   recorded.  I don't think we were able to record that phone call

8   because I don't think -- that was outside our presence, it was

9   during the drug buy, so if they didn't have a speaker, it would

10:03AM 10   be very hard for us to pick up that conversation.

11   Q.   But you were briefed on that by CW-1, correct?

12   A.   Yes.

13   Q.   And what CW-1 told you was that the leader --

14        MR. POHL:  Objection.

15        THE COURT:  Let me see counsel at sidebar.

16        (THE FOLLOWING OCCURRED AT SIDEBAR:)

17        THE COURT:  Why is it not hearsay, Mr. Murphy?

18        MR. MURPHY:  There are two reasons, your Honor.

19   Number 1, it's not being offered for the truth.  Number 2 --

10:04AM 20        THE COURT:  What do you expect the answer to be, the

21   full question and answer?

22        MR. MURPHY:  The full question is that -- and I will

23   say at the beginning of the questions that this agent -- which

24   he testified about on direct examination, that this agent

25   learned that there was a significant dispute between the

1   leaders of MS-13 in El Salvador and Mr. Sandoval.  He learned

2   about that from Pelon, so we say, your Honor, it's admissible

3   for a number of different reasons.

4          First, the government was permitted over the defense

5   objection to provide this agent's summary of a number of steps

6   in the investigation, and he's already testified in very

7   summary fashion, and we would say somewhat misleading by this

8   dispute, that's Number 1.

9          So, Number 2 is that we say that to the extent that

10:05AM 10   these are statements from Pelon, which they all are, that they

11   are admissions of a party opponent, and that issue has been

12   briefed, as the Court has already said.

13          But I would say, your Honor, that, you know,

14   ultimately, the government, having chosen to put this witness

15   on as a summary witness, we are entitled to ask specific

16   questions about the fax data that he wrote that underlie the

17   summary.

18          THE COURT:  I thought the dispute evidence came on

19   cross-examination.  I don't think the government elicited that.

10:05AM 20   I thought that was elicited by Mr. Iovieno.  I don't remember

21   he testifying, and Mr. Pohl, help me out.  What is your -- what

22   did he testify on direct?

23          MR. POHL:  Concerning?

24          THE COURT:  Concerning the dispute.

25          MR. POHL:  I mean, I think there was testimony that

1    agents were aware, through the recordings through Pelon, to the

2    extent that Pelon was the delivery device for the recordings,

3    that there was an ongoing dispute between MS-13 leaders in

4    El Salvador and the East Coast Program concerning whether that

5    clique was going to join, but -- and that frankly, that

6    information elicited and captured on recordings in several

7    different forms and dates was one of the reasons why the agents

8    had warned Mr. Sandoval.

9            THE COURT:  Oh, that's right.

10           MR. POHL:  But I think -- so I don't, A, agree that

11   Special Agent Wood testified as a summary witness.  And, B,

12   everything that's going to come through that question would be

13   hearsay.

14           THE COURT:  Well, I don't accept the confidential

15   witness as agent argument.  I've looked at that, and I

16   just -- I find that troublesome, so put that aside.

17           It seems to me that evidence having come out on direct

18   is the background for warning the witness that there was this

19   dispute that I will permit some -- either partway down this

20   path in order to provide a complete picture.  If you say, you

21   know, isn't it true that CW-1 told you that there was this

22   dispute and these were the contours of the dispute, that door

23   having been opened slightly, I think I'll let you get that out,

24   but it is otherwise I think hearsay, classic hearsay.

25           Again, I'm not saying it's irrelevant.  CW-1 could so

1  testify, Sandoval could so testify, that's not the issue.  The

2  witness is can we get it in through this witness, but I will

3  allow if we could go question by question to go down this path

4  to provide a complete picture of the dispute with headquarters

5  in El Salvador.

6          MR. POHL:  Okay.  Thank you.

7          (SIDEBAR CONFERENCE WAS CONCLUDED)

8          THE COURT:  I think we have a juror who needs a break,

9  so we might as well take our break now.

10:08AM 10         THE CLERK:  All rise.

11          (A recess was taken.)

12          THE CLERK:  Thank you.  You may be seated.  Court is

13  now back in session.

14          THE COURT:  I think what we'll do is we'll go until --

15  I don't know, 11:30, 11:40 somewhere in there and take our next

16  break.

17  Q.   Special Agent Wood, we're talking about May, 29, 2015, the

18  time when you were working on this case, correct?

19  A.   Yes.

10:20AM 20  Q.   And that was the day that an individual named Bandito was

21  called into the middle of this drug transaction that you'd

22  arranged, correct?

23  A.   Well, we directed, yes.

24  Q.   And Bandito, you said, was a leader of MS-13 in

25  El Salvador, correct?

1    A.    Yes.

2    Q.    And he called CW-1, correct, on CW-1's phone?

3    A.    Yes.

4    Q.    And CW-1 had a conversation with Bandito that he reported

5    back to you about, correct?

6    A.    Yes.

7    Q.    And ultimately there was a recording of that call, which

8    you had a report about, right?

9    A.    Well, if it worked properly, we had consensual T3 on so we

10:21AM 10   should have recorded that, and, yes, I do remember this day

11   very well, and I remember writing my report.

12   Q.    So, Bandito told CW-1 that he and the other leaders in

13   El Salvador were concerned about Mr. Sandoval and Mr. Guzman,

14   correct?

15   A.    That is correct, yes.

16   Q.    And that they weren't following the rules established by

17   the East Coast Program, correct?

18   A.    Yes, sir.

19   Q.    And that he would not hesitate ordering Mr. Sandoval's

10:22AM 20   removal as the leader of the clique, correct?

21   A.    Yes.

22   Q.    And that there was discussions about promoting Muerto,

23   correct?

24   A.    Yes.

25   Q.    And CW-1, in that same conversation, when he was talking

1    back to the man in El Salvador said --

2            MR. POHL:  Objection.

3            THE COURT:  Is this something off the report now,

4    Mr. Murphy?

5            MR. MURPHY:  It's something off the summary

6    transcript, your Honor.

7            THE COURT:  I'm sorry.  This is not a summary of a

8    recorded conversation, it's something different?

9            MR. MURPHY:  This is a summary of the same recorded

10   conversation, your Honor.

11           THE COURT:  All right.  Overruled.

12   Q.   And what CW-1 told the individual in El Salvador, the

13   leader, was that the leader could ask any clique about CW-1 and

14   the only ones on the street were him and Muerto, correct?

15   A.   That's what it says, yes.

16   Q.   Now, on May 31, 2015, CW-1, Pelon, told agents about a

17   conference call that he had with a number of MS leaders in

18   El Salvador, correct?

19   A.   I believe so, but I'd have to see my report.

20   Q.   So let me put a document on the document camera.  Let me

21   show you a report.  That's a report by Ben Wallace dated

22   May 31, 2015?

23   A.   That doesn't say it's by Ben Wallace, he was the case

24   agent for --

25   Q.   I apologize.  The second page, the last page would tell us

1    who wrote the report, correct?

2    A.    Yes, and that's me.

3    Q.    And turning to the last page, it was you, correct?

4    A.    Yes, sir.

5    Q.    In this report, if we turn to page 2, talks about a

6    conference call between Pelon and a number of leaders in -- of

7    MS-13 in El Salvador, correct?

8    A.    Yes.

9    Q.    And that included Bandito, the man they were talking about

10   a moment ago, correct?

11   A.    Yes.

12   Q.    A person by the name of -- it's spelled here "Sugar," but

13   do you know how that's pronounced?

14   A.    I believe we called it "Suga," we dropped the R.

15   Q.    And who was he?

16   A.    Another leader within the clique or within the East Coast

17   Program.

18   Q.    And was he also situated down in El Salvador?

19   A.    He was.

20   Q.    And a person named Gorras, G-o-r-r-a-s.  Who is that?

21   A.    A leader in El Salvador.

22   Q.    So CW-1 was directly in touch with those leaders in

23   El Salvador, correct?

24   A.    Yes, I believe I testified earlier that in 2015, I was

25   aware of those communications with him and the CW and leaders

1    in El Salvador.

2    Q.   And on those conference calls, what Pelon told you about

3    them was that the leaders in El Salvador expressed their

4    displeasure with Mr. Sandoval's leadership of the ESLS clique,

5    correct?

6    A.   Yes.

7    Q.   But they were upset about his failure to include the

8    clique in the East Coast Program?

9    A.   Yes, that's correct.

10:25AM 10   Q.   And that recently Mr. Sandoval had refused to even speak

11   with those individuals who were the leaders of the East Coast

12   Program in El Salvador, correct?

13   A.   Yes.

14   Q.   And they talked on those conference calls -- and this is

15   back in the end of May 2015, right?

16   A.   Correct.

17   Q.   They talked in those conference calls about punishing

18   Mr. Sandoval for disobeying their orders and replacing him as

19   leader of the clique, correct?

10:26AM 20   A.   Yes.

21   Q.   They stressed that the punishment would consist of a

22   beating, which could be administered by the leader of a MS

23   clique in Rhode Island, correct?

24   A.   Yes, sir.

25   Q.   And that was May 31, 2015?

```
  1    A.    Yes.
  2    Q.    Now, on July 14, 2015, so about six weeks later, Pelon,
  3    that is CW-1, briefed agents about another call that he had
  4    with Gorras, that's one of the big guys in El Salvador,
  5    correct?
  6    A.    Yes.
  7    Q.    Suga and others, correct?
  8    A.    Yes.
  9    Q.    And during that call, do you recall that the leaders in
 10    El Salvador instructed local clique members to elect two
 11    members to ensure that the rules of the East Coast Program
 12    would be followed?
 13    A.    I'd have to see my report, but I believe that was in
 14    reference to two clique members, two clique leaders
 15    representing all of the cliques operating in Massachusetts in
 16    the East Coast Program.
 17    Q.    So let me show you a document dated July 18, 2015 and ask
 18    you whether you recognize that document?
 19    A.    I do.
 20    Q.    And does that refer to a conference call among Gorras,
 21    Sugar and others?
 22    A.    Yes.
 23    Q.    And this was a conference call, again, that CW-1
 24    participated in, correct?
 25    A.    Yes.
```

1    Q.    Mr. Sandoval was not part of this conference call,

2    correct?

3    A.    That is correct.

4    Q.    And what you learned after this call was that the leaders

5    in El Salvador wanted to set up a meeting to elect two members

6    who would ensure that the rules of the East Coast Program would

7    be followed, correct?

8    A.    Yes.

9    Q.    And that the two elected members would be in charge of all

10:28AM 10   of the Massachusetts MS cliques and tasked with enforcing the

11   rules of the East Coast Program, correct?

12   A.    They would be the East Coast Program representatives over

13   the cliques here in Massachusetts.

14   Q.    And CW-1 called Mr. Sandoval to tell him, right?

15   A.    What's that?

16   Q.    CW-1, after this call that he participated in from the big

17   guys in El Salvador, called Mr. Sandoval to tell him about it,

18   right?

19   A.    Yes, it says that right there.

10:28AM 20   Q.    Right.  And eventually CW-1 did talk to Mr. Sandoval about

21   it, correct?

22   A.    Yes.

23   Q.    And what he told CW-1 when they eventually did talk was

24   that he was going to call a meeting to discuss the East Coast

25   Program --

1          MR. POHL:  Objection.

2          THE COURT:  Sustained.

3     Q.    What did CW-1 tell you Mr. Sandoval said about the East

4     Coast Program?

5          MR. POHL:  Objection.

6          THE COURT:  Let me see you at sidebar.

7          (THE FOLLOWING OCCURRED AT SIDEBAR:)

8          THE COURT:  All right.  Now you're listening to your

9     own client's statements as opposed to these calls.  The only

10:29AM 10    reason I'm allowing this at all was the idea was the government

11    had learned, you know, this information.  That was the basis of

12    their warning to him, but his opinions as stated by him out of

13    court seem to me to be classic hearsay.

14         MR. MURPHY:  Your Honor, I think, again, the

15    government was allowed to elicit summary testimony over our

16    objection.

17         THE COURT:  I don't remember any summary testimony at

18    all, but go on.

19         MR. MURPHY:  And the agent was allowed to give a

10:30AM 20    generalized description of this dispute and what the ESLS

21    clique's position was.  First they said they didn't want to

22    join now, then they said they did, then they said they didn't,

23    so all of that stuff has been the subject of testimony already

24    as part, and I think, frankly, your Honor, the record will

25    reflect that you said this was permissible summary testimony.

1            And so we need to be able to, having the door been

2       opened, we need to be able to put in the details.

3            THE COURT:  Why can't you do that without your own

4       client's statements as to what his beliefs and intentions and

5       opinions are, as opposed to the threat against him, which is

6       just what the door was opened.  Again, you can call your

7       client, obviously.

8            MR. MURPHY:  I understand, your Honor.

9            THE COURT:  Or you call someone else who, you know,

10:31AM 10  who has something that falls within the hearsay exception, but

11      it seems to me, you know, here you're just eliciting your own

12      client's statements that are, you know, that perhaps the whole

13      thing is problematic from a hearsay standpoint, but this is

14      another layer beyond that where you just, you know, the

15      government can't cross-examine your client about these

16      statements, and I don't think it's necessary for completeness

17      under the circumstances, so I can also take it a question at a

18      time, but this is just him stating his intentions or supposedly

19      his opinions, and you are eliciting your own client's

10:32AM 20  statements, so I'm going to sustain the objection.

21           MR. MURPHY:  Thank you.

22           MR. POHL:  Thank you.

23           (SIDEBAR CONFERENCE WAS CONCLUDED)

24           THE COURT:  All right.  Let's put another question to

25      the witness.

1    Q.    You testified on questions Friday, I believe, that -- let

2    me ask you a different question.  Do you recall that on

3    July 29, 2015, Mr. -- CW-1, Pelon, gave your team another

4    briefing?

5    A.    I'd have to see the report.  There was a lot of -- okay.

6    Q.    And he reported about a meeting of the folks at that

7    Norman Street Garage, correct?

8    A.    Yes.

9    Q.    And the subject of the meeting was that -- the dispute

10   between Mr. Sandoval and the leaders of MS-13 in El Salvador,

11   correct?

12   A.    Can you turn the page so I can continue reading, please?

13   Q.    Absolutely, sir.

14   A.    Okay.  I did review this, yes, but I did not write this

15   report.

16   Q.    Fair enough, sir.  Is it fair to say that you learned that

17   the upshot of this meeting was that, at least for a time, the

18   members of ESLS decided to -- that they would tell the leaders

19   in El Salvador that they would be part of the ESLS -- they

20   would be part of the East Coast Program, but they didn't want

21   them to have control of the clique?

22   A.    Yes.

23   Q.    And when you testified Friday about there was a time when

24   they did join the East Coast Program, it was this that you

25   referred to, correct?

1    A.    I was not referring to this one, no.

2    Q.    Now, is it fair to say, sir, that on August 15th, Pelon

3    conducted another controlled purchase of drugs from that

4    individual named Flaco?

5    A.    I would have to see the report, but we purchased a lot so

6    I would say that we were purchasing drugs throughout the entire

7    year, so Herzzon, we did purchase drugs from him in August.

8    Q.    And if I show you a report dated August 6, 2015, does this

9    concern a drug purchase on August 15th between Pelon and this

10:35AM 10   individual Flaco?

11   A.    It appears so.  Yes, it does.  Yes.

12   Q.    Flaco reported to Pelon about --

13         THE COURT:  I'm sorry, this says August 5th.  I think

14   you said August 15th earlier, Mr. Murphy.

15         MR. MURPHY:  I'm sorry.  I meant to say August 5th,

16   your Honor.

17         THE COURT:  Go ahead.

18   Q.    So we're on August 5th, correct?

19   A.    It was August 5th, yes.

10:35AM 20   Q.    And Pelon, CW-1, told you what he had heard from Flaco

21   about what was happening in this dispute between the leaders in

22   El Salvador and Mr. Sandoval, correct?

23   A.    Yes.

24   Q.    And what he told you was that El Salvador --

25         MR. POHL:  Objection.

1          THE COURT:  Overruled.

2     Q.   -- was now sending someone to discipline Casper and that's

3     Mr. Sandoval, right?

4     A.   I believe Special Agent Wallace was debriefing on this

5     one, so reading this report, that's what it says.

6     Q.   Now, you don't doubt that the report was accurate,

7     correct?

8     A.   No, I believe the report is accurate.

9     Q.   Okay.  So we're not quibbling about whether that

10:36AM 10  report --

11    A.   No, no.  I just want to make sure that --

12    Q.   It's not your report?

13    A.   It's not my report, yes, sir.

14    Q.   Fair enough.  So what Flaco told CW-1 was that El Salvador

15    was now sending someone to discipline Casper for not accepting

16    the East Coast Program rules and he also said that that

17    information came from a person named Donkey, correct?

18    A.   Yes.

19    Q.   Who is Donkey?

10:37AM 20  A.   He's a leader of MS-13.

21    Q.   In El Salvador?

22    A.   Yes, sir.

23    Q.   Okay.  Now, between August 15th and September 3, 2015,

24    things began to continue to escalate concerning this threat to

25    Mr. Sandoval, correct?

1    A.   According to this, this is August 5th.  You said August

2    15th again.

3    Q.   I did, I apologize.  So between August 5th and

4    September 3rd, this dispute continued to escalate, correct?

5    A.   I believe it did.

6    Q.   And it was on September 3, 2015 that you and several other

7    officers went to warn Mr. Sandoval that his life was in danger,

8    correct?

9    A.   Yes.

10:37AM 10   Q.   And that was according to FBI policy, correct?

11   A.   I don't know if it's policy, it's just the thing to do,

12   the right thing to do.  If we get information that someone's

13   life is in danger, we warn them.

14   Q.   And even after that warning, you picked up information

15   that this dispute continued, correct?

16   A.   I believe so.

17   Q.   And you intercepted conversations in which Mr. Sandoval

18   told the leaders in El Salvador directly that he was not going

19   to be participating in the East Coast Program, correct?

10:38AM 20   A.   I don't know.  I'd have to see reports on intercepted

21   conversations between Mr. Sandoval and the East Coast leaders.

22   I didn't have a Title III on his phone.

23            THE COURT:  Ladies and gentlemen, let me explain what

24   a Title III is.  That's the reference to the section of the law

25   that permits the government, under some circumstances, to

1    intercept telephone calls, which requires a showing of probable

2    cause and a court warrant, and it's called T3 or Title III.

3    It's just kind of law enforcement jargon.  Go ahead.

4    Q.   So let me show you a transcript summary that was completed

5    on September 23, 2015.  Do you see that, sir?

6    A.   I do.

7    Q.   And it shows that the date and time of the recording was

8    September 15th -- September 5, September 5, 2015, pardon me?

9    A.   Yes, September 5, 2015 at 7:49 p.m.

10:39AM 10    Q.   And this describes a conversation that was -- that

11    occurred between Pelon, whose phones you were recording,

12    correct, CW-1, and others, correct?

13    A.   Yes.

14    Q.   And at that point CW-1 was giving instructions to

15    Mr. Sandoval --

16         MR. POHL:  Objection.

17    Q.   -- about how to deal with these folks in El Salvador --

18         MR. POHL:  Objection.

19    Q.   -- that he had a direct line to, correct?

10:40AM 20         THE COURT:  Sustained.

21    Q.   Was CW-1 providing advice --

22         MR. POHL:  Objection.

23    Q.   -- to Mr. Sandoval?

24         THE COURT:  I'll allow that.  Overruled.

25    A.   All homeboys can give advice to the leaders of the gang,

1    so, yes.  CW-1 offered advice.

2    Q.   And what CW-1 advised Mr. Sandoval is to tell the leaders

3    in El Salvador --

4         MR. POHL:  Objection.

5         THE COURT:  I'm sorry.  Let me see counsel.

6         (THE FOLLOWING OCCURRED AT SIDEBAR:)

7         THE COURT:  What's your objection to this piece of it

8    as opposed to, you know, how we've gotten to this point?  In

9    other words, what's different about this?

10:41AM 10        MR. POHL:  Well, I think to the extent that it was

11   allowed before, it was as a generalized way of completing -- I

12   don't think it was an incomplete picture on direct or after

13   Mr. Iovieno's cross, but to the extent that this was let out, I

14   think we've sort of reached the end point of that.

15        We have, you know, the cooperating witness's

16   conversation is with Casper, so whatever is coming next is

17   going to be classic hearsay either through CW-1 or an attempt

18   to elicit what Mr. Sandoval said in return and for the reasons

19   we've set before, I don't think that's...

10:42AM 20        THE COURT:  This is advice to Casper, okay, for

21   whatever that's worth, CW-1 tells him that, Casper with the

22   meetings --

23        MR. MURPHY:  I would be turning to the next page, your

24   Honor.

25        THE COURT:  Well --

1          MR. MURPHY:  Your Honor.

2          THE COURT:  Yes.

3          MR. MURPHY:  I would say that in addition to the

4     arguments that I made before that this is not hearsay because I

5     said before that it was not offered for the truth.  That's

6     because it's offered to show Mr. Sandoval's state of mind.  It

7     falls within the state of mind exception to the hearsay rule,

8     your Honor.

9          THE COURT:  Okay.  Casper's own statements are -- all

10:43AM 10     right.  Obviously CW-1's statements are hearsay, but the

11     hearsay within hearsay, you're saying it's Casper's state of

12     mind?

13          MR. MURPHY:  CW-1's statements are also state of mind.

14          THE COURT:  And just to be -- well, yes, I'm sorry,

15     Ms. Lawrence.

16          MS. LAWRENCE:  No.  I think, you know, to the extent

17     the state of mind exception would apply, it would only have to

18     apply to something that's overlooking gravity at this moment

19     and not to prove the fact of the dispute.

10:44AM 20          THE COURT:  But it can be his future intention, it

21     could be his state of mind.  All right.  One of the reasons I'm

22     having trouble with this is I'm having also trouble seeing just

23     how this hurts the government and so -- well, let's do this.  I

24     haven't gotten down -- this far down the path.  I'm going to

25     allow it here, and I'll allow you to elicit your client's

1    statements to the extent that it is his current state of mind

2    or his future intentions.

3                MR. MURPHY:  Your Honor, with respect to the

4    beginning, the prelude?

5                THE COURT:  The prelude, I'll permit that.

6                (SIDEBAR CONFERENCE WAS CONCLUDED)

7                THE COURT:  Go ahead, Mr. Murphy.

8    Q.    So, on the first paragraph, the highlighted paragraph,

9    sir, that tells us the advice that CW-1 gave to Mr. Sandoval

10   about what he should tell the leaders of MS-13 down in

11   El Salvador, correct?

12   A.    Yes.

13   Q.    And CW-1 advised Mr. Sandoval that Mr. Sandoval needs to

14   calmly tell Gorras -- he was one of the leaders, right?

15   A.    Yes.

16   Q.    That they, as a clique, have all decided that continuing

17   to be part of Gorras' program is not convenient for them

18   because they cannot be responsible for all the things that take

19   place down there and cannot deal with their consequences,

20   correct?  That's what he said?

21   A.    That's a summary.  It's not verbatim, so, you know, as a

22   summary, I would say that's what he's advising, but the

23   specifics, we don't have a specific exact word for word

24   verbatim translation here.

25   Q.    Fair enough, sir, but this is a summary prepared by one of

1    those linguists that you were talking about with Mr. Norkunas,

2    right?

3    A.    That is correct.

4    Q.    She's flown in?

5    A.    Actually, she's assigned to the Boston office, if you look

6    at the front page.

7    Q.    But she's here the whole time, correct?

8    A.    Yes, sir.

9    Q.    So it's an FBI linguist summary of a tape recording that

10:46AM 10    the FBI made?

11    A.    That is correct, sir.

12    Q.    And as part of this advice, CW-1 told Mr. Sandoval to say,

13    to tell them, for them down there, it's easy to kill and it's

14    easy to collect but not here, correct?

15    A.    Yes, that is correct.

16    Q.    And, in fact, Mr. Sandoval did have a conversation with

17    these individuals in El Salvador, correct?

18    A.    Further down it looks like there is a conversation.

19    Q.    And these are the ones who you believe had threatened to

10:47AM 20    kill him, correct?

21    A.    Well, when it says they talked to Chuba, I'm not sure

22    there, but, yes.

23    Q.    And in that conversation, Mr. Sandoval told an individual

24    named Suga -- do you know whether that's Suga or whether that's

25    simply a mistranslation?

1     A.    It could very well be, yes.

2     Q.    You don't know a person name Chuga, C-h-u-g-a, in

3     El Salvador's leadership?

4     A.    Is it C-h-u-b-a?

5     Q.    It's C-h-u-g-a in this, or b-a in this one.

6     A.    I think it's b-a from what I'm reading -- oh.  And then

7     there's another one where it says C-h-u-g-a.  I would believe

8     that's Suga.

9     Q.    Okay.  So that's one of the leaders in El Salvador?

10:48AM 10    A.    Correct.

11    Q.    And Mr. Sandoval tells Suga that his clique is not going

12    to continue with the Program or being part of it at all,

13    correct?

14    A.    Yes.

15    Q.    That his clique cannot find common ground with the

16    Program?

17    A.    That is correct.

18    Q.    And that they're not going to continue to be part of the

19    Program and there's nothing that says they have to, correct?

10:48AM 20    A.    That's correct.

21    Q.    And Suga told Mr. Sandoval that the barrio is the one who

22    will be making decisions for ESLS and not Casper and his

23    members, correct?

24    A.    He does say that, yes.

25    Q.    And what's the barrio?

1   A.   That's MS-13.

2   Q.   Now, you testified about a beating that took place in

3   December, 2015.  Do you recall that, sir?

4   A.   Was it December or January?

5   Q.   Let me ask you.  This was a meeting that took place in

6   Virginia, sir.  Do you recall testifying about that?

7   A.   Oh, the East Coast Program leader meeting?

8   Q.   Yes.

9   A.   Yes.

10:49AM 10  Q.   So, I will try to shortcut this.  What happened is that an

11  individual named Demente, correct, another clique leader?

12  A.   Yes.

13  Q.   Not part of ESLS?

14  A.   No, he's not with ESLS.

15  Q.   Was asked to give -- asked CW-1 to give him a ride down to

16  this meeting in the Maryland-Virginia area, correct?

17  A.   Yes.

18  Q.   And they went to Maryland first, correct?

19  A.   Yes.

10:50AM 20  Q.   To a couple different locations there, correct?

21  A.   Yes.

22  Q.   And they ended up in Richmond, Virginia, correct?

23  A.   They did.

24  Q.   And that was a meeting that was led by an individual named

25  Chucky, correct?

1    A.    Chucky.

2    Q.    Chucky?

3    A.    Correct.

4    Q.    And Chucky was the leader of the East Coast Program,

5    correct?

6    A.    In the United States, yes.

7    Q.    And before Chucky permitted CW-1 to come into the meeting,

8    he had to make a call to El Salvador to make sure that someone

9    in El Salvador would vouch for Pelon, correct, for CW-1?

10:50AM 10  A.    I believe that is correct.

11   Q.    And during -- it was a long meeting, correct?

12   A.    Yes, it was.

13   Q.    And during that meeting, there was a discussion that

14   specifically focused on Mr. Sandoval; isn't that correct?

15   A.    Yes, I believe so.

16   Q.    And there is a transcript of that meeting, correct?

17   A.    Yes, sir.

18   Q.    And showing you a document on the screen, do you recognize

19   that as a transcript of that meeting?

10:51AM 20  A.    Yes.  Is it an excerpt?  It's an excerpt of the

21   transcript, though.

22   Q.    Again, prepared by the government, correct?

23   A.    Yes, sir.

24        MR. MURPHY:  Your Honor, with the Court's permission,

25   I'd like to mark this now for identification.

         1              THE COURT:  For identification?  All right.  What's

         2      the number?

         3              THE CLERK:  Judge, the next number would be 225.

         4              THE COURT:  225.  225 for identification.

         5              (Exhibit 225 was marked for identification.)

         6      Q.   And that contains several passages that relate directly to

         7      Mr. Sandoval, correct?

         8      A.   I believe it does, yes.

         9      Q.   And if we turn to page 11.

10:52AM 10      A.   Yes.

        11      Q.   Does that part of the transcript --

        12              THE COURT:  Hold on.  Are we showing this to the jury?

        13              THE CLERK:  No.

        14              THE COURT:  This is not in evidence.

        15              MR. MURPHY:  It shouldn't be.

        16              THE COURT:  Did you take it -- okay.  Go ahead.

        17      Q.   Does that part of the document -- it says verbatim at

        18      10:03:07, does that relate at page 11 moving onto page 12 to a

        19      conversation about Mr. Sandoval?

10:52AM 20      A.   Well, I know they were talking about Mr. Sandoval, yes.

        21      Q.   And if we turn to page 29, does that show additional

        22      conversation about Mr. Sandoval?

        23      A.   It doesn't start off, it just says -- the question is

        24      asked "What's happening?"  And they ask the CW-1 what's

        25      happening, so you'd have to go forward where they start talking

1    about your client, sir.

2    Q.   But on the next page, on page 30, they do, correct?

3    A.   Yes.

4         MR. MURPHY:  If I may approach, your Honor?

5         THE COURT:  Yes.

6    Q.   Let me show you a three-page document, Special Agent Wood,

7    and ask you whether that's an excerpt of a longer excerpt that

8    we've been looking at that was marked as an exhibit for

9    identification that contains those passages that we just looked

10:53AM 10   at on the document marked for identification relating to the

11   discussion of Mr. Sandoval?

12   A.   Yes, it appears to be exactly that.

13        MR. MURPHY:  May we offer this as an exhibit?

14        MR. POHL:  Objection.

15        THE COURT:  Can I see it?  All right.  I'll admit it.

16   226.

17        (Exhibit No. 226 received into evidence.)

18        MR. MURPHY:  May I approach, your Honor?

19        THE COURT:  Yes.

10:55AM 20        MR. MURPHY:  I'm going to put it up on the document

21   camera.

22   Q.   So when you were reading transcripts with Mr. Pohl, you

23   were taking the position of CW-1; is that correct?

24   A.   Yes, sir.

25   Q.   So why don't we do the same, and if we could read this

1    transcript together.

2             MR. MURPHY:  The jury does not have this, your Honor,

3    but I would propose to, now that it's been admitted, to submit

4    it to be part of the jury's evidence binder.

5             THE COURT:  Well, I don't know how we're going to do

6    that, but can they see it now?

7             MR. MURPHY:  Yes.

8             THE COURT:  All right.  We'll talk about that later.

9    Go ahead.

10:56AM 10   Q.   So at 1:03:07, Chucky, he's the leader of the East Coast

11   Program in the United States, correct?

12   A.   Yes, sir.

13   Q.   He says, "How many cliques are there organized in the

14   sector which work together?  Some?  Is there Mara there?"

15            And then Demente -- who's Demente?

16   A.   Demente is the leader of the Molinos.

17   Q.   It's another Boston area clique?

18   A.   It's the United States clique.

19   Q.   Okay.  Not ESLS, correct?

10:56AM 20   A.   That's correct.

21   Q.   Demente says, "No, because how many times have they had

22   you pay?"

23            Chucky:  "Nothing, no one from that sector."

24            Demente:  "Well, me, we were looking, I made them see

25   before, well, yes, but there --"

1          Chucky:  "And how is it there with your clique?"

2     A.    CW-1:  "No, man, the main leader was pushing us down.  You

3     know, what I mean?  He was like --- I'm being honest."

4     Q.    Chucky:  "The old guy?"

5     A.    CW-1: "Yeah, man."

6     Q.    Chucky:  "Who was this guy?"

7     A.    CW-1:  "Casper."

8     Q.    Chucky: "And why don't you kill him?  Why don't you get

9     together?"

10:57AM 10   A.    CW-1:  "Well, that is the plan we have right now since

11    we're like only about 30, but we are all older.  We are

12    planning, like some seven homeboys who are the ones who

13    coordinate."

14    Q.    Chucky:  "You are all older."

15    A.    CW-1:  "Yes."

16    Q.    Chucky:  "So why haven't you?"  Chucky:  "Why don't you

17    all get together, the ones who are willing to meet this

18    challenge, because that guy is making your clique look bad, you

19    can?"

10:57AM 20   A.    CW-1:  "Yes, that's what we are talking about.  That's why

21    I am here, man, to face things.  You know what I mean?  To see

22    what (unintelligible.)  Because the thing is that the guy, he

23    is saying he is here, but he doesn't run with anyone, you know?

24    That's it.  He will be independent.  So what happens then?

25    That we --"

1    Q.    Demente:  "That's why I say we have to bring this guy so

2    he can face things."  Chucky:  "Okay, if you are willing to

3    represent your clique and see what's up or to organize with

4    homeboys who want to and tell them, look, homeboy, that's

5    really not good."

6              Demente:  "But Mamia."

7              Now, who's Mamia?

8    A.    A leader from a different clique in the East Coast

9    Program.

10:58AM 10   Q.    "Take him out."

11             Chucky:  "You, yourself, can come."

12             Demente:  "But this is very dangerous for these

13   homeboys."

14             Now, later in the meeting in the transcript that was

15   marked for identification, there's another discussion about

16   Mr. Sandoval, correct?

17   A.    Yes, sir.

18   Q.    And that's summarized here, that's excerpted here, I

19   should say?

10:58AM 20   A.    Yes.

21   Q.    And if we could read the parts as before.  Suga, he's the

22   person we were talking about before, correct?

23   A.    Yes.

24   Q.    The leader in El Salvador?

25   A.    Correct.

1   Q.    They got him on the phone?

2   A.    Yes.

3   Q.    "We're going to do something, but right now I want to talk

4   to these dudes in the Eastside Program.  What's happening,

5   Pelon?"

6   A.    CW-1:  "Not much, doggie."

7   Q.    Suga:  "When you go back to your homeboys."

8   A.    CW-1: "That's right.  I'm going there."

9   Q.    Suga:  "I want you to meet with your people, brother so

10:59AM 10   that they don't come here, you know the reality of your clique,

11   brother, because your clique doesn't, you know, and I don't

12   know why the homeboys?"

13   Q.    CW-1:  "Suga, you know the whole thing with Casper.  This

14   is (redacted.)  What was I told?  (Unintelligible.)  Me and

15   Muerto, but we had to (unintelligible.)  So now we are

16   planning, me, Muerto and Caballo, we're seniors and we're going

17   to be Eastside, but we're going to be like two groups, because

18   we're going to, they never support us here.  You know how those

19   dudes are."

10:59AM 20   Q.    Now, in that transcript that we just saw, CW-1 said he was

21   going to kill Mr. Sandoval, correct?

22   A.    He never said that he was going to kill your client, sir.

23   I think he says that's what we're planning.

24   Q.    Oh, that's what we're talking about?

25   A.    Yes.

1    Q.    Okay.  So CW-1 was talking about killing Mr. Sandoval?

2    A.    In this report, yes, or in this transcript.

3    Q.    Now, let me turn to a number of different subjects.

4    Number 1, you testified a few moments ago about these

5    protection details, correct?

6    A.    Yes.

7    Q.    And you said the protection details offered people who

8    were -- offered people the opportunity to volunteer to

9    participate in a drug transaction, correct?

11:00AM 10    A.    Yes.

11    Q.    Pelon gave that opportunity to volunteer to Mr. Sandoval,

12    correct?

13    A.    He did.

14    Q.    Mr. Sandoval said no, correct?

15    A.    I believe that is correct.

16    Q.    Now, it's true, isn't it, that sometimes cliques commit

17    crimes as a group for the benefit of the group, correct?

18    A.    Yes, sometimes cliques do commit crimes that benefit the

19    whole group.

11:01AM 20    Q.    So, for example, the Everett clique, you learned in the

21    course of this investigation, has some of its members with

22    selling marijuana, which was a group clique project, correct?

23    A.    Yes.

24    Q.    And the money from that clique, the money that were

25    received from selling marijuana became clique money, correct?

1    A.    Yes.

2    Q.    Okay.  But you learned in the course of your investigation

3    that sometimes clique members or associates freelanced,

4    correct?

5    A.    I'm not sure.  Do you mean that -- can you rephrase that

6    because I'm not quite sure what you mean by the freelancing

7    aspect.

8    Q.    Sure.  So, sometimes people who were members of cliques or

9    were associated with cliques would commit crimes on their own

11:02AM 10    without the knowledge or permission of the clique's leaders,

11    correct?

12    A.    Cliques would commit -- clique members could commit

13    crimes, but the clique would find out about it.  They may not

14    know beforehand, but they discussed crimes that would occur

15    depending on the type of crime.

16    Q.    Okay.  Well, let me give you a specific example, sir.  Did

17    you learn in the course of your investigation that there was an

18    individual named Clacker, correct, right, who was associated

19    with the Enfermos clique in Boston?

11:02AM 20    A.    Yes.

21    Q.    And did you learn that in the winter of 2014 and '15

22    Clacker and others committed between 30 and 40 armed robberies

23    of gypsy cab drivers, stealing money and cell phones and

24    sharing money with their accomplices, but they did that without

25    the knowledge of the clique itself?

1    A.    I would disagree with how you're phrasing that.  I don't

2    know if that number is completely accurate, and I would also

3    say at the point that those robberies were occurring -- at that

4    point, most of the Enfermos were already arrested, Clacker were

5    not, so it would be very hard for Clacker to tell his clique

6    what he had been doing in 2014.

7    Q.    Well, let's see if we can break that down.  Clacker was

8    affiliated with the Enfermos clique, correct?

9    A.    Yes, sir.

11:03AM 10    Q.    And the leader of the Clacker's clique was in jail,

11    correct?

12    A.    Yes, sir.

13    Q.    But somebody else was designated as the leader when he was

14    not, correct?

15    A.    Yes.  Well, no, Tremendo was still the leader, but there

16    was also another leader.

17    Q.    An acting leader?

18    A.    Yes, that be would fine to say.

19    Q.    And it was Clacker who told you about these 30 or 40 armed

11:04AM 20    robberies of gypsy cab drivers that he committed with others,

21    correct?

22    A.    Yes, he told us that he was committing robberies, but the

23    questions were asked where he said, "How many did you do?"  And

24    he said, "I did several."

25         "Well, how many?"  "I don't know."

1          "Would it be fair to say 7?"  "Yes."

2          "Would it be fair to say 10?"  "Yes."

3          "Would it be fair to says 15?"  "Yes."

4          So he didn't really know, and he just agreed to make

5     it say 30, 40, but I would believe that it was actually less

6     than that.

7     Q.   Clacker testified in the grand jury that it was between 30

8     and 40, correct?

9     A.   I didn't read his testimony, so I don't know what he

11:04AM 10   actually testified.  When we asked him what he had done, he

11    agreed to that number.  Again, as I said, I think he

12    overestimated.  I don't believe it, but that's what we put on

13    the record, 30 to 40.

14    Q.   So I'm going to try to see if I understand that.  Clacker

15    told you about these armed robberies of gypsy cab drivers that

16    he and others had committed, correct?

17    A.   Yes, sir.

18    Q.   You put on the record, as you say, that it was between 30

19    and 40, correct?

11:05AM 20   A.   Yes, because he didn't fully remember, and he just kept

21    agreeing to the number that was asked him, so we said, okay,

22    that's what he thinks, we're going to go with that.  As I said,

23    personally, I think it's lower than that, but that's what we

24    had him finally say, yes, I think it's 30 to 40, so we're going

25    to go with 30 to 40.

1    Q.   You weren't there, correct?

2    A.   No.

3    Q.   Clacker was?

4    A.   At the robberies?

5    Q.   Yes.

6    A.   Yes.

7    Q.   And is it your experience, sir, that people who are

8    talking to the FBI typically inflate the number of crimes they

9    committed rather than minimize them?

11:05AM 10    A.   I have found some people are very truthful and admit to

11    everything.  I found some people try and bolster who they are.

12    I find that people also limit or try and hide what they've

13    done, so I've seen it range from underestimating to

14    overestimating.

15    Q.   And I take it you don't know what Chucky testified in the

16    grand jury about whether any clique members knew what he was

17    doing?

18    A.   I don't know, no.

19    Q.   Because you've never read his grand jury under oath,

20    correct?

21    A.   I have not, no.

22    Q.   Were there any reports that were written about this

23    interview of Chucky where -- I'm sorry, of Clacker, where he

24    said might have been 5, might have been 10, might have been 7,

25    might have been 30, might have been 40?

1    A.    I know -- I believe a report was written.  I didn't read

2    that report.  I can remember I was driving home from Virginia

3    from that meeting when I was called and said this is what we

4    just found out from Clacker, and I remember that's how I was

5    told the conversation went with trying to figure out how many

6    he had committed.

7    Q.    And who was that call from, sir?

8    A.    That was either from Special Agent Wallace or

9    Sergeant Millett.

11:07AM 10   Q.    And do you know of your own personal knowledge whether

11    either of them ever wrote a report about this meeting you're

12    describing?

13    A.    I believe Special Agent Wallace would have written a

14    report.

15    Q.    But you have not read it?

16    A.    If the report was generated, no, I've not read it.

17    Q.    And did you ever talk to Clacker personally about whether

18    it was 5 or 10 or 15 or 20 or 30 or 40?

19    A.    I have not spoken directly to him, no, sir.

11:07AM 20   Q.    Now, when CW-1 was out there working for the FBI, the FBI

21    recorded the calls on one of his phones, correct?

22    A.    Yes.

23    Q.    But he had two phones, correct?

24    A.    Yes, sir.

25    Q.    Why was he given two phones?

1    A.    We didn't give him two phones.  He had his phone and then

2    we had his other phone.

3    Q.    Okay.  You didn't record the calls on the second phone,

4    correct?

5    A.    Yes, that's correct.

6    Q.    You had something called a pen register on that, correct?

7    A.    I believe we had a pen register on both phones, but I'd

8    have to go back to review and see if we had pen registers on

9    both phones or just the one.

11:08AM 10   Q.    And a pen register, if you did have it on the second

11   phone, that does not allow you to record the contents of any

12   conversations between someone who calls CW-1 and CW-1, correct?

13   A.    That is correct, yes.

14   Q.    It tells you the numbers that are called in and the

15   numbers that he calls out, correct?

16   A.    It breaks it down by the date, the time, you know, on this

17   date, this time this phone call was either made or incoming,

18   yes.

19   Q.    But it looks more or less, not exactly, but more or less

11:09AM 20   like a detailed cell phone bill like we used to get in the old

21   days, right, with all the numbers that we called?

22   A.    Yes.

23   Q.    And unless you looked and checked to see who CW-1 was

24   talking with on his second line, you wouldn't know who he was

25   talking to, correct?

1    A.    Yes, that's absolutely correct.

2    Q.    And do you recall ever doing that during the course of the

3    investigation?

4    A.    No, I wasn't checking the phone logs, other people were.

5    Q.    Now, the in-person meetings that CW-1 recorded, he had to

6    tell you about those, correct?

7    A.    Yes.

8    Q.    So he would be the one who would alert you to a meeting

9    that he thought should be recorded, correct?

11:09AM 10    A.    No, he would alert us to -- on having a meeting or having

11    been called to a meeting or I'm going to meet so and so, and at

12    that point we'd say, okay, let's get this recorded.

13    Q.    But you were relying on him to tell you when there were

14    meetings, correct?

15    A.    Yes.

16    Q.    And if he didn't tell you about a meeting, you'd never

17    know about it?

18    A.    Odds are that would be absolutely correct, yes.

19    Q.    Now, the conversations that we've seen that were tape

11:10AM 20    recorded in his car, he had the authority -- he had the ability

21    to turn that recorder on and off, correct?

22    A.    Yes.

23    Q.    You had a kill switch that could turn that car off

24    remotely, correct?

25    A.    That was only during the protection details.  We didn't

1    kill switch his case, just the car that was used for the

2    protection details.

3    Q.    Fair enough, sir.  But he had control over the tape

4    recording equipment in his car, correct?

5    A.    At the end of the investigation, yes.  In the initial, no.

6    We turned it on and off and then due to the amount of times he

7    was meeting people, we showed him how to work it so he could

8    turn it on.

9    Q.    But you didn't turn it on and off remotely, correct?

11:11AM 10   A.    You can't turn it off and on remotely, no, sir.

11    Q.    So even earlier in the investigation when it required the

12    FBI to turn it on, he had to bring the car to a designated

13    location and you turned it on then, correct?

14    A.    We would install the recorder for those meetings because

15    yes, as I told you, when the procedures we talked about last

16    week, that be would part of the procedure.

17    Q.    So Mr. -- CW-1, it's fair to say, had lots of

18    conversations with lots of people in and out of the car that

19    the FBI did not record, correct?

11:11AM 20   A.    Oh, absolutely, yes.

21    Q.    And it was essentially his decision about what the FBI

22    would record and not?

23    A.    No, it was not his decision like that, the way you phrased

24    it, no, sir.

25    Q.    But if he didn't tell you about a meeting or a -- if he

1   didn't tell you about a meeting, you wouldn't know to record

2   it?

3   A.   Yes, that's correct.

4   Q.   Now, as part of your investigation in this matter, did you

5   look into a stabbing that took place on May 12, 2015 near

6   Highland Park in Chelsea?

7   A.   Yes.

8   Q.   Tell us what you did to investigate that stabbing, sir.

9   A.   We interviewed the CW.

11:12AM 10   Q.   Did you do anything else, sir?

11   A.   I believe we got the reports from the stabbing.

12   Q.   Was a person named Miner Ochre the victim of that

13   stabbing?

14   A.   I can't remember the victim of the stabbing at this point.

15   I'd have to see the reports to see.

16   Q.   What did you learn in the course of your investigation

17   about the circumstances of that stabbing, sir?

18   A.   If I remember correctly, an MS member had seen 18th

19   Street, he called for backup, people came in, one of the MS

11:13AM 20   members stabbed the kid, and then they all fled the area.

21   Q.   So who was the MS member that first saw the 18th Street

22   people, as you understand it in your investigation?

23        MR. POHL:  Objection.

24        THE COURT:  I don't know how he could testify about

25   this.  Well, sustained.

1    Q.   Do you know, sir?

2         MR. POHL:  Objection.

3         THE COURT:  Sustained.

4    Q.   Now, you testified on direct examination about the

5    Trenton Street homicide of Irvin De Paz that was committed by

6    the individual you've identified as Animal, correct?

7    A.   Yes, sir.

8    Q.   At the time of Mr. De Paz's stabbing, Animal was not then

9    associated with ESLS, correct?

11:13AM 10  A.   That is correct.

11   Q.   But he did know CW-1, correct?

12   A.   I don't know when he first met him, but, yes, he at some

13   point did become familiar with CW-1.

14        MR. MURPHY:  If I could ask for Exhibit 103, the

15   transcript.

16        THE COURT:  I'm sorry, is this in evidence?

17        MR. POHL:  It is in evidence, your Honor.

18        THE COURT:  Okay.  Go ahead.

19   Q.   So this is the conversation that we saw on tape earlier,

11:14AM 20  correct?

21   A.   Yes, sir.

22   Q.   And it's between Animal and CW-1, correct?

23   A.   Yes, but I believe there were at least or two other people

24   in the back of the, car and I don't believe they were speaking

25   during this portion -- well, no, one did.  David spoke, but

1    yes.

2    Q.    So none of these defendants were in the back of the car?

3    A.    That is absolutely correct, sir.

4    Q.    And CW-1 says about two-thirds of the way down the page,

5    "And, hey, you just didn't take down anyone," correct?

6    A.    That is correct.

7    Q.    And Animal says, "No, a major culero," correct?

8    A.    Correct.

9    Q.    And what does CW-1 say next?

11:15AM 10   A.    "A major culero, I had already smashed his head, dude,"

11    didn't they tell you how -- or, "didn't they tell you?"

12    Q.    And that's Pelon CW-1 saying that he had already smashed

13    Mr. De Paz's head, correct?

14    A.    Yes.

15    Q.    And if we turn to page 2, I think the fifth line, The

16    fifth entry down, Animal says, "He could never stop me, the

17    culero, and whenever he would see me, he would immediately

18    run."

19         And then CW-1 says, could you read that, please?

11:16AM 20   A.    "Scooby and I asked Snoopy.  I gave him a fucking beating

21    with Snoopy."

22    Q.    And does he later say that he hit him with a bat in this

23    conversation?

24    A.    Yes.

25    Q.    And that was CW-1 talking, correct?

1   A.   Yes, sir.

2   Q.   And those were not activities that were authorized by the

3   FBI, correct?

4   A.   I don't believe those activities took place.  I think he's

5   using the cover right now to make himself look good in front of

6   Animal.

7   Q.   And how do you know that, sir?

8   A.   Because I would've believe we would have found a report

9   saying that people hit this kid with a baseball bat, and I

11:17AM 10   don't remember ever having a report or seeing a report saying

11   that this kid had been hit in the head with a baseball bat.

12   Q.   Did you confront CW-1 about it?

13   A.   Not at all.

14   Q.   You didn't say how come you're bragging about hitting this

15   kid with a baseball bat?

16   A.   Not at all.

17   Q.   Because you were confident, sir, that this was just a

18   cover story, correct?

19   A.   Yes.

11:17AM 20   Q.   Did you have any reason to believe that CW-1 was doing

21   things like this in circumstances where it was not a cover

22   story?

23   A.   No.

24   Q.   To this day?

25   A.   To this day, I know of things that occurred, but then when

1   you were asking me, no.  I wasn't aware of anything in

2   September of 2015.

3   Q.   So whatever CW-1 was or was not doing in September 2015

4   that was not authorized by the FBI, you didn't know about?

5              MR. POHL:  Objection.

6              THE COURT:  I'm not sure I follow the question.  Let's

7   start there.  Rephrase.

8   Q.   You since learned about some things that CW-1 was doing --

9              MR. POHL:  Objection.

11:18AM 10  Q.   -- that were unauthorized by the FBI?

11             THE COURT:  I'll allow that.  Yes or no.

12  A.   Yes.

13  Q.   But whatever those things were, you didn't know about them

14  back in September of 2015?

15  A.   That is correct.

16  Q.   When CW-1 made the statements on this tape, correct?

17  A.   That is correct.

18  Q.   Now, you testified on direct examination about the reasons

19  why Animal was not arrested after November 2nd, when he

11:18AM 20  confessed on tape?

21  A.   Yes.

22  Q.   Now, one of the reasons you gave was that you were

23  concerned about the safety of CW-1 and his family, six

24  individuals here and another 12 in El Salvador?

25  A.   Give or take that number, yes.

1    Q.   Isn't it fair to say, sir, that the government controlled

2    the timing of when that relocation process would begin?

3    A.   Not at all.

4    Q.   You couldn't have done that before?

5    A.   No.

6    Q.   Why not, sir?

7    A.   Because when this fell in our lap, we weren't prepared and

8    we weren't prepared to bring his family into the country.

9    Q.   Well, you could have located them as soon as he started

11:19AM 10    cooperating back in 2014 and 2013, correct?

11    A.   I don't think we could have.

12    Q.   Because he hadn't done enough to justify that effort, is

13    that your testimony?

14    A.   I'm not saying that, either.  I'm just saying we weren't

15    sure.  In 2013, this was brand new.  We didn't know what was

16    going on to say what we can and can't do for someone.

17    Q.   You knew, sir, that in November 2015 the Boston Police had

18    located a witness who had information about the stabbing,

19    correct?

11:19AM 20    A.   I believe that is correct.

21    Q.   And is it fair to say that if you had wanted to, you could

22    have given the Boston Police Department a photograph of

23    Mr. Martinez and said why don't you put this photograph in a

24    photo array, a photo lineup, and show it to your witness?  Did

25    you think about doing that, sir?

1     A.   I wasn't aware of -- and no.

2     Q.   You had a photo of Mr. Martinez, correct?

3     A.   We did, yes.

4     Q.   And you knew the Boston Police Department was working the

5     case as an active homicide investigation, correct?

6     A.   We did, yes.

7     Q.   And you knew they had a witness?

8     A.   I wasn't aware of them having a witness to show a photo

9     array to, no.

11:20AM 10   Q.   Did you know that they had already showed a photo array

11    with a different suspect to the witness?

12    A.   I wasn't a part of that investigation to know what they

13    were and weren't doing at the time.  I knew they were

14    investigating a homicide.

15    Q.   And there were no Boston Police Officers assigned to your

16    task force back in November 2015, correct?

17    A.   Not from the homicide unit, but we have a Boston Detective

18    assigned to the task force.

19    Q.   You said that one of the reasons you wanted to bring

11:21AM 20   Animal -- you wanted Pelon, CW-1, to bring Animal back to

21    Boston so he'd be close when the big take down occurred,

22    correct?

23    A.   Yes, we wanted to know where he was and we didn't have a

24    good solid working knowledge of where he was located in Newark,

25    New Jersey.

1   Q.   Well, CW-1 was in contact with him by phone, correct?

2   A.   Yes.

3   Q.   And CW-1 went down to visit him, correct?

4   A.   Yes.

5   Q.   So CW-1 knew where he lived and how to find him?

6   A.   Well, he had an idea of where he lived, but it doesn't

7   mean that we had solid proof that this is, you know, the exact

8   house he's living in.  We had an idea, but we weren't sure, but

9   if we had him here, we would know exactly where he would be.

11:22AM 10   Q.   Now, it's true, isn't it, that there are FBI offices all

11   around the country?

12   A.   Yes.

13   Q.   And pretty much every day all around the country, FBI

14   agents from one district arrest people on warrants issued by

15   other districts, correct?

16   A.   That does occur.  I don't know if it's every single day,

17   but, yes, we do make arrests for other field offices around the

18   country.

19   Q.   And there's an office in the Newark area, correct?

11:22AM 20   A.   There is a Newark office, yes.

21   Q.   Now, you said you wanted to know where Animal was.  When

22   you brought him back here -- and it was Pelon who brought him

23   back here, CW-1, correct?

24   A.   Yes, we directed the CW to go down and pick him up and

25   bring him back.

1    Q.   Did you take any steps to monitor his whereabouts?

2    A.   We were doing our best at that time to monitor everyone we

3    were planning to arrest and their whereabouts.

4    Q.   And were you conducting surveillance on Animal?

5    A.   We were going out and looking at all the addresses where

6    all of the defendants were residing so we could try and put

7    them, as we call, to bed.  That way when we go and hit the

8    houses in the morning, we're hitting the right house.

9    Q.   But you weren't conducting surveillance in the sense of

11:23AM 10    following him around, right?

11    A.   No.

12    Q.   And did you give the Boston Police a heads-up that he was

13    back?

14    A.   I don't remember if we told them that he was back or not.

15    Q.   Now, I think you volunteered in response to -- I think it

16    was Mr. Iovieno's questions that December 2015 and January 2016

17    was the most stressful time of your professional career?

18    A.   Started in November, yes.

19    Q.   And part of the work was the work necessary to charge the

11:23AM 20    defendants?

21    A.   Part of that was the work to charge, part of that was what

22    we had going on, part of that was the fact that my boss was

23    leaving and so I didn't have a supervisor and I was doing his

24    job and my job at that time.

25    Q.   Part of it was dealing with the relocation of CW-1 and his

1    family?

2    A.   Absolutely.

3    Q.   You were preparing search warrants and arrest warrants,

4    correct?

5    A.   We were in the grand jury, so the indictment would have

6    granted the arrest warrants, but we were also seeking search

7    warrants.

8    Q.   Now, was there any other significant event relating to the

9    case that was causing you stress in that period, sir?

11:24AM 10   A.   You'd have to be specific to say what was causing me

11   stress.

12   Q.   I mean, can you think of anything as you sit here today,

13   anything else that was major going on in the investigation that

14   contributed to the stress that you volunteered?

15   A.   Just the whole 9 yards of everything getting ready.  We

16   were trying to indict, we were trying to make sure we kept the

17   community safe.

18        We had meetings that occurred, and each time we had a

19   meeting, we didn't have a transmitter so we couldn't listen

11:25AM 20   realtime what was going on in the meetings, and I know that

21   MS-13 members have killed other members they suspect of

22   cooperating with law enforcement at these meetings, so you're

23   always concerned will they find the recorder on the CW, will

24   they kill him in that meeting, and we won't know, we won't be

25   able to go in there and try and save him because I have

1    participated in meetings where things go wrong, not in this

2    case, but in other cases where we have to come in and save

3    either a CW or an undercover.  So all those things at once was

4    very stressful.

5            MR. MURPHY:  May I approach, your Honor?

6            THE COURT:  Yes.

7            MR. MURPHY:  I'm sorry.  I meant sidebar.

8            (THE FOLLOWING OCCURRED AT SIDEBAR:)

9            MR. MURPHY:  Your Honor, I think at this point I would

11:25AM 10    like to ask the following question:

11            Isn't it true that you were told in December of 2015

12    that Pelon participated in the armed robberies of a number of

13    gypsy cab drivers in East Boston and Chelsea, along with -- I

14    think at this point, your Honor, there's been a foundation laid

15    for that relevance.

16            I would say, Number 1, he testified about why he

17    didn't have any concerns about Pelon having smashed

18    Irvin De Paz in the head.  I think that he also has testified

19    to a whole litany of things about why he was stressed in

11:26AM 20    November, December, January of 2015, and, frankly, I think it's

21    incredible that he would say all that but omit the fact that he

22    learned that his own cooperating witness had been out there

23    committing crime.

24            THE COURT:  What does any of this have to do with the

25    guilt or innocence of any of these defendants?

1        MR. MURPHY:  It goes to the credibility of this

2   witness who's been allowed to testify about MS-13 in a way,

3   your Honor, which suggested anybody who joins MS-13 is guilty

4   of the charges that --

5        THE COURT:  He didn't testify about that.

6        MR. MURPHY:  I say I think that's the logical

7   inference of his testimony, your Honor.  That it's all about

8   violence, that it's a rule that they kill people, so I think it

9   goes directly to his credibility, your Honor, and I think it's

11:27AM 10   relevant.  It's relevant.  He's been presented as a person who

11   conducted a detailed thorough investigation, and the fact that

12   this stuff was going on under his nose is relevant to his

13   overall credibility as a witness.

14        THE COURT:  The government, what's your response?

15        MS. LAWRENCE:  That information had already been

16   brought out.  I think you allowed him in court to admit to the

17   fact that he was committing unauthorized acts while he was

18   under the cooperation agreement that's been brought out on

19   cross-examination, and I don't see any reason why we need to go

11:28AM 20   into the details of that.  I don't know how this is remotely

21   relevant to the point we're trying to make.

22        THE COURT:  I'm going to be consistent and keep the

23   details of that out because I think it's irrelevant, but I

24   suppose to complete this completely irrelevant line of

25   testimony about his personal stress, which was irrelevant in

1    the first place and continues to be irrelevant, I would permit

2    you to ask isn't it true that the unauthorized -- that you

3    learned, you know, in November, whenever it was, that this was

4    when CW-1 was committing unauthorized acts and that added to

5    his stress but not the details of what those acts were.

6              MR. POHL:  Your Honor, may I ask unauthorized criminal

7    acts?

8              THE COURT:  Yes.

9              (SIDEBAR CONFERENCE WAS CONCLUDED)

11:28AM 10    Q.   Special Agent, is it also fair to say that another thing

11    that was contributing to your stress in November and

12    December of 2015 was that you learned that CW-1, whom you

13    brought here, the FBI had brought here from El Salvador to work

14    for the FBI, had been committing unauthorized criminal acts

15    without your knowledge?

16    A.   That didn't cause me any stress, no.  I mean, not like

17    what you're suggesting, no.

18              MR. MURPHY:  May I have a moment, your Honor?

19              THE COURT:  Yes.

11:30AM 20    Q.   Sir, I just want to return to one point.  It's been your

21    experience that sometimes people who are speaking to law

22    enforcement exaggerate and embellish what they have done,

23    correct?

24    A.   Yes, people have done that, yes.

25              MR. MURPHY:  Thank you, your Honor.  Nothing further.

1          THE COURT:  Mr. Lopez.

2          MR. LOPEZ:  Thank you, your Honor.

3                    CROSS-EXAMINATION

4    BY MR. LOPEZ:

5    Q.   Good morning, Agent Wood.

6    A.   Good morning, sir.

7    Q.   My name is Scott Lopez.  I represent Edwin Guzman.  Now, I

8    think you testified on your direct that MS-13 began as a

9    nonviolent gang?

11:31AM 10   A.   I don't know if I said nonviolent, I said they formed a

11   gang in 1979.

12   Q.   And that was the Stoners?

13   A.   Yes.

14   Q.   And the Stoners basically existed to get stoned?

15   A.   They did smoke marijuana, yes.

16   Q.   And to listen to hard rock?

17   A.   That was another thing that they did, yes.

18   Q.   And would you agree with me that most aspects of gang life

19   are nonviolent?

11:32AM 20   A.   I would disagree with you on that one.

21   Q.   Well, would you agree that gangs hang out, socialize on

22   street corners, alleyways, in front of apartment buildings, or

23   in strip malls?

24   A.   Yes, I would say that gang members hang out together.

25   Q.   A yes or no will suffice.

1           THE COURT:  Well, not if it's not a fair response.

2    You can't give that instruction.  Put another question to him.

3    Q.   Would you agree that gang members sometimes watch

4    television, watch movies, or play video games?

5    A.   Yes, they would do that.

6    Q.   Okay.  And they drink beer?

7    A.   I imagine they drink beer.

8    Q.   Or alcohol?

9    A.   Yes.

11:32AM 10  Q.   Hang out at each other's homes?

11   A.   Yes.

12   Q.   They smoke marijuana?

13   A.   Some do, yes.

14   Q.   And they like to party?

15   A.   Yes.

16   Q.   And they like to hang out in parks?

17   A.   I don't think that's a yes or no question.

18   Q.   Okay.  And some of them work part-time jobs?

19   A.   Some.

11:33AM 20  Q.   And so there are many things that gang members do that are

21   not violent, would you agree?

22   A.   I still don't know if I'd completely agree with that

23   statement.

24   Q.   Well, could you agree to any extent?

25   A.   No, I think that what I've seen in my experience is that

1    gang members form gangs to be violent and control their

2    territory, so to say that they're not violent, I just don't

3    agree with.

4    Q.   And that's based on your experience as an FBI agent?

5    A.   Yes.

6    Q.   Do you think your view of gangs might be a little skewed

7    by your experience as an FBI agent?

8    A.   No.

9    Q.   Now, most gang members are recruited when they are

11:34AM 10   teenagers?

11   A.   That has been a predominant -- I'm trying to think of the

12   word, it's escaping, but yes.  I've seen high school students,

13   and I've seen as low as middle school kids being recruited into

14   the gangs.

15   Q.   And high school students getting tattoos?

16   A.   I think you have to be 18 to get a tattoo, so I'm sure

17   some underage kids get tattoos, but I don't know when or how.

18   Q.   Are you saying in your experience as an FBI agent, you've

19   never seen an underage teenager with a tattoo?

11:34AM 20   A.   No, I have seen some underage, but I'm just saying it's

21   illegal.  It's usually a little harder for them to get tattoos.

22   Q.   Well, so are violent acts, but according to you, that's

23   all they do.  I take that back, your Honor.  Now, do you see a

24   correlation between adolescents and alcohol?

25            MR. POHL:  Objection, on relevance grounds.

1        THE COURT:  Sustained.

2    Q.   What about adolescents and drugs?

3        MR. POHL:  Objection.

4        THE COURT:  Sustained.  I don't think he's an expert

5    on adolescents.

6        MR. LOPEZ:  Well, actually, your Honor, that's what he

7    was put forth as.  May I be heard?

8        THE COURT:  No, he's talked about gangs.  He doesn't

9    talk about adolescents.  Go ahead.  Put another question to

11:35AM 10   him.

11   Q.   Do you know if there's any correlation between gang

12   membership and female companionship?

13       MR. POHL:  Objection.

14       THE COURT:  I'll allow that.

15   A.   In what sense do you mean?

16   Q.   Well, I'm a high school student, I'm a gang member, and

17   girls are attracted to me.  Does that happen?  Yes or no.

18   A.   I was going to say I don't know if that's quite yes or no

19   because I think all adolescent boys and girls are attracted to

11:36AM 20   one another.

21   Q.   Exactly.  And if your identity is attractive, that's a

22   good thing, right?

23   A.   Certain things can be attractive, yes.

24   Q.   Now, throughout this investigation or through most of it,

25   Mr. Guzman was referred to in many of the reports by the

1    nickname Playa.  Do you agree?

2    A.    Player, Playa, yes.

3    Q.    No, no.  Playa, not Player?

4    A.    Well, I'm not very good at dropping the Rs, so I always

5    called him Player, but, yes.

6    Q.    And then as we've got closer to trial, everything got

7    changed to Playa, right?

8    A.    Well, since I came in on the reinvestigation as a co-case

9    agent in 2015, I always called him Player.

11:36AM 10   Q.    Now, do you know what Playa means in Spanish?

11   A.    No, I'm not a very good Spanish speaker.

12   Q.    Do you know why Mr. Guzman's nickname is Playa?

13   A.    No.

14   Q.    Do you know whether or not he got that name because he was

15   a lady's man?

16          MR. POHL:  Objection.

17          THE COURT:  That was your objection?

18          MR. POHL:  Yes.

19          THE COURT:  If you know how he got his nickname, you

11:37AM 20   can say so, but otherwise.

21   A.    I don't know.

22   Q.    Now, would you agree that the average age of most gang

23   members when they're recruited is about 15?

24   A.    I can't agree to that, no.

25   Q.    And some join as young as 13?

1    A.   Again, I know -- depending on where you are, I've seen it

2    younger than that.

3    Q.   And in 2015, I think you testified that some were as young

4    as 11 or 12?

5    A.   That is correct.

6    Q.   And that was in November of 2015?

7    A.   Yes.

8    Q.   And that was at that time a recent phenomenon, right?

9    A.   That was more in El Salvador, but, yes.

11:37AM 10    Q.   And that was in El Salvador, but those recruits were

11    coming into the United States?

12    A.   Yes.

13    Q.   Okay.  And who is Special Agent David LeValle?

14    A.   I'd have to see his name.

15    Q.   You're not familiar with his role in the MS-13

16    investigation in Virginia?

17    A.   Again, I'd have to see him.  I'm not familiar with every

18    single MS-13 investigator in the United States.

19    Q.   Well, in 2016, he was interviewed and he said the mass

11:38AM 20    migration of unaccompanied minors from Central America in 2014

21    created a whole new crop of recruits.  My question is do you

22    agree with his assessments?

23    A.   With the unoccupied minor program, I would say there's a

24    lot of truth to that, yes.

25    Q.   So, in 2014, things began to change vis-à-vis MS-13 and

1    young recruits?

2    A.    Yes, that was a general.

3    Q.    And, in fact, some of those young men who came in, as

4    young as 11 or 12, had already committed murders in

5    El Salvador, right?

6    A.    I would say there were probably a little older than 11 or

7    12, they were recruited at 11 or 12, and then if they had

8    already killed someone that, yes, they would be coming in

9    across the border, but I would say they were probably at that

11:39AM 10   point between 13 to 16.

11    Q.    But that was a new phenomenon that was being discovered in

12    2014 by the FBI, right?

13    A.    Yes.

14    Q.    Okay.  Now, between 2000, the early 2000 and 2012, would

15    you agree that MS-13 was mostly in hibernation?

16    A.    I would not agree with that.

17    Q.    Well, you started in the gang unit in 2004?

18    A.    2002.

19    Q.    2002, and this indictment was filed in 2016, right?

11:40AM 20   A.    Correct.

21    Q.    And the investigation began in 2012?

22    A.    Correct.

23    Q.    So if these MS-13 cliques existed between 2000 and 2012,

24    there weren't any prosecutions of them, right?

25    A.    Not federally, no.

1    Q.    Now, when you look at gang members, do you differentiate

2    between violent and nonviolent gang members?

3    A.    They are all violent to me.  A gang is a violent gang.

4    Q.    During the course of your investigation in this case, did

5    you categorize MS-13 gang members?

6    A.    What do you mean categorize?

7    Q.    Well, are you aware that there are peripheral gang members

8    of MS-13?

9    A.    Well, I believe I testified that you have your paros that

11:41AM 10   are the new brand new recruits, they're under observation, then

11   your chequeos, and then your homeboys.

12   Q.    I'm talking about homeboys.  Are there peripheral homeboys

13   that you're aware of?

14   A.    No, you're a homeboy.

15   Q.    Are there core members of the group that you're aware of?

16   A.    If you're a homeboy, you're a homeboy, sir.

17   Q.    Are there hard core members of the group that you're aware

18   of?

19   A.    Again, sir, if you're a homeboy, you're a homeboy.

11:41AM 20   Q.    So just one broad stroke, anyone who's a homeboy is hard

21   core?

22   A.    Yes, sir.

23   Q.    Are you aware that only about 5 percent of hardcore MS-13

24   members commit violent crimes?

25   A.    I would disagree with that, sir.

1    Q.   Well, you said that you've been studying this group since

2    2002.  Have you done any reading on it?

3    A.   Yes.

4    Q.   Have you read any books on it?

5    A.   Not books, no.

6    Q.   You've never read a book about MS-13?

7    A.   No, I've read the intelligence documents that the FBI puts

8    out.

9    Q.   So the source of your information has all been law

11:42AM 10    enforcement sources?

11   A.   And debriefing of or MS-13 gang members themselves.

12   Q.   Are you aware of a rule in MS-13, in the MS-13 gang, that

13   allows older members to step away from the gang life and

14   essentially retire or become comado (ph)?

15   A.    In my investigation, I knew things like that occurred, but

16   then by 2015, well, we had learned that the way to get out of

17   the gang was to find church, and then you were out of the gang.

18   Q.   I think you previously testified that although that was an

19   option, that you needed permission?

11:43AM 20   A.    Well, you had to go to the leaders and say I found church,

21   I found God, I want to leave the gang.

22   Q.   And that permission was rarely granted?

23   A.   No, no, I didn't say permission was rarely granted.  I

24   said that they would be granted permission.  I also said

25   that --

1    Q.    So --

2            THE COURT:  Don't interrupt him.

3    A.    At an East Coast Program meeting, the leader said surveil

4    those who have sought to leave the gangs through church and God

5    to make sure that they are, in fact, going to church, they are

6    following the way of God, because if not, then we will kill

7    them.

8    Q.    And so you're basing your information, your knowledge

9    about finding God based on what one of the leaders said?

11:43AM 10  A.    What the whole, all the leaders in that meeting were

11   agreeing to.

12   Q.    Well, prior to that, were you aware that that was a way

13   out of the gang?

14   A.    Well, like all gangs, I've known --

15   Q.    Sir, were you aware that that was a way out of the gang

16   prior to that?  Yes or no.

17   A.    What part?  The God?

18   Q.    Prior to that meeting, were you aware that finding God was

19   a way out of the gang?  Yes or no.

11:44AM 20  A.    Yes, I knew that finding God was a way out.

21   Q.    And were you aware that there were other ways out?

22   A.    At that point in the investigation, it was you either died

23   or you found God.

24   Q.    And that was in 2015?

25   A.    Correct.

1    Q.   What about from 2000 to 2015?  Was there another way that

2    you knew about as someone who is so knowledgeable about MS-13

3    if there was another way out?

4    A.   Well, again, in 2015, when I learned, I'm not sure when

5    finding God first came into place.  I knew that like other

6    gangs, MS-13, if you had been in long enough --

7    Q.   I'm concerned about --

8         THE COURT:  Please don't interrupt him.

9         MR. LOPEZ:  But, your Honor --

11:45AM 10         THE COURT:  Please.  I get to control the questioning

11   and answering, Mr. Lopez.  Don't interrupt me, or the witness.

12   Okay.  Please continue your answer.

13   A.   So I knew that like other gangs, senior long-term members

14   could get out in a retirement phase, but again, as I said, when

15   I took over the case, I became involved in the case, it was

16   finding God or you're dead.

17   Q.   So with respect to other gangs, you were aware that there

18   was a way to retire from gang life?

19   A.   I said other gangs and MS-13.  I said it was a broad range

11:45AM 20   of gangs.

21   Q.   So both other gangs and MS-13 members could retire,

22   correct?

23   A.   Yes.

24   Q.   Without finding God, correct?

25   A.   Yes.

1    Q.   And without being killed, correct?

2    A.   Yes.

3              THE COURT:  Let me -- are you changing to another

4    subject now?

5              MR. LOPEZ:  Yes, I am.

6              THE COURT:  Let's take a break.

7              THE CLERK:  All rise.

8              (A recess was taken.)

9              THE CLERK:  All rise for the jury.

12:00PM 10              (JURORS ENTERED THE COURTROOM.)

11              THE CLERK:  Thank you.  You may be seated.  Court is

12   now back in session.

13              THE COURT:  Mr. Lopez.

14              MR. MURPHY:  Thank you, your Honor.  May I approach

15   the witness, your Honor?

16              THE COURT:  Yes.

17   Q.   Agent, I've put a book before you entitled *Gangsters*

18   *Without Borders: An Ethnography of a Salvadoran Street Gang* by

19   Professor Thomas W. Ward?

12:01PM 20   A.   Yes, I see this, yes.

21   Q.   Have you seen that before?

22   A.   No.

23   Q.   I take it you haven't read it?

24   A.   No, sir.

25   Q.   And are you familiar with what an ethnographic study is?

1    A.   I am not, no.

2    Q.   Well, do you know what ethnography is?

3    A.   No.

4    Q.   Do you know whether it's a branch of anthropology that

5    involves trying to understand how people or cultures live?

6    A.   Again, I don't know.

7    Q.   Have you ever seen any other book on MS-13?

8    A.   I have not read any other books on MS-13.

9         MR. MURPHY:  Your Honor, I'd like to ask him about

12:02PM 10   some passages in this book.

11        THE COURT:  Well, I think we need a foundation under

12   Rule 803, 18(b).

13        MR. MURPHY:  Well, your Honor --

14        THE COURT:  I mean, he's not acknowledged as an

15   authority, and we don't have any other testimony.

16        MR. MURPHY:  Correct, but you can take judicial notice

17   of it.

18        THE COURT:  I'm not sure I can do that.  Let me see

19   that book.  Well, I'm not sure I can do that.  To do that, it

12:03PM 20   has to be beyond dispute.  I just don't know one way or the

21   other.  I don't think I can take judicial notice of it.

22   Q.   Now, directing your attention to CW-1 --

23   A.   Yes, sir.

24   Q.   So I just want to be clear, his mission was to take down

25   MS-13, right?

1    A.    No, that's my mission, sir.  His mission is to cooperate

2    with the Federal Government.

3    Q.    So your mission was to take down MS-13?

4    A.    My mission is to investigate violent street gangs, in this

5    case, MS-13, disrupt and dismantle them.

6    Q.    And CW-1 was authorized to lie, right?

7    A.    I'm not sure what you mean by that, sir.

8    Q.    Well, he was authorized to tell falsehoods to gang members

9    in order to induce them into making incriminatory statements,

12:04PM 10   right?

11   A.    I don't think we induced anyone, as you're trying to

12   reference.

13   Q.    Well, Mr. Murphy asked you some questions about whether or

14   not you believed the statements in the transcript that he

15   showed you and you said you didn't believe him?

16   A.    Oh, in that sense, absolutely, yes.

17   Q.    So he lied, right?  In your mind, he lied?

18   A.    Yes.

19   Q.    Because you didn't believe what he said in those tapes?

12:05PM 20   A.    Correct.

21   Q.    So he was authorized to lie?

22   A.    He's authorized to keep to his story of being an MS-13

23   gang member.

24   Q.    He was authorized to have a cover story?

25   A.    Yes.

1    Q.    And the cover story was a lie?

2    A.    Yes.

3    Q.    So he was authorized to lie?

4    A.    Yes.

5    Q.    And he was authorized to sell drugs?

6    A.    No, he did not sell drugs.

7    Q.    Oh, he was authorized to participate in protection

8    details?

9    A.    Correct.

12:05PM 10    Q.    And he wasn't authorized to sell drugs?

11    A.    No, we purchased drugs from targets, and then he did the

12    protection details.  That's not selling drugs to civilians.

13    Q.    And he was authorized to drive a gypsy cab?

14    A.    Yes.

15    Q.    And a gypsy cab is an illegal cab?

16    A.    Yes.

17    Q.    And you, the FBI, provided him with the very cab to do

18    that?

19    A.    Yes.

12:05PM 20    Q.    Now, he wasn't authorized to commit murder?

21    A.    Correct.

22    Q.    And he wasn't authorized to commit attempted murder?

23    A.    Correct.

24    Q.    Or assault with intent to murder?

25    A.    Correct.

1  Q.   Or robbery?

2  A.   Correct.

3  Q.   Or attempted robberies?

4  A.   Correct.

5  Q.   Now, was he authorized to bring Muerto and Brujo to the

6  Highland Street Park in Chelsea on May 12, 2015?

7  A.   We did not talk to him before that, no.

8  Q.   So he did that on his own?

9  A.   He did that with the gang, yes.

12:06PM 10  Q.   And then afterwards he told you that he really didn't do

11  anything?

12           MR. POHL:  Objection.

13           THE COURT:  I'm sorry, is there an objection?

14           MR. POHL:  Yes.

15           THE COURT:  Let me hear the question.

16           MR. LOPEZ:  I'll strike the question, your Honor.

17  Q.   Was he authorized to participate in that attempted murder

18  of Miner Ochoa?

19           MR. POHL:  Objection.

12:07PM 20           THE COURT:  I'll allow it.  Overruled.

21  A.   He was not participating when we interviewed him.  He said

22  he drove there and that Muerto stabbed the kid, but he did not

23  stab him.

24  Q.   Can you try to answer the question I asked instead of the

25  question you want me to ask?  The question is did you authorize

```
 1    him to participate in the attempted murder of Miner Ochoa?
 2    A.    No.
 3    Q.    And you learned later that he actually drove the person
 4    who stabbed Mr. Ochoa to the scene?
 5    A.    We found out almost immediately that yes, he was there.
 6    Q.    And he drove them from the scene?
 7    A.    Yes.
 8    Q.    Now, if Mr. Guzman had done that, Mr. Guzman could be
 9    charged with conspiracy to commit attempted murder, right?
10    A.    Yes.
11    Q.    But you didn't charge CW-1 with conspiracy to commit
12    attempted murder?
13    A.    No, we charged the stabber.
14    Q.    Who is now cooperating with the government?
15    A.    Yes.
16    Q.    So, this investigation began around March of 2012?
17    A.    I believe so, yes.
18    Q.    And the indictment was unsealed in January of 2016?
19    A.    Yes.
20    Q.    So nearly a four-year investigation?
21    A.    Correct.
22    Q.    And would you agree with me that all you needed for the
23    indictment to be filed was probable cause?
24    A.    I don't know if I can answer the way you're asking that
25    question.
```

```
 1   Q.   Are you aware of what the standard of proof is for an
 2   indictment?
 3          MR. POHL:  Objection.
 4          THE COURT:  Well, I mean you're asking him a legal
 5   principle.  To convict someone based on an indictment, it has
 6   to be proof beyond a reasonable doubt.  Put another question to
 7   the witness.
 8   Q.   You're an FBI agent?
 9   A.   Yes, sir.
10   Q.   For 18 years?
11   A.   Yes, sir.
12   Q.   And do you know what you need in order to get an
13   indictment issued?
14   A.   I know what I need.
15   Q.   And you need probable cause, right?
16   A.   Yes.
17   Q.   And that's to say a crime probably was committed?
18   A.   Correct.
19   Q.   And proof that something probably happened?
20   A.   To charge, yes.
21   Q.   It's not proof beyond a reasonable doubt?
22   A.   Correct.
23   Q.   Now, before the indictment was filed -- strike that.  Did
24   you conduct any investigation into Mr. Guzman's background
25   before the indictment was filed?
```

12:09PM (line 10)

12:09PM (line 20)

```
 1    A.   What kind of background?
 2    Q.   Well, you're an FBI agent.  You know how to do a
 3    background check, don't you?
 4    A.   Yes.
 5    Q.   Okay.  Did you do a background check of Mr. Guzman before
 6    you filed the indictment?
 7    A.   I had the evidence that the FBI had gathered over the
 8    course of the investigation, and that's what I had.
 9    Q.   Sir, we're going to try this again, and I'm going to ask
10    you to answer the question I asked, not the question you wanted
11    me to ask.  Did you conduct an investigation into Mr. Guzman's
12    background before you -- before the indictment was filed?
13    A.   Again, that's not a complete yes or no question.  I know
14    what you're trying to ask me, but the answer isn't a simple yes
15    or no the way you're asking, so --
16    Q.   Did you determine whether he was in the calmado stage in
17    his membership in the gang?
18    A.   Not at all, he was not.
19    Q.   Did you determine what age he was when he became a member?
20    A.   I did not.
21    Q.   Did you determine what age he was when he got a tattoo?
22    A.   I did not.
23    Q.   Did you determine whether he was married?
24    A.   I did not.
25    Q.   Did you determine whether he had two children?
```

12:10PM (line 10)
12:10PM (line 20)

1    A.    I had not.

2    Q.    Did you know that -- did you determine whether he had full

3    employment?

4              MR. POHL:  Objection.

5              THE COURT:  Sustained.

6    Q.    Did you know anything about his work history?

7              MR. POHL:  Objection.

8              THE COURT:  Sustained.

9    Q.    Did you know that he was a home owner?

12:11PM 10            MR. POHL:  Objection.

11             THE COURT:  Sustained.

12   Q.    Did you know that he was a taxpayer?

13             MR. POHL:  Objection.

14             THE COURT:  Sustained.  All right.  Let's move on.

15   Q.    Now, did he have any convictions or drug dealing?

16             MR. POHL:  Objection.

17             THE COURT:  Sustained.

18             MR. LOPEZ:  Your Honor, may I approach?

19             THE COURT:  No.

12:11PM 20   Q.    Now, Mr. Murphy talked about the green light that was put

21   on Herzzon Sandoval?

22   A.    I don't think we ever fully -- we got word that there was

23   a green light.  I don't know if we every got proof that there

24   was a full green light issued.

25   Q.    I don't want to quibble with you about interpreting the

1   evidence.  That's for the jury.  My question is that at some

2   point, you went and warned Mr. Sandoval, right?

3   A.   Yes, I did.

4   Q.   Now, in that meeting in December, 2015 in Virginia, there

5   was also discussion of Mr. Guzman, right?

6   A.   I thought the transcript I read was talking about Casper,

7   not your client, sir.

8   Q.   Do you know whether or not Mr. Guzman's name was raised in

9   that meeting?

12:12PM 10   A.   I'd have to read the whole transcript and not the excerpt

11   that was provided to me.

12   Q.   So as you sit here today, you don't know?

13   A.   I'd have to review it.  I don't remember.

14   Q.   So you don't know today, as you sit here?

15   A.   I don't remember.  If I had the transcript, I could easily

16   refresh my memory.

17   Q.   Well, I think you testified that Mr. Guzman was the second

18   in command?

19   A.   That is correct.

12:13PM 20   Q.   By the way, what are the duties of the second in command

21   based on your experience with respect to MS-13?  What exactly

22   do they do?

23   A.   They're the second in command.  He collected dues when he

24   was -- they were hosting meetings, and if Casper wasn't around,

25   he would be in charge, but Casper was here, and so Casper was

the first word, he was the second word.

Q.   So, his function was primarily ceremonial?

A.   No, it would be like a commander in the Army and the executive commander, the executive officer for the Army.

Q.   So you said that he collected dues?

A.   Yes.

Q.   And wouldn't the treasurer collect dues?

A.   No, not necessarily.

Q.   And I think you said that if Casper wasn't there, that he would run meetings?

A.   He could run meetings or he'd be someone who would issue commands.

Q.   Over the four-career investigation in this case, did you come upon any meetings that Mr. Guzman started and ran?

A.   Me, personally, no.  I don't know.

Q.   Now, after that meeting in Virginia among the MS leadership, no one warned Mr. Guzman that, as a leader, his life might be in danger as well, right?

A.   That is right.

Q.   Now, I think you said that this case -- in this case you targeted MS-13?

A.   Yes.

Q.   And you targeted Mr. Guzman?

A.   When I became included in the case, yes, and reviewing other reports and everything, he was a target from the start,

1    yes.

2    Q.    And you used CW-1 to target MS-13.

3    A.    Yes.

4    Q.    And you imbedded CW-1 into the Eastside clique?

5    A.    That's the clique that accepted him.  We didn't just say

6    this is a clique you're in.  He -- that's who recruited him

7    into the clique.

8    Q.    And you encouraged CW-1 to try to get Eastside clique

9    members to commit violent acts, right?

12:15PM 10    A.    No, I would not say he recruited people on the Eastside to

11    commit violent acts.

12    Q.    Have you really listened to the tapes in this case?

13    A.    Yes, I have.

14    Q.    And you don't have any memory of CW-1 ever encouraging

15    Muerto or Brujo or Tigre to commit violent acts against others?

16    A.    Not the way you're suggesting, no.

17    Q.    You don't have any memory of CW-1 complaining that

18    Mr. Guzman and Mr. Sandoval didn't want people to go out and

19    commit violent acts?

12:15PM 20    A.    I remember a meeting where Casper, Mr. Sandoval and

21    Mr. Guzman wanted the CW-1 and Muerto punished, disciplined for

22    talking to East Coast Program leaders.  And they made the case,

23    they made the pitch, the whole clique got to listen to the

24    responses, and the clique voted that, no, they should not be

25    punished.

1    Q.   Let me try again.  In your review of the tapes, you

2    haven't seen any conversations where Mr. Guzman and

3    Mr. Sandoval are telling clique members not to go out into the

4    street?

5    A.   To make sure that I understand your question properly, are

6    you saying that they are telling people not to go out and do

7    violent acts?

8    Q.   Yes.

9    A.   That's a tough -- let me think how to answer that question

12:16PM 10    because I know how you're getting, sir.  I remember

11    conversations where I believe it was Casper, he said, "We've

12    already done our dirt."  I remember conversations where they

13    issued a punishment.

14    Q.   Sir --

15         MR. LOPEZ:  Your Honor, can I move to strike this

16    answer?  It's not responsive to my question.

17    A.   I'm not sure where your question --

18         THE COURT:  Hold on.  Hold on.  The precise question

19    was have you seen conversations where Guzman and Sandoval are

12:17PM 20    telling clique members not to go out into the street?

21         MR. LOPEZ:  That's a --

22         THE COURT:  Go out into the street.  Answer the

23    question, go ahead.

24    A.   No, I would disagree.  I would say the orders were, you

25    know, you need to have your presence known out on the street.

1    I don't -- the way you're phrasing the question is difficult

2    for me to answer.

3           THE COURT:  All right.  Let's stop and put another

4    question.

5    Q.   Did CW try to get Mr. Guzman to commit crimes?

6    A.   I don't know if he had asked Mr. Guzman to participate in

7    the protection detail.  Again, I'm not sure what kind of crimes

8    you're talking about.  I don't know.

9    Q.   Well, with respect to the protection detail, do you know

12:18PM 10   whether Mr. Guzman refused to participate?

11   A.   I know that both Mr. Sandoval and Mr. Guzman did not

12   participate.

13   Q.   Because they were working?

14          MR. POHL:  Objection.

15          THE COURT:  I'll let you say whatever was on the

16   tapes.

17   A.   I don't know the answer of why they did not participate.

18   I wasn't --

19   Q.   Well, as part of your investigation, wouldn't that be

12:18PM 20   important to know whether or not they were actively

21   participating in crimes?

22   A.   I knew they were actively participating in crimes.

23   Q.   During the course of this investigation?

24   A.   Yes.  Being the leaders of the gang --

25          THE COURT:  Stop.  Okay.  Put another question to him.

1          MR. MURPHY:  The last answer, your Honor.

2          THE COURT:  The last bit will be struck, yes.  Go

3    ahead.

4    Q.   Now, you encouraged CW-1 to get Joel Martinez, the Animal,

5    into the Eastside clique, right?

6    A.   We directed the CW to ask if the clique would accept him

7    into that clique, yes.

8    Q.   Well, I don't want to get into semantics here, but by

9    suggesting to CW-1 to get him into the clique, you wanted him

10   to succeed, right?

11   A.   I wanted to see if the clique leaders would accept Animal

12   into the clique.

13   Q.   So you encouraged CW to try to do that?

14   A.   We asked the CW, we listened to a phone call where Casper

15   talks to Animal, and he says, "Come up here so we can observe

16   you."

17   Q.   And CW persuaded Muerto to support Animal getting brought

18   into the clique, right?

19   A.   I don't know where Muerto came in other than I do know

20   that Muerto went down with the CW to bring Animal back.

21   Q.   You are the lead case agent on this case, right?

22   A.   Oh, yes.

23   Q.   Okay.  And Mr. Guzman was against the idea of Mr. Martinez

24   being jumped into the clique, right?

25   A.   I would say no to the way you phrased that question.

1   Q.   Is Mr. Guzman on any tape saying that he wants

2   Joel Martinez to be brought into the clique that you're aware

3   of?

4   A.   I know that in the jump-in meeting, he's a participant of

5   that meeting and he's all for it.

6   Q.   Well, the tape that you played doesn't show him, right?

7   A.   Oh, I think it does.  I remember that someone said,

8   pointed him out to me two -- a little over two years ago.

9   Q.   So what you're saying, if I understand correctly, is that

12:21PM 10   his mere presence indicated his approval, correct?

11   A.   It was more than his presence, he welcomed him into the

12   MS-13 gang.

13   Q.   Well, let's talk about that because that's where I was

14   going.  Now, early on in this case you --

15          MR. POHL:  Judge, objection.

16          THE COURT:  There's no question yet.

17   Q.   You believed that it was Mr. Guzman who said when

18   Mr. Martinez was jumped in, "Welcome to the Mara," right?

19          MR. POHL:  Objection.

12:21PM 20          THE COURT:  I'll allow that.

21   A.   Yes.

22   Q.   And you've subsequently learned that wasn't him, right?

23   A.   I have not learned that, no.

24   Q.   You have not learned that?

25   A.   My impression was he was there and he welcomed him to the

1  Mara.

2  Q.   So if you're wrong about that, that would be news to you

3  as the lead case agent, right?

4  A.   The last I remember is he was there welcoming him into the

5  Mara like the rest of the gang.

6  Q.   But did he say the words "Welcome to the Mara"?

7  A.   That's what I was told, yes.

8  Q.   That's what you were told?

9  A.   Yes, I don't speak Spanish.

12:22PM 10  Q.   Okay.  Now, would it be fair to say that this prosecution

11  has been good for your career?

12          MR. POHL:  Objection.

13          THE COURT:  It's pretty argumentative.  Sustained.

14  Q.   Well, in 2016, you were promoted to supervisory special

15  agent?

16  A.   I was.

17  Q.   And that position came with a pay raise?

18  A.   Not a very big one.

19  Q.   But a pay raise, nonetheless?

12:23PM 20  A.   Yes.

21  Q.   And a higher profile within the FBI?

22  A.   Actually, I thought I had a higher profile as a case agent

23  than I do as a supervisor.

24  Q.   And that's led to speaking engagements?

25  A.   I was speaking before I became a supervisor.

1    Q.    And attendance at conferences?

2    A.    I was doing that long before I ever became a supervisor.

3    Q.    And you've hosted conferences here in Boston?

4    A.    I have hosted, yes.

5    Q.    And you've talked on the campus of the University of

6    Maryland, you've talked on the campus of Boston College, right?

7    A.    I have.

8    Q.    And in 2017, you went to the annual meeting of the

9    International Association of Chiefs of Police held in

12:23PM 10  Philadelphia, and you gave a briefing on the FBI Gang Task

11   Force, right?

12   A.    Yes.

13   Q.    And specifically the work that you did in this case?

14   A.    Well, specifically for the work the task force did, not

15   just me.

16   Q.    Now, you've previously testified that CW-1 was going to be

17   charged with a Hobbs Act robbery, right?

18            MR. POHL:  Objection.

19            THE COURT:  Sustained.

12:24PM 20        MR. LOPEZ:  May I approach, your Honor?

21            (THE FOLLOWING OCCURRED AT SIDEBAR:)

22            THE COURT:  Well, to begin, his prior testimony is

23   hearsay, but where are you going in terms of relevance?  In

24   other words, you start with asking about previous testimony is

25   x.

1           MR. LOPEZ:  It's inconsistent with his current

2     testimony that he --

3           THE COURT:  We've heard nothing about Hobbs Act.

4           MR. LOPEZ:  Well, about whether or not CW-1 was going

5     to be charged for the robberies that he did with Clacker and he

6     testified here that he wasn't going to be charged, and he

7     testified previously twice and in the affidavits to the Court

8     to get a search warrant that he was going to be charged.

9           THE COURT:  First off, Hobbs Act is extortion, not

12:25PM 10     robbery, but, anyway, tell me where you're going with this.

11           MR. LOPEZ:  It's inconsistent testimony.

12           THE COURT:  All right.  Mr. Pohl.

13           MR. POHL:  I don't recall any testimony in this trial

14     about, you know, the nature of the charge or any of that.  I

15     think we left all of that out because we, you know, I think as

16     we talked about -- I think this came on Friday, it became

17     relevant because of the connection in the November trial with

18     Clacker and the fact that that came up together, but in this

19     trial we haven't talked about it.  We've had a generic

12:25PM 20     disclosure that there was an unauthorized activity while he was

21     cooperating, but that was --

22           THE COURT:  I don't remember any testimony about him,

23     whether he would be charged or not charged.

24           MR. POHL:  I agree.

25           THE COURT:  So --

1       MR. LOPEZ:  He didn't testify on direct that the CW

2   wasn't charged, that a decision subsequently was made not to

3   charge him?

4       THE COURT:  Even assuming that's true, although I

5   don't remember.  Let's assume it's true.  How is it

6   inconsistent that at one point he thought that the person would

7   be charged?  How is that inconsistent?

8       MR. LOPEZ:  Your Honor, if the plan was to charge him,

9   and it didn't happen.

12:26PM 10       THE COURT:  That's not a prior inconsistent statement

11   though.  That just means your plan didn't -- you know, somebody

12   overruled him or he changed his mind.

13       MR. LOPEZ:  Then he should have qualified his

14   testimony under oath that he might be charged, not that he will

15   be charged.

16       THE COURT:  I'm not following the whole thing, so

17   sustained.

18       (SIDEBAR CONFERENCE WAS CONCLUDED)

19   Q.   Now, I think you testified earlier that when the

12:27PM 20   translations that we've seen in this case, when they were done,

21   CW-1 actually had a role in determining the accuracy of the

22   tape?

23   A.   He would provide to non-El Salvadorian speaking Spanish

24   translators the slang that El Salvadorians used, so when they

25   would go through, they could understand what was being said.

1    Q.   And did people believe them when he told them those words?

2         MR. POHL:  Objection.

3         THE COURT:  Sustained.

4         MR. LOPEZ:  No further questions.

5         THE COURT:  Redirect.  Thank you, your Honor.

6                    REDIRECT EXAMINATION

7    BY MR. POHL:

8    Q.   Good afternoon, Special Agent Wood.

9    A.   Good afternoon, sir.

12:28PM 10    Q.   I only have a few questions for you.  There's been a

11   couple inquiries on cross-examination concerning the period of

12   time after the FBI recorded Animal on its -- on a video

13   recording talking about the Irvin De Paz murder and the time

14   that he was arrested.  So can I ask you, you and members of the

15   task force did have conversations with the Boston Police

16   Department about that, correct?

17   A.   We did.

18   Q.   All right.  And Mr. Murphy suggested you could have simply

19   given a picture of Mr. Martinez to the Boston Police

12:29PM 20   Department.  You've been an investigator for 18 years, correct?

21   A.   Yes.

22   Q.   All right.  And in your capacity as a federal law

23   enforcement agent, you're often called upon to meet with state

24   and local counterparts, correct?

25         THE COURT:  You're not allowed to lead.  Sustained.

1          MR. POHL:  Thank you.

2     Q.   In the 18 years that you've been a special agent, have you

3     met with state and local counterparts coordinating

4     investigations?

5     A.   I have.

6     Q.   All right.  And during those conversations, what kind of

7     information -- can you just tell the jury something about that?

8     When those meetings occur, what type of information are you

9     typically exchanging?

12:29PM 10          THE COURT:  Are you talking about in general or in

11     this case?

12     Q.   Well, let's make it specific in this case.  What kind of

13     information would you be exchanging in this case?

14          MR. MURPHY:  Objection, your Honor.

15          THE COURT:  I'll allow that as a very general matter.

16     A.   We would provide information that we have evidence now

17     helping solve different crimes and that we're working towards

18     indictments and we're just trying to share information that we

19     can share that's allowed by the Attorney General.

12:30PM 20     Q.   And one of the pieces of information in this case was the

21     recording?

22     A.   Yes.

23     Q.   All right.  And when you had -- when you and the members

24     of the task force had those meetings, were you in a position to

25     provide them, the FBI, with that recording?

1  A.   No.

2       MR. MURPHY:  Objection, your Honor.

3  Q.   And why not?

4       THE COURT:  I'll allow that.

5  Q.   Why not, Special Agent Wood?

6  A.   Because it would expose the identity of our cooperating

7  witness, and by the Attorney General rules, we can't release

8  that information without certain authority from higher-ups.

9  Q.   Was -- well, do you know when Joel Martinez was arrested

12:31PM 10  in this case?

11  A.   I believe the take-down was January 29, 2016, so our

12  arrest for most of the subjects in this case were on that day,

13  but we had fugitives that were in New York, New Jersey, other

14  parts of the country that we had to track down.

15  Q.   To the best of your knowledge as you sit here today, do

16  you remember when Joel Martinez was arrested in this case?

17  A.   On that day, which would have been -- I believe it was

18  January 29, 2016.

19  Q.   There was some questions during cross-examination about

12:31PM 20  the difference between a cooperating witness and a cooperating

21  defendant.  I want to talk to you about that for just a few

22  minutes.  In the course of your career as an FBI Special Agent,

23  can you tell the jury what it is that you mean when you used

24  the term "cooperating witness"?

25  A.   It's a very broad term.  The FBI has confidential

1    informants.  One branch is a CI confidential informant that

2    just provides information but no evidence.  You have to prove

3    what they tell you, it's just kind of information.  Your

4    cooperating witness actually gathers evidence that we can then

5    bring here for you to review.

6           So that's -- in this case, we used a cooperating

7    witness, not a confidential informant.

8    Q.   Okay.  Now, that's a cooperating witness?

9    A.   Correct.

12:32PM 10   Q.   Okay.  All right.  A "cooperating defendant."  Have you

11   heard that term used in the course of your career as a FBI

12   Special Agent?

13   A.   Yes, I have.

14   Q.   All right.  So what's the difference between a cooperating

15   witness -- well, first of all, what is a cooperating defendant?

16   A.   It's somebody that we have indicted, has been charged and

17   now they're seeking consideration on their sentence for

18   cooperating with the government.

19   Q.   Okay.  So, we've testified -- you've testified I think

12:33PM 20   several times concerning the protection details?

21   A.   Yes.

22   Q.   All right.  And so you personally were on surveillance for

23   the October 2014 protection detail, correct?

24   A.   I was, yes.

25   Q.   And that protection detail involved a cooperating witness,

1    correct?

2    A.    Yes.

3    Q.    And that was who?

4    A.    Pelon.

5    Q.    Okay.  And during the course of your surveillance on the

6    October 2014 protection detail, did you see or learn whether or

7    not Jose Hernandez Miguel was present?

8    A.    Yes.

9    Q.    All right.  And Jose Hernandez Miguel is who?

12:33PM 10   A.    Muerto.

11   Q.    And at the time -- and was Jose Hernandez Miguel the only

12   MS-13 gang member present on that protection detail?

13   A.    No.

14   Q.    All right.  And you may not have been physically present

15   for the protection detail before and the protection detail

16   after, correct?

17   A.    That's correct.

18   Q.    You've certainly reviewed the reports and recordings of

19   those protection details, correct?

12:34PM 20   A.    I have.

21   Q.    All right.  Was Jose Hernandez Miguel, to the best of your

22   knowledge, involved in all three of the protection details?

23   A.    Yes.

24          MR. MURPHY:  Objection.

25          THE COURT:  Sustained.  The answer will be struck.

1    Q.   Well, let me ask the question this way, Special Agent

2    Wood.  You've talked in the protection details about a

3    cooperating witness being represent for the protection detail

4    you were on, correct?

5    A.   Yes.

6    Q.   And you used undercover police officers, correct?

7    A.   Yes.

8    Q.   All right.  Sort of at the front and at the back?

9    A.   Yes.

12:34PM 10    Q.   All right.  Is there any other cooperating witness

11    involved in the October 2014 protection detail?

12    A.   No.

13    Q.   I think you were asked about the location of the ESLS

14    clique meetings earlier today.  At the time -- are you aware of

15    whether or not ESLS had clique meetings in other locations

16    other than the garage that we've seen in Exhibit 1?

17    A.   Yes.

18    Q.   All right.  You became the case agent in 2015?

19    A.   Yes.

12:35PM 20    Q.   All right.  At the time -- at your time in 2015, beginning

21    in 2015, was there -- where were the locations where ESLS held

22    its clique meetings?

23    A.   The garage in Everett.

24    Q.   All right.  To the best of your knowledge, as you sit here

25    today, do you recall any other locations besides that garage

1    that we've seen in Exhibit 1 being the location of where ESLS

2    had its clique meetings?

3    A.    I knew in one of the meetings they were outside of that

4    garage, but when I was present, all the meetings occurred at

5    that location in Everett.

6    Q.    And you testified I think on -- you were asked on

7    cross-examination concerning recordings and how you made

8    recordings in this case.  Special Agent Wood, both in terms of

9    the time you've had as the case agent and reviewing some of the

12:36PM 10    evidence that was gathered before you became a case agent,

11    could you estimate, as you sit here today, how many hours of

12    recordings the FBI made in connection with this investigation?

13    A.    A few thousand, if not more.  It was -- we made lots of

14    tape, we had -- as talked about with the consensual Title III

15    where the CW allowed us to intercept his phone calls.  That's

16    just hours upon hours of recordings.

17    Q.    And were there occasions when CW-1 advised you of a

18    meeting that you were not able to record it?

19    A.    Yes.

12:37PM 20    Q.    All right.  How frequently did that happen?

21    A.    It happened quite frequently.

22    Q.    In 2015, Special Agent Wood, I think you testified that

23    the pace of the recordings of ESLS had sort of picked up?

24    A.    Yes.

25    Q.    And one of the meetings you recorded involving a beating,

1    correct?

2    A.   Yes.

3    Q.   Involved a beating.  So I want to take a step back, not

4    talk specifically about the case but about your experience with

5    MS-13 and your conversations that you've had with other law

6    enforcement agents in El Salvador and throughout the country,

7    all right.

8         What can you tell the jury about the -- what kind of

9    person would be allowed into an MS-13 clique meeting?

12:38PM 10         MR. MURPHY:  Objection, your Honor.

11         THE COURT:  Sustained without a foundation.

12   Q.   Well, let me start -- maybe I'll start specifically with

13   the garage recording.  You've reviewed the clique, the recorded

14   meetings of ESLS at least in 2015, correct?

15   A.   Yes.

16   Q.   All right.  What time of night -- what time of day would

17   those meetings typically begin?

18   A.   It was at night.

19   Q.   All right.  And were you in a position through

12:38PM 20   surveillance to identify the people that were coming and going

21   from the garage?

22   A.   No.

23   Q.   Were you in a position to tell from your review of the

24   recordings whether the garage was closed or open?

25   A.   I believe the garage was closed.

1   Q.   And so were you -- and can you describe, when you looked

2   at the recordings, sort of what you -- how the meetings that

3   you recorded in the ESLS garage would commence?

4   A.   I believe I testified that Casper would bring them

5   together and form a group where, instead of people being here,

6   there, talking, they all came together as a group.

7   Q.   Well, let me put it this way.  What is the -- the clique,

8   the clique, itself, right, the unit of a clique, how -- well,

9   when you testified about the sort of structure of MS-13

12:40PM 10   previously, what's the relationship between the clique and say

11   a larger program?

12           MR. MURPHY:  Objection, your Honor.

13           THE COURT:  Overruled.

14           MR. MURPHY:  Would my objection stand, your Honor?

15           THE COURT:  Yes.

16   A.   The clique would report to regional East Coast or program

17   leaders, who would then report to the United States program

18   leader, who would report back to El Salvador.

19   Q.   And based on your work on this investigation and

12:40PM 20   conversation with other agents, does MS-13 require cliques to

21   have meetings?

22   A.   Yes, yes.

23   Q.   Okay.  And are those meetings open to the public?

24   A.   No.

25   Q.   So, what kind of people would be at a clique meeting?

```
 1    A.    Homeboys.
 2          MR. MURPHY:  Objection.  Hearsay.
 3          THE COURT:  Sustained.
 4    Q.   Special Agent Wood, Mr. Murphy, on cross-examination,
 5    asked you some questions about recordings that the FBI picked
 6    up in 2015 concerning conversations about Casper, correct?
 7    A.   Yes.
 8    Q.   Do you remember that?  All right.  And some of those
 9    conversations discussed what would happen to Casper, correct?
10    A.   Yes.
11    Q.   All right.  Well, let me say this, Special Agent Wood.  I
12    think you testified earlier that MS-13 has gang rivals,
13    correct?
14    A.   Yes.
15    Q.   Okay.  And based on your work on this investigation, your
16    time in El Salvador, your conversations with other agents,
17    debriefing of cooperating witnesses and defendants, what does
18    MS-13 have to do to seek permission to kill a rival?
19          MR. MURPHY:  Objection, your Honor.
20          THE COURT:  Is this someone in another gang?
21          MR. POHL:  Yes, not MS-13.
22          THE COURT:  All right.  I'll permit this testimony,
23    again, as a general matter about how MS-13 -- the witness
24    believes MS-13 ordinarily operates.  Go ahead.
25    A.   If there's a question of the identity, or -- if this
```

1    person is, they're not sure if the person is a member of the

2    gang, they need to get permission from their leaders, but there

3    is a standing order that if they have solid proof and they

4    could safely get away with it, kill the person on sight.  If

5    they know that's an 18th Street gang member and they would have

6    their own little photographs that they collected from Facebook

7    or other social media, so they would know who was in a rival

8    gang, so if they saw them, they could assault them.

9    Q.   Well, if you had say conversations or recordings which

12:43PM 10    discussed whether and how to discipline somebody and if the

11    conversations involved other MS-13 gang members, what

12    conclusion would you draw concerning whether or not that person

13    that was the subject of the conversation would be in the MS-13

14    gang?

15         MR. MURPHY:  Objection.

16         THE COURT:  Sustained.

17    Q.   One or two last questions, Special Agent Wood.  You

18    discussed the process by which the recordings were sort of

19    formed into transcripts, correct?

12:44PM 20    A.   Yes.

21    Q.   All right.  And can you tell the jury -- well, at the risk

22    of going over old ground for one second, how many other agents

23    on the task force speak Spanish that were working on this case?

24    A.   Only Trooper Depena and Trooper Estevez, I believe, are

25    Spanish speakers from the task force.

1    Q.    All right.  And you've reviewed many of the recordings

2    that took place, that were made in 2015, correct?

3    A.    Yes.

4    Q.    And let's talk about the clique meetings themselves.  It's

5    fair to say that many of those are multi-party conversations,

6    correct?

7    A.    Yes.

8    Q.    Okay.  And it's fair to say that many of the recordings in

9    2015 were not multi-party conversations?

12:44PM 10    A.    Yes.

11    Q.    All right.  Mr. Murphy pulled up an example, I think, of

12    Exhibit 103.  This is the conversation with CW-1 and Animal,

13    correct?

14    A.    Yes, sir.

15    Q.    All right.  And that conversation -- just to remind the

16    jury, where did that conversation take place?

17    A.    In the CW's vehicle.

18    Q.    Okay.  And where was Animal seated in the vehicle?

19    A.    In the passenger's seat.

12:45PM 20    Q.    And in addition to that, I think you testified -- there

21    are other examples in 2015 like that of conversations you

22    gathered in this investigation from CW-1's car, correct?

23              MR. MURPHY:  Objection.

24              THE COURT:  Yes, not the content of the investigation,

25    but you can answer the question as to how it was gathered.  Go

1    ahead.

2    A.    Yes.

3    Q.    I'm putting up what's previously been admitted, your

4    Honor, as Exhibit Number 108.  Do you remember that photograph,

5    Special Agent Wood?

6    A.    Yes.

7    Q.    Who was seated in the passenger seat?

8    A.    That's Mr. Sandoval.

9    Q.    And that photograph came from a conversation that was

12:46PM 10    recorded in 2015?

11    A.    It did.

12    Q.    And what were the circumstances of that conversation being

13    recorded?

14    A.    This is where the CW, Mr. Sandoval, and Animal have a

15    telephone conversation.

16    Q.    All right.  Mr. Sandoval is in CW-1's car?

17    A.    Yes.

18    Q.    And seated where?

19    A.    In the passenger seat.

12:47PM 20    Q.    You were asked a couple questions about the -- I guess

21    what we'd call the jump-in video, the jump-in from January 8,

22    2016.  Do you recall those questions?

23    A.    Yes, I remember.

24    Q.    And we played -- you saw an excerpt of that video,

25    correct?

1    A.   Yes.

2    Q.   All right.  Prior to your testimony here today, have you

3    reviewed, maybe not all, but many of the recordings that were

4    made in 2015?

5    A.   Yes.

6    Q.   All right.  What can you tell the jury about the full

7    length of the full Animal jump-in video?

8    A.   It was a couple hours.  It wasn't just that.  It was a

9    longer period.

12:47PM 10    Q.   You were asked a couple questions, I think both by

11    Mr. Norkunas and Mr. Lopez, about nicknames?

12    A.   Yes.

13    Q.   During your time in 2015 to today, you've reviewed reports

14    of this case, correct?

15    A.   I have.

16    Q.   And transcripts, correct?

17    A.   I have.

18    Q.   And it's fair to say that -- well, do many of those

19    transcripts contain the gang names or nicknames of the

12:48PM 20    defendants throughout this case, not just seated in this

21    courtroom?

22    A.   Yes.

23    Q.   All right.  Are the spellings always consistent?

24    A.   No.

25    Q.   All right.  When you hear the name CheChe spelled

1    C-h-e-C-h-e --

2    A.    Yes.

3    Q.    -- and C-h-e-C-h-a?

4    A.    Yes.

5    Q.    -- do those names describe the same person?

6            MR. NORKUNAS:  Objection, Judge.

7            THE COURT:  Sustained.

8            MR. POHL:  Can I have just one moment, your Honor.

9    Thank you.

12:49PM 10           THE COURT:  Mr. Iovieno, recross.

11           MR. IOVIENO:  No, your Honor.

12           THE COURT:  Mr. Norkunas.

13           MR. NORKUNAS:  No, Judge.

14           THE COURT:  Mr. Murphy.

15           MR. MURPHY:  Briefly, your Honor.

16                    RECROSS-EXAMINATION

17   BY MR. MURPHY:

18   Q.   Special Agent Wood, you were not at the meetings between

19   the task force --

12:50PM 20           THE COURT:  I'm sorry.  If you're going to examine

21   from over there, can you make sure --

22           MR. MURPHY:  I'll move over here.

23           THE COURT:  Okay.  Thanks.

24   Q.   Mr. Pohl asked you about coordinating with the Boston

25   Police Department after you had learned that Joel Martinez

1  killed Mr. De Paz, correct?  You recall those questions?

2  A.   Yeah, I remember those questions, yes.

3  Q.   You didn't participate in that meeting, correct?

4  A.   There were several meetings, and I did participate in one.

5  Q.   When was that meeting?

6  A.   It was -- the one I participated in, I believe, was in

7  November of 2015.

8  Q.   Did you write a report about that?

9  A.   No.

12:50PM 10  Q.   Is there any record at all of what was discussed in that

11  meeting to your knowledge?

12  A.   No.

13  Q.   And by the time of that meeting, where was Mr. Martinez?

14  A.   New Jersey.

15  Q.   Did you personally meet with the Boston Police Department

16  and tell them that Mr. Martinez was back?

17  A.   No.

18  Q.   You did not, I think we've already established, provide a

19  photograph of Mr. Martinez to the Boston Police Department so

12:51PM 20  that they could use it in a photo array, correct?

21  A.   I did not, no.

22  Q.   And it's not your testimony, is it, sir, that there is

23  some set of Attorney General or Department of Justice or FBI

24  guidelines that says that you couldn't have shared the

25  photograph you had of Joel Martinez with the Boston Police

1   Department?

2   A.   No, I never testified to anything like that, no.

3   Q.   I just wanted to make that clear, sir.  You testified that

4   Mr. Martinez was arrested in connection with this case in late

5   January of 2016?

6   A.   Yes.

7   Q.   Did the FBI investigate -- you can just answer this yes or

8   no with the Court's permission.  Did the FBI investigate a

9   crime that occurred on December 27, 2015 in connection with

12:52PM 10  this case?

11  A.   You'd have to be more specific for me to answer that

12  question.

13  Q.   Do you know whether, in this indictment, there are charges

14  relating to a stabbing that took place on December 27, 2015?

15  A.   If you're referencing two stabbings that occurred around

16  the holidays, I am aware of two stabbings, and I'm familiar

17  with the stabbings, yes.

18  Q.   And who participated in those stabbings?

19            MR. POHL:  Objection.

12:53PM 20            THE COURT:  Sustained.

21            MR. MURPHY:  Thank you, your Honor.

22            THE COURT:  Mr. Lopez.

23            MR. LOPEZ:  No questions, your Honor.

24            THE COURT:  Thank you.  You may step down.

25            THE WITNESS:  Thank you, your Honor.

1          THE COURT:  All right.  We have eight minutes to go.

2     I don't ordinarily like to break early.  Are we on track,

3     Mr. Pohl?

4          MR. POHL:  Maybe after the break we could talk about

5     the schedule for tomorrow.

6          THE COURT:  Okay.  We'll break early then rather than

7     have -- instead of eight minutes of testimony.  Ladies and

8     gentlemen, remember my caution not to discuss the case among

9     yourselves or with anyone else, and we'll see you tomorrow at

12:53PM 10     9:00.

11          THE CLERK:  All rise.

12          (JURORS EXITED THE COURTROOM.)

13          THE COURT:  Mr. Pohl, the previous record in my

14     courtroom when the lawyers says one or two more questions is

15     17, and I'm pretty sure you blew past that.  I'll have to count

16     from the transcript.

17          All right.  What is tomorrow's lineup?

18          MS. LAWRENCE:  Oh, the lineup for tomorrow, yes, we

19     have three police officers, we have Sergeant Detective Robert

12:54PM 20     Impemba, Trooper Shawn Riley and Trooper Carlos Rivera will be

21     the first three witnesses who will be taking the stand.

22          THE COURT:  We'll be on a normal break schedule again

23     tomorrow.  Again, I guess I should check with defense counsel,

24     on everyone's assurance that we are on track, we are not

25     following behind.

1          MR. POHL:  I was going to supplement what Ms. Lawrence

2    said.  I doubt that those three witnesses are going to take us

3    through tomorrow.  They're short.  I expect we'll provide

4    additional names to defense counsel about that.

5          THE COURT:  All right.

6          MR. POHL:  So I think if the Court was looking at the

7    witness list and looking at the time and thinking and sort of

8    calculating that all of those people might, if those were all

9    rough estimates, that we'd be long.

12:55PM 10          THE COURT:  I can't do that because the first few

11   witnesses tend to be the lengthiest.  You tend to call the most

12   important witnesses, and it tends to have the most

13   cross-examination, but, you know, we'll have to see how it

14   goes.

15          MR. POHL:  I think we'll be moving rapidly tomorrow,

16   your Honor.

17          THE COURT:  Mr. Murphy.

18          MR. MURPHY:  Can we have a sidebar, your Honor?

19          THE COURT:  Yes.

12:56PM 20          (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

21          MR. MURPHY:  During the break, I was approached by a

22   woman in the back of the courtroom, whose name apparently is

23   Michelle McPhee asking me for the exhibits that were offered by

24   the defense and admitted during the case.  She told me, I have

25   no idea whether this is true --

1          THE COURT:  Is this a radio person, Michelle McPhee?

2          MR. MURPHY:  I'm afraid I think it is, your Honor.  I

3    wish I hadn't said that on the transcript now.  She asked me

4    for a copy of the exhibits that had been admitted by the

5    defense and told me that the government had given the admitted

6    exhibits to her.  I don't know whether that's true or not, but

7    I'm not -- I know it's a hassle for the Court sometimes to give

8    press access to admitted exhibits.  If it would be helpful to

9    the Court, I'd be happy to give her copies of the ones that

12:56PM 10   were admitted, but I just want to make sure that, Number 1, I'm

11   not misunderstanding what's previously happening, and,

12   Number 2, that I'm not doing something that's going to run

13   afoul of any concern the Court or the government would have.

14         THE COURT:  Well, I guess, you know, it's a public

15   proceeding.  The exhibits are supposed to be public.  I don't

16   know whether I can restrict anyone's access to it.  I don't

17   have to order anyone to be helpful, but I don't know that I can

18   restrict it either.

19         Mr. Pohl, do you want to weigh in?

12:57PM 20         MR. POHL:  We've had not just from Ms. McPhee but I

21   think from one or two other news organizations, we've had sort

22   of requests sort of on a daily basis to make available, request

23   to our press office to make available publicly admitted items,

24   and so we've been getting them on a daily basis, and now

25   Mr. Murphy has had their first one.

1          MR. MURPHY:  From our end of it, there is a protective

2     order that we're not allowed to distribute the record.

3          THE COURT:  Well, I think it certainly was my intent

4     that whatever the protective order did or didn't do, it doesn't

5     apply to exhibits.  Again, it's a public proceeding.  I mean, I

6     think I have to make pretty specific findings to seal them.

7     I'm happy to talk about that as a framework, but there is a

8     press right of access to trials.

9          MR. POHL:  I think so far, I don't think there's

12:58PM 10     anything that I have concerns with the protective order about,

11     but I think it's possible that tomorrow if we get to a

12     cooperating witness, I think the jury would want to see an

13     unredacted version of the plea and cooperation agreement, and

14     that would be something that I would be concerned about

15     disclosing publicly.

16          THE COURT:  I'm going to want that briefed again

17     because it's, you know, again, there's a press right, and, you

18     know, under *Richmond Newspapers* and that line of cases and

19     First Circuit cases argued by Mr. Murphy's former partner,

12:58PM 20     Jonathan Albino, as to *The Globe's* right of access, I'm very

21     unclear what I have power to seal, and, if so, under what

22     circumstances, so I'm going to need guidance from the parties

23     and the government.  My assumption is everything is certainly

24     public to start with.

25          MR. POHL:  Well, I'll start by talking about it with

1    counsel, and we can talk about it in the morning.

2              THE COURT:  Okay.  But, again, even if counsel agree

3    doesn't necessarily answer the question.

4              MR. POHL:  Right.

5              MR. MURPHY:  Thank you, your Honor.

6              THE COURT:  Thank you.  8:30 tomorrow.

7              THE CLERK:  All rise.

8              (Whereupon, the hearing was adjourned at 12:59 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7            I do hereby certify that the foregoing transcript was

8    recorded by me stenographically at the time and place aforesaid

9    in Criminal Action No. 15-10338-FDS, UNITED STATES vs. HERZZON

10   SANDOVAL, et al., and thereafter by me reduced to typewriting

11   and is a true and accurate record of the proceedings.

12            Dated this 7th day of June, 2018.

13                      s/s Valerie A. O'Hara

14            _____

15                      VALERIE A. O'HARA

16                      OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25