1               UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS

2

3

UNITED STATES OF AMERICA        )
4                              )
    vs.                      )  Criminal Action
5                              )
    HERZZON SANDOVAL,          )  No. 15-10338-FDS
6    EDWIN GUZMAN,             )
    CESAR MARTINEZ,           )
7    ERICK ARGUETA LARIOS,     )
                 Defendants    )

8

9

BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
10

11

                  JURY TRIAL DAY 6
12

13

14

     John Joseph Moakley United States Courthouse
15                Courtroom No. 2
               1 Courthouse Way
16               Boston, MA 02210

17              February 6, 2018
                9:00 a.m.
18

19

20

21

22

23              Valerie A. O'Hara
             Official Court Reporter
     John Joseph Moakley United States Courthouse
24          1 Courthouse Way, Room 3204
             Boston, MA 02210
25          E-mail: vaohara@gmail.com

1     APPEARANCES:

2

3     For The United States:

         United States Attorney's Office, by CHRISTOPHER J. POHL,

4   ASSISTANT UNITED STATES ATTORNEY, and KELLY BEGG LAWRENCE,
ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200,

5   Boston, Massachusetts 02110;

6     For the Defendant Herzzon Sandoval:

7         Foley Hoag LLP, by MARTIN F. MURPHY, ESQ. and
MADELEINE K. RODRIGUEZ, ATTORNEY,

8   155 Seaport Boulevard, Boston, Massachusetts 02210;

9     For the Defendant Edwin Guzman:

10        Lawson & Weitzen, by SCOTT P. LOPEZ, ESQ.,
    88 Black Falcon Avenue, Suite 345, Boston, Massachusetts 02210

11

12    For the Defendant Erick Argueta Larios:

13       THOMAS J. IOVIENO, ESQ., 345 Neponset Street
    Canton, MA 02021;

14    For the Defendant Cesar Martinez:

15       Stanley W. Norkunas, 11 Kearney Square,
    Howe Building, Suite 202, Lowell, Massachusetts 01852.

16

17       ROBERT M. SALTZMAN, ESQ., 1 Central Street, Suite 5,
    Stoneham, Massachusetts 02180.

18

    ALSO PRESENT:  Gabriel Haddad, Spanish Interpreter
19              Carrie Lilley, Spanish Interpreter

20

21

22

23

24

25

1                        I N D E X

2    WITNESS                    DIRECT   CROSS  REDIRECT  RECROSS

3    SHAWN RILEY
        By Ms. Lawrence            8
4       By Mr. Iovieno                    18

5    ROBERT IMPEMBA
        By Ms. Lawrence           20
6
     CARLOS RIVERA
7       By Ms. Lawrence           25

8    MICHAEL CAPASSO
        By Ms. Lawrence           36
9
     STAR CHUNG
10      By Mr. Pohl               46
        By Mr. Norkunas                   60
11
     DEBORAH HUACUJA
12      By Ms. Lawrence           63            107
        By Mr. Iovieno                    84              109
13      By Mr. Norkunas                   92
        By Ms. Rodriguez                  96
14      By Mr. Lopez                     105              111

15   JOSE HERNANDEZ-MIGUEL
        By Mr. Pohl              112
16

17

18

19

20

21

22

23

24

25

| EXHIBITS | FOR I.D. | IN EVIDENCE |
|---|---|---|
| D | 111 | |
| 5 and 19 | | 16 |
| 7, 9, 10, 11, 12 | | 137 |
| 11 | | 31 |
| 14 | | 41 |
| 28 | | 100 |
| A portion of 28 | | 103 |
| 34.1 through 34.17 | | 50 |
| 35.1 and 35.2 | | 59 |
| 45 | | 44 |
| 46.1, 46.2 and 46.3 | | 45 |
| 49.1 and 49.2 | | 113 |
| 51, 52, 53 and 54 | | 24 |
| 68 | | 10 |
| 69 | | 17 |
| 82.1, 82.2 and 82.3 | | 33 |
| 83.1, 84, and 86 | | 34 |
| 85 | | 35 |
| 87 | | 35 |
| 206 | | 100 |

<u>PROCEEDINGS</u>

THE CLERK:  All rise.  Thank you.  Please be seated.
Court is now back in session.

THE COURT:  Good morning, everyone.

MR. POHL:  Good morning, your Honor.

THE COURT:  What, if anything, do we have to talk
about?  Mr. Iovieno.

MR. IOVIENO:  Yes, your Honor, thank you, my
understanding is today we're going to get into the firearm
issue, the issue I raised in my motion in limine.  My memory
with the Court I'm going to object at the appropriate time that
the Court was inclined to give a limiting instruction.

THE COURT:  I've got my notes here.  All right.  I
think this is your motion 1734, you wanted to exclude all
evidence of firearm offenses, correct?

MR. IOVIENO:  Yes.

THE COURT:  All right.  What do you want me to, I
guess what's the evidence and what do you want me to say?

MS. LAWRENCE:  Yes, your Honor, we will be putting in
evidence today that various individuals who are members of this
clique, the defendant's clique possessed firearms and one of
the defendants as well.  The evidence will not be that firearms
are a racketeering act, possession or use of, it will be simply
being conducting the affairs of the enterprise guns were
involved, and they used the guns to carry out those criminal

1    activities.

2         THE COURT:  Okay.  What do you want me to say,

3    Mr. Iovieno?

4         MR. IOVIENO:  Something to the effect that firearms,

5    possession of and perhaps dealing in firearms is not a

6    racketeering act.  It may be admissible for some other purpose,

7    identification for the use, but is not racketeering act.

8         THE COURT:  Okay.

9         MR. NORKUNAS:  Judge, I join with that if I might, my

08:34AM 10   anticipation is Mr. Muerto is going to place some sort of

11   firearm, wasn't seen by anywhere else, wasn't acquired but he

12   would still place a firearm in Mr. Martinez's hands at some

13   point.

14        THE COURT:  All right.  I would expect that the

15   evidence I will give a cautionary instruction.  I haven't

16   really talked to them very much about racketeering act.  Let me

17   think about that for a moment.  I don't want to drop this out

18   of them out of the blue, in other words, I think I want to say

19   that proof of the crime requires, among other things, proof

08:35AM 20   that there were two or more racketeering acts, which in this

21   case are specifically charged, does not include any firearms

22   related crimes.  They are not charged as rear acts, in fact, no

23   one is charged with a firearms crime.

24        MS. LAWRENCE:  I think that would be fine, your Honor.

25   The context, it does a little bit out of context at this point

1    in the trial, and we certainly wouldn't object to giving that

2    at the end of the case to make clear that one of the

3    racketeering acts charged is not the use or possession of

4    firearms.  Now it seems a little as you said out of the blue to

5    the jury but we don't really object to some kind of objection.

6                THE COURT:  All right.  Again, I expect that I'll

7    admit the evidence and expect to give an instruction along

8    those lines.

9                MR. IOVIENO:  Thank you, your Honor.

08:35AM 10                THE COURT:  Anything else?  All right.  We'll start

11    then as soon as we have our full complement of jurors, today

12    will be a normal break day, today we start at 9:30, take one

13    mid-morning break.

14                MR. POHL:  Thank you.

15                THE CLERK:  All rise.

16                ( A recess was taken.)

17                THE CLERK:  All rise for the jury.

18                (JURORS ENTERED THE COURTROOM.)

19                THE COURT:  Good morning, everyone.

09:10AM 20                MR. POHL:  Good morning, your Honor.

21                THE COURT:  Ms. Lawrence, are you ready?

22                MS. LAWRENCE:  The government calls Shawn Riley.

23                SHAWN RILEY, having been duly sworn by the Clerk,

24    testified as follows:

25

<u>DIRECT EXAMINATION</u>

BY MS. LAWRENCE:

Q.   Good morning.  Can you please state and spell your name for the record jury, please.

A.   Good morning.  My name is Shawn Riley, S-h-a-w-n, R-i-l-e-y.

Q.   Where do you work?

A.   I've been employed by the Massachusetts State Police since June of 2000.

Q.   What is your title?

A.   I'm a trooper.

Q.   And, Trooper Riley, what is your current assignment with the Massachusetts State Police?

A.   I'm assigned to the state-wide gang unit.

Q.   Do you have any other assignments?

A.   Yes, I'm also a task force officer with the FBI North Shore Gang Task Force.

Q.   Can you tell us a little bit about the North Shore Gang Task Force and what it does?

A.   It's a collaborative of different agencies, local, state, federal.  We investigate gangs and the various crimes that they commit.

Q.   As part of your work with the Massachusetts State Police Gang Unit, do you also investigate gangs?

A.   Yes.

1    Q.    Through your work with the task force and Massachusetts

2    State Police, have you become familiar with a gang known as

3    MS-13?

4    A.    Yes, I have.

5    Q.    And what is MS-13?

6          MR. MURPHY:  Objection, your Honor.

7          THE COURT:  I think we've been over this.  Sustained.

8    Go ahead.

9    Q.    Have you personally participated in police investigative

09:12AM 10  activities in connection with the MS-13 gang?

11   A.    Yes, I have.

12   Q.    What kinds of things have you done?

13   A.    I've partaken in surveillance of gang meetings, also

14   surveillance of controlled narcotic buys, as well as my patrol

15   function just patrolling certain areas of the Commonwealth.

16   Q.    I want to turn your attention to January 28, 2015.  Were

17   you involved in an arrest on that date?

18   A.    Yes, I was.

19   Q.    How did you get involved?

09:13AM 20  A.    I was notified by a trooper that I work with that his

21   informant was with an individual at a restaurant in Chelsea,

22   Massachusetts that had a firearm on them.

23   Q.    And what did you do when you received that information?

24   A.    Myself and others went to that area and conducted

25   surveillance.

1            MS. LAWRENCE:  Okay.  I'd like Exhibit 68 just for the

2       witness, please.

3       Q.   Trooper Riley, do you recognize the area shown in this

4       photograph?

5       A.   Yes, I do.

6       Q.   What is it?

7       A.   It's a depiction of a Casa Mariachi, which is a business

8       located on Everett Avenue in Chelsea at the corner of Walnut

9       Street.

09:14AM 10   Q.   Does the picture show the restaurant and the area in front

11      of it as it looked on January 28, 2015?

12      A.   No, it does not.

13      Q.   How is it different?

14      A.   There was a lot of snow.

15      Q.   And apart from the lack of snow in this photograph, does

16      it accurately represent the business and the sidewalk street

17      area around it?

18      A.   Yes, it does.

19           MS. LAWRENCE:  Your Honor, at this time I move to

09:14AM 20   admit Exhibit 68 in evidence.

21           THE COURT:  It's admitted, Exhibit 68.

22           (Exhibit No. 68 received into evidence.)

23      Q.   Trooper Riley, using this photograph, and if you'd like to

24      draw on the screen with your finger, you can, can you describe

25      what happened when you arrived at this location on January 28,

1    2015?

2    A.    We were conducting surveillance of that restaurant, and an

3    individual who we believed was the person that we were

4    surveilling stepped out of the restaurant and walked to this

5    area over here on the side of building, which is on Walnut

6    Street.

7    Q.    And the person that you were surveilling that day, do you

8    see that individual in the courtroom today?

9    A.    Yes, I do.

09:15AM 10   Q.    Can you please point him out for the jury.

11   A.    The gentleman sitting in the middle table right there.

12   Q.    Can you describe what he's wearing, please?

13   A.    A blue sports coat with a white shirt.

14   Q.    Okay.  Thank you.  So you saw the individual walk around

15   the corner toward Walnut Street.  What happened next?

16   A.    Myself and Trooper Christopher St. Ives decided to

17   approach the individual.  I pulled my cruiser down Walnut

18   Street and exited my cruiser and approached the individual from

19   the Walnut Street side in this area over here, and

09:16AM 20   Trooper St. Ives came in this area here, so we started having a

21   conversation with him on the sidewalk on the side of the

22   restaurant.

23   Q.    What did you say to him?

24   A.    Initially just identified myself.  Because we're dressed

25   in plain clothes, I didn't want to -- in my past experience, I

didn't want to alarm the person, so I identified myself, I

said, "State Police, can I talk to you for a minute?"  And my

badge was shown and when we started talking to the individual,

just having casual conversation, I eventually asked him, I

said, "Hey, do you happen to have a weapon on you?"

Q.    And what did he do when you asked him that?

A.    He started to look around and he backed up towards the

restaurant.

Q.    Did you do anything in response to his actions?

A.    I did.

Q.    What was that?

A.    I was standing, which would have been to his left, my

right, I immediately grabbed his left hand, and

Trooper St. Ives grabbed his right hand.

Q.    Did you do anything after that?

A.    I did.

Q.    What was it?

A.    While we had control of his hands, with my left hand, I

reached around his waistband from the front patting him down.

Q.    Did you feel anything during the pat frisk?

A.    I did.

Q.    What?

        MR. NORKUNAS:  Objection, your Honor.

        THE COURT:  Overruled.

A.    I felt what, in my experience, has taught me to be the

1    butt of a handgun.

2    Q.   And when you felt what you thought to be the butt of the

3    handgun, what did you do?

4    A.   I notified Trooper St. Ives of what I thought was a

5    handgun on his hip, and Trooper St. Ives reached in and pulled

6    out a handgun that was on the individual's right hip.

7    Q.   And where did he put that gun when he took it from the

8    individual?

9    A.   He put it in his pocket.  Trooper St. Ives put it in his

09:17AM 10   pocket.

11   Q.   So you're holding onto the individual.  You've taken a gun

12   from his waistband.  What happened next?

13   A.   I looked right at him, I said, "Hey, do you have a license

14   for this gun?"  And he said, "No."

15   Q.   And what did you do?

16   A.   At that point, we placed him in handcuffs and told him

17   that he was under arrest for possession of handgun.

18   Q.   Did you leave with him at that point, or what did you do

19   with him?

09:18AM 20   A.   Yes, eventually we transported him to the State Police

21   Barracks in Revere where he was booked.

22   Q.   And what happened to the handgun?

23   A.   It was placed into evidence.

24   Q.   Okay.  And while you were booking this individual, did you

25   learn his name?

```
  1    A.   We did, yes.

  2    Q.   What was his name?

  3    A.   Erick Argueta.

  4              MS. LAWRENCE:  For the witness, please.

  5    Q.   I'm showing you what's been marked as Exhibit 5.  Do you

  6    recognize the person in this photograph?

  7    A.   Yes.

  8    Q.   Who is it?

  9    A.   Mr. Argueta.

09:18AM 10   Q.   The person you arrested?

 11    A.   Yes.

 12    Q.   With the gun?

 13              MS. LAWRENCE:  Okay.  Next, I'm showing just for the

 14    witness, please, Exhibit 19.

 15    Q.   Do you recognize the man in this photograph?

 16    A.   Yes.

 17    Q.   And who is it?

 18    A.   Again, Mr. Argueta.

 19    Q.   What are those hand gestures that he is making in this

09:19AM 20   photograph?

 21              MR. NORKUNAS:  Objection, your Honor.  Foundation.

 22              THE COURT:  Sustained.

 23    Q.   Do you know Mr. Argueta by another name?

 24    A.   Yes.

 25    Q.   What is that?
```

```
 1              MR. NORKUNAS:  Objection, your Honor.
 2              THE COURT:  Again, you'll have to lay a foundation.
 3    Sustained.
 4    Q.   Did you -- when you arrested Mr. Argueta and booked him at
 5    the police station --
 6    A.   Yes.
 7    Q.   -- did you observe anything about his physical appearance?
 8    A.   Yes.
 9    Q.   What was that?
10    A.   He had several tattoos on his body.
11    Q.   Can you describe, if you remember, what those look like,
12    or any one of them?
13    A.   I'd have to see them.
14              MS. LAWRENCE:  Your Honor, I move Exhibits 5 and 19
15    into evidence at this time.
16              THE COURT:  What are 5 and 19?
17              MS. LAWRENCE:  The photographs the trooper just --
18              MR. NORKUNAS:  Objection.
19              MS. LAWRENCE:  Trooper Riley just identified.
20              THE COURT:  The two photographs?
21              MS. LAWRENCE:  Two photographs.
22              MR. IOVIENO:  My objection is to the second
23    photograph.
24              MS. LAWRENCE:  He identified the individual, your
25    Honor, in the second photograph.
```

1          THE COURT:  Overruled.  5 and 19 are admitted.

2          (Exhibit Nos. 5 and 19 received into evidence.)

3    Q.   Back to the gun that you took from Mr. Argueta, you said

4    you placed it into evidence?

5    A.   Yes.

6          MS. LAWRENCE:  Permission to approach the witness,

7    your Honor.

8          THE COURT:  Yes.

9          While we're doing is that, let me give the jury an

09:20AM 10    instruction.  Again, all four defendants are charged with

11    racketeering conspiracy, which I'll define for you at the end

12    of the case.  Two others are also charged with drug conspiracy,

13    which I'll also define.

14          To prove a racketeering conspiracy, the government has

15    to prove beyond a reasonable doubt a number of those things.

16    One of those things is that the defendant in question agreed to

17    or intended that one or more members of the racketeering

18    enterprise would commit two or more racketeering acts.

19          Basically, and in summary form, racketeering acts are

09:21AM 20    crimes, certain defined crimes under federal and state law.

21    The indictment here charges specific racketeering acts, it

22    charges specific murders, attempted murders, drug trafficking,

23    and so on.  It does not charge any firearms crimes as

24    racketeering acts.

25          There are different types of firearm crimes.  For

example, possession of a firearm without a license is a crime,

but that crime is not charged in the indictment, either by

itself or as part of the racketeering conspiracy.

I'm permit you to hear this evidence for whatever

weight you choose to give it in terms of the overall proof of

the racketeering enterprise, but just to be clear, this

defendant is not charged with a firearms crime, and no firearm

crime is charged as a racketeering act.

All right, Ms. Lawrence.

MS. LAWRENCE:  Thank you, your Honor.

Q.   Trooper Riley, showing you what's been marked as

Exhibit 69, do you recognize this?

A.   I do.

Q.   And what is it, please?

A.   It is a Ruger 9 millimeter handgun, and it's the handgun

that was taken off of Mr. Argueta.

MS. LAWRENCE:  Thank you.  Permission to publish to

the jury, your Honor?

THE COURT:  Well, it has to be admitted first.

MS. LAWRENCE:  I'm sorry.  Move to admit Exhibit 69.

MR. IOVIENO:  Same objection, your Honor.

THE COURT:  Overruled.  It's admitted.

(Exhibit No. 69 received into evidence.)

MS. LAWRENCE:  No further questions, your Honor.

THE COURT:  Mr. Iovieno.

CROSS-EXAMINATION

BY MR. IOVIENO:

Q.   Good morning, Trooper Riley.

A.   Good morning, sir.

Q.   My name is Thomas Iovieno.  I represent Mr. Larios.  You testified that you were provided information that led you to this area?

A.   Yes, sir.

Q.   And that information was provided to you by another trooper?

A.   Yes, sir.

Q.   And he indicated that the -- there was a confidential informant inside the restaurant with Mr. Larios?

A.   Yes, sir.

Q.   And he reported that Mr. Larios had a firearm?

A.   Yes, sir.

Q.   And that confidential informant, do you know he was identified as confidential informant CW-1?  Do you know that?

A.   I believe so.  Yes, sir.

Q.   And he's known as Pelon?

A.   Yes, sir.

Q.   And you're familiar with that name, correct?

A.   Yes, sir.

Q.   And did the trooper tell you that Pelon had given the firearm to Mr. Larios?

1          MS. LAWRENCE:  Objection, your Honor.

2          THE COURT:  Sustained.

3     Q.   In any event, you recovered the firearm from Mr. Larios,

4     and is it fair to say that the firearm was -- did not contain

5     any ammunition?

6     A.   Yes, sir.  It did not.

7     Q.   No bullets in the chamber, nor was there a magazine inside

8     the firearm, correct?

9     A.   That is correct, sir.

09:24AM 10  Q.   And you subsequently charged Mr. Larios with possession of

11    a firearm in the Chelsea District Court?

12    A.   I believe so.  Yes, sir.

13    Q.   And that case was dismissed?

14    A.   I don't know the disposition.

15         MR. IOVIENO:  All right.  Thank you.  No further

16    questions.

17         THE COURT:  Anything else?

18         MR. NORKUNAS:  No, your Honor.

19         THE COURT:  Any redirect?

09:24AM 20       MS. LAWRENCE:  No redirect, your Honor.

21         THE COURT:  All right.  Thank you.  You may step down.

22         THE WITNESS:  Thank you, your Honor.

23         THE COURT:  Ms. Lawrence.

24         MS. LAWRENCE:  The government calls Carlos Rivera.

25         Your Honor, I'd like to take a witness out of order if

1    it's okay.  We're going to call instead Robert Impemba.

2          ROBERT IMPEMBA, having been duly sworn by the Clerk,

3    testified as follows:

                    DIRECT EXAMINATION

4

5    BY MS. LAWRENCE:

6    Q.   Good morning.

7    A.   Good morning.

8    Q.   Can you please state and spell your name for the jury,

9    please.

09:25AM 10   A.   Yes, Robert Impeba, I-m-p-e-m-b-a.

11   Q.   Where do you work?

12   A.   I'm employed by the City of Revere, the Revere Police

13   Department.

14   Q.   What is your title?

15   A.   I'm a sergeant detective responsible for the supervision

16   of the narcotics in the gang unit.

17   Q.   Sergeant Detective Impemba, how long have you worked with

18   the Revere Police Department?

19   A.   I'm in my 13th year.

09:26AM 20   Q.   And what kind of work do you do as part of the narcotics

21   and gang unit?

22   A.   On the narcotics end, we do a lot of street level

23   narcotics, distribution monitoring, prepare search warrants,

24   undercover buys, confidential informant buys.  On the gang

25   side, we typically conduct FIOs, identify any impact players in

1    our neighborhoods and try to disrupt any street level gang

2    activity or youth violence.

3    Q.    Do you have any other assignments outside the Revere

4    Police Department?

5    A.    No.  I'm assigned to the -- I'm sorry, I do.  I'm assigned

6    to the FBI North Shore Gang Task Force as part of my

7    responsibilities with the Revere Police Department.

8    Q.    And as part of your work with the North Shore Gang Task

9    Force or the Revere Police Department, are you familiar with a

09:26AM 10  street gang called MS-13?

11   A.    Yes, I am.

12   Q.    And have you personally participated in investigative

13   activities related to MS-13?

14   A.    Yes, I have.

15   Q.    What kinds of things have you done in connection with that

16   investigation?

17   A.    We've assisted in controlled narcotics purchases,

18   surveillance, search warrants, that type of stuff.

19   Q.    I'm going to turn your attention to May 20, 2016.  Did you

09:27AM 20  participate in the execution of a search warrant on that day?

21   A.    May 20, 2016 was a consent search.  Yes.

22   Q.    And how did you get involved in that search?

23   A.    I was notified by one of the agents on my task force that

24   he had a location in Revere that he wanted to go to after

25   receiving information to search a certain area.

1   Q.   Do you remember the address of the location?

2   A.   I do, it was 538-540 Beach Street in Revere.

3   Q.   Was that address significant to you?

4   A.   Yes.

5   Q.   Why?

6   A.   During a series of arrests that we made relevant to an

7   investigation, it was one of the target locations.

8   Q.   Okay.  Do you know who lived there?

9   A.   I do.

09:27AM 10   Q.   Who was that?

11   A.   It was an individual identified as Jose Hernandez-Miguel.

12   Q.   Do you know him by other name?

13   A.   I do, Muerto.

14   Q.   And after you got the call telling you that you wanted to

15   search that location, what did you do?

16   A.   I met the agents along with a couple of Mass. State Police

17   troopers assigned to my task force at that location.

18   Q.   And did you search that location?

19   A.   Yes, I was involved in the search of the basement area of

09:28AM 20   that location.

21   Q.   And I believe you said earlier you had consent to search?

22   A.   Yes, the agents assigned to my task force received consent

23   prior to responding to that address, and I believe they had the

24   building manager fill out a consent form.

25   Q.   And can you describe the search, please, and what you did?

1    A.    Basically, we responded directly to the common area

2    basement on the bottom level, ground level of 538-540

3    Beach Street, and I had a very specific location that we were

4    directing our attention towards.  It was under a set of stairs

5    leading into the basement.

6    Q.    And did you find anything there?

7    A.    Yes, we did.

8    Q.    What was that?

9    A.    We found a silver, grayish-type cooler bag almost, if you

09:29AM 10    will, that contained a semiautomatic firearm and numerous

11    rounds of ammunition.

12    Q.    What did you do with that, those items after you found

13    them?

14    A.    Those items were taken into our possession, brought back

15    to the Revere police station and then turned over to the Mass.

16    State Police.

17          MS. LAWRENCE:  Permission to approach?

18          MR. IOVIENO:  Judge, for the record, could we have a

19    continuing objection to this line?

09:29AM 20          THE COURT:  Yes.

21    Q.    Sergeant Detective Impemba, I'm showing you what's been

22    marked as Exhibit 51.  Do you recognize this?

23    A.    Yes, I do.

24    Q.    What is it?

25    A.    This is the semiautomatic firearm that we located under

1    the basement stairs of 538-540 Beach Street.

2    Q.    And I'm showing you what's been marked as Exhibit 52.

3    A.    Yes.

4    Q.    53 and 54.  What are these items, if you know?

5    A.    These are two boxes of 9 millimeter ammunition that were

6    located inside the bag, as well as a plastic bag containing

7    several round of .45 caliber ammunition.

8              MS. LAWRENCE:  Your Honor, I move to admit Exhibit 51,

9    52, 53 and 54 into evidence.

09:30AM 10        THE COURT:  All right.  They're admitted.

11             (Exhibit Nos. 51, 52, 53 and 54 received into

12   evidence.)

13             MS. LAWRENCE:  Permission to publish?

14             THE COURT:  Yes.

15             MS. LAWRENCE:  No further questions.

16             THE COURT:  All right.  Cross-examination.

17             MR. IOVIENO:  No questions, your Honor.

18             MR. NORKUNAS:  No.

19             THE COURT:  Okay.  All right.  You may step down.

09:31AM 20   Thank you.

21             Ms. Lawrence.

22             MS. LAWRENCE:  Your Honor, the government would call

23   Carlos Rivera.

24             CARLOS RIVERA, having been duly sworn by the Clerk,

25   testified as follows:

DIRECT EXAMINATION

BY MS. LAWRENCE:

Q.    Good morning.

A.    Good morning.

Q.    Can you please state and spell your name for the jury.

A.    Carlos Rivera, R-i-v-e-r-a.

Q.    Where are you employed?

A.    I'm employed with the Massachusetts State Police.

Q.    What's your title there?

A.    I'm a trooper assigned to the Violent Fugitive Apprehension Task Force.

Q.    Trooper Rivera, can you explain what the Violent Fugitive Apprehension Task Force is?

A.    We basically look for individuals wanted on violent felony warrants in and out of Massachusetts.

Q.    Turning your attention to September 16, 2016, did you arrest a fugitive on that day?

A.    Yes, I did.

Q.    How did you get involved?

A.    I'm sorry, ma'am.

Q.    How did you get involved?

A.    I received information from one of my counterparts in the Boston area about an investigation he was helping the State Police and FBI gang unit and led information of possible subject associated with the wanted person out in the Pittsfield

area.

Q.   And wanted person is -- can you explain what a wanted

person is?

A.   He was warranted on a federal warrant for a RICO

conspiracy along with other charges.

Q.   Do you remember the individual's name?

A.   Efrain Vasques-Yanes.

Q.   Okay.  When you learned information -- when you got the

information that Mr. Vasques-Yanes might be located in the

Pittsfield area, what did you do?

A.   I basically advised the task force members of the

information we assembled.  I gathered some more information of

my own and we basically went to the address to try and attempt

to locate the subject.

Q.   What did you do when you arrived at the address?

A.   We basically showed the photo of the possible subject in

case we encountered someone in or around the house.  We

basically did a perimeter around the house to make sure the

person didn't escape if he decided to see police, and we

confirmed the address as a person of interest that he was

associated with living at the house.

Q.   Do you remember what that address was?

A.   It was 226 Bradford Street in Pittsfield.

Q.   Okay.  So after you secured the perimeter, what did you

do?

A.    We entered the -- it's a two-sided duplex.  We found the

226, looked at the mailbox, and saw the name associated with

Vasques-Yanes and at that point decided to knock at the door.

Q.    Did anyone answer?

A.    Yes.

Q.    What happened then?

A.    There was a male that answered the door after a few

minutes, broken English.  I asked what the name was in English,

and he gave his last name as being Flores and was a little

09:35AM hesitant to give me his first name.  I saw he might have been a

little hesitant because of the language barrier, so I asked him

again in Spanish what the last name of the residence was.

Q.    So you speak Spanish?

A.    Yes, I do.

Q.    Did you continue the conversation with him in Spanish?

A.    Yes, I did.

Q.    And what did you say to him next?

A.    I advised I was looking for Ms. Yasmin Hernandez, which

was a person associated with the target.  He stated that she

09:35AM did live at the house and was unsure if she was inside the

apartment or not.

Q.    So what did you do next?

A.    We asked to come in and talk to him and possibly talk to

Yasmin if she was there.  We basically entered, and then at

that point he started becoming elusive in regards to his

1    answers when we're asking if she was upstairs, if she was in

2    the house.  At that point, we basically started getting a

3    little suspicious.

4    Q.    And based on your suspicions, what did you do?

5    A.    We advised him that we were going to make sure that Yasmin

6    was inside the house, do a protective sweep, and see if anyone

7    else -- he also did advise that he did have a brother that was

8    sleeping upstairs possibly on the third floor.

9    Q.    So did you conduct that protective sweep of the house?

09:36AM 10   A.    The other officers did conduct a protective sweep as I

11   continued talking to Mr. Flores, and as I started talking to

12   him, I noticed some markings on his sleeve like a tattoo.  I

13   started asking, you know, what the tattoo was, and he started

14   covering up his arms as he couldn't produce any proper

15   identification when we asked him his actual name.

16   Q.    And his actions, what did his actions cause you to do

17   next?

18              MR. MURPHY:  Objection, your Honor.

19              THE COURT:  Overruled.

09:36AM 20              MR. MURPHY:  Just relevance.

21              THE COURT:  Okay.  Overruled.

22              MR. MURPHY:  Thank you.

23   A.    It was a little suspicious, because of the fact we were

24   looking for someone that was wanted on gang activity charges

25   from the Boston area, and in my experience, the way he was

1    answering my questions was being a little elusive, so for my

2    safety and the protection of the other officers that were

3    inside, I decided to place him in handcuffs just for -- until

4    we identified who he actually was.

5    Q.   And did you learn any information from the officers

6    who -- actually, let me ask you this.  Can you describe what a

7    protective sweep is?

8    A.   Protective sweep is just looking inside the house to make

9    sure no one else is hiding in any location.  That's for our

09:37AM 10   safety.

11   Q.   And you said, while you were speaking with this

12   individual, other officers were conducting the protective

13   sweep?

14   A.   Yes, ma'am.

15   Q.   Did they find anyone or anything?

16   A.   Yes, as I was talking to the gentleman on the first floor,

17   they advised that they had seen a gentleman on the third floor

18   peek down the stairs and then go out of view still on the third

19   floor walking around.

09:37AM 20   Q.   So what did you do with that information?

21   A.   At that point, the gentleman on the first floor was

22   already secured in handcuffs, trying to get his identity.  The

23   officers upstairs were trying to call the individual down to,

24   you know, make sure that they knew who he was and go from

25   there.

1    Q.    Did you speak with that individual eventually?

2    A.    Eventually, yes.  Once the individual came down, they

3    secured him in handcuffs to make sure and then walked him

4    downstairs and he had given a different name from the person we

5    were looking for.

6    Q.    Trooper Rivera --

7          MS. LAWRENCE:  This is for the witness only, please.

8    Q.    I'm showing you what has been marked as Exhibit 11.  Do

9    you recognize the person in this photo?

09:38AM 10    A.    Yes, ma'am.

11   Q.    Who is he?

12   A.    That's the subject, Efrain Vasques-Yanes that we were

13   looking for.

14   Q.    And did you recognize him when he was brought downstairs?

15   A.    I did.  I asked him what his name was.  He gave me the

16   alias name.  I believe the last name was Hernandez, and at that

17   point I turned the photo to him, and I said, "Who's this?"  At

18   that point, he –

19   Q.    I'm sorry, excuse me, what was on the phone -- the photo,

09:39AM 20   sorry.

21   A.    The photo I had on my paperwork, I flipped it over to him,

22   and I asked him, "Who is this?"  At that point, he smiled, And

23   he basically says, "Okay, you got me," and then he stated his

24   name was Efrain Vasques-Yanes.

25         MS. LAWRENCE:  Your Honor, I'd move to admit

1     Exhibit 11 into evidence.

2                 MR. MURPHY:  Objection, relevance, your Honor.

3                 THE COURT:  Overruled.  It's admitted, Exhibit 11.

4                 (Exhibit No. 11 received into evidence.)

5     Q.    So you mentioned that you had Mr. Vasques-Yanes in

6     handcuffs?

7     A.    Correct.

8     Q.    At that point.  Did you find anything else during the

9     protective sweep?

09:39AM 10     A.    The two gentlemen were downstairs.  There seemed to be

11     more rooms that were in the house.  It's a three-level duplex.

12     So as they stayed downstairs, I continued assisting the

13     officers upstairs, and it appeared that on the third deck where

14     the subject was hiding or at least located, there seemed to be

15     things out of place that looked like he was attempting to hide

16     something.

17     Q.    Did you see anything in particular that was suspicious to

18     you?

19     A.    There was a bright green sweater that was folded in a

09:40AM 20     manner consistent and very quickly as to try to conceal

21     something from our view.

22     Q.    Okay.  And did you take that item or look at it more

23     closely at that time?

24     A.    I did not.  We had information from the officers and

25     detectives out here that he was known to carry and was supposed

1    to be carrying a firearm with him at all times due to the

2    propensity of violence and the threats that he has been getting

3    and giving.

4    Q.   So what did you do?

5    A.   We at that point decided to secure the apartment or the

6    duplex.  I contacted the attorneys and the FBI investigators

7    involved in this area.  I advised them what we had, and we

8    basically waited for a search warrant.

9    Q.   Did you eventually get a search warrant?

09:41AM 10   A.   Yes, we did.

11   Q.   Did you execute that search warrant?

12   A.   Yes, we did.

13   Q.   Did you find anything when you executed the search

14   warrant?

15   A.   Yes, ma'am.

16   Q.   What did you find?

17   A.   We actually were able to find a firearm that was inside

18   that bright green sweatshirt along with a lot of ammunition,

19   along with false documents of the name that he had given to

09:41AM 20   police officers, some knives and a machete.

21        MS. LAWRENCE:  Permission to approach the witness,

22   your Honor.

23        THE COURT:  Yes.

24   Q.   Trooper Rivera, I'm showing you what has been marked as

25   Exhibit 82.1.  Do you recognize this?

1    A.   I do.

2    Q.   What is it?

3    A.   That is basically a black semiautomatic handgun that we

4    located that day.

5    Q.   Okay.  Where was it located when you recovered it?

6    A.   That was inside the bright green sweatshirt.

7    Q.   Okay.  I'm also showing what has been marked as Exhibits

8    82.3 and 82.2.  Do you recognize these?

9    A.   That is the clip that was inside and these are the rounds

09:42AM 10   that's marked as .45 caliber rounds that were inside the

11   magazine.

12   Q.   Okay.  All wrapped up in the sweatshirt?

13   A.   Yes, ma'am.

14        MS. LAWRENCE:  I move to admit Exhibit 82.1, .2 and .3

15   into evidence.

16        MR. MURPHY:  Your Honor, may we have a continuing

17   objection on relevance to the --

18        THE COURT:  Yes.

19        MR. MURPHY:  Thank you.

09:43AM 20        THE COURT:  Overruled.  82.1, 82.2, 82.3 are admitted.

21        (Exhibit Nos. 82.1, 82.2 and 82.3 received into

22   evidence.)

23        MS. LAWRENCE:  Permission to publish?

24        THE COURT:  Yes.

25   Q.   I'm showing you now what's been marked as Exhibit 83.1.

1    A.    Yes, ma'am.

2    Q.    84?

3    A.    Yes, ma'am.

4    Q.    And 86.

5    A.    Yes, ma'am.

6    Q.    Okay.  Do you recognize these items?

7    A.    I do.  Those are items that were seized with the firearm.

8    It's basically ammunition for the .45 that we took into

9    evidence.

09:44AM 10  Q.    Is this chewing gum?

11   A.    It is not chewing gum.  It's pretty much a deception to

12   make believe it's chewing gum, but there's actually rounds

13   inside.

14   Q.    And were these wrapped up in the sweatshirt or found

15   somewhere else?

16   A.    I believe everything was with the firearm and sweatshirt.

17          MS. LAWRENCE:  Your Honor, I move to admit

18   Exhibit 83.1, 84, and 86 into evidence.

19          THE COURT:  They're admitted, 83.1, 84, and 86.

20          (Exhibit Nos. 83.1, 84, and 86 received into

21   evidence.)

22   Q.    Trooper Rivera, showing you what's been marked as

23   Exhibit 87, do you recognize this item?

24   A.    Yes, ma'am.

25   Q.    What is that?

1   A.   That is a butterfly knife that was located inside the

2   apartment.

3   Q.   And by butterfly, what do you mean?

4   A.   It easily opens in a fashion that would make it look very

5   flashy.

6   Q.   And where did you find this, if you remember?

7   A.   I believe it was on the third floor.

8   Q.   Okay.

9        MS. LAWRENCE:  Your Honor, I'd move to admit Exhibit

09:45AM 10   87 into evidence.

11        THE COURT:  All right.  It's admitted, 87.

12        (Exhibit No. 87 received into evidence.)

13   Q.   I'm showing you what's been marked as Exhibit 85.  Do you

14   recognize this?

15   A.   I do.

16   Q.   And what is it?

17   A.   That is a machete.

18   Q.   And where did you find this?

19   A.   That was located downstairs, I believe, in a closet on the

09:46AM 20   first floor.

21        MS. LAWRENCE:  Okay.  Your Honor, I'd move to admit

22   Exhibit 85 into evidence.

23        THE COURT:  All right.  It's admitted.  85.

24        (Exhibit No. 85 received into evidence.)

25   Q.   Trooper Rivera, do you know Mr. Efrain Yanes-Vasques by

1    another name?

2    A.   Just the name that he had given officers.  I don't recall

3    the actual first name, but I know the last name was Hernandez.

4    I'd have to refer to my report to get the exact.

5         MS. LAWRENCE:  No further questions for this witness,

6    your Honor.

7         THE COURT:  Cross?

8         MR. IOVIENO:  Nothing, your Honor.

9         MR. NORKUNAS:  No.

09:46AM 10    THE COURT:  Okay.  Thank you.  You may step down.

11         THE WITNESS:  Thank you, sir.

12         MS. LAWRENCE:  The government calls Michael Capasso.

13         MICHAEL CAPASSO, having been duly sworn by the Clerk,

14    testified as follows:

15         THE WITNESS:  Good morning, your Honor.

16                    DIRECT EXAMINATION

17    BY MS. LAWRENCE:

18    Q.   Good morning.

19    A.   Good morning.

09:47AM 20    Q.   Could you please say and spell your name for the jury?

21    A.   My name is Michael Capasso.  And did you say spell it?

22    Q.   Just the last name.

23    A.   C-a-p-a-s-s-o.

24    Q.   And where do you work?

25    A.   Somerville Police Department.

1    Q.    Do you have a title?

2    A.    I do.

3    Q.    What is it?

4    A.    Detective sergeant.

5    Q.    How long have you worked for the Somerville Police

6    Department?

7    A.    Ten years.

8    Q.    And what is your current assignment?

9    A.    My current assignment is the gang unit supervisor.

09:48AM 10    Q.    Have you held other assignments with the Somerville Police

11    Department?

12    A.    I have.

13    Q.    And what are those?

14    A.    Patrol officer and narcotics detective.

15    Q.    Focusing on January 2015, what kind of police work were

16    you doing at that time?

17    A.    I was assigned to the patrol unit.

18    Q.    And what kinds of activities did you do with the patrol

19    unit?

09:48AM 20    A.    That was a uniformed division, so I would answer any calls

21    that came into the 9-1-1 center, whether they be emergency or

22    just calls for service.

23    Q.    Were you working on the night of January 1, 2015?

24    A.    I was.

25    Q.    Did you take a call that night?

```
 1    A.    Yes.

 2    Q.    And where did you go?

 3    A.    7 Cross Street.

 4    Q.    And why did you go to 7 Cross Street?

 5    A.    We received an unknown trouble 9-1-1 call.

 6    Q.    Okay.  What did you do when you responded to

 7    7 Cross Street?

 8    A.    We went to the -- the house that we went to was a third --

 9    apartment number 3.  We entered the house with -- I entered the

09:49AM 10    house with two of my fellow police officers.

11    Q.    And what did you do when you arrived at the third floor

12    apartment?

13    A.    When I entered the house, I observed a Hispanic male

14    sitting on the couch who was pointing to a bedroom door.

15    Q.    Did you talk to him?

16    A.    I did not, no.

17    Q.    Did anyone else talk to him?

18    A.    Yes, one of my colleagues.

19    Q.    Did they say anything?

09:49AM 20    A.    They did have a conversation, which we later discovered.

21    Would you like me to --

22    Q.    No, no.  You said he was pointing at a door?

23    A.    Correct.

24    Q.    And what did you do when you saw him pointing at the door?

25    A.    I knocked on the door.
```

1    Q.    What happened?

2    A.    After a brief delay, I heard the door lock.

3    Q.    Did anyone speak on the other side of the door?

4    A.    No.

5    Q.    You heard the door lock.  What did you do next?

6    A.    As soon as I heard the door lock, I heard somebody running

7    away from the door.  At that point, I announced to my partner

8    that I was going to force open the door due to the fact that we

9    were there for unknown trouble, and I did not know what was

09:50AM 10    going on behind that now locked door.

11    Q.    Did you force the door open?

12    A.    No, I did not.

13    Q.    Why?

14    A.    Because as I was about to force the door, a female opened

15    the door ever so slightly with just enough room that her head

16    popped out.

17    Q.    Did you speak to her?

18    A.    No, one of my colleagues did.

19    Q.    Why didn't you talk to her?

09:50AM 20    A.    She did not speak English, and I don't have any bilingual

21    skills.

22    Q.    And your colleague did speak Spanish?

23    A.    Yes, he's now Lieutenant Jaliveira (ph.), he spoke to her

24    in Spanish.

25    Q.    Okay.  After he spoke to her, what happened?

A.    We entered the bedroom to do a protective sweep.  Again,
based on the unknown trouble call, we needed to make sure that
nobody was in there that needed any medical assistance or was
injured.

Q.    And when you entered the bedroom, what did you see?

        MR. MURPHY:  Objection.  Relevance.  And may we have a
continuing objection?

        THE COURT:  Overruled.  And, yes, you may have a
continuing objection.

        MR. MURPHY:  Thank you, your Honor.

Q.    When you entered the bedroom, what did you see, Sergeant
Detective Capasso?

A.    On the right-hand side of the room, I saw a bed with an
infant crying, and I saw behind the bed was a walk-in closet
with the lights on with no door, and on the left-hand side, I
saw an opened window with a blanket blowing due to the frigid
cold and the wind blowing the blanket open.

Q.    Were there any other individuals in the room besides the
baby and the woman who let you in?

A.    Yes, there was.

Q.    Who?

A.    Jose Andrade.

Q.    Where was he located?

A.    Jose was directly across from the window laying kind of
sideways with his feet on the ground and his upper torso on the

1    bed itself near the baby.

2            MS. LAWRENCE:  Could I have Exhibit 14 for the

3    witness, please.

4    Q.   Sergeant Detective Capasso, do you recognize the person in

5    this photograph?

6    A.   Yes, I do.

7    Q.   And who is it?

8    A.   That would be Mr. Andrade.

9    Q.   The person you said was in the bedroom that evening?

09:52AM 10   A.   Correct.

11           MS. LAWRENCE:  I move to admit Exhibit 14 into

12   evidence, your Honor.

13           THE COURT:  This is Exhibit 14?

14           MS. LAWRENCE:  Yes, it is.

15           THE COURT:  Yes, it's admitted, 14.

16           (Exhibit No. 14 received into evidence.)

17   Q.   What did you do after you entered the room and observed

18   the window open, Mr. Andrade on the bed?

19   A.   I went up to Mr. Andrade and conducted a pat frisk of his

09:52AM 20   person to make sure he was not concealing any weapons.

21   Q.   Was he concealing any weapons?

22   A.   No.

23   Q.   And what happened after that?

24   A.   At that point, I instructed my colleague, Officer Cicerone

25   to wait with Mr. Andrade while I conducted a quick sweep of the

1    walk-in closet to make sure that there was nothing in there

2    that would potentially harm us.

3    Q.   Did you find anything in the closet?

4    A.   No, I did not.

5    Q.   Did you do anything else in the room?

6    A.   I did.

7    Q.   What?

8    A.   I looked out the window because I thought it was odd that

9    the window at the time of night with a sick child crying on the

09:53AM 10  bed would be open with no screen, insect screen, so I popped my

11   head out the window to take a look outside.

12   Q.   Why did you think it was odd that the window was open?

13   A.   It was 10:40 at night, it was freezing out.  I don't

14   remember exactly how cold, but it was uncomfortably cold out,

15   and due to the fact that the baby was sick, according to the

16   mom, it didn't make any sense for a window to be opened at that

17   time of night with the cold.

18   Q.   When you popped your head out the window, did you see

19   anything?

09:53AM 20  A.   I did.

21   Q.   What did you see?

22   A.   I could see the side yard of a house leading to the

23   backyard of the house that was across the street.

24   Q.   But you didn't see -- was that unusual for you to look out

25   the window and see the side of the house?

1    A.    No, no.

2    Q.    Okay.  What did you do after you looked out the window?

3    A.    I advised my colleagues that I believed Mr. Andrade had

4    possibly thrown something out the window, and I was going to go

5    outside and check.

6    Q.    Okay.  And did you go check?

7    A.    I did.

8    Q.    Okay.  Describe where you went after you left the bedroom.

9    A.    So when I was still in the room, I had looked outside,

09:54AM 10   obviously, to find out where I was based on where the window

11   was and straight down.  So I went to that spot outside, looked

12   up, confirmed that it was the same exact spot that I had been

13   looking out.

14   Q.    Okay.  And when you were outside, did you find anything?

15   A.    I did find -- I found a firearm resting on top of a pile

16   of leaves.

17              MS. LAWRENCE:  Exhibit 45 for the witness, please.

18              THE WITNESS:  I'm sorry, could you repeat that?

19              MS. LAWRENCE:  I was just bringing up a picture.

09:54AM 20   Q.    Sergeant Detective Capasso, do you recognize this

21   photograph?

22   A.    Yes, I do.

23   Q.    And what is it?

24   A.    That would be the firearm that I located on the side of

25   the house.

1          MS. LAWRENCE:  Your Honor, at this time I move to

2     admit Exhibit 45 into evidence.

3          MR. IOVIENO:  I object, your Honor.

4          THE COURT:  That's this photo?

5          MS. LAWRENCE:  Yes, it is.

6          THE COURT:  All right.  Overruled.  It's admitted.

7     45.

8          (Exhibit No. 45 received into evidence.)

9     Q.   What did you do when you saw the gun lying on top of the

09:55AM 10    leaves?

11    A.   I yelled out to my colleagues that I located a firearm,

12    and subsequently they went upstairs and placed Mr. Andrade in

13    our custody.

14    Q.   Okay.  And what did you do with the firearm?

15    A.   I contacted Detective Thermidor from the Somerville Police

16    Criminal Investigation Division.  He came by and photographed

17    the firearm.

18          MS. LAWRENCE:  Permission to approach, your Honor?

19          THE COURT:  Yes.

09:55AM 20    Q.   Sergeant Detective Capasso, I'm showing you what's been

21    marked as Exhibit 46.1, 46.2 and 46.3.  Do you recognize these

22    objects?

23    A.   I do.

24    Q.   What are they?

25    A.   That would be the firearm and the magazine from the back

1    yard.  It's okay to open these?

2    Q.    You can open them, if you like.

3    A.    Ammunition.  Yeah.

4           MS. LAWRENCE:  The government moves to admit 46.1, .2,

5    and .3 into evidence.

6           THE COURT:  They're admitted, 46.1, 46.2, 46.3.

7           (Exhibit Nos. 46.1, 46.2 and 46.3 received into

8    evidence.)

9    Q.    Sergeant Detective Capasso, did you know Mr. Andrade by

09:56AM 10   any other name?

11   A.    I believe that he went by an alias name as "Triste," and I

12   heard rumors that --

13          MR. IOVIENO:  Objection.

14          THE COURT:  Sustained.  Stop there.

15          MS. LAWRENCE:  Thank you.  No further questions, your

16   Honor.

17          THE COURT:  Any cross?

18          MR. IOVIENO:  No, your Honor.

19          THE COURT:  All right.  You may step down.

09:56AM 20   THE WITNESS:  Thank you, your Honor.

21          MR. POHL:  Your Honor, at this time the government

22   calls Star Chung.

23          STAR CHUNG, having been duly sworn by the Clerk,

24   testified as follows:

25          THE WITNESS:  Good morning, your Honor.

```
 1              MR. POHL:  May I inquire, your Honor?

 2              THE COURT:  Yes.

 3              MR. POHL:  Thank you.

 4                        DIRECT EXAMINATION

 5    BY MR. POHL:

 6    Q.   Good morning.

 7    A.   Good morning, sir.

 8    Q.   Can you please introduce yourself to the ladies and

 9    gentlemen of the jury?

10    A.   Yes.  Good morning, jurors.  My name is Officer

11    Star Chung.

12    Q.   Could you spell your last name for the record?

13    A.   Yes, C-h-u-n, as in November, g.

14    Q.   Where do you work?

15    A.   Chelsea Police Department.

16    Q.   How long have you worked for the Chelsea Police

17    Department?

18    A.   Eight years now, sir.

19    Q.   And what is your current assignment, Officer Chung?

20    A.   I'm in patrol, I work overnights.

21    Q.   From when to when?

22    A.   11:30 at night to 7:30 in the morning.

23    Q.   Officer Chung, let me direct your attention to

24    December 14, 2014.  Do you remember if you were working on that

25    date?
```

1    A.    Yes.

2    Q.    All right.  Let me direct your attention to the early

3    morning hours of December 14, 2014.  Do you remember, did you

4    receive a radio call?

5    A.    Yes.

6    Q.    And what was the radio call for?

7    A.    It was a call for a victim of a gunshot wound, shots

8    fired.

9    Q.    Okay.  And do you remember where the shots fired call

09:59AM 10   directed you to go?

11   A.    Yes, an address on Chester Avenue.

12   Q.    Okay.  And what did you do when you got the radio call?

13   A.    I began responding to the scene.

14   Q.    And you pull up to -- is there a particular address on

15   Chester Avenue that you pulled up to, Officer Chung?

16   A.    Yes, 60 Chester Avenue specifically was called in for

17   Apartment Number 2.

18   Q.    Now, let me ask you, Officer Chung, we're talking about

19   December 14, 2014.  Before that date, before December 14, 2014,

09:59AM 20   were you familiar with that address, 60 Chester Avenue?

21   A.    Yes, sir.

22          MR. MURPHY:  Objection, your Honor.

23          THE COURT:  Sustained.

24   Q.    All right.  Officer Chung, you pulled up, got to

25   60 Chester Avenue.  Why don't tell the ladies and gentlemen of

1     the jury what you saw when you pulled up.

2     A.    Upon my approach, there was a male party out in the front

3     area of said address.  When I pulled up, I noticed that he was

4     holding onto his left pectoral area.

5     Q.    What did you do when you saw that?

6     A.    At that point, I asked him if he was hurt, if he's been

7     shot due to the nature of the call, in which -- at that point I

8     lifted up his shirt and could see that there was a gunshot

9     wound.

10:00AM 10   Q.    What did you do next?

11               MR. MURPHY:  Objection, your Honor, relevance.  And

12    again, may we have a continuing objection to this subject

13    matter?

14               THE COURT:  Yes, overruled, and you may have the

15    continuing objection.

16               MR. MURPHY:  Thank you.

17    Q.    Officer Chung, you lifted up the individual's shirt,

18    correct?

19    A.    Yes, sir.

10:00AM 20   Q.    Saw he had a gunshot wound?

21    A.    Yes, sir.

22    Q.    What's the next thing that you did?

23    A.    I hailed for EMS Cataldo for medical aid.

24               MS. LAWRENCE:  And can we have Exhibit 34.1 for the

25    witness, please.

1    Q.   All right.  So, Officer Chung, do you see the photograph

2    in front of you on your screen?

3    A.   Yes, sir.

4    Q.   Do you recognize that location?

5    A.   60 Chester Ave.

6    Q.   Okay.  And I'm going to quickly walk you through a series

7    of photographs that follow that I think you reviewed before

8    your testimony here today.  I want you to quickly take a look

9    at them.

10:02AM 10        Have you seen those pictures before your testimony

11   here today?

12   A.   Yes.

13   Q.   All right.  Do you recognize those?

14   A.   Yes.

15   Q.   And how do you recognize them?

16   A.   I was there on scene that night.

17   Q.   Those pictures are from -- do they accurately depict

18   60 Chester Avenue, Apartment 2 as you saw it on December 14,

19   2014?

10:02AM 20   A.   Absolutely.

21        MR. POHL:  All right.  I'd move to admit Exhibits 34.1

22   through 34.17 and ask your permission to publish to the jury,

23   your Honor.

24        MR. MURPHY:  Same objection, your Honor.

25        THE COURT:  All right.  Overruled.  They're admitted.

1    34.1 through 34.17.

2             (Exhibit Nos. 34.1 through 34.17 received into

3    evidence.)

4    Q.   All right.  Officer Chung, why don't you take us through

5    these pictures as you were there that night.  On -- what are we

6    looking here with 34.1?  It's the first picture in the

7    sequence.  What's this?

8    A.   This is the front area to 60 Chester Ave.

9    Q.   All right.  So where -- I think you testified a moment ago

10:03AM 10   about the person you encountered who had a gunshot wound to his

11   chest.  Where was that person when you pulled up to 60 Chester

12   Ave.?

13   A.   He was actually on the center steps to the left of

14   60 Chester Ave.

15   Q.   So just out of view of this photo?

16   A.   Yes.

17   Q.   All right.  And when you pulled up to 60 Chester Avenue,

18   how did you and -- where did the person with the gunshot wound,

19   did you walk to him, did he walk to you?  What happened?

10:03AM 20   A.   As soon as we arrived and he saw us, he immediately went

21   to his feet and went to us to seek for help.  Now, we met right

22   in the middle where 60 Chester Ave. was.

23   Q.   Okay.  And did you have a conversation with that

24   individual?

25   A.   Yes.

1   Q.   Did you later learn his name?

2   A.   Yes.

3   Q.   And what was his name?

4   A.   His name was Saul Rivera.

5   Q.   And based on that conversation that you had with

6   Mr. Rivera, what did you try to do next?

7   A.   At that point, I applied pressure to his wound while we

8   were waiting for Cataldo.  He also informed us of what

9   occurred, and then at that point through the authorization of

10:04AM 10   our street supervisor, we attempted to make entry to the front

11   common door.

12   Q.   Of 60 Chester Ave.?

13   A.   Yes, sir.

14   Q.   And why did you want to go inside 60 Chester Avenue?

15   A.   Because Saul said that there were other -- possible other

16   victims upstairs who were also shot.

17   Q.   Okay.  The front door that you were talking about is --

18   you can actually -- Officer Chung, you can actually draw on it

19   with your finger on the screen.

10:04AM 20   A.   Yes.

21   Q.   What's the 60 Chester Avenue front door that you're

22   talking about?

23   A.   (Witness drawing on diagram)

24   Q.   Right there, okay.  Thank you.  When you got to the front

25   door of 60 Chester Avenue and you tried to go inside, what

1    happened?

2    A.    The door was locked.

3    Q.    What did you do?

4    A.    At that point, we hailed for the fire department to come

5    by to assist in the forced entry.

6    Q.    Did you get inside the door?

7    A.    Yes, sir.

8    Q.    All right.  When you got inside the door, what did you

9    see?

10:05AM 10    A.    Trails of blood.

11    Q.    All right.  So let's go through some of these pictures

12    quickly.  Let's go to 2.  All right.  What do you see here,

13    Officer Chung?

14    A.    I see, again, the front steps of 60 Chester Ave. and some

15    blood particles.

16    Q.    Okay.  3.

17    A.    This is the other view to 60 Chester Ave. and also there

18    are some blood droplets there.

19    Q.    4.

10:05AM 20    A.    A closer zoomed in view of 60 Chester Ave. front steps

21    with the blood droplets.

22    Q.    5, please.  Is this the front door?

23    A.    The front door now ajarred with the -- some blood droplets

24    on the door.

25    Q.    6?

1    A.    Closer look of the blood droplets on the door.

2    Q.    7.  Where is this, Officer Chung?

3    A.    This is as soon as you open the door and you could see the

4    blood droplets of blood.

5    Q.    And there's a stairway.  That's fine.  The next

6    photograph, there's a stairway essentially right as you enter

7    that front door?

8    A.    Yes.

9    Q.    What did you do when you got to those stairs?

10:06AM 10    A.    Due to the possible presence of a firearm, all officers

11    drew our department-issued firearm.

12    Q.    Where did you go next?

13    A.    At that point, we went up to the second landing.

14    Q.    When you got to the -- next photograph, please.  Stairs?

15    A.    Stairs leading up to the second landing.

16    Q.    Down on the left-hand side of the stairs, you see what?

17    A.    The left-hand side of the stairs, there's also blood

18    droplets on those steps.

19    Q.    All right.  So I think I could -- am now caught up to you.

10:07AM 20    This is the second floor landing?

21    A.    Yes.

22    Q.    What do you see right before the door?

23    A.    There's a yellow item there, there's also some blood

24    droplets there.

25    Q.    All right.  So you said that -- I think you used the word

1    "we," "We drew our service weapons."  Were you with other

2    officers at this time?

3    A.   Yes, sir.

4    Q.   All right.  How many officers approached the door to the

5    second floor landing?

6    A.   There were three of us, including myself.

7    Q.   Okay.  And when you got to the second floor landing,

8    Officer Chung, what did you do then?

9    A.   At that point actually a female tenant came out from the

10:08AM 10  second, apartment 2.

11   Q.   And what happened next?

12   A.   That's when my street supervisor, Lieutenant Sanchez,

13   engaged her at the door, spoke to her in Spanish gaining

14   consent to enter.  She let us in.

15   Q.   All right.  So there's three of you.  Do you remember the

16   sequence of officers who went in and -- sort of in what order?

17   A.   Yes, sir.

18   Q.   And what was that?

19   A.   It was Lieutenant Sanchez guiding point, Officer Tom Riley

10:08AM 20  in the middle and myself in the rear.

21   Q.   Okay.  So where did the -- the first two officers that you

22   just mentioned, where did they go in the apartment?

23   A.   At that point, they conducted a protective sweep of the

24   apartment, they entered, and they split into the rooms.

25   Q.   And looking for what?

1    A.    For presence of a weapon, any other suspects hiding,

2    victims.

3    Q.    All right.  What did you do when you went in the

4    apartment?

5    A.    As soon as I entered the apartment, there was a bathroom

6    to my right with the door ajarred, in which I could see a male

7    party lying on the floor.

8    Q.    The next photograph, please.  Is that the bathroom,

9    Officer?

10:09AM 10    A.    Yes, sir.

11    Q.    All right.  You come in the front door and the bathroom is

12    where?

13    A.    To my right, immediate right.

14    Q.    All right.  Can you tell the ladies and gentlemen of the

15    jury what you're seeing, what you see in the bathroom floor?

16    A.    Ladies and gentlemen of the jury, in the bathroom floor

17    here, I saw a male party on the floor in a fetal position,

18    which actually his -- may I?

19    Q.    Yes.

10:09AM 20    A.    With his head facing this way towards the door.

21    Q.    What did you do when you saw the man lying on the

22    bathroom?

23    A.    At that point, I immediately engaged him.  I checked him

24    for injuries.  I noticed that he was not breathing.  He was

25    also unconscious.  I lifted up his shirt and checked for

1    injuries, and indeed there were gunshot wounds.

2          THE COURT:  I'm sorry, Officer, can you -- the mic is

3    very sensitive.  If you could just move maybe an inch further

4    away.

5          THE WITNESS:  Like this, your Honor?

6          THE COURT:  Yes.  Thank you.

7          THE WITNESS:  No problem, sir.

8          MR. POHL:  Thank you, your Honor.

9    Q.   All right.  Officer Chung, you lifted up the shirt of the

10:10AM 10   man on the bathroom floor?

11   A.   Yes.

12   Q.   All right.  And what did you see?

13   A.   Gunshot wounds.

14   Q.   What did you do then?

15   A.   At that point, I immediately conducted chest compressions

16   and rendered medical aid.

17   Q.   The person wasn't breathing?

18   A.   No, sir.

19   Q.   And how long did you do that for?

10:11AM 20   A.   I did it for at least two rounds for chest compressions,

21   which are at 30 intervals.

22   Q.   After you had completed doing chest compressions, what

23   happened?

24   A.   At that point, Cataldo subsequently came up behind me, and

25   they took over medical aid.

1    Q.   Were you present when the -- maybe everybody knows this,

2    maybe they don't.  Cataldo are emergency technicians, right?

3    A.   Paramedics, yes.

4    Q.   And were you there when the paramedics attempted to help

5    the person in the bathroom?

6    A.   Yes, sir, but they removed him from the bathroom to give

7    them a little bit more space.

8    Q.   Okay.  Where did they bring the individual that you had

9    done chest compressions on?  Where did they bring in the

10   apartment?

11   A.   They brought him out into the hallway and brought him more

12   into the kitchen space where there was more space.

13   Q.   Okay.  Next photograph, please.  What are we seeing here,

14   Officer Chung?

15   A.   This is behind us would be the entryway, behind us to the

16   right would be the bathroom, and this is the hallway leading

17   out into the kitchen with the blood droplets on the floor and

18   the big puddle of blood there was where he was worked on.

19   Q.   Next photograph, please.

20   A.   Again, this is the -- a more open view of the kitchen

21   space as you're standing immediately inside of it, and right

22   there is the some of the tools paramedics used during the

23   medical aid of the victim.

24   Q.   And, Officer Chung, let's take a step back.  Do you

25   see -- what do you see on the kitchen counters, on the table,

1    on the table against the window there?

2    A.    A large amount of beer cans.

3    Q.    Okay.  Next photograph, please.  Is this just a reverse

4    angle of the same picture we were looking at before?

5    A.    Yes, sir.

6    Q.    All right.  What do you see on the floor?

7    A.    On the floor you see the big puddle of blood here where

8    the victim was worked on.  Again, you see the beer bottles

9    lining the apartment.

10:13AM 10         MR. POHL:  Can we have Exhibit 35 for the witness,

11   please.

12   Q.    Officer Chung, I'm going to show you, I think there's two

13   pictures.  Let me show you both.  35.  This is Exhibit 35.1 and

14   .2.  Do you recognize those?

15   A.    Absolutely, sir.

16   Q.    How do you recognize them?

17   A.    This is the rear porch of 60 Chester Ave.

18   Q.    Okay.  And did you see -- did you take a look outside onto

19   the porch when you were there on December 14, 2014?

10:14AM 20   A.    Yes, I did.

21   Q.    All right.  And do those fairly and accurately capture how

22   the porch looks?

23   A.    Absolutely.

24         MR. POHL:  Your Honor, I'd offer 35.1 and 2 into

25   evidence and ask to publish.

1        THE COURT:  All right.  They're admitted.

2        MR. POHL:  Thank you.

3        (Exhibit Nos. 35.1 and 35.2 received into evidence.)

4   Q.   All right.  Officer Chung, what are we looking at here?

5   A.   This is another angle of the rear porch.

6   Q.   Okay.  And .2.

7   A.   And, again, this is the other angle.

8   Q.   Okay.  So to get to the porch from the apartment, what did

9   you do?

10AM 10  A.   You'd have to enter through the kitchen, open up the rear

11  door, and then it leads out to the rear porch.

12  Q.   Okay.  Officer Chung, what happened next that night while

13  you were at 60 Chester Avenue?

14  A.   At that point, Cataldo attempted to work on the gentleman

15  like I've mentioned, and then they shipped him for transport.

16  Q.   You remained on scene?

17  A.   I was on scene.  I spoke to other roommates who were in

18  the living quarters.

19  Q.   Okay.  And after the conversations that you had with those

10:15AM 20 individuals, what did you do next?

21  A.   At that point, I was cleared to go back to the station to

22  write the report.

23  Q.   While you were writing the report of what transpired that

24  night, Officer Chung, did you learn the name of the person that

25  was on the bathroom floor that you gave chest compressions to?

1   A.   Yes.

2   Q.   And who was that?

3   A.   Javier Ortiz.

4   Q.   And while you were writing your report, Officer Chung, did

5   you receive an update as to Mr. Ortiz' medical condition?

6   A.   Yes.

7   Q.   What did you learn?

8   A.   I learned that he succumbed to his injuries and as a

9   result was pronounced deceased at 4:01 in the morning.

10:16AM 10          MR. POHL:  Thank you very much.

11          THE WITNESS:  Thank you, sir.

12          THE COURT:  Cross-examination.

13          MR. IOVIENO:  No.

14          MR. NORKUNAS:  If I might, Judge, just briefly.

15                    CROSS-EXAMINATION

16   BY MR. NORKUNAS:

17   Q.   Good morning, Officer.

18   A.   Good morning, sir.

19   Q.   You looked at a series of photographs relative to

10:17AM 20   60 Chester Ave. in this particular case.  And if I could just

21   have you -- I think it's 34.3, the front door.  The next one,

22   please.  That actually shows the door.  In relation to this

23   particular area, would it be fair to say when you examined that

24   there did not appear to be any forced entry to that door?

25   A.   Yes.

1   Q.   You're saying yes.  You mean there was not any evidence?

2   A.   There was no forced entry to the door, correct, sir.

3   Q.   And there is not a photograph of the door entering the

4   individual apartment up on the second floor, correct?

5   A.   Correct.

6   Q.   Was there any evidence to your memory that there was any

7   type of forced entry to that door?

8   A.   Which one, sir, the second floor landing?

9   Q.   Second floor entry?

10:18AM 10   A.   No, sir.

11   Q.   And if we could show the kitchen area on -- I think it

12   would probably be four more up.  This area.  It did not

13   appear -- when you went into that area of the apartment, there

14   did not appear to be any evidence that there had been a

15   physical struggle; is that fair to say?

16   A.   Yes.

17   Q.   Nothing -- there's obviously disarray from the EMTs that

18   were trying to administer to the person, but nothing is thrown

19   about, knocked about.  There's cans and bottles on tops of the

10:18AM 20   tables and counters, right?

21   A.   Yes.

22       MR. POHL:  And if we could have the next photograph,

23   please.

24   Q.   The view there, there's a significant amount of blood

25   there, but appeared that there was nothing disarrayed on the

1    countertops as well, correct?

2    A.    Yes.

3    Q.    And you indicated -- I believe you indicated the body was

4    found in the bathroom?

5    A.    Yes.

6    Q.    But it appears that he was treated in the kitchen.  Did

7    the EMTs bring him out or did he come out on his own to that

8    spot?

9    A.    I testified earlier, sir, that the EMTs brought him out

10:19AM 10   from the bathroom into the hallway and into the kitchen where

11   there was more space.

12   Q.    When you -- you had also testified to there was a rear

13   door going out to a back porch, correct?

14   A.    Yes, sir.

15   Q.    Was there any evidence that that had been a forced entry

16   or broken entry?

17   A.    No, sir.

18   Q.    And then there was an actual exterior door to the porch as

19   well, correct?

10:19AM 20   A.    Yes.

21   Q.    Was that, again, appeared to be broken or forced in any

22   way?

23   A.    No, sir.

24         MR. NORKUNAS:  Thank you.  I have nothing further,

25   Judge.

1          THE WITNESS:  Thank you, sir.

2          THE COURT:  Redirect?

3          MR. POHL:  No, your Honor.  Thank you, Officer.

4          THE COURT:  Thank you.  You may step down.

5          THE WITNESS:  Thank you, your Honor.  Thank you,

6     jurors.

7          MS. LAWRENCE:  The government calls Deborah Huacuja.

8          DEBORAH HUACUJA, having been duly sworn by the Clerk,

9     testified as follows:

10                      DIRECT EXAMINATION

11    BY MS. LAWRENCE:

12    Q.    Good morning.

13    A.    Good morning.

14    Q.    Can you please say and spell your name for the jury.

15    A.    My name is Deborah Huacuja, D-e-b-o-r-a-h, H-u-a-c-u-j-a.

16    Q.    Where were you born?

17    A.    I was born in Mexico.

18    Q.    And what is your first language?

19    A.    Spanish.

20    Q.    You also speak English?

21    A.    Yes.

22    Q.    When did you learn English?

23    A.    I started studying English in first grade.

24    Q.    Did you at some point move to the United States?

25    A.    I'm sorry, I did not hear you.

1    Q.   Did you at some point move to the United States?

2    A.   Yes, while I was in high school.

3    Q.   Do you have a college degree?

4    A.   I do.  I went to Rutgers at the Mason Gross School of Art.

5    Q.   Do you have any advanced degrees?

6    A.   No.

7    Q.   What do you do for a living, Ms. Huacuja?

8    A.   I'm an interpreter in the federal courts and in the state

9    courts.

10:21AM 10  Q.   How long have you been working as an interpreter?

11   A.   I became certified in the State of Washington in 1991.

12   Q.   Do you also hold a certification here in the federal

13   court?

14   A.   Yes, I became federally certified in 1998.

15   Q.   And in what languages are you certified to interpret?

16   A.   In the federal system, there's only certification for

17   Spanish and Navajo, but I'm qualified for -- I'm certified in

18   Spanish, English, and I'm qualified for Hebrew.

19   Q.   Can you explain what the certification process is for the

10:22AM 20  federal court?

21   A.   The process is -- takes two years.  First, you have to

22   pass a written exam, which is I would say equivalent to a

23   master's degree language proficiency.  And if you pass the

24   written exam, a year later, you are able to take the oral exam,

25   which is much more specific to the judicial language.

Q.   And what do you mean by "judicial language"?

A.   To be familiar with all the terminology in criminal cases,

both in the courts, in the courtroom, and at the level of

ordinary people on the street.

Q.   Once you become certified, do you have recertification,

tests or exams?

A.   Not really, no.

Q.   And when you interpret for the Court, who do you work for?

A.   I work for myself.  I'm self-employed.

Q.   And are there different types of things that you do in the

course of providing services?

A.   Yes.  I pretty much cover every aspect of the judicial

system, starting with interpreting for probation, pretrial

services.  I work for both the defense attorneys and for the

prosecution, and I know there's something else, but basically

every aspect of the Court procedures in and out of court.

Q.   And when you do that work, whether you're interpreting for

pretrial services or the Court, the government or the

defendant, are you paid?

A.   Yes.

Q.   Okay.  And the party that hires you pays you, or the Court

pays you for everything?

A.   Correct -- no.  Well, a lot of it -- I think there are two

budgets, like CJA and court and probation is one, is paid by

the Administrative Court, and the prosecution is paid by the

Department of Justice.

Q.   And have you provided interpreter services in connection
with this case?

A.   Yes.

Q.   And how long have you been working on this case?

A.   Since before -- I'd say about roughly three years.

Q.   And in connection with this case, has the work that you
have done included a variety of things that you just described,
working for the Court, probation, the government and the
defense?

A.   Yes.

Q.   And I want to focus on your work for the government right
now.  Have you prepared English transcripts of Spanish
recordings?

A.   Yes, I have.

Q.   Can you please describe how you create a transcript of a
recording.

A.    I have a headset, and I'm given the recording and the
laptop, and I listen to the recording, and I translate it, and
I write it down on the laptop, and that's it.

Q.   And you said translate.  Can I ask you, is there a
difference between interpreting or translating?

A.   Yes.

Q.   What is that?

A.    Interpreting is usually oral.  Like I will -- like in a

1    trial or in a hearing, if the defendant doesn't speak English

2    and speaks Spanish, one of -- myself or one of my colleagues

3    will stand and translate, what we call interpreting, what is

4    being said so that there is a communication between the Court

5    and the defendant.

6    Q.   And so when you're making your transcript, you're

7    listening to the recording?

8    A.   Yes.

9    Q.   And you're typing while you're listening, or how does that

10:26AM 10   work?

11   A.   Well, it's actually a pretty tedious process because you

12   don't listen to it once, you know.  Sometimes the recordings

13   aren't great, sometimes -- and usually you have to listen more

14   than once even when the recording is great, you don't like --

15   it's not like speaking where you say it and you're done.

16   Writing it down is -- you have to be very exact.

17   Q.   And what kinds of things are you considering when you're

18   listening to a recording and you're trying to make it an exact

19   translation of what you're listening to?

10:27AM 20   A.   Well, at all times, regardless of whether I'm transcribing

21   or interpreting, you know, verbally, I am always interested in

22   focusing, laser focusing on being accurate, so that is my main

23   concern is to be accurate.  If I am not able to be sure of what

24   I hear, I will write "unintelligible."  I don't guess.

25   Q.   When you -- a slightly different question.  In your

1   experience, do all Spanish speakers speak Spanish in the same

2   way?

3   A.   Well, Spanish is one language.  It's the same language

4   that we all speak.  We can all understand each other, of

5   course.  In different parts of the world, there are many

6   countries that are Spanish-speaking, and people develop the

7   language in different ways.  Sometimes there are different

8   accents, or words might be used differently.

9        The simplest example would -- even the word for beans

10:28AM 10   in Mexico is "frijoles," and in other places, it might be

11   "porotos."  And so one of the challenges and pleasures, I'd

12   say, of being an interpreter is becoming familiar with all the

13   different ways of using the same words or similar words.

14   Q.   And in addition to a word having different -- not the word

15   having different meanings but the same thing being described by

16   two different words, are there other considerations or

17   differences in the language in terms of context or formality

18   that you take into consideration?

19   A.   Yes, that's what we call the register of the language.

10:29AM 20   For instance, when the Judge is giving instructions to a jury,

21   that's very formal and high level language; whereas if you're

22   having coffee with your friend, it's going to be much more

23   relaxed, and so that we call the registry, and I think part of

24   being an interpreter is maintaining the same tone or the same

25   register of what has been said.

1    Q.    And you said earlier that your goal was to make an

2    accurate transcript?

3    A.    Correct.

4    Q.    And it takes a long time?

5    A.    Sometimes, yes.

6    Q.    And actually do you have a sort of benchmark that you use

7    for how long it would take to transcribe a certain amount, like

8    a minute of recording takes this amount of time, or is there

9    anything like that that you use?

10:29AM 10    A.    Sometimes interpreters are asked -- you know, if they're

11    going to be asked to do a recording how long it will take, and

12    the benchmark is about an hour per minute of recording.

13    Q.    Per minute of spoken?

14    A.    From hearing and writing and translating.

15    Q.    Okay.  When you are listening to a recording and you are

16    transcribing the words that are spoken, taking into

17    consideration the differences in regional -- regional word

18    usage and the register, do you also attempt to identify the

19    voices of the speakers?

10:30AM 20    A.    No.

21    Q.    No.  And if your transcript includes voices, speakers

22    identified, where do those come from?

23    A.    I'm told who the speakers are, or it's already included in

24    the information that I have, and if I have the opportunity to

25    verify it, if I don't know who the speaker is, I write

1      unidentified male or female, so that would be the UM or UF.

2      Q.    When you're making transcripts, do you sit down and write

3      a final transcript from the recording when you listen to it?

4      A.    What do you mean?

5      Q.    Is your product one final product?

6      A.    You usually make a draft of it because of, you know, I

7      might need to review it again and just to make sure because

8      it's something that I want to do correctly.

9      Q.    So you might have several iterations of a translation

10:31AM 10     before you reach the point where you feel like it's accurate?

11     A.    Yes.

12     Q.    In this case, in terms of achieving an accurate transcript

13     and also identifying voices, did you work with anyone to try to

14     do both of those things?

15     A.    Yes.

16     Q.    And who was that individual?

17     A.    You want his name?

18     Q.    Yes, please.

19     A.    Jose Hernandez.

10:32AM 20     Q.    And who is he in connection to this case?

21     A.    He's a defendant.

22     Q.    Okay.  And you worked with him as part of making these

23     transcripts, correct?

24     A.    Well, no, I made the transcripts.

25     Q.    Yes.

1    A.    And I had the opportunity to let him listen to them and

2    identify the speakers.

3    Q.    Okay.  And did he also at times identify words or phrases

4    or provide context?

5    A.    Yes.

6    Q.    Okay.  So you did take into consideration some of the

7    things he said in producing the final transcripts?

8    A.    That is correct.

9          THE COURT:  Is this a good break point?

10:32AM 10          MS. LAWRENCE:  Sure.

11          THE CLERK:  All rise.

12          (JURORS EXITED THE COURTROOM.)

13          (A recess was taken.)

14          THE CLERK:  All rise for the jury.

15          (JURORS ENTERED THE COURTROOM.)

16          THE CLERK:  Thank you.  You may be seated.  Court is

17    now back in session.

18    Q.    Ms. Huacuja, when we broke, just before we broke, we were

19    talking a bit about your process for preparing a transcript?

10:49AM 20    A.    Correct.

21    Q.    And you mentioned that you worked with Jose

22    Hernandez-Miguel as part of that process?

23    A.    Yes.

24    Q.    Can you tell the jury what you did as part of that process

25    with him?

1    A.   Well, I was not alone with Mr. Hernandez.  There were

2    agents, and there was a laptop and we played the recording for

3    Mr. Hernandez-Miguel to listen to while I already had my

4    transcript, my draft transcript in front of me.  And as we

5    listened to each recording, he identified who the speakers

6    were.  If there was a word or a phrase that I was unfamiliar

7    with, I had the opportunity to ask him the meaning of that, and

8    that's what we did with each recording.

9    Q.   And in the course of preparing the transcripts, you

10:50AM 10  mentioned earlier that you listened to the recordings several

11   times?

12   A.   Correct.

13   Q.   And you described how long it would take.  It's fair to

14   say several hours you'd listen to a recording in preparing that

15   one transcript?

16   A.   Yes, more than that even.

17   Q.   Okay.  And how many hours do you think you spent listening

18   to recordings in this case preparing transcripts?

19   A.   I couldn't say a number, but many.

10:51AM 20  Q.   Many.  In the course of listening those recordings, did

21   you become familiar with certain voices?

22   A.   Yes, I could hear that there was a voice similar to the

23   one I had heard previously.

24   Q.   And did you also watch videos?  Were some of these

25   recordings video and audio?

1     A.   Yes.

2     Q.   And when you were watching the video, could you see people

3     speaking at times on screen?

4     A.   Yes.  My focus was mostly audio.  Having a visual really

5     makes no difference in my translation.

6     Q.   Did it make any difference to you in whether you felt your

7     identification of a speaker or someone else's was accurate?

8     A.   I really didn't focus that much on it.  I just really

9     focused on what each person was saying.

10:52AM 10   Q.   And the translation of those words onto the transcript?

11    A.   Yes.

12    Q.   Okay.  Ms. Huacuja, I'd like to show you -- just for the

13    witness, please.  Exhibit -- I'm sorry, this is just for the

14    witness.  This is what's been marked as Exhibit 200.  Do I hit

15    it or -- this is a disk -- well, tell me, what is this that

16    you're seeing on the screen right now?

17    A.   I see an envelope with a compact disk in it.

18    Q.   And is there a date on that disk?

19    A.   Yes, 1-25-14.

10:53AM 20   Q.   Do you know what this is?

21    A.   It says Exhibit 200 from 15-10338.

22    Q.   And is this a recording made on January 25, 2014?  This is

23    a disk of that recording?

24    A.   I don't know when it was made, but it is a recording.

25    Q.   Okay.  All right.  Did you listen to this recording?

1    A.   Yes.

2         MS. LAWRENCE:   Okay.  Can I pull up for the exhibit --

3    this is back to the screen.  Exhibit 20, please.

4    Q.   Ms. Huacuja, do you recognize this document on the screen?

5    A.   Yes.

6    Q.   Okay.  What is that, please?

7    A.   It's a transcript that I made.

8    Q.   And is this the full transcript or an excerpt?

9    A.   Well, all I see is the first page.  I believe this is an

10:54AM 10   excerpt from a full transcript.

11   Q.   And this is a transcript that you made, correct?

12   A.   Correct.

13        MS. LAWRENCE:   Okay.  Back to the Elmo, please, for

14   the witness.

15   Q.   So what's been marked for identification as Exhibit 201.

16   Did you listen to this recording made on February 16, 2014?

17   A.   I listened to that recording, yes.

18        MS. LAWRENCE:   And for the witness, please,

19   Exhibit 119.

10:54AM 20   Q.   Do you recognize this?

21   A.   Yes.

22   Q.   What is it, please?

23   A.   It's another transcript that I made.

24   Q.   That you made, okay.  Thank you.

25        MS. LAWRENCE:   And back to the Elmo, please.  I'm

1    showing you what's been marked as Exhibit 202.

2    Q.   Did you listen to this recording made on June 14, 2014?

3    A.   Yes.

4         MS. LAWRENCE:  And for the witness, please,

5    Exhibit 22.

6    Q.   Ms. Huacuja, do you recognize this item?

7    A.   Yes, it's another transcript that I made.

8    Q.   And also of the June 14, 2014 recording, correct?

9    A.   Yes.

10:56AM 10    MS. LAWRENCE:  Exhibit 120 for the witness, please.

11   Q.   Do you recognize this document?

12   A.   Yes.

13   Q.   And what is it?

14   A.   It's another transcript that I made.

15        MS. LAWRENCE:  Back to the Elmo, please.

16   Q.   Ms. Huacuja, did you listen to this recording made on

17   February 8, 2015?

18   A.   Yes.

19        MS. LAWRENCE:  And Exhibit 23 for the witness, please.

10:56AM 20   Q.   Do you recognize this document?

21   A.   Yes.

22   Q.   And what is that?

23   A.   It's another transcript that I made.

24   Q.   A recording we just --

25   A.   Correct, of the previous recording.

```
 1              MS. LAWRENCE:  Elmo again, please.

 2    Q.   Did you listen to this recording made on March 29, 2015?

 3    A.   I did.

 4              MS. LAWRENCE:  And Exhibit 24 for the witness.

 5    Q.   Do you recognize this document?

 6    A.   Yes, I do.

 7    Q.   And what is it, please?

 8    A.   It's another transcript that I made.

 9    Q.   Of the recording we just --

10    A.   Of the recording that I just saw.

11    Q.   Okay.

12              MS. LAWRENCE:  Elmo, please.

13    Q.   Did you listen to this recording made on August 31, 2015?

14    A.   Yes, I did.

15              MS. LAWRENCE:  Exhibit 27 for the witness, please.

16    Q.   Do you recognize this document?

17    A.   Yes.

18    Q.   What is it?

19    A.   It's another transcript that I made from the previous

20    recording.

21              MS. LAWRENCE:  Elmo, please.

22    Q.   Did you listen to this recording of an October 24, 2015

23    recording?

24    A.   Yes.

25              MS. LAWRENCE:  Exhibit 28 for the witness, please.
```

```
 1    Q.   I'm going to show you two documents related to the
 2    recording we just saw.  The first is the one before you now.
 3    Do you recognize this?
 4    A.   Yes, it's a transcript that I made of the recording that
 5    we just saw.
 6              MS. LAWRENCE:  Okay.  And then Exhibit 121, please.
 7    Q.   And do you also recognize this document?
 8    A.   Yes.
 9    Q.   Okay.  And what is that?
10    A.   It's a transcript that I made of the same recording.
11    Q.   Okay.  And why were there two transcripts?
12    A.   There are two different parts.
13    Q.   Two different parts, okay.
14              MS. LAWRENCE:  Elmo again, please.
15    Q.   Did you listen to this recording made on January 8, 2016?
16    A.   Yes.
17              MS. LAWRENCE:  For the witness, Exhibit 31.
18    Q.   Do you recognize this document?
19    A.   Yes.
20    Q.   What is it, please?
21    A.   It's another transcript that I made of the previous
22    recording.
23    Q.   I will show you another document related to the disk we
24    just saw.  This is Exhibit 122.  Do you recognize this?
25    A.   Yes.
```

10:58AM (line 10)
10:59AM (line 20)

```
          1    Q.    What is it, please?

          2    A.    It's a transcript that I made of the previous recording,

          3    different section.

          4    Q.    Thank you.

          5          MS. LAWRENCE:  Elmo again, please.

          6    Q.    Did you listen to calls -- I'm sorry, did you listen to

          7    the recordings of calls made on December 16, 2014?

          8    A.    Yes.

          9          MS. LAWRENCE:  For the witness, please.

11:00AM  10    Q.    I'm showing you Exhibit 44.1 through 44.4.  Do you

         11    recognize those documents?

         12    A.    Yes.

         13    Q.    And what are they, please?

         14    A.    They are transcripts I made of the previous recordings.

         15          MS. LAWRENCE:  Elmo, please.

         16    Q.    Did you listen to a recording made on January 21st, 2014?

         17          THE COURT:  Before we -- you talked about a disk

         18    bearing the date December 16, 2014, but you didn't give it a

         19    number?

11:01AM  20          MS. LAWRENCE:  I'm sorry, 209, your Honor.

         21          THE COURT:  Okay.  Go ahead.

         22    Q.    This is a disk marked for identification as Exhibit 210,

         23    recording made on January 21st, 2013.  Did you listen to this

         24    recording?

         25    A.    Yes.
```

1          MS. LAWRENCE:  For the witness, please, Exhibit 55.

2     Q.   Do you recognize this document?

3     A.   Yes.

4     Q.   And what is it, please?

5     A.   It's a transcript I made of the previous recording.

6          MS. LAWRENCE:  Elmo, please.

7     Q.   Okay.  Showing you a disk that's been marked as

8     Exhibit 211.  It's a recording of calls made on February 14,

9     2014.  Did you listen to these calls?

11:01AM 10  A.   Yes, I did.

11          MS. LAWRENCE:  For the witness, please, Exhibits 56.1

12    through 53.

13    Q.   Do you recognize those documents?

14    A.   Yes.

15    Q.   What are they?

16    A.   They are transcripts I made of the recordings.

17    Q.   That were on the prior disk that we --

18    A.   Correct, of the previous disk.

19          MS. LAWRENCE:  Okay.  Elmo, please.

11:02AM 20  Q.   Showing you a disk that's been marked for identification

21    as Exhibit 212.  Did you listen to these recordings of calls

22    made December 1, 2014 through December 8, 2014?

23    A.   Yes.

24          MS. LAWRENCE:  For the witness, please, Exhibit 62.1

25    through 62.4.

1    Q.   Do you recognize these documents?

2    A.   Yes, they are transcripts that I made of the previous

3    recording.

4         MS. LAWRENCE:  Elmo, please.

5    Q.   Showing you what's been marked as Exhibit 214 for

6    identification, a recording made on June 4, 2015.  Did you

7    listen to this recording?

8    A.   I did.

9         MS. LAWRENCE:  Exhibit 73 for the witness, please.

11:03AM 10    Q.   Do you recognize this document?

11    A.   Yes.

12    Q.   What is it, please?

13    A.   It's a transcript that I wrote of the previous recording.

14         MS. LAWRENCE:  Okay.  Elmo, please.

15    Q.   I'm showing you two disks.  One is marked as

16    Exhibit 215.1, the other is 215.2.  These are recordings made

17    on April 28, 2015.  Did you listen to these recordings?

18    A.   Yes.

19         MS. LAWRENCE:  Okay.  Exhibit 89 for the witness,

11:04AM 20    please.

21    Q.   Do you recognize this document?

22    A.   Yes.

23    Q.   What is it?

24    A.   It's a transcript I made of the previous recordings.

25         MS. LAWRENCE:  Okay.  Elmo, please.

1    Q.   Showing you what's been marked as Exhibit 216 for

2    identification.   This is a recording made on October 2, 2015.

3    Did you listen to this recording?

4    A.   Yes.

5    Q.   Exhibit 103 for the witness, please.   Do you recognize

6    this document?

7    A.   Yes.

8    Q.   What is it?

9    A.   It's a transcript I made of the previous recordings.

11:04AM 10        MS. LAWRENCE:   Elmo, please.

11   Q.   Showing you a disk that's been marked as Exhibit 217.

12   It's a recording made on December 6, 2015.   Did you listen to

13   this recording?

14   A.   Yes, I did.

15        MS. LAWRENCE:   Exhibit 106 for the witness, please.

16   Q.   Do you recognize this document?

17   A.   Yes.

18   Q.   And what is it?

19   A.   It's a transcript I did of the previous recording.

11:05AM 20        MS. LAWRENCE:   I'd like to show the witness also

21   Exhibit 125.

22   Q.   Do you also recognize this document?

23   A.   Yes.

24   Q.   And what is that?

25   A.   It's a transcript I made of the previous recording.

1  Q.   And as with prior disk that had two transcripts, is this a

2  separate part of the recording?

3  A.   Yes.

4        MS. LAWRENCE:  Okay.  Elmo, please.

5  Q.   Showing you what's been marked as Exhibit 218.  It's a

6  recording of a call made on January 1, 2016.  Did you listen to

7  this recording?

8  A.   Yes.

9        MS. LAWRENCE:  Exhibit 115 for the witness, please.

11:05AM 10  Q.   Do you recognize this document?

11  A.   Yes.

12  Q.   And what is it?

13  A.   It's a transcript I made of the previous recording.

14        MS. LAWRENCE:  Elmo, please.

15        MR. MURPHY:  Is that 115 or 114, your Honor?

16        THE COURT:  She said 115.  I think the last one --

17        MS. LAWRENCE:  It was 114.

18        THE COURT:  It should be 114?

19        MS. LAWRENCE:  It should've been 114.

11:06AM 20        THE COURT:  The transcript.

21        MS. LAWRENCE:  Thank you.

22  Q.   Now showing you what's been marked as Exhibit 219 for

23  identification.  It's a recording made on January 2, 2016.  Did

24  you listen to this recording?

25  A.   Yes, I did.

```
 1    Q.   Okay.

 2         MS. LAWRENCE:  Now.  Exhibit 115 for the witness.

 3    Thank you.

 4    Q.   Do you recognize this document?

 5    A.   Yes.

 6    Q.   And what is it?

 7    A.   It's a transcript I made of the previous recording.

 8         MS. LAWRENCE:  Elmo again, please.

 9    Q.   Okay.  Now I'm showing you what's been marked as

11:07AM 10   Exhibit 220 for identification.  This is a recording -- a

11    different recording made on January 2, 2016.  Did you listen to

12    this?

13    A.   Yes.

14         MS. LAWRENCE:  And Exhibit 116 for the witness,

15    please.

16    Q.   Do you recognize this document, Ms. Huacuja?

17    A.   Yes.

18    Q.   And what is it, please?

19    A.   It's a transcript I made of the previous recording.

11:07AM 20        MS. LAWRENCE:  No further questions at this time, your

21    Honor.

22         THE COURT:  All right.  Mr. Iovieno.

23         MR. IOVIENO:  Yes, your Honor.  Thank you.

24

25
```

CROSS-EXAMINATION

BY MR. IOVIENO:

Q.   Good morning.

A.   Good morning.

Q.   We know each other, correct?

A.   Correct.

Q.   We've worked together in the past?

A.   Yes, we have.

Q.   Is it fair to say that you spent hundreds of hours doing

these transcriptions?

A.   As I said, I really can't tell you a number, but many

hours.

Q.   It was a pretty big job to do, correct?

A.   Yes, sir.

Q.   And you spent about three years doing this for the

government?

A.   I've been working on this case for about three years, not

only doing this.

Q.   And is it fair to say that this was a tedious process for

you doing this?

A.   Which part?

Q.   Actually listening to the tapes and then transcribing

them, that that was a tedious type of task for you?

A.   Well, I mean it's -- the nature of the work is tedious in

the sense that you have to listen over and over again.

1    Q.   And you have to listen over and over again because the

2    recordings, if you will, are not sometimes of good quality,

3    correct?

4    A.   In some cases, the recordings are sometimes not a good

5    quality.  In this case, as it turned out, they were pretty

6    consistently a good quality.

7    Q.   But with respect to say when there's a number of voices

8    being heard at a meeting, sometimes it's difficult to hear some

9    of the voices that are off and to a distance that are speaking,

11:09AM 10   correct?

11   A.   That's correct.

12   Q.   Simply for the fact that the person recording or the

13   recording device is located in one area and the other people

14   may be located a distance away?

15   A.   That's possible, yes.

16   Q.   And their voices, if you will, are sometimes -- are

17   muffled?

18   A.   Yes.

19   Q.   And you come across that situation and you can't

11:10AM 20   understand what someone is saying, you put down whatever you

21   heard was unidentified, right?

22   A.   "Unintelligible" or sometimes "voices overlapping," which

23   implies that it's unintelligible.

24   Q.   And that occurred on a number of occasions during the

25   course of this case, correct?

1   A.   Yes.

2   Q.   And with respect to -- you knew the identity of the person

3   who had the recorder on, correct?

4   A.   I knew that person as CW.

5   Q.   CW-1?

6   A.   CW-1, yes.

7   Q.   And it's fair to say that his voice was pretty clear,

8   because the recording device was on him, so you could recognize

9   his voice, correct?

11:10AM 10   A.   Not necessarily.  I mean, all the voices -- there were

11   many voices that were pretty clear.

12   Q.   But with respect to his, in particular, because the

13   recording device was on him, you had no difficulty after

14   listening a few times to identify his voice, correct?

15   A.   I didn't identify any voices.  That was somebody else's

16   job.

17   Q.   Okay.  So, you didn't identify any of the speakers on

18   these transcripts?

19   A.   Correct.

11:11AM 20   Q.   You relied on other people to do that for you, right?

21   A.   To do that, period.  Not for me, but for the case.

22   Q.   And on the documents that you were shown by the

23   government, the actual identification of the speakers you did

24   not do?

25   A.   Correct.

1    Q.    And when you were doing this process, when you first

2    started the process, were you given any draft transcripts by

3    other linguists who did this for the government?

4    A.    Sometimes.

5    Q.    Okay.  And on how many occasions were you given other

6    transcripts done by others?

7    A.    I don't know.

8    Q.    But it was a number of occasions?

9    A.    Yes, not that many, but a few.

11:11AM 10   Q.    And did you work off of those transcripts that other

11   people did to come up with your own version of the transcripts?

12   A.    I sometimes reviewed the other transcripts, but mostly

13   even if there was a previous transcript, I would create my own

14   transcript.

15   Q.    And is it fair to say that you came up with a number of

16   different draft transcripts and they morphed or changed over

17   time?  Is that fair to say?

18   A.    As I progressed, you know, it wasn't like I did the full

19   translation of a transcript in one sitting.  So as I worked on

11:12AM 20   it, it wasn't that only that might have changed but that I was

21   advancing in the translation.  So if it was unfinished, I just

22   called it a draft, and then even once it was finished, I still

23   left myself the option of being able to go back and make a

24   change, if necessary.

25   Q.    And you had conversations with the government about that

1    process; is that fair to say?

2    A.   Yeah.

3    Q.   And its fair to say that you told them that this was not a

4    final product, that this needs work, and the transcripts went

5    over transformation until it became a final transcript, right?

6    A.   I didn't say it needed work.  I'd just write "draft" on

7    it.  It wasn't a conversation about it.

8    Q.   Well, you understood that certain of these draft

9    transcripts were produced during the course of this trial,

11:13AM 10   correct?

11   A.   I'm sorry.  I didn't understand the question.

12   Q.   Was it your understanding that certain drafts of the

13   transcripts were produced during the course of this litigation?

14   A.   Yes.

15   Q.   And you understood that with respect to say one meeting

16   that may have been three, four or five or even six transcripts

17   that were produced that were drafts?

18   A.   I don't know.

19   Q.   You had no role in that, correct?

11:13AM 20   A.   No.

21   Q.   And at some point when you completed your work on say one

22   of the meetings, did you indicate this was the final

23   transcript?

24   A.   Yes.

25   Q.   And there was nothing more for you to do on it?

1    A.    Yes.

2    Q.    That that was the best you could do with it, correct?

3    A.    Correct.

4    Q.    And coming to that end product, there were numerous drafts

5    in between on some of these meetings; not all of them, but some

6    of them?

7    A.    Well, it wasn't that there was a finished draft and then

8    another finished drafts.  Mostly the drafts were, as I said,

9    previously, because it was unfinished.

11:14AM 10   Q.    Well, let's direct your attention to a specific task that

11   you did, okay.

12          MR. IOVIENO:  And I'm going to show the document

13   camera for the witness.

14          MS. LAWRENCE:  Your Honor, objection.

15          THE COURT:  I'm sorry.

16          MS. LAWRENCE:  Objection.

17          THE COURT:  Well, he hasn't shown anything.  Let me

18   see what he's showing her.  This is the witness, should be

19   witness only?

11:14AM 20         MR. IOVIENO:  Yes.

21          THE COURT:  Yes.

22   Q.    I'm going to show you a document, and it appears to be the

23   January, 2016 draft transcript, correct?

24   A.    Yes.

25   Q.    The first page of it?

```
 1    A.   I'm sorry.

 2    Q.   The first page of it?

 3    A.   Yes.

 4    Q.   All right.  And that's a draft transcript that you did for

 5    the government, right?

 6    A.   Yes.

 7    Q.   And with respect to this meeting, is it fair to say that

 8    there were a number of draft transcripts that you submitted

 9    regarding this meeting?

10    A.   Possibly.

11    Q.   Okay.  And there were certain information or translations

12    in that transcript during the various drafts that changed over

13    time, correct?

14    A.   I believe so, yes.

15    Q.   And with respect to say the identification of the

16    speakers, it's your understanding that also changed on some

17    occasions?

18    A.   Yes.

19    Q.   Okay.  And that changed because somebody told you it was a

20    different speaker, right?

21    A.   Correct.

22    Q.   And that wasn't something that you did?

23    A.   Correct.

24    Q.   And if I could just turn to page 51.  And, again, just so

25    we're clear, the identification of the speakers on page 51, on
```

1    this version, this is not something that you did, someone else

2    did?

3    A.    Correct.

4    Q.    I'll show you another document which appears to be another

5    draft transcript of the January 8, 2016 recording, correct?

6    A.    Yes.

7    Q.    Okay.  This is another version of the transcript that you

8    put in to the government?  You gave this to the government?

9    A.    It appears to be different, yes.

11:16AM 10    Q.    It's an earlier version of what I just showed you earlier,

11    correct?  This predated that version?

12    A.    Well, this might be one of the transcripts that was

13    originally made by somebody else.

14    Q.    So with respect to the January 8th meeting, specifically,

15    that's one of the transcripts that someone else may have

16    contributed to in making the --

17    A.    Possibly, yes.  There are certain abbreviation lists that

18    I don't use.

19    Q.    And could you just point that out on this document for me?

11:17AM 20    A.    Right there.

21    Q.    And that is something that you do not use, and that would

22    indicate to you that you didn't produce this draft transcript?

23    A.    It's possible that I worked on it.

24    Q.    Now, with respect to the -- I think you testified that

25    some of the language was -- the dialect was different?

A.   Some words are different.  It's not a different dialect.

Q.   Is it fair to characterize some of the language that you heard on these tapes as slang?

A.   Yes.

Q.   And it's fair to say that there were certainly muffled words and language during the course of your doing these transcriptions?

A.   Well, like I said, if it's muffled, if I can't understand it, I don't translate what I didn't hear.

Q.   And, again, with respect to -- you understood that there was someone with the name of Lobo that was identified to you as perhaps one of the speakers, correct?

A.   As a nickname, yes.

Q.   Okay.  And were you told that there were two Lobos involved in this case?

A.   No.

         MR. IOVIENO:  I have nothing further.

         THE COURT:  Any other cross?  Mr. Norkunas.

                    CROSS-EXAMINATION

BY MR. NORKUNAS:

Q.   Good morning.

A.   Good morning.

Q.   We also have worked together.

A.   That is correct.

Q.   In relation to the rough product, if I could call it that,

1    the original disk that came in, was there ever a meeting in

2    which multiple interpreters or translators were all together in

3    one area and trying to work on transcripts?

4    A.   No.

5    Q.   Did you ever meet or discuss transcripts that came from

6    other providers as to why they had interpreted certain terms in

7    certain ways?

8    A.   No.

9    Q.   It's fair to say that -- is it fair to say that there were

11:20AM 10   different people -- you became familiar with there were

11   different people in different sections of the country that were

12   interpreting the rough tapes and then those transcripts were

13   coming to you?

14   A.   I'm sorry.  Could you repeat the question?

15   Q.   There were other interpreters in other sections of the

16   country which were preparing initial transcripts of some of the

17   recordings and then those would come to you?

18   A.   I don't know where they came from.

19   Q.   So you were never told by anybody we have had a certain

11:20AM 20   person do transcripts and they're coming to you?

21   A.   No.

22   Q.   You didn't know their proficiency, you didn't know their

23   training, you didn't know their background, you were just given

24   a transcript and told this is part of the case?

25   A.   I didn't know anything about the transcripts that were

1    done before I saw them.

2    Q.   So once you were given a transcript, a typed version of a

3    recording, you weren't asked to redo it, correct?

4    A.   Most of the transcripts that I made, I was given a

5    recording from the start.  Some transcripts had been done

6    previously.  I was -- I looked at some of them because I was

7    asked to and then produced my own transcript, if necessary.

8    Q.   That would be -- some of them, is that a number that means

9    1, 2, 3, 4?

11:21AM 10    A.   Yes, maybe three or four.

11    Q.   Three or four, all right.  Do you know how many came in

12    from other interpreters that you had not met or encountered?

13    Do you know what the total number of that would have been?

14    A.   No, I have no idea.

15    Q.   And did you simply -- or not simply.  Did you go into

16    those to determine if there was something there that you

17    thought that was not consistent with the way you were

18    interpreting a phrase or a name?

19    A.   When I was asked to review a transcript, it was already

11:22AM 20    done by somebody else.  My process was to listen to the

21    recording while I'm reviewing the transcript and see if I agree

22    with that transcript or not.  And if it was a transcript that

23    needed to be produced, I made changes in my own transcript.

24    Q.   So there were terms used by another interpreter someplace

25    that you may have disagreed with and then you would change it?

```
 1   A.   No terms, words.
 2   Q.   Words that you would disagree with and you would change
 3   those?
 4   A.   Sometimes it would say "unintelligible," and I could tell
 5   what was being said, so I would put in what I heard, and
 6   sometimes there were things that were incorrect and I corrected
 7   them.
 8   Q.   When you say incorrect, that was your interpretation of
 9   whether that was correct or not correct?
11:23AM 10   A.   Yes and no because a language is used because it has
11   meaning, so if something that you hear is -- if you hear it and
12   what is written is not what you hear, then that is incorrect,
13   so it's not a matter of interpretation, it's, you know, what it
14   says.
15   Q.   But you were unfamiliar with the knowledge or the skills
16   of the person that had given you the original transcript,
17   correct?
18   A.   I had no knowledge of the person who had done the original
19   transcript.
11:23AM 20   Q.   You became the final judge?
21   A.   Yes.
22        MR. NORKUNAS:  Thank you.
23        THE COURT:  Anyone else?  Any redirect?  I'm sorry,
24   Ms. Rodriguez.
25
```

CROSS-EXAMINATION

BY MS. RODRIGUEZ:

Q.   Good morning, Ms. Huacuja.

A.   Good morning.  How are you?

Q.   We have not worked together, but my name is

Madeleine Rodriguez, and I represent Mr. Sandoval.  I just want

to ask you a few questions about some of the translations that

you reviewed with Ms. Lawrence, if that's okay.

A.   Yes.

THE COURT:  Can you get the cord off the screen, if

you would, please.  Thank you.

Q.   Ms. Huacuja, do you recall seeing this translation

transcript?

A.   Yes.

Q.   And you prepared this transcript, correct?

A.   Correct.

Q.   I want to direct your attention to the statement -- the

paragraph towards the bottom.  I'm going to play for you the

original recording, if that's all right, and then once we've

listened to the Spanish, I'd like to discuss the translation.

THE COURT:  This isn't in evidence.  It has not been

admitted into evidence, the recording or the transcript, at

this point.  If everyone agrees, we can just admit it, if that

saves time, but --

MS. RODRIGUEZ:  Could we be seen at sidebar briefly?

1        THE COURT:  All right.

2        MS. RODRIGUEZ:  Thank you.

3        (THE FOLLOWING OCCURRED AT SIDEBAR:)

4        MS. LAWRENCE:  It hasn't been admitted because the

5   speakers have not been identified yet by Ms. Huacuja.

6        THE COURT:  I understand why you haven't offered it

7   yet.  If she wants to offer the recording or the disk, you're

8   not going to object to it, you intend to offer it at some

9   point, right?

11:26AM 10        MR. POHL:  I don't think so.  I don't think we intend

11   to offer the Spanish recording.  I mean, there's one or two

12   excerpts for one or two reasons like the one last week with --

13   but I don't expect we would offer the full recordings

14   themselves.

15        THE COURT:  Even so, what would the objection be to

16   playing the recording?  Presumably, it's the government's own

17   recording in Spanish.

18        MS. LAWRENCE:  Sorry.  The objection would be that

19   that's not the evidence, and we're not entirely sure what the

11:26AM 20   point of playing --

21        THE COURT:  But how else does Ms. Rodriguez, if she

22   wants to contest the translation of a word?

23        MS. LAWRENCE:  Is it the translation or the speaker

24   because we haven't --

25        THE COURT:  If it's the speaker, she's not the right

1    witness.  Is it the translation?

2         MS. RODRIGUEZ:  It's the translation.

3         THE COURT:  Okay.  Well, it seems to me that -- I

4    guess I don't see any reason why I can't admit the disk, at

5    least for this purpose and then, at a minimum, we can admit the

6    transcript of the relevant paragraph or word or whatever that

7    she's arguing about, although, I don't know why the whole, you

8    know, again, unless someone objects --

9         MS. LAWRENCE:  We are going to object because we're

11:27AM 10   offering it.

11        THE COURT:  You are not offering it?

12        MS. LAWRENCE:  We would be offering it.

13        THE COURT:  Okay.  Is there an objection to the whole

14   transcript coming in?  Does anyone object to it?

15        MR. IOVIENO:  I would object to the transcript coming

16   in?  It's the first time I've heard that the tapes weren't

17   going in.  So if the tapes don't go in, I don't know how the

18   transcript is coming in, so I object to the transcripts.

19        MS. LAWRENCE:  The tapes are the evidence of the --

11:27AM 20   THE COURT:  Because the tapes are in Spanish, they

21   aren't normally the evidence English transcription is.  You can

22   offer it.  I mean, it's relevant, again, for the purpose of

23   proving that it's wrong, as we're doing here, but I don't know

24   that we need to clutter the record with 30 disks.

25        MR. IOVIENO:  Doesn't the transcript have to interpret

 1    something that's in evidence?

 2            THE COURT:  Well, no.  I mean, like -- I guess it's a

 3    form of expert testimony.  It can be based on things that, you

 4    know, could be admissible, but you don't have to admit the

 5    underlying recordings.  If they were English, they'd come in.

 6            So let's do this, let's admit the disk, and I will

 7    admit, so far as the transcript as -- it's a particular

 8    sentence or phrase or paragraph or whatever that you're

 9    disputing and identify it and maybe put a piece of paper over

11:28AM 10    the rest of it until I admit the whole transcript.  I thought I

11    heard someone saying you were objecting to the transcript as a

12    whole?

13            MR. IOVIENO:  Yes.

14            THE COURT:  Okay.  Why don't we handle it that way.

15    And just for the sake of convenience, I don't know if it's

16    possible to block off the speaker's name or not.  If it's not,

17    I'll have to give a limiting instruction at this point.

18            MS. RODRIGUEZ:  Thank you, your Honor.

19            (SIDEBAR CONFERENCE WAS CONCLUDED)

11:29AM 20            THE COURT:  Ladies and gentlemen, let me try to

21    explain what we're doing here.  Counsel expects to

22    cross-examine the witness about the Spanish translation.  I'm

23    going to admit the underlying disk in evidence so that she can

24    listen to it.

25            What is the relevant disk?  What number?

1          MS. RODRIGUEZ:  I believe it's 206, your Honor.

2          THE COURT:  All right.  Exhibit 206 is admitted.

3          (Exhibit No. 206 received into evidence.)

4          THE COURT:  And then as to this document, which is

5   Exhibit 28, the government expects to introduce it later, but

6   it's not yet in evidence.  I'm going to admit the apparently

7   disputed translation portions in this case.  You're going to be

8   shown what looks like a sentence or a paragraph or so and that

9   piece.  So Exhibit 28, that portion of Exhibit 28 will be

11:30AM 10   admitted.

11          (Exhibit No. 28 received into evidence.)

12          MS. RODRIGUEZ:  Thank you, your Honor.

13          THE COURT:  Whenever you're ready, Ms. Rodriguez.

14   Q.   All right.  So, Ms. Huacuja, as I said, we're going to

15   focus on this specific paragraph, and I'm going to play you the

16   corresponding audio recording.  You could just listen and

17   follow along with me.

18          THE COURT:  We're not going to play the whole disk?

19          MS. LAWRENCE:  Objection, your Honor.

11:30AM 20          THE COURT:  We're just --

21          MS. LAWRENCE:  As to the identification of this

22   portion of the tape corresponding to that part of the

23   transcript.  It was a foundation.

24          THE COURT:  Overruled.

25          (Video in Spanish played)

1    Q.    Ms. Huacuja.

2    A.    Huacuja.

3    Q.    Huacuja, I'm sorry.  Did you hear in that excerpt the

4    following Spanish phrase, "enoce que decisiones van a tomar

5    despues de que le peguen a desconton ay este loco?"

6    A.    A desconton, I heard, yes.

7    Q.    Did you hear "despues de que le peguen un desconton ay

8    este loco"?

9    A.    I'd have to listen again.

11:31AM 10  Q.    Would you like me to play it again for you?

11   A.    Yes, please.

12          (Video played in Spanish)

13   A.    I believe that's what you said.

14   Q.    Okay.  And if we return to the translation that you

15   prepared, you translated that phrase as, "So I don't know what

16   decisions you will make after you give this dude the beating,"

17   correct?

18   A.    Correct.

19   Q.    And just turning momentarily back to the Spanish phrase,

11:32AM 20  there's a word in there that's "peguen", correct?

21   A.    I believe so, yes.

22          THE COURT:  Could you spell that for the record?

23          MS. RODRIGUEZ:  P-e-g-e-n.

24          THE WITNESS:  P-e-g-u-e-n.

25          THE COURT:  P-e-g-u-e-n is the word, correct?

1        THE WITNESS:  Yes.

2        THE COURT:  All right.  Go ahead.

3   Q.   And so in the translation that you prepared, the sentence,

4   "So I don't know what decisions you will make after you give

5   this dude the beating," the word "peguen", what is that

6   translating to in the English?

7   A.   The word "pegar" is usually to hit, it can also mean to

8   "attach" or "glue."  And, again, it's colloquial Spanish, so

9   can you tell me what your question is, again?

11:33AM 10   Q.   Sure.  So you mentioned that one of the translations would

11   be the word "to hit"; is that correct?

12   A.   It can be, yes.

13   Q.   Okay.  So in this sentence that you translated from that

14   audio recording, the sentence, "So I don't know what decisions

15   you will make after you give this dude the beating," peguen, or

16   as you said, which is a conjugated form of the verb pegar, what

17   is that being translated into?

18   A.   I'm not translating that word alone.  I'm translating it

19   with the word that comes afterwards, which is "desconton,"

11:33AM 20   which is one of the words of art used in this case, and it was

21   explained to me by Mr. Hernandez, which means a beating.

22   Q.   "A beating."  So, "peguen," it's hitting in this sentence

23   in the form of a beating; is that fair to say?

24   A.   No.  In this sentence, I'd say is "give him a desconton,"

25   so the "pegar un desconton" would be to -- pegar would be to

 1     sort of give him -- that's not the part of the phrase that is

 2     the hitting part.

 3     Q.   Fair enough.

 4          THE COURT:  Okay.  I'm sorry to do this to you, but

 5     can I ask you to spell the phrase that you're talking about

 6     here?

 7          THE WITNESS:  Yes, your Honor, "peguen" is

 8     p-e-g-u-e-n, "desconton" would be d-e-s-c-o-n-t-o-n.

 9          THE COURT:  Thank you.

11:34AM 10     Q.   All right.  I'd like to turn to another paragraph in this

11     same transcript, if that's all right.

12          THE COURT:  All right.  This paragraph, which in the

13     translation begins, "the problem is that" will be admitted,

14     again, as a portion of Exhibit 28.

15          (A portion of Exhibit No. 28 received into evidence.)

16     Q.   All right.  And do you see this paragraph?

17     A.   Yes, I do.

18     Q.   And you prepared this transcription, correct?

19     A.   That's correct.

11:36AM 20     Q.   Okay.  I'd also like to now listen to the corresponding

21     Spanish underlying this sentence.

22          (Video played in Spanish)

23     Q.   During that recording, did you hear the phrase, the

24     Spanish phrase, "habemos y hay muchos que aun pegado, homie"?

25     A.   Yes.

1   Q.   And is it fair that you've translated that phrase into

2   "There are many of us here who have killed, homie"?

3   A.   Yes.

4        MR. LOPEZ:  Objection, your Honor.

5        THE COURT:  Overruled.

6   Q.   So in that Spanish recording that we listened to, you

7   confirmed that we heard the word "pegado", correct?

8   A.   "Aun pegado" from the same verb "pegar".

9   Q.   Yes, from the same verb "pegar".  And earlier you said

11:37AM 10  that "pegar" can be translated into, you know, hitting someone,

11  "glue," being, you know, "adjacent to one another," but not the

12  word "kill," correct?

13  A.   That's correct.

14  Q.   I'd like to turn to another translation.

15       THE COURT:  While she's getting set up, ladies and

16  gentlemen, let me again just remind you.  It's up to you to

17  decide whether to accept a particular version of the

18  translation or when we get to that point, the identification of

19  the speakers.  It's a decision that you are to make in the

11:38AM 20  context of deciding this case.  Go ahead.

21  Q.   Do you recognize this transcript?

22  A.   It appears to be one of the transcripts that was

23  previously translated before I translated it.  It might be one

24  that I worked on.

25  Q.   Do you recall whether or not you worked on this

1    translation?

2    A.   I'd to have see the transcript.

3            THE COURT:  Do you have the whole document?

4            MS. RODRIGUEZ:  I do.  May I approach?

5            THE COURT:  Yes.

6            THE WITNESS:  I don't recall this offhand.

7            MS. RODRIGUEZ:  No further questions, your Honor.

8            THE COURT:  Mr. Lopez.

9                    CROSS-EXAMINATION

10   BY MR. LOPEZ:

11   Q.   Good morning.

12   A.   Good morning.

13   Q.   I, as the others, have worked with you?

14   A.   Yes, many times.

15   Q.   Directing your attention to a transcript of an excerpt

16   from January 25, 2014, at the bottom of page 3.

17            MR. LOPEZ:  Can I just show this to the witness?

18   Q.   Do you see the highlighted portion there?

19   A.   Yes.

11:42AM 20  Q.   And it's attributed to a particular speaker?

21   A.   Yes.

22   Q.   And I think you said that it was Mr. Hernandez who

23   assisted you in identifying the speakers?

24   A.   He didn't assist me in identifying, he identified.  I did

25   not identify.

1    Q.   He's also known as Muerto?

2    A.   That is his street name.

3    Q.   And so he was the one that told you that the person

4    identified at the bottom of page 3 of this transcript was the

5    person identified, not Mr. Muerto?

6    A.   I'm sorry.

7    Q.   Do you follow me?  Muerto was the one that told you this

8    speaker wasn't him?

9    A.   He told me who the speaker was.

11:43AM 10    Q.   And he told you it wasn't him?

11    A.   Well, it wasn't -- if it was that person, then it wasn't

12    another person.

13    Q.   Fair enough.  Now, there's also a transcript from

14    January the 8th that we expect to see.  And on page --

15              THE COURT:  I'm sorry, January the 8th.  What year?

16              MR. LOPEZ:  I'm sorry, your Honor, 2016.

17              THE COURT:  2016.

18    Q.   And on page 23 of that transcript, there is a reference to

19    a phrase, "Welcome to the Mara," do you see that?

11:43AM 20    A.   Yes.

21    Q.   Now, originally when the indictment came down in this

22    case, do you know who that phrase was attributed to?

23    A.   No.

24    Q.   You don't.  At some point in November of last year, were

25    you aware that a similar transcript attributed this to someone

1    other than the person identified in this document?

2    A.    I believe so.

3    Q.    And it wasn't the same person that's identified here?

4    A.    I'd have to see both transcripts.

5    Q.    What I'm trying to get at, at some point the person who

6    was identified in the transcript that was used during the

7    November trial, if you know, was changed to the person who's

8    identified here?

9    A.    I don't know.

11:44AM 10    Q.    You don't know.  Then for this trial, yet a third person

11    was identified?

12    A.    Possibly.  You know, I didn't memorize the transcripts.

13            MR. LOPEZ:  No further questions, your Honor.

14            THE COURT:  Redirect, Ms. Lawrence.

15                    REDIRECT EXAMINATION

16    BY MS. LAWRENCE:

17    Q.    You were asked on cross-examination a little bit about

18    your process and you were asked about different drafts?

19    A.    Correct.

11:45AM 20    Q.    Again, can you just explain to the jury how you go through

21    the process of preparing a transcript from a recording, just in

22    simple terms?

23    A.    I listen to the recording, and I write the -- I transcribe

24    it into English.

25    Q.    And you make changes as you go as you listen to the

```
 1    recording repeated times?
 2    A.   Yes.
 3    Q.   Okay.  And you also talked about you testified that you
 4    did not identify the speakers?
 5    A.   Correct.
 6    Q.   And that one source of identification that appears on the
 7    transcripts you create is information from Jose
 8    Hernandez-Miguel?
 9    A.   Yes.
11:45AM 10   Q.   I believe you also testified on direct that there was
11    another source of information for the identity of the speakers?
12    A.   Yes, I could be -- I could have received the information
13    along with a recording of who the speakers are, but I don't
14    know exactly who identified those.
15    Q.   I'd like to show you.
16         MS. LAWRENCE:  This is just for the witness, please.
17    This is the excerpt of Exhibit 28 that was admitted into
18    evidence.  The jury can see this, too, correct?  It's been
19    admitted, this particular piece?
11:46AM 20        THE COURT:  Yes.
21         MS. LAWRENCE:  Thank you.
22    Q.   You were asked about the phrase in English, "There are
23    many of us here who have killed, homie"?
24    A.   Yes.
25    Q.   And you were asked about the meaning of the word "peguen,"
```

1    the Spanish?

2    A.    Peguen, of the word here, yes.

3    Q.    So why did you translate this particular Spanish phrase

4    into this English phrase?

5    A.    That is one of the words that is used by this group of

6    people to mean either a hit or a murder, a kill.

7    Q.    How do you know that?

8    A.    Because I was told by Mr. Hernandez.

9          MS. LAWRENCE:  One minute, your Honor.  Nothing

11:47AM 10    further, your Honor.

11          THE COURT:  Recross.

12                       RECROSS-EXAMINATION

13    BY MR. IOVIENO:

14    Q.    With respect to certain phrases now, you relied on Jose

15    Miguel Hernandez specifically with this phrase to tell you what

16    a word meant, correct?

17    A.    Not only on him, because I have in the last three years

18    become familiar through talking with different people involved

19    in this case, so I have acquired a vocabulary in the sense for

11:48AM 20    this particular case.

21    Q.    From other people involved in this case, correct?

22    A.    Well, you know, I think you'd call it experience.  From

23    working on something, you learn about it, and you learn the

24    words that are used.  I don't remember specifically where I

25    first heard the word, meaning -- with this meaning, but

1    including Mr. Hernandez, yes.

2    Q.    Were there other people who gave you that information

3    besides Mr. Hernandez?

4    A.    Nobody that comes to mind at this moment.

5    Q.    And you indicated that you relied on Mr. Hernandez, Jose

6    Miguel-Hernandez to identify the speakers, but you also relied

7    on unidentified people who had made other draft transcripts

8    that identified some speakers, too, also?

9    A.    For the final draft, I relied only on Mr. Hernandez to

11:49AM 10    identify.

11    Q.    For the other drafts that you incorporated into the final

12    draft, you relied on other people's interpretation in

13    identification of speakers, correct?

14    A.    I may have begun with a certain identification, but if

15    Mr. Hernandez identified it differently, I changed -- if it was

16    different, I changed it.

17    Q.    So you relied on what Mr. Hernandez gave you even to

18    change what other people had given you, correct?

19    A.    Well, who do you mean by other people?  Do you mean the

11:49AM 20    previous identifications in some of -- in the three or four

21    drafts that I saw?

22    Q.    Yes.

23    A.    Yes.

24    Q.    Thank you.

25          MR. LOPEZ:  Can I just have one question, your Honor?

```
 1              THE COURT:  Yes.
 2                     RECROSS-EXAMINATION
 3    BY MR. LOPEZ:
 4    Q.   You never relied on CW-1; is that fair to say?
 5    A.   Yes.
 6              MR. LOPEZ:  Thank you.
 7              THE COURT:  You may step down now.  Thank you.  And we
 8    may as well take our break now.
 9              THE CLERK:  All rise.
10              (JURORS EXITED THE COURTROOM.)
11              (A recess was taken.)
12              THE CLERK:  All rise.
13              THE COURT:  Can I see counsel quickly at sidebar.
14              (SEALED SIDEBAR RELATING TO A JUROR).
15              (Exhibit D was marked for identification.)
16              THE COURT:  We need to swear in Ms. Huacuja as a
17    translator, which is different from being sworn in as a
18    witness.
19              (The interpreter was sworn.)
20              JOSE HERNANDEZ-MIGUEL, having been duly sworn by the
21    Clerk, testified through the Interpreter as follows:
22              MR. POHL:  May I, your Honor?
23              THE COURT:  Yes.
24              MR. POHL:  Thank you.
25
```

11:50AM (line 10)
12:07PM (line 20)

                          DIRECT EXAMINATION

1

2    BY MR. POHL:

3    Q.   Good afternoon.

4    A.   Good afternoon.

5    Q.   What is your name?

6    A.   Jose Hernandez-Miguel.

7    Q.   How old are you?

8    A.   Thirty.

9    Q.   You appear here today in court in an orange jumpsuit,

10   correct?

11   A.   Yes.

12   Q.   In 2016, were you charged in this court?

13   A.   Yes.

14   Q.   And did you plead guilty to the crimes you were charged

15   with?

16   A.   Yes.

17   Q.   And at the time you pleaded guilty, did you have a plea

18   agreement?

19   A.   Yes.

20        MR. POHL:  For the witness, Madam Clerk.  Thank you.

21   Q.   Do you see the document in front of you,

22   Mr. Hernandez-Miguel?

23   A.   Yes.

24   Q.   Okay.  Have you reviewed that document before your

25   testimony here today?

1    A.    Yes.

2    Q.    And I'm going to start with the first paragraph here.  To

3    make it easier for you to read, I'm going to blow it up I think

4    a little bit.  And this is paragraph 1 -- is this your plea

5    agreement?

6    A.    Yes.

7    Q.    Okay.  And does it list the crimes to which you pleaded

8    guilty?

9    A.    Yes.

12:09PM 10    Q.    And --

11              THE COURT:  Excuse me, are you going to offer this?

12              MR. POHL:  Yes, your Honor.

13              THE COURT:  What number?

14              MR. POHL:  It would be 49.1, and the corresponding

15    cooperation agreement will be 49.2.  If there's no objection,

16    I'll just move these into evidence now.

17              THE COURT:  We'll admit them, 49.1 and 49.2.

18              (Exhibit No. 49.1 and 49.2 received into evidence.)

19              THE COURT:  Thank you, your Honor.

12:09PM 20              MR. POHL:  Thank you.  All right.  Madame Clerk, for

21    the jury.

22    Q.    All right.  This is part of your plea agreement, correct?

23    A.    Yes.

24    Q.    And it sets out the crimes to which you've pleaded guilty,

25    correct?

1   A.   Yes.

2   Q.   And there are three crimes?

3   A.   Yes.

4   Q.   And one of them is racketeering conspiracy?

5   A.   Yes.

6   Q.   One of them is conspiracy to distribute 5 kilograms or

7   more of cocaine?

8   A.   Yes.

9   Q.   And the last one is conspiracy to distribute cocaine and

12:10PM 10   cocaine base, sometimes called "crack cocaine"?

11   A.   Yes.

12   Q.   Okay.  And there's a final portion of the plea

13   agreement -- of this section of the plea agreement below it,

14   correct?

15   A.   Yes.

16   Q.   As part of your plea in the racketeering conspiracy, you

17   admitted that you committed a violent crime, correct?

18   A.   Yes.

19   Q.   And what was that?

12:11PM 20   A.   That's participating in organized crime.

21   Q.   And while you were participating in that, did you commit a

22   stabbing?

23   A.   Yes.

24   Q.   Okay.  All right.  So I'll quickly go through this next

25   paragraph, Mr. Hernandez-Miguel.  It talks about the maximum

1   penalty that you can get for the crimes you pleaded guilty to,

2   correct?

3   A.   Yes.

4   Q.   And for racketeering conspiracy, you can go to prison for

5   20 years, correct?

6   A.   Yes.

7   Q.   Okay.  And for the conspiracy to distribute 5 kilograms or

8   more of cocaine, you could go to prison for the rest of your

9   life, correct?

12:12PM 10   A.   Yes.

11   Q.   And at a minimum, you could serve -- you have to serve --

12   you would be required to serve 10 years in prison?

13   A.   Yes.

14   Q.   And for the conspiracy to distribute cocaine and crack

15   cocaine, you could again be sentenced to prison for 20 years?

16   A.   Yes.

17   Q.   Okay.  I'm going to show you the last two pages of this

18   part of your plea agreement.  This is the signature page,

19   correct?  This is a signature page, correct?

12:13PM 20   A.   Yes.

21   Q.   Where the government lawyer signed, correct?

22   A.   Yes.

23   Q.   And that's my signature on the bottom, correct?

24   A.   Yes.

25   Q.   Okay.  And the next page is the agreement by you, correct?

| | |
|---|---|
| 1 | A.   Yes. |
| 2 | Q.   All right.  And is there a place where you signed to |
| 3 | indicate that you understood what you were agreeing to when you |
| 4 | signed the plea agreement? |
| 5 | A.   Yes. |
| 6 | Q.   Okay.  And is your signature on that document? |
| 7 | A.   Yes. |
| 8 | Q.   And under that signature is a space for your lawyer? |
| 9 | A.   Yes. |
| 12:14PM 10 | Q.   And that was signed on October 10, 2016? |
| 11 | A.   Yes. |
| 12 | Q.   Okay.  In addition to the plea agreement, it sets out the |
| 13 | charges against you, correct?  You had a second agreement, |
| 14 | correct? |
| 15 | A.   Yes. |
| 16 | Q.   All right.  Mr. Hernandez-Miguel, have you reviewed |
| 17 | this -- this is, for the record, 49.2.  Have you reviewed this |
| 18 | document before you testified here today? |
| 19 | A.   Yes. |
| 12:15PM 20 | Q.   Okay.  And I'm going to just skip all the way to the end. |
| 21 | Again, there's a signature lines for the government lawyers to |
| 22 | sign, correct? |
| 23 | A.   Yes. |
| 24 | Q.   And then the final page, there's again a space for you to |
| 25 | sign, correct? |

1   A.   Yes.

2   Q.   Okay.  And Mr. Hernandez-Miguel, can you, in your own

3   words, explain what you are required to do under the

4   cooperation agreement that you signed?

5   A.   What I understand from this paper is that I have to speak

6   only the truth.

7   Q.   Okay.  You've pleaded guilty in this case, correct?

8   A.   Yes.

9   Q.   All right.  Have you been sentenced yet?

12:16PM 10   A.   No.

11   Q.   Okay.  And do you know, as you sit here today, what

12   sentence you will get for the crimes you've pleaded guilty to?

13   A.   Yes.

14   Q.   Okay.  Well, you haven't been sentenced yet, correct?

15           MR. MURPHY:  Objection, your Honor.

16           THE COURT:  Overruled.

17   A.   No.

18   Q.   Okay.  And do you know when you are -- do you have a date,

19   do you know when that sentencing is going to happen?

12:16PM 20   A.   Yes.

21   Q.   Okay.  Well, Mr. Hernandez-Miguel, when you said that you

22   have to tell the truth, okay --

23   A.   Yes.

24   Q.   -- prior to your testimony here today, have you met with

25   agents?

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Okay.  And have they asked you questions? |
| 3 | A. | Yes. |
| 4 | Q. | Okay.  And have you reviewed recordings? |
| 5 | A. | Yes. |
| 6 | Q. | And audio recordings? |
| 7 | A. | Yes. |
| 8 | Q. | And video recordings? |
| 9 | A. | Yes. |

12:17PM 10  Q.   Mr. Hernandez-Miguel, have you ever heard of the

11  organization known as "La Mara Salvatrucha" or "MS-13"?

12  A.   Yes.

13  Q.   Okay.  Are you a member of MS-13?

14  A.   Yes.

15  Q.   Where were you born?

16  A.   In El Salvador.

17  Q.   How long did you -- well, when did you first come to the

18  United States?

19  A.   In 2001.

12:18PM 20  Q.   And where did you grow up in El Salvador?

21  A.   La Union.

22  Q.   And who did you live with?

23  A.   With my parents.

24  Q.   Okay.  Do you have any brothers and sisters?

25  A.   Yes.

1    Q.    How many?

2    A.    Nine.

3    Q.    Did you ever hear of MS-13 when you lived in El Salvador?

4    A.    Yes.

5    Q.    How did you hear about MS-13 in El Salvador?

6    A.    In the area where I lived, there were many members of MS.

7    So in the area where we lived, there were a lot of members, and

8    that's how I met them.

9    Q.    So, how old were you when you first met members of MS-13?

12:20PM 10   A.    About 10 years ago.

11   Q.    Did you join MS-13 when you were in El Salvador?

12   A.    No.

13   Q.    Okay.  How old were you when you first came to the

14   United States?

15   A.    Fourteen years old.

16   Q.    How did you come to the United States?

17   A.    I came with a coyote.

18   Q.    Okay.  What is a coyote?

19   A.    Someone whom you pay who knows the route well and you pay

12:20PM 20   them to bring you to this country.

21   Q.    So how did you -- tell the jury how you did that.  How did

22   you leave El Salvador and how did you travel to the

23   United States?

24   A.    When I was 14 years old, an uncle of mine came to

25   El Salvador to travel, and he told me that he would help me in

```
 1    order for me to help my family, to help my father.

 2    Q.   Let me interrupt you.  Your uncle, did he live in the

 3    United States at the time he came to visit you in El Salvador?

 4    A.   Yes.

 5    Q.   Okay.  So your uncle came to visit?

 6    A.   Yes.

 7    Q.   And after that visit, you decided to come to the

 8    United States?

 9    A.   Yes.

12:21PM 10    Q.   With the coyote?

11    A.   Yes.

12    Q.   Okay.  How did you get from El Salvador to the

13    United States when you came at age 14?

14    A.   My uncle paid for a coyote.  He paid half in El Salvador

15    and the other half when I was in L.A.

16    Q.   Where did you cross into the United States?

17    A.   Through Arizona.

18    Q.   Did you walk across?

19    A.   Yes.

12:22PM 20    Q.   And after you crossed into Arizona, where did you go?

21    A.   I reached L.A., and my uncle picked me up in L.A.  My

22    uncle lived at a place called Seaside in California.  It's near

23    Salinas.

24    Q.   And is that where you settled initially?

25    A.   Yes.
```

1    Q.    Did you go to school?

2    A.    Yes.

3    Q.    Where did you go to school?

4    A.    At the high school in Seaside.

5    Q.    What happened in high school?

6    A.    When I arrived, I had two jobs, when I arrived at Seaside.

7    After that, a friend that played soccer with me asked me how

8    old I was.  I told him I was 15, and he told me you have to go

9    to high school.  And he said if you ever want to go to high

10   school, call me, I will take responsibility for you.  So one

11   day I called him that I wanted to go to school, and he took

12   charge, and that's why I went to high school.

13   Q.    Okay.  While you were in high school, okay, would it be

14   fair to say that you got in fights while you were in high

15   school?

16   A.    Yes, when I started high school, I met the Surenos.

17   Q.    Okay.  What are the Surenos?

18   A.    It's an L.A. gang, and they are called Surenos 13.  I met

19   about four of them, and they represent the blue, the color

20   blue.  So I started joining them, and it was through them that

21   I met a member of MS because one day I went out to smoke with

22   them, and we used to fight the Nortenos, and one day, through a

23   girl, he told me to go with him to smoke at a dude's house who

24   was from MS.

25   Q.    Smoke what?

1    A.    Marijuana.

2    Q.    So your friends that were in the Surenos took you to a

3    house, and the person who lived in the house was an MS-13?

4    A.    Yes.

5    Q.    Okay.  Who was that?

6    A.    But I went with a girl to the member's house of MS-13.

7    Q.    Okay.  All right.  Who did you meet at that house?

8    A.    Curly.

9    Q.    Okay.  Who was Curly?

12:26PM 10    A.    He was the word for a clique called Eastside Loco

11    Salvatrucha.

12         THE INTERPRETER:  I'm sorry, not Eastside, Seaside

13    Loco Salvatrucha.

14    Q.    Okay.  You said that he was the word?

15    A.    Yes.

16    Q.    What does that mean, to be the word?

17    A.    He's the -- palabrero is the person that runs the clique

18    because in the clique there's first word and second word.  The

19    first word is in charge of bringing together all the members of

12:27PM 20    the clique for a meeting, for meetings.

21    Q.    What is a clique?

22    A.    Cliques are small groups of MS-13.

23    Q.    And the person that you met, Curly, was the first word of

24    a particular clique?

25    A.    Yes.

1    Q.   Okay.  And it was called Seaside?

2    A.   Yes.

3    Q.   All right.  Once you met Curly, did you begin spending

4    time with members of MS-13?

5    A.   Yes.

6    Q.   What kind of things did you do?

7    A.   When I first met Curly, he asked me who I hung out with,

8    and I told him I hung out with Surenos in the high school, and

9    he said why don't you hang out with the dudes from MS-13, and I

12:29PM 10    told him I hadn't met anyone in that area, so he told me that

11    if I wanted to, I could start hanging out with them, and that's

12    when I started hanging out with the MS.

13    Q.   Okay.  So what kinds of things would you do when you hung

14    out with the members of the Seaside clique of MS-13?

15    A.   Fights against Nortenos, sometimes stabbing.  That's what

16    the MS-13 does is kill rivals.

17    Q.   As you were hanging around and meeting MS-13 members, they

18    taught you about what it means to be an MS-13?

19    A.   Yes.

12:30PM 20    Q.   Did they teach you -- they taught you about cliques,

21    correct?

22    A.   Yes.

23    Q.   As you were hanging out, did you meet members of other

24    cliques?

25    A.   In Seaside, that was the only clique.

1    Q.    Okay.  What did they teach you about how you could become

2    a member of MS-13?

3    A.    That one has to learn, that one has to gain the respect of

4    the homies.

5    Q.    Of the homies, is that what you said?

6    A.    Yes, the people who are already jumped in.

7    Q.    Okay.  So you said three things there.  I'm going to ask

8    you about all three of them.  First of all, you said the word

9    "homies."  Okay.  Is that a shorthand way of saying homeboy?

12:31PM 10   A.    Yes.

11   Q.    What is a homeboy?

12   A.    A homeboy is someone who belongs to MS-13 that's already

13   been jumped.

14   Q.    Okay.  So, how do you become a homeboy in MS-13?

15         MR. MURPHY:  Objection, your Honor, time frame.

16         THE COURT:  Well, I guess we'll start with what he

17   learned or understood as to the Seaside clique during this time

18   period.

19         THE INTERPRETER:  Could you repeat the question?

12:32PM 20   Q.    Let me ask you a better question.  You heard -- you used

21   the term "jumped" or "jumped in."  What does that mean to you?

22   A.    To "jump" or "jump in" is when one already has the respect

23   of the clique and they jump you in.  They make a circle, and

24   three of them hit you while the runner is counting for 13

25   seconds.

```
 1    Q.   And then you used the term "respect."  What things does
 2    someone have to do to earn that respect, to become a homeboy in
 3    MS-13?
 4              MR. MURPHY:  Objection, your Honor, same objection.
 5    Time frame.
 6              THE COURT:  I guess let's start by putting a time
 7    frame on that.
 8              MR. POHL:  Yes, your Honor.
 9    Q.   This is -- well, you came to the United States in 2001?
10    A.   Yes.
11    Q.   Okay.  All right.  So how many years had you been in the
12    United States when you first began to associate with MS-13?
13    A.   About two years.
14    Q.   Okay.  And so for now, the questions I'm asking you are
15    what you were learning at the time that you were first getting
16    to know people in MS-13.  So at the time that you were learning
17    about MS-13 in California, you were told that you had to earn
18    respect in order to become a member of MS-13; is that correct?
19    A.   Yes.
20    Q.   What kinds of things did you have to do to gain the
21    MS-13's respect before you could become a member?
22    A.   To go out and look for rivals, Nortenos, fight, fight or
23    stab them.
24    Q.   Did somebody tell -- well, how long did you spend time
25    with the members of the clique -- well, let me ask you this.
```

1    Did you become a member of MS-13 in the Seaside clique in

2    California?

3    A.    Yes.

4    Q.    So how long did you spend getting to know the members of

5    MS-13 before you became a member?

6    A.    About six months.

7    Q.    All right.  Did you do anything during that time, those

8    six months, to earn MS-13's respect?

9    A.    Yes.

12:36PM 10    Q.    What was that?

11    A.    Stab, fights.

12    Q.    Let's talk about the stabbing.  Can you tell the jury

13    about the stabbing you committed while you were in this period

14    of six months before you became a member of MS-13?

15    A.    We would go out with other dudes walking to look for

16    Nortenos.  Sometimes we'd go out to the liquor stores on the

17    main streets and stand there, and we would grab them right

18    there and fight with them because that's the mission of the

19    dudes of MS, which is to kill or stab rival members.

12:37PM 20    Q.    Why?  Why is that the mission?

21    A.    Because MS want to be the only one.  It doesn't want any

22    rivals.  It wants to control everything.

23    Q.    All right.  You committed a stabbing while you were

24    getting to know the members of the MS-13 clique in California,

25    correct?

```
 1   A.    Yes.

 2   Q.    Okay.  And what did you use to commit the stabbing?

 3   A.    It was a knife that had three blades.

 4   Q.    Okay.  So you did something with your hand there.  Can you

 5   hold it up for me?  What is it that you did?

 6   A.    It was like this. (Indicating)

 7   Q.    And who did you stab?

 8   A.    A Norteno.

 9   Q.    And who were you with when you stabbed them?

10   A.    With Curly, a Sureno, and Curly's girlfriend.

11   Q.    After that stabbing, what happened to you with the Seaside

12   clique?

13   A.    Curly said to me that I had already now done something for

14   MS-13 and that I had some respect and that since I had now done

15   something for MS, if I wanted to, I could be jumped in, and I

16   said yes.  So I was taken to a park and they formed a circle,

17   they put me in the middle, and I started getting a beating

18   there and while somebody counted to 13.  And then after the

19   counting is over, everybody throws up their hand to flash the

20   Mara in joy.

21   Q.    What do you mean by that, that everybody holds up their

22   hands?  How do they hold up their hands?

23   A.    Flashing your hand up, flashing the MS-13 sign, the M and

24   the S.

25   Q.    Okay.  So you did it while you were talking.  Can you do
```

1    it again when you're not talking.  What is it exactly that you

2    do to signify that you're an MS?

3    A.   Like this (indicating).  This is the M and this is the S.

4    Q.   After you became a member of MS-13, did you come to visit

5    Boston?

6    A.   Yes.

7    Q.   Why did you come -- maybe I shouldn't have said Boston.

8    Why did you come to Massachusetts?

9    A.   I had a sister in Massachusetts and her husband had passed

12:41PM 10    away and she asked me to come here.

11    Q.   Where did she live?

12    A.   In East Boston.

13    Q.   And do you remember when approximately you first came to

14    visit your sister in East Boston?

15    A.   Around 2004.

16    Q.   Okay.  And before you left to come to Boston, did you talk

17    about that with Curly?

18    A.   Yes, I spoke to Curly, and I told him that I was planning

19    to come to Boston because I had a sister here, and Curly told

12:42PM 20    me that he had been in Boston and that he knew the dudes from

21    the MS here and that if I came to Boston, he was going to put

22    me in touch with the members of MS so that I could hang out

23    with them.

24    Q.   Okay.  Did he do that?

25    A.   Yes.

```
 1    Q.   How did he do that?

 2              MR. MURPHY:  Objection, your Honor.

 3              THE COURT:  Let me see counsel quickly.

 4              (THE FOLLOWING OCCURRED AT SIDEBAR:)

 5              THE COURT:  What answer do you expect to elicit?

 6              MR. POHL:  Curly put him in touch with Casper and then

 7    he met Casper when he came to Boston.

 8              MR. MURPHY:  Your Honor, this is really merely to make

 9    sure we are not waiving our earlier Petroziello-type objections

10    since I don't know that we've heard of Curly before.  We've

11    heard of him in discovery.

12              MR. POHL:  But not during the trial.

13              THE COURT:  Yes.  Mr. Lopez.

14              MR. LOPEZ:  I would also ask that the witness just

15    answer the question asked and not continue to speak and add

16    stuff about what Curly told him.  I mean, we can move to

17    strike, but I know it's background, but there's a lot of

18    hearsay coupled in.

19              THE COURT:  I'm not sure there's too much of it, but

20    you're going to have to move to strike.  I guess -- I mean, I'm

21    sure Mr. Pohl's ability to limit this is limited, you know, so

22    we'll take it question and answer at a time.  We'll try to

23    control it as best we can as with any witness.  And if you

24    think it's something really out of line, you'll have to move to

25    strike, okay?  Obviously, if you think he's about to blurt out
```

1   hearsay, you can interrupt him for that purpose with an

2   objection.

3   　　　　MR. LOPEZ:  Mu point is simply that there's no

4   allegation that Curly is part of this conspiracy.  His

5   statements are not part of --

6   　　　　THE COURT:  Well, I'm assuming that there's no Curly,

7   because of the *Petroziello* statements.

8   　　　　MR. POHL:  Correct.

9   　　　　THE COURT:  So I don't expect that to be elicited.

12:44PM 10　　　　MR. LOPEZ:  All right.  Okay.  Thank you.

11　　　　(SIDEBAR CONFERENCE WAS CONCLUDED)

12　　　　THE COURT:  Why don't you put the question to the

13   witness again.

14   Q.   So, I think that the question was after you told Curly you

15   were coming to Boston and he told you that he knew people in

16   the Boston area there in MS, did Curly put you in touch with

17   any MS members in Boston?

18   A.   Yes.

19   Q.   Okay.  And who did he put you in touch with?

12:45PM 20   A.   With Casper.

21   Q.   When did you meet Casper?

22   A.   I met him about two weeks after I arrived in Boston.

23   Q.   And where did you meet him?

24   A.   I lived on Eutaw Street in East Boston, and he came by

25   there to pick me up.

1      MR. POHL:  And for the witness.

2   A.    That's Casper.

3   Q.    This is -- for the record, I'm showing the witness

4   Exhibit 2.  That's Casper?

5   A.    Yes.

6      MR. POHL:  I'd offer this, your Honor.

7      THE COURT:  It's already in.

8      MR. POHL:  All right.

9   Q.    When Casper came to pick you up, what do you remember

12:46PM 10   about the first time you met Casper?

11   A.    Well, Curly had already told me that Casper was a homeboy,

12   so he came by --

13      MR. MURPHY:  Objection, your Honor.

14      THE COURT:  I'm going to strike the thing about what

15   Curly said.  Let's start over.

16      MR. POHL:  Sure.

17   Q.    And you met with -- well, you got in the car with Casper?

18   A.    Yes.

19   Q.    And where did you go?

12:46PM 20   A.    We went to hang out in Lynn, but since I didn't know my

21   way around, I don't remember which house we went to, but I do

22   remember that there were other dudes from MS there.

23   Q.    Like who?

24   A.    Playa was there, there were other dudes as well, like

25   Rebelde (ph).  There was a dude that they called Tecolote, (ph)

1    and there were more there, but I don't recall.

2    Q.   Can I put up Exhibit 3, which has already been admitted.

3    Mr. Hernandez-Miguel, I'm putting up Exhibit 3.  Do you

4    recognize the person in that photograph?

5    A.   Yes, Playa.

6    Q.   All right.  So that -- what did you do that day when you

7    met Casper and Playa?

8    A.   We went there and we were drinking there.

9    Q.   When you met Casper and Playa and the other people that

12:48PM 10   you met that day, is there a way that you, as a member of

11   MS-13, would introduce yourself to other members?

12   A.   Yes.

13   Q.   What would you say?  Well, strike that.  What did you say?

14   A.   Well, when you arrive somewhere where there are other

15   dudes from MS-13, you flash the MS sign, and you say the name

16   of the clique you belong to, and you also say what rank you

17   are.

18   Q.   Okay.

19   A.   I'm sorry, and you also say your street name.

12:49PM 20   Q.   Okay.  So did you have a street name at that time?

21   A.   Yes.

22   Q.   Okay.  Did you get it at the time that you were -- or did

23   you being to use it after you were jumped in?

24   A.   That name you are given after you become a homeboy.

25   Q.   Right.  And what was the name that you used after you

1    became a homeboy with MS-13?

2    A.    Muerto.

3    Q.    So, all right, let's jump back to Boston now.  So when you

4    met Casper, Playa, the other people you talked about, you

5    introduced yourself?

6    A.    Yes.

7    Q.    And how did you introduce yourself?

8    A.    That I was Muerto from the Seaside Locos in California.

9    Q.    Okay.  And I think you said, in your answer before, you

12:50PM 10   said something about your rank or your position.  What did you

11   say to that?

12   A.    Yes.

13   Q.    What did you say?

14   A.    Homeboy.

15   Q.    Okay.  And did you have that conversation with Casper?

16   A.    While we were in the car.

17   Q.    What did Casper say to you when you -- after you

18   introduced yourself?

19   A.    He was the runner of the Eastsides.

12:51PM 20   Q.    After he drove you to the house in Lynn and you met

21   Playa -- excuse me after you met Mr. Guzman, you introduced

22   yourself to -- you introduced yourself?

23   A.    Yes.

24   Q.    The same way?

25   A.    Yes.

1    Q.    What did Mr. Guzman say to you after you introduced

2    yourself?

3    A.    Well, one flashes MS and identifies the clique.  At first,

4    he didn't tell me that he was a runner.

5    Q.    The first time you met him, how did he introduce himself?

6    A.    As a homeboy.

7    Q.    So, Mr. Hernandez-Miguel, how long did you say in Boston

8    that first time that you met Casper and Playa?

9    A.    About six or seven months, something like that.

12:52PM 10    Q.    And after that time, where did you go?

11    A.    I went back to California.

12    Q.    Eventually -- would I be correct that you came back and

13    forth from California to Boston a couple of times?

14          MR. MURPHY:  Objection, leading.

15          THE COURT:  Sustained.

16    Q.    Well, at some point, Mr. Hernandez Miguel did you move to

17    Massachusetts permanently?

18    A.    Yes.

19    Q.    About when was that?

12:53PM 20    A.    Around 2007.

21    Q.    When you came to Massachusetts in 2007, where did you

22    live?

23    A.    In East Boston.

24    Q.    Okay.  And did you spend -- well, when you moved back in

25    2007, what did you do?  Well, who did you -- did you see Casper

1    and Playa when you came back in 2007?

2    A.    Not in the first few days because I went to hang out with

3    some dudes in Somerville, so I was hanging out with the dudes

4    in Somerville, and about six months later I came and met with

5    them.  I started to see them again in Everett at Tecolote's

6    house.

7    Q.    And when you began to see them again six months after you

8    came back to Massachusetts to stay, did you have a conversation

9    with Casper about his clique?

12:54PM  10         THE INTERPRETER:  I'm sorry.  Can you repeat the last

11    part of the question?

12    Q.    And his clique.

13    A.    Yes.

14    Q.    Okay.  And what did Casper -- what did you and Casper talk

15    about concerning his clique, concerning Casper's clique?

16    A.    Since I was hanging out with the dudes in Somerville and

17    then I came to hang out at Tecolote's, one day Casper said why

18    don't you run with the Eastside clique since my clique was in

19    California and to take the word with Eastside.

12:55PM  20    Q.    What did you say to that?

21    A.    I said yes.

22    Q.    And through -- after that conversation, did you begin to

23    associate yourself with the Eastside clique?

24    A.    Yes.

25    Q.    Okay.  Now, you were jumped into MS-13 in Seaside in

1    California, correct?

2    A.    Yes.

3    Q.    Yet you were allowed to associate with Eastside here?

4          MR. MURPHY:  Objection, your Honor.  Leading.

5          THE COURT:  Sustained.

6    Q.    Well, when Casper brought you into the -- well, when

7    Casper suggested that you start to hand out with Eastside, did

8    you meet other members of the clique?

9    A.    Yes, I saw Playa again.

12:56PM 10   Q.    Okay.  And what would you do with Casper and Playa?

11   A.    Well, Casper was the runner and at that point Playa

12   introduced as second.

13   Q.    Did you meet other members of the clique through Casper

14   and Playa?

15   A.    Yes.

16   Q.    I'm putting up Exhibit 5.  Who is that?

17   A.    Lobo.

18   Q.    Putting up Exhibit 4, who is that?

19   A.    CheChe.

12:57PM 20   Q.    Okay.  All right.  I'm going to show you a series of other

21   pictures starting with 7 for the witness.

22   A.    Tigre.

23   Q.    8?

24   A.    Brujo.

25   Q.    9?

1    A.   Animal.

2    Q.   10?

3    A.   Vincentino.

4    Q.   And 11.

5    A.   Caballo.

6    Q.   I want to show you one more picture, 12.

7    A.   Danger.

8    Q.   Okay.  How do you know those people?  How do you know

9    Tigre, Brujo, Animal, Vincentino, Caballo, and Danger?

12:58PM 10        MR. MURPHY:  Objection.

11             THE COURT:  I'll allow it.

12             THE WITNESS:  They are homeboys.

13             MR. POHL:  I'd offer all of those, your Honor, 7

14   through 12, yes.  8 is already in, 7, 9, 10, 11, 12.

15   Thank you, Madam Clerk.

16             THE COURT:  7, 9, 10, 11, 12 are admitted.

17             (Exhibit No. 7, 9, 10, 11, 12 received into evidence.)

18   Q.   Let's go back to 4 for one minute, okay.  Who is that?

19   A.   CheChe.

12:59PM 20   Q.   When did you meet CheChe?

21   A.   Around 2008 or maybe 2007.

22   Q.   And tell us about how you met CheChe.

23   A.   I met him in East Boston.

24   Q.   And did you introduce yourself to him?

25   A.   Yes.

```
 1   Q.   All right.  And after you introduced yourself to him, how

 2   did he introduce himself to you?

 3   A.   He was a homeboy.

 4   Q.   Okay.  With what clique?

 5   A.   Eastside.

 6        MR. NORKUNAS:  Judge, I object to that and ask that

 7   that be stricken.

 8        THE COURT:  Overruled.

 9   Q.   Okay.  And putting up Exhibit 5, who is that?

10   A.   Lobo.

11   Q.   All right.  And when -- do you remember meeting Lobo?

12   A.   Yes.

13   Q.   When did you meet Lobo?

14   A.   I met him around 2013.

15   Q.   All right.  Where did you meet him?

16   A.   I met him after he had been jumped.

17   Q.   Okay.  And you introduced yourself to him?

18   A.   Yes.

19   Q.   And when you said you met him after he had been jumped,

20   what clique had he been jumped into?

21   A.   The Eastside Locos Salvatrucha.

22        MR. POHL:  Judge, would this be a good time to stop?

23        THE COURT:  Yes.  All right.  Ladies and gentlemen,

24   we're going to stop for the day.  Tomorrow is the day that

25   we're going to start at 9:30.  We'll still go to one.  My plan
```

1   is, unless someone needs a break, to try to break whatever the

2   mid-point is of that, 11:15, somewhere in there and go to 1:00

3   to have a normal day, and hopefully it will be about as long as

4   a regular day.

5           So again, please remember my caution not to discuss

6   the case among yourselves or with anyone else and not to pay

7   any attention to any media reports if there are any, and I'll

8   see you tomorrow morning at 9:30.

9           THE CLERK:  All rise.

10          (JURORS EXITED THE COURTROOM.)

11          THE COURT:  I don't know whether I'll have time to

12  meet you before trial tomorrow, but if I could ask you to all

13  be here about 9:15 or so, I may or may not be able to do it,

14  I'd like having any opportunity to see if there's any issues we

15  need to discuss, and is there anything we need to take up now?

16          MR. LOPEZ:  Your Honor, this morning there was some

17  problem with the defendants getting dressed and coming here for

18  the 8:30 time with you.  I don't know what the mix-up was, but

19  they were here very early.  For some reason, they weren't

01:03PM 20  brought up, and my client just wanted me to bring to your

21  attention he prefers to be present at those.

22          THE COURT:  Yes, and I would prefer him to be present

23  as well.  Sometimes the van is late, sometimes there are

24  logistical issues, you know, it's hard to make this perfect,

25  but I would like the defendants here in civilian clothing at

1    8:30, if at all possible.

2           MR. LOPEZ:  I believe he arrived about 6:30 this

3    morning.

4           THE COURT:  And I'll ask the marshals and CSOs and

5    whoever is in charge of that to try and make that happen.  I do

6    understand sometimes it doesn't all fall into place.

7           MR. LOPEZ:  Thank you, your Honor.

8           THE COURT:  All right.  Thank you.

9           THE CLERK:  All rise.

10          (Whereupon, the hearing was adjourned at 1:03 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3  UNITED STATES DISTRICT COURT )

4  DISTRICT OF MASSACHUSETTS ) ss.

5  CITY OF BOSTON )

6

7            I do hereby certify that the foregoing transcript was

8  recorded by me stenographically at the time and place aforesaid

9  in Criminal Action No. 15-10338-FDS, UNITED STATES vs. HERZZON

10  SANDOVAL, et al., and thereafter by me reduced to typewriting

11  and is a true and accurate record of the proceedings.

12            Dated this 7th day of June, 2018.

13                      s/s Valerie A. O'Hara

14            _____

15                      VALERIE A. O'HARA

16                      OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25