1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2


3
     UNITED STATES OF AMERICA          )
4                                      )
     vs.                               )  Criminal Action
5                                      )
     HERZZON SANDOVAL,                 )  No. 15-10338-FDS
6    EDWIN GUZMAN,                      )
     CESAR MARTINEZ,                    )
7    ERICK ARGUETA LARIOS,             )
                    Defendants         )
8


9

     BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
10

11
                      JURY TRIAL DAY 10
12

13

14        John Joseph Moakley United States Courthouse
                      Courtroom No. 2
15                    1 Courthouse Way
                      Boston, MA 02210
16
                      February 12, 2018
17                       8:38 a.m.

18

19

20

21

22                    Valerie A. O'Hara
                      Official Court Reporter
23        John Joseph Moakley United States Courthouse
                 1 Courthouse Way, Room 3204
24                    Boston, MA 02210
                 E-mail: vaohara@gmail.com
25

1   APPEARANCES:

2   For The United States:

3       United States Attorney's Office, by CHRISTOPHER J. POHL,
    ASSISTANT UNITED STATES ATTORNEY, and KELLY BEGG LAWRENCE,
4   ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200,
    Boston, Massachusetts 02110;

5
    For the Defendant Herzzon Sandoval:
6
        Foley Hoag LLP, by MARTIN F. MURPHY, ESQ. and
7   MADELEINE K. RODRIGUEZ, ATTORNEY,
    155 Seaport Boulevard, Boston, Massachusetts 02210;

8
    For the Defendant Edwin Guzman:
9
        Lawson & Weitzen, by SCOTT P. LOPEZ, ESQ.,
10  88 Black Falcon Avenue, Suite 345, Boston, Massachusetts 02210

11  For the Defendant Erick Arueta Larios:

12      THOMAS J. IOVIENO, ESQ., 345 Neponset Street
    Canton, MA 02021;
13
    For the Defendant Cesar Martinez:
14
        Stanley W. Norkunas, 11 Kearney Square,
15  Howe Building, Suite 202, Lowell, Massachusetts 01852.

16      ROBERT M. SALTZMAN, ESQ., 1 Central Street, Suite 5,
    Stoneham, Massachusetts 02180.

17

18

19

20

21

22

23

24

25

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| By Mr. Norkunas | | 40 | | |
| By Mr. Murphy | | 77 | | |

| EXHIBITS | FOR I.D. | IN EVIDENCE |
|---|---|---|
| 48 | | 80 |
| 62.5 | | 18 |

<u>PROCEEDINGS</u>

1

2          THE CLERK:  All rise.  Thank you.  Please be seated.

3    All right.  Good morning, everyone.  What do we have to talk

4    about this morning?  Mr. Pohl.

5          MR. POHL:  Thank you, Judge.  One issue that I wanted

6    to raise with you that I talked to Mr. Iovieno about, we caught

7    a typographical error in a heading in the calls related only to

8    Defendant Martinez and have discussed this with Mr. Norkunas,

9    and with the Court's permission, it does not relate to the

08:38AM 10   content of the calls at all, that there's been some testimony

11   about that, it relates to a telephone number, and with

12   Mr. Norkunas' assent and with your assent, we propose to swap

13   that page out.  I don't expect that they'll be testimony about

14   the phone number today.

15          THE COURT:  Is this a transcript that we've gone over?

16          MR. POHL:  Yes, but not the phone number.

17          THE COURT:  But not the phone number?

18          MR. POHL:  Correct.

19          THE COURT:  Still, I think we should just explain to

08:38AM 20   the jury there's a typographical error.

21          MR. POHL:  That's fine, when we get to that part of

22   the evidence, we can certainly do that.  I think in terms of --

23   so we can find the right time to do that, and just for the

24   record, that will be Exhibit 56.1 through 56.3.

25          THE COURT:  Okay.  Anything from the defense?

1    Mr. Murphy.

2          MR. MURPHY:  Your Honor, just to alert the Court,

3    during my cross-examination, I expect that we intend to play a

4    part of one of the tapes in Spanish.  From a mechanical

5    perspective, that will entail our connecting to the system, and

6    given my own limitations, with the Court's permission,

7    Ms. Rodriguez is going to help me do that.

8          We can't really do it now given kind of space and

9    technology constraints, so it's going to have to be done during

08:39AM 10   the cross-examination.  I will kind of keep an eye on the

11   clock, and if there's a way to do that during the break, then

12   we'll do that, but it may be there's a slight delay while we

13   set that up.

14         THE COURT:  All right.  Do the best you can.

15         Mr. Lopez.

16         MR. LOPEZ:  Your Honor, I've given the government a

17   series of maps and photos of bridges and things of that nature,

18   mostly taken off of Google Maps, which I may want to try to use

19   with this witness, but I just wanted to give you a heads-up on

08:40AM 20   that.

21         THE COURT:  All right.  If they're taken off Google

22   Maps, I imagine their authenticity is not in dispute, but,

23   still, you'll have to ask the witness are you familiar with

24   such-and-such location, you know, the kind of things you'd have

25   to ask with any witness with a photograph.

```
 1              MR. LOPEZ:  Yes.

 2              THE COURT:  I guess, presumably, whatever event you're

 3    talking about, the photograph was not taken that day but taken

 4    at some other time, and there may be differences.

 5              MR. LOPEZ:  That's correct, your Honor.

 6              THE COURT:  All right.  I don't see a problem with

 7    that.  And presumably if you do lay the foundation, the photos

 8    will not be demonstratives but will actually come in.

 9              MR. LOPEZ:  Yes, your Honor.

08:40AM 10              THE COURT:  Yes.  All right.  If there's nothing else

11    then we'll get started as soon as we have all 15 jurors.  Okay.

12    Thank you.

13              THE CLERK:  All rise.

14              (A recess was taken.)

15              (JURORS ENTERED THE COURTROOM.)

16              THE CLERK:  Thank you.  You may be seated.  Court is

17    now in session.

18              THE COURT:  Good morning, everyone.  We're starting 25

19    minutes late because of transportation issues with the witness,

09:26AM 20    and let's just see how much we get done today.  Why don't we go

21    until 11:00 before we take a break.

22              Mr. Iovieno, are you ready?

23              MR. IOVIENO:  Yes, your Honor, thank you.

24              THE COURT:  Let me just remind the witness he's still

25    under oath.  Do you understand that?
```

1          THE WITNESS:  Yes.

2          THE COURT:  Okay.  Go ahead.

3          JOSE HERNANDEZ MIGUEL, RESUMED

4          CROSS-EXAMINATION, CONTINUED

5   BY MR. IOVIENO:

6   Q.   Good morning, Mr. Miguel Hernandez.

7   A.   Good morning.

8   Q.   Last Friday, we left off talking about the activity that

9   you and Pelon had -- strike that.  We talked about the drug

09:26AM 10  activity that you and Pelon were undertaking, correct?

11  A.   Yes.

12  Q.   And it's fair to say that this had been ongoing for -- at

13  least through 2014 into 2015?

14  A.   Yes.

15  Q.   And you protected some of the deals he was doing, right?

16  A.   Yes.

17  Q.   And then on about, I think it was four or five occasions,

18  you went up to New Hampshire?

19  A.   As far as I recall, there were two.

09:27AM 20  Q.   Two times, okay.  The first time you did that, you brought

21  up or Pelon brought up one kilo of cocaine, right?

22  A.   Yes.

23  Q.   And Mr. Larios wasn't involved in that episode, right?

24  A.   No.

25          MR. IOVIENO:  If I could have Exhibit 55, please.  I

1    believe it's in evidence.

2    Q.   And this is -- you identified this as a transcript of the

3    recording for the January 21, 2014, and that involved a trip to

4    New Hampshire and the one kilo, right?

5    A.   Yes.

6    Q.   Okay.  And could we turn to page 3, please.  I'm just

7    going to direct your attention down to the bottom.

8         CW-1 says, "No, this isn't a big deal.  Right now this

9    is nothing.  I had just asked them to help me out because I

09:28AM 10   don't have" -- and it was your understanding he was referring

11   to the trip, the anticipated trip to New Hampshire for the one

12   kilo when he said it wasn't a big deal, right?

13   A.   I don't understand the question.

14   Q.   This conversation involved the trip to New Hampshire and

15   the one kilo, right?

16   A.   Yes.

17   Q.   And it was your understanding that this wasn't a big deal,

18   it was one kilo, right?

19   A.   Yes.

09:29AM 20   Q.   And the next time you went up, you went up with more

21   people, right?

22   A.   Yes.

23   Q.   And that was in December of 2014, right?

24   A.   Yes.

25   Q.   And on this occasion, is it fair to say that all the

1      arrangements of who was going to go up and who got the people

2      to go up, those were made by Pelon, right?

3      A.   Yes.

4      Q.   And you understand that subsequently after your arrest

5      that -- you understand that Pelon recorded every conversation

6      he had with Mr. Larios, right?

7              MR. POHL:  Objection.

8              THE COURT:  I'll let him answer it.  Overruled.

9      A.   Yes.

09:31AM 10      Q.   And you've identified those transcripts here in court,

11      right?

12      A.   Yes.

13      Q.   And just so we're clear, this was the December 8, 2014

14      trip to New Hampshire, right?

15      A.   Yes.

16      Q.   And Pelon had asked you to go with him, right?

17      A.   Yes.

18      Q.   And he asked Caballo to go with him, right?

19      A.   Yes.

09:31AM 20      Q.   And also asked your brother, Smiley, who became known as

21      Danger, right?

22      A.   Yes.

23      Q.   And Crazy also went, right?

24      A.   Yes.

25      Q.   And Mr. -- Lobo was asked, Mr. Larios was asked to go?

1    A.   Yes.

2    Q.   And Pelon made all those arrangements, right?

3    A.   Yes.

4         MR. IOVIENO:   Could I have Exhibits 62.1 through 62.4.

5    Q.   And so you identified these last week, and specifically

6    these were the telephone conversations between Pelon, who we

7    know as CW-1, and my client, Mr. Larios, right?

8    A.   Yes.

9    Q.   And this begins on December 1, 2014, and it's at about

09:32AM 10   5:12 in the afternoon, right?

11   A.   Yes.

12        MR. IOVIENO:   Could I have the next page, please.

13   Q.   And you understand -- you understood from reviewing these

14   transcripts that CW-1 was asking Lobo to go to New Hampshire,

15   right?

16   A.   Yes.

17   Q.   And you testified last week that before the cars left, you

18   had a meeting with everybody involved, right?

19   A.   Yes.

09:33AM 20   Q.   And during this meeting, Pelon told everybody what he was

21   carrying, right?

22   A.   Yes.

23   Q.   And he specifically told them it was 5 kilos of powdered

24   cocaine, right?

25   A.   Yes, but that was told to them prior to that when they

1   were talking about going to New Hampshire.

2   Q.   Okay.  That's not what you said last week.  Okay.  You

3   said --

4        MR. POHL:  Objection.

5        THE COURT:  Well, just put a question to him.

6   Q.   You said last week that you met before you went to

7   New Hampshire and you talked about what you were bringing up?

8   A.   Beforehand, they were told how many people were going and

9   how much he would be taking, and then after that there was a

09:35AM 10   meeting.

11   Q.   Okay.  You understood that Pelon recorded the entire trip

12   from Massachusetts up through New Hampshire, right?  You

13   understand that?

14   A.   I don't know.

15   Q.   You haven't seen recordings of the trip from --

16   surveillance photographs, have you seen surveillance

17   photographs?

18   A.   Yes.

19   Q.   And you know there's recordings, there was a camera inside

09:35AM 20   Pelon's car, right?

21   A.   Yes.

22   Q.   And Pelon had an audio recorder on his person, right?

23   A.   I don't know that.

24   Q.   Well, you listened to recordings, have you not?

25   A.   Yes.

1    Q.   And that's in order to cooperate with the government

2    you've listened to and identified certain videos and audio,

3    correct?

4    A.   Yes.

5    Q.   And you know from listening to those audio recordings and

6    video recordings that this entire trip was recorded?

7    A.   Yes.

8    Q.   Have you listened to a recording of a prior meeting with

9    Pelon and everybody else involved where Pelon described what he

09:36AM 10  was bringing up?

11   A.   I heard the phone calls.

12   Q.   Okay.  These are the phone calls here that you identified

13   last week?

14   A.   Yes.

15   Q.   And specifically in this area here, CW-1 says exactly, "If

16   we're going to go, you will have to ask for the day off because

17   I don't want you to let me down because I'm counting on you.

18   You know it will be $500 for a short while, you know."

19        Lobo:  "Yes, yes, yes."

09:37AM 20       CW-1:  "It's not that big a deal.  But you have to ask

21   for the day off because you can't tell me you're going to go

22   out with me for a little while and then you can't do."

23        Lobo:  "No, no, I'm saying we will go."

24        THE INTERPRETER:  Your Honor, may the interpreter read

25   that?

1          THE COURT:  Yes.

2          THE INTERPRETER:  Could you put the arrow where it

3     begins, counsel?

4          MR. IOVIENO:  Go to the next page, please, the next

5     exhibit, I'm sorry.

6     Q.   So then there's another phone call at December 4th at

7     about 5:52.  And, again, this is a telephone conversation

8     between Lobo and CW-1, Pelon.  Turn to the last page.  And then

9     down toward the end, Mr. Larios says, "Let's go get some tacos,

09:39AM 10    man."

11         CW-1:  "Where, man?"

12         Lobo:  "I don't know."

13         CW-1:  "Call me back later and we'll make a plan.

14    I'll stop by your place later."

15         Lobo:  "Fine."

16         CW-1:  "Fine, man."

17         And then you understood from that conversation that

18    you listened to that there was some conversation about getting

19    something to eat later, right?

09:39AM 20    A.   Yes.

21         MR. IOVIENO:  Could I have the next exhibit.

22    Q.   The next telephone call is December 6, 2014 at about 5:30.

23    That's the next exhibit, correct?

24    A.   Yes.

25    Q.   And this was offered by the government last week.

1    A.    Yes.

2    Q.    And these are recordings that you listened to and you

3    identified the recording and the transcript?

4    A.    Yes.

5    Q.    But there's a call missing, isn't there?

6    A.    I don't remember.

7          MR. IOVIENO:  Can I have the document camera just for

8    the witness, please.

9    Q.    I'm going to show you a document, sir.  And if you recall

09:40AM 10   we just talked about the December 4th conversation where they

11   talked about getting something to eat.  And that was about 5:52

12   on December 4th.  And this appears to be a document reflecting

13   a telephone conversation that happened four minutes later after

14   that conversation.  Do you recall reviewing that?

15   A.    Yes.

16   Q.    So this was not put in by the government last week,

17   correct?

18   A.    I don't remember.

19   Q.    Well, do you agree with me this is part of the

09:41AM 20   conversation between Lobo and CW-1?

21         MR. POHL:  Judge, I'd object at this point.

22         THE COURT:  I'm sorry?

23         MR. POHL:  I'd object.

24         THE COURT:  Well, it's an identification question, not

25   a content question.  I'll permit it.

1           THE INTERPRETER:  Could you repeat the question,

2     please?

3     Q.    You identified a number of documents last week --

4     A.    Yes.

5     Q.    -- of transcripts between CW-1 and my client, Lobo,

6     transcripts of the telephone conversations?

7     A.    Yes.

8     Q.    And these occurred prior to December 8th, the trip to

9     New Hampshire, right?

09:42AM 10    A.    Yes.

11    Q.    And this document reflects one of the conversations that

12    wasn't introduced last week?

13    A.    I don't remember.

14    Q.    Well, because it wasn't introduced last week, this is --

15    you have just seen this today, correct?

16    A.    I don't remember.

17    Q.    Was your memory refreshed that there was another

18    conversation --

19          MR. POHL:  Objection.

09:43AM 20    Q.    -- by looking at this document?

21    A.    Before this?

22    Q.    Your memory.  You didn't have a memory of this

23    conversation, this December 6th -- I'm sorry, December 4th

24    conversation last week, right?

25          MR. POHL:  Objection.  I don't think that's the

1    testimony.

2           THE COURT:  Sustained in that form.

3    Q.   You testified last week to a number of telephone

4    conversations and transcripts, you identified those,

5    Exhibit 62.1 through 62.4, correct?

6    A.   Yes.

7    Q.   And this December 4, 2014 transcript was not part of that

8    group that you identified, right?

9    A.   I don't remember.

09:44AM 10   Q.   Okay.  But looking at this document, do you now recall

11   that there was another conversation?

12   A.   Before leaving for New Hampshire, there was a conversation

13   between Pelon and Lobo where Lobo was saying he was at

14   Casa Mariachi.

15   Q.   That was December 8th.  This is December 4th, sir, right,

16   you understand this is December 4th?

17   A.   I don't remember that.

18   Q.   Well, you remember the conversation you spoke about a

19   minute ago regarding them getting something to eat, right?

09:44AM 20   A.   Yes.

21   Q.   And this conversation happened four minutes later?

22   A.   I don't remember.

23          MR. IOVIENO:  May I approach, your Honor, at sidebar?

24          THE COURT:  Yes.

25          (THE FOLLOWING OCCURRED AT SIDEBAR:)

1        MR. IOVIENO:  Judge, I just wanted to approach

2   sidebar.  I'm going to offer this under 106, I believe it's

3   part of the recordings that was introduced last week, but it's

4   not the complete recordings that were introduced.  This is

5   another conversation, and under 106, under verbal completeness,

6   this should go in as part of that exhibit.

7        THE COURT:  Yes, Ms. Lawrence.

8        MS. LAWRENCE:  Well, it's a separate call, number one.

9   They're each separate calls, and the content, I don't believe

09:46AM 10   there's anything in the content that explains or clarifies

11   anything that was said in the other calls.  As to the issue,

12   I'm not sure what the substance of this is.

13        THE COURT:  Well, you tell me what are you getting it

14   in for other than the fact that he has a daughter who's 11

15   years old?  Is there anything substantive?

16        MR. IOVIENO:  Yes, this is on the back page.

17        THE COURT:  I didn't see the back page.  All right.

18   Let's do this.  It is a separate call.  It is hearsay, but I'm

19   going to admit it under Rule 106, in light of the four-minute

09:46AM 20   gap between this and the earlier call and the fact that that

21   earlier call talked about this, I'll let it in.  I'm going to

22   take each one of these separately.  In other words, I'm not

23   giving everyone a license to put in any statement they want,

24   but under the circumstances here of the very short time frame,

25   I'll allow it.

```
 1              Can we call it 62.5, will that mess it up?
 2              MR. IOVIENO:  That's fine.
 3              (SIDEBAR CONFERENCE WAS CONCLUDED.)
 4              THE COURT:  You're offering it, Mr. Iovieno?
 5              MR. IOVIENO:  Yes, your Honor.
 6              THE COURT:  I'll admit it as 62.5.
 7              (Exhibit No. 62.5 received into evidence.)
 8     Q.    This document has been admitted as 62.5, and I'm just
 9     going to refer -- it's for the jury -- to the back page of this
10:47AM 10  and with respect to this area.
11              CW-1:  "Fine, but don't tell Casper about this thing
12     or anything because last time I told the dudes, they told me
13     some shit that they were going for sure and at the last minute
14     they canceled on me, man."
15              Lobo:  "Don't worry about that."
16              Has that been read to you?
17     A.    Yes.
18     Q.    Okay.  And you understood that this drug activity that you
19     were engaged in with Pelon was something that you didn't want
09:48AM 20  to share with Casper or any other members of the Eastside,
21     correct?
22     A.    No.
23     Q.    Okay.
24     A.    They were asked if they wanted to go and they said that
25     they were going to go and afterwards they said no.
```

Q.   Right.  Those are the people that are going to
New Hampshire now on December 8, I understand that.  Some of
the members weren't members of Eastside, I understand that, but
this was money that you kept for your own personal gain, right?

        THE INTERPRETER:  I'm sorry, you, meaning who, for the
interpreter?

Q.   Mr. Hernandez Miguel, this is money that you kept?

A.   Yes.

Q.   And so on that day, December 8th, you agreed to meet I
think it was at the Burger King parking lot?

A.   Yes.

Q.   And, again, this entire trip is recorded, right?

A.   Yes.

Q.   And you testified last week that you always met before and
you talked about what was going to happen?

A.   Yes, he always said how much, the quantity of drugs that
was going up and how much he was going to pay.

Q.   Well, it's recorded, so if he said that, we'll know that,
but it's fair to say that Lobo showed up, was driving a
different car, right?

A.   Yes.

Q.   And Pelon had a car?

A.   Yes.

Q.   And I think -- did Crazy bring another car or one of the
other people?

1    A.   No, Pelon had his car and another car, a Nissan and a

2    Honda, and Lobo had a different car, so I drove one.

3    Q.   Pelon had two cars, right?

4    A.   Yes.

5    Q.   Because he operated a gypsy cab company or something like

6    that?

7    A.   I don't know if he had two cars.  When we went with the

8    drugs, he told me to drive his car, and he was driving a

9    different car.

09:51AM 10    Q.   Okay.  And you know that Lobo showed up and came into the

11    car for a short period of time, right, came into the car you

12    were in?

13    A.   Yes.

14    Q.   And that conversation was recorded, you know about that

15    conversation, right?

16    A.   I don't remember.

17    Q.   You don't remember that you heard recordings of that

18    conversation?

19    A.   We all went into the same car there, but I don't remember.

09:52AM 20    Q.   Okay.  But after you were arrested, after you agreed to

21    cooperate with the government, did you hear any recordings of

22    that conversation?

23    A.   I saw when we were inside the car.

24    Q.   There's a video of you inside the car, right, video

25    recording?

1    A.    Yes.

2    Q.    And you've seen that?

3    A.    Yes.

4    Q.    But there's also audio, you can hear the conversation that

5    is going on, can't you?

6    A.    I don't remember.

7    Q.    That's not something you reviewed for the government?

8    A.    Yes.

9    Q.    You did review it?

09:53AM 10   A.    Yes.

11   Q.    So you do remember an audio conversation that you could

12   hear?

13   A.    Because we all got in the car and what was said was how we

14   were going to go in the cars.

15   Q.    Right.  How you were going to go to Saugus?

16   A.    Yes.

17   Q.    Who was going go in front, who was going to go behind?

18   A.    Yes.

19   Q.    And then how to go to New Hampshire?

09:53AM 20   A.    Yes.

21   Q.    And Lobo came in the car for that conversation, right?

22   A.    Yes.

23   Q.    And he left the car, right?

24   A.    Yes.

25   Q.    He was only in the car for a short period of time, right?

```
 1    A.   Yes.

 2    Q.   And then the cars left and you went to Saugus, right?

 3    A.   Yes.

 4    Q.   And you recall it was snowing out?

 5    A.   I don't remember.

 6    Q.   Okay.  So then you left, Pelon met someone in Saugus and

 7    picked up the product, right?

 8         THE INTERPRETER:  I missed the last part.

 9    Q.   Pelon met somebody in Saugus and picked up the package,

09:54AM 10    right?

11    A.   Yes.

12    Q.   And Lobo wasn't in that car, was he?

13    A.   No, he was behind.

14    Q.   And then you left and went up to -- drove up to

15    New Hampshire, right?

16    A.   Yes.

17    Q.   And you got on 93 and went through a toll booth, right?

18    A.   I don't remember paying a toll.

19    Q.   Okay.  But you went into New Hampshire on Route 1,

09:55AM 20    correct?  On 93, I'm sorry, 93.

21    A.   We went down at Saugus, and then we took off to

22    New Hampshire.

23    Q.   And do you know what a toll booth is?

24    A.   A toll, yes.

25    Q.   And you don't have to physically stop and pay, you can
```

1    just drive through, correct, you understand that?

2    A.    That I can recall, we didn't go through a toll.

3    Q.    But you know a toll booth, they can take photographs of

4    every car that goes through, right, you know that?

5    A.    Yes.

6    Q.    And so you went into New Hampshire and you got off the

7    exit, and Pelon met somebody and delivered what he was supposed

8    to deliver, right?

9    A.    Yes.

09:56AM 10    Q.    And do you recall on the trip up that -- you recall a

11    conversation about Lobo, he got lost, he wasn't around?

12    A.    Yes, I recall, but it wasn't that he had gotten lost.  He

13    called to say that I was driving too slowly and that I needed

14    to go faster.

15    Q.    And you've seen surveillance photographs of the cars,

16    right?

17    A.    Yes.

18    Q.    And there's a lot of those photographs.  There's a lot of

19    them.  Are there a lot?  There's a great number of those

09:57AM 20    photographs, isn't there?

21    A.    Yes.

22    Q.    And there's no photograph in there of Lobo's car in

23    New Hampshire?

24    A.    I don't know.

25    Q.    Isn't it true, sir, that Lobo left and went back to a

1    restaurant to eat?

2    A.    After we finished with the trip, we did go to a restaurant

3    and also to drop off Lobo's car.

4    Q.    Lobo was already at the restaurant, wasn't he?

5    A.    No, that was afterwards coming back from New Hampshire.

6    Q.    He was already there when you came back, right?

7    A.    I don't understand the question.

8    Q.    When you came back, Lobo was not around, was he?

9    A.    He was the last one to arrive at the parking lot again.

09:59AM 10    Q.    He had to be called to the car, didn't he?  He had to be

11    called to the car, telephone call?

12    A.    No, he was called to find out where he was because it

13    wasn't about the car.

14    Q.    Well, he was called because you didn't know where he was,

15    right?

16    A.    No, he was behind us.  The thing is he was the last one.

17    He was the last one to arrive at the parking lot again when

18    Pelon paid everybody.

19    Q.    But he had to be called to the car by Pelon.  Pelon

09:59AM 20    physically picked up his cell phone and called Lobo, right?

21    A.    There was a call to Lobo asking where he was at.

22    Q.    Okay.  And Lobo was eating in Acapulco's Restaurant,

23    wasn't he?

24          MR. POHL:  Objection.

25          MR. IOVIENO:  I'll withdraw the question.

1          THE COURT:  All right.

2     Q.   Sir, you testified about Vida Loca and delivering a

3     firearm to him, correct?  Do you recall that last week?

4     A.   Yes.

5     Q.   And I believe you testified that Crazy was calling, it was

6     late at night, and you were at the garage, right?

7          THE INTERPRETER:  I'm sorry, could you repeat the

8     question?

9     Q.   Crazy was calling, and it was late at night when you were

10:01AM 10    at the garage?

11    A.   Yes.

12    Q.   And Lobo wasn't there, right?

13    A.   No.

14    Q.   And Lobo didn't know anything about delivering the gun to

15    Vida Loca, did he?

16    A.   No.

17    Q.   Now, you talked about the firearm that Lobo was given, and

18    you talked about the reason why he was given a gun.  Do you

19    recall that last week?

10:01AM 20    A.   Yes.

21    Q.   And that was in January, just to refresh your

22    recollection, January 25, 2015 that Mr. Larios was arrested,

23    right?

24    A.   Yes.

25    Q.   And he had been given the firearm because someone reported

1   he had been shot at, right?

2   A.   He reported that.

3   Q.   And a decision was made to let him have a gun to protect

4   himself, right?

5   A.   Yes.

6   Q.   All right.  And you had a meeting -- when I say you,

7   Eastside had a meeting February 8, 2015, right?  Do you recall

8   that testimony?

9   A.   Yes.

10:02AM 10   Q.   And during that meeting, one of the topics that was

11   discussed was Lobo had to explain himself why he lost the gun

12   and how he lost it?

13   A.   Yes.

14   Q.   And CW-1, Pelon, was at that meeting, right?

15   A.   Yes.

16   Q.   And actually Pelon was with Lobo at Casa Mariachi when

17   Lobo got arrested, right?

18   A.   He was there before Lobo was arrested because Pelon left

19   Casa Mariachi.

10:03AM 20   Q.   So, during the meeting February 8th, when Lobo was asked

21   to explain himself, is it fair to say that a number of the

22   members, including yourself, you weren't satisfied with his

23   explanation, correct?

24   A.   Yes.

25   Q.   All right.  And, in fact, he was confronted by a number of

1    you about -- to tell the truth, to tell us what really

2    happened?

3    A.    Yes.

4    Q.    And at no time during that meeting did Lobo say Pelon

5    snitched on me or Pelon is an informant, he never said anything

6    about Pelon, did he?

7    A.    Not at that time.  He told me that later at Wyatt.

8    Q.    So, and later on after you were arrested, you had a

9    conversation you testified to last week that Lobo told you then

10:05AM 10   that he asked for a green light on Pelon, right?

11   A.    Yes.

12   Q.    Okay.  And this meeting about the firearm happened

13   February 8, 2015, right?

14   A.    Yes.

15   Q.    And you were arrested January of 2016, so a little less

16   than a year later you were arrested?

17   A.    Yes.

18   Q.    And you learned -- well, strike that.  You agreed to

19   cooperate with the government about May of 2016, right?

10:05AM 20   A.    Yes.

21   Q.    Okay.  When you agreed to cooperate with them, you told

22   them things that you had learned after you had been arrested,

23   right?

24   A.    Yes, I told them that he and Checha were planning to kill

25   Pelon because Lobo was 100 percent sure that he had been the

```
 1   snitch.

 2   Q.   Okay.  And he told you that, according to you -- after you

 3   agreed to cooperate with the government, you gave the

 4   government this information, right?

 5   A.   That was before I started cooperating and we were together

 6   at Wyatt.

 7   Q.   Okay.  But you had a meeting in May of 2016 with the

 8   government, right?

 9   A.   Yes.

10   Q.   And they took notes of what you told them, right?

11   A.   I don't remember.

12        MR. IOVIENO:  This is just for the witness, your

13   Honor.

14   Q.   You understand that they took notes of your meeting of

15   May 19, 2016, right?

16   A.   Yes.

17   Q.   And part of what you told them in May, even though you

18   just testified that Lobo told you this before you began to

19   cooperate with the government and, this was one of your initial

20   first meetings with the government, you told them some

21   information while you were in custody what you learned, you

22   told them some information, right?

23        THE INTERPRETER:  I'm sorry, could you repeat the

24   second part of your question?

25   Q.   You told them information -- well, let me start over
```

10:07AM (line 10)

10:08AM (line 20)

1    again.  You began to cooperate about May of 2016, right?

2    A.    More or less, yes.

3    Q.    And you just testified that Lobo apparently told you

4    before you began to cooperate that he asked for a green light

5    on Pelon?

6    A.    Yes.

7    Q.    Okay.  In May, you began to cooperate and you wanted to

8    tell them all the information that you learned that you were

9    aware of while you were in custody, right?

10:09AM 10   A.    I don't understand the question.

11   Q.    Okay.  If you just refer down to the bottom portion and

12   perhaps the interpreter can read, with the Court's permission,

13   the highlighted portion to you.

14            THE COURT:  All right.

15            (Interpreter translating document)

16   Q.    Maybe start right here, I'm sorry.  So having been read

17   that, it was your understanding that a green light had been

18   issued from El Salvador against Pelon, right?

19   A.    That's what Chucky told me that he was certain.

10:10AM 20   Q.    But you learned that while you were custody, right?

21            MR. POHL:  Objection.

22            THE COURT:  I'm sorry.  You're objecting to that

23   question, Mr. Pohl, that you learned that while you were in

24   custody or the previous question?

25            MR. POHL:  Previous question.

1          THE COURT:  The question before that I think was

2     problematic.  You asked -- you said based on your reading that,

3     it was your understanding X.  I'm not sure that's a proper

4     question, so let's start over.  In other words, he can't learn

5     something for the trial and then testify about it.  You have to

6     ask him about what happened in the past.

7     Q.   So, when you began to cooperate, you had the opportunity

8     to tell the government what you had learned while you were in

9     custody, and that was in May of 2016, right?

10:11AM 10    A.   Yes.

11    Q.   And according to your testimony, you were aware at this

12    point in time that Lobo had apparently said -- he had asked for

13    a green light on Pelon, right?

14    A.   Yes.

15    Q.   But you didn't tell them, the government, that in May of

16    2016, did you?

17    A.   No, but I did tell them.

18    Q.   You told them afterwards, after you had some time to think

19    about your cooperation and what you were going to say, you told

10:12AM 20    them afterwards, right?

21          MR. POHL:  Objection.

22          THE COURT:  Overruled.

23          THE INTERPRETER:  Could you repeat the question,

24    please?

25    Q.   So you told them afterwards after you had an opportunity

1    to think about what you were going to say to the government

2    about your cooperation, you didn't tell them about Lobo until

3    afterwards, right?

4    A.    No, we were working on that.

5    Q.    Working on your cooperation?

6    A.    And all of this.

7    Q.    Okay, But you just testified you knew about it before the

8    May meeting?

9    A.    Yes, I knew, and Lobo told me.

10:13AM 10    Q.    But you didn't tell the government that in May?

11    A.    The government knows it.

12    Q.    They didn't know it until it came from you, sir, right?

13    A.    Yeah, I told them.

14    Q.    So it comes from your words, what you say.  You told the

15    government, and the government relies on what you say.

16    A.    I told them that Lobo had told me --

17         MR. MURPHY:  Objection, your Honor.

18         THE COURT:  Sustained.

19    Q.    Now, I direct your attention to September of 2015.  You

10:14AM 20    knew Joel Martinez, right?

21    A.    I met him only by telephone.  I used to talk to him on the

22    phone.

23    Q.    And that was around September of 2015?

24    A.    I don't remember when it was.

25    Q.    When is the first time you met him in person?

1    A.    I don't remember.

2    Q.    Do you recall meeting him for the first time with Pelon?

3    A.    I think we went to bring him from New Jersey.

4    Q.    Okay.  And that was Pelon and yourself went to pick him up

5    in New Jersey, right?

6    A.    Yes.

7    Q.    And that's the first time you physically met him?

8    A.    I don't remember if it was the first time.

9    Q.    But Mr. Larios didn't know him prior to December of 2015,

10:15AM 10   right?

11   A.    I don't know that.

12   Q.    But, in any event, you went down to New Jersey with Pelon,

13   and it was Pelon's idea to pick him up, right?

14   A.    Yes.

15   Q.    And you testified last week you had many conversations

16   with Pelon, and you hung out with him regularly, right?

17   A.    Yes.

18   Q.    And it was Pelon's idea to bring up Animal, Joel Martinez,

19   and introduce him into the Eastside clique, right?

10:16AM 20   A.    When I spoke with Animal, he told me that he had already

21   spoken to Casper.

22   Q.    Okay.  But, in any event, you brought him up.  Physically

23   you went down with Pelon and brought him up to stay up here,

24   right?

25   A.    Yes.

1    Q.   And CW-1 proposed or Pelon proposed that he be jumped into

2    the Eastside clique, right?

3    A.   I don't know.

4    Q.   Well, he was jumped into the clique at some point in

5    January.  Do you recall testifying about that meeting?

6    A.   Yes.

7    Q.   And you know that not everybody agreed that Animal should

8    be jumped in, correct?

9    A.   Animal had spoken with Casper, and Animal had told Casper

10:17AM 10   that he wanted to hang out with the Eastside clique, and Casper

11   had told him to come to Boston and hang out with the clique and

12   if he liked the clique, then that would be fine.

13   Q.   Okay.  But other members of Eastside, there was a number

14   of members who didn't want anything to do with Animal, right?

15   A.   I don't know.

16   Q.   Did you tell the government that, that there were members

17   who did not want to jump in Animal?

18   A.   What I do know is that there were a lot of dudes that

19   wanted Animal to be in the MS-13.

10:18AM 20   Q.   A lot of dudes wanted him to be in?

21   A.   Yes.

22   Q.   Okay.  And there were a lot of dudes who didn't want him

23   in, right?

24   A.   I don't know that.

25           MR. IOVIENO:  Just for the witness, your Honor.

1    Q.    FBI agents, they took notes of your sessions with them,

2    correct?

3    A.    Uh-huh.

4          MR. IOVIENO:  And with the Court's permission, may the

5    interpreter read this area down here that's highlighted?

6          THE COURT:  Yes.

7    Q.    Now do you remember telling the FBI that many members of

8    Eastside didn't want to jump in Animal?

9    A.    Not a lot because -- perhaps two because had it been the

10:19AM 10   majority, we would not have jumped him in.

11   Q.    When you told the FBI, you didn't say "perhaps two," did

12   you?

13         MR. POHL:  Objection.

14         THE COURT:  No, overruled.

15   A.    I didn't say two, what I'm saying is that had the majority

16   opposed his being jumped in, we would not have jumped him in.

17   Q.    No, I understand that, but I'm saying you told him many,

18   many ESLS members opposed?

19   A.    If we had been opposed, we wouldn't have jumped him in.

10:20AM 20   Q.    I know that, I understand that.  Now, directing your

21   attention to May of 2015, do you recall testifying last week

22   about a stabbing that you committed at Highland Park in

23   Chelsea?

24   A.    Yes.

25   Q.    Okay.  And you said that you were at the garage, correct,

1    and then you were going to go eat at Casa Mariachi?

2    A.    Yes.

3    Q.    Okay.  And you received a telephone call?

4    A.    Yes.

5    Q.    And as a result of that telephone call, Pelon told you to

6    do something, right?

7              MR. POHL:  Objection.

8              THE COURT:  Overruled.

9    A.    I don't understand the question.

10:21AM 10   Q.    Well, Pelon asked you to call somebody, right?

11   A.    Oh, yeah.

12   Q.    Domingo, right?

13   A.    Yes.

14   Q.    You testified last week that you called Domingo to bring

15   something, you testified to that, right?

16   A.    Yes.

17   Q.    But you didn't identify what that something was last week,

18   did you?

19   A.    I don't remember.

10:22AM 20          MR. IOVIENO:  This is page 34, line 24.

21   Q.    "Pelon told me let's call Domingo, so I called Domingo to

22   bring something from the house?"  That something was a knife,

23   sir, wasn't it?

24   A.    Yes.

25   Q.    So you called Domingo to bring a knife?

1    A.    Yes.

2    Q.    And you then arrived at the park, and Pelon was driving

3    and you're in the passenger's seat, right?

4    A.    Yes.

5    Q.    And you testified that you were going to go in but you

6    weren't going to start any problems.  Do you remember

7    testifying to that last week?

8    A.    Yes.

9    Q.    You didn't want to start problems, but you had someone

10:23AM 10   bring a knife?

11   A.    Yes.

12   Q.    And it wasn't just a knife, it was what you called a

13   yatagan?

14   A.    Yes.

15   Q.    And that's a pretty large knife, correct?

16   A.    Yes.

17   Q.    And you also testified that Pelon stayed in the car,

18   right?

19   A.    He was the last one in the car.

10:23AM 20   Q.    Okay.  He didn't stay in the car, did he?

21   A.    At the end he also got out.

22   Q.    He got out and chased the 18th Street members, didn't he?

23   He chased them, didn't he?

24   A.    We went in first, when I went in, it was me, myself,

25   Brujo, Domingo, Vampiro, and Vago.  We went in from the other

1    side, and when we chased the chavalas, the dude Pelon was the

2    last one that was just coming in the park.

3    Q.    So he didn't stay in the car, did he?

4    A.    He was the last one to leave the car, and then he went in

5    that direction, too.

6    Q.    And he chased the chavalas, right?

7    A.    I don't know that because I wasn't watching for that.  I

8    was just involved in what I was doing.

9    Q.    Well, you told the government that he chased them and

10:25AM 10    grabbed one of them and was beating one of them, right?

11   A.    Not that I can recall.

12   Q.    Did you also -- do you also recall that he knocked one of

13   them down and you tried to stab the individual that was knocked

14   down by Pelon?

15        THE INTERPRETER:  I'm sorry, can you repeat the

16   question?

17   Q.    Do you recall that Pelon knocked one of the 18 Street

18   members down, the chavalas down; do you remember telling the

19   government that?

10:26AM 20   A.    I don't remember.

21   Q.    But, in any event, you stabbed the chavala, right, or

22   tried to stab him?

23   A.    Yes.

24   Q.    And then you left with Pelon again, he was driving the

25   car?

1    A.    Yes.

2    Q.    And Lobo wasn't there for any of this, right?

3    A.    No.

4    Q.    And this happened rather quickly, the call, as you're on

5    your way to the restaurant, and Lobo didn't know anything about

6    this prior to it occurring, right?

7    A.    Yes.

8              MR. IOVIENO:  Just one moment.

9              Can I have Exhibit 49.2.  This is for everybody, I

10:27AM 10    believe.  Could I have page 2, please.

11   Q.    Again, back to your cooperation agreement that you have

12   with the government.  You understand from this agreement that

13   it's the United States Attorney who will determine whether or

14   not -- the value of your testimony, correct, you understand

15   that?

16   A.    Yes.

17   Q.    And you understand that in order to get the benefits and

18   the promises they promised you, they make that determination,

19   no one else, right?

10:28AM 20    A.    Yes.

21              MR. IOVIENO:  Can I have just one moment, your Honor.

22   Q.    Just briefly, we talked earlier about the Highland Park

23   stabbing, and you indicated you didn't remember if Pelon had

24   held somebody down or pushed someone down or chased somebody;

25   do you remember that?

1   A.   I don't understand the question.

2   Q.   Okay.

3            MR. IOVIENO:   This is just for the witness, your

4   Honor.

5   Q.   Again, you understood that the agents took notes of your

6   interviews?

7   A.   Yes.

8   Q.   And you talked to them about the Highland Park stabbing?

9   A.   Yes.

10:29AM 10            MR. IOVIENO:   With the Court's permission, can the

11   interpreter just read the highlighted portion?

12            THE COURT:   Yes.

13   Q.   Do you recall now that Pelon held that individual down?

14            MR. POHL:   Objection.

15            THE COURT:   Overruled.

16   A.   Pelon was the last one to come in.

17   Q.   I know he's the last one to come in, but he held down the

18   chavala while you stabbed him, right?

19   A.   I don't remember that.

10:31AM 20   Q.   So even though you told the agent that --

21            MR. POHL:   Objection.

22   Q.   -- in January, you don't remember today?

23            THE COURT:   Sustained in that form.

24            MR. IOVIENO:   I have no further questions, your Honor.

25            THE COURT:   Mr. Norkunas.   We'll take a break.

|    |    |
|----|----|
| 1  | THE CLERK:  All rise. |
| 2  | (JURORS EXITED THE COURTROOM.) |
| 3  | (A recess was taken.) |
| 4  | THE CLERK:  All rise for the jury. |
| 5  | (JURORS ENTERED THE COURTROOM.) |
| 6  | THE COURT:  All right.  Mr. Norkunas. |
| 7  | MR. NORKUNAS:  Thank you, your Honor. |
| 8  | CROSS-EXAMINATION |
| 9  | BY MR. NORKUNAS: |

10:47AM 10   Q.   Good morning, sir.

11   A.   Good morning.

12   Q.   You had told Mr. Iovieno and you had told Mr. Pohl that

13   you had complained in 2014 and 2015 that the members of the

14   clique were not going out to do enough acts of violence; is

15   that correct, sir?

16   A.   Yes.

17   Q.   And the older members particularly were the ones you were

18   upset with, they were not active, correct?

19   A.   Yes.

10:48AM 20   Q.   Now, some time at the end of 2015, beginning of 2016, you

21   had just told us that Mr. Iovieno, you went down to New Jersey

22   with Pelon to bring back a person known as Animal, correct?

23   A.   Yes.

24   Q.   And you knew either before going down or on the way back

25   that Animal had murdered a young man back in Massachusetts,

1    correct?

2    A.    Yes.

3    Q.    And he also told you, was it on the ride back, that at

4    some point in time he had participated in stabbing another

5    person along with Brujo?

6    A.    No, that was later.

7    Q.    The second stabbing was later after the ride back; is that

8    correct?

9    A.    Yes.

10:49AM 10         MR. NORKUNAS:    Could I see Exhibit 9, please.

11    Q.    Exhibit 9 is being presented to you, sir.    Is that the

12    person you knew as Animal?

13    A.    Yes.

14    Q.    And he's a young man.    Do you know how young he was and

15    what his age was?

16    A.    He's not so young.    He's more than 20 years old.

17    Q.    How old are you, sir?

18    A.    Thirty.

19    Q.    Now, bringing him back, you and Mr. Pelon, particularly

10:50AM 20    you wanted him to join your clique so that there would be more

21    active younger men, correct?

22    A.    No.    When I spoke with Animal, he told me he had already

23    spoken to Casper, and Animal had told Casper that he wanted to

24    join the clique, and Casper had told him that if he wanted to

25    join the clique, first he had to come to Massachusetts to see

1    the clique and hang out and only then decide if he really liked

2    the clique or not.

3    Q.    You wanted him to come into the clique, sir, because he

4    was a young man of violence, right?

5    A.    The majority wanted him to enter the clique.

6    Q.    I asked about you, sir.

7    A.    Being in MS, yes, everybody wanted that, because he's also

8    going to be in MS-13.

9    Q.    Well, you wanted him in, sir, because you're a person of

10:52AM 10   great violence, right?

11   A.    Everyone who is in MS-13 is violent.

12   Q.    I asked you, sir.  You're a person, you would agree, of

13   great violence, right?

14   A.    All of us who are in MS-13 are violent.

15   Q.    You, Mr. Hernandez Miguel, have stabbed many people,

16   right?

17   A.    Yes.

18   Q.    Some of them you stabbed with a three-bladed knife,

19   correct?

10:52AM 20   A.    Yes.

21   Q.    And the purpose of that is so you can turn it a little bit

22   and make the damage more significant, right?

23   A.    Yes.

24   Q.    And you had a machete, right, a three-foot machete with a

25   sharp-edged blade, right?

1   A.   That machete was given to me, and I never took it out of

2   the house, and I never used it.

3   Q.   I think Mr. Iovieno already established, sir, that you

4   told the government agents, however, that you took it out

5   consistently and had problems putting it in your pants to hide

6   it, right?

7   A.   No, I explained to him how the MS-13 people took out their

8   machetes in the street, not how I did it.

9   Q.   You told us, sir, that starting at the age of 18 in

10:54AM 10   California, you were involved in fights and stabbings, correct?

11   A.   It was when I was about 17.

12   Q.   In California, sir?

13   A.   Yes.

14   Q.   So, when you were first in the Seaside in California, you

15   were 17 years of age, you were not 14?

16   A.   I was 14 when I came to Seaside, not when I went into

17   MS-13.

18   Q.   I didn't ask you that, sir.  When you were in California,

19   you told us, in high school in California, you were involved in

10:55AM 20   many beatings and stabbings, correct?

21   A.   No, not many stabbings, only one.  That's what I said.

22   Q.   In California?

23   A.   Yes.

24   Q.   And many beatings?

25   A.   Fights, yes.

1    Q.   Now, when you brought Animal up here and you were

2    expecting that he would become a member of your clique, sir,

3    you discussed that with Pelon, right?

4    A.   I don't understand the question.

5    Q.   Well, when you were coming up from New Jersey and you were

6    talking to Animal about what he had done, you also were

7    bringing him up as you told us to hopefully be beaten in to

8    your clique as a younger violent man?

9    A.   It was Casper who told him to come up.  I at no time told

10:56AM 10   him to come to the clique.

11            MR. MURPHY:  Objection.  Motion to strike.

12            THE COURT:  I'll let it stand.  Overruled.

13   Q.   Sir, as the date for the Animal's beat-in came, there was

14   dissension in the clique, right, to your knowledge?

15   A.   Some didn't want it, and most of them, the majority did.

16   Q.   You knew several days before the meeting, sir, you knew

17   one of the people that were strenuously opposed to that was

18   Cesar Martinez, right?

19   A.   I heard about that.

10:57AM 20   Q.   Well, you knew, sir, that he had expressed concern about

21   the number of young people that were trying to be brought in to

22   the clique, right?

23   A.   I don't understand the question.

24   Q.   Well, he had -- you knew that he had expressed his anger

25   about the number of young people being brought in to the shop

1    because he had no idea what any of them had done?

2         THE INTERPRETER:  I'm sorry, counsel, could you use

3    the name of the person that you're referring to, the "he"?

4    Q.   You, sir, Mr. Hernandez Miguel, knew and had heard Cesar

5    express his reservations about Animal coming in, correct?

6    A.   What Checha said was Animal was hot, and that could cause

7    dudes from the clique to get arrested.

8    Q.   Sir --

9    A.   At no time did I hear him say let's not jump Animal in.

10:59AM 10   Q.   You knew that -- you were present, sir, at the meeting.

11   He was chastised at that meeting for his stance, right?  Pelon

12   singled him out, right?

13        THE INTERPRETER:  I'm sorry, I hadn't translated.

14   Could you repeat that, please?

15   Q.   Correct, Pelon had singled him out for his stance against

16   Animal?

17        MR. POHL:  Objection.

18        THE COURT:  I'll sustain it as argumentative.

19   Rephrase.

10:59AM 20   Q.   Cesar had been called out at the meeting because of his

21   position, right?

22   A.   Because that day, Cesar was drinking, and that's why he

23   was told to be careful with what he said because he was

24   drinking.

25   Q.   Did you ever tell anybody in the world that day Cesar had

1    been drinking?  You've never made that statement ever before,

2    right?

3    A.   No, I wasn't there.  Pelon said that.

4    Q.   You were at the meeting where Animal was going to be beat

5    in, right?

6    A.   Yes.

7    Q.   And you hear Cesar being called out because he opposed the

8    young kids coming in, and he didn't want Animal to come in,

9    right?

11:01AM 10   A.   But Cesar wanted to jump a different friend of his.

11   Q.   The question, sir, is --

12   A.   That is what he wanted.  He said --

13            MR. NORKUNAS:  Your Honor, I ask that the answer be

14   stricken, not responsive to the question.

15            THE COURT:  All right.  The answer will be struck.

16   Put another question to him.

17   Q.   Now, the place where you had your meetings, sir, was a

18   functioning mechanical garage, right?

19   A.   Yes.

11:01AM 20   Q.   And Cesar did work there, did mechanical work there,

21   right?

22   A.   No.

23   Q.   He had a tow business, as well, associated with that,

24   correct?

25   A.   Yes.

1    Q.   And that operated out of that garage, right?

2    A.   Not at the garage, no.

3    Q.   Well, you have to keep a tow truck someplace, correct?

4    A.   Yes, but he didn't put it at the garage.

5    Q.   And he did mechanical work also at the garage, correct?

6    A.   Not that I know of.

7    Q.   Sir, one of the statements he made, that is

8    Cesar Martinez, that day was on January 8, 2016, that you heard

9    was, "You could close down my shop if you bring Animal in

11:03AM 10   here," right?

11             MR. POHL:  Objection.

12             THE COURT:  I'm sorry.  Was there an objection?

13             MR. POHL:  Yes, your Honor.

14             THE COURT:  I'm sorry.  Sometimes you're talking over

15   each other.  I can't quite pick it up.  Overruled.

16   A.   That's what he told Pelon earlier, not at the time that we

17   jumped Animal in.  He explained later what he had said.

18   Q.   Now, sir, in 2008, when you came here -- or in 2008, where

19   were you working, sir?

11:04AM 20   A.   I worked chopping trees down.

21   Q.   And in 2012 to 2016, did you do any work?

22   A.   Yes.

23   Q.   Well, the primary work you had was selling drugs, right?

24   A.   No, my main job was painting, painting houses.

25   Q.   Sir, you sold crack cocaine from 2012 to when you were

1   arrested in 2016, right?

2   A.   I didn't sell it.  I went with Pelon as protection so that

3   he could buy it.

4   Q.   Well, you found out after you were arrested, you made some

5   sales, you made some sales to undercover FBI agents of crack

6   cocaine, right?

7   A.   Yes.

8   Q.   And you were selling powder cocaine, right?

9   A.   I don't understand the question.

11:05AM 10   Q.   You also sold powder besides crack cocaine separately,

11   correct?

12   A.   I don't understand the question.

13   Q.   When you were selling cocaine, you would cook some of it

14   at your house into crack cocaine, right?

15   A.   I've never cooked cocaine.

16   Q.   You sold the powder along with the hard rock substance

17   called crack cocaine, right?

18   A.   I never sold cocaine.  I always accompanied Pelon when he

19   sold to protect him, and he would give me $100.

11:06AM 20   Q.   You already told us, sir, you knew you sold crack cocaine

21   to some undercover FBI agents?

22   A.   Pelon was in Texas, and he asked me if I could go and get

23   the cocaine and deliver it to him and he would give me $100.

24   Q.   Now, besides being a drug merchant, you were also a gun

25   merchant, right?

```
 1   A.   I've never been a drug merchant.  I would get $100, and
 2   that's what I did.
 3   Q.   Well, at one point in time, you brought Mr. Pelon over,
 4   and you arranged a sale for him to buy a handgun directly,
 5   right?
 6   A.   The guy that had the gun told me he had a gun, and then
 7   Pelon said he wanted to buy it and he went and bought it.
 8   Q.   Well, you went with him, sir, right, you introduced him?
 9   A.   Yes.
10   Q.   And if you didn't introduce him, Mr. Pelon would not have
11   known that person had a gun for sale, right?
12   A.   Yes.
13        MR. NORKUNAS:  If I could have Exhibit 122, please.
14   Q.   Now, sir, back as part of the January 8, 2016 meeting --
15        MR. NORKUNAS:  Could I have the next page, please.
16   Q.   You were having a conversation with Caballo, and you're
17   talking about guns, correct?
18   A.   I don't remember.
19   Q.   And in context of telling him -- if we can go back to page
20   2 for a moment.  You say that you ask him what gun do you want,
21   and you tell him I have to talk to a guy, right?
22   A.   Yes.
23   Q.   And you tell him -- page 3, please -- that both you and
24   Mr. Caballo indicate that when you get a new gun, you scrape
25   off the serial number, right?
```

1      THE INTERPRETER:  I'm sorry, can you repeat the

2    question?

3    Q.   You tell Mr. Caballo, have a discussion with Mr. Caballo

4    that both you, Mr. Hernandez Miguel and Mr. Caballo, when you

5    get a new gun, you scrape off the serial number?

6    A.   I never said that to Caballo.

7    Q.   Sir, you said, "I erase those two, homie," right?

8    A.   I didn't even have a gun.  The clique gun was there.

9    Q.   Sir, back on January 8, 2016, Mr. Caballo says to you, "I

11:10AM 10    spent about four weeks erasing the serial numbers that it has

11    underneath where the trigger is."  Muerto:  "I erased those

12    too, homie."

13      THE INTERPRETER:  Your Honor, may the interpreter read

14    that?

15      THE COURT:  Yes.

16    A.   How would I erase something if I don't have one?

17    Q.   You obviously did have it, sir, you were talking to your

18    friend telling him you did erase the serial numbers, correct?

19    A.   That's what it says there.

11:11AM 20    Q.   So, is it your position that you, once again, you were

21    lying to enhance yourself to look better?

22    A.   I've never erased numbers from a gun.

23    Q.   That wasn't my question, sir.  Did you say you did that to

24    enhance your status even though you knew you were lying?

25    A.   I don't remember.

1    Q.   Sir, when you were initially shown the handgun though,

2    you -- this, which is marked as Exhibit Number 51, the black

3    semiautomatic, you immediately knew what the caliber was,

4    right?

5    A.   Yes.

6    Q.   That would mean a person has to be familiar with handguns

7    to be able to do that, right?

8    A.   I had it.

9    Q.   And the serial numbers are usually kept in a very small

11:13AM 10   area where it becomes difficult to get at it if you're trying

11   to scrape it off, right?

12   A.   I've never seen that.

13   Q.   Well, you told Mr. Caballo that you scraped off serial

14   numbers.  Why would you want to scrape off a serial number off

15   a handgun?

16   A.   I don't know if that gun has the numbers erased or not.

17   I've never had a different gun.

18   Q.   Now -- and sir, again, how old are you today?

19   A.   Thirty.

11:14AM 20   Q.   And during your 30 years, you've used five or six

21   different names, correct?

22   A.   I use them for work purposes.

23   Q.   Well, the question though, sir, is you used five or six

24   different names in your life, right?

25   A.   I don't know if I've used that many.

1    Q.   Did you use just -- did you ever use your brother's name

2    as your name?

3    A.   Not that I can recall.

4    Q.   Did you ever indicate that you had different places of

5    birth other than El Salvador?

6    A.   Not that I can recall.

7    Q.   Do you recall telling anyone you were born in Mexico?

8    A.   I don't remember.

9    Q.   But you do admit to using five or six different names

11:15AM 10   throughout your life, correct?

11   A.   I don't remember.  When I came here, I was using a

12   different name when I was arrested.  That was the name that I

13   used to work.

14   Q.   Now, Mr. Iovieno has talked to you about the five

15   different times you went in, six different times you went in to

16   meet with the government and talked to them in what is called a

17   proffer session, correct?

18   A.   Yes.

19   Q.   Now, when you were selling the crack cocaine on your

11:16AM 20   own --

21        MR. POHL:  I object to whatever is coming next because

22   I don't think that's the testimony.

23        THE COURT:  Sustained in that form.

24   Q.   Sir, when you were selling any drugs on your own, did you

25   have anybody else come with you as a protection detail?

1    A.   I've never sold drugs.

2    Q.   You told us earlier, sir, you did recall selling the crack

3    cocaine, and you learned after you were arrested to the

4    undercover FBI agents, right?

5    A.   I would get $100 to bring it to him.

6    Q.   Now, when you would go along with Mr. Pelon for the

7    protection detail for the sales that he would make, you would

8    ride in the car with him?

9    A.   Yes.

11:18AM 10   Q.   And you would carry a firearm with you?

11   A.   No.

12   Q.   Well, you're there to protect for what?

13   A.   Who would want to mess with MS-13?

14   Q.   Do you have a sign on the side of your car that said MS-13

15   when you pull up for a drug deal?

16   A.   When one gets there, who's going to try to rob somebody

17   else there?  If you go alone, they will try to rob you, but if

18   you go with another person, do you think they're going to try

19   to rob you?

11:19AM 20   Q.   The protection detail, sir, is so you can be a violent

21   person if someone tries to rob Mr. Pelon, correct?

22   A.   So everyone who delivers drugs is violent?  That's why we

23   go there.

24   Q.   They're associated with drug deals, right?

25   A.   I'm not going to be paid just to go there.

1   Q.   So you go, and to protect Mr. Pelon and the drugs and the

2   money, you've got a weapon with you, and you're prepared to use

3   it, right?

4   A.   I never had a gun.  Many went to protect the drugs, and as

5   far as I know, many did not take guns.  I never saw them.

6   Q.   So you basically just went along for the ride with

7   Mr. Pelon?

8   A.   I would go with him, he would buy the drug, and I was

9   always next to him, so the person that was selling the drug was

11:20AM 10   there, and I was there on the sidewalk also.  Afterwards, he

11   would give me $100.

12   Q.   Now, some time in January of 2014, Mr. Pelon comes up to

13   you, and he's got a presentation about being a protector of him

14   if he drives drugs into New Hampshire, right?

15         THE INTERPRETER:  I'm sorry, the interpreter did not

16   understand the question.

17   Q.   Some time in early 2014, Mr. Pelon comes up to you,

18   Mr. Hernandez Miguel, and has a proposal about protecting drugs

19   going into New Hampshire, right?

11:21AM 20   A.   Yes.

21   Q.   And Mr. Pelon has decided he's going to approach

22   Cesar Martinez to see if he can get him into this scam, right?

23   A.   I spoke with Pelon, and Pelon asked me if I knew anyone

24   else who might be interested in going, and I suggested that

25   maybe Checha could go because Checha had always told me that he

1    would go to Texas --

2          MR. NORKUNAS:  Judge, I would ask it be stricken.

3    It's beyond the question.

4          THE COURT:  We'll stop it there.  I'll let it stand,

5    but put another question to him.

6    Q.   Sir, at some point in time, you asked Cesar to come on a

7    date that's agreed upon, right?

8          THE INTERPRETER:  I'm sorry.  Could you repeat the

9    first part?

11:22AM 10   Q.   At some point, they're going to meet Cesar on a date that

11   they agreed upon?  Yes or no, sir.

12   A.   Yes.

13   Q.   Then on that particular day, Cesar doesn't show up when

14   you are expecting him to show up, correct?  Yes or no.

15   A.   I don't remember.

16   Q.   Well, there's a phone call.  You have to call him and ask

17   him where he is, correct?

18   A.   Yes.

19   Q.   Then when he comes, he's got a buddy with him, right,

11:23AM 20   another man?

21   A.   Yes.

22   Q.   And he's got a rental car, right?

23   A.   I don't know if it was rented or if it belonged to his

24   friend.

25   Q.   At that point in time, there's a discussion, you, Pelon

1      and Cesar, and it's like this isn't play time, get rid of your

2      friend, and let's go, right?

3      A.   Yes.

4      Q.   And when you head out into New Hampshire all the way up,

5      you and Pelon are complaining about Cesar, correct?  Yes or no,

6      sir.  Yes or no, are you complaining about him?

7      A.   Not that I can recall because Cesar was behind us.

8      Q.   Well, there's constant communication between you and him,

9      right?

11:24AM 10   A.   I don't remember.

11     Q.   And at the end of the day, you're so upset, you meet with

12     Pelon -- you had been in the car with Pelon, correct?

13     A.   I don't remember.

14     Q.   You don't remember if you were in the car with Pelon?

15     A.   I remember going to New Hampshire.  I was with Pelon in

16     the car.

17     Q.   Well, do you remember you and Pelon, when you come back

18     and you say to Pelon, Cesar's fired, he's not doing this

19     anymore, he's out; do you remember that?

11:25AM 20   A.   Because Cesar followed the other guy who was taking the

21     drug, and he wasn't supposed to do that.  That was not part of

22     the plan that Cesar would follow the guy taking the drugs.

23     Q.   So you fired him, you said you're not going to use him

24     again, he's out?

25     A.   We said that for the time being no more.

```
 1    Q.   He was fired, right, he was out?

 2    A.   I don't recall firing him.

 3    Q.   You said you're never going to use him again to Pelon,

 4    right?

 5    A.   I recall I did not say that.

 6    Q.   You don't recall saying he was fired, sir, or you don't

 7    recall the conversation?

 8    A.   I don't remember.

 9    Q.   Now, in 2008, sir, where were you living?

10    A.   In East Boston.

11    Q.   You were living in East Boston?

12    A.   Yes.

13    Q.   Do you recall that Cesar Martinez was living in Revere on

14    20 Summer Street?

15    A.   At that time there was an accident with Cesar Martinez,

16    and at that time he lived in Chelsea.

17         THE INTERPRETER:  I'm sorry, excuse me, Chelsea

18    Street.

19    Q.   He was living in Revere at that time, correct, 2008?  Yes

20    or no.

21    A.   As far as I know, I met him in East Boston, not in Revere.

22    Q.   So you didn't know where he was living?

23         MR. POHL:  Objection.

24         THE COURT:  Overruled.

25    A.   He told me that he lived in East Boston, and I went to
```

where he lived.

Q.   Well, so you don't really know where he lived, sir, that would be a fair assessment?

A.   I was at his house.

Q.   Well, you told us that at some point in time in 2008, you went over to his house for a barbecue, right?

A.   Yes.

Q.   So if you go over to his house for a barbecue, chances are it's good weather, right?

A.   I think so.

Q.   You're not going to be having too many barbecues inviting friends over in January, right?

A.   We were there eating and we were inside.

Q.   Now, you brought your girlfriend along, right?

A.   Yes.

Q.   And then good weather, everybody in shorts and T-shirts?

A.   I don't remember.

Q.   Well, and at some point in time, according to you, a phone call comes in?  Yes or no.

A.   Yes.

Q.   And as a result of the phone call, people get up to leave, correct?

A.   To leave, I don't understand the question.

Q.   I'm sorry, I missed that.

A.   I don't understand the question.

1    Q.   Well, following the phone call, according to you, you

2    then -- people then get up and start to leave, correct, start

3    to go out of the house?  Yes or no, sir.  Some people go out of

4    the house?

5    A.   I don't remember.

6    Q.   Well, did you tell us that at some point in time a group

7    of people went down to the bus station looking for somebody?

8    A.   Yes.

9    Q.   And initially did you make the statement that when people

11:31AM 10   left the house, two people had machetes, you had a baseball bat

11   and somebody else had a knife?

12   A.   I said one person had a machete.  I don't recall saying

13   two people had machetes.

14   Q.   Do you ever recall saying to the -- two people had a

15   machete at some point in time, sir?

16   A.   No, I don't recall that.

17   Q.   Well, on October 14, 2016, you met for a proffer session

18   with agents and members of the U.S. Attorney's Office, correct?

19   A.   Yes.

11:32AM 20   Q.   And at that point in time, you were asked or you had a

21   discussion with them about what you were claiming wasn't your

22   story about something that took place at the Maverick Street

23   Station in East Boston.  Please.

24        THE INTERPRETER:  Could you repeat the question for

25   the interpreter?

1        MR. NORKUNAS:  Let me strike that question.

2        Can I have the Elmo just for the witness, please.  And

3   down at the bottom, if you could read -- if the interpreter

4   could read that to the witness.

5        THE INTERPRETER:  Starting on the last two lines?

6        MR. NORKUNAS:  The last two lines and the top line of

7   the next page.

8        THE INTERPRETER:  Just the highlighted?

9        MR. NORKUNAS:  Just the highlighted portion, correct,

11:33AM 10   the top line.

11   Q.   Having read that, sir, does that refresh your memory of

12   what you had told the investigators back on October 14, 2016,

13   about what weapons you say people had when they left the house

14   in East Boston?

15   A.   Yes.

16   Q.   So, four people leave the house.  You told us it was two

17   blocks from the Maverick Street Station, right?

18   A.   Yes.

19   Q.   That's one of the busiest areas in all of East Boston,

11:34AM 20   correct?

21   A.   At that moment it wasn't very full.

22   Q.   Well, you're having a barbecue, chances are it's going to

23   be daylight, right?

24   A.   But not at Maverick.

25   Q.   Pardon me.

1    A.   But you were asking me if Maverick was crowded.

2    Q.   Well, we are trying to figure out the time of the day,

3    daylight, warm weather, right, you told us?

4    A.   It was going into the afternoon.

5    Q.   Going into the afternoon.

6    A.   Because we had already gone indoors.

7    Q.   Well, you didn't change your clothes, you're still in

8    shorts and T-shirts, right?

9    A.   I don't remember that.

11:35AM 10   Q.   But you're carrying, according to you, on this story

11   you're telling us, two machetes, a baseball bat -- and you got

12   the baseball bat, right?

13   A.   I had the bat.

14   Q.   And a large hunting knife, right?

15   A.   Yes.

16   Q.   Four guys start down one of the main streets in East

17   Boston with two machetes, a baseball bat, and a hunting knife?

18   A.   I recall having said one machete.  I don't recall more.

19   Q.   So one person didn't have anything.  That would have been

11:36AM 20   Cesar who didn't have any type of weapon in your story, right?

21   A.   Cesar is the one who had the machete.

22   Q.   And you're not disputing that you're all walking down the

23   main street of East Boston carrying these weapons?

24   A.   There were two -- it was two and two.

25   Q.   So two guys with weapons on one side, two guys with

1    weapons on the other side?

2    A.    Yes.

3    Q.    Kind of carrying the machete and the baseball bat over

4    your shoulder in East Boston, and who cares?

5    A.    The things we carry in here and I had the bat in here.

6    (Indicating)

7    Q.    You had the bat where, sir, the baseball bat where?

8    A.    I had put it in here. (Indicating)

9    Q.    So you're walking with the baseball bat very slowly

11:37AM 10    because you couldn't move your leg with the baseball bat in it?

11    A.    You can figure that out.  You can imagine.

12    Q.    Well, sir, a baseball bat would go from your hip to your

13    ankle, right?

14    A.    It depends on how big the baseball bat is.

15    Q.    Perhaps you were carrying one of those souvenir bats?

16    It's your story, sir, you can do whatever you want.

17          THE COURT:  Hold on.  Strike that.  Let him answer

18    your question.

19    A.    It was like this. (Indicating)

11:38AM 20    Q.    A small bat, right?

21    A.    Immigration took the bat.  They have it.

22    Q.    And were the machetes and the knives kind of small, too?

23    A.    The machete was about this big. (Indicating)

24    Q.    Bigger than your bat?

25    A.    They are different sizes.

1    Q.   You would know, sir, because you're experienced with them,

2    right?

3    A.   Everyone in MS-13 knows that because that's what they use.

4    Q.   Now, you approach the station in your story, and the

5    people you're looking for, according to you, don't get off the

6    bus, right?

7    A.   We got only to the corner.  We didn't go all the way to

8    the station, and we told him to walk towards where we were.

9    Q.   But, sir --

11:39AM 10   A.   The ones that didn't get off the bus were the chavalas.

11   Q.   Well, you said that you were living in East Boston.

12   Maverick Street is the last stop on that bus line, right?

13   A.   Yes, I know that well.

14   Q.   Okay.  And the police station is real close by as well,

15   correct?

16   A.   On Meridian, yes.

17   Q.   And at some point in time then, according to your story,

18   you get into a fight with at least one of these gentlemen,

19   right?

11:40AM 20   A.   There were two, one ran away and one was caught.

21   Q.   Okay.  And you told us that you hit him with the little

22   souvenir bat, right?  Did you hit him with the bat?

23   A.   We all hit him, not just me.

24   Q.   So guys were chopping at him with the machete, guys were

25   hitting, stabbing him with the knife?  And, sir --

1      THE COURT:  We need an answer to that.

2  A.  They didn't use the knives, some were kicking him.  And

3  the taxi pulled up there and started honking the horn.

4  Q.  So you brought the weapons along for show only?

5  A.  When we got back, Checha said that there was blood on his

6  machete.

7  Q.  That isn't what I asked you, sir.  The question was so you

8  brought the weapons for show only, correct?

9  A.  If that had been so, we wouldn't have hit him, and Checha

11:42AM 10  would not have had blood on his machete if it was just showing

11  off.

12  Q.  So, sir, you believe that damage was done to the young man

13  on the street?

14  A.  Yes, because afterwards, when we locked ourselves into

15  Checha's house, the detectives arrive --

16  Q.  Sir, I'll ask you the next question.

17      THE COURT:  Well, hold on.  You asked him a question.

18  He should answer it.  You asked him he believes the damage was

19  done to the man on the street.

11:43AM 20      MR. NORKUNAS:  Yes or no, answer.

21      THE COURT:  Just because you say doesn't mean he has

22  to answer yes or no.  He can answer.

23  A.  The detectives arrived and started knocking on the door.

24      MR. NORKUNAS:  Judge, if I may pose another question.

25  It's not responsive.  It's a bad question.

```
 1              THE COURT:  Go ahead.
 2    Q.   So you had told us before that you believed this was done
 3    on Chelsea Street in East Boston, right?
 4    A.   Yes, it was on Chelsea Street.
 5    Q.   And you only had to go two blocks from the Maverick Street
 6    Station in your story where you say Cesar Martinez lived,
 7    correct?
 8    A.   Something like that.
 9    Q.   So, in your story, there's a major confrontation with
10    weapons in the middle of one of the major streets in East
11    Boston, correct?
12    A.   Yes.
13    Q.   And then four people with -- strike that for a minute.
14    And what did you do to that person, sir?
15    A.   We beat him up.  I hit him with a bat, and I also kicked
16    him.  We left him because the taxi, because of the taxi driver
17    that started honking his horn.
18    Q.   So, how big are you, sir?  What's your height?
19    A.   I don't know.
20    Q.   Six feet?
21    A.   I don't know.
22    Q.   200 pounds?
23    A.   I don't know.  I haven't weighed myself.
24    Q.   And according to all that you said here at this trial as
25    MS-13, you wanted to really beat that person, perhaps even kill
```

1    that person, right?

2    A.    I couldn't hit him hard because there were other dudes

3    there also hitting.

4    Q.    So you only gave him little taps with the bat?

5    A.    When you beat somebody up, you're not going to hit him

6    while feeling sorry for him.  If you cut somebody with a

7    machete, you don't know if you're going to kill him or only

8    wound him.

9    Q.    So now according to your story, all four of you run the

11:46AM 10    remaining distance back to the house?

11    A.    Yes.

12    Q.    And you believe the police come immediately, correct?

13    A.    Yes, because the other one that ran away ran towards the

14    police station.

15    Q.    Which is very close to that area, right?

16    A.    Yes.

17    Q.    And then the police come up to the house looking for the

18    four armed men in your story who just did a major assault on a

19    young man, correct?

11:46AM 20    A.    Yes.

21    Q.    And you don't know from these weapons whether there were

22    drops of blood on the front steps or not, right?

23    A.    It was the first floor.

24    Q.    And they politely ring the bell, the police?

25    A.    Yes.

1    Q.   Looking for the four armed men who just ran away from a

2    major assault, right?

3    A.   Yes.

4    Q.   Is the grill still going?

5    A.   No, we were already inside the house.

6    Q.   And you know the grill had been shut off, right?

7    A.   I imagine it was off.

8    Q.   And the police, nobody immediately answers the door, and

9    they politely leave, according to your story, right?

11:47AM 10    A.   They were knocking at the door for a long while, and they

11    also had a female police woman talking and ringing the bell.

12    We all, we had turned off all the lights, and we were all

13    inside quietly.

14    Q.   Well, at some point in time you said you then leave and

15    get a ride home, right?

16    A.   Yes, but not to the house.

17    Q.   And there's no police officer outside still, right?

18    A.   No, but I left through the back, not through the front.

19    Q.   And the police would never think that someone might leave

11:48AM 20    through the back, right?

21    A.   I don't know that.

22    Q.   Sir, you indicated that -- that was 2008, you believe; is

23    that correct, sir?

24    A.   Before I was deported.

25    Q.   And you were deported when, sir?

1    A.    I was deported in 2009.

2    Q.    But you were arrested before you were deported, right?

3    A.    Yes.

4    Q.    And you were held in custody for a while, right?

5    A.    I don't remember.

6    Q.    Have you been in jail so often, sir, that you can't

7    remember when you were in custody and when you weren't?

8    A.    Immigration took me at once.  I don't remember how long I

9    was in jail.

11:50AM 10    Q.    All right.  And then you indicated at some point in time

11    you're over at the garage and you thought Crazy, Brujo and some

12    others were with you, correct?

13    A.    We have many times at the garage.

14    Q.    But it's also a particular evening when you believed

15    Vida Loca was looking for Crazy to bring him a gun, correct?

16    A.    Yes.

17    Q.    Now, Crazy couldn't come in the garage at any point in

18    time when the owner was there because he hated him, right?

19    A.    I don't know that.

11:51AM 20    Q.    Well, according to your story in relation to this, Crazy

21    had a handgun, right?

22    A.    Yes.

23    Q.    Was that your clique gun?

24    A.    Not that I know of because Crazy is not from our clique.

25    Q.    Okay.  Is Vida Loca from your clique?

1   A.   No.

2   Q.   So, those are two guys that you don't really have any need

3   to assist or help, right?

4   A.   That doesn't matter because we're all MS-13.

5   Q.   So if you don't help an MS-13 guy when he asks for help,

6   you could get beaten?

7   A.   Yes.

8   Q.   And on this particular evening, according to you, you're

9   then looking to see how you could get over with Crazy, Brujo to

11:53AM 10   see Vida Loca, right?

11   A.   I wasn't looking to get to Vida Loca.

12   Q.   Well, to your knowledge, how did Crazy get to the garage

13   that night?

14   A.   I don't know how he got there.

15   Q.   Well, how did Brujo get there?

16   A.   Brujo lived there.

17   Q.   At the garage, right?  How did Danger get there?

18   A.   He was with Crazy.

19   Q.   And you don't know whether they drove over or not, right?

11:53AM 20   A.   I don't know how they got there.

21   Q.   How did you get there?

22   A.   On the bus.

23   Q.   And according to you, at some point in time then,

24   Cesar Martinez shows up, and you told him that he was going to

25   have to drive you someplace, correct?

1  A.   Checha got there because he had the car.  Since he was the

2  only one there with a car, we had been waiting for a taxi that

3  never arrived.

4  Q.   Sir, the question was you told him he was going to have to

5  drive the group, right, in your story?

6  A.   I've never told Checha to drive.  I don't recall saying

7  that.

8  Q.   Well, sir, you testified the other day in regard to this

9  matter, correct, back on the 7th day of February, 2018, and on

11:55AM 10  page 92, you indicated that --

11       MR. POHL:  Judge, if that could be shown.  I think

12  it's testimony of a witness.

13       THE COURT:  No, just ask him about it.

14  Q.   Okay.  You told -- in response to a question, "Well, since

15  Checha just arrived, we told Checha to bring us."

16  A.   I told Checha to drop me off at my house.  I didn't go to

17  bring the gun to --

18  Q.   Sir, I just asked you that was your testimony the other

19  day that "We told Checha to bring us," correct?

11:56AM 20  A.   Yes.

21  Q.   And then according to you, everybody gets in the car,

22  correct?

23  A.   Yes.

24  Q.   And at that point in time, you decide you're going to go

25  home in violation of MS-13 rules, correct?

```
 1    A.    I told them to drop me off at my house.

 2    Q.    And your house is where, sir?

 3    A.    I live in Revere.

 4    Q.    And where did you believe they were going to meet

 5    Vida Loca?

 6    A.    Chelsea.

 7    Q.    So, there was no hurry to get there, correct?

 8    A.    I don't know that.  I just told them to drop me off first.

 9    Q.    So, despite the MS-13 rules that you've told us about, the

10    group first has to take you home in Revere?

11    A.    I told them to take me to the house because I had told

12    Crazy that Vida Loca might be drunk, and if a dude from MS-13

13    is drunk, I can't bring him a gun.  That's why I didn't go.

14    Q.    So, according to you, sir, they bring you home and then

15    the only source of information you have is what Brujo tells you

16    a week or so later, right?

17    A.     It wasn't a week later, it was within days that he told

18    me.

19    Q.    Pardon me, it was what?

20    A.    Days, just days later he told me.

21          MR. NORKUNAS:  If I could have the -- for the witness

22    only.

23    Q.    Sir, showing you a copy of your proffer agreement from

24    June 9, 2016 to the government?

25          THE COURT:  I think you misspoke.  It's not an
```

11:57AM (line 10)

11:58AM (line 20)

1    agreement.

2         MR. NORKUNAS:  I'm sorry, Judge.  It's a session, my

3    apologies.

4    Q.   And, sir, did you tell them that approximately -- if you

5    read that, sir, the second paragraph, did you tell them that

6    approximately one week later, Brujo talked to you?

7         THE INTERPRETER:  Should the interpreter read that

8    paragraph?

9         MR. NORKUNAS:  Yes, please.

12:00PM 10         Just that top paragraph, Madam Interpreter.

11         THE INTERPRETER:  I'm on my way there.  I'm done.

12    Q.   Sir, having had that read to you now, does that refresh

13    your memory that in June of 2000 -- June 9, 2016, you told

14    agents and members of the U.S. Attorney's Office that it was a

15    week later that Brujo talked to you?

16    A.   I don't remember having said that.

17    Q.   Do you recall, sir, telling them at that point in time,

18    Brujo told you that what took place took place at a restaurant

19    in Chelsea?

12:01PM 20    A.   Brujo at no time told me that it was a restaurant.

21    Q.   So, if someone had listed a restaurant, it would have been

22    incorrect, you never would have said that; is that correct?

23         THE INTERPRETER:  I'm sorry.

24    Q.   If it was listed as a restaurant, that would have been

25    incorrect as to what he said?

1    A.   As far as I recall, I never would have said restaurant

2    because it wasn't a restaurant.  It was a place where they sell

3    beer at night, a house.

4    Q.   But in this particular presentation, sir, it repeats the

5    word "restaurant" several times, correct?

6    A.   That's what it says, but as far as I know, I never said

7    restaurant because it didn't happen in a restaurant.

8    Q.   And it says "Brujo stepped into the restaurant," according

9    to you, "and stepped right back out," correct?

12:02PM 10    A.   I didn't say any of that.

11    Q.   Then in October --

12         THE COURT:  Sorry to interrupt.  Do you all want a

13    12:00 break?  Yes, I'm seeing some nods.  All right.

14         THE CLERK:  All rise.

15         (JURORS EXITED THE COURTROOM.)

16         (A recess was taken.)

17         THE CLERK:  All rise for the jury.

18         (JURORS ENTERED THE COURTROOM.)

19         THE CLERK:  Thank you.  You may be seated.  Court is

12:17PM 20    now back in session.

21         THE COURT:  Mr. Norkunas.

22         MR. NORKUNAS:  Judge, I just have a few more

23    questions, if I may.

24    Q.   So, back in October, when you were again asked about

25    Vida Loca and the murder in the home, you at that point in time

1    then told the agents that Vida Loca actually lived in the house

2    where the young man died; do you remember that?

3    A.   Brujo had told me that he had lived up on the second

4    floor.

5    Q.   He, being Vida Loca?

6    A.   Yes.

7    Q.   And so did you ever receive a beating for not going to

8    assist Vida Loca?

9    A.   No.

12:18PM 10         MR. NORKUNAS:  If I could have Exhibit 49.2, please,

11   page 2.  And if we could highlight just the first paragraph,

12   blow that up for me.  Thank you.  Could I get the next

13   paragraph, close that one.  Right there.  Thank you.

14   Q.   Mr. Hernandez Miguel, you understand that in this

15   particular case, the issue of who makes a determination of

16   whether you're going to get any help is the U.S. Attorney's

17   Office; is that correct?

18   A.   Yes.

19   Q.   And they've used a term called "substantial assistance" is

12:19PM 20   what they're going to look at and determine how much weight to

21   put to that to make a recommendation to the Court for your

22   sentencing, correct?

23         THE INTERPRETER:  Could you highlight, please.

24         MR. NORKUNAS:  Pardon me?

25         THE INTERPRETER:  Could you point to that?

```
 1              MR. NORKUNAS:  I'm not asking him to read it.

 2              THE INTERPRETER:  I'm sorry, could you repeat the

 3     question again.

 4     Q.   The people that make a determination, the folks that make

 5     a determination sit over here, correct, the U.S. Attorney's

 6     Office?

 7     A.   Yes.

 8     Q.   Now, sir, you're a person that has substantially harmed a

 9     lot of people in your life, right?

12:20PM 10     A.   Yes.

11     Q.   And you've done that to enhance your status, correct?

12     A.   Everyone in MS-13 does the same thing.

13     Q.   I didn't ask about everyone, sir, I asked about you.

14     A.   Everyone in MS-13, we all do the same thing.

15              MR. MURPHY:  Objection, your Honor, motion to strike.

16              THE COURT:  I'll sustain it and strike the answer.

17     The question was about you.

18     Q.   The question is about you, Hernandez Miguel.  You did

19     that, you did the substantial harm to increase your stature in

12:21PM 20     MS-13, right?

21     A.   Yes.

22     Q.   And now, sir, you know that the determination of whether

23     you're going to get away with all of that harm you did to other

24     people depends upon, again, a weight of substantial assistance,

25     right?
```

1          MR. POHL:  Objection.

2          THE COURT:  I'll sustain it in that form.

3     Q.   Sir, you now are trying once again to harm other

4     people --

5          MR. POHL:  Objection.

6          THE COURT:  Sustained.

7     Q.   Sir, you know by putting forward, you've placed in harm's

8     way, by your testimony, other people in this case, right?

9          MR. POHL:  Objection.

12:22PM 10       THE COURT:  Sustained.

11    Q.   Sir, you know the most important aspect of this agreement

12    is whether you get substantial assistance or not, correct?

13         MR. POHL:  Objection.

14         THE COURT:  I'll allow that.

15    A.   Yes.

16    Q.   And you're not here to testify about your harm, you're

17    here to testify about what you claim other people may have done

18    so you can gain something, correct?

19         MR. POHL:  Objection.

12:22PM 20       THE COURT:  Sustained in that form.

21         MR. NORKUNAS:  I have nothing further, Judge.

22    Thank you.

23         THE COURT:  Mr. Murphy.

24         MR. MURPHY:  Thank you, your Honor.

25

CROSS-EXAMINATION

BY MR. MURPHY:

Q.   Good afternoon, sir.

A.   Good afternoon.

Q.   My name is Marty Murphy, and I represent Mr. Sandoval.
Now, sir, you testified last week that you joined MS-13 in
Los Angeles when you were in high school, correct?

A.   I was with the Surenos at that time, and then I joined
MS-13.

Q.   When you were in high school, sir, correct?

A.   Yes.

Q.   Who were the Surenos?

A.   They are also a gang that flashes 13.

Q.   And, sir, you met with the government, the prosecution
team, for the first time in this case on May 19, 2016, correct?

A.   Yes.

Q.   And that was upstairs in this building, correct?

A.   I don't know where it was, but it was here.

Q.   And it was in the U.S. Attorney's Office, correct?

A.   Yes.

Q.   There were two prosecutors there, correct?

A.   Yes.

Q.   An FBI agent?

A.   Yes.

Q.   And a state trooper, correct?

1    A.    Yes.

2    Q.    And Ms. Huacuja was also there, correct?

3    A.    Yes.

4    Q.    And she was translating for you just the way that she has

5    been during this trial, correct?

6    A.    Yes.

7    Q.    And before you spoke to the prosecution team for the first

8    time on May 19, 2016, you signed an agreement, correct?

9    A.    Yes.

12:25PM 10          MR. MURPHY:  And may we see Exhibit 48 for the

11   witness, please.

12   Q.    I'd ask you to take a look at the screen, sir, and ask

13   whether you can identify what's been marked as Exhibit 48.

14   A.    Yes.

15   Q.    And is that the first agreement that you signed with the

16   prosecution?

17          THE COURT:  Hold on, is this in?

18          MR. POHL:  No.

19          THE CLERK:  It's not being shown to the jury.

12:26PM 20          THE COURT:  Oh, isn't?  Okay.  I'm sorry.  I thought

21   it was.  Go ahead.

22   Q.    Is that the first agreement that you signed with the

23   prosecution team?

24   A.    Yes.

25   Q.    And if we could turn to page 2, is that your signature?

1   A.   Yes.

2   Q.   And is that the signature of your lawyer?

3   A.   Yes.

4   Q.   And that's Mr. Barron, correct?

5   A.   Yes.

6   Q.   Who is here in the courtroom?

7   A.   Yes.

8   Q.   And before you signed this agreement, sir, Ms. Huacuja

9   translated it for you in Spanish, correct?

12:26PM 10   A.   Yes.

11   Q.   And that's true, sir, of all of the agreements that we've

12   been talking about, correct?

13   A.   Yes.

14        MR. MURPHY:  If we could see 49.1, please.

15   Q.   That's your plea agreement, sir?

16   A.   Yes.

17   Q.   And before you signed that, Ms. Huacuja translated that

18   for you into Spanish, correct?

19   A.   Yes.

12:27PM 20        MR. MURPHY:  And if we could see Exhibit 49.2, please.

21   Q.   That's your cooperation agreement?

22   A.   Yes.

23   Q.   And Ms. Huacuja also translated that document into Spanish

24   for you before you signed it, correct?

25   A.   Yes.

1          MR. MURPHY:  We'd offer Exhibit 48, your Honor.

2          MR. POHL:  No objection.

3          THE COURT:  It's admitted, 48.

4          (Exhibit No. 48 received into evidence.)

5          MR. MURPHY:  Now, could we turn back to Exhibit 48,

6     please, thank you.  And may that be shown to the members of the

7     jury.

8          THE CLERK:  It is.

9          MR. MURPHY:  Thank you.

12:28PM 10   Q.   Now, if we turn first to page 2, that again so the jury

11    can see it, that's your signature, correct?

12    A.   Yes.

13    Q.   And the signature of your lawyer, correct?

14    A.   Yes.

15    Q.   And if we go back to the first page, if we look at the

16    second line, that states that you are agreeing to provide

17    information that was accurate and complete, correct?

18    A.   Yes.

19    Q.   And you understood, sir, that accurate meant that you had

12:28PM 20   to tell the truth, correct?

21    A.   Yes.

22    Q.   And complete meant that you had to leave nothing out,

23    correct?

24    A.   Yes.

25    Q.   Now, at the very beginning of your very first meeting with

1    the prosecution team, they asked you some questions about your

2    background, correct?

3    A.    Yes.

4    Q.    And you told them that you had entered the United States

5    in 2001, correct?

6    A.    Yes.

7    Q.    And they asked you whether you had been a member of a gang

8    in Los Angeles, correct?

9    A.    Yes.

12:29PM 10    Q.    And which you told the prosecution team on May 19, 2016

11    was that you attended high school in Los Angeles and was always

12    getting in fights with members of MS-13 and 18th Street because

13    you were not a member of either gang, correct?

14    A.    I never said that.

15          MR. MURPHY:  If I could show you what's been -- for

16    the witness only.

17          THE CLERK:  Document camera.

18    Q.    It's your testimony, sir -- let me ask if Ms. Huacuja

19    could read to the witness the sentence that begins, "Hernandez

12:31PM 20    Miguel."

21    A.    I don't recall having said that.

22    Q.    You acknowledge, sir, that's what the report says however,

23    correct?

24    A.    The report says that, but I do not recall having said

25    that.

Q.   And what the report says is that you told the government
you weren't a member of MS-13 when you were in Los Angeles,
correct?

MR. POHL:  Objection.

THE COURT:  Overruled.

A.   I had told them that first I met the Surenos and
afterwards, I had met the MS-13 dudes.

Q.   Now, sir, you -- there's no question pending, sir.  Now,
May 19, 2016 was only the first time that you met with the
government, correct?

A.   Yes.

Q.   You met with them again on June 19 -- I'm sorry, June 9,
2016?

A.   I think so.

Q.   Well, let's see if this helps you remember.

MR. MURPHY:  I'd like it for the witness only.

Q.   I'd ask you to direct your attention to the screen.  If I
point here, sir, does that help you remember that you met with
the government on June 9, 2016?

A.   Yes.

THE COURT:  Let me, if I can, just explain to the jury
something.  What typically happens and what apparently happened
here is the witness meets with the FBI and FBI agent, one or
more FBI agents take notes and then write up a report.  So it's
not the witness' -- it's not a verbatim transcript, it's not a

```
 1    recording, and the witness can either, you know, agree or

 2    disagree that that's what he said or didn't say or that the

 3    notes were accurate, but the point is it's the FBI agent's

 4    report that has been written up that we're showing the witness.

 5    Continue.

 6              MR. MURPHY:  Thank you, your Honor.

 7    Q.   Sir, you met with the prosecution team a third time on

 8    July 15, 2016, correct?

 9    A.   Yes.

10    Q.   And you met with the prosecution team for a fourth time on

11    October 14, 2016, correct?

12    A.   Yes.

13    Q.   And you met with the prosecution team for a fifth time on

14    November 10, 2016, correct?

15    A.   Yes.

16              MR. MURPHY:  And for the witness only from the

17    document camera.

18    Q.   Do you recognize that, sir, as a list of the meetings that

19    we just talked about?

20    A.   Yes.

21              MR. MURPHY:  Your Honor, I'd ask that this be

22    displayed to the jury simply as a chalk.

23              THE COURT:  Yes.

24    Q.   Now, in each of those meetings, you had promised to be

25    truthful, correct?
```

1    A.    Always.

2    Q.    And in each of those meetings, you had promised to be

3    complete, correct?

4    A.    Yes.

5    Q.    And as you testified, that meant that you understood that

6    you were not supposed to leave anything out, correct?

7    A.    Yes.

8    Q.    And it's a fact, sir, isn't it, that at every one of those

9    meetings, the prosecution team asked you questions about

12:35PM 10    Mr. Sandoval?

11    A.    Yes.

12    Q.    And at no time from the first meeting on May 19th to the

13    last one that we have a report about on November 10, 2016, did

14    you tell the prosecution team that you had asked Mr. Sandoval

15    for permission to get your MS-13 tattoos?

16    A.    To do them, to make them, yes.

17    Q.    At no time during any of those meetings did you tell the

18    prosecution team that, did you, sir?

19    A.    No.  I don't recall having said that.

12:36PM 20    Q.    Thank you, sir.  Now, you told us last week that the first

21    time you met Mr. Sandoval, he came by the house where you were

22    staying and picked you up?  Do you recall that, sir?

23    A.    Yes.

24    Q.    It's a fact, sir, is it not, that on May 31st -- I'm

25    sorry, on May 19, 2016, the day that you first met with the

1    government, you told the prosecution team that you met

2    Mr. Sandoval while you were playing soccer in Somerville?

3    A.   I don't recall.

4         MR. MURPHY:  If I could show you -- for the witness

5    only, please, on the document camera.  If I could ask

6    Ms. Huacuja to read the paragraph where my pen is to the

7    witness, please.

8    Q.   And, sir, does that refresh your memory that when you

9    spoke to the prosecution team back on May 19, 2016, the first

12:38PM 10   time you met with them, you told them that you had met Sandoval

11   for the first time while playing soccer in Somerville?

12   A.   As far as I can recall, I never said that because I didn't

13   play soccer with Casper.  I met Casper when he came to pick me

14   up on Eutaw Street in Boston.

15   Q.   You agree, sir, that what the report that the FBI agent

16   who is interviewing say is that you met him for the first time

17   while you were playing soccer in Somerville?

18        MR. POHL:  I object because that's not what it says.

19   Q.   Well, let me read it, sir.  "However, Hernandez Miguel

12:40PM 20   soon met Casper and several other members of ESLS while playing

21   soccer in Somerville, Massachusetts."

22        You agree, sir, that that's what you told the FBI,

23   correct?

24   A.   No.  I said that I first met Casper when he came to pick

25   me up on Eutaw Street in East Boston, which was where I first

1    lived when I came here.  I never played soccer with Casper.

2    Q.    And you agreed, sir, that the business about Eutaw Street

3    is not in the report that we just saw, correct?

4    A.    It's not there.

5    Q.    And there's nothing about that, sir, you'd agree, in the

6    reports from your meetings of May 19th, June 9th, July 15th,

7    October 14th or November 10th?

8    A.    I don't remember.

9    Q.    Now, sir, you testified last week and I think a little bit

12:41PM 10   earlier today about a conversation that you say you had with

11   Mr. Larios after you were arrested.  Do you recall that?

12   A.    Yes.

13   Q.    And you agree, sir, that you were arrested at the end of

14   January, 2016, correct?

15   A.    Yes.

16   Q.    And you say that it was after your arrest that you had a

17   conversation with Mr. Larios about Pelon, correct?

18   A.    Yes.

19   Q.    How long after your arrest, sir?

12:42PM 20   A.    About one month to one month and a half later, but I'm not

21   sure.

22   Q.    Okay.  So, some time February or March of 2016, correct?

23   A.    I don't remember exactly.

24   Q.    Around then?

25   A.    Could be.

1    Q.   And you were having a conversation with Mr. Larios,

2    correct?

3    A.   We were in the same cell.

4    Q.   Mr. Sandoval was not there?

5    A.   No.

6    Q.   And you and Mr. Larios, according to you, were talking

7    about something that happened a year earlier, correct?

8    A.   What we were talking about was that Lobo told me that he

9    had asked for a green light to kill Pelon, and he told me that

12:43PM 10   had Casper given him the green light, only one dude would be in

11   jail instead of all of us.

12   Q.   And, sir, if we could try to stick with my questions.  My

13   question was you were talking about something that happened a

14   year earlier, correct?

15   A.   I don't understand the question.

16   Q.   It's your testimony that Mr. Larios was -- and that's

17   Lobo, correct?

18   A.   Yes.

19   Q.   Was talking to you about something that happened shortly

12:44PM 20   after the police took the clique gun from him, correct?

21   A.   Yes.

22   Q.   And you know, sir, that the police took the gun from

23   Mr. Larios, that is, Lobo, in January of 2015, correct?

24   A.   I think it was then.  I'm not sure.

25   Q.   And according to your testimony, a year later Mr. Larios

1    is talking with you about a conversation that he had with

2    Mr. Sandoval back in January 2015, shortly after the gun was

3    taken from Mr. Larios, correct?

4    A.   I don't know when they had the conversation.  That's what

5    Lobo told me.

6    Q.   But he told you it was shortly after the gun had been

7    taken from him, correct?

8    A.   What Lobo told me is that he had requested the green light

9    because Lobo was sure that Pelon was a snitch and that he had

12:46PM 10  snitched on him at Casa Mariachi.  He never told me at what

11   date or time or year he had asked for the green light.

12   Q.   But you knew it was before -- according to you, this

13   conversation took place before anyone was arrested in the case,

14   correct, sir?

15   A.   Yes.

16   Q.   And, sir, what you say Lobo told you was that he asked

17   Mr. Sandoval for permission to green light Pelon, correct?

18   A.   Yes.

19   Q.   And according to you, what Lobo was told by Mr. Sandoval

12:47PM 20  was that no, unless there's clear evidence, correct?

21   A.   Yes.

22   Q.   Now, last week, we talked about a clique meeting that took

23   place on February 8, 2015?

24        MR. MURPHY:  If we could look at Exhibit 23.

25   Q.   And that was a meeting on February 8th where there was a

        1   discussion with Lobo about his having had the gun taken away

        2   from him by the police, correct?

        3   A.    Yes.

        4   Q.    And Pelon was there for that meeting, correct?

        5   A.    Yes.

        6   Q.    And during that meeting, Mr. Sandoval and others asked

        7   Mr. Larios, Lobo, questions about what happened, correct?

        8   A.    Yes.

        9   Q.    And Mr. Larios never said anything in that meeting about

12:49PM 10   believing that Mr. Pelon was an informant, correct?

       11   A.    No.

       12   Q.    And that's what happened in the clique, is if somebody

       13   broke the rules, they were called to task for what they did in

       14   clique meetings, correct?

       15   A.    Yes.

       16   Q.    And that's what was happening to Mr. Larios on February 8,

       17   2015 at the meeting that we're looking at now in Exhibit --

       18   pardon me, Exhibit 23, correct?

       19   A.    I didn't understand the question.

12:50PM 20   Q.    Sure.  Mr. Larios was being questioned about losing the

       21   clique gun to the police during the meeting on February 8th,

       22   correct?

       23   A.    Yes.

       24   Q.    It's fair to say, sir, that Pelon attended many clique

       25   meetings between February 2015 to January 2016, when the

1    arrests were made?

2    A.   Yes.

3    Q.   And he attended clique meetings right up until the time

4    that you were arrested, correct?

5    A.   Yes.

6    Q.   And, sir, it's fair to say that at no time during any of

7    those meetings was Pelon questioned about whether he was an

8    informant the way Lobo was questioned about why he lost the

9    gun, correct?

12:51PM 10    A.   No.  I asked Lobo why he hadn't spoken.  I asked him why

11    he hadn't told me that supposedly he thought Pelon was a

12    snitch, and he told me that they hadn't said anything to me

13    because I would stick up for Pelon, and that's why they hadn't

14    said anything.

15    Q.   But my question, sir, was whether at any of the clique

16    meetings anyone had questioned Pelon?

17    A.   No.

18    Q.   Right.  And at no point after February 2015 until the

19    arrests in January, 2016 did Mr. Sandoval attempt or any other

12:52PM 20    member of ESLS attempt to search Pelon, correct?

21    A.   I don't know.

22    Q.   Not at any clique meeting you attended, that's something

23    you would remember, correct?

24    A.   Yes.  Lobo never told me that he was going to kill Pelon,

25    Lobo told me that --

1          MR. MURPHY:  Your Honor, I'd ask the response be

2     stricken as unresponsive.

3          THE COURT:  All right.  That will be struck.  Put

4     another question to the witness.

5     Q.   Now, let me ask you briefly, sir, before we break for the

6     day, about the events of May 12, 2015.  That was the day that

7     you ended up at Highland Park in Chelsea, correct?

8     A.   Yes.

9     Q.   And you started the beginning of these events with Pelon,

12:54PM 10    correct?

11    A.   Of that event?

12    Q.   Yes.

13    A.   Yes.

14    Q.   And you were together in Pelon's car, correct?

15    A.   Yes.

16    Q.   And that was the car that you later learned was the car

17    that was used to record conversations, correct?

18    A.   Yes.

19    Q.   What kind of car was it?

12:55PM 20    A.   I think it was a Toyota Camry.

21    Q.   And the other folks who were involved that day were at the

22    park, Highland Park in Chelsea, correct?

23    A.   Yes.

24    Q.   And that was Brujo, Vago, and Vampiro, correct?

25    A.   Yes.

1    Q.   And the other person who got involved was a person named

2    Domingo, correct?

3    A.   Yes.

4    Q.   And so he was the person who was at home and who had the

5    knife, correct?

6    A.   Yes.

7         MR. MURPHY:  So if I were to show the witness --

8    witness only on the document camera.

9    Q.   Does that show who was where when you first received the

12:56PM 10   telephone call that led you to eventually head to Highland Park

11   in Chelsea?

12        THE INTERPRETER:  May the interpreter read it?

13        MR. MURPHY:  Please, thank you.

14        THE WITNESS:  Yes.

15        MR. MURPHY:  If that may be shown as a demonstrative,

16   as a chalk, your Honor, to the jury?

17        THE COURT:  Yes.

18   Q.   So you and Pelon started off at the garage, correct?

19   A.   Yes.

12:57PM 20   Q.   And decided to go get something to eat for lunch, correct?

21   A.   I don't know if it was for lunch, but we were going to eat

22   something.

23   Q.   Okay.  Fair enough, sir.  You were going to eat somewhere,

24   you were going to go to eat, correct?

25   A.   Yes.

1    Q.   And it's true, isn't it, sir, that you received a call

2    from Brujo who was at the park, correct?

3    A.   I didn't understand the question.

4    Q.   You were with Pelon and you received a call from Brujo,

5    correct?

6    A.   Yes.

7    Q.   And Brujo told you that he and Vega had seen some 18th

8    Street members at the park in Chelsea, correct?

9    A.   Vago had gone in to buy marijuana, and he had seen the 18s

12:58PM 10    there, and they had said things to him.

11    Q.   And he wanted you to come to the park to help, correct?

12    A.   Yes.

13    Q.   You did not want to go, did you, sir?

14    A.   Because I had nothing on me.

15    Q.   No weapons, correct?

16    A.   No.

17    Q.   And it was also true that you believed you'd be

18    outnumbered by the 18th Street gang members, correct?

19    A.   Yes.

12:58PM 20    Q.   And Pelon talked you into going, isn't that correct, sir?

21         MR. POHL:  Objection.

22         THE COURT:  Overruled.

23    A.   I don't remember.

24    Q.   I'd like to take -- ask you to take a look at what's on

25    the document camera for the witness only.  You told the FBI

1    about this set of events on July 15, 2016, correct?  Is that

2    correct, sir?

3    A.   Yes.

4    Q.   And do you see here there's a set of events under the

5    heading "Stabbing in Chelsea, Massachusetts"?

6    A.   Yes.

7    Q.   If I could turn to page 2.

8         MR. MURPHY:  And ask you to read, Ms. Huacuja, the

9    sentence that begins "Hernandez Miguel" that I've just pointed

01:00PM 10  to.

11        MR. POHL:  Is this just for the witness, your Honor?

12        THE CLERK:  Yes.

13        MR. MURPHY:  Ms. Huacuja, I'm sorry.  I only wanted

14   the first sentence.

15        THE INTERPRETER:  Okay.

16        MR. MURPHY:  I apologize.

17        THE INTERPRETER:  Okay.  It's done.

18   Q.   Sir, does that help you remember that you did not want to

19   go because you thought you would be outnumbered and because --

01:01PM 20  but you went because Pelon talked you into going?

21   A.   No, what I told him was not to go because we had nothing

22   on us, and so that's why we called Domingo to bring something

23   from his house.  We were not going to attack them, we just were

24   going to see what was up because they had tried to attack Vago.

25        THE COURT:  Can I steal just a few minutes of

1      everyone's time, maybe four minutes and keep going?  Okay.  I

2      just want to make up for some lost ground.

3              Go ahead, Mr. Murphy.

4      Q.   You'd agree, sir, what you told the FBI on July 15, 2016

5      was that Pelon talked you into going, correct?

6              MR. POHL:  Objection.  It's been asked and answered.

7              THE COURT:  Overruled.

8      A.   No one talked me into anything.

9      Q.   But you'd agree, sir, that that's what the report states,

01:02PM 10   correct?

11     A.   I don't know.

12     Q.   Did you just read that, sir?

13     A.   I heard the interpreter read it to me.

14     Q.   And that's what it said, correct?

15     A.   No one talks me into anything.  I do things for my own --

16     on my own account.

17     Q.   Well, sir, my question is, is that what the report says?

18     A.   I don't understand.

19     Q.   Ms. Huacuja just read you that sentence from the report,

01:03PM 20   correct?

21     A.   But I don't understand what you want to know.

22     Q.   I want to ask you whether you agree, sir, that the FBI's

23     report of their interview with you states that you told the FBI

24     on July 15, 2016 that Pelon talked you into going.  Is that

25     what the report says, sir?

A.   Yes, that's what the report says.

        MR. MURPHY:  Should I continue, your Honor?

        THE COURT:  We may as well break there for the day.
Thank you, ladies and gentlemen.  Remember my cautions not to
discuss the case among yourselves or with anyone else and to
ignore any media reports, and hopefully we will get started
promptly at 9:00 tomorrow.

        THE CLERK:  All rise.

        (JURORS EXITED THE COURTROOM.)

01:05PM  (THE FOLLOWING OCCURRED AT SIDEBAR:)

        THE COURT:  How are we doing on scheduling?  Let's
figure out how far we have to go.  How much more do you have,
Mr. Murphy?

        MR. MURPHY:  Half an hour at the most.

        THE COURT:  Mr. Lopez.

        MR. LOPEZ:  What I have has to be paired down because
what's happened here today.  I imagine I'd go an hour to an
hour and a half.

        THE COURT:  And some redirect?

01:05PM  MR. POHL:  Yes, but not a lot.  If that schedule
holds, I would expect this witness would be done and we'd be
putting on witnesses after that.

        THE COURT:  Assuming all of that is true, do you think
you'll rest on Friday?

        MS. LAWRENCE:  We have another cooperating defendant

1    who won't be as long as this one, but he will take some time.

2              MR. POHL:  I still think we're on track today.

3              THE COURT:  Can I see someone from the marshals about

4    transport?  Yes, sir.  What happened this morning?

5              THE MARSHAL:  Got stuck in traffic.  The witness comes

6    from Barnstable down the Cape, so we got stuck in traffic.

7              THE COURT:  Okay.  Again, to state the obvious, I know

8    it's a long distance, and I'm sure it's happening very early.

9              THE MARSHAL:  I'll follow up, your Honor, and try to

01:06PM 10   get him here on time.

11             THE COURT:  I know things happen, you know, it's out

12   of your control but just to make sure people aren't leaving 5

13   or 10 minutes late or, you know, 15 minutes late.

14             THE MARSHAL:  I'll give them a call, your Honor.

15             THE COURT:  Thank you, sir.  Anything else?  8:30

16   tomorrow.

17             MR. POHL:  8:30 tomorrow.  Okay.  Thank you, your

18   Honor.

19             (SIDEBAR CONFERENCE WAS CONCLUDED)

01:06PM 20             THE CLERK:  All rise.

21             (Whereupon, the hearing was adjourned at 1:06 p.m.)

22

23

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7              I do hereby certify that the foregoing transcript was

8    recorded by me stenographically at the time and place aforesaid

9    in Criminal Action No. 15-10338-FDS, UNITED STATES vs. HERZZON

10   SANDOVAL, et al., and thereafter by me reduced to typewriting

11   and is a true and accurate record of the proceedings.

12             Dated this 13th day of June, 2018.

13                      s/s Valerie A. O'Hara

14             _____

15                  VALERIE A. O'HARA

16                  OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25