1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2


3
     UNITED STATES OF AMERICA          )
4                                      )
     vs.                               )  Criminal Action
5                                      )
     HERZZON SANDOVAL,                 )  No. 15-10338-FDS
6    EDWIN GUZMAN,                     )
     CESAR MARTINEZ,                   )
7    ERICK ARGUETA LARIOS,             )
                      Defendants       )
8


9
     BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
10

11
                      JURY TRIAL DAY 12
12

13

14          John Joseph Moakley United States Courthouse
                      Courtroom No. 2
15                    1 Courthouse Way
                      Boston, MA 02210
16
                      February 14, 2018
17                      8:31 a.m.

18

19

20

21

22

23                    Valerie A. O'Hara
                    Official Court Reporter
24       John Joseph Moakley United States Courthouse
                 1 Courthouse Way, Room 3204
25                    Boston, MA 02210
                E-mail: vaohara@gmail.com

1  APPEARANCES:

2  For The United States:

3      United States Attorney's Office, by CHRISTOPHER J. POHL,
   ASSISTANT UNITED STATES ATTORNEY, and KELLY BEGG LAWRENCE,
4  ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200,
   Boston, Massachusetts 02110;

5
   For the Defendant Herzzon Sandoval:
6
       Foley Hoag LLP, by MARTIN F. MURPHY, ESQ. and
7  MADELEINE K. RODRIGUEZ, ATTORNEY,
   155 Seaport Boulevard, Boston, Massachusetts 02210;

8
   For the Defendant Edwin Guzman:
9
       Lawson & Weitzen, by SCOTT P. LOPEZ, ESQ.,
10 88 Black Falcon Avenue, Suite 345, Boston, Massachusetts 02210

11 For the Defendant Erick Arueta Larios:

12     THOMAS J. IOVIENO, ESQ., 345 Neponset Street
   Canton, MA 02021;
13
   For the Defendant Cesar Martinez:
14
       Stanley W. Norkunas, 11 Kearney Square,
15 Howe Building, Suite 202, Lowell, Massachusetts 01852.

16     ROBERT M. SALTZMAN, ESQ., 1 Central Street, Suite 5,
   Stoneham, Massachusetts 02180.

17

18

19

20

21

22

23

24

25

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| EDWARD NOFTLE | | | | |
| By Ms. Lawrence | 10 | | | |
| | | | | |
| TIMOTHY O'CONNOR | | | | |
| By Ms. Lawrence | 15 | | | |
| By Mr. Norkunas | | 24 | | |
| By Mr. Murphy | | 25 | | |
| By Mr. Lopez | | 27 | | |
| | | | | |
| GLENN COTE | | | | |
| By Mr. Pohl | 28 | | | |
| By Mr. Norkunas | | 40 | | |
| | | | | |
| MATTHEU KELSCH | | | | |
| By Mr. Pohl | 43 | | | |
| By Mr. Norkunas | | 53 | | |
| | | | | |
| BRIAN ESTEVEZ | | | | |
| By Ms. Lawrence | 57 | | 134 | |
| By Mr. Iovieno | | 104 | | |
| By Mr. Norkunas | | 115 | | 136 |
| By Mr. Lopez | | 129 | | |
| | | | | |
| SCOTT CONLEY | | | | |
| By Mr. Pohl | 137 | | | |
| By Mr. Norkunas | | 150 | | |
| By Mr. Murphy | | 152 | | |
| | | | | |
| WILLIAM BRIZUELA | | | | |
| By Mr. Pohl | 158 | | | |
| By Mr. Murphy | | 164 | | |
| | | | | |
| MAURICIO SANCHEZ | | | | |
| By Ms. Lawrence | 167 | | | |

| EXHIBITS | FOR I.D. | IN EVIDENCE |
|---|---|---|
| 37 | | 17 |
| 39.1 through 39.5 | | 36 |
| 41 | | 22 |
| 42 | | 23 |
| 43 | | 68 |
| 59 | | 149 |

1

64.4                                              93
64.5                                              95
70                                                12
71                                                10
110.1 and 110.2                                  168
111                                              160
117.1, 117.2 and 117.3                           164
118.1 through 118.30                              96

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1

2          THE CLERK:  All rise.  Thank you.  Please be seated.

3     Court is now back in session.

4          THE COURT:  Good morning, everyone.  What do we have

5     to talk about?  Anything from the government?

6          MS. LAWRENCE:  Yes, your Honor.  We've sent to defense

7     counsel a transcript of a recording that we had not put on our

8     exhibit list, but we prepared the transcript after we received

9     copies of defense counsel's transcripts that they had intended

08:31AM 10     to offer, and we gave this to defense counsel in draft form

11     last Thursday, and we sent them a final copy last night that we

12     authenticated with one of our witnesses who will be testifying

13     today or tomorrow, so we'd like to offer that through that

14     witness.

15          MR. MURPHY:  Your Honor, what we would prefer is if we

16     could file a written opposition or objection to the government

17     and take it up tomorrow morning.

18          THE COURT:  Is the question the timing of it?

19          MR. MURPHY:  The question is largely the timing, yes,

08:32AM 20     your Honor.

21          THE COURT:  And the reason I'm asking that is if it's

22     something that the government could be permitted to put on in a

23     responsive case after a defense case, you know, it's not really

24     case in chief material, and it might save time to do it now.

25     Mr. Lopez.

1        MR. LOPEZ:  Yes, your Honor.  The government has

2    framed this as a transcript in response to a couple of very

3    brief excerpts of that same meeting, which I have no intention

4    of attempting to introduce in the defense or on

5    cross-examination, so to the extent it will be considered in

6    some type of rebuttal, that's just not going to happen.

7        THE COURT:  Okay.  And the timetable, CW-7 is the

8    witness?

9        MS. LAWRENCE:  Yes, it is, your Honor, we noticed the

08:33AM 10    part, the part that we are offering is not the same part of the

11    recording that Mr. Lopez had identified in his case, however

12    the part we are offering in response to arguments that have

13    been made by the defense in cross-examination thus far in the

14    case, and it would be the type of thing that would be part of

15    our rebuttal case if we were to present one separately.

16        THE COURT:  All right.  And how many pages are we

17    talking about?

18        MS. LAWRENCE:  Four pages, your Honor.  It's an

19    excerpt from part of a recording.

08:33AM 20        MR. LOPEZ:  From a three-hour meeting, your Honor.

21        THE COURT:  Okay.  And at what point do you expect

22    this to come up?  Do you expect it to come up today?

23        MS. LAWRENCE:  I would expect it to come up towards

24    the end of CW-7's testimony, so I don't believe we would get to

25    it today.

1          THE COURT:  Won't get to it today.  In that case, why

2      don't you get me a copy of the transcript and don't elicit or

3      offer the transcript until I've had a chance to rule on it.

4          MS. LAWRENCE:  Obviously.  CW-7 refers to this meeting

5      in another transcript that we are planning to offer and did put

6      on our exhibit list, so he talks about the content of this in a

7      separate recording.

8          THE COURT:  All right.  Anything else that anybody

9      wants to take up?  Mr. Guzman.

08:34AM 10          THE COURT:  Yes.

11          MR. GUZMAN:  Could I use an interpreter?

12          THE COURT:  Yes.

13          MR. GUZMAN:  Your Honor, I'm talking to you this

14     morning, I'm taking the chance to talk to you because I have an

15     issue with the evidence, evidence that I believe has not been

16     presented to either you or the magistrate.  It was going to be

17     introduced yesterday, but my lawyer said he had some issues

18     with his computer.

19          After the time that he spent here, it seems to me the

08:35AM 20     time that he has spent preparing for the case, it seems to me

21     incomprehensible that he should say that at the last minute he

22     has some issues with his computer.  I have in my hand a letter

23     that I sent to the Court where I was issuing or making

24     reference to part of the evidence and the need to be

25     introduced.

1          May I hand it up to you, your Honor?

2          THE COURT:  You may hand the letter.  Before I read

3     it, I don't want to read anything that includes attorney-client

4     confidential communications, but you can hand it.  I'm going to

5     put it under seal until I've decided what to do with it.

6          Let me say two things in response.  The first is that

7     even if Mr. Lopez was having difficulty with the computer, even

8     if Mr. Lopez is having issues with the computer, he can

9     introduce the evidence during the defense case.  He was not

08:36AM 10    required to do it at that time, Number 1.

11         Number 2, I have complete confidence in Mr. Lopez in

12    his ability to represent you, and he is in charge of your

13    defense.  Of course, he has to work with you, but we can't have

14    two people making decisions.  He has to direct and perform your

15    defense while working with you, and subject, of course, to your

16    ultimate decision-making authority.

17         Mr. Lopez, do you want to add anything here?

18         MR. LOPEZ:  No, your Honor.

19         THE COURT:  All right.  Why don't we leave it at that.

08:37AM 20    In terms of the letter --

21         MR. GUZMAN:  That's where the whole problem lies.  The

22    problem to me is that he doesn't want to introduce, bring in

23    the evidence right now because the witness that was here

24    yesterday will no longer be present.  That's what he said.

25    It's in my interest, I believe, that this evidence is

1    introduced as evidence for the defense and that the jury gets

2    to see it and hear it.

3            I came to trial so that this evidence would be proved,

4    but it's my Sixth Amendment right to come to trial and bring on

5    the evidence and face my accusers.

6            THE COURT:  All right.  The trial is not over.

7    Whatever the evidence is, I think Mr. Lopez said it was a

8    translation issue, may come in through another witness.

9    Certainly Mr. Lopez would be within his rights to conclude that

08:39AM 10    it would be better to come in through a witness who is more

11    cooperative than yesterday's witness, but the case is not over.

12    The defense will have the opportunity to present evidence and

13    to call witnesses, and I'm going to leave it at that for the

14    time being.

15            In the meantime, I've put your letter under seal, and

16    I will think about how I want to handle that, whether I want to

17    read it or perhaps give it to Magistrate Judge Kelley for her

18    to screen it because I don't want to be reviewing issues

19    concerning trial strategy in the middle of the trial because

08:39AM 20    I'm the presiding judge, but let me think about that.

21            Okay.  Thank you.

22            MR. GUZMAN:  Your Honor, the magistrate has already

23    read that letter, and she is the one that recommended my

24    attorney introduce that evidence.

25            THE COURT:  All right.  Let me take it a step at a

1    time, okay.  I understand your issue.  I'll leave it for there

2    for now.

3           MR. GUZMAN:  Thank you very much, your Honor, and I

4    apologize for taking up your time.

5           THE COURT:  All right.  Anything else?  All right.

6    We'll get started as soon as we have all our jurors.

7           THE CLERK:  All rise.

8           (A recess was taken.)

9           MS. LAWRENCE:  The government calls Edward Noftle.

09:03AM 10           EDWARD NOFTLE, having been duly sworn by the Clerk,

11    testified as follows:

12                        DIRECT EXAMINATION

13    BY MS. LAWRENCE:

14           THE WITNESS:  Good morning, Judge.

15           THE COURT:  Good morning.

16           MS. LAWRENCE:  Your Honor, before I begin my direct

17    examination, the parties have a stipulation regarding the

18    admissibility of Exhibit 71, which is a 9-1-1 tape.  I

19    offer 9-1-1 -- sorry, I offer Exhibit 71 into evidence and ask

09:03AM 20    that it be played for the jury.

21           THE COURT:  All right.  It's admitted, Exhibit 71.

22           (Exhibit No. 71 received into evidence.)

23           (Video plays)

24    Q.   Good morning.  Can you please introduce yourself to the

25    jury?

A.   Good morning.  Edward Noftle.  Last name is N-o-f, like

Frank, t-l-e, and I'm a police officer with the City of

Chelsea.

Q.   Thank you.  How long have you worked for the Chelsea

Police Department?

A.   This is my 30th year.

Q.   What unit are you currently assigned to?

A.   I'm assigned to the patrol division, and I'm a canine

handler.

09:04AM Q.   What's your title, sir?

A.   Police officer.

Q.   What kinds of things do you do as a patrol officer with

the K-9 unit?

A.   We handle routine calls for service, accidents, domestics,

fights.

Q.   Were you working as a patrol officer on May 12, 2015?

A.   Yes.

Q.   Did you receive a call that day?

A.   Yes, I did.

09:05AM Q.   And what did you do?

A.   I responded to Highland Park.

Q.   When you arrived, what did you see?

A.   There were a group of males on the right side.  As you

enter the park, there's a basketball court.

Q.   Actually, one moment, please.  Can I show you Exhibit 70,

1    please.  Do you recognize this photograph?

2    A.    Yes.

3    Q.    What is it a picture of?

4    A.    It's Highland Park in Chelsea.

5    Q.    Does this look like it did on May 12, 2015?

6    A.    Yes.

7             MS. LAWRENCE:  Your Honor, I move to admit Exhibit 70.

8             THE COURT:  All right.  It's admitted, Exhibit 70.

9             (Exhibit No. 70 received into evidence.)

09:05AM 10   Q.    Okay.  Officer Noftle, as you were describing when you

11   arrived on the park, can you point on the screen where you

12   responded to?

13   A.    (Indicating) I came on scene from Willow Street, which is

14   here and the entrance to the parking lot is just north of right

15   here.

16   Q.    And when you arrived at the parking lot, what did you see?

17   A.    I pulled in on the far side, and to my right, which was

18   right in this area here, there were a group of males, and there

19   was one male laying on the ground with his back against the

09:06AM 20   fence.

21   Q.    What did you do when you saw him?

22   A.    I could see that he was bleeding, lifted up his shirt,

23   applied direct pressure to -- it was a single stab wound.

24   Q.    In what area of his body?

25   A.    It was middle of his torso to the left of center just

1    below his breast line.

2    Q.    Did you see anything else when you lifted up his shirt?

3    A.    He had several tattoos on his torso.

4    Q.    Did you or someone from your force, police officer force,

5    take a picture of the tattoos?

6    A.    No, I did not.

7    Q.    And why did you not do that?

8    A.    At the time because of the blood and the stab wound just

9    applying direct pressure waiting for the ambulance to show up.

09:07AM 10   Once the ambulance came, we got him right in, and they

11   transported him immediately to the hospital.

12   Q.    Okay.  But did you observe a tattoo?

13   A.    Yes.

14   Q.    And prior to your testimony here today, did you look at

15   examples, pictures of other tattoos?

16   A.    Yes.

17        MS. LAWRENCE:  Exhibit 222 for the witness, please.

18   Q.    Officer Noftle, what is this?

19   A.    That's a tattoo.  The X and the 8 usually symbolizes the

09:07AM 20   18th Street gang.

21   Q.    And is this similar to the tattoo that you observed on the

22   person who had been stabbed on May 12, 2015?

23   A.    It is.

24        MS. LAWRENCE:  Okay.  May we publish this to the jury

25   as a chalk please, your Honor?

1          THE COURT:  All right.

2     Q.   And, again, Officer Noftle, can you just describe to the

3     jury what this is?

4     A.   So the X would be the roman numeral 10 here and then the

5     8, so added together it would be 18 for 18th Street.

6     Q.   Okay.  You said that after you had applied direct pressure

7     to the wound, the victim was taken away in an ambulance.  Did

8     you happen to learn the victim's name at some point?

9     A.   Yes.

09:08AM 10     Q.   What was that?

11     A.   I believe the last was Ochoa.  I'm not sure of the -- I

12     don't remember the first.

13     Q.   After he was taken away, Mr. Ochoa was taken away, what

14     did you do?

15     A.   He was put into the ambulance, and his sister arrived on

16     scene and she was visibly upset.  She was trying to get

17     information from us about her brother, and she asked about the

18     stab wound.

19     Q.   What did you tell her?

09:09AM 20     A.   I told her that it was a stab wound to the chest, could be

21     fatal, sometimes they're superficial, there's no way to tell on

22     scene, but that she should try to find out from her brother if

23     she could get any information on who stabbed him.

24     Q.   What did she do after you told her to talk to her brother?

25     A.   She went into the front of the ambulance and I never heard

1    from her again.

2    Q.   So she never provided you with any information about the

3    stabbing?

4    A.   No.

5              MS. LAWRENCE:  Okay.  Nothing further, your Honor.

6              THE COURT:  Cross?

7              MR. IOVIENO:  No, your Honor.

8              THE COURT:  Okay.  Thank you.  You may step down.

9              THE WITNESS:  Thank you, Judge.

09:09AM 10              MS. LAWRENCE:  The government calls Timothy O'Connor.

11              TIMOTHY O'CONNOR, having been duly sworn by the Clerk,

12    testified as follows:

13                        DIRECT EXAMINATION

14    BY MS. LAWRENCE:

15    Q.   Good morning.

16    A.   Good morning.

17    Q.   Can you please introduce yourself to the ladies and

18    gentlemen of the jury?

19    A.   My name is Trooper Timothy O'Connor.

09:10AM 20    Q.   Who do you work for Trooper O'Connor?

21    A.   Massachusetts State Police.

22    Q.   How long have you worked for the State Police?

23    A.   Approximately 12 years.

24    Q.   What's your current assignment?

25    A.   I'm currently assigned to the homicide division of the

1    Suffolk County Detective unit.

2    Q.    What kind of things do you investigate?

3    A.    We conduct death investigations throughout Suffolk County,

4    which includes Chelsea, Revere, Winthrop, state property in the

5    City of Boston, MassPort, Seaport District.  We conduct

6    homicide investigations, any type of unattended death, suicide,

7    overdose.

8    Q.    Were you called to investigate a death on December 14,

9    2014?

09:11AM 10   A.    I was.

11   Q.    And tell us what happened that night?

12   A.    I received a call from the Chelsea Police that there was

13   an active homicide scene at 60 Chester Ave. Apt No. 2 in

14   Chelsea.

15   Q.    So by active homicide, does that mean someone had already

16   died?

17   A.    Yes.

18   Q.    Do you know who that person was?

19   A.    I do.

09:11AM 20   Q.    Who was he?

21   A.    Javier Ortiz.

22        MS. LAWRENCE:  For the witness, please, Exhibit 37.

23   Q.    Trooper O'Connor, do you recognize this document?

24   A.    I do.

25   Q.    What is it?

1    A.   It's the death certificate for Javier Ortiz.

2         MS. LAWRENCE:  Your Honor, I'd move to admit

3    Exhibit 37 into evidence.

4         THE COURT:  All right.  It's admitted, Exhibit 37.

5         (Exhibit No. 37 received into evidence.)

6         MS. LAWRENCE:  Can we blow up the name, please.

7    Q.   So is this the individual who had died on December 14,

8    2014?

9    A.   It is.

10        MS. LAWRENCE:  Okay.  Can we blow up the cause of

11   death.

12   Q.   And can you please tell us what the cause of death was?

13   A.   Multiple gunshot wounds of torso.

14   Q.   Okay.  Thank you.  Do you know if there are any other

15   victims that night?

16   A.   Yes.

17   Q.   Did that person die?

18   A.   No, he survived.

19   Q.   Do you remember his name?

09:12AM 20   A.   I do.

21   Q.   What was it?

22   A.   Saul Rivera.

23   Q.   When you responded to the scene, what did you see?

24   A.   I noticed that the area was cordoned off with police tape.

25   I noticed an amount of blood on the sidewalk out front of

```
 1   60 Chester Ave.  I entered through the front door, it was a

 2   three apartment multi-family dwelling.  There was a blood trail

 3   that led from the first floor up to the second floor apartment.

 4   Q.   Trooper O'Connor, I want to show you some photographs.

 5   These have already been admitted into evidence.

 6        MS. LAWRENCE:  Exhibit 34.1, please.

 7   Q.   Do you recognize this?

 8   A.   Yes.

 9   Q.   What is it?

10   A.   It's 60 Chester Ave. in Chelsea.

11        MS. LAWRENCE:  34.12, please.

12   Q.   Okay.  You said that you went upstairs to the second

13   floor?

14   A.   Yes.

15   Q.   Did you enter the apartment?

16   A.   I did.

17   Q.   Do you recognize this photograph?

18   A.   I do.

19   Q.   What is it?

20   A.   The hallway as you enter Apartment No. 2.

21   Q.   Okay.  And what is on the floor?

22   A.   There's a blood trail and debris from EMTs treating the

23   victim.

24        MS. LAWRENCE:  34.14, please.

25   Q.   And what is this a photograph of?
```

1    A.    That's the kitchen.

2    Q.    And on the floor again?

3    A.    Blood.

4          MS. LAWRENCE:  34.15, please.

5    Q.    We're looking at the hallway again?

6    A.    Yes.

7    Q.    What are the markers on the floor?

8    A.    Evidence.

9          MS. LAWRENCE:  34.16.

09:14AM 10   Q.    What is this a photograph of?

11   A.    It's a shell casing and a projectile.

12   Q.    And where exactly was that in relation to the hallway?

13   A.    The threshold to the bathroom.

14         MS. LAWRENCE:  34.17.

15   Q.    And what are these on the floor near the markers?

16   A.    Two more shell casings.

17   Q.    And where was this in relation to the hallway?

18   A.    In the hallway adjacent to the bathroom.

19   Q.    Okay.  Trooper O'Connor, was there anyone else inside the

09:14AM 20   apartment apart from law enforcement when you got there?

21   A.    Yes.

22   Q.    Who was that?

23   A.    It was three male roommates who had been sleeping in the

24   back bedrooms.

25   Q.    Did you talk to them?

```
 1    A.   I did not.

 2    Q.   Okay.  Did you talk to anyone there?

 3    A.   I did.  I talked to a third floor tenant while I was

 4    there.

 5    Q.   What did you do after you talked to the tenant?

 6    A.   I had asked the Chelsea Police to bring the three males to

 7    the station for interview, and then I proceeded to go draft a

 8    crime scene search warrant to process the apartment.

 9    Q.   Did you obtain a search warrant from a Judge?

10    A.   I did.

11    Q.   And was it executed?

12    A.   It was.

13    Q.   Do you know what was recovered?

14    A.   I do.

15    Q.   What were those things?

16    A.   There was the .380 caliber shell casings, three of them,

17    projectile, which was also a .38 caliber class, a number of

18    empty Bud Light beer cans and additional swabbings of blood.

19    Q.   Through your investigation, were you able to identify a

20    suspect for the murder of Javier Ortiz?

21    A.   Yes.

22    Q.   Who was that?

23    A.   A male by the name of Vida Loca.

24    Q.   What was his real name?

25    A.   Hector Enamorado.
```

09:15AM (line 10)
09:15AM (line 20)

1    Q.    What did you know about Mr. Enamorado?

2    A.    At the time we knew that his mother had lived next door --

3              MR. MURPHY:  Objection, your Honor.

4              THE COURT:  Sustained.

5    Q.    Once you identified Hector Enamorado as a suspect, what

6    did you do?

7    A.    We -- I assembled photo arrays to be shown to witnesses.

8    Q.    Okay.  And did you show those photo arrays?

9    A.    I did not, but they were shown to witnesses.

09:16AM 10  Q.    Okay.  And after you showed the photo arrays, did you take

11   any next investigative steps?

12   A.    Yes.

13   Q.    What was that?

14   A.    I drafted a search warrant for his wife's residence at

15   60 Parker Street in Chelsea and also obtained an arrest warrant

16   for him.

17   Q.    Okay.  Was he arrested immediately?

18   A.    No.

19   Q.    Why not?

09:16AM 20  A.    We didn't know where he was.

21   Q.    Okay.  Did you take any steps to locate him?

22   A.    Yes.

23   Q.    What did you do?

24   A.    I assembled a wanted poster with his picture, and it was

25   disseminated to law enforcement agencies as well as the media.

1          MS. LAWRENCE:  For the witness, please, could I have

2    Exhibit 41.

3    Q.   Do you recognize this, Trooper O'Connor?

4    A.   Yes.

5    Q.   What is it?

6    A.   It's the wanted poster of Hector Enamorado that I put

7    together.

8          MS. LAWRENCE:  Okay.  I'd like to move to admit

9    Exhibit 41 into evidence.

09:17AM 10          THE COURT:  All right.  It's admitted, 41.

11          (Exhibit No. 41 received into evidence.)

12    Q.   You said this was made public?

13    A.   Yes.

14    Q.   So it was released to the media?

15    A.   Yes.

16    Q.   What happened next in your investigation?

17    A.   At some point I was contacted on December 16th by members

18    of the North Shore Gang Task Force.

19    Q.   And what did you do after you received information from

09:17AM 20    them?

21    A.   They advised me that they had received information that

22    Hector Enamorado was attempting to flee the state.

23    Q.   Was he ultimately arrested?

24    A.   He was.

25    Q.   On what date?

```
 1   A.   December 16th.

 2   Q.   And what happened after his arrest?  Did you see him

 3   again?

 4   A.   I did.

 5   Q.   Where?

 6   A.   At the Chelsea Police Department.

 7   Q.   What did you do with him there?

 8   A.   I interviewed him.

 9   Q.   Okay.  Was he also booked at the Chelsea Police

10   Department?

11   A.   He was.

12        MS. LAWRENCE:  For the witness, please, can I have

13   Exhibit 42?

14   Q.   Do you recognize this photograph?

15   A.   I do.

16   Q.   What is it?

17   A.   It was taken at booking.  It's a picture of Hector

18   Enamorado and a small bruise under his left eye.

19        MS. LAWRENCE:  I'd move to admit Exhibit 42.

20        THE COURT:  All right.  It's admitted, 42.

21        (Exhibit No. 42 received into evidence.)

22        MS. LAWRENCE:  I have nothing further, your Honor.

23        THE COURT:  Cross?  Mr. Murphy?

24        Mr. Norkunas.

25
```

09:17AM (line 10)
09:18AM (line 20)

CROSS-EXAMINATION

BY MR. NORKUNAS:

Q.   Good morning, Trooper.

A.   Good morning, sir.

Q.   In relation to your investigation, you indicated that you found some spent shells in the apartment; is that correct?

A.   Correct.

Q.   And in an assessment of those, they all came from the same caliber weapon?

09:18AM A.   I did not -- I'm not a ballistician, but to my knowledge, yes, they came from the same weapon.

Q.   They all appeared to be -- I think you said a .38 caliber or consistent with a .38 caliber?

A.   .380 shell casing.

Q.   .380 caliber.  And there was no other indications of a second shooter, correct?

A.   No.

Q.   And at any point in time, did you interview, or did you know if Saul Rivera had been interviewed by members of your

09:19AM department?

A.   I interviewed him.

Q.   You interviewed him?

A.   Yes.

Q.   And he sustained wounds to where?

A.   Chest.

1    Q.   And that led you to believe that he would have seen his

2    assailant, correct?

3    A.   He said he saw who shot him, yes.

4    Q.   And did he indicate where he was shot in the building?

5    A.   In the kitchen.

6    Q.   Of that second floor apartment?

7    A.   Yes.

8         MR. NORKUNAS:  That's all I have, thank you.

9         THE COURT:  Mr. Murphy.

09:19AM 10                    CROSS-EXAMINATION

11   BY MR. MURPHY:

12   Q.   Good morning, Trooper.  My name is Marty Murphy, and I

13   represent Mr. Sandoval.  Could you explain to the members of

14   the jury in more detail what a photo array is?

15   A.   So we assemble 8 total photos with a suspect photo and 7

16   similar looking individuals, and they're shown in some kind of

17   order by a presenter, and they read a form, they show them the

18   pictures one at a time, and if they see somebody they

19   recognize, they identify it to the presenter and tell them how

09:20AM 20   or why they know that person.

21   Q.   And so the 8 photos are photos of individuals that the

22   police happened to have, correct?

23   A.   Yes.

24   Q.   And you typically include a photo of the suspect, correct?

25   A.   Correct.

1    Q.    And photos of other people who look more or less like him

2    so that it's not obvious to the individual who the suspect is,

3    correct?

4    A.    Similar looking individuals, yes.

5    Q.    Thank you, sir.  Let me ask you, you work for the

6    Suffolk County Homicide Squad of the Massachusetts State

7    Police, correct?

8    A.    Correct.

9    Q.    And is it fair to say, sir, that there are homicide squads

09:21AM 10   like that in every county in the state?

11   A.    Correct.

12   Q.    Including Middlesex County?

13   A.    That's right.

14   Q.    And that's been the case since you began working for the

15   State Police some 12 years ago?

16   A.    Yes.

17   Q.    And it's their job to respond to every unattended death in

18   the county, correct?

19   A.    Yes, sir.

09:21AM 20   Q.    And so you work on a call system?

21   A.    That's right.

22   Q.    And so somebody has a call and has to go out no matter

23   what time of day, correct?

24   A.    Yes.

25   Q.    And so whenever anyone is found anywhere in the state in

1    those areas where the State Police has jurisdiction, a trooper

2    will respond to the scene of that unattended death, correct?

3    A.   Typically, yes.

4         MR. MURPHY:  I have nothing further, your Honor.

5    Thank you.

6         THE COURT:  Any redirect?  Oh.  I'm sorry.

7         Mr. Lopez.

8                        CROSS-EXAMINATION

9    BY MR. LOPEZ:

09:22AM 10   Q.   Good morning, Trooper.  My name is Scott Lopez.  I

11   represent Mr. Guzman.  When you identified Vida Loca as the

12   murderer, were you approached by any other law enforcement

13   agencies and asked to delay your investigation in any way?

14   A.   No.

15   Q.   Were you made aware of an ongoing investigation that was

16   being conducted by the U.S. Attorney's Office into MS-13?

17   A.   Yes, I had received information from the North Shore Gang

18   Task Force that -- in regards to Mr. Enamorado, yes.

19   Q.   And I take it then that you weren't asked to delay arrest

09:23AM 20   in order to -- because of any safety concerns they had for

21   their cooperating witness?

22   A.   No.

23        MR. LOPEZ:  Thank you.

24        THE COURT:  Any redirect?

25        MS. LAWRENCE:  Nothing further, your Honor.

1          THE COURT:  All right.  Thank you, Trooper.  You may

2     step down.

3          Mr. Pohl.

4          MR. POHL:  Thank you, your Honor.  The government

5     calls Glenn Cote.

6          GLENN COTE, having been duly sworn by the Clerk,

7     testified as follows:

8                        DIRECT EXAMINATION

9     BY MR. POHL:

09:24AM 10          MR. POHL:  May I, your Honor?

11          THE COURT:  Yes.

12          MR. POHL:  Thank you.

13     Q.   Good morning, sir.

14     A.   Good morning, Counselor.

15     Q.   Can you do me a favor and pull that microphone up nice and

16     close to you?  Thank you.  Could you please introduce yourself

17     to the ladies and gentlemen of the jury?

18     A.   My name is Glenn Patrick Cote.

19     Q.   Could you spell your last name for the record, sir.

09:24AM 20     A.   Yes, the spelling of my last name is C-o-t-e.

21     Q.   Where do you work?

22     A.   I work for the Massachusetts State Police.  I'm a trooper

23     currently assigned to the firearms identification section, also

24     referred to as ballistics.

25     Q.   Okay.  How long have you been a trooper?

1    A.   I have been a trooper for approximately 18 years, and

2    prior to that I was a local police officer for a little over

3    five years.

4    Q.   Okay.  And how long have you been assigned to the

5    ballistics unit?

6    A.   About 11 years now.

7    Q.   Okay.  And can you tell the ladies and gentlemen of the

8    jury something about the training and experience that you've

9    had since joining the ballistics unit?

09:24AM 10    A.   Yes.  Just prior to joining, I was in the firearms

11    identification unit -- I mean, I was a firearms instructor at

12    the academy.  But while in the unit, I've attended some

13    schools.  I've gone down to Lago, Florida and learned under a

14    place called NIBIN, which is the National Institute of

15    Ballistics Information Network, where we learn how to enter

16    cartridge casings and projectiles into a national database to

17    cross-reference against unsolved crimes.

18         I've also learned under senior criminologist Nancy

19    J. McCombs out of the Fresno laboratory.  I've also

09:25AM 20    participated in a two-year apprenticeship type program with the

21    State Police in regards to firearms identification, where I

22    learned under seasoned ballisticians basically where we'd

23    respond to scenes, and I'd do actual work on cases from scene

24    work and from cases that come in over the counter.

25         And I'm an armorer in several different weapons

1    systems.  They send us to manufacturers so that we can become

2    familiar with the nomenclature of firearms in the event we have

3    to render minor repairs to weapons to make them operable.  And

4    I also attend conferences from AFTE, which is the Association

5    of Firearms and Toolmark Examiners.  I've taken microscope

6    courses, I've taken toolmark identification courses, just to

7    name a few.

8    Q.   So what kinds of things are you called upon to do in your

9    work in the ballistics unit of the State Police?

09:26AM 10    A.   Basically I responded to crime scenes where I gather and

11    preserve firearms-related evidence.  I conduct test firings of

12    weapons, including distance type pattern test when requested.

13    And I perform microscopic examinations of recovered evidence

14    against test firearms from suspect weapons.  And I also test

15    firearm ammunition and firearms to determine function

16    capability.  And, lastly, we also receive evidence over the

17    counter from our own State Police barracks and from local

18    municipalities.

19    Q.   Okay.  So let me just ask you about one of the things you

09:26AM 20    just talked about, microscopic testing.  Can you explain that

21    in a little bit more detail for the jury.  What is it that you

22    do -- when you use the term "microscopic testing" what is it

23    exactly that you mean?

24    A.   Well, we have a dual microscope -- we have a couple of

25    dual microscopes in my office, and we can look at evidence

1    under microscope -- evidence meaning either projectiles,

2    bullets that were discharged from the firearm, or the

3    discharged cartridge casings that were also discharged from a

4    firearm.  We can look at them under a high-powered microscope

5    80 times the magnification of what you would see with the naked

6    eye.

7            And we can look for striated marks or impressed

8    markings that are -- from a microscopic point of view, you can

9    see them a lot clearer, and we try to match these objects.  We

09:27AM 10   have a line of bifurcation on the microscope where we can look

11   at two objects at the same time, and we try to match up the

12   striated marks or these impressed markings, and we will make

13   certain determinations or form opinions as to what we think.

14   Q.   Okay.  And what is a striation mark?  What does that mean?

15   A.   A striated mark is when you have a barrel that's produced,

16   the production of that barrel, because there's random and

17   spontaneous shavings that come off during a drill when it's

18   being drilled down a barrel --

19   Q.   And just to be 100 percent clear, when we're talking about

09:28AM 20   the barrel, we're talking about the barrel of a gun?

21   A.   Yes, sir.  We're talking about the barrel of a firearm.

22   When they're actually manufacturing these pieces that will

23   eventually be a firearm, when they send the drill down the

24   barrel, there's small bits of metal and debris that will come

25   off, and as the drill is going in and out and it's making that

1    hole so eventually it can become a barrel that a bullet can go

2    down, it's leaving very specific marks in there that that

3    individual, it's like a fingerprint of that gun for us.

4         So in the final analysis when that barrel is made and

5    a bullet does get fired down it, the softer alloy or lead,

6    whichever substance you're talking that the bullet is made of,

7    will pick up these specific individual microscopic markings in

8    that barrel as it's going down that barrel because it was

9    fired.

09:28AM 10         And we're looking at those -- they're called

11   striations on a microscope, and we'll do several test fires

12   with the weapon to see if there's replication of marks, and if

13   we're satisfied based on this known sample, because we fired

14   it, that there's replication, it is then that we can compare it

15   to an unknown sample, something that might have been recovered

16   from a scene or a body or an object.

17   Q.   And those marks, the marks that are left on a bullet or a

18   shell casing, and those are capable of being compared to

19   weapons themselves to determine whether or not a gun fired

09:29AM 20   those weapons or fired those bullets?

21   A.   Yes, they are.

22   Q.   In the course of your duties in the ballistics unit, I

23   think you testified earlier that you respond to crime scenes,

24   correct?

25   A.   I do, sir.

1    Q.   And can I direct your attention, sir, to December 14, 2014

2    and ask if you responded to a scene on that day?

3    A.   I did.  I was asked to respond to 60 Chester Ave,

4    Apartment No.  2 in regards to a fatal shooting investigation.

5    Q.   Okay.  And what did you do at 60 Chester Avenue?

6    A.   When I was there, I was there to collect any possible

7    ballistics-related evidence, and I did collect some items there

8    that day.

9         MR. POHL:  May I approach the witness, your Honor?

09:30AM 10         THE COURT:  Yes.

11    Q.   Trooper, I'm going to hand you what's been marked Exhibits

12    39.1 through 39.4 and ask you to take a quick look at those and

13    see if you recognize them.

14    A.   Can I open these up?

15    Q.   Sure.

16    A.   This is one of the jacketed lead spent projectiles.  This

17    is a bullet that was recovered from the scene.  This was on the

18    floor in the threshold near the bathroom, and we had marked it

19    Number 3 for photos.

09:30AM 20    Q.   All right.  Thank you.  The other ones looked sealed, but

21    you were the one that -- you recovered those items, correct?

22    A.   I do, so I can speak to them.

23    Q.   Sure.

24    A.   This is -- when I recovered it, I -- we'll use your

25    exhibit numbers.  This is Exhibit No. 39.2.  This was a .380

1    auto-caliber discharged cartridge casing.  It was also

2    recovered on the floor right next to where I recovered that

3    projectile of the threshold to the bathroom.  It had a

4    head-stamp of "win 380 auto," and I recovered it from that

5    scene.

6    Q.   What's a discharged casing, and what's the difference

7    between the bullet that you testified to at 39.1 and the

8    discharged casing that you described at 39.2?

9    A.   Okay.  When you're looking at a bullet that's in a gun, if

09:31AM 10   you're going to fire it, the bullet consists of four

11   components:  It has a cartridge casing.  Inside the casing is

12   gunpowder.  On the back end of the casing is a primer, that's

13   the igniter which will cause the explosion to fire it.  And

14   then you have the projectile, which is on the end of it.

15        Now, when you fire a gun and the bullet is inside of

16   it, the projectile is the small object.  It's either lead or

17   some type of alloy that goes through the barrel.  That's the

18   part the actually causes harm to a person if it hits them.  The

19   discharged cartridge casing is the casing that -- it was

09:32AM 20   encompassing -- it was holding in that gunpowder, and it's

21   formulated, it's manufactured to handle the explosion.

22        When that explosion occurs, if it's in a semiautomatic

23   pistol, which is likely where you're going to recover

24   discharged cartridge casings, it's usually because there was a

25   semiautomatic pistol on scene.  When that explosion occurs, the

1   slide goes back on the weapon, and the extractor grabs that

2   discharged cartridge casing, and it pulls it back, and then

3   another little machine part in the weapon on the slide, it's

4   called an ejector, pushes it out, and it discharges the

5   cartridge casing onto the floor away from the weapon, so that

6   the slide when it's going forward can put a new live cartridge

7   from a magazine, if it's seated in the weapon.  So that's what

8   a discharged cartridge casing is.

9   Q.   Okay.  Why don't you look at the next two items and see if

09:32AM 10   you recognize those, 39.3 and 39.4?

11   A.   Both of these items, 39.3 was a discharged cartridge

12   casing.  It was recovered in the hallway on the floor.  This

13   was marked number 4 for photos and 39.4 was also a discharged

14   cartridge casing.  It was marked number 5 for photos, and it

15   was recovered in the hallway on the floor.

16   Q.   Okay.  Thank you.  And before I leave the stand, in

17   addition to leaving -- to visiting 60 Chester Avenue and

18   recovering that ballistics evidence, did you go to any other

19   scene in connection with this investigation?

09:33AM 20   A.   I did.

21   Q.   Where did you go?

22   A.   I went to -- the following day, on December 15th, I went

23   to the medical examiner's office, and I recovered a jacketed

24   lead spent projectile from the medical examiner's office in

25   regards to -- it was recovered from the victim of the fatal

1    shooting investigation.

2    Q.   And that was?

3    A.   It was Ortiz, I think.

4    Q.   I'm going to hand you what's been marked 35.5.  Do you

5    recognize that?

6    A.   I do.

7    Q.   What is that?

8    A.   This is the jacketed lead spent projectile that I

9    recovered from the victim at autopsy.

09:33AM 10           MR. POHL:  Your Honor, I'd move 39.1 through 5 into

11    evidence.

12           THE COURT:  They're admitted, 39.1 through 39.5.

13           (Exhibit No. 39.1 through 39.5 received into

14    evidence.)

15    Q.   I'll leave those with you, Trooper.

16    A.   Yes.

17    Q.   So Trooper, when you had those -- recovered those items,

18    both from the scene at 60 Chester Avenue and from the body of

19    Mr. Ortiz at the medical examiner's office, what did you do

09:34AM 20    with them?

21    A.   I brought them back to my lab for analysis where we were

22    going to have them sent to the different disciplines for

23    fingerprint analysis, and then once those officers are through,

24    then they come back to my office so that I can analyze them.

25    Q.   And were you able to examine those spent -- the bullet and

1    the spent discharged casings?

2    A.    I was.  I was able to examine both the discharged

3    cartridge casings and the two jacketed lead spent projectiles.

4    Q.    And what, if anything, were you able to determine by

5    examining of those items?

6    A.    It was obvious to me, based on striated marks and

7    impressed markings and firing imprint impression marks that the

8    three discharged cartridge casings were fired by the same

9    weapon and the two jacketed lead spent projectiles were fired

09:35AM 10    by the same weapon.

11    Q.    Were you -- at some point after you visited the crime

12    scene at 60 Chester Avenue and the medical examiner's office,

13    did you receive a request to examine another firearm in

14    connection with your investigation?

15    A.    I did.  The Somerville Police Department had recovered a

16    weapon and dropped it off at our lab for analysis on

17    January 8th, and they were requesting that we compare the

18    weapon that they had dropped off to the evidence that I

19    collected at the scene of the fatal shooting investigation.

09:35AM 20              MR. POHL:  May I approach the witness, your Honor?

21              THE COURT:  Yes.

22    Q.    Okay.  Trooper, I want to show you what has been marked as

23    Exhibit 46.1, which is a firearm recovered from 7 Cross Street

24    in Somerville on January 1, 2015.  Do you recognize that?

25    A.    I do.

1    Q.   How do you recognize it?

2    A.   It's the same .380 auto caliber weapon that I examined

3    that day and the serial number matches what I wrote down, which

4    was CP033661.

5    Q.   And in addition to 46.1, I'm going to show you four

6    envelopes which have been grouped together as Exhibit 46.3 and

7    ask if you recognize those?

8    A.   I do.  These are test fires from the weapon.  I utilized

9    two live cartridges from section inventory in my lab, and I

09:36AM 10  test fired them in this weapon for comparison purposes, and I

11   also utilized two live cartridges that were submitted with this

12   weapon and test fired them also for comparative analysis.

13          MR. POHL:  Your Honor, I don't think we've admitted

14   46.3, but I'd move to admit those now.

15          THE COURT:  I've got it on my list as admitted, but if

16   it hasn't been, we'll admit it now.

17   Q.   Trooper, you said a moment ago that you -- 46.3 contains

18   two different kinds of test fires, correct?

19   A.   Yes, sir.

09:37AM 20  Q.   You said that you used two bullets from --

21   A.   Section.

22   Q.   Or session?

23   A.   Yes.

24   Q.   What do you mean by that?

25   A.   We have a library of ammunition that we can use if we want

1    to conduct test fires, ammunition that's new so it doesn't have

2    any previous chamber marks or cycling marks on it.

3    Q.   Why do you do that?

4    A.   I do that because when -- I want to have pristine

5    ammunition that I'm test firing to make sure that there's no

6    other marks on it and also I want a different sample in terms

7    of when somebody submits -- when evidence is submitted, meaning

8    other ammunition with a gun, I don't know if that has been

9    cycled through a particular weapon.  I want to make sure that

09:37AM 10   I -- at least they're not from the same lot of ammunition, so I

11   have different authentic samples to look at.

12   Q.   And you did that in this case?

13   A.   I did.

14   Q.   All right.  And when you test fired the ammunition from

15   sort of the stock ammo that the State Police have at the

16   ballistics unit and you compared it to the ammunition that you

17   observed and examined from 60 Chester Avenue and from the body

18   of Javier Ortiz, what conclusion did you draw?

19   A.   I think -- my opinion to within a degree of ballistic

09:38AM 20   certainty was that the three discharged cartridge casings

21   recovered from the scene of the fatal shooting were in fact

22   fired by the .380 auto caliber weapon, the Cobra Enterprises

23   Model CA 380 semiauto pistol.

24        And I also formed the opinion that the two projectile

25   -- the jacketed lead spent projectiles, one recovered from the

1    scene and one recovered from the victim, Ortiz, at autopsy were

2    also fired by the same .380 auto caliber Cobra Enterprises

3    Model 380.

4    Q.   And finally you said that the gun came with two -- you

5    test fired two rounds of ammunition that came with the gun

6    itself, correct?

7    A.   I did.

8    Q.   All right.  And did you compare those test fires to the

9    ammunition recovered at the scene and from the body of

09:39AM 10   Mr. Ortiz?

11   A.   I did.  I compared all four test fires to the evidence

12   recovered from the fatal shooting.

13   Q.   And what conclusion did you draw?

14   A.   Same conclusion.

15            MR. POHL:  Thank you, sir.

16            THE WITNESS:  Thank you.

17            THE COURT:  Cross?

18            MR. IOVIENO:  No, your Honor.

19            THE COURT:  Mr. Norkunas.

09:39AM 20            MR. NORKUNAS:  Just briefly, Judge, if I might.

21                      CROSS-EXAMINATION

22   BY MR. NORKUNAS:

23   Q.   Good morning, Trooper.

24   A.   Good morning, Counselor.

25   Q.   You told us about how you became a ballistician, and it's

1    fair to say that that's a learned trade, correct?

2    A.    Yes, sir.

3    Q.    You don't go to B.U., you don't go to M.I.T. and get a

4    degree as a ballistician?

5    A.    No, sir.

6    Q.    And as you learned it, you're passing on the trade that

7    you learned to others that are coming up through the ranks as

8    well, correct?

9    A.    Yes, sir.

09:40AM 10    Q.    And you indicated also that you had a designation as an

11    armorer?

12    A.    Yes, sir.

13    Q.    And is it fair to say that there's only the one official

14    armorer in the State Police at a time stationed out in

15    New Braintree?

16    A.    That's fair to say.  Yes.  He's the official armorer for

17    the State Police.

18    Q.    But when you had attended the schools at the various

19    manufacturers, you became more familiar with it and you could

09:40AM 20    use that term in your trade, correct?

21    A.    Yes, sir.

22    Q.    Okay.  Since it's a trade, is it fair to say when you

23    render an opinion, such as you have here today, that it's

24    really you're saying it's consistent with rather than a

25    reasonable degree of ballistic certainty?

1   A.   Well, my opinion is based on both objective, you know,

2   facts and subjective analysis.  So that's where, when I state

3   that it's within a reasonable degree of ballistic certainty,

4   it's based on my training and experience.

5   Q.   It's like a carpenter saying, you know, in my trade it's

6   consistent with what I know, right?

7   A.   Well, it is consistent with what I know, yes.

8   Q.   But there's no -- it's not, as with a doctor, a reasonable

9   degree of medical certainty, there's no ballistics courses,

09:41AM 10   it's a learned trade, so it's a consistency, right?

11   A.   Well, I don't believe it's just a learned trade, because

12   there's a lot of education that goes into it as well in terms

13   of the courses you have to take, the analysis you go through,

14   the conferences you attend, so there's a little bit more that I

15   think does enable me to say to within a degree of ballistic

16   certainty that's why I usually state that.

17   Q.   Thank you, Trooper.

18        MR. NORKUNAS:  Thank you, Judge.

19        THE COURT:  Okay.  Any redirect?

09:41AM 20        MR. POHL:  No, your Honor.

21        THE COURT:  Thank you.  You may step down.

22        MR. POHL:  Mattheu Kelsch.

23        MATTHEU KELSCH, having been duly sworn by the Clerk,

24   testified as follows:

25

<u>DIRECT EXAMINATION</u>

BY MR. POHL:

MR. POHL:  May I, your Honor?

THE COURT:  Yes.

Q.   Good morning, sir.

A.   Good morning.

Q.   Could you please introduce yourself to the ladies and gentlemen of the jury?

A.   Yes, my name is Mattheu Kelsch, and I'll spell both because it's a little different.  It's M-a-t-t-h-e-u, and Kelsch is K-e-l-s-c-h.

Q.   Where do you work?

A.   I work for the Bureau of Alcohol, Tobacco, Firearms and Explosives, or more commonly called ATF.

Q.   What's your title, sir?

A.   I'm a special agent.

Q.   How long have you been a special agent with ATF?

A.   I've been with ATF for approximately 17 years.

Q.   And what is your current assignment?

A.   Currently assigned to our intelligence group.  We call it the Crime Gun Intelligence Center.

Q.   And during your time that you have worked for the Bureau of Alcohol, Tobacco, Firearms and Explosives, have you received any training and experience concerning what's called interstate nexus analysis?

1    A.    Yes.  All our agents, when they go through our basic

2    academy, a six-month academy down in Georgia, receive some

3    training on firearms identification and firearms manufacturing,

4    but then there are certain agents that go onto further training

5    which is what we call interstate nexus.

6    Q.    And what is that?

7    A.    So interstate nexus, in a nutshell to make it very simple,

8    is determining where a particular firearm or ammunition were

9    manufactured.

09:44AM 10    Q.    And how do you develop that information?  How do you learn

11    sort of where firearms are manufactured?

12    A.    So ATF has a specialized school that's held down in our

13    firearms tracing center.  In order to go down, you're given

14    study material.  Once you arrive at the class, you take an

15    examination.  Once you pass that examination, you're allowed to

16    go through their one-week course.  That course specializes in

17    firearms identification, the different parts of a firearm, and

18    more specifically the markings that, by law, have to be placed

19    on a firearm.

09:44AM 20         In addition to that, ATF has almost like a library,

21    but instead of having books, we have firearms.  So they have a

22    catalogue of over 10,000 different firearms.  So if you're a

23    gun enthusiast, it would be your dream place to be.  You spend

24    time there, and there's also testing on identifying different

25    types of firearms, the markings on them, and also ammunition

 1    during that time.

 2          At the end of that one-week training, there's a

 3    written examination.  If you pass that examination, you're

 4    allowed to testify as to nexus.  We also have advanced courses

 5    in ammunition and in factory tours.  So during the advanced

 6    factory tour, the agents actually go to a number of different

 7    firearms manufacturers that are located -- a lot of them are up

 8    here in the Northeast, and we see the different manufacturing

 9    processes for firearms and how the identifying numbers and

09:45AM 10   information are actually placed on the firearms during that

11    process.

12    Q.   Have you -- and you've taken that course?

13    A.   Yes, I have.

14    Q.   And have you been called upon to testify concerning the

15    origin of firearms and whether -- and the sort of interstate

16    nexus of firearms prior to your testimony here today?

17    A.   Yes, I have.

18          MR. IOVIENO:  Objection, your Honor.

19          THE COURT:  I'll let it stand.  Overruled.

09:45AM 20         MR. IOVIENO:  May we approach sidebar, your Honor,

21    briefly?

22          THE COURT:  All right.

23          (THE FOLLOWING OCCURRED AT SIDEBAR:)

24          MR. IOVIENO:  Judge, I understand what he's trying to

25    get out of this witness, but in this case a firearm and where

1    it comes from in the nexus to interstate commerce is

2    irrelevant.  This is a racketeering case along with a drug

3    conspiracy case.  I think this evidence is irrelevant.  It

4    doesn't -- it's not germane to any issue before the Court.  If

5    the Court does allow it, I'd ask for a limiting instruction as

6    the Court previously gave about firearms.

7            THE COURT:  Mr. Pohl.

8            MR. POHL:  It is relevant because one of the elements

9    of the racketeering conspiracy is that the enterprise has to

09:46AM 10  have affected interstate commerce, and the fact that multiple

11   members had possession of firearms that have moved in

12   interstate commerce is relative for that purpose.  I think you

13   admitted it for similar purposes in the November trial.

14           THE COURT:  Yes.

15           MR. POHL:  And I don't think it's appropriate to give

16   another limiting instruction at this time.  They've heard that

17   several times already, and this testimony doesn't really go to

18   that.  It's simply going to talk about where the guns were made

19   and the fact that they were all made outside of Massachusetts.

09:47AM 20          THE COURT:  Okay.  I agree with that.

21           MR. POHL:  Thank you.

22           (SIDEBAR CONFERENCE WAS CONCLUDED)

23           THE COURT:  Mr. Pohl, put a question for the witness.

24           MR. POHL:  Thank you very much, your Honor.

25   Q.   You have testified concerning where firearms were made and

1    manufactured prior to your testimony here today?

2    A.    Yes, I have.

3    Q.    Approximately how many times have you offered that type of

4    testimony, Special Agent Kelsch, in the course of your career?

5    A.    In U.S. District Courts, over 20 times.

6    Q.    And in other courts?

7    A.    I have testified in state courts as well as the District

8    of Massachusetts and the District of Connecticut.

9    Q.    And how many examinations have you conducted of the

09:47AM 10   origins of firearms and whether or not they have moved in or

11   traveled in interstate commerce prior to your testimony here?

12   A.    I've authored over 220 reports, but each of those reports

13   could contain multiple firearms and multiple rounds of

14   ammunition, so hundreds of rounds of ammunition, if not

15   thousands and hundreds of firearms.

16   Q.    All right.  Special Agent Kelsch, were you asked to

17   examine firearms that were recovered in connection with this

18   case?

19   A.    Yes, I was.

09:48AM 20        MR. POHL:  May I approach the witness?

21        THE COURT:  Yes.

22        MR. POHL:  And with the Court's permission, I'm going

23   to bring all four of these items up now.

24   Q.    Special Agent Kelsch, I'm going to show you what has been

25   marked as Exhibit 51 and ask if you have examined that firearm

1    prior to your testimony here today?

2    A.    Yes, I have.

3    Q.    And what can you tell the jury about the make and

4    manufacture of that particular firearm?

5    A.    Sure.  I think I mentioned briefly before that there are

6    certain markings that have to be placed on a firearm.  The Gun

7    Control Act of 1968 mandated that manufacturers put certain

8    markings on a firearm, all right, in particular you have to

9    have the manufacturer's name, the model number, if they -- the

09:49AM 10   model number or make if they have one, the caliber of the

11   firearm, the state and the city where the manufacturer is based

12   and a serial number.

13          So all of those things have to be placed on a firearm.

14   So when I look at a particular firearm during an examination, I

15   break it down, I look for that particular information that is

16   required to be there by law.

17   Q.    Okay.  And did you do that in connection with this

18   particular firearm?

19   A.    Yes, I did.

09:49AM 20   Q.    And what, if anything, did you determine when you examined

21   that firearm?

22   A.    So I'm looking at this particular firearm.  I see that

23   it's labeled "H&K," so -- which is Heckler and Koch is the name

24   of the company.  It's a Model P30, it's a .9 millimeter

25   semiautomatic pistol, and there's also a serial number if you'd

1      like me to read that.  So it's serialized with 129055554.

2           In addition, I left out before, if a firearm is made

3      outside of the United States, in addition to those things I

4      mentioned, it also has to have the name and city and state of

5      the importer, so the company that imported that firearm into

6      the United States also must be present on this firearm.  So

7      this particular firearm also has importer information, which is

8      labeled as HK-I Columbus, Georgia.

9      Q.   All right.  So based on your training and experience,

09:50AM 10   Special Agent Kelsch and your examination of that particular

11     firearm, what, if anything, can you tell the jury about the

12     manufacturer of the firearm?

13     A.   Yes, so this particular firearm would have been

14     manufactured in Germany.

15     Q.   Okay.  And imported into the United States?

16     A.   That is correct, yes.

17     Q.   Where?

18     A.   And that would have been by the company HK-I and they're

19     based in Columbus, Georgia.

09:50AM 20   Q.   Thank you.  Next, I'm going to show you Exhibit Number 69

21     and ask if you had examined that firearm in connection with

22     your work on this case?

23     A.   Yes, I did.

24     Q.   And what, if anything, can you tell the jury about that

25     particular firearm?

1    A.   So, once again, looking at this particular firearm, I look

2    for the required manufacturer information that must be placed

3    on there, so here I see it's labeled as Ruger, which would be

4    the Sturm Ruger Company.  It's a Model P94DC.  It's a .9

5    millimeter semiautomatic pistol, and it's labeled on the side

6    as Southport, Connecticut.  There's no visible serial number on

7    this particular firearm.

8    Q.   Okay.  And what can you tell the ladies and gentlemen of

9    the jury about where that firearm was manufactured?

09:51AM 10   A.   So this particular firearm made by Sturm & Ruger, although

11   it says Southport, Connecticut on the side of it, the company

12   has a variance issued by ATF.  A lot of companies manufacture

13   their firearms in a different state but want to put their

14   headquarters address on the firearm.

15        So Sturm & Ruger is headquartered out of Southport,

16   Connecticut, and that's the information that's on the side

17   here, but all Sturm & Ruger semiautomatic pistols are actually

18   made in Prescott, Arizona, and that's where this pistol would

19   have been manufactured.

09:52AM 20   Q.   Okay.  Thank you.  Let me show you Exhibit 46.1, which is

21   this weapon here.  Did you examine that firearm before your

22   examination -- before your testimony here today?

23   A.   Yes, I did.

24   Q.   And what can you tell the ladies and gentlemen of the jury

25   about that particular firearm?

A.   So this particular firearm -- and it's affixed to a box,
so I can't flip it over to read you directly, but I know from
my training and experience that this is a Cobra Model CA380,
caliber .380 semiautomatic pistol, and the serial number on the
back strap is CP033661.

Q.   Okay.  And you examined that firearm before your testimony
here today?

A.   Yes, I did.

Q.   What can you tell the ladies and gentlemen of the jury
about where that firearm was manufactured?

A.   This particular firearm would have been manufactured in
Salt Lake City, Utah.

Q.   Okay.  And finally, I'll take that back from you.  I'm
going to show you what's been introduced as Exhibit 82.1 and
ask if you recognize that.

A.   Yes, I do.

Q.   How do you recognize it?

A.   So this particular firearm, once again, it's affixed to a
box, so I can't read you directly but I can tell from my
training and experience that this particular firearm is a high
point .45 caliber pistol with Serial Number X464014, and all
the other information is on the reverse side of the pistol.

Q.   Okay.  And based on your training and experience and your
examination of the firearm, can you tell the jury where that
firearm was manufactured?

1   A.   Yes, all high point .45 caliber pistols are manufactured

2   by a company called Haskell, and they're manufactured in Lima,

3   Ohio.

4   Q.   Special Agent Kelsch, based on your examination of the

5   firearms themselves and your training and experience, did you

6   form an opinion concerning whether or not the objects that we

7   just had you examine, which are 46.1, 51, 69 and 82,1 moved in

8   or affected interstate commerce?

9        MR. MURPHY:  Objection.

09:55AM 10        MR. IOVIENO:  Objection.

11        THE COURT:  I'll let him testify as to whether they

12   moved in interstate commerce.

13   A.   None of those firearms were manufactured in the

14   Commonwealth of Massachusetts, so they would have all moved in

15   or affected interstate commerce.

16   Q.   All right.  Special Agent Kelsch, let me ask you a general

17   question about ammunition.  In addition to the firearms that

18   you've examined here today and prior to your testimony, there

19   is ammunition that was seized in connection with some of these

09:55AM 20   weapons that you examined, correct?

21   A.   That is correct, yes.

22   Q.   All right.  And you have, in the course of your duties as

23   an ATF agent, been asked to examine many different brands of

24   ammunition, correct?

25   A.   Yes, I have.

```
 1   Q.   All right.  And can you tell the jury generally whether
 2   ammunition -- you're aware of whether any ammunition was
 3   manufactured in the Commonwealth of Massachusetts?
 4   A.   Sure.  So, in speaking of commercial ammunition, when
 5   ammunition is made and the bottom of the brass, a
 6   manufacturer's name is stamped into the headstamp.  They call
 7   it a head-stamp on the ammunition.  So when we look at that
 8   ammunition, we look at the headstamp to see who the
 9   manufacturer was.
10            Currently, there are no commercial manufacturers of
11   ammunition in Massachusetts.  Historically many years ago,
12   there was military ammunition made in Springfield Armory out in
13   Western Massachusetts, but as far as commercial-made
14   ammunition, there is none being produced in Massachusetts nor
15   has there been.
16   Q.   Thank you, sir.
17   A.   Thank you.
18            THE COURT:  Cross.
19            MR. IOVIENO:  No, your Honor.
20            THE COURT:  Mr. Norkunas.
21            MR. NORKUNAS:  Just briefly, Judge, if I might.
22                        CROSS-EXAMINATION
23   BY MR. NORKUNAS:
24   Q.   Good morning, sir.
25   A.   Good morning.
```

1    Q.    Relative to your examination of the three weapons that

2    were shown to you, the three handguns, are you able to age

3    them?

4    A.    I'm sorry.  There were four firearms that we talked about.

5    Q.    Four.  That's correct.  Four.  Were you able to age them?

6    A.    So you mean date of manufacture?

7    Q.    Right.

8    A.    We do have their information, I just do not procure that

9    as part of my examination.

09:57AM 10    Q.    Would you have a -- at least, a reasonable degree of

11    professional certainty that they were not new when you examined

12    them?  They did not appear to be something that had been

13    recently purchased and then presented to you?  Let me strike

14    that.  Let me give you perhaps a better question.

15    A.    Sure.

16    Q.    Do firearms evolve such as other products so that if

17    you're having a .9 millimeter, it looks something like this,

18    and then four years later they slightly change the model, they

19    do something different when you're looking at it, you realize

09:58AM 20    that had been Model A vs. Model B?

21    A.    That is a fair assumption.  Firearm manufacturers do

22    change the models over time, yes.

23    Q.    One is because they want sales, too, right?  They want you

24    to come back and buy something new or better?

25    A.    Sometimes that, or something they're just general

1   improvements, safety improvements that are made to certain

2   firearms, so they change that model.

3   Q.   So from the firearms that you examined here, would these

4   be something that would likely to have been 10, 12, 14 years

5   old?

6   A.   I can't suppose to that.  I can tell you that two of the

7   firearms are still currently manufactured in that same model

8   number.  Two others I believe are models that have been

9   discontinued over time, but I don't know the year they were

09:58AM 10   discontinued.

11   Q.   Now, you've indicated with each of the weapons that you've

12   looked at, the handguns had manufacturer, model, caliber, state

13   where their plant is located and a serial number on them.  Do

14   you examine weapons that periodically, when you look at them,

15   someone has filed or attempted to erase all of that

16   information?

17   A.   Just to step back with your question.  It's not the state

18   where it was manufactured that may be on the firearm, it's

19   usually the headquarters of manufacturer or the state where it

09:59AM 20   was manufactured, so it could be either/or, just to correct

21   that, but, yes, I have looked at firearms where the serial

22   numbers have been tampered with.

23   Q.   And from your training and experience as a representative

24   or a Special Agent in ATF, what's your understanding of the

25   purpose for someone doing it?

1    A.    So we're talking about if someone were to obliterate a

2    serial number on a firearm?

3    Q.    Right.

4    A.    The main reason that we a serial number being tampered

5    with or obliterated is to affect the tracing of that firearm,

6    to find out where that firearm came from.

7    Q.    So that if that's used for some elicit purpose and the

8    weapon is found, you're not going to know a person to go back

9    to, right?

10:00AM 10    A.    That is correct, yes.

11    Q.    And the purpose of that is all of this information that's

12    on, generally, a weapon is stored by you, being the ATF,

13    correct?

14    A.    The information is actually stored by the firearms

15    manufacturers and then the dealers of the firearms.  We don't

16    maintain an active database ourselves, we're not allowed to by

17    law, but we take that information, we go back to the

18    manufacturer.  They'll tell us where that firearm was shipped

19    to as far as a dealer, and then the dealer will have the

10:00AM 20    information as to the first person that ever purchased that

21    firearm was.

22    Q.    Thank you, sir.  Thank you.

23              THE COURT:  Redirect.

24              MR. POHL:  No.  Thank you very much, Agent Kelsch.

25              THE WITNESS:  Thank you, your Honor.

1          MS. LAWRENCE:  The government calls Brian Estevez.

2          BRIAN ESTEVEZ, having been duly sworn by the Clerk,

3     testified as follows:

                        DIRECT EXAMINATION

4

5     BY MS. LAWRENCE:

6          THE WITNESS:  Good morning, your Honor.

7     Q.    Good morning, sir.

8     A.    Good morning.

9     Q.    Can you please introduce yourself to the ladies and

10:01AM 10  gentlemen of the jury?

11    A.    Yes, Trooper Brian Estevez.

12    Q.    Where do you work Trooper Estevez?

13    A.    I'm currently employed by the Massachusetts State Police.

14    Q.    What's your current assignment there?

15    A.    I'm a trooper with the gang unit, assigned to the gang

16    unit.

17    Q.    And do you have another assignment?

18    A.    Yes.  I'm also assigned to the FBI North Shore Gang Task

19    Force.

10:02AM 20  Q.    Can you tell us a little bit about what you do in the gang

21    unit for the State Police?

22    A.    We conduct long-term and short-term gang investigations

23    along with the FBI task force.  We also have a patrol function

24    every day, Monday through Friday, where we cover cities on the

25    North Shore of Boston, Chelsea, East Boston, Everett, Lynn,

1    Revere.  And we patrol those cities attempting to prevent

2    violence and conduct motor vehicle stops, identify gang

3    members.

4            THE COURT:  Can you move that mic just a little bit

5    closer, not too close.  It's very sensitive.  Okay.  Thank you.

6    Q.   What additional things do you do with the North Shore Gang

7    Task Force?

8    A.   We conduct long-term gang investigations.

9    Q.   And what types of investigative activities does that

10:03AM 10   involve?

11   A.   We conduct surveillance, we do controlled buys with

12   informants and confidential witnesses, we attempt to record

13   evidence.

14   Q.   When you work, you said confidential informants and

15   cooperating witnesses.  Is there a difference between those

16   two?

17   A.   Yes.  A confidential informant or CI is an individual that

18   provides information to law enforcement.  A confidential

19   witness or CW is an individual that proactively gathers

10:03AM 20   evidence and provides information to law enforcement.

21   Q.   As part of your work with either the State Police or the

22   North Shore Gang Task Force or both, have you investigated a

23   street gang called MS-13?

24   A.   Yes.

25   Q.   When did you begin working on the MS-13 investigation?

1    A.    The investigation began in 2014, but I was one of the

2    individuals that picked up the CW-1 at the airport when he

3    arrived in 2013.

4    Q.    Was that individual known by another name during the

5    investigation?

6    A.    Yes, Mako.

7    Q.    Mako.  Did he have even another name?

8    A.    His street name?

9    Q.    His street name.

10:04AM 10    A.    Yes.  They called him Pelon.

11    Q.    Are you a fluent Spanish speaker, Trooper Estevez?

12    A.    Yes.

13    Q.    How many members of the North Shore Gang Task Force are

14    fluent in Spanish?

15    A.    There's two of us, myself and my partner, Trooper Depena.

16    Q.    Did you speak with CW-1 during the investigation in

17    Spanish?

18    A.    Yes.

19    Q.    Does he also speak English?

10:04AM 20    A.    Yes.

21    Q.    And how often did you speak with CW-1 during the

22    investigation?

23    A.    We would speak definitely on several times a week,

24    sometimes daily.

25    Q.    Did you speak to him in person?

1    A.    Yes.

2    Q.    On the phone?

3    A.    Yes.

4    Q.    And are you familiar with his voice?

5    A.    I am.

6    Q.    What was the nature of your conversations with CW-1?

7    A.    CW-1 would call me and provide information that he had

8    gathered from MS-13 members about things that they have said or

9    things that they had done.

10:05AM 10    Q.    And what kinds of things -- again, just in general terms,

11    what kind of things would he report on?

12    A.    He'd talk about statements that they've made about recent

13    violence, gang meetings, clique meetings that they've had,

14    things of that nature.

15    Q.    What steps did you take to verify the information that

16    CW-1 gave to you?

17    A.    The task force would attempt to record these meetings.

18    We'd also conduct surveillance of controlled buys and try to

19    attempt to surveil these events as much as possible.

10:05AM 20    Q.    Did CW-1, in fact, record conversations or meetings with

21    MS-13 members?

22    A.    He did.

23    Q.    Were those recordings -- were the persons speaking on the

24    recordings speaking Spanish or English?

25    A.    Spanish.

1    Q.    Did you listen to those recordings?

2    A.    I did.

3    Q.    Did you listen to them during the investigation or after?

4    A.    Both.

5    Q.    When you listened to the meetings or the recordings, were

6    you able to identify the speakers on the recordings?

7    A.    Yes.

8    Q.    How did you go about doing that?

9    A.    A lot of these individuals I've spoken to in the past,

10:06AM 10   some I've met, and through monitoring these recordings prior to

11   and after the investigation, I made myself familiar with their

12   voices.

13   Q.    When you received the recordings, did you also have

14   information from CW-1 about them?

15   A.    Yes.

16   Q.    What was that information, generally?

17   A.    Generally, he would tell me who was there, who was

18   speaking, and what things were said.

19   Q.    You mentioned that you had talked to some of the

10:06AM 20   individuals during the investigation or after.  I want to focus

21   on the after part.  Did you participate in interviews or what

22   has been called proffer sessions with cooperating defendants in

23   this case?

24   A.    Yes.

25   Q.    Can you explain to the jury what a proffer session is?

            1    A.    A proffer is more -- it's kind of an agreement between

            2    prosecutors and law enforcement.  An individual will come in

            3    and talk to the prosecutors and law enforcement about events

            4    and things that they know in this particular case about the

            5    gang and the gang's activity.

            6    Q.    When you attended a proffer session, did you know in

            7    advance, for example, what questions you would ask the person

            8    you were interviewing?

            9    A.    Yes, sometimes we did.  We would have some questions in

10:07AM    10    mind, but it all really depended on what they said and what

           11    they were able to provide, and then we'd go from there.

           12    Q.    Was it uncommon for you to meet with a particular witness

           13    or cooperating defendant more than once?

           14    A.    No.  It was not uncommon.  I've been in proffers with

           15    individuals several times.  It's kind of a trust building

           16    exercise in the beginning where they kind of get to know you.

           17          MR. MURPHY:  Objection, your Honor.

           18          THE COURT:  I'll allow it.  It's in generals, he's

           19    speaking in general terms and not about specific witnesses.

10:08AM    20    I'll allow it.

           21    Q.    You can finish.

           22    A.    It's more of a trust building exercise where individuals

           23    come in.  They kind of get to know you in the process, and the

           24    next time you talk, they're a little bit more comfortable,

           25    they're able to provide a little bit more information.

```
 1           MR. MURPHY:  Objection.

 2           THE COURT:  Same ruling, he's speaking generically,

 3    not about any specific person.

 4    Q.   So you get to know them over time.  And do you also learn

 5    information that would cause you to ask different questions of

 6    them?

 7    A.   Correct.

 8           MR. MURPHY:  Objection, your Honor, as to relevance.

 9           THE COURT:  Well, that's a fair point.  Why don't we

10    move on.

11    Q.   Trooper Estevez, as part of this MS-13 investigation, did

12    you investigate a murder that occurred on December 14, 2014?

13    A.   I did.

14    Q.   How did you get involved in that investigation?

15    A.   I was contacted by CW-1 regarding a conversation that he

16    had with two individuals where they had mentioned --

17           MR. MURPHY:  Objection, your Honor.

18           MR. IOVIENO:  Objection.

19           THE COURT:  All right.  Let's stop there.  Put another

20    question to him.

21    Q.   I'd like to show --

22           MS. LAWRENCE:  Could I have the document camera,

23    please, for the witness.  Thank you.

24    Q.   Okay.  Trooper Estevez, do you see something on your

25    screen right now?
```

1    A.    Yes.  It's a DVD.

2    Q.    And what is the date on the disk, please.

3    A.    12-14-14.

4    Q.    Okay.  This has been marked as Exhibit 208.  Have you

5    listened to this recording prior to your testimony today?

6    A.    I have.

7    Q.    When you listened to the recording, were you able to

8    identify the speakers on the recording?

9    A.    Yes.

10:09AM 10          MS. LAWRENCE:  Could I have the computer screen now

11   for the witness, please.  43.

12   Q.    I'm now showing you, Trooper Estevez, a transcript of

13   excerpts of the recording on the disk that you just saw.  Did

14   you prepare this transcript?

15   A.    I did not.

16   Q.    Have you read this transcript?

17   A.    I have.

18   Q.    And when you read the transcript and listened to the

19   recording, did you find that the transcript accurately

10:10AM 20   reflected the English and Spanish words that were spoken on the

21   recording?

22   A.    Yes.

23          MS. LAWRENCE:  Your Honor, the disk that we just saw

24   goes with this transcript marked Exhibit 43.  I'd like to move

25   Exhibit 43 into evidence.

1          THE COURT:  I think he needs to say whether he

2     also -- whether the transcript reflects the identity of the

3     speakers.

4     Q.   You said that the words spoken were accurate on the

5     transcript as you listened to it.  Does this transcript also

6     accurately reflect the speakers on that recording?

7          MR. MURPHY:  Objection.

8          THE COURT:  Overruled.

9     A.   Yes.

10:10AM 10     MS. LAWRENCE:  Thank you.  I move Exhibit 43 the

11     transcript.

12          MR. MURPHY:  Your Honor, subject to the Court's

13     *Petroziello* and our prior objection.

14          THE COURT:  I'll give you a standing objection on

15     this.  Thank you.  It's overruled.  It's admitted, Exhibit 43.

16          THE COURT:  Again, one more time, let me remind you,

17     ladies and gentlemen, this is what the government says is an

18     accurate translation and what the government says are the

19     relevant speakers.  That's a question for you to determine

10:11AM 20     based on all of the evidence.

21          MR. MURPHY:  May we approach, your Honor?

22          THE COURT:  Yes.

23          (THE FOLLOWING OCCURRED AT SIDEBAR:)

24          THE COURT:  Yes.

25          MR. MURPHY:  Your Honor, I'd just like to make a very

1    specific objection to Exhibit 43 on the grounds that, although

2    this witness certainly established that he has familiarity with

3    CW-1's voice, he has not established familiarity with the other

4    individuals who were identified on the transcripts, and I think

5    without a basis that he knows what Crazy sounds like, that he

6    knows what Danger sounds like, et cetera, the government should

7    not be permitted to offer the transcript.

8            THE COURT:  I think that's fair.  Why don't you ask

9    him those questions and we'll see.  I'll be prepared to vacate

10:12AM 10   the admission of the exhibit if the foundation is not laid.

11           MR. MURPHY:  Thank you.

12           (SIDEBAR CONFERENCE WAS CONCLUDED)

13           THE COURT:  All right.  Ms. Lawrence.

14   Q.    Trooper Estevez, before we take a closer look at that

15   transcript, I want to show you admitted Exhibit 13, please.  Do

16   you recognize this individual?

17   A.    I do.

18   Q.    Who is he?

19   A.    Noe Perez-Vasquez, a.k.a. Crazy.

10:12AM 20   Q.    And how do you know this person?

21   A.    Through the course of the investigation.

22   Q.    And can you tell us a little bit more about him and what

23   you've learned through the investigation, please?

24   A.    Through the investigation, we've had several recordings of

25   him speaking on tape, also pictures of him, surveillance

1    pictures of him.  He's an influential member of the Everett

2    Locos clique.

3    Q.   He's an MS-13 member?

4    A.   He's an MS-13 member.

5         MS. LAWRENCE:  Okay.  May I have admitted Exhibit 12,

6    please.

7    Q.   Who is this person, if you know?

8    A.   An individual Smiley/Danger.

9    Q.   And what have you learned about him through the

10:13AM 10   investigation?

11         MR. MURPHY:  Objection, your Honor.

12         THE COURT:  Sustained in that form.

13   Q.   Do you know this individual?

14   A.   I do.

15   Q.   Have you learned anything about him in the course of your

16   investigation?

17   A.   Yes.  An MS-13 member, he's also --

18         MR. MURPHY:  Objection.

19         THE COURT:  Sustained.

10:13AM 20   Q.   What do you know about this person that you've learned in

21   the investigation?

22         MR. MURPHY:  Objection, your Honor.

23         THE COURT:  Sustained.  I mean, I thought you were

24   going to ask about whether he's familiar with what his voice

25   sounds like, which is what you're trying to do.

1      MS. LAWRENCE:  Yes, your Honor.

2  Q.    Have you heard this person speak?

3      MR. MURPHY:  Objection, your Honor.  Foundation.

4      THE COURT:  Overruled.

5  Q.    In what context, Trooper Estevez, have you heard him

6  speak?

7  A.    Through the course of the MS-13 investigation.

8  Q.    Did you speak to him in person?

9  A.    No.

10:14AM 10  Q.    How did you hear his voice?

11  A.    On a recording.

12  Q.    Okay.

13      MS. LAWRENCE:  Your Honor, I'd now move to admit

14  Exhibit 43, if it hasn't been formally admitted.

15      MR. MURPHY:  Objection, your Honor.

16      THE COURT:  The objection is overruled, and 43 is

17  admitted.

18      MS. LAWRENCE:  All right.  Thank you.

19      (Exhibit No. 43 received into evidence.)

10:14AM 20  Q.    Trooper Estevez, I'd like to look at Exhibit 43, please,

21  again.  Please.  All right.  I'd like to read just a little bit

22  of this transcript.  I'll read CW-1, if you would read the

23  other voices, please, starting with the first two lines.

24      CW-1:  "So Vida Loca is gone then, dude?"

25  A.    "Yes, he got away."

1          MS. LAWRENCE:  May I have admitted Exhibit 42, please.

2     Q.   Trooper Estevez --

3          MS. LAWRENCE:  Sorry.  Can I have a moment, your

4     Honor?

5          THE COURT:  Yes.

6          MS. LAWRENCE:  Thank you.  Jurors, open your binders

7     so you can follow along, please.

8     Q.   Do you recognize this individual in the photograph?

9     A.   I do.

10:15AM 10    Q.   Who is he?

11    A.   Hector Enamorado, also known as Vida Loca.

12    Q.   And what do you know about him in the context of this

13    investigation?

14    A.   He's a member of the Chelsea Loco Salvatruchas clique and

15    he was a suspect in the homicide.

16    Q.   And is that the person that we -- do you understand that

17    that's the person that Crazy is talking about in this

18    transcript?

19    A.   Yes.

10:15AM 20         MS. LAWRENCE:  Okay.  Could we turn, please, to page

21    2 -- 3, please.  Sorry.

22    Q.   All right.  Let's start at the top of the page with Crazy,

23    if you could read that, please, Trooper Estevez?

24    A.   Yes.  Crazy: "To kill him because he was already there.

25    The guys wanted to fight him again so then the crazy guy called

1  me and told me, no, man, it's better if you lend me your gun.

2  I'm going over.  I'm going over and I'm going over, and you'll

3  see, hey, dude, do me the favor, fuck, he told me.  They are

4  all rival gang members."

5  Q.   CW-1:  "They are rival gang members.  It can be done

6  there."

7  A.   Crazy:  "Yeah, they are rival gang members.  They are

8  chavalas, 18th Street gang.  They are gang rivals."

9  Q.   CW-1:  "The little lady just told --"

10:16AM 10  A.   Crazy:  "They are rival gang members, but I call them

11  Maras, sons of bitches, and that's why I got into a fight with

12  one of them.  That's what he told me.  There is no problem he

13  said, and, sure enough, he called yesterday at two in the

14  morning."

15        Danger:  "He went over to leave them a rapid fire of

16  beans."

17        Crazy:  "Yes."

18  Q.   CW-1:  "That's fine, the lady, the lady tells me that."

19  A.   Crazy:  "And one is not -- and one of them is in grave

10:17AM 20  condition and alive."

21  Q.   CW-1:  "And the other one is dead?"

22  A.   Crazy:  "Yes, one is dead and the other one is in grave

23  condition."

24  Q.   CW-1:  "Yes, that's what the lady told me and that's why I

25  wanted to tell you that the lady told me that one died and the

1    other one is in serious condition and that --"

2    A.   Crazy: "Uh-huh.  I have Vida.  Vida shot him in a really

3    good spot."

4    Q.   Okay.  I think we'll pause there.  Trooper Estevez, there

5    was a phrase, a statement by Danger that you read earlier.  He

6    said, "He went over to leave them a rapid fire of beans."  In

7    your training and experience and particularly in connection

8    with this investigation, what do you understand that statement

9    to mean?

10:18AM 10   A.   Beans or frijoles in Spanish are what this gang uses for

11   bullets, so when he says "a rapid fire of beans," it's a rapid

12   fire of bullets.

13   Q.   And we're going to continue on just to the end of the

14   page.  CW-1 says, "So, they were chavalas, dude?"

15   A.   I'm sorry, where are you reading?

16   Q.   The dot dot dot.

17   A.   Okay.  Yes.  Crazy: "They were chavalas.  There was a

18   bunch of them, there, dude, and --"

19   Q.   CW-1:  "But the lady is telling me that they sold, they

10:18AM 20   sold beer and --"

21   A.   Danger:  "But I called them."

22          Crazy:  "Yes, it's a house, it's an after party house,

23   dude, you know what I mean?"

24          Danger:  "I called the crazy dude when he left, man."

25          Crazy:  "They were drinking.  They were drinking

1    there, dude."

2    Q.    "Huh?"

3    A.    Danger:  "I called Vida when he left, man."

4    Q.    Can you turn to the next page, please.  Okay.  Could we

5    start reading, Trooper Estevez, toward the top of the page

6    about a third down where Crazy starts with "listen".  At the

7    eighth line down.

8    A.    Yes.  Crazy:  "Listen, they came over here to break

9    everything in the house and they are looking for weapons, she

10   told me, and she said I don't know anything about that."

11   Q.    CW-1:  "But you got your gun back?"

12   A.    Crazy:  "That's right."

13         Danger:  "I have it here."

14   Q.    CW-1.  "Oh, that's good, man."

15   A.    Danger:  "It's a .380, but it only has two beans now."

16   Q.    CW-1:  "Son of a bitch, we have to find some beans."

17   A.    Danger:  "That's why I wanted to get that thing soon,

18   too."

19   Q.    CW-1:  "And was he the only one that went over?"

20   A.    Danger:  "With Brujo, Brujo had the .22."

21   Q.    CW-1:  "Really?"

22   A.    Danger:  "Yes, he went with Brujo.  Brujo said, "I'll go

23   with you.  I am not staying behind."  He told them and they

24   left, dude."

25   Q.    CW-1:  "And who shot them, Vida Loca?"

1    A.    Danger:  "Vida Loca was the one who shot them."

2    Q.    CW-1:  "Yes?"

3    A.    Danger:  "Yes.  I was the one that called them."

4          Crazy:  "Vida Loca killed the guy.  You think he was

5    joking?"

6    Q.    CW-1:  "That dude."

7          Trooper Estevez, again, can we stay on page 3 for a

8    second.  When Danger says that the .380 only has two beans in

9    it now, can you explain to the jury what that means again.

10:20AM 10  A.    Yes, the .380 is, it's a firearm -- .380 caliber firearm

11   and it only has two bullets left in it now.

12   Q.    And when Danger says, "With Brujo.  Brujo had the .22, he

13   went with Brujo," what do you understand that to mean?

14   A.    I understand that to be another weapon, a .22 caliber

15   handgun.

16          MS. LAWRENCE:  Could I have admitted Exhibit 8,

17   please.

18   Q.    Do you recognize this individual?

19   A.    Yes.

10:21AM 20  Q.    Who is he?

21   A.    Brujo.

22   Q.    And what do you know about him in the context of this

23   investigation?

24   A.    He's an --

25          MR. MURPHY:  Objection, your Honor.

         1              THE COURT:  Sustained.

         2    Q.   On page 4, if we could have page 4.  I'm sorry, it's 3.

         3    When Crazy says "Vida Loca killed the guy, you think he was

         4    joking?"  And then he says, "He shot him and he shot the

         5    other."  What is that referring to?

         6              MR. LOPEZ:  Objection.

         7    Q.   Or what do you understand that to mean?

         8              MR. LOPEZ:  Objection.

         9              THE COURT:  Sustained.

10:22AM 10    Q.   One more question.  Crazy says, "He got his gun back."

        11              MS. LAWRENCE:  Could I have admitted Exhibit 14,

        12    please.

        13    Q.   Do you recognize this individual?

        14    A.   I do.

        15    Q.   Who is he?

        16    A.   Innocente.

        17    Q.   What do you know about him?

        18    A.   He's an MS-13 member of the Everett Locos.

        19    Q.   Is that the same clique that you said Crazy belonged to?

10:22AM 20    A.   Correct.

        21    Q.   Okay.  Just to be clear, Trooper Estevez, this transcript

        22    of the recording that we just read, did you listen to that in

        23    realtime on December 14, 2014?

        24    A.   I did not.

        25    Q.   So at that time did you know which MS-13 member was

1    suspected of killing a Javier Ortiz?

2    A.    No.

3    Q.    Was there another state police unit investigating the

4    homicide?

5    A.    Yes.

6    Q.    Who was that?

7    A.    The troopers assigned to the Suffolk County

8    District Attorney's Office.

9    Q.    Were they able to identify a suspect in the murder?

10:23AM 10    A.    Yes.

11    Q.    Do you know who they identified?

12    A.    Yes.

13    Q.    Who was that?

14    A.    Hector Enamorado.

15    Q.    Do you know him by another name?

16    A.    Vida Loca.

17    Q.    Did they -- were they able to arrest him immediately?

18    A.    No.

19    Q.    So what happened next in the investigation after the

10:23AM 20    December 14th information you received from CW-1?

21    A.    On December 16th, CW-1 contacted me via telephone and

22    advised, sorry -- on the December 14th, CW-1 initially

23    contacted me and advised that he believed there was an MS-13

24    member --

25            MR. MURPHY:  Objection, your Honor.

1          MR. IOVIENO:  Objection, your Honor.

2          THE COURT:  I'll allow it not for the truth of the

3     matter asserted but for the fact that the trooper was told

4     this.  Again, ladies and gentlemen, remember my analogy of the

5     witness who comes into the courtroom and says the building is

6     on fire.  In other words, you can consider this for the fact

7     that it was said to the trooper but not for the truth.

8          Go ahead.

9     Q.   And after you received that information on the 14th, did

10:24AM 10    you receive other information on the 16th?

11    A.   I did.

12    Q.   Okay.  And after you received that information, what did

13    you do?

14    A.   On the 16th, the information I received was that Crazy had

15    contacted CW-1 and asked him to move somebody, they wanted to

16    take somebody to New York.

17    Q.   Okay.  I'd like to show you admitted Exhibit 44.1, please.

18    Okay.  Trooper Estevez, this is a transcript of a call between

19    CW-1 and Crazy on December 16th at approximately 5 p.m.  Have

10:25AM 20    you reviewed this transcript?

21    A.   Yes.

22    Q.   Okay.  I want you to read part of the transcript starting

23    with where Crazy says, towards the bottom, "to go on a trip"

24    and I'll read CW-1.

25    A.   Okay.  Crazy:  "To go on a trip, or if you want to go to

1    New York to drop them off over there, what do you say?"

2    Q.    CW-1:  "When?"

3    A.    Crazy:  "Now.  You'll get 400."

4    Q.    CW-1.  "I'll get 400?"  Let's go to page 2, thanks.

5    Q.    Crazy:  "Yes.  Right now, at once, before you leave."

6    Q.    CW-1:  "And who needs to be dropped off?"

7    A.    Crazy:  "A dude."

8    Q.    Okay.  That's fine for now.  Trooper Estevez, during the

9    investigation, did CW-1 have a job?

10:25AM 10   A.    Yes.

11   Q.    What was that job?

12   A.    He was a cab driver.  I'm sorry.  He used his own personal

13   car for cab driving.

14   Q.    And did he routinely take people on rides?

15   A.    Yes.

16   Q.    And he was paid to do that?

17   A.    Correct.

18         MS. LAWRENCE:  Can we turn Exhibit 44.2, please.  It's

19   also been admitted.

10:26AM 20   Q.    Okay.  Trooper Estevez, this is a transcript of a

21   recording made on December 16, 2014 at approximately 5:17 p.m.

22   So that's how much longer after the call we just heard?

23   A.    17 minutes.  17 minutes.

24   Q.    17 minutes later?

25   A.    Yeah.

1   Q.   Have you reviewed this transcript?

2   A.   Yes.

3   Q.   Okay.  I'm going to show you quickly before we talk about

4   this Exhibit 44.3.  Okay.  This is a transcript of a call

5   between CW-1 and Crazy, also on December 16, and this is

6   5:42 p.m.  Have you reviewed this transcript?

7   A.   Yes.

8   Q.   Okay.  Having reviewed these transcripts, I'm not going to

9   read them directly right now.  What do you understand the

10:26AM 10   content of this conversation to be between Crazy and CW-1?

11   A.   That he wanted CW-1 to pick him up and another individual

12   to drive him to New York.

13   Q.   Okay.  And from reviewing the transcripts, do you know

14   what time Crazy wanted CW-1 to pick up the person?

15   A.   He wanted to do it immediately.

16   Q.   Okay.  After you received this information from CW-1, what

17   did you do next in the investigation?

18   A.   I contacted the task force members and advised them that

19   Crazy wanted to move somebody out of Boston to New York and

10:27AM 20   advised them that we should start surveillance.

21   Q.   Where did you start that surveillance?

22   A.   I started that surveillance at Breman Street.

23   Q.   And were you familiar with Breman Street?

24   A.   Yes.

25   Q.   From the investigation?

1    A.    Yes.

2    Q.    And how were you familiar with it?

3    A.    It was an address known to us as a destroyer house, an

4    MS-13 gang house.

5    Q.    Did you conduct surveillance yourself on Breman Street

6    that night?

7    A.    I did.

8    Q.    What did you see during your surveillance?

9    A.    I saw CW-1's car pull up and three individuals enter the

10   car.

11   Q.    Could you recognize the individuals then?

12   A.    No.

13   Q.    What happened after the individuals got in the car?

14   A.    As the car moved on, we knew he was transferring Hector

15   Enamorado, Vida Loca, out of the state because of the

16   information that he was involved in a homicide.  And knowing

17   that Hector Enamorado already had a state warrant that was

18   applied for by the troopers at the Suffolk District Attorney's

19   Office, we contacted other members of the task force, and we

20   made a plan to allow the car to drive onto the Mass. Pike and

21   then we would conduct a motor vehicle stop of the vehicle.

22   Q.    Before we get to that stop, I'd like to turn to

23   Exhibit 44.4, please.  This is a transcript of a recording made

24   on the same night, December 16, 2014, and this appears to have

25   been made at 6:42 p.m., so approximately an hour after the last

1    call between Crazy and CW-1.  Who is this call between?

2    A.    CW-1 and a/k/a Anderson Chacon, a.k.a Scooby.

3    Q.    Okay.  And I'd like, if you would, to read the part where

4    Scooby starts talking, "Tell that dude" and I'll read CW-1.

5    A.    Scooby:  "Tell that dude to be careful right now when he

6    goes because I just got a call from Vampy from the clique

7    saying that the dude was even on Google because he's the most

8    wanted man in Chelsea, man."

9    Q.    CW-1:  "Oh, that's what I just heard."

10:29AM 10    A.    Scooby:  "Yes, man.  I just got a call from the dude that

11    it is on the news and that he's the most wanted.  Be careful

12    right now when you go so that the police doesn't stop you,

13    man."

14    Q.    CW-1:  "I heard that shit, but I don't believe the woman.

15    She told me that there was a photo of this guy on the news with

16    the license, bro."

17    A.    Scoopy:  "Well, it's like I'm telling you, that dude

18    called me and yes, he says that they have photos even on Google

19    and all.  It's on the news, just turn on Chelsea news and the

10:30AM 20    dude comes up there and the whole thing, man."

21    Q.    Okay.  We'll stop there.  Do you know who Scooby was --

22    is?

23    A.    Yes.

24    Q.    Who is he?

25    A.    He's a member of the TLS clique.

1    Q.   And in your own words, what do you understand Scooby to be

2    talking to CW-1 about?

3    A.   Vida Loca, Hector Enamorado.

4    Q.   Okay.  Let's continue back to you were just saying that

5    you were making a plan to stop the car?

6    A.   Yes.

7    Q.   On the Mass Pike?

8    A.   Yes.

9    Q.   Okay.  Tell us a little more about how that plan was going

10   to be carried out?

11   A.   So we would allow the car to enter the Mass. Pike.  By

12   that time, we had plenty of surveillance teams following the

13   vehicle and monitoring its progress.  We were going to have my

14   supervisor, Sergeant Mario Millett, put his uniform, State

15   Police uniform on, and on top of that, we were going to have

16   two CAT teams, it's an abbreviation for Community Action Team,

17   troopers that patrol the Mass Pike help with the motor vehicle

18   stop as well.

19   Q.   So, Trooper Estevez, let me ask you this.  You said

20   earlier Vida Loca -- there was an arrest for Vida Loca or

21   Hector Enamorado.  Why are you creating this somewhat elaborate

22   seeming plan to stop him instead of just having a regular

23   trooper arrest him on the warrant?

24   A.   So what we would -- this is what we call a wall-off stop

25   where we attempt to allow the vehicle to drive in this case

1    about an hour away from where he had initially started in order

2    to -- and then conduct a motor vehicle stop of the vehicle,

3    make it look routine in order not to alert anybody inside the

4    vehicle that the real reason that the car is being stopped is

5    for the wanted individual inside the car and make it look like

6    it was more of an accident than that we knew he was in there,

7    and the reason we do that is to protect the confidential

8    witness in the vehicle so it doesn't get back to him.

9    Q.   Okay.  And did you execute the wall-off stop in this case?

10:32AM 10   A.   Yes.

11   Q.   Okay.  What was the result of that?

12   A.   The result was the arrest of Hector Enamorado, a.k.a

13   Vida Loca.

14   Q.   And did anything else happen to your knowledge after the

15   wall-off stop with respect to CW-1's car?

16   A.   Yes.  So CW-1's car had a defective tail light, and that

17   was essentially the reason for the motor vehicle stop.  After

18   the arrest of Enamorado, Crazy made CW-1 pull over on the

19   highway and verified and made him check that the tail light was

10:33AM 20   out.

21               THE COURT:  Why don't we take our break.

22               MS. LAWRENCE:  Okay.  Thank you.

23               THE CLERK:  All rise.

24               (JURORS EXITED THE COURTROOM.)

25               (A recess was taken.)

1        THE CLERK:  All rise for the jury.

2        (JURORS ENTERED THE COURTROOM.)

3        THE CLERK:  Thank you.  You may be seated.  Court is

4   now back in session.

5        THE COURT:  Ms. Lawrence.

6        MS. LAWRENCE:  Thank you, your Honor.

7   Q.   Trooper Estevez, right before we broke, you said that

8   Vida Loca was arrested that night, on December 16, 2014?

9   A.   Yes.

10  Q.   How long after the murder of Javier Ortiz was Vida Loca

11  arrested and charged with that murder?

12  A.   Two days.

13  Q.   Two days.

14       MS. LAWRENCE:  Could I have admitted Exhibit 8 again,

15  please.

16  Q.   Trooper Estevez, you testified earlier that you recognized

17  this individual?

18  A.   Yes.

19  Q.   What was his name again?

20  A.   Brujo.

21  Q.   How do you recognize him?

22  A.   I took that picture.

23  Q.   Okay.  And did you talk to him when you took that picture?

24  A.   I did.

25  Q.   And did you learn anything from him about who he was or

1    how he's related to this investigation?

2    A.   He's known to me as --

3              MR. MURPHY:  Objection.

4              THE COURT:  Hold on.  Sustained.

5              MS. LAWRENCE:  Can I have admitted Exhibit 14, again,

6    please.

7    Q.   Earlier you testified or you identified this individual as

8    Innocente?

9    A.   Yes.

10:51AM 10    Q.   Who's a member of the Everett?

11    A.   Everett Loco Salvatrucha.

12    Q.   Do you know him by another gang name?

13    A.   Yes.

14    Q.   What is that?

15    A.   Triste.

16    Q.   I'm going to switch gears and talk about a different topic

17    right now, Trooper Estevez.  Are you familiar with an

18    investigative technique called a drug protection detail?

19    A.   I am.

10:51AM 20    Q.   Could you explain what that is for the jury, please.

21    A.   Essentially it's a -- a drug protection detail technique

22    is when one undercover officer provides a significant amount of

23    narcotics to a CW and that drug -- those drugs are escorted and

24    protected by gang members and brought to another undercover

25    officer while being surveilled the entire time by law

1    enforcement officers.

2    Q.   Okay.  Do you use real drugs when you conduct a drug

3    protection detail?

4    A.   Yes.

5    Q.   Was this investigative technique used in this case?

6    A.   Yes.

7    Q.   How many times?

8    A.   Three times.

9    Q.   Were you personally involved in all three of those times?

10:52AM 10    A.   Yes.

11    Q.   Okay.  Do you remember when they occurred?

12    A.   February, October and December of 2014.

13    Q.   And what was your role in the investigation on those days?

14    A.   Surveillance officer and I also debriefed the CW.

15    Q.   And when you conduct surveillance, can you just describe a

16    little bit about what you do, how the surveillance teams

17    operate during the drug protection detail?

18    A.   We attempt to use as many vehicles as possible.  We call

19    them soft vehicles.  They're vehicles that -- not your typical

10:53AM 20    police car with lights and markings, they're undercover cars,

21    regular cars, using mixed bags of different cars.  We try to

22    set up at locations prior to the arrival of the person that

23    we're surveilling if we know in advance, otherwise we just try

24    to tail the vehicles at a safe distance but keeping them within

25    our eye at all times.

1    Q.   What kind of drug did you use for the investigative, I'm

2    sorry, the drug protection details in this case?

3    A.   Cocaine.

4    Q.   How did -- you said you set up this drug protection

5    detail.  How do you know -- who are you surveilling when this

6    is happening?

7    A.   We were surveilling the CW, the narcotics, and the

8    individuals involved.

9    Q.   Did you direct the CW-1 to do anything before the drug

10:53AM 10  protection detail took place?

11   A.   I don't understand the question.

12   Q.   Did he ask anyone to participate with him?

13   A.   He did.

14   Q.   Okay.  And did you tell him to ask different members of

15   MS-13 to participate in these details with him?

16   A.   I did not personally, no.

17   Q.   Did someone from law enforcement?

18   A.   The task force.

19   Q.   Okay.  I'd like to focus on the February protection

10:54AM 20  detail, February 14, 2014.  Who from MS-13 was involved in that

21   drug protection detail?

22   A.   Muerto.

23        MR. NORKUNAS:  Objection, Judge, characterization.

24        THE COURT:  All right.  How about who was involved in

25   that drug protection detail?

1    Q.   Who was involved in that drug protection detail, please?

2    A.   CW-1, Muerto and Checha.

3              MS. LAWRENCE:  Could I have admitted Exhibit 6,

4    please.

5    Q.   Who is this, Trooper Estevez?

6    A.   Muerto.

7    Q.   And who is he?

8    A.   He is a member of the Eastside Loco Salvatrucha clique.

9    Q.   And could I -- sorry.  Who else was involved that day,

10:55AM 10   CW-1 and who else?

11   A.   Checha.

12   Q.   And who is Checha?

13   A.   He's also a member of the Eastside Locos Salvatrucha

14   clique.

15   Q.   Do you recognize Checha here in the courtroom today?

16   A.   I do.

17   Q.   Can you point him out for the jury, please?

18   A.   Yes, right over there.

19   Q.   Can you describe what he's wearing?

10:55AM 20   A.   He has a beard, he has a green shirt, green striped shirt

21   and a black and green and white tie, striped tie.

22             MS. LAWRENCE:  May the record reflect the

23   identification of the defendant, Cesar Martinez, please?

24             THE COURT:  Yes.

25   Q.   On February 14, 2014, what was the quantity of cocaine

1    that was being protected during the detail?

2    A.   One kilogram.

3    Q.   And, again, did you provide a real kilogram of cocaine for

4    this detail?

5    A.   The task force did, yes.

6    Q.   Okay.  Did Muerto and Checha get paid for protecting this

7    one kilogram of cocaine shipment?

8    A.   They did.

9         MR. NORKUNAS:  Objection, Judge.

10:55AM 10        THE COURT:  Overruled.

11   Q.   How much did they get paid?

12   A.   $500.

13   Q.   Each or together?

14   A.   I'm sorry, each.

15   Q.   Okay.  Let's turn to the October drug protection detail.

16   On October 17th, who was involved in that drug protection

17   detail?

18   A.   CW-1, Muerto and Chucho.

19   Q.   Just three individuals?

10:56AM 20   A.   And Caballo.

21   Q.   Okay.  Who is Caballo?

22   A.   Caballo is also a member of the Eastside Locos Salvatrucha

23   gang.

24        MS. LAWRENCE:  Could I have admitted Exhibit 11,

25   please.

```
 1    Q.   Do you recognize this person?

 2    A.   Yes.

 3    Q.   Who is it?

 4    A.   Caballo.

 5    Q.   Who is Chucho?

 6    A.   He's also an MS-13 member.

 7    Q.   Of the same clique, or a different clique?

 8    A.   Of the same clique.

 9    Q.   Okay.  Who -- what quantity of cocaine was being protected

10    during the October protection detail?

11    A.   One kilogram.

12    Q.   And was one real kilogram of cocaine provided for that

13    detail?

14    A.   Yes.

15    Q.   Did the participants, Muerto, Caballo, and Chucho get paid

16    for protecting that one kilogram detail?

17    A.   Yes.

18    Q.   How much did they get paid?

19    A.   $500 each.

20    Q.   Let's turn to the December 8, 2014 detail.  Who was

21    involved in that one?

22    A.   CW-1, Muerto, Lobo, Caballo, Crazy.

23    Q.   Five persons that time?

24    A.   Yes.  And Danger/Smiley.

25    Q.   Lobo?
```

1          THE COURT:  Danger/Smiley is one person?

2          THE WITNESS:  One person, yes.

3   Q.    Who's Lobo?

4   A.    Eric Argueta.  He's an MS-13 member, Eastside

5   Locos Salvatrucha gang.

6   Q.    Do you recognize him here in the courtroom today?

7   A.    I do.

8   Q.    Can you point him out, please?

9   A.    He's sitting right there.  He's got a black blazer with a

10:57AM 10   white shirt, no tie.

11          MS. LAWRENCE:  May the record reflect the

12   identification of defendant Eric Argueta Larios?

13          THE COURT:  Yes.

14   Q.    Thank you.  Okay.  You said Muerto, Lobo, Caballo -- we

15   just saw a picture of Caballo.  Crazy?

16   A.    Yes.

17          MS. LAWRENCE:  Could I have admitted Exhibit 13 again,

18   please.

19   Q.    Is this the same Crazy we looked at before?

10:58AM 20   A.    Yes.

21   Q.    The same individual?

22   A.    Yes.

23          MS. LAWRENCE:  Okay.  And admitted Exhibit 12, please.

24   Q.    And who's this?

25   A.    Smiley or Danger.

1    Q.   And this person you said was involved in the drug

2    protection detail?

3    A.   Correct.

4    Q.   Okay.  And you conducted surveillance that day of the

5    detail?

6    A.   Correct.

7    Q.   Did you see him during your surveillance?

8    A.   Yes.

9    Q.   And who is he?

10:58AM 10   A.   He's also an MS-13 gang member.

11   Q.   Do you know if he's related to another MS-13 member that

12   you investigated?

13   A.   Yes.

14   Q.   Who's that?

15   A.   Muerto.  He's Muerto brother.

16   Q.   Where is Smiley/Danger now, if you know?

17   A.   In El Salvador, I believe.

18   Q.   Was he charged in this case?

19   A.   Yes.

10:58AM 20   Q.   When did you learn that he was -- sorry, do you know how

21   he got to El Salvador?

22   A.   He was deported by Homeland Security.

23   Q.   And when did you learn that he was deported?

24   A.   During the investigation.

25   Q.   Did you know he would be deported?  Did you know before he

1    was deported that he was going to be?

2    A.   We had no idea.

3    Q.   All right.  So what was the quantity of cocaine that was

4    being protected during the December 8, 2014 protection detail?

5    A.   5 kilograms of cocaine.

6    Q.   And did you provide 5 real kilograms of cocaine for that

7    protection detail?

8         MR. MURPHY:  Objection, your Honor.

9         THE COURT:  Overruled.

10:59AM 10   A.   Yes.

11   Q.   Did Crazy, Danger, Lobo, Caballo and Muerto get paid for

12   protecting this 5 kilogram shipment of cocaine?

13   A.   Yes.

14   Q.   How much did they get paid?

15   A.   $500.

16   Q.   Okay.  Trooper Estevez, I'd like you to watch what has

17   been admitted as Exhibit 64.4, please.

18        THE CLERK:  What is this?

19        MS. LAWRENCE:  64.4.

10:59AM 20        THE COURT:  It's not admitted.

21        MS. LAWRENCE:  Okay.  May I just have it for the

22   witness, please then.

23   Q.   I'm going to play a short clip of this.  It's not very

24   long in its entirety, but I ask you to watch it before I ask

25   you questions.

1          (Video played.)

2     Q.   Trooper Estevez, do you recognize this recording?

3     A.   Yes.

4     Q.   Have you seen it before?

5     A.   Yes.

6     Q.   What is it?

7     A.   It's a recording of the day of the protection detail on

8     December 8, 2014.

9     Q.   And you've watched this recording, this clip in its

11:00AM 10  entirety; is that correct?

11    A.   Yes.

12    Q.   And does it accurately reflect what you know to have

13    happened on December 14, 2014?

14    A.   Yes.

15         MS. LAWRENCE:  Okay.  I'd move to admit Exhibit 64.4

16    into evidence, your Honor.

17         THE COURT:  It's admitted, 64.4.

18         (Exhibit No. 64.4 received into evidence.)

19         MS. LAWRENCE:  Can we start over and publish for the

11:01AM 20  jury, too, please.

21         (Video played)

22    Q.   Trooper Estevez, you testified earlier that you speak

23    Spanish, correct?

24    A.   Yes.

25    Q.   So could you understand what was being spoken on that

1    recording?

2    A.    Yes.

3    Q.    And what did you hear people saying, in particular, the

4    person -- oh, did you see the person handling money?

5    A.    Yes.

6    Q.    Who was that?

7    A.    CW-1.

8    Q.    And what was he saying as he was handling the money?

9    A.    He was counting the money and paying everybody in the car.

11:03AM 10    Q.    Did he say different people's names as he was counting?

11    A.    He did.

12    Q.    Who did you hear him say?

13    A.    At the end he said, he counted 1, 2, 3, 4, 5, and he said

14    for Lobo.

15    Q.    During the video at some points he reached back into the

16    back seat of the car?

17    A.    Yes.

18    Q.    At that time when he said for Lobo --

19    A.    Yes.

11:03AM 20    Q.    -- he seemed to put the money and set it aside?

21    A.    Yes.

22    Q.    Why did he do that?

23    A.    Because he wasn't there.  He had left.

24    Q.    Okay.  Did you hear any talk of that on the recording?

25    A.    Yes.  He said this money is for Lobo and, you know, I want

1    to give it to him because I don't want him to think that we got

2    more money, that I paid anybody more money.

3    Q.    Trooper Estevez --

4          MS. LAWRENCE:  Could I have 64.5 for the witness.

5    Q.    I'll play just a short part of this for you to see if you

6    recognize it.

7          (Video played.)

8    Q.    Do you recognize this recording?

9    A.    Yes.

11:04AM 10   Q.    What is it, please?

11   A.    A recording from the same date, 12-8-14, drug protection

12   detail.

13          MS. LAWRENCE:  Okay.  Your Honor, I move to admit

14   64.5, please.

15          THE COURT:  It's admitted, 64.5.

16          (Exhibit No. 64.5 received into evidence.)

17          MS. LAWRENCE:  Let's play this in its entirety.

18   Thank you.

19          (Video played.)

11:04AM 20   Q.    Okay.  Trooper Estevez, what did we just see there and

21   hear?

22   A.    Hear the door open and closing, somebody gets in the

23   vehicle, CW-1 passes cigarettes, and he says, "These are for

24   you, Lobo," and then he gets the money from the center console

25   again, counts it and hands it back to him.

1    Q.    Okay.  Thank you.

2            MS. LAWRENCE:  I'd like to show the witness, please,

3    Exhibits 118.1 through 30.

4    Q.   We can just click through them as I'm talking.

5    Trooper Estevez, I want you to just take a look at these

6    photographs.  There are about 20 some of them.  We'll go

7    through them as we talk.  Do you recognize these photographs?

8    A.    Yes.

9    Q.    What are they?

11:05AM 10    A.    These were photographs taken during the 12-8-14 drug

11    protection detail.

12    Q.    Did you personally take these photographs?

13    A.    I did not.

14    Q.    Were you present when the photographs were taken?

15    A.    Yes.

16    Q.    And do the photos accurately reflect what you saw on

17    surveillance that day?

18    A.    Yes.

19            MS. LAWRENCE:  Okay.  Your Honor, I'd move to admit

11:05AM 20    all of the -- Exhibits 118.1 through 118.3 -- 30.  Sorry, 30,

21    not 2.

22            THE COURT:  All right.  They're admitted, 118.1

23    through 118.30.

24            (Exhibit No. 118.1 through 118.30 received into

25    evidence.)

1    Q.   Okay.  I'd like to start and show you Exhibit 118.20.

2    Trooper Estevez, what are we looking at in this photograph?

3    A.   It's a photograph of the vehicle, the white Ultima which

4    was used in the drug protection detail and an individual on a

5    phone known to me as Lobo with a blue coat.

6    Q.   Do you see -- so is it the white Ultima that's in the

7    foreground of the photograph?

8    A.   The one closest to us.

9    Q.   And do you see any figures in that car?

10   A.   Yes.

11   Q.   Can you count -- maybe you can't, but how many can you see

12   if you can?

13   A.   I see about three.

14   Q.   Okay.  And we just watched a video of individuals in a

15   car --

16   A.   Yes.

17   Q.   -- passing out money?

18   A.   Yes.

19   Q.   Was that car they were sitting in the white Ultima that

20   you just referenced and pointed out on the photograph?

21   A.   Yes.

22        118.1 through 118.30, so 118.21, please.

23   Q.   And what do we see here?

24   A.   Again, I can see four individuals in a car now and a white

25   Ultima, and, again, a head shot of Lobo walking in the

1    background.

2    Q.    Okay.  And then 118.22, what is that?

3    A.    Again, the same vehicle, one individual with his back to

4    us and again Lobo going towards the individual.

5    Q.    And 118.23.  What's he doing there?

6    A.    The same Ultima, Lobo in the blue coat and the other

7    individual I believe is Caballo opening the rear door of the

8    Ultima.

9    Q.    Okay.  I'd like to show you 118.27, please.  What do we

11:08AM 10    see here?

11    A.    It looks like they've all exited the vehicle.  There's

12    Crazy on the left with the black jacket, Muerto in the blue

13    short sleeve shirt, Smiley/Danger in the middle with his back

14    towards us and Lobo in the blue coat leaning on the white

15    Ultima.

16    Q.    And Exhibit 118.28.

17    A.    That's Lobo walking away, Crazy looking back in the

18    middle, Smiley looking back to his right and Muerto next to the

19    Ultima.

11:09AM 20    Q.    And finally 118.29.  Do you recognize that vehicle?

21    A.    Yes.

22    Q.    What is it, please?

23    A.    That's CW-1's vehicle, personal vehicle.

24    Q.    Okay.  All right.  Thank you very much.  Different topic

25    now, Trooper Estevez.  During the MS-13 investigation, were you

1   involved in a gun seizure on January 28, 2015?

2   A.   Yes.

3   Q.   How did you get involved?

4   A.   On that evening, I received a phone call from CW-1 that he

5   had just been inside a restaurant in Chelsea, Casa Mariachi,

6   and that he had run into Lobo at this restaurant.  While there

7   at the restaurant, Lobo asked him to go inside the bathroom.

8          MR. IOVIENO:  Objection, your Honor.

9          THE COURT:  Overruled.  This is part of the

11:09AM 10   *Petroziello*?

11          MR. IOVIENO:  Yes, and also 403, your Honor.

12          THE COURT:  But is it part of the *Petroziello*

13   disclosures?

14          MS. LAWRENCE:  It's really more just to say what he

15   did next.  I think it's both, but I think it's fine to put

16   another question.

17          THE COURT:  Let's stop there for now.

18   Q.   After you received this call from CW-1, what did you do?

19   A.   I called my partners, I called my supervisor,

11:10AM 20   Sergeant Millett, and advised him that I just received a phone

21   call from CW-1 that Lobo was at Casa Mariachi and he was in

22   possession of a handgun.

23          THE COURT:  Just to be clear, I'm going to admit that,

24   for -- again, for the fact that that statement was made to the

25   officer, not for the truth of the matter.

1    Q.   So what did they do?

2    A.   I was on my way in, my partners were already in Chelsea,

3    and they had set up surveillance outside of the restaurant to

4    observe if Lobo came out of the restaurant.

5    Q.   Did he come out of the restaurant?

6    A.   He did.

7    Q.   And what did they do?

8    A.   They approached him, had a conversation with him, and made

9    an arrest for the firearm.

11:11AM 10   Q.   Was it your plan to approach Lobo right outside the

11   restaurant?

12   A.   No, it was not.

13   Q.   What was the plan?

14   A.   My plan was that I wanted surveillance to surveil the

15   restaurant.  As I was on my way in, we were going to wait for

16   Lobo to drive away in his vehicle and conduct a wall-off stop

17   at that point, a motor vehicle stop of his vehicle and attempt

18   to recover the firearm that way.

19   Q.   And why were you -- was a wall-off stop, that's what you

11:11AM 20   used in connection with the Vida Loca arrest, correct?

21   A.   Correct.

22   Q.   And why did you want to use a wall-off stop to question

23   Lobo in this case?

24          MR. IOVIENO:  Objection, your Honor.

25          THE COURT:  It doesn't seem relevant.  Sustained.

1          MS. LAWRENCE:  Okay.

2    Q.   So the officers did make an arrest of Lobo that night?

3    A.   Yes.

4    Q.   And why did they arrest him?

5    A.   Illegal possession of a firearm.

6    Q.   Did you respond to Casa Mariachi, that location, that

7    evening?

8    A.   I was on my way.  Once the arrest was made, it wasn't -- I

9    turned around and went to the State Police barracks in Revere

11:12AM 10    and I waited for them there.

11   Q.   Okay.  Did you look for anything that night?

12   A.   Yes, we -- after the -- after he was brought to Revere and

13   I found out that the firearm was missing the clip or the

14   magazine that carries the bullets, myself and Trooper

15   Shawn Riley went back and searched the area of Casa Mariachi

16   and his vehicle for the magazine.

17   Q.   Did you find it?

18   A.   No.

19   Q.   Okay.  After the arrest of Lobo, did you learn anything

11:12AM 20   about the gun that was taken from him?

21   A.   Yes.

22   Q.   What did you learn?

23   A.   During the recorded clique meeting from CW-1, we were made

24   aware that the gun was actually a clique gun.

25   Q.   What is a clique gun in your understanding?

```
 1    A.   My understanding --
 2              MR. IOVIENO:  Objection.
 3              MR. MURPHY:  Objection.
 4              THE COURT:  Sustained.
 5    Q.   Have you heard the term "clique gun" before?
 6    A.   Yes.
 7    Q.   And when have you heard it?
 8    A.   Through the investigation.
 9    Q.   What part of the investigation?
11:13AM 10    A.   Throughout the investigation, we've known about clique
11    guns, not just in this particular event.
12              MS. LAWRENCE:  May I have admitted Exhibit 23, please.
13    Q.   Trooper Estevez, this is a transcript of part of a
14    recording made on February 8, 2015, which is about 10 days
15    after Lobo's arrest and gun seizure.  Is this the clique
16    meeting that you were referring to when you said you learned
17    that the gun that was seized was a clique gun?
18    A.   Yes.
19    Q.   I'd like to read a bit of this starting on page 2.
11:14AM 20              MR. IOVIENO:  Objection.  It's 403.
21              THE COURT:  Overruled.
22    Q.   If you could read the "Lobo" starting in the middle of the
23    page where -- sorry, hold on one second.  I'm sorry.  At the
24    very bottom of 2 where Lobo starts to say, "That was later,"
25    can you read that and continuing onto the first paragraph of
```

1    the other page?

2    A.    I have the transcript here.  Can I read it from here?

3    Q.    Yes, that's fine.

4    A.    Lobo:  "That was later.  When they took me away, they

5    opened the car.  So when I went back, there was a man shoveling

6    snow digging out a car.  When I saw that one was coming towards

7    me and one from the other side, I did this with the magazine.

8    I did this with it and it fell like this to the side in the

9    snow.  I bent over to look for the gun like this and the old

11:15AM 10   man told me where the gun had fallen, otherwise they wouldn't

11   have gotten that gun."

12   Q.    What do you understand Lobo to be talking about when they

13   said, "I did like this" with the magazine?

14   A.    I released the magazine.

15          MR. MURPHY:  Objection.

16          THE COURT:  Overruled.

17   Q.    Can we turn to page 7, now, please.  Toward the top of the

18   page, the third time down where Lobo starts speaking?

19   A.    Yes.

11:15AM 20   Q.    I wanted to talk about that, too.  I'll read the CW-1 part

21   in the middle, just -- so I want you to read that starting

22   there.

23   A.    Okay.

24   Q.    Thank you.

25   A.    Lobo:  "I wanted to talk about that, too.  I was talking

1    with the compadre from whom it was bought, and if I can recover

2    this, I will replace it because I have to get a gun so I will

3    recover it and turn over to the MS-13."

4    Q.    CW-1:  "That's good."

5    A.    Lobo:  "So I was talking to the compadre, and I met with

6    him and told him and he told me he was going to do everything

7    he could.  I can't say an exact date, but perhaps it won't be

8    the same kind, but he did tell me he's going to give me a gun.

9    I will buy it and turn over to you guys."

11:16AM 10    Q.    Okay.  That's fine there.  And what do you understand Lobo

11    to be saying?

12    A.    That he was going to buy a replacement gun.

13    Q.    For the clique?

14    A.    For the clique.

15         MS. LAWRENCE:  One moment, please.  Nothing further,

16    your Honor.

17         THE COURT:  Cross, Mr. Iovieno.

18                    CROSS-EXAMINATION

19    BY MR. IOVIENO:

11:16AM 20    Q.    Good morning, sir.

21    A.    Good morning, sir.

22    Q.    My name is Thomas Iovieno.  I represent Mr. Larios.  You

23    were involved in this investigation for approximately three

24    years?

25    A.    Yes.

```
 1    Q.    And, in fact, I think you testified you had picked up
 2    Pelon at the airport when he first arrived in the
 3    United States?
 4    A.    Yes, sir.
 5    Q.    And you speak fluent Spanish, correct?
 6    A.    I do.
 7    Q.    And I think you testified there was only two, you and
 8    another officer spoke Spanish as part of this investigation?
 9    A.    Correct.
10    Q.    And it's fair to say that you've listened to hundreds of
11    hours of tapes?
12    A.    I've listened to hours and hours of tapes, yes.
13    Q.    And you were able to identify voices and conversations and
14    then relay that to the other members of the investigation,
15    right?
16    A.    Correct.
17    Q.    And I think you said you spoke to CW-1, Pelon, almost
18    daily, but on -- certainly several times a week, right?
19    A.    Yes.
20    Q.    And it's fair to say that you were aware that certain
21    members would commit illegal activity that was not something
22    that benefited MS-13 all the time, correct?
23    A.    Correct.
24    Q.    And you called that "freelancing," is that a term that
25    you're familiar with?
```

```
 1    A.    I'm familiar with the term, yes.

 2    Q.    And that involved drug dealing, correct?

 3    A.    Yeah.

 4    Q.    Okay.  And certain members did certain drug deals for

 5    their own personal benefit, right?

 6    A.    I don't know many that did, but yes.

 7    Q.    But you're familiar with that during the investigation?

 8    A.    Yes.

 9    Q.    And directing your attention, you talked about the
```
11:18AM 10    December 8, 2014 drug protection detail.  And just so we're
```
11    clear, that was the only drug protection detail that involved

12    Mr. Larios, correct?

13    A.    Yes.

14    Q.    Okay.  And you're familiar with a report that was written

15    about this December 14, 2014 protection detail, right?

16    A.    Correct.

17          THE COURT:  I'm sorry.  You may have misspoken the

18    date.

19    Q.    December 8, 2014 drug protection detail.
```
11:19AM 20    A.    Yes.
```
21    Q.    And you're familiar that the investigation, someone wrote

22    a report about this?

23    A.    Okay.

24    Q.    And did you write it?

25    A.    I did not.
```

1    Q.    Okay.  Have you seen it before?

2    A.    Yes.

3    Q.    Okay.  And are you aware that the target of that

4    investigation, the person identified as Lobo was Jose Argueta

5    Rodriguez?

6    A.    Okay.

7    Q.    Are you familiar with that?

8    A.    Not necessarily, but I can see that happening.

9          MR. IOVIENO:  This is just for the witness, your

11:19AM 10    Honor.

11    A.    I see it.

12    Q.    I'd ask you to read the top portion to yourself.

13    A.    Yes.

14    Q.    So does that refresh your recollection whether or not the

15    investigation into the December 8, 2014 had targeted Jose

16    Argueta Rodriguez as Lobo?

17    A.    Yes.

18    Q.    And I think you indicated that -- well, you identified

19    some videos, correct?

11:20AM 20    A.    Yes.

21    Q.    And those are just excerpts of the entire videos, right?

22    A.    Correct.

23    Q.    And it's a pretty lengthy video.  There's different parts

24    of it, but it's pretty long?

25    A.    Yes.

1 Q. And it was the video depicting what was occurring inside

2 CW-1's motor vehicle, right?

3 A. Yes.

4 Q. And you also had cameras -- well, the officers had

5 stationary cameras that could take pictures?

6 A. The surveillance pictures at the end?

7 Q. Yes.

8 A. Yes.

9 Q. And, in fact, those are photographs taken by the

11:20AM 10 investigating team, right?

11 A. Correct.

12 Q. And you also had an audio -- CW-1 was equipped with an

13 audio recorder?

14 A. The vehicle was.

15 Q. And the entire conversations that were inside the motor

16 vehicle were recorded, right?

17 A. As far as I know, yes.

18 Q. And you've identified a portion of them, a snippet of

19 them, right?

11:21AM 20 A. Yes.

21 Q. Okay.  And there's an English translation of the entire

22 transaction, right?

23 A. Correct.

24 Q. And you've seen that?

25 A. Yes.

1    Q.   And you've read that?

2    A.   I have.

3    Q.   And you understand that Lobo, as you refer to him, arrived

4    at the location of the parking lot on his own in another

5    vehicle, right?

6    A.   Yes.

7    Q.   And he was then called over to the vehicle that CW-1 was

8    in, right?

9    A.   Correct.

11:21AM 10   Q.   And that's the photographs that you identified of him

11   walking over early on in the blue jacket?

12   A.   Yes.

13   Q.   And he -- then at some point -- so it's fair to say he

14   wasn't inside the car with CW-1 through the entire transaction,

15   right?

16   A.   Right.

17   Q.   In fact, he was only in the car with CW-1 for a brief

18   period of time, correct?

19   A.   As far as I know, yes.

11:22AM 20   Q.   Prior to the vehicles taking off, right?

21   A.   Yes.

22   Q.   Okay.  And have you reviewed the transcript of the portion

23   where Lobo was inside the motor vehicle?

24   A.   Yes.

25   Q.   And are you aware of the substance of the conversations

1    that CW-1 had with Lobo and the other people inside that motor

2    vehicle?

3    A.    Yes.

4    Q.    Okay.  And it's fair to say at no time during that

5    conversation did CW-1 tell Lobo that he was carrying or picking

6    up 5 kilos of cocaine?

7    A.    No.

8    Q.    And then Lobo got out of the car, right?

9    A.    Yes.

11:22AM 10    Q.    And he got into another car?

11    A.    Yes.

12    Q.    And then the investigation followed the vehicles as they

13    left the parking lot, right?

14    A.    Correct.

15    Q.    And you had cameras with you, right?

16    A.    Yes.

17    Q.    And you followed the vehicles to Saugus?

18    A.    Yes.

19    Q.    And then the vehicles left Saugus and proceeded down I

11:23AM 20    think it was 95 to 93?

21    A.    Yeah.

22    Q.    And then the vehicles -- well, you claim the vehicles went

23    up to New Hampshire, all three vehicles?

24    A.    Correct.

25    Q.    And did you take a photograph of the vehicle you say

1  Mr. Larios was in in New Hampshire?

2  A.   I don't have that photograph, no.

3  Q.   Have you seen a photograph of his vehicle in

4  New Hampshire?

5  A.   No.

6  Q.   And you testified when you came back, do you remember the

7  testimony of the counting of the money?

8  A.   Yes.

9  Q.   And that CW-1 was counting the money inside a car?

11:23AM 10  A.   Yes.

11  Q.   And, in fact, you identified just a snippet of that

12  transaction, right?

13  A.   Correct.

14  Q.   And, in fact, isn't it true, sir, that there's another

15  portion of that video that was not shown to you that shows CW-1

16  calling Lobo, right, on his telephone?

17  A.   Okay.

18  Q.   Because -- have you seen that?

19  A.   Yes.

11:23AM 20  Q.   Okay.  And, in fact, in this video you see him putting the

21  phone down in the center console, right?

22  A.   Uh-huh.

23  Q.   And he had actually called Lobo because he didn't know

24  where he was, right?

25  A.   Yes.  This is at the end?

```
 1    Q.    Yes.

 2    A.    Yes.

 3    Q.    And he wanted to know where are you?

 4    A.    Right.

 5    Q.    And you heard that in Spanish, right?

 6    A.    I believe so, yeah.

 7    Q.    Okay.  Come over to the car?

 8    A.    This is at the end?  Yeah.

 9    Q.    Do you remember, could you hear what the speaker on the

11:24AM 10   other end of the telephone call was saying?

11    A.    I don't recall by memory exactly.

12    Q.    But it was difficult to hear because it was not picked up

13    by the recorder; is that fair to say?

14    A.    Yes.

15    Q.    So Lobo was not around at the end when they were counting

16    the money until later on, right?

17    A.    Correct.

18          MR. IOVIENO:  One moment, your Honor.

19    Q.    Now, you testified that when you went back and searched

11:24AM 20   the area where Mr. Larios was arrested with the firearm, you

21    found no ammunition and no clip?

22    A.    Correct.

23    Q.    And you went back that night?

24    A.    Yes.

25    Q.    And the information you got about the gun came directly
```

1    from CW-1, right?

2    A.   Yes.

3    Q.   And did you learn in your investigation that throughout

4    the course of your interactions with CW-1 that he was truthful

5    and honest with you on all occasions?

6    A.   Did I?

7    Q.   Yes.

8    A.   Yeah, I mean I --

9    Q.   You never learned any information that he had committed

11:25AM 10   any illegal acts?

11   A.   Yes.

12   Q.   And so he never told you that during your conversations,

13   did he?

14   A.   Correct.

15           MR. IOVIENO:  Thank you.

16           MR. MURPHY:  Your Honor, may we approach?

17           THE COURT:  Yes.

18           (THE FOLLOWING OCCURRED AT SIDEBAR:)

19           MR. MURPHY:  If I understand correctly, the

11:25AM 20   government --

21           THE COURT:  Hold on.

22           MR. MURPHY:  Sorry.  The government intends to call

23   this witness later as well.

24           MS. LAWRENCE:  Yes, exactly.

25           MR. MURPHY:  So I just want to make sure.  I don't

1    have many questions anyway, but I'd just like to ask them all

2    once after his second round of testimony, if that's consistent

3    with the Court's wishes.

4         THE COURT:  That's fine.

5         MR. IOVIENO:  My understanding is he's coming back up.

6         MR. LOPEZ:  When he comes back, is he going to testify

7    about the May 12th Highland Park stabbing?

8         MR. POHL:  No.

9         MR. MURPHY:  That's my point is that I should be able

11:26AM 10    to ask about on either round.

11         THE COURT:  In other words, let's say he testifies A,

12    B today, comes back in a couple days, testifies C, D.  You can

13    defer and cross-examine him on A, B, C, D on the second day.

14         MR. MURPHY:  Exactly, your Honor.

15         MR. LOPEZ:  I believe he had a very important

16    conversation with CW-1 the evening of May 12, 2015 that I want

17    to inquire into.

18         THE COURT:  You don't have to defer, you can ask now.

19         MR. LOPEZ:  I'll defer, but I just want to be able to

11:27AM 20    be sure that I can inquire about that.

21         MR. POHL:  We've represented that we will call him

22    twice, so you're not going to miss having a chance to ask him

23    questions if you don't ask them now.

24         THE COURT:  If for some reason they don't, you can

25    call him as your own witness if something happens.

1          MR. POHL:  Our next, when we're done with that --

2          MR. LOPEZ:  I don't have much.

3          THE COURT:  Are you going to cross him now?

4          MR. LOPEZ:  Just a couple of questions.

5          THE COURT:  All right.  Let's get it done and let's --

6     we're losing all kind of time on these breaks, so let's just

7     keeping pressing forward.

8          MR. POHL:  Okay.  Thank you.

9          (SIDEBAR CONFERENCE WAS CONCLUDED)

11:27AM 10          THE COURT:  All right.  Mr. Norkunas.

11                        <u>CROSS-EXAMINATION</u>

12    BY MR. NORKUNAS:

13    Q.   Good morning, Trooper.  I had to check to make sure it's

14    still morning.

15    A.   Good morning, sir.

16    Q.   In relation to the February, 2014, what you called a

17    protection detail, you were present during that detail,

18    correct?

19    A.   Yes.

11:28AM 20    Q.   And you've had an opportunity prior to coming in here

21    today to refresh your memory or to look at reports that were

22    done from that era; would that be fair to say?

23    A.   Yes.

24    Q.   Granted, they're four years ago, everybody would need to

25    refresh their memory --

1   A.   Of course.

2   Q.   -- of what had taken place.  And one of the reports was

3   done also by a -- if I can have the right name, David

4   Cedarleaf -- Cedarleaf?

5   A.   Yes.

6   Q.   Is he a trooper that was working with you?

7   A.   No, he's an FBI agent.

8   Q.   Okay.  And would it be fair to say that when you were

9   taking your observations of the activities that were going to

11:29AM 10   take place on that day that initially Cesar Martinez shows up

11   in what turns out to be a rental car with another individual to

12   meet with CW-1 and Muerto?

13   A.   Correct.

14   Q.   And either in reviewing the tapes -- let me strike that.

15   Were you contemporaneously able to hear the conversations of

16   CW-1 and Muerto that day as they were taking place?

17   A.   I don't believe that day, no.  I don't remember that.

18   Q.   So, when you heard conversations, they would have been

19   from the recordings afterwards?

11:30AM 20   A.   Yes.  I know on one of the protection details we did have

21   an active listening device, but I don't remember which one it

22   was.

23   Q.   Okay.  If I showed you a report from that date, might that

24   refresh your memory of whether that was the incident -- that

25   was the event?

```
 1    A.    Sure.

 2    Q.    February 14th?

 3              MR. NORKUNAS:  May I approach briefly?

 4              THE COURT:  Yes.

 5    A.    Yes.

 6    Q.    Having looked at that, would that refresh your memory of

 7    whether it was the February 14th event?

 8    A.    Yes.

 9    Q.    Where you were able, that time, to --

10    A.    Yes.

11    Q.    -- contemporaneously hear what was being said?

12    A.    Correct.

13    Q.    And actually that report reflects someone was writing down

14    times with events as well, correct?

15    A.    Yes.

16    Q.    In relation to that event, it was clear that CW-1 and

17    Muerto, as you were listening to it, were having some problems

18    with Mr. Martinez and his performance, right?

19    A.    Correct.

20    Q.    They wanted him to do something different than he was

21    doing, correct?

22    A.    Yes.

23    Q.    And when the two cars arrived -- it was Derry,

24    New Hampshire you went to, right?

25    A.    I believe so, yes.
```

1    Q.   When you arrived there, Mr. Martinez parks in a completely

2    different area than where CW-1 and Muerto went to meet your

3    other agent, correct?

4    A.   Correct.

5    Q.   And, again, the transaction starts in Saugus where there

6    is an undercover agent giving a package to CW-1, correct?

7    A.   Correct.

8    Q.   And then when you get to Derry, New Hampshire, there's

9    another undercover officer receiving that package and giving

11:32AM 10    money to -- I believe it was CW-1, correct?

11   A.   Correct.

12   Q.   Okay.  Relative to that incident, were there either a

13   video or any photographs showing either CW-1 or Mr. Muerto

14   actually handing cash to Cesar Martinez?

15   A.   No, I don't think so.

16   Q.   Now, in fact, after the cash comes into the car with

17   Muerto and CW-1, Mr. Martinez leaves the parking lot on his

18   own, correct?

19   A.   Yes.

11:32AM 20   Q.   He ends up you have some sort of -- the person that

21   receives the package from you, he starts tailing that person,

22   right?

23   A.   Correct.

24   Q.   Which is -- again, is an undercover officer, correct?

25   A.   Yes.

1   Q.   Now, prior to that incident taking place, you gave some

2   instructions to CW-1 the night before in regard to Muerto,

3   correct?

4   A.   I don't recall that.

5        MR. NORKUNAS:  If I may approach again?

6        THE COURT:  Yes.

7   Q.   I'm going to use the camera, it might be easier.  When the

8   event was over, do you hand CW-1 something?  Do you give him

9   back a knife?

11:33AM 10   A.   I didn't personally, no.

11   Q.   Did you know that that had occurred?

12   A.   Yes.

13   Q.   And whose knife was it?

14   A.   I don't recall.

15   Q.   Was it Muerto's knife?

16   A.   I don't recall.

17        MR. NORKUNAS:  If we could just have this for the

18   witness.

19   Q.   I'd ask you, sir, if you look at the time that's reflected

11:34AM 20   there is 3:22 p.m.?

21   A.   I see it.

22   Q.   If you would read that to yourself for a moment.

23   A.   Yes.

24   Q.   Would that refresh your memory as to whose knife was given

25   to CW-1?

1    A.   Correct.

2    Q.   It would have been Muerto's, right?

3    A.   Correct.

4    Q.   And had you, in fact, given instructions to CW-1 the night

5    before to make sure that he was able to get Muerto's knife from

6    him?

7    A.   I don't recall that either.

8         MR. NORKUNAS:  Again, just for the witness.

9    Q.   If you look at the top -- and at some point in time if you

11:35AM 10   read that to yourself beginning with CHS.  CHS is CW-1,

11   correct?

12   A.   Correct.  I see that.

13   Q.   And it's fair to say -- does that refresh your memory that

14   CW-1 obtained Muerto's knife the night before and gave it to

15   your task force?

16   A.   Correct.

17   Q.   Do you recall what type of knife it would have been?

18   A.   I never handled the knife.

19   Q.   And would that have been because you were concerned for

11:35AM 20   the safety of CW-1?

21   A.   The knife?

22   Q.   By Muerto, right?

23   A.   Correct.

24   Q.   Now, when this -- you indicated also that when the

25   incident was over, there was then a debriefing of CW-1,

```
 1  correct?

 2  A.   Yes.

 3  Q.   And as part of that, do you remember or do you recall that

 4  CW-1 told you that Muerto had called him and said that Checha

 5  was out and that we won't be using him anymore?

 6  A.   Yes.

 7  Q.   And, in fact, on the two subsequent protection details,

 8  Mr. Martinez is not involved at all, right?

 9  A.   Correct.

10  Q.   Now, in terms of your involvement within the task force,

11  do you have a recollection that Mr. Muerto was an individual

12  that, in fact, sold crack cocaine to undercover agents?

13  A.   Yes.

14  Q.   I'm sorry.

15  A.   Yes.

16  Q.   And that that sale of his by Muerto to undercover agents

17  been taking place for several years?

18  A.   I don't remember exactly how long it was taking place, but

19  I do remember him being involved in that.

20  Q.   And if I showed you another document, see if this

21  refreshes your recollection, excuse me.  I'll get the word out

22  eventually.  Looking at that, particularly the date on the top,

23  would that refresh your memory as to -- at least from 2014 on?

24  A.   Yes.

25  Q.   And those were direct sales by Mr. Muerto to undercover
```

11:36AM (line 10)
11:37AM (line 20)

1   operatives, correct?

2   A.   I don't believe they were direct sales.

3   Q.   Pardon me?

4   A.   I don't believe they were direct sales.  I believe he

5   bought it from somebody else or middled it is my recollection

6   of it.

7   Q.   If -- the highlighted portion here, if you could read that

8   to yourself.

9   A.   Yes.  I see that.

11:38AM 10   Q.   Okay.  And UCE would have been your undercover officer,

11   correct?

12   A.   Correct.

13   Q.   And he was buying directly from Mr. Muerto, correct?

14   A.   Correct.

15   Q.   And that was at least in 2014 and you have no basis to

16   know it did not discontinue after that, correct?

17   A.   I know it stopped at some point.  I don't know how long it

18   went for.

19   Q.   Now, as part of the investigation that you had ongoing,

11:39AM 20   did you ever determine whether Cesar Martinez had any tattoos?

21   A.   Tattoos?

22   Q.   Tattoos.

23   A.   I did not personally, no.

24   Q.   Did you ever come to find out if he had any tattoos?

25   A.   Maybe other agents on the task force, but not myself

          1    personally.

          2    Q.   And, again, this was an investigation that began in 2012,

          3    right?

          4    A.   2014.

          5    Q.   Did it begin in December of 2012 initially?

          6    A.   I don't believe so.

          7    Q.   Did Sergeant Millett began an investigation in

          8    September of 2012?  You don't have a memory of that, correct?

          9    A.   No.

11:39AM  10    Q.   Okay.  But as the investigation began, did you look into

         11    who these people were that you were investigating?  Can you

         12    tell us the individuals, did you make a determination who

         13    Cesar Martinez was?

         14    A.   I didn't personally.  I mean, we tried.  Yeah, we tried to

         15    get as much information as we can.

         16    Q.   Okay.  And did you receive any type of --

         17         MR. NORKUNAS:  For the witness only again, please.

         18    Q.   Did you receive any type of documentation as to where

         19    Cesar Martinez had been living from 2008 forward?

11:40AM  20    A.   I have never seen that document before.

         21    Q.   I'm sorry.

         22    A.   I've never seen that document before.

         23    Q.   I'm just asking if that would refresh your memory, if you

         24    had seen such a document.

         25    A.   I have not.

1    Q.   Did you make any -- were you able to make any

2    determination as to where he had been living say in 2008?

3    A.   I have not.

4    Q.   And, again, you had a comprehensive North Shore Gang Task

5    Force, correct?

6    A.   Correct.

7    Q.   Within that you had representatives from Homeland

8    Security, correct?

9    A.   Yes.

11:41AM 10    Q.   Carolyn Scott, was she Homeland Security?

11    A.   I don't know who that is.

12    Q.   Okay.  And if you needed documents relative to any

13    individuals from Homeland Security, you asked that person, can

14    you get us these documents, correct?

15    A.   We had a representative, yeah.  We would ask.  Yeah.

16    Q.   Right.  And if you wanted to know if there was

17    documentation on a particular person either as to their

18    immigration status or where they were living or had reported

19    living in a particular year, you could obtain that, correct?

11:41AM 20    A.   Yes.

21         MR. NORKUNAS:  Judge, may I be seen for a moment at

22    sidebar?

23         THE COURT:  Okay.

24         (THE FOLLOWING OCCURRED AT SIDEBAR:)

25         THE COURT:  Yes.

1          MR. NORKUNAS:  Judge, this is a copy of a form for a

2     work authorization that was filed in 2008 by Mr. Martinez which

3     shows that he was living in Revere.  I don't believe the

4     government is contesting the validity of the document, and what

5     I would be seeking to do at this point in time, although he

6     cannot specifically identify it, the government is not

7     challenging the validity, I offer this.

8          MR. POHL:  Mr. Norkunas and I conferenced this issue

9     prior to today, and I advised him and he's represented

11:42AM 10     correctly that we certainly weren't going to ask for a Keeper

11     of the Records or something to authenticate the document, that

12     I'm sure it's authentic.  We told him then and I would say

13     again now that I don't see the relevance of the document, and

14     we'd object on those grounds for it to be admitted.

15          THE COURT:  I guess I don't see the relevance unless

16     it's tied into something.

17          MR. NORKUNAS:  May I address that?

18          THE COURT:  Yes.

19          MR. NORKUNAS:  The relevance would be that it would

11:43AM 20     come in as a business record, and it shows that he is

21     representing to a government agency that he lived in Revere,

22     when Mr. Muerto in 2008 was contending that he lived in East

23     Boston, and, therefore, was able to do some sort of violent act

24     at Maverick Street Station.

25          THE COURT:  But you didn't use it with Muerto, you're

1    using with this guy who said he's never seen it before, so

2    let's do this.  Asking this witness about it isn't going to do

3    any good.  He's said he's never seen it before.  Let's talk

4    about this later.

5            And I'm seeing you every morning at 8:30 not to get

6    you out of bed early but because I want to minimize sidebars,

7    and we keep having sidebar conferences about things that we

8    could take up in the morning, okay, and this is a good example

9    of it.  We're bogging down in the conferences, but I'm not

11:43AM 10   excluding it.  It just it seems to me that it certainly isn't

11   relevant to this witness, and so let's take it up at the break.

12           (SIDEBAR CONFERENCE WAS CONCLUDED)

13           THE COURT:  Go ahead, Mr. Norkunas.

14           MR. NORKUNAS:  Thank you, Judge.

15   Q.   Now, you've indicated that you had listened to a number of

16   the CDs in this case; is that correct?

17   A.   Yes.

18   Q.   Did you listen to or can you recall if you had listened

19   to --

11:44AM 20           MR. NORKUNAS:  If I could see 207, please, for the

21   witness.

22   Q.   Do you recall if you had listened to a CD involving an

23   ESLS meeting on January 8, 2016?  That was the Animal beating

24   as it's being referred to.

25   A.   Yes.

1    Q.   And did you have an opportunity to initially listen to

2    that in Spanish?

3    A.   Correct.

4    Q.   And then had you had an opportunity to consider -- and you

5    were able to identify speakers within that from your

6    familiarity with different people?

7    A.   Yes.

8    Q.   And if I may show the witness.  Sir, do you recall from

9    your -- excuse my voice.  Can you recall, sir, that there had

11:46AM 10   been a discussion in that meeting in which CW-1 was attempting

11   to chastise Mr. Martinez?

12        MS. LAWRENCE:  Objection, your Honor.  I don't believe

13   he established a foundation that this witness has read that

14   transcript as opposed to listening to the recording.

15        THE COURT:  Well, I didn't quite hear all that, but he

16   did say that he listened to the recording, so he's asking a

17   question about a subject matter.  I'll allow that.  Go ahead.

18   Q.   Do you recall part of that recording you had listened to,

19   Trooper, in which CW-1 was having a conversation and citing

11:46AM 20   specifics to Mr. Martinez and chastising him?

21   A.   Yes.

22   Q.   And is it fair to say that he was chastising him about

23   Mr. Martinez having openly spoken to he, CW-1, several days

24   before that he was tired of the young people coming in and

25   causing problems for the shop, he said, right?

A.   I don't remember the details.  I remember the incident.

Q.   Well, again, does that -- the page I've put in front of you, does that refresh your memory if you read the bottom portion, CW-1?

A.   Yes.

Q.   And showing you again another portion from CW-1 of that same transcript, the ensuing page, if you read that to yourself beginning here --

THE COURT:  Is this Exhibit 122 or is this not in evidence?

MR. NORKUNAS:  This portion of it is not, Judge.  I could move these two pages into evidence.  It would perhaps save some time.

MS. LAWRENCE:  We would object as far as CW-1's statements don't come in for the truth, so I'm not sure what the point of admitting it in substantive evidence would be.

THE COURT:  Let's just do it this way for now.

Q.   Does that refresh your memory that Mr. Martinez had spoken up to the group about bringing in the young kids who were causing problems for his shop?

A.   Yes.

Q.   And when he says his shop, did you come to know that he was running some sort of mechanical tow business out of Mr. Gonzalez' shop?

A.   I didn't personally know that, no.

1    Q.   And had CW-1 come and debriefed you on that at all prior

2    to the meeting with Animal in the shop that there were

3    problems?

4    A.   No.

5         MR. NORKUNAS:  Judge, at this point in time I would

6    have no further questions.

7         THE COURT:  Okay.  All right.  Mr. Murphy.

8         MR. MURPHY:  No questions at this time, your Honor.

9         THE COURT:  Mr. Lopez.

11:49AM 10    MR. LOPEZ:  Your Honor, just a few questions.

11                    CROSS-EXAMINATION

12   BY MR. LOPEZ:

13   Q.   Good morning, Trooper Estevez.

14   A.   Good morning, sir.

15   Q.   My name is Scott Lopez, I represent Mr. Guzman.  You

16   earlier in your testimony made a distinction between a

17   confidential informant and a cooperating witness?

18   A.   Correct.

19   Q.   And a confidential informant is someone that you use after

11:50AM 20   a crime has been committed?

21   A.   It's a person that gives information.

22   Q.   But usually it's someone --

23   A.   It could be before, it could be after, it could be during.

24   Q.   Whereas a cooperating witness is someone who proactively

25   goes out and gathers evidence for you?  Yes?

1    A.    Yes.

2    Q.    Okay.  Now, you talked about the arrest of Vida Loca and

3    you spoke about a procedure you use which you called a

4    wall-off?

5    A.    Yes.

6    Q.    And the shooting occurred on December 14th, right?

7    A.    Yes.

8    Q.    The arrest occurred on December 16th?

9    A.    Correct.

11:51AM 10    Q.    And you didn't write any reports about that arrest, did

11    you?

12    A.    No.  I did not arrest him.

13    Q.    But a Benjamin Wallace did?

14    A.    Okay.

15    Q.    And who's Benjamin Wallace?

16    A.    He's an FBI agent.

17    Q.    And did he talk to you about the information he was

18    gathering before writing his report?

19    A.    No.

11:51AM 20    Q.    And do you recall an interview in February of 2015 with

21    the confidential witness we've heard in this case was called

22    Mako or Pelon?

23    A.    You'd have to be more specific.

24    Q.    Okay.  Well, do you know whether or not there was an

25    interview of the confidential informant where Assistant U.S.

1    Attorney Peter Levitt was present, Special Agent Benjamin

2    Wallace was present, Massachusetts State Police Trooper Mario

3    Millet, who I believe you said is your supervisor --

4    A.    Yes.

5    Q.    - was present, And the linguist Deborah Huacuja was

6    present, as well as the confidential informant?

7    A.    I wasn't there though, right?

8    Q.    Now, I think you testified that the confidential informant

9    contacted you upon learning from Crazy that he wanted -- that

11:52AM 10   Crazy wanted to move Vida Loca out of the state?

11   A.    Yes.

12   Q.    Right?  And you decided that a wall-off was the best way

13   to accomplish that?

14   A.    The task force did.

15   Q.    What's that?

16   A.    The task force.

17   Q.    The task force.  Well, were you involved in that decision

18   making?

19   A.    Yes.

11:53AM 20   Q.    And that was your preferred approach because you wanted to

21   stop the car for a legitimate reason to protect CW-1?

22   A.    Right, MS-13 is known for killing their informants, so we

23   wanted to make sure that didn't come back to him.

24           MR. MURPHY:  Objection, your Honor, motion to strike.

25           THE COURT:  Well, I'll let it stand.  Overruled.

1    Q.   The pretext was that there was going to be a broken tail

2    light or a tail light that wasn't working?

3    A.   Right, a tail light wasn't working.

4    Q.   A tail light, in fact, wasn't working?

5    A.   Correct.

6    Q.   And did you later learn that it was the confidential

7    informant Pelon or Mako who actually unscrewed the brake light

8    on his vehicle prior to the stop?

9    A.   So I heard about that, but I don't believe that to be

11:53AM 10    true.

11    Q.   So what CW-1 told Special Agent Wallace you don't believe

12    to be true?

13    A.   I don't know what he told him or not.

14    Q.   Well, do you know that he also told him that prior to

15    the -- prior to the traffic stop and Vida Loca's arrest in this

16    investigation, CS1 or CW-1 did tell Trooper Estevez that his

17    brake light was not working?

18    A.   Can you repeat that?

19         MS. LAWRENCE:  Objection, your Honor.

11:54AM 20         THE COURT:  Sustained.

21    Q.   Do you recall CW-1 telling you before the wall-off stop

22    that his brake light was not working?

23    A.   I made the observation of his brake light not working

24    prior to anybody telling me, or any bulbs being taken out.  I

25    don't know anything about that, but I made the observation that

1    his brake light wasn't working, and I relayed that information

2    to surveillance.

3    Q.   And did you know that CW-1 stated that he unscrewed the

4    brake light so that, in CSI's mind or CW-1's mind, law

5    enforcement would have a legitimate reason to stop his vehicle

6    if Vida Loca was in the car?

7             MS. LAWRENCE:  Objection.

8             THE COURT:  Sustained.  You already asked him that.

9    Q.   Did anyone ever tell you that that's what CW-1 told

11:55AM 10   Special Agent Wallace after the fact?

11            MS. LAWRENCE:  Objection.

12            THE COURT:  Sustained.

13            MR. LOPEZ:  Well, can I have the document camera.

14            THE COURT:  You're asking this witness about something

15   CW-1 said to someone else when he wasn't there, so I don't see

16   how you're going to get there.

17   Q.   Well, you have reviewed all the reports that have been

18   written in this case, right?

19   A.   Not all of them.

11:56AM 20   Q.   You haven't?

21   A.   Not every report, no.

22   Q.   No?  And I take it that you haven't actually reviewed the

23   report that detailed the arrest of Vida Loca that you just

24   testified about?

25   A.   I didn't write that report.

1    Q.    But did you review the report, sir?

2    A.    I did not, sir.

3    Q.    So it's your testimony here today that you came in to

4    testify about an event that happened in December of 2014 and

5    you didn't review every report written about that event?

6    A.    I'm only talking about what I know and what I did, so I

7    don't know why I would need to read somebody else's report.

8    Q.    Sir, the question is did you review all of the reports

9    related to Vida Loca's arrest on December 16, 2014?

11:56AM 10    A.    No.

11          MR. LOPEZ:  No further questions, your Honor.

12          THE COURT:  Redirect.

13          MS. LAWRENCE:  Yes, please.

14                    REDIRECT EXAMINATION

15    BY MS. LAWRENCE:

16    Q.    Trooper Estevez, you were asked a question or two on

17    cross-examination and were shown a report about the December 8,

18    2014 drug protection detail and an individual was listed there

19    by the name of Jose Argueta Larios, a.k.a Lobo?

11:57AM 20    A.    Correct.

21    Q.    Was the Lobo that you saw when you were conducting

22    surveillance of the December 8, 2014 drug protection detail the

23    same Lobo you've identified here in court today?

24    A.    Yes.

25    Q.    Okay.  You also were asked some questions about where Lobo

1  was located at the end -- toward the end of the drug protection

2  detail, that you had seen him outside the car?

3  A.   Yes.

4  Q.   And that you saw him on the video inside CW-1's car for a

5  short period of time?

6  A.   Right.

7  Q.   What happened while Lobo was in the car with CW-1 at the

8  end of the drug protection detail?

9  A.   He was paid.

11:57AM 10  Q.   And why did he get paid?

11  A.   For being present for the drug protection detail.

12  Q.   Okay.  You were also asked a question or two about the

13  February 14, 2014 protection detail and specifically about a

14  statement that Muerto might have made about not inviting Checha

15  back to do another drug protection detail?

16  A.   Correct.

17  Q.   To your knowledge, did Checha ever say that he did not

18  want to participate in another protection detail?

19  A.   No.

11:58AM 20  Q.   Okay.  And also in that February 14 protection detail, you

21  were on surveillance, yes?

22  A.   Yes.

23  Q.   Okay.  And you were asked some questions about how

24  Checha's car pulled off and followed a different car on the

25  return trip to Massachusetts; is that right?

1    A.   Correct.

2    Q.   Okay.  Did you in the course of surveillance see what

3    happened to Checha's car after it left trailing CW-1's car?

4    Did he rejoin the group, is my question?

5    A.   Yes.

6    Q.   Okay.  And did he arrive back in Massachusetts together

7    with CW-1?

8    A.   Yes.

9         MS. LAWRENCE:  Okay.  Nothing further, your Honor.

11:59AM 10         THE COURT:  Any recross?

11         MR. NORKUNAS:  Very brief, Judge.  If I may do it from

12    here?

13         THE COURT:  Yes.

14                        RECROSS-EXAMINATION

15    BY MR. NORKUNAS:

16    Q.   Trooper, you never had any conversation with Mr. Martinez

17    after February 14, 2014, correct?

18    A.   Correct.

19    Q.   And to your knowledge CW-1 never had any conversation with

11:59AM 20    him in terms of participating in a protection detail that you

21    were aware of or heard recorded, correct, after February 14,

22    2014, correct?

23    A.   Correct.

24    Q.   And nor did you ever hear any recorded conversations with

25    Mr. Muerto after he had told CW-1 that Checha is fired about

1    Mr. Martinez participating in any further protection details,

2    correct?

3    A.   Correct.

4         MR. NORKUNAS:  Thank you, Judge.

5         THE COURT:  All right.  Thank you, you may step down.

6    We'll take a break.

7         THE CLERK:  All rise.

8         (A recess was taken.)

9         THE CLERK:  All rise for the jury.

12:14PM 10      (JURORS ENTERED THE COURTROOM.)

11        THE CLERK:  Thank you.

12        THE COURT:  Mr. Pohl.

13        MR. POHL:  Thank you, your Honor.  The government

14   calls Scott Conley.

15        SCOTT CONLEY, having been duly sworn by the Clerk,

16   testified as follows:

17                      DIRECT EXAMINATION

18   BY MR. POHL:

19   Q.   Good afternoon, sir.

12:14PM 20   A.   Good afternoon.

21   Q.   Could you please introduce yourself to the ladies and

22   gentlemen of the jury.

23   A.   My name is Scott Conley, C-o-n-l-e-y.

24   Q.   Where do you work?

25   A.   In the Chelsea Police Department.

1    Q.    How long have you worked for the Chelsea Police

2    Department?

3    A.    Approximately 23 years.

4    Q.    And what's your rank?

5    A.    I'm a detective.

6    Q.    In addition to your work with the Chelsea Police

7    Department, do you work on a federal task force?

8    A.    Yes, I do.

9    Q.    And what is that?

12:15PM 10    A.    I'm a task force officer with the Federal Bureau of

11    Investigation Gang Task Force here in Boston.

12    Q.    How long have you been a member of the FBI Gang Task

13    Force?

14    A.    Approximately 14 years.

15    Q.    Detective Conley, you participated, through the task

16    force, in an investigation into MS-13; is that correct?

17    A.    Yes, I did.

18    Q.    All right.  And I'd like to ask you a few questions about

19    a particular day, which is February 14, 2014.  Do you remember

12:15PM 20    if you were working on that day?

21    A.    Yes, I do.

22    Q.    All right.  And do you remember what you and the task

23    force -- what investigative technique you and the task force

24    utilized that day?

25    A.    Yes, we were conducting an operation, a surveillance

1    operation that involved what we called a protection detail

2    doing the surveillance on the transport of narcotics.

3    Q.    Okay.  And to be clear, the task force utilized this on I

4    think three different occasions; is that correct?

5    A.    Yes, it is.

6    Q.    All right.  And did you participate in all three?

7    A.    Yes, I did.

8    Q.    All right.  I'm just going to ask you about the

9    February 14th, 2014 protection detail here.  What was your job

12:16PM 10    that day?

11    A.    I was one of the surveillance vehicles.

12    Q.    And do you recall, Detective Conley, sort of how the

13    protection detail unfolded on February 14, 2014?

14    A.    I do.

15    Q.    All right.  What can you tell the jury?

16    A.    The cooperating witness would meet task force officers at

17    a predetermined location.  There would be some administrative

18    things that would take place then to include the searching of

19    the vehicle and searching of the cooperating witness.  Contact

12:17PM 20    would be made and sometimes prearranged on which individuals

21    were going to be participating in the protection detail.

22         On this day, I believe, there were two additional

23    individuals.  We would have -- we would have an operations

24    order kind of given out at that time at the predetermined

25    location and then surveillance vehicles would then be

         1   dispatched to specific locations.

         2   Q.   Okay.  And that happened that day, correct?

         3   A.   Yes, it did.

         4   Q.   And where did you go sort of at the beginning of the

         5   investigation -- at the beginning of the protection detail,

         6   what was your -- where did you travel to?

         7   A.   I was one of the surveillance vehicles that traveled in

         8   the area of Central Ave. in Chelsea, Massachusetts.

         9   Q.   Okay.  And did you identify the parties that were going

12:17PM 10   with CW-1 on the February 14, 2014 protection detail?

        11   A.   Yes.

        12   Q.   Who were they?

        13   A.   Muerto and Checha.

        14   Q.   Do you see Checha in court today?

        15   A.   I do.

        16   Q.   All right.  Could you point him out to the ladies and

        17   gentlemen of the jury?

        18   A.   Yes, he's the gentleman sitting at the table.  He has

        19   black hair, looks like a checkered shirt and a tie.

12:18PM 20   Q.   All right.  Thank you.

        21        MR. POHL:  I'd ask that the record reflect that

        22   Detective Conley has identified Mr. Martinez.

        23        THE COURT:  Yes.

        24        MR. POHL:  Thank you.

        25   Q.   All right.  So, do you remember where the first

1    time -- well, did you see Cesar Martinez on February 14, 2014?

2    A.   I did.

3    Q.   When was the first time you remember seeing him?

4    A.   I believe it was 118 Central Ave. in front of a house on

5    Central Ave.

6    Q.   Okay.  And walk the jury through what you did next that

7    day.  Where did you go once you saw Cesar Martinez?

8    A.   I continued to do the surveillance along with other task

9    force agents.  The surveillance brought us through Chelsea up

12:19PM 10   Route 1, north towards the Kowloon Restaurant on Route 1 in

11   Saugus.

12         There was a brief stop there where surveillance

13   continued.  Vehicles then left that location and headed up

14   towards Salem, New Hampshire where the surveillance again

15   continued.  They met additional parties, narcotics were

16   exchanged, and then we headed back down 93 south towards I

17   believe Somerville.

18   Q.   And how many cars were you surveilling on that day?

19   A.   I was surveilling two.

12:19PM 20   Q.   All right.  And one of them involved the car driven by

21   CW-1?

22   A.   That's correct.

23   Q.   What about the second car?

24   A.   The second car was operated by Checha, Cesar Martinez.  I

25   believe it was a blue Honda.

1   Q.   And sort of where was that car during your surveillance

2   activities that day as it followed, starting in Saugus, heading

3   up to New Hampshire and then on the way back?

4   A.   The second car was conducting surveillance for the first

5   car, so the blue Honda that was operated by Checha was

6   conducting surveillance for the second car, which was operated

7   by the cooperating witness.

8   Q.   And inside that car with the cooperating witness was who?

9   A.   Muerto.

12:20PM 10   Q.   All right.  So, Detective Conley, what kind of car were

11   you driving that day on February 14, 2014.  Do you remember?

12   A.   I do.

13   Q.   What was it?

14   A.   It was a dark-colored Ford F150 pickup truck.

15   Q.   Okay.  And when you're conducting a surveillance on an

16   operation like this, is it fair to say that you want -- you're

17   not using a marked police car; is that correct?

18   A.   That's correct.  We use unmarked police vehicles.

19   Q.   And do you recall, Detective Conley, whether the Ford

12:20PM 20   pickup truck that you were operating that day, whether it did

21   or did not have a front license plate?

22   A.   I do.

23   Q.   What do you remember about the license plate?

24   A.   I did not have a front license plate.

25        MR. POHL:  Can I have Exhibit 56.3, which is in

1    evidence.

2         Your Honor, ladies and gentlemen of the jury, that's a

3    transcript.  If you want to pull that out of your binders.  And

4    your Honor, at this time -- I think we discussed this earlier

5    this week, but I'd like to just notice a stipulation of the

6    parties concerning this particular page.  And that is that

7    while the content of this call, I think, has been the subject

8    of earlier testimony, that the top section concerning times and

9    the phone numbers, during the course of the trial, the parties

12:21PM 10   noted a typographical error.

11         I don't think there's been any testimony about the top

12   of the page, but to the extent the jurors may have made a note

13   about the top of the page before today that the parties

14   stipulate and agree that that page was swapped out.  This page

15   is correct and the parties have entered this as an amended

16   exhibit.

17              THE COURT:  All right.

18              MR. POHL:  Thank you.

19              THE COURT:  And that went to one of the phone numbers?

12:22PM 20              MR. POHL:  That's correct.

21              THE COURT:  Okay.  Go ahead.

22   Q.   All right.  So, Detective Conley, can you see that?

23              MR. POHL:  Can I have the document camera for the

24   witness.

25              THE CLERK:  Just the witness?

1          MR. POHL:  No, this is in evidence.  Thank you.

2     Q.   Can you see that, Detective?

3     A.   Yes, I can.  Thank you.

4     Q.   All right.  So, first of all, let me ask you a couple

5     questions about the top of the page, all right.  Are you aware

6     during the course of this investigation whether the cooperating

7     witness had something called a consensual T3 or Title III on

8     his phone?

9     A.   Yes, I am aware of that.

12:23PM 10  Q.   And in layman's terms, what does that mean?

11    A.   We are monitoring his phone calls.

12    Q.   So all the calls that came into that phone were recorded?

13    A.   That's correct.

14    Q.   And it recorded the phone numbers that came in, correct?

15    A.   Yes.

16    Q.   And the phone numbers that CW-1 called out on?

17    A.   That's correct.

18    Q.   And so on the top of this page is an incoming telephone

19    number.  Do you recognize that?

12:23PM 20  A.   I do.

21    Q.   And so incoming would be from another phone number coming

22    into CW-1's phone?

23    A.   That's correct.

24    Q.   All right.  And the incoming telephone number on this page

25    is 781-521-8365; is that correct?

1    A.   Yes, sir.

2    Q.   All right.  And the telephone number to the right of that

3    target, is that CW-1's phone, or the one that was used in this

4    case?

5    A.   Yes, it is.

6    Q.   All right.  That has a date, correct, February 14, 2014?

7    A.   That's correct.

8    Q.   And a time of -- a military time of 15:01:33 which is just

9    after 3:00, correct?

12:24PM 10    A.   That's correct.

11    Q.   All right.  I'm going to read CW-1.  Detective Conley, I'd

12    ask you to read the portion that's been previously identified

13    as the voice of Cesar Martinez, Checha.

14         CW-1:  "What's up?  What's up, Checha, Checha.  What's

15    going on?"

16    A.   "There goes the truck and the -- again along Central

17    Street, man."

18    Q.   CW-1:  "Don't fuck with me.  Where is the truck?"

19    A.   "It's on Central Street right now.  I'm telling you, I

12:24PM 20    just saw it.  As I was coming down, it's on Central Street

21    right now, dude."

22    Q.   CW-1:  "Well I'm here already on Central Street, dude."

23    A.   "Well, there goes the son of a bitch right now, right here

24    at the light by the car wash.  It went up the -- it went up

25    that way right now, the son of a bitch, watch out for it."

1    Q.    CW-1:  "Don't fuck with me.  Here, by the car wash?"

2    A.    "No, on Central Street, Central.  It's going up the

3    truck."

4    Q.    "Oh, on Central?"

5    A.    "It's on Central, look for it."

6    Q.    CW-1:  "Check the plate or something.  Tell me what you

7    see."

8    A.    Can you just slide it up a little bit?

9    Q.    Yeah, apologies.

12:25PM 10    A.    "The whore doesn't have a front plate."

11    Q.    CW-1:  "It has no plate, all right."

12          Do you recall, Detective Conley, while you were

13    conducting the surveillance on the way back from New Hampshire

14    whether you observed Mr. Martinez in the area of Central Street

15    in Chelsea?

16    A.    Yes, I do.

17    Q.    Detective, I'm going to jump to January 29, 2016 and ask

18    if you recall whether that was a significant date in the course

19    of this investigation?

12:26PM 20    A.    Yes, it was.

21    Q.    All right.  And would it be fair to say that that was the

22    date that a series of arrest warrants were executed in

23    connection with a number of defendants charged in this case?

24    A.    That's correct.

25    Q.    All right.  Now, were you present on a -- did you

1    participate in those arrests?

2    A.    Yes.

3    Q.    All right.  To be clear, you did not participate in the

4    arrest of Cesar Martinez, correct?

5    A.    That's correct.

6    Q.    All right.  Were you aware, through your work on the

7    investigation, that a number of the targets in the

8    investigation were arrested in or around the City of Chelsea?

9    A.    That's correct.

12:26PM 10   Q.    All right.  And was there a plan in place to sort of help

11   process defendants that were arrested in that vicinity prior to

12   being taken to federal court?

13   A.    Yes.

14   Q.    What can you tell the jury about that?

15   A.    We call it --

16          MR. MURPHY:  Objection, your Honor.  Relevance.

17          THE COURT:  Well, I assume it's a lead in to something

18   else.  Overruled.

19          MR. POHL:  It is, thank you.

12:27PM 20   Q.    Detective.

21   A.    We call it a courtesy booking procedure where we would

22   assist with taking down the vital information of the individual

23   that was in custody.  We would take that information down.  We

24   would create a booking page and then we'd pass that booking

25   page onto federal partners when we conducted the transport over

1    to a federal facility.

2    Q.   All right.  So Detective Conley in the course of your

3    duties as a police officer, have you been asked to book persons

4    that have been placed under arrest?

5    A.   Yes, I have.

6    Q.   And are you familiar with whether or not the Chelsea

7    Police Department has a standard practice or procedures

8    concerning how individuals that are placed under arrest are to

9    be booked?

12:27PM 10   A.   Yes.

11   Q.   And what kind of questions are typically asked of persons

12   that are booked in the Chelsea Police Department booking

13   process?

14   A.   Name, date of birth, home address, phone number, married,

15   questions like that.

16        MR. POHL:  Okay.  Can I have Exhibit 59 for the

17   witness.

18   Q.   Can you see that, Detective Conley?

19   A.   I can.

12:28PM 20   Q.   And what is it?

21   A.   It's a Chelsea Police cover sheet of an arrest number

22   16111.  It would be the document that would be produced during

23   and at the time of booking.

24   Q.   Okay.  And this booking sheet was dated January 29, 2016?

25   A.   That's correct.

1    Q.    And the individual listed on the booking sheet is who?

2    A.    Cesar Antonio Martinez.

3          MR. NORKUNAS:  Objection, Judge.

4          THE COURT:  I'll allow that, but go ahead.

5    Q.    And pursuant to the sort of policies and practices of the

6    Chelsea Police Department that you described before, we don't

7    need to get into all of the information, but it's fair to say

8    that the types of questions that you talked about earlier are

9    answered on this page?

12:29PM 10   A.    Yes.

11   Q.    Name, height, weight, biographical information, correct?

12   A.    That's correct.

13   Q.    What about the phone number?

14   A.    That's correct.  It does appear on this booking sheet.

15   Q.    Okay.  What phone number is listed on the booking sheet?

16         MR. NORKUNAS:  Objection, Judge.

17         THE COURT:  Sustained.

18         MR. POHL:  I'd offer the document, your Honor.

19         MR. NORKUNAS:  I'd object, Judge.

12:29PM 20        THE COURT:  The objection is overruled.  It's admitted

21   59.

22         (Exhibit No. 59 received into evidence.)

23         MR. POHL:  For the jury.

24         THE CLERK:  Yes.

25   Q.    Detective, there's a phone number listed on the booking

1  sheet; is that correct?

2  A.   Yes, sir.

3  Q.   All right.  And what phone number is that?

4  A.   781-521-8365.

5  Q.   Okay.  And the information that is provided on the booking

6  sheet, okay.  Where does -- when you conducted a booking, where

7  do you get that information from?

8  A.   From the individual that is in custody.

9       MR. POHL:  And if I could again have the document

12:30PM 10  camera for the witness and for the jury, 56.3 in evidence.

11  Q.   Again, the telephone number for the February 14, 2014 call

12  from -- to CW-1 was 781-521-8635?

13  A.   Yes, sir.  That's correct.

14  Q.   Same phone number as on the booking sheet?

15  A.   Yes, it is.

16       MR. POHL:  Thank you very much.

17       THE WITNESS:  Thank you.

18       THE COURT:  Cross.

19                    CROSS-EXAMINATION

20  BY MR. NORKUNAS:

21  Q.   Detective, did you participate in activities other than

22  doing a surveillance on February 14, 2014?

23  A.   I was primarily just doing surveillance that day.

24  Q.   So you were to be a follow-on vehicle that day was your

25  function; is that correct?

1    A.    A surveillance vehicle, that's correct.

2    Q.    So you weren't having any contemporaneous monitoring of

3    conversation between any parties present, and you ended when it

4    appears from the Exhibit 56.3 that you're on Central Street,

5    you're home, right?

6    A.    That's correct, doing surveillance.

7    Q.    The day is done at that point in time, right?

8    A.    I'm sorry.

9    Q.    And the day is done at that point, you're home.  Once the

12:31PM 10   surveillance came down to Central Street in Chelsea, that ends

11   for you, right?

12   A.    No, I continued the surveillance up to Saugus and then up

13   towards New Hampshire and then back down again on Route 93.

14   Q.    Okay.  So this is on the way up, not on the way back.  The

15   transcript that you read 56.3, the observations of seeing you

16   on Central Street is beginning.  That's at the end, correct?

17   A.    I believe that is at the end, yes.

18   Q.    Which would have ended your function as a surveillance

19   officer at about that time as well, correct?

12:32PM 20   A.    Once that surveillance was done that day, I ended my

21   participation, I'm done.

22          THE COURT:  Any redirect?

23          MR. POHL:  No.

24          THE COURT:  I'm sorry, Mr. Murphy.

25

                            CROSS-EXAMINATION

1

2    BY MR. MURPHY:

3    Q.   Good afternoon, Officer -- Detective.  My name is Marty

4    Murphy, and I represent Mr. Sandoval.  You had worked on this

5    investigation from the very start, correct?

6    A.   Yes.

7    Q.   As a matter of fact, you were one of the folks who went to

8    El Salvador to meet the person who later became known as Pelon

9    in the first instance, correct?

10   A.   Yes.

11   Q.   And that was in 2012, correct?

12   A.   That sounds correct, yes.

13   Q.   And eventually he was brought back here to Massachusetts

14   and set up in business, correct?

15   A.   He was brought back to Massachusetts.

16   Q.   And did there come a time when he began to operate as a

17   gypsy cab driver?

18   A.   There was a time that he was operating, giving rides, in

19   that capacity, correct.

20   Q.   And when was that, sir?

21   A.   During the investigation.  I really can't be sure when

22   that started or when that ended.

23   Q.   Now, as part of the investigation there was an agent from

24   Homeland Security assigned, correct?

25   A.   I'm not sure.

1    Q.   Did you ever interact with an agent from Homeland Security

2    during the course of this investigation?

3    A.   I'm really not sure if I had a name.

4    Q.   As a member of the Chelsea Police Department, do you have

5    occasion from time to time to deal with folks from Homeland

6    Security?

7    A.   Yes.

8    Q.   And do you have occasion from time to time to check on the

9    immigration status of individuals that you come into contact

12:34PM 10   with in your job?

11   A.   Yes.

12   Q.   And sometimes it's important for you to know whether an

13   individual is in the United States legally or is in the

14   United States illegally, correct?

15   A.   Yes.

16   Q.   Now, are you aware from your participation in this

17   investigation that in late October 2015, an individual named

18   Irvin De Paz was stabbed in East Boston?

19   A.   Yes.

12:34PM 20   Q.   And are you aware from your participation in this

21   investigation that in early October, on October 2, 2015, an

22   individual named Joel Martinez confessed to the confidential

23   informant that he had committed that murder, correct?  Are you

24   aware of that?

25   A.   No, not firsthand.  I'm not aware of that.

1    Q.   Did anybody tell you in October 2015 that Mr. Martinez had

2    confessed to the murder of Irvin De Paz?

3    A.   No.

4    Q.   In 2015, in October 2015, did anyone tell you that

5    Mr. Martinez -- and he's known as Animal; is that correct?

6    A.   Yes.

7    Q.   That he had been taken to New Jersey?

8    A.   I don't know about that.

9    Q.   And in October 2015 or November 2015, did anyone tell you

12:35PM 10   that Cooperating Witness Number 1, Pelon, and a fellow by the

11   name of Muerto had driven him from New Jersey back to the

12   Boston area?  Did anyone tell you that?

13   A.   Yes.

14   Q.   Okay.  Now, when did you learn that, sir?

15   A.   I can't remember exactly, but probably during that same

16   week.

17   Q.   Before his arrest, correct?

18   A.   Yes.

19   Q.   And he was not arrested until January of 2016, correct?

12:36PM 20   A.   Yeah.  I'm not really sure of the dates where different

21   individuals were placed in custody.

22   Q.   Mr. Martinez, we can agree, was arrested as part of the

23   big take-down, correct?

24   A.   I believe so.  I'm just not sure exactly what date.

25   Q.   Now, did you know where Mr. Martinez was living after he

1    returned from New Jersey in late 2016?

2    A.    I do not.

3    Q.    Did you have occasion as a part of your work on this case

4    to learn of an event that took place in Chelsea on December 27,

5    2015, pardon me?

6    A.    There were many events.  I just don't know specifically on

7    that day.

8    Q.    Did you learn of a stabbing involving a person -- where a

9    person named William Calderon was stabbed on December 2016?

12:37PM 10   A.    Yes, I am aware of that.

11   Q.    And to your knowledge was that after Mr. Martinez was

12   brought back by Pelon and Muerto to Chelsea?

13   A.    I really don't remember the time frame, but I do remember

14   the stabbing.

15   Q.    And do you also remember a stabbing that took place around

16   January 1st or January 2nd, 2016 on Chestnut Street in Chelsea?

17   A.    Again, you'd have to be more specific about the stabbing

18   just because there were multiple incidents like that in

19   Chelsea.

12:37PM 20   Q.    Is it fair to say that sometimes assaults in Chelsea go

21   unreported by the victims?

22   A.    Yes.

23   Q.    And that's because oftentimes the victims themselves may

24   have immigration problems, correct?

25   A.    That could be one of the reasons, sure.

1    Q.   And so is it fair to say that if you were to learn that

2    someone had been hit by a baseball bat, for example, you

3    wouldn't conclude simply from the fact that the police had no

4    report of that baseball bat attack that nothing had actually

5    happened, correct?

6    A.   I'd probably conduct a further investigation.

7    Q.   And the fact that no one had reported being hit by a

8    baseball bat wouldn't lead you to believe that someone hadn't

9    actually been hit by a baseball bat, correct?

12:38PM 10   A.   Again, I would continue my investigation, but it's

11   possible.

12   Q.   And it's particularly possible for those folks who are

13   members of the immigrant community, correct?

14   A.   We do know that that has happened, yes.

15   Q.   Now, let me ask you.  Sir, to your knowledge after

16   the -- after Animal, Mr. Martinez, came back to the Boston

17   area, did you or any of the other task force agents check to

18   see whether he was in the country legally?

19   A.   I did not, but I can't answer for the entire task force.

12:39PM 20   Q.   And to this day, sir, do you know whether or not, as of

21   November 2016, Mr. Martinez was in the country legally?

22   A.   I do not know for sure, no.

23   Q.   Well, do you have any information about that subject?

24   A.   Mr. Martinez?

25   Q.   Yes.  And whether he's in the country legally or not?

1    A.    I do not know.

2    Q.    Now, you said that you were monitoring CW-1's phone calls,

3    or I should say the task force was, correct?

4    A.    That's correct.

5    Q.    And did you know, in fact, during the investigation, sir,

6    that he had two phones?

7    A.    I do remember that at one point he had two phones.

8    Q.    And it's fair to say, sir, that you were only listening to

9    the recordings he was making on one of those phones, correct?

12:40PM 10    A.    I'm not really sure.  I couldn't be sure if they were

11    monitoring both or just one.

12    Q.    Do you know, sir, whether anyone from the task force

13    reviewed the records of Mr. Martinez' phone call use on

14    May 12, 2015?

15    A.    Again, I don't know what other task force agents did.

16    Q.    And you're familiar, sir, that there was a stabbing that

17    took place in Highland Park in Chelsea on May 12, 2015?

18    A.    That I do remember, yes.

19    Q.    And, sir, were any arrests made in connection with that

12:40PM 20    stabbing before January 2016?

21    A.    I don't believe so.

22    Q.    And it's fair to say, sir, however, that the members of

23    the task force knew exactly who had committed that stabbing

24    shortly after May 2015, correct?

25    A.    I'm not sure how long after, but I do know that members of

1    the task force did receive information which led them to

2    believe that they knew who was responsible for the stabbing.

3    Q.   And that was -- if you're not sure when, sir, that was

4    well before January, 2016?

5    A.   Yes.

6         MR. MURPHY:  May I have a moment, your Honor.  Thank

7    you, your Honor.

8         MR. LOPEZ:  No questions, your Honor.

9         THE COURT:  Redirect.

12:41PM 10         MR. POHL:  No, thank you.  Thank you, again.

11         THE WITNESS:  Thank you.

12         MR. POHL:  Will Brizuela.

13         WILLIAM BRIZUELA, having been duly sworn by the Clerk,

14    testified as follows:

15                    DIRECT EXAMINATION

16    BY MR. POHL:

17         MR. POHL:  May I, your Honor?

18         THE COURT:  Yes.

19    Q.   Good afternoon, sir.

12:42PM 20    A.   Good afternoon.

21    Q.   Thank you for your patience.  I know you've been here more

22    than one day.

23    A.   Not a problem.

24    Q.   Can you please introduce yourself to the ladies and

25    gentlemen of the jury?

1    A.   My name is William Brizuela.

2    Q.   Would you spell your last name, sir?

3    A.   B-r-i-z-u-e-l-a.

4    Q.   Where do you work?

5    A.   The Chelsea Police.

6    Q.   How long have you been a Chelsea police officer?

7    A.   I'm in my 22nd year now.

8    Q.   What's your current assignment, Detective?

9    A.   I am the sergeant in charge of the drug unit.

12:43PM 10   Q.   Okay.  And would it be fair to say that in the course of

11   your duties as a Chelsea police officer that you've responded

12   to a number of different types of reports of crimes including

13   stabbings?

14   A.   Yes.

15   Q.   All right.  Do you remember whether you were --

16   participated in an investigation into an incident that took

17   place on December 27, 2015?

18   A.   I do.

19   Q.   What can you tell the jury about what you remember about

12:43PM 20   that day?

21   A.   That day I was a patrol supervisor working from 3 p.m. to

22   11 p.m.  One of the patrol officers called off with a --

23   somebody had flagged them down, that there was a fight in the

24   area of 4th and Pearl Street.

25            MR. POHL:  Can I have Exhibit 111 for the witness.

1    Q.    All right.  Can you see that on your screen?

2    A.    Yes.

3    Q.    And have you seen that before your testimony here today?

4    A.    Yes.

5    Q.    What are we looking at?

6    A.    A map of Chelsea.

7    Q.    And you said something about an area where there had been

8    a radio call for a fight in progress?

9    A.    Yes.

12:44PM 10    Q.    Where was that?

11    A.    By the corner of 4th and Pearl.

12    Q.    And do you see that on this map?

13    A.    I do.

14    Q.    You patrol Chelsea regularly.  Does this aerial photograph

15    look like an accurate representation of this section of Chelsea

16    to you?

17    A.    Yes.

18              MR. POHL:  Your Honor, I'd offer Exhibit 111.

19              THE COURT:  All right.  It's admitted, 111.

12:44PM 20              (Exhibit No. 111 received into evidence.)

21    Q.    All right.  So, Detective, I believe that with your finger

22    you can actually press on the screen and tell, show the jury

23    sort of the area, once you got that radio call, where you

24    responded to?

25    A.    The call was related to a stabbing, so therefore I

1   responded and when I got to the area the officers were at, it

2   was right around here.  Sorry.  I think right here, in this

3   area.

4   Q.   All right.  And that is sort of you said 4th Street and

5   Pearl Street?

6   A.   They were actually on Pearl Street, somewhere over here

7   where the arrow is now.  This general area here.

8   Q.   Okay.  And what did you see when you got there?

9   A.   When I got there, there was some people standing around.

12:45PM 10   I'm assuming it was the victim, they put him into the ambulance

11   and the ambulance had taken off.

12   Q.   And what's the next thing that you did?

13   A.   While we were there -- well, I asked Officer Rosetti what

14   happened.

15   Q.   And you asked an officer named Rosetti?

16   A.   Rosetti.

17   Q.   Why?

18   A.   He was the responding officer, to see if he learned any

19   information.

12:45PM 20   Q.   Okay.  So you spoke to Officer Rosetti?

21   A.   Yes.

22   Q.   And after you spoke to Office Rosetti, what did you do

23   next?

24   A.   Officer Leon had informed us that people had informed him

25   that they saw a group of males, five or six males run into a

1    building at 141 Hawthorn Street leaving the scene of the

2    stabbing.

3    Q.   Okay.  And from the map at 111, how sort of -- can you

4    tell the jury sort of where that is and how close it is to the

5    intersection of 4th and Pearl?

6    A.   It's very close, about a block and a half away, something

7    like that.

8    Q.   Can you point it out on the map?

9    A.   Yes, sorry.  Right here.

12:46PM 10   Q.   So what's that building?  What does it look like?

11   A.   It's a multi-dwelling building.  It's like -- I think

12   three or six apartments, I forget, but it's right on the corner

13   of Hawthorn and Chester Avenue.

14   Q.   And when you got that information that there might be some

15   people in the building who were involved in the stabbing, what

16   did you do?

17   A.   We set up a perimeter around the building, and then we

18   entered the building.  There was an open -- there was a door in

19   the back that was open that led down to the basement area.

12:46PM 20   Q.   Did you go down to the basement yourself?

21   A.   Yes.

22   Q.   What happened when you got to the basement?

23   A.   We found three males hiding in the basement.

24   Q.   Did you see anything else in the basement?

25   A.   There were some clothes, like they had taken off and

1    thrown about in the basement, set of keys as well, I believe.

2    Q.   What did you do once you found those three men in the

3    basement?

4    A.   I asked them what they were doing down there and one of

5    them said they were smoking.

6    Q.   What ultimately did you do with all three of them?

7    A.   They were placed under arrest for trespassing.

8    Q.   And when they were placed in the -- for trespassing.  When

9    they were placed under arrest for trespassing, excuse me, what

12:47PM 10   did you do with them?

11   A.   They were transported to the station where they were

12   booked and placed into cells.

13          MR. POHL:  Okay.  And can I have 117.1 - .3 for the

14   witness.

15   Q.   I'm going to show you a series of three pictures,

16   Detective.  Ask you if you recognize those pictures?

17   A.   Yes, those were the males that were arrested for

18   trespassing that day in the basement.

19   Q.   And during the booking procedure, were you able to

12:48PM 20   identify the three persons that were arrested for trespassing?

21   A.   Yes.

22   Q.   All right.

23          MR. POHL:  Your Honor, could I offer 117.1 - .3 into

24   evidence, and I'd ask for permission to publish it to the jury.

25          THE COURT:  I'm sorry.  117.1, 117.2, 117.3?

1          MR. POHL:  Correct.  Thank you very much, your Honor.

2          (Exhibit Nos. 117.1, 117.2 and 117.3 received into

3     evidence.)

4     Q.   Let's look at 117.1.  Do you recognize this individual?

5     A.   Yes, that person was identified later as David Moratia

6     (ph).  I don't know if I'm saying it right.

7     Q.   All right.  And 117.2.  Who is that?

8     A.   That would be Luis Cruz.

9     Q.   And 117.3.

12:49PM 10    A.   That would be Sergio, I want to say Atavalo Hernandez.

11    Artavalo Hernandez (ph).

12          MR. POHL:  Can I have one moment, your Honor.

13    Thank you, sir.

14          THE WITNESS:  Thank you.

15          THE COURT:  Cross-examination.  Mr. Murphy.

16                     CROSS-EXAMINATION

17    BY MR. MURPHY:

18    Q.   Good afternoon, Officer.

19    A.   Good afternoon.

12:49PM 20    Q.   My name is Marty Murphy, I represent Herzzon Sandoval.  Is

21    the area that we just saw on that map -- I don't know if you

22    could put the map back up, please.  Is there a restaurant

23    called the Santo Negro Restaurant near there, do you know, sir?

24    A.   There is, yes.  I believe, yes.

25    Q.   And do you know where on the map that would be located?

1    A.    If I'm not mistaken, I believe it's on the corner of 5th

2    and Chestnut Street, if I'm thinking of the right restaurant.

3    Q.    Thank you, sir.  Now, sir, you're a sergeant in the drug

4    unit?

5    A.    Yes.

6    Q.    And in the course of your career in the Chelsea Police

7    Department, you also served as a patrol officer?

8    A.    Yes.

9    Q.    And does the Chelsea Police Department have roll calls at

12:50PM 10   the beginning of shifts?

11   A.    Yes.

12   Q.    And what happens at a roll call at the beginning of a

13   shift in the Chelsea Police Department in let's say December of

14   2015.  What would happen?

15   A.    Typically, we might go over what happened the previous

16   shift, things the officers need to know about.  Assignments are

17   given out, cruiser assignments are given out.  Certain areas

18   they're assigned to do like impact patrols type of thing.

19   Q.    And if there was a person who was viewed as being a person

12:50PM 20   of particular danger in the area, sometimes they'd be a

21   briefing about that, correct?

22   A.    Yes, if we were aware of it.  Yeah.

23   Q.    Right.  So on the day that you talked about, on

24   December 27, 2015, was there any briefing about the person

25   named Joel Martinez?

1    A.    Not that I'm aware of, sir.  No.

2    Q.    And do you know who Joel Martinez is?

3    A.    No.

4    Q.    And had anybody told you that as of December 27, 2015 that

5    there was a person named Joel Martinez who confessed to the

6    commission of a murder in Chelsea?

7              MR. POHL:  Objection.

8              THE COURT:  Overruled.

9    A.    No, sir.

12:51PM 10              MR. MURPHY:  Thank you, your Honor.

11              THE COURT:  Redirect.

12              MR. POHL:  No, thank you.

13              THE COURT:  You may step down.

14              MR. POHL:  May we approach?

15              THE COURT:  Is the question whether to start a new

16    witness?

17              MR. POHL:  Yes.

18              THE COURT:  I want to make use of the ten minutes.  I

19    know it's not ideal, but --

12:51PM 20              MR. POHL:  We just wanted to make sure that's what you

21    wanted to do.  Thank you.

22              MAURICIO SANCHEZ, having been duly sworn by the Clerk,

23    testified as follows:

24

25

<u>DIRECT EXAMINATION</u>

BY MS. LAWRENCE:

Q.   Good afternoon.

A.   Good afternoon.

Q.   Can you please say your name for the jury, please.

A.   Mauricio Sanchez.

Q.   Mr. Sanchez, are you currently in prison?

A.   Yes.

Q.   Why?

A.   For being affiliated with a gang.

Q.   Which gang?

A.   MS-13.

Q.   When you -- did you plead guilty before you entered prison in this case?

A.   Yes.

Q.   When you pled guilty, did you have an agreement with the government?

A.   Yes.

Q.   Okay.

     MS. LAWRENCE:  May I have Exhibit 110.1 for the witness, please.

Q.   Mr. Sanchez, on the screen, is this your plea agreement with the government?

A.   Yes.

Q.   Is this your signature on the page?

1    A.    Yes.

2         MS. LAWRENCE:   Okay.  Can I have Exhibit 110.2 for the

3    witness.

4    Q.    Is this your cooperation agreement with the government?

5    A.    Yes.

6    Q.    Is this your signature on the page?

7    A.    Yes.

8         MS. LAWRENCE:   Your Honor, I'd move to admit Exhibits

9    110.1 and 110.2.

10        THE COURT:   All right.  They're admitted.  110.1 and

11   110.2.

12        MS. LAWRENCE:   Can you go back to 110.1, please?

13        (Exhibit No. 110.1 and 110.2 received into evidence.)

14   Q.    Mr. Sanchez, you said you pled guilty to being affiliated

15   with a gang.  I'm just going to read a part of your plea

16   agreement for you.  This page says that you are charged with

17   conspiracy to conduct enterprise affairs through a pattern of

18   racketeering activity and that you expressly and unequivocally

19   admit that you committed that crime.  Okay.  And on the bottom

12:55PM 20   of the page it says that you may be incarcerated for up to 20

21   years and on the following page, please, and that you may be

22   deported from the United States as a result of this crime.

23        Do you understand that to be what the plea agreement

24   says?

25   A.    Yes.

1          MS. LAWRENCE:  Can we have 110.2, please.

2     Q.   Mr. Sanchez, this is your cooperation agreement with the

3     government.  In your own words, what does this agreement

4     require you to do to get the benefits of this agreement?

5     A.   Tell the truth.

6     Q.   And what benefits do you expect to get or hope to get if

7     you do that in this case?

8     A.   A lower sentence and not to be deported.

9     Q.   Have you been sentenced yet?

12:57PM 10   A.   No.

11    Q.   Do you know what sentence you will get?

12    A.   No.

13    Q.   Do you know who will decide what sentence you will get?

14    A.   The Judge.

15    Q.   Okay.  All right.  Mr. Sanchez, how old are you?

16    A.   30.

17    Q.   Where were you born?

18    A.   Honduras.

19    Q.   When you were in Honduras, did you learn anything about

12:57PM 20   MS-13?

21    A.   Yes.

22    Q.   Were you a member of MS-13 in Honduras?

23    A.   No.

24    Q.   Did you come to the United States at some point?

25    A.   Yes.

```
 1    Q.   When was that?

 2    A.   December of 2008.

 3    Q.   How old were you then?

 4    A.   20.

 5    Q.   How did you get here to the United States from Honduras?

 6    A.   I walked and I walked across the border.

 7    Q.   Did you have help from anyone to do that?

 8    A.   A coyote.

 9    Q.   What's a coyote, please?

12:58PM 10  A.   A person that guides people to cross the border more

11    quickly.

12    Q.   Okay.  And did you have to pay that person, the coyote?

13    A.   Yes.

14    Q.   How much did you pay the coyote?

15    A.   $5,000.

16    Q.   Was that your own money?

17    A.   My mother paid for it.

18    Q.   Okay.  Why did you leave Honduras?

19    A.   Over an incident that happened with my mother.

12:59PM 20  Q.   What kind of incident?

21    A.   She was attacked.

22    Q.   Why did that cause you to leave?

23    A.   She recommended that I come so as to not get myself into

24    trouble.

25    Q.   Okay.  She was attacked.  Did anything specific happen to
```

```
 1    her?

 2    A.    Yes, she was shot at.

 3    Q.    Is she still alive?

 4    A.    Yes.

 5    Q.    Do you know who shot at her?

 6    A.    I saw the guys, but I did not recognize them actually.

 7    Q.    Did you ever at some later time tell anyone that you had

 8    shot your mother?

 9    A.    Yes.

10    Q.    Who did you tell?

11    A.    The first person I told was Lobo.

12    Q.    Do you see Lobo in the courtroom here today?

13    A.    Yes.

14    Q.    Can you point him out, please?

15    A.    Right there.

16          MS. LAWRENCE:  Can the record reflect that the witness

17    has identified the defendant Argueta Larios?

18          THE COURT:  Yes.

19    Q.    Did you tell anyone other than Lobo?

20          MR. MURPHY:  Objection, your Honor, relevance and

21    hearsay.

22          THE COURT:  I'll allow it.  Overruled.

23    Q.    Why did you tell Lobo that you had shot your mother?

24    A.    I made it up while I was drunk.

25    Q.    And was there a reason why you made it up?
```

1          MR. MURPHY:  Objection, your Honor.

2          THE COURT:  Overruled.

3     A.   Yes.

4     Q.   What was that reason?

5     A.   To make myself appear worse, because not just anyone will

6     shoot his mother.

7     Q.   Okay.  All right.  So when you crossed the border into the

8     United States, where did you go?

9     A.   To Boston.

01:01PM 10  Q.   Why did you go to Boston?

11    A.   Part of my family is here.

12    Q.   Okay.  You testified that you're a member of MS-13?

13         THE COURT:  Actually, are you changing subjects now?

14         MR. POHL:  Yes, I am.

15         THE COURT:  All right.  Why don't we break there for

16    the day.  Let me see lawyers at sidebar to talk about the

17    schedule.  The jury can leave.

18         (THE FOLLOWING OCCURRED AT SIDEBAR:)

19         THE COURT:  All right.  What's the current estimate of

01:02PM 20  when you're going to rest?

21         MR. POHL:  Well, I think, Judge, we're going to finish

22    with Mr. Sanchez.  I think we may or may not call

23    Sergeant Millett, and that's it, I think.  I expect that that

24    would be -- I'm not certain we'd call all those people, but

25    that would be sort of the lineup as we go on.

1        THE COURT:  Best case scenario is probably Friday but

2   more likely spill into Monday is the present state?

3        MR. POHL:  I would guess Friday.  The only reason I

4   say that, cross is a different story, obviously, but I don't

5   want -- this witness will not be like Hernandez Miguel.  I

6   don't expect him to be on direct any near that long.

7        THE COURT:  Okay.  So, I guess, obviously, it depends

8   on the defense case and so forth, but if you have issues you

9   want to take up again, let's not do it while the jury is

01:03PM 10  waiting, let's reconvene at 8:30 tomorrow, and, you know, this

11  is the timetable.  If there is a defense case, it ought to be,

12  I guess, you know, prepared to go Friday at the earliest, more

13  likely Tuesday next week.

14       MR. MURPHY:  Your Honor, I do intend to file something

15  on the transcript.  Did the government hand up a copy?

16       MS. LAWRENCE:  We did.

17       THE COURT:  I'm sorry.

18       MS. LAWRENCE:  The transcript we discussed this

19  morning, December 17th, 2015.

01:03PM 20       THE COURT:  Okay.

21       MR. POHL:  That will be something we can take up

22  tomorrow morning.

23       THE COURT:  All right.

24       MR. LOPEZ:  Your Honor.

25       THE COURT:  I'm sorry, Mr. Lopez.

1     MR. LOPEZ:  For planning purposes, how long do you

2  think that Mr. Sanchez will be on his direct?

3     MR. POHL:  We'll be done tomorrow.  I don't think it

4  would be the end of the day, a guess maybe not before the first

5  break before certainly before the second break.

6     MR. LOPEZ:  It won't be the 7 or 8 hours?

7     MR. POHL:  We're not going all day tomorrow.

8     MR. LOPEZ:  You anticipate three or four hours?

9     MR. POHL:  I would anticipate we'd be done before the

01:04PM 10  second break tomorrow.  Thank you.

11     (Whereupon, the hearing was adjourned at 1:03 p.m.)

12             C E R T I F I C A T E

13  UNITED STATES DISTRICT COURT )

14  DISTRICT OF MASSACHUSETTS ) ss.

15  CITY OF BOSTON )

16     I do hereby certify that the foregoing transcript was

17  recorded by me stenographically at the time and place aforesaid

18  in Criminal Action No. 15-10338-FDS, UNITED STATES vs. HERZZON

19  SANDOVAL, et al., and thereafter by me reduced to typewriting

20  and is a true and accurate record of the proceedings.

21     Dated this 21st day of June, 2018.

22             s/s Valerie A. O'Hara

23     _____

24         VALERIE A. O'HARA

25         OFFICIAL COURT REPORTER