1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2


3
      UNITED STATES OF AMERICA          )
4                                       )
      vs.                               )  Criminal Action
5                                       )
      HERZZON SANDOVAL,                 )  No. 15-10338-FDS
6     EDWIN GUZMAN,                      )
      CESAR MARTINEZ,                    )
7     ERICK ARGUETA LARIOS,             )
                     Defendants         )
8


9
      BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
10


11
                       JURY TRIAL DAY 14
12


13
           John Joseph Moakley United States Courthouse
14                      Courtroom No. 2
                        1 Courthouse Way
15                      Boston, MA 02210

16                     February 16, 2018
                        8:35 a.m.
17


18


19


20


21


22


23                    Valerie A. O'Hara
                    Official Court Reporter
24     John Joseph Moakley United States Courthouse
                 1 Courthouse Way, Room 3204
25                   Boston, MA 02210
                E-mail: vaohara@gmail.com

APPEARANCES:

For The United States:

     United States Attorney's Office, by CHRISTOPHER J. POHL, ASSISTANT UNITED STATES ATTORNEY, and KELLY BEGG LAWRENCE, ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston, Massachusetts 02110;

For the Defendant Herzzon Sandoval:

     Foley Hoag LLP, by MARTIN F. MURPHY, ESQ. and MADELEINE K. RODRIGUEZ, ATTORNEY, 155 Seaport Boulevard, Boston, Massachusetts 02210;

For the Defendant Edwin Guzman:

     Lawson & Weitzen, by SCOTT P. LOPEZ, ESQ., 88 Black Falcon Avenue, Suite 345, Boston, Massachusetts 02210

For the Defendant Erick Arueta Larios:

     THOMAS J. IOVIENO, ESQ., 345 Neponset Street Canton, MA 02021;

For the Defendant Cesar Martinez:

     Stanley W. Norkunas, 11 Kearney Square, Howe Building, Suite 202, Lowell, Massachusetts 01852.

     ROBERT M. SALTZMAN, ESQ., 1 Central Street, Suite 5, Stoneham, Massachusetts 02180.

1                          I N D E X

2   WITNESS                      DIRECT   CROSS   REDIRECT   RECROSS

3   MAURICIO SANCHEZ
        By Mr. Lopez                       11
4       By Mr. Iovieno                     14
        By Ms. Rodriguez                   20
5       By Mr. Norkunas                    24
        By Ms. Lawrence                             28
6       By Mr. Lopez                                            32

7   BRIAN ESTEVEZ
        By Ms. Lawrence          33                 92
8       By Mr. Murphy                      60                   95
        By Mr. Iovieno                     88
9       By Mr. Lopez                       90

10

11  EXHIBITS                          FOR I.D.   IN EVIDENCE

12      232                                        104
        233                                        105
13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1

2        THE CLERK:  All rise.  Thank you.  Please be seated.

3    Court is now back in session.

4        THE COURT:  Good morning.  What, if anything, do we

5    have to talk about?  Let me raise something if you can't think

6    of anything.  I have been handed things over the course of the

7    trial with the suggestion that they would come up at some

8    point, and I would need to rule on them.

9        One of them is the Threat and Risk Assessment from

08:35AM 10    Agent Wood, which I reviewed in camera.  Is he going to be

11    recalled?  What is the plan there?  And do I need to rule on

12    this?

13        MR. POHL:  Well, your Honor, we provided to you, to be

14    absolutely clear, my understanding is that while

15    Special Agent Wood testified he prepared it, I don't think he's

16    actually the one that signed it, it's signed by the actual

17    special agent-in-charge, but Mr. Murphy had requested it.  We

18    had suggested that we didn't think it was discoverable, I

19    guess, both because it's not technically Jencks, and, B,

08:35AM 20    because of the material that's in it, and we provided it to you

21    for that reason.  I certainly do not intend to recall

22    Special Agent Wood.

23        I think to the extent if Mr. Murphy's question was,

24    you know, did Special Agent really work on it and prepare a

25    Threat Assessment, the answer to that question now is yes, and,

1    you know, is it information that's relevant, material

2    discoverable in this case, I think the answer to that question

3    is no, and that's why we provided it to you.

4         I got permission from the Ops, Operations, to provide

5    it to you for your review.  Mr. Murphy's requested it in

6    discovery.  We've declined to produce it, so I'd ask you,

7    essentially I think at this point, especially given the state

8    of play and the evidence and where we are in the trial that I

9    don't think it's discoverable, particularly in light of the

08:36AM 10   fact that CW-1 is not going to be a witness.

11        THE COURT:  One of the reasons I'm asking, what I have

12   is redacted, that which is readable is unremarkable, I guess,

13   and the thought occurred to me that I could seal it, provide it

14   to counsel with the instructions that they're to review it and

15   then decide whether we need to take it to the next step.

16        Unless I'm missing something, it all seemed pretty

17   unremarkable and not much in there that wasn't in The Globe

18   article.  Mr. Murphy.

19        MR. MURPHY:  That is one of the points I was going to

08:37AM 20   be making, however, I think it is Jencks, whether or not the

21   agent signed it, if he prepared it or his office endorsed it,

22   it is Jencks.

23        THE COURT:  It probably, if he wrote it, if other

24   people edited it, signed it, it starts to get less clear.

25        MR. MURPHY:  In other words, we asked for it before

1    trial, and we asked for it after he testified on direct.  I

2    think that we should be at least entitled -- looking at it, I

3    can see a little bit here that looks like large black sections,

4    so we would -- we think we are entitled, your Honor, to the

5    entire Threat Assessment as Jencks material,

6    Special Agent Wood, so we can see whether or not when we review

7    that we would want to recall Special Agent Wood to examine him

8    about any potential inconsistency between his trial testimony

9    and what he either wrote or endorsed in connection with this,

08:38AM 10    with the Threat Assessment.

11         And, again, I recognize it was a former Assistant U.S.

12    Attorney, but a former U.S. Attorney has spoken publicly with

13    The Globe, which I think has been marked for identification

14    about many of the issues that would likely appear in whatever

15    sections of the Threat Assessment the Court agreed to.

16         The last thing I would say, your Honor, I do not

17    frankly understand the government's position that there is a

18    category of information that is not discoverable.  It's not to

19    my knowledge protected by either federal common law or

08:39AM 20    statutory privilege.  If it's *Jencks Act* material, I would

21    suggest to the Court that we would -- we are entitled to see it

22    after Special Agent Wood testifies.

23         THE COURT:  All right.  I'm going to take it a step at

24    a time.  What I'm going to do is this.  I'm going to permit it

25    to be produced to counsel under seal a step at a time.  We can

1      then talk about, you know, what the next step beyond that,

2      whether there should be a next step.

3           I mean, you know, my guess is that the sections of

4      this document that talk about how brutal and violent MS-13 is

5      you're not probably going to elicit that from anyone as part of

6      the defense case.  Why don't we do that, if there's any reason

7      for me to make a further ruling.

8           I'm doing that as a matter of prudence.  I'm not

9      ruling it is Jencks because I know I need more information to

08:39AM 10   know that or not, but because I think it may short circuit the

11     whole discussion once you've seen this thing, I think I'm going

12     to handle it that way, so it will be provided to counsel only

13     under seal.  That's a provisional ruling, just to, again, cabin

14     the issue and take it a step at a time.  Okay.

15          MR. POHL:  Yes, your Honor.

16          THE COURT:  Mr. Murphy.

17          MR. MURPHY:  Your Honor, the Court at the end of the

18     day yesterday mentioned jury instructions.

19          THE COURT:  Yes.

08:40AM 20   MR. MURPHY:  And I don't know whether the Court has

21     already formulated its preliminary or its proposed jury

22     instructions or whether the Court would be planning to do that

23     between now and Monday.

24          THE COURT:  Here's my plan.  We have a working draft.

25     It is exactly that, a working draft.  Some of that is, I think,

1    complete like what is the burden of proof, things like that,

2    others less so.  My plan was to circulate it later today as

3    Draft 1 just so you can look at it and get the discussion

4    going.

5         As to anything that is disputed, I've obviously made

6    no final decisions, but some of this is, you know, cut and

7    paste, pattern instructions, things like that that may change,

8    but just to get the ball rolling, that's what my plan was to

9    have my -- at the moment my law clerk and I are sufficiently

08:41AM 10    satisfied we won't embarrass ourselves by circulating it, we

11    will circulate it, but you'll have it for the weekend.

12         MR. MURPHY:  Thank you, your Honor.  I wonder if the

13    Court may entertain one point, our proposed jury instructions.

14         THE COURT:  Yes.

15         MR. MURPHY:  We proposed consistently, your Honor,

16    that rather than use the terminology "join the conspiracy,"

17    which the Court used in the first trial that the Court replace

18    that with the actual statutory language, "agree to participate

19    in a conduct of the affairs of the enterprise."

08:41AM 20         THE COURT:  I actually like that change and have made

21    it.  Again, it's not a final decision but actually "joining"

22    makes a little more sense here than it does in the normal case

23    where you're creating a conspiracy, not really joining, but I

24    think that change is appropriate.

25         We did note, by the way, going over the actual

1    language of the indictment that the indictment doesn't charge

2    firearm offenses as predicate acts, but I think it does -- I

3    think it's under manner and means of the conspiracy, something

4    like that, there's a reference to firearms.  It probably would

5    be confusing to put any of that in the jury instructions, so

6    I'm not planning to.

7           One of the wrinkles in this case is normally I give

8    the indictment to the jury.  We agreed last time that that was

9    problematic.  I would prefer not doing it here, but I do have

08:42AM 10   to describe what is the conspiracy with which they have been

11   charged, and that's kind of complicated, so we need to somehow

12   figure that out.

13          In other words, I give them an instruction they're

14   charged with this conspiracy, and that's the only decision

15   they're to make, and if they conclude they either weren't part

16   of that conspiracy or that conspiracy didn't exist or they were

17   part of a different conspiracy, then they're to acquit, and

18   it's only the indictment charged in the conspiracy, so I have

19   to describe -- the conspiracy charged, I have to describe what

08:43AM 20   that conspiracy is, and I'm going to have to summarize it in

21   some form or another.  Even reading it verbatim is complicated,

22   61 alleged participants, but if I have to do that, I'll do.

23          MR. POHL:  Well, we'll think about that and have a

24   proposal for you.  This came up in a different context in a

25   case I charged before Judge Stearns a few months ago.  We ended

1    up not sending the indictment back to the jury and discussing a

2    proposal how to describe the conspiracy.

3            THE COURT:  I'm hopeful we can work this out in some

4    kind of summary fashion that is fair.

5            MR. POHL:  Ms. Lawrence and I, we don't oppose your

6    inclination to not send the formal indictment back.

7            THE COURT:  That's one of the issues we need to talk

8    about.  Mr. Lopez.

9            MR. LOPEZ:  Yes, your Honor.  After leaving yesterday,

08:44AM 10    I turned on NPR, and there was an extensive interview involving

11    MS-13 and the immigration consequences, and I didn't listen to

12    all of it, but my concern is that if any of the jurors happened

13    to listen to NPR, which is pretty popular --

14            THE COURT:  Less so than you might think, but I'm

15    happy to make the inquiry.  If it were on sports radio, it

16    might have a bigger problem, but I'll make the inquiry.

17            MR. LOPEZ:  I think they're all in the sensitivity

18    training today, your Honor.

19            THE COURT:  Okay.  Anything else?  Okay.

08:45AM 20            THE CLERK:  All rise.

21            (A recess was taken.)

22            THE CLERK:  All rise for the jury.

23            (JURORS ENTERED THE COURTROOM.)

24            THE CLERK:  Thank you.  You may be seated.

25            THE COURT:  Good afternoon, everyone.  Good morning.

1    I think it's morning.  Mr. Sanchez, you understand that you're

2    still under oath?

3            THE WITNESS:  Yes.

4            THE COURT:  All right.  Mr. Lopez.

5            MR. LOPEZ:  Thank you, your Honor.

6                    MAURICIO SANCHEZ

7                CROSS-EXAMINATION, CONTINUED

8    BY MR. LOPEZ:

9    Q.   Good morning, Mr. Sanchez.

09:04AM 10   A.   Good morning.

11   Q.   Now, Mr. Sanchez, do you remember after signing your

12   proffer agreement how many times you met with the government?

13   A.   Several times.

14   Q.   Did you meet with them on February 16, 2016?

15   A.   Yes.

16   Q.   And March 3, 2016?

17   A.   I don't remember the dates, I just remember that I met.

18   Q.   And August 16, 2016?

19   A.   Yes.

09:05AM 20   Q.   And, again, on September 30, 2016?

21           THE INTERPRETER:  September 30th?

22   Q.   September 30, 2016?

23   A.   Yes.

24           MR. LOPEZ:  Your Honor, I've created a chalk which I'd

25   ask to have on the screen.

1         THE COURT:  All right.

2    Q.   Now, directing your attention to your February 16, 2016

3    proffer, do you recall telling the government that the Eastside

4    clique is not that active of a clique?

5    A.   I did tell them that.

6    Q.   Okay.  And you said that the most violent member of the

7    clique was Muerto?

8    A.   Yes.

9    Q.   And in your -- in your March proffer, did you tell them

09:06AM 10   that Muerto was a drug dealer?

11   A.   Yes.

12   Q.   And you told them that Muerto supplied MS gang members

13   with cocaine?

14   A.   Not just to MS-13, he sold cocaine to non-MS members as

15   well.

16   Q.   Well, I was going to get there, but not only -- others as

17   well?

18   A.   Yes.

19   Q.   And he supplied cocaine in $40 bags?

09:07AM 20   A.   Yes.

21   Q.   And $100 bags?

22   A.   Yes.

23   Q.   And he supplied you with cocaine?

24   A.   Yes.

25   Q.   And you paid for it?

1    A.    Yes.

2    Q.    And Muerto also used a runner to deliver his drugs; is

3    that correct?

4    A.    Sometimes he would send Chentino.

5    Q.    And Chentino would deliver the drugs?

6    A.    Yes.

7    Q.    And also collect the money?

8    A.    Yes.

9    Q.    And the money would go back to Muerto?

09:08AM 10    A.    Yes.

11    Q.    And Muerto didn't share his profits with the clique,

12    right?

13    A.    I don't know about that.

14    Q.    Okay.  Now, during your proffers, you also told the

15    government about crimes that you had committed, right?

16    A.    Yes.

17    Q.    And during those four proffer sessions, you never told the

18    government that you committed any murders, correct?

19    A.    No.

09:09AM 20    Q.    Because you've never committed any murders, right?

21    A.    No.

22    Q.    In fact, you testified yesterday about going with Animal

23    to look for Gallo, you also told the government that you

24    intentionally misled Animal because you were reluctant to be

25    involved with a murder, right?

1    A.    Yes.

2    Q.    And you also told the government that you didn't shoot

3    your mother?

4    A.    Yes.

5    Q.    Rather, you told the government that you witnessed an

6    attack on your mother in Honduras by organized crime figures,

7    right?

8    A.    Yes.

9    Q.    But that's not what you told members of the Eastside

09:10AM 10   clique, right?

11   A.    No.

12   Q.    You told them that you shot your mother, right?

13   A.    Yes.

14   Q.    And you told them that you had committed murders, right?

15   A.    Yes.

16   Q.    In fact, you told them that you committed seven murders,

17   right?

18   A.    Yeah, I used to show off like that.

19         MR. LOPEZ:  No further questions, your Honor.

09:10AM 20         THE COURT:  Okay.

21                        CROSS-EXAMINATION

22   BY MR. IOVIENO:

23   Q.    Good morning, Mr. Sanchez.

24   A.    Good morning.

25   Q.    My name is Thomas Iovieno.  I represent Mr. Larios and I

1   just have a few questions for you.  I believe you testified

2   that you met Mr. Larios in 2010?

3   A.   Yes.

4   Q.   And you were working for a trash removal company?

5   A.   Yes.

6   Q.   And when you met Mr. Larios, you understood that he had a

7   family?

8   A.   I met him.  I did not meet his family.

9   Q.   But you've known him from 2010, you still know him today,

09:12AM 10  you know during that period of time that Mr. Larios was married

11  and had children?

12  A.   Yes.

13  Q.   And you also knew that he was working in the community

14  with Russell Disposal, a trash removal company?

15  A.   Yes.

16  Q.   And I think you testified that you were jumped in to

17  Eastside in March of 2013, right?

18  A.   It was in 2013.  I don't recall the month or the date.

19  Q.   Fair enough.  But I think you testified you also were

09:13AM 20  drunk at the time that you were jumped in?

21  A.   Yes.

22  Q.   Okay.  And that's against the rules, correct?

23  A.   Yes.

24  Q.   Is it fair to say that throughout your -- the period of

25  time that you were associated with Eastside, you had a

1     substance abuse problem, both with cocaine and with alcohol?

2     A.    Yes.

3     Q.    And it's fair to say that you didn't hang around with

4     Mr. Larios that much, did you?

5     A.    No.

6     Q.    And you would see him periodically at meetings, right?

7     A.    You asked me if it was, and I said no, it wasn't correct,

8     I did hang out with him a lot.

9     Q.    Oh, you hung with him outside of meetings?

09:14AM 10    A.    Almost every weekend.

11    Q.    Okay.  And you would see Lobo in restaurants and bars?

12    A.    Yes.

13    Q.    And you also saw him at meetings that you attended, right?

14    A.    Yes.

15    Q.    Okay.  And is it fair to say at some point in 2015 that

16    Lobo, he had missed some meetings, correct?

17    A.    Yes.

18    Q.    And he was questioned about that at a meeting, right?

19    A.    Yes.

09:14AM 20    Q.    And they wanted an explanation from him of where he had

21    been, where are you?

22    A.    Yes.

23    Q.    And is it also fair to say that during this period of time

24    you were hanging around with Muerto and Pelon quite a bit,

25    right?

1    A.   I hung around with everyone in the clique.  All of us who

2    were active would go out on weekends to look for chavalas, so I

3    don't know why you're focusing only on Muerto and Pelon because

4    we were all MS-13.

5    Q.   Well, you said that you were close with Muerto?

6    A.   I got along well with him, yes.

7    Q.   And you described him as well respected and solid in your

8    mind, right?

9    A.   Yes.

09:15AM 10    Q.   And you testified that you hung around in October of 2015

11   with Animal?  You met Animal and you hung around with him a

12   little bit?

13   A.   No, I met him in October of 2015 but I started hanging out

14   with him in December.

15   Q.   Okay.  That's when you committed the beating and the

16   stabbing, correct, with Animal?

17   A.   Yes.

18   Q.   And Muerto at the time, around the fall of 2015, it's fair

19   to say that you were at a meeting when Muerto complained that

09:16AM 20   nobody was out in the street, right?

21        MR. MURPHY:  Objection, your Honor.

22        THE COURT:  Overruled.

23        THE INTERPRETER:  I'm sorry, could you repeat the

24   question?

25   Q.   You were at a meeting when Muerto complained that nobody

1    was out in the street?

2    A.   That's what he was saying but, in fact, we were going out

3    every weekend.  I was going out with the runners, with Lobo,

4    and with various members of the clique.

5    Q.   Okay.  But at that meeting you said no one is in the

6    street, correct?

7          MR. MURPHY:  Can I have a standing objection, your

8    Honor.

9          THE COURT:  Yes.

09:17AM 10   Q.   You were at that meeting, correct?

11   A.   Yes.

12   Q.   And you said no one was out in the street.  That's what

13   you said?

14   A.   That's what they were saying so I was just following

15   along.

16   Q.   Okay.  Because it's fair to say that during meetings --

17   Mr. Lopez asked you questions, and it wasn't unusual for you to

18   show off, to brag and embellish about what you were doing,

19   right?

09:18AM 20   A.   Mostly the time when I would go, I was drunk.  A drunk

21   person always like to make things up.  It's not the same as a

22   person that is sober.

23   Q.   So you were drunk at a lot of meetings and you made a lot

24   of things up, right?

25   A.   Not at the meetings, more on the weekends when I was

1    drunk.

2    Q.   But it was important for you to appear tough, strong, and

3    to be feared, right?

4    A.   That's what I wanted them to think.

5    Q.   Because it gave you status within the Eastside clique,

6    right?

7    A.   Because not just the Eastside, but in all of MS-13, you

8    can't show any weakness, you have to show that you're strong

9    and bad.

09:19AM 10   Q.   And you did that by making things up, right?

11   A.   Yes.

12   Q.   And Mr. Lopez asked you a question about a conversation

13   you had with the government about Eastside not being that

14   active a clique, right?  Do you remember that?

15        THE INTERPRETER:  I'm sorry, could you repeat for the

16   interpreter?

17   Q.   Yes.  Mr. Lopez asked you a question a few minutes ago

18   about your statements to the government in February that you

19   said that Eastside was not that active a clique?

09:20AM 20   A.   At that time that's what I said, but in fact, Eastside was

21   one of the biggest cliques in Boston.  It had the -- one of the

22   cliques that had the most members.

23   Q.   It had the most members but you told them it wasn't that

24   active, right?

25   A.   During the time that I was there, yes.

1    Q.   And you also told the government that the members were

2    mostly older?

3    A.   Yes.

4    Q.   And they mostly engage in bar fights, right?

5    A.   Yes.

6              MR. IOVIENO:   Thank you, I have no further questions.

7              THE COURT:   Ms. Rodriguez.

8                         CROSS-EXAMINATION

9    BY MS. RODRIGUEZ:

09:21AM 10   Q.   Good morning, Mr. Sanchez.

11   A.   Good morning.

12   Q.   My name is Madeleine Rodriguez, and I represent

13   Mr. Sandoval, and I just have a few questions for you this

14   morning.

15   A.   All right.

16   Q.   Mr. Sanchez, it was your testimony yesterday that you

17   bought a gun for personal use in December 2014, correct?

18   A.   Yes.

19   Q.   And you also testified that Mr. Sandoval took it away from

09:22AM 20   you because he was concerned that you might hurt someone,

21   correct?

22   A.   The truth is this.  As I told you, I bought the gun

23   because I had a problem at work.  A guy had threatened to beat

24   me up, so I bought a gun and so that I would beat him up first.

25   That was the reason I bought the gun.

1    Q.    But after you bought the gun, you were getting drunk and

2    acting a little crazy and so Mr. Sandoval took the gun away

3    from you as a result of that.   That was your testimony,

4    correct?

5    A.    Yes.

6    Q.    And, in fact, you had already shot the gun accidentally

7    before Mr. Sandoval took it away from you, correct?

8    A.    Yes.

9    Q.    One day you were driving in the car with Chentino and

09:23AM 10   Flaco?

11   A.    Yes.

12   Q.    You were drunk?

13   A.    Yes.

14   Q.    And you pulled out the gun in the car and you accidentally

15   shot around, correct?

16   A.    Yes.

17   Q.    And that bullet almost hit Flaco, correct?

18   A.    No.

19   Q.    It was after that incident that Mr. Sandoval took the gun

09:24AM 20   away from you, correct?

21   A.    Yes.

22   Q.    Okay.   You also testified that you met Animal in October

23   2015, correct?

24   A.    Yes.

25   Q.    And you knew that Animal had entered the United States

1    illegally, correct?

2    A.    He didn't tell me that.

3    Q.    Did you ever talk to him about his immigration status?

4    A.    Later on in December when we got together, he did tell me

5    that.

6    Q.    And he told you that he was in the United States

7    illegally, correct?

8    A.    Yes.

9    Q.    And you've already testified that you also entered the

09:25AM 10    country illegally, correct?

11    A.    Yes.

12    Q.    And you've known people who have come into this country

13    without any legal status who have been deported, correct?

14    A.    Yes.

15    Q.    And you know some clique members who have been deported,

16    correct?

17    A.    Yes.

18    Q.    And it's your understanding, sir, correct, based on these

19    experiences and observations that if you were in this country

09:25AM 20    illegally, you could be arrested by immigration at any time,

21    correct?

22    A.    Yes.

23    Q.    That's a risk as an immigrant in this country without

24    status that you have to be concerned about on a day-to-day

25    basis?

1    A.    Yes.

2    Q.    But by joining a clique, you were at least guaranteed that

3    if you did get deported, your fellow clique members would

4    collect money to possibly bring you back into the

5    United States, correct?

6    A.    I didn't join with that end.  I realized that after I had

7    already joined the clique when members had been deported and

8    were down below that would call the clique to get help to come

9    back.

09:26AM 10   Q.    So it was one of the benefits of joining the clique.  If

11   you got deported, the clique would collect money and help bring

12   you back into this country, correct?

13   A.    Yes.

14   Q.    And they could also possibly help your family by

15   collecting money to assist your family while you were outside

16   the country, correct?

17   A.    Possibly, yes.

18   Q.    Mr. Sanchez, you've testified a few times now about having

19   a drinking and drug problem, correct?

09:27AM 20   A.    I had a problem.

21   Q.    Is it fair to say that the more you drank, the more

22   trouble you got in?

23   A.    Every person that's drunk will have more and more problems

24   the more he drinks.

25   Q.    And the same, the more you did drugs, the more problems

1    you had, correct?

2              MS. LAWRENCE:  Objection, your Honor.

3              THE COURT:  I'll allow it.

4    A.   Not exactly when I used drugs did I get in trouble or look

5    to get in trouble, but I was always looking to get in trouble.

6    Q.   And Mr. Sandoval tried to get you to stop drinking and

7    doing drugs, correct?

8    A.   Yes.

9              MS. RODRIGUEZ:  May I have a moment, your Honor?

09:29AM 10              THE COURT:  Yes.

11              MS. RODRIGUEZ:  No further questions, your Honor.

12                        CROSS-EXAMINATION

13   BY MR. NORKUNAS:

14   Q.   Good morning, sir.

15   A.   Good morning.

16   Q.   In relation to what you have told us about Muerto's sale

17   of drugs, do you recall a time when -- that you had gone to his

18   shop and when you were purchasing some drugs, he had numerous

19   other bags set up for distribution?

09:29AM 20   A.   Yes.

21   Q.   Now, was there a time when you were with Mr. Muerto and

22   Pelon and you were in Pelon's car and Pelon showed you a hidden

23   compartment where he kept a firearm and there was a firearm in

24   there?

25   A.   It wasn't a hidden compartment.  It was just a gun that he

1    had in the car in some compartment.

2    Q.   And from your familiarity with Muerto and Pelon, was that

3    a gun that he consistently kept in the car?

4         MR. LOPEZ:  Objection, your Honor.  May we be heard?

5         MR. NORKUNAS:  I'll withdraw the question.

6         THE COURT:  All right.

7    Q.   Now, you were asked to look at a series of photographs of

8    various people, correct?

9    A.   Yes.

09:31AM 10   Q.   And once you were able to identify anybody in the

11   photograph, you were then asked by the government what you knew

12   about that person in relation to what they would do or not do,

13   right?

14   A.   Yes.

15   Q.   Mr. Lopez had set up a listing of four different proffer

16   sessions in which you went into the government and you spoke to

17   them about the people you had identified in the photographs,

18   right?

19   A.   Yes.

09:32AM 20   Q.   And in each of those sessions, you weren't restrained as

21   to what you could say, you could say whatever you felt you

22   needed to, right?

23   A.   No.

24   Q.   Well, you were asked questions about different people,

25   right?

A.    Yes.

Q.    And you had to be as truthful and as full in your answers as you could be, right?

A.    Yes.

Q.    And you identified, at one point in time, a particular photograph that you said was my client, Cesar Martinez, correct?

A.    Yes.

Q.    And then you had told the government at that time that he was a person that operated a tow truck business, correct?

A.    Yes.

Q.    And that he also did mechanical work at the shop where you would have the meetings?

A.    Yes.

Q.    And when you had talked about Cesar Martinez, you had indicated that he was a person known to the people and yourself, he would not show up for any fights or any other gang activities, correct?

A.    I don't recall having said that.

MR. NORKUNAS:    If I could have the Elmo just for the witness.

Q.    Sir, I'm calling your attention to the proffer session of August 16, 2016, and I have the interpreter read to you what would be listed as I think line 21 or item 21.

Having read that, sir, do you recall having told the

1    government that Cesar Martinez was known for not showing up for

2    any fights or other gang activity?

3    A.    Yes.

4    Q.    Was there a time when -- on the weekends, when you were

5    visiting the bars and the restaurants when you encountered

6    Mr. Martinez and his daughter?

7    A.    I don't remember.

8    Q.    Did you see him on weekends with his daughter?

9    A.    I remember one time, yes.  Okay.  It was during the day he

09:36AM 10    was having a meal.

11    Q.    And his daughter was with him?

12    A.    Yes.

13    Q.    Now, you had indicated that Brujo was an individual that

14    had talked to you about some incidents or some attacks on

15    potential rivals and he also had a discussion or was made a --

16    was telling about Vida Loca and the shooting that Vida Loca was

17    involved in, correct?

18    A.    Yes.

19    Q.    And when Brujo had told you about that, he had indicated

09:37AM 20    that he, Brujo, had gone into the building where Vida Loca did

21    the shooting, correct?

22    A.    During the shooting when he murdered, did the murder,

23    Brujo was with him, behind him.

24    Q.    And he also told you that -- in relating that tale, that

25    Crazy and Chentino had been outside waiting in their car,

1    right?

2    A.    No, Chentino was not in the car.  It was Crazy and Danger.

3    Q.    And that's the tale that he had related to you about that

4    episode, correct?

5    A.    Yes.

6    Q.    Now, you indicated that you were familiar with Mr. Muerto

7    and you and he would hang out together somewhat; is that

8    correct?

9    A.    Yes.

09:38AM 10    Q.    And do you know what type of car Mr. Muerto drove?

11    A.    I saw a Nissan.

12    Q.    Okay.  And would you ever ride with him in that car?

13    A.    He gave me a ride one time.

14          MR. NORKUNAS:  I have nothing further, Judge,

15    thank you.

16          THE COURT:  All right.  Redirect.

17          MS. LAWRENCE:  Certainly.

18                      REDIRECT EXAMINATION

19    BY MS. LAWRENCE:

09:39AM 20    Q.    Mr. Sanchez, when Casper took your gun away from you, did

21    the clique pay you for that gun?

22    A.    Yes.  That was on a Sunday, and when I saw him at work, he

23    told me that the clique was going to buy that gun.

24    Q.    And I'm going to talk to you a little bit about the

25    questions you were just asked regarding Vida Loca's murder.

1    You testified earlier that Chentino got a beating for not

2    assisting Vida Loca during that event, right?

3              MR. LOPEZ:  Objection, your Honor.

4              THE COURT:  Overruled.

5    A.   Yes.

6    Q.   And I believe you testified that he -- that Chentino had

7    been at the after hours beer hall the night that Vida Loca got

8    in a fight and the next night when he returned to shoot

9    Javier Ortiz?

09:40AM 10   A.   I had told you that on the night of the fight with the 18

11   he hadn't done anything to help, that Vida Loca had told him it

12   was an 18 and he, however, did not help.

13   Q.   Was Chentino also there when Vida Loca shot and killed a

14   man?

15   A.   That's what Brujo and Crazy told the clique that he had

16   been there and not helped also.

17   Q.   And Brujo told the clique that.  Did Brujo tell the clique

18   that he had been there that night when Vida Loca shot and

19   killed a man?

09:41AM 20   A.   Yes.

21   Q.   Mr. Sanchez, did Checha go to clique meetings?

22   A.   Yes.

23   Q.   Did he talk about MS-13 activities at clique meetings?

24   A.   Yes.

25   Q.   Did he -- was he also asked to and did he beat people,

1   beat other MS-13 members at clique meetings?

2   A.   Yes.

3   Q.   You testified and were asked some questions about meeting

4   Animal in October of 2015.  Can you tell us again who

5   introduced you to Animal?

6   A.   I met him through Brujo.

7   Q.   Okay.  You also testified earlier and were asked some

8   questions about what you did on the weekends as an MS-13

9   member.

09:43AM 10   A.   Yes.

11   Q.   What did you do on the weekends as an MS-13 member?

12   A.   What every gang member does, go out to look for rivals, to

13   gain respect with the clique.

14   Q.   Okay.  Who did you go out with?

15   A.   When I was first jumped in the people that called me the

16   most were Casper and Playa.  I used to go out with them a lot.

17   Q.   And later, later after you joined, who did you go out

18   with?

19   A.   I would hang out with all of them.

09:44AM 20   Q.   And where did you go?

21   A.   There were specific points.  There were bars where

22   chavalas would go often and so we would head out there.

23   Q.   Okay.  You said you went out to look for chavalas to earn

24   respect.  And earlier you also said that you were one of the

25   more respected members of your clique?

1     A.    In certain ways with some.

2     Q.    Okay.  Well, how did you earn respect from those that did

3     respect you?

4           MR. MURPHY:  Objection, your Honor.

5           THE COURT:  I'll allow it as to his understanding.

6     Obviously he can't testify about what others were thinking.

7     A.    Because they would see that I was one of the most -- one

8     of the ones that would fight the most.

9     Q.    And you also testified that you believe and your opinion

09:45AM 10    is that Muerto was one of the most solid members of the clique?

11    A.    The entire clique thought that.

12    Q.    Why did you think he was?

13    A.    That's what I heard and also he told me that he had done

14    several hits in El Salvador.

15    Q.    Okay.  Why was it important for you to have this respect

16    among your fellow clique members to look tough or to be solid?

17          MR. MURPHY:  Objection, your Honor.

18          THE COURT:  I'll sustain as to the leading.

19    Q.    Earlier you testified that you tried to make yourself look

09:46AM 20    tough.  Why did you do that?

21    A.    Because like I said before, in order to be in a gang, you

22    can't show any weakness.  You either are or you are you not.

23          MS. LAWRENCE:  One moment, your Honor.  Nothing

24    further, your Honor.

25          THE COURT:  Any recross?

1          MR. LOPEZ:  Yes, your Honor.

2                    RECROSS-EXAMINATION

3    BY MR. LOPEZ:

4    Q.   Mr. Sanchez, after Vida Loca committed the murder that

5    we've been talking about, Chentino went into hiding, right?

6    A.   Yes.

7    Q.   And he went into hiding because he knew that he didn't

8    defend Vida Loca against rival gang members the night before

9    the murder, right?

09:47AM 10   A.   Only he knows that.

11   Q.   Well, when he was corrected, he was corrected because he

12   didn't defend Vida Loca the day before the murder, correct?

13   A.   Yes.

14          MR. LOPEZ:  Thank you.

15          THE COURT:  Anything else?

16          MR. IOVIENO:  No, your Honor.

17          THE COURT:  All right.  Thank you.  You may step down.

18          MS. LAWRENCE:  The government calls Brian Estevez,

19   please.  Recalls, I should say.

09:48AM 20          THE COURT:  We'll administer the oath again even

21   though it's a recall.

22          BRIAN ESTEVEZ, having been duly sworn by the Clerk,

23   testified as follows:

24

25

DIRECT EXAMINATION

BY MS. LAWRENCE:

Q.   Good morning, Trooper Estevez.

A.   Good morning, ma'am.

Q.   When you testified before you, you talked about your
investigation of MS-13 from approximately August, 2013 through
the beginning of early 2015?

A.   Yes.

Q.   Today, I want to turn your attention to the later stage of
the investigation.  In early January, 2016, did you receive
information that the Eastside clique was planning to make a new
member?

A.   Yes.

Q.   And how did you receive that information?

A.   Through CW-1.

Q.   And did you have other sources to verify his information?

A.   Yes, recordings.

        MS. LAWRENCE:  Okay.  Could we have Exhibit 116?  It's
been admitted, please.  If you'd like to open your transcript
binders, it's tab 116.

        MR. POHL:  May I approach?

Q.   Trooper Estevez, before you testified here today, did you
review transcripts and recordings?

A.   Yes.

Q.   And this is a transcript of a recording made on January 2,

1  2016.  Did you review this transcript?

2  A.   I did.

3  Q.   Okay.  And do you recall, just in general terms, what the

4  gist of this conversation is about in this transcript?

5  A.   It's about an incident that took place in January and a

6  conversation about Animal.

7  Q.   And who is Animal?

8  A.   An MS-13 member.

9  Q.   Down at the bottom of the page, toward the bottom, Tigre

09:51AM 10  says, "And we are running with the Hollywoods, homeboy.  We

11  talked about that at the meeting, you remember right?"

12       What are the Hollywoods?

13  A.   The Hollywoods are a -- they're a clique and there's also

14  a Hollywood program.

15  Q.   And do you know other programs, MS-13 programs?

16  A.   Yes.

17  Q.   Can you give us an example of one?

18  A.   There's --

19       MR. MURPHY:  Objection, your Honor.

09:52AM 20       THE COURT:  I'll allow it.

21  A.   There's the East Coast Program, the L.A. program, the -- I

22  mean, there's a lot of them.

23  Q.   Did you obtain information during the course of your

24  investigation regarding whether the Eastside clique belonged to

25  a particular program?

1          MR. MURPHY:  Objection, your Honor.

2          THE COURT:  Sustained.

3   Q.   All right.  After this incident on January 2nd, or

4   actually what do you know about what happened -- sorry.  In the

5   transcript we just reviewed, you said that they were talking

6   about an incident that occurred on January 1st or 2nd?

7   A.   Yes.

8   Q.   What do you know about that incident?

9   A.   It was a stabbing that took place in -- I believe it was

09:52AM 10   in Chelsea, and Animal and Tigre were involved and some other

11   individuals.

12   Q.   Did you learn about any other stabbings that Animal was

13   involved with during this time frame?

14          MR. MURPHY:  Objection, your Honor.

15          THE COURT:  Sustained.

16   Q.   Trooper Estevez, did you receive information in early

17   January, 2016 that the Eastside clique was having a meeting, an

18   upcoming meeting?

19   A.   Yes.

09:53AM 20   Q.   What did you do after receiving that information?

21   A.   We do what we always do is try to surveil the meeting as

22   best as we can, make sure CW-1 had audio and video recording on

23   his person to record the meeting.

24   Q.   Where did you set up surveillance for this meeting in

25   early January?

1   A.   We usually just set up right outside the area of where the

2   meetings took place, which usually was at a garage in Everett.

3   Q.   And do you recall the date of the meeting when you set up

4   the surveillance outside the garage in Everett?

5   A.   I believe it was January 8th.

6   Q.   And was CW-1 able to record that meeting?

7   A.   Yes.

8   Q.   Have you reviewed a recording and transcript of that

9   meeting prior to your testimony here today?

09:54AM 10   A.   I have.

11        MS. LAWRENCE:  Could I have admitted Exhibit 32.1,

12   please.  32.3, please.

13   Q.   Trooper Estevez, I'm going to play some clips from this

14   January 8, 2016 ESLS clique meeting, and I'd like to ask you if

15   you recognize the individuals in the video?

16        (Video played)

17   Q.   Do you recognize that person in the video?

18   A.   I do.

19   Q.   Who is it?

09:54AM 20   A.   Lobo, Erick Argueta.

21   Q.   Thank you.  Who is that individual, if you know?

22   A.   Playa.

23   Q.   Playa, okay.

24        THE COURT:  I'm sorry, the individual on the right?

25        THE WITNESS:  Correct, sir, with the black

           1    dark-colored hat.

           2             (Video played.)

           3    Q.   Who is the person in the knit winter cap?

           4    A.   Brujo.

           5    Q.   Brujo, okay.

           6             (Video played.)

           7    Q.   Who is the person in the yellow sweatshirt?

           8    A.   Checha.

           9             (Video played.)

09:56AM 10    Q.   Who is the individual who was on the frame to the right

          11    for most of that clip?

          12    A.   Casper.

          13             MS. LAWRENCE:  I would like to read portions of the

          14    recording -- I'm sorry, the transcript that is at tab 31 in

          15    your transcript binder.  Can we have admitted Exhibit 31,

          16    please?

          17             Your Honor, may I approach the witness?

          18             THE COURT:  Yes.

          19             MS. LAWRENCE:  This is in the binder just make it

09:57AM 20    easier to read.

          21    Q.   Okay.  Trooper Estevez, can you begin reading the

          22    highlighted portions of the transcript that I just handed you,

          23    please.

          24    A.   Yes.  Casper:  "Hey, so, look, how are things then?  Are

          25    we going to jump this homie today, or what?"

1          Continue at the bottom of the page?

2    Q.   Yes, please.

3    A.   Casper:  "You know how it is with you, man.  They are on

4    the street looking for you with everything, doggie.  Do you

5    agree?"

6    Q.   Animal:  "Yes."

7    A.   Casper:  "And the plan that we have for this homeboy once

8    he's in so that the police does not get him, we have to take

9    care of this dude, homies.  How are we going to do it?"

09:58AM 10   Q.   Muerto:  "Well, that's why."

11   A.   Casper:  "Do you have a place to stay right now?"

12   Q.   Muerto:  "That's the same thing, we're moving him."

13   A.   Casper:  "Where to stay and everything?"

14   Q.   Muerto:  "That's why we're moving him however we can,

15   dude.  Also several dudes don't want to give him a place to

16   stay dude, so then."

17          CW-1:  "No."

18          Muerto:  "Son of a bitch with this dude."

19   A.   Casper:  "No.  So you guys can't say you don't want to,

09:58AM 20   homeboy.  If we're not sure about what's really going on in

21   each guys's house."

22   Q.   Muerto:  "That's what I'm saying, many of the dudes don't

23   want him staying there anymore.  So what we're doing is moving

24   the guy."

25          CW-1:  "I've even paid for hotels for the dude and the

1    man can tell you out of my own pocket."

2         Muerto:  "Yeah."

3    A.   Casper:  "Fuck that's awesome, dog."

4         Lobo:  "There is -- there is room right now for 500

5    fucking bucks.  I don't know if you guys are in agreement."

6    Q.   Caballo:  "Where?"

7    A.   Lobo:  "Because I know that girl, I prefer not telling her

8    that this homie is with the Mara, you know."

9         Casper:  "Yes, but 500 bucks is expensive, son of a

09:59AM 10   bitch."

11   Q.   Caballo:  "No, man.  500 bucks is cheap, dude."

12        CW-1:  "And where is it, dude?"

13   A.   Lobo:  "Here in Chelsea next to the clock."

14   Q.   Caballo:  "And in Chelsea?"

15   A.   Casper:  "No, man.  This dude has to go far from there,

16   dude."

17        Casper:  "The thing right now, dudes, the move is that

18   this homeboy should not be in Mara turf.  We're in Lynn,

19   Chelsea, East Boston."

09:59AM 20   Q.   Unidentified male:  "And Lynn would be possible."

21   A.   Casper:  "In Somerville, Everett."

22   Q.   CW-1:  "Somerville is too hot."

23   A.   Casper:  "Those are the territories that this dude can't

24   be in, dude.  So then we're going to -- we are going to send

25   this dude to the clique, homeboy.  We have to hide him so that

1    he won't be arrested, dude.  Right now it is our priority that

2    this dude not be locked up, dude."

3         Casper:  "That's the bad thing.  Look, that's what I'm

4    referring to.  Talking when one kills.  Look, that's what I'm

5    referring to."

6    Q.   Vago:  "One can say."

7    A.   Casper:  "Right now, right now.  Let's see what we're

8    going to do, dudes.  They're going to get those two guys and

9    they're going to try to put blame on them.  They know that he's

10:00AM 10   not the one.  They know that they aren't the ones who did it.

11   They know that you did it, homie.  What they're doing right now

12   is trying to see if these dudes will turn into snitches,

13   homie."

14   Q.   Animal:  "Yes, but I don't know what the deal is because

15   to me at first they were coming down on me, right, but it was

16   just for some other shit that we had done with Crazy and

17   Chucho.  Yeah, but it's the culeros that are also after me

18   about that thing, because they already know what's going on."

19   CW-1:  "But the police doesn't know.  The police doesn't know

10:01AM 20   because they would have already put it on the news."

21        Animal:  "There were two guys that went into a

22   laundromat.  There were two of them and when they saw me they

23   ran out, but one of them went into the laundromat, right?  Yes

24   and since another guy was looking at me, I ran away."

25   A.   Casper:  "But if those fuckers know that you went to the

1    police, those dudes."

2    Q.   CW-1:  "No way, man.  The police would have already put

3    his photo in the newspaper."

4    A.   Casper:  "Oh, well.  Then the asshole has not been

5    able --"

6    Q.   CW-1:  "No."

7    A.   Casper:  "-- to identify him in the photo that the police

8    have."

9    Q.   CW-1:  "No, no, no.  Listen, dudes, yeah because they

10:02AM 10   would have already turned him over to the police.  Hey, just

11   like with Vida Loca.  By the third day, wasn't he already in

12   the?"

13   A.   Casper:  "That's right."

14   Q.   "In the newspaper and all that shit, in the newspaper and

15   everything, man."

16   A.   Casper:  "The culeros will snitch on you.  Right now they

17   are really high, dude.  The deal is that about the thing with

18   the two homies."

19   Q.   CW-1:  "It's not about disappearing, but rather not to go

10:02AM 20   out into the streets too much."

21        Vago:  "The dude that escaped called me, you know, and

22   he was asking me if the son of a bitch that they caught, you

23   know.  That they were asking about -- asking him about the

24   incident that happened in East Boston, you know, but supposedly

25   the Everetts had given it to him, you know, the dude."

1    A.   Casper:  "Well, dude let them say that."

2    Q.   (Unintelligible).

3    A.   Casper:  "That is better for us and that is good for you,

4    too, dude."

5    Q.   Vago:  "And the dude was telling me, you know, to warn the

6    homies you know to take care of themselves because that's the

7    trail they are pursuing, you know?"

8    A.   Casper:  "No, man that's great."

9    Q.   Muerto:  "Yeah.  The other guy that took off is still

10   around there, dude."

11   A.   Casper:  "As long as the police say that the Everetts did

12   it, dude, that's even better, dude."

13           Playa:  "If he could hide him for at least a month in

14   that house that would be awesome."

15   Q.   CW-1:  "Well, right now he's already over there in that

16   house, you know?"

17   A.   Playa:  "We have to look for a room."

18   Q.   CW-1:  "We have to look for another room for next month,

19   man."

20   A.   Playa:  "We can get a room between all of us, dude."

21   Casper:  "That's what fucked up about it, homie."

22   Q.   Caballo:  "The thing is we all have to be on the lookout.

23   We don't have anything.  You can go look around, because you

24   are driving a taxi and I will be looking around, too."

25           CW-1:  "No, man.  I've already looked around here, but

1    I found one, but they wanted a deposit."

2    A.    Lobo:  "Let's go tomorrow if you want and we'll do it

3    tomorrow.  I don't work tomorrow."

4         Playa:  "Well, that's the thing.  We have to look into

5    it to get the money together, homie, Brujo."

6         Brujo:  "I can give you the money depending on

7    what -- no, on Tuesday.  I'll give you what I'm supposed to

8    give, dude, plus what I owe for the (unintelligible)."

9    Q.    Unintelligible -- sorry.  Unidentified man:  "How much

10:04AM 10    would each have to give or even if we don't watch after him,

11    just as long as we get the money, homie.  Playa, how much more

12    or less would we have to give to more or less get a room for

13    this dude?"

14    A.    Casper:  "It's that it's not just us, it's everybody

15    because."

16    Q.    Muerto:  "That's right, all of us."

17    A.    Playa:  "I think that the entire clique (unintelligible).

18    Casper:  "Playa."

19    Q.    "The entire clique."

10:04AM 20    A.    Casper:  "The problem, the problem is this, look."

21    Q.    Caballo:  "Whoever does not want to give, no problem."

22    A.    Casper:  "I'm going to give you something to get a room

23    for this homeboy for 500 bucks.  I'm calculating that we all

24    have to meet twice a week, man.  The thing is like this, dude.

25    The homie has to learn how to look after himself, he has to

1    find a job."

2    Q.    CW-1:  "Exactly."

3          Animal:  "Well, yeah."

4    A.    Brujo:  "Well, we have to help him find a job."

5    Q.    Caballo:  "Look, dude."

6          Animal:  "That's right, that's what I'm doing right

7    now.  I'm trying to find work."

8          Caballo:  "There's a place by where you can get a job

9    as a dishwasher if you want to stay and make 12 bucks an hour,

10   dude."

11         Animal:  "12 bucks is good."

12   A.    Lobo:  "How are you with garbage, bro?"

13   Q.    Animal:  "Huh?"

14   A.    Lobo:  "How good are you with garbage?"

15   Q.    Animal:  "(Unintelligible)."

16   A.    Playa:  "Look I am quite relaxed here, dude.  That dude

17   has killed, dude, and look that homie is taking it easy.  A lot

18   of people found out about the murder that guy did, dude, and I

19   ran into the guy walking around with his glasses here and he's

10:05AM 20   all calm, dude, and he is working, man."

21   Q.    Animal:  "Yeah."

22   A.    Playa:  "Many of you since I started talking know whom I'm

23   talking about so you can do the same thing, too."

24   Q.    Caballo:  "The good thing is that look, homie, I work with

25   civilians.  We all work with civilians, dude, and right there

1   where the civilians are, if a son of a bitch fucks up, I will

2   break his trap and I've already done so.  I was fired from good

3   jobs, homie.  What I'm trying to tell you is that you can't be

4   telling civilians that you go here or there, dude.  You know?

5   You know what you are, homie, and we all know what you are."

6   A.   Playa:  "Without any problems, always, without any

7   problems."

8   Q.   Caballo:  "But because of that same shit, dude, we have to

9   be saying that we aren't because we know what we are here,

10:06AM 10   right?  Whatever problem we have, if you have problems and you

11   belong to the Side, then we are all going to have the same

12   problems that you have."

13       Animal:  "Yeah."

14       Caballo:  "But let that be clear, homie, understand?"

15   A.   Casper:  "You always deny it to police.  Tell them that

16   you don't know."

17   Q.   Caballo:  "Bullshit the fucking police.  You are nothing."

18       Animal:  "(Unintelligible)."

19   A.   Playa:  "And it's even better if they don't ask you.  If

10:07AM 20   they don't ask you, that's even better."

21       Casper.  "Hey, homie.  Do what they do when they do on

22   the news.  Keep running away from the violence in El Salvador."

23   Q.   Animal:  "(Unintelligible)."

24   A.   Casper:  "And how are going to get to Boston?  You have to

25   play low with those motherfuckers, man."

1    Q.   Animal:  "Yeah, man."

2         MS. LAWRENCE:  Let's go to page 9.

3    A.   Casper:  "When you have to talk with the homeboys from the

4    Mara."

5         Playa:  "I did it alone for me."

6         Casper:  I did it, because I don't like those

7    culeros."

8    Q.   All right.  We're on page 9, middle of the page.

9         Animal:  "Yeah."

10:07AM 10   A.   Playa: "I didn't do it for Everett.  You are no longer

11   being saying that you did it for (unintelligible), dude.

12   Q.   Duke:  "Hey, Animal, do you want to settle down here to be

13   a homie for the Eastsiders?"

14        Animal:  "Yes, yes, that's why I came to this clique.

15   Doggie.  I want to be here."

16   A.   Playa:  You feel the Eastsiders?  The Eastsides clique?"

17   Q.   Animal:  "Yes, yes, that's why I came over here."

18        Caballo:  Great, because he is looking for some

19   homies, man."

10:08AM 20        Caballo:  "Decide if you want to jump in the doggie,

21   or if you only want him to hang out with us, dude."

22        Duke:  "Hey, is it your decision or what?"

23        Chentino:  "Caballo."

24   A.   Casper:  "The dude already has an in, dude, I am preparing

25   that."

1          Brujo:  "Huh?  The homeboy did that thing with me."

2     Q.   CW-1:  "Hold on."

3     A.   Brujo:  "Twice in a short time he did it with me and that

4     is some serious shit, man."

5     Q.   Caballo:  "That's what I'm telling you, look."

6          CW-1:  "He did another one with Tigre, doggie."

7          Duke:  "Well, then let him in."

8          CW-1:  "No, but hold on, dog."

9          Caballo:  "You can go say that (unintelligible) looks

10:08AM 10   awesome and everything.  Yes to the Mara, right?  But the thing

11    is we have to see how we work, dog."

12         Animal:  "Yes."

13         Caballo:  "Because if we don't work, we're going to

14    get screwed, understand?"

15         Animal:  "Yeah, I know what it is."

16         Caballo:  "Because we have to work, dog."

17         Page 11, please.

18    A.   Lobo:  "What then, Casper?"

19         Casper:  "No, well the dude is firm there, is firm

10:09AM 20   there, homie."

21         Playa:  "Well, then do it."

22         Casper:  What I am doing right now, what we are doing

23    is right.  It's not good, you know, to get jumped in alone.  He

24    knows he's going through the same situation as us and at the

25    same time we have to see how we're going help him out, dude,

1    because we have to take care of that homie."

2           Lobo:  "All of us are" -- excuse me -- "all of us are

3    also aware of what's going on."

4    Q.   CW-1:  "What you're saying is fine, Lobo.  We have to find

5    a room."

6           Muerto:  "That, too."

7    A.   Playa:  "We have to be careful, homie, because it is

8    important because of the 40 bucks that we got together the

9    other day, we were here, was sent to El Salvador."

10:10AM 10   Q.   Unidentified male:  "Uh-huh?"

11   A.   Casper:  "Yeah, but it's going to be very difficult for us

12   to give 500 bucks for this dude's rent."

13   Q.   CW-1:  "No, no, no.  Not $500.  That's just to get

14   started, understand?  Just while he -- because we also have to

15   think about the move."

16          Caballo:  "All right, work, dog."

17          Unidentified male:  "That's right."

18   A.   Lobo:  "Look, if Caballo doesn't take you there to where

19   he's working, I'm going to try to get you into where I work,

10:10AM 20   where I took Duke."

21   Q.   Caballo:  "All right, go for it."

22   A.   Lobo:  "That's true, this dude."

23   Q.   Duke:  "Where you took me, where he took me."

24   A.   Playa:  "Well, he did take Duke, homie."

25   Q.   Caballo:  "I'm going to try.  I mean, I'm going to try."

1      CW-1:  Right, try.  Well, trying is one thing."

2      Unidentified male:  "I'm not -- not --"

3      Caballo:  "You'll see the money there, too, homie."

4  A.   Lobo:  "I'm not saying I'm going to get you in.  I'm

5  telling you that I'm going to try."

6      MS. LAWRENCE:  Page 13.

7  A.   Brujo:  "So are we going to get a guy just because he

8  wants to be with us at a bar?"

9      Brujo:  "Hey, let's get a dude now because hey we are

10:11AM 10  going to get to another bar."

11  Q.   Casper:  "No, several."

12  A.   Brujo:  "If a son of a bitch is looking for me

13  (unintelligible)."

14  Q.   Casper:  "Several stages.  He has to go through

15  several --"

16      Unidentified male:  "No, man."

17  A.   Casper:  "Several phases so that we can (unintelligible)."

18      Brujo:  (Unintelligible), that's what I'm saying."

19      Playa:  "It's like this, dude.  Look, how can this

10:12AM 20  dude snitch on someone else if he's got that problem on him,

21  whereas another guy who was just drunk and doing things like

22  that."

23  Q.   Duke:  "That's right."

24  A.   Brujo:  "They are here all the fucking time only because

25  they are here all the fucking time.  They are here all the

1    fucking time just because they are at the bars treating."

2    Q.   Caballo:  "Uh-huh."

3    A.   Brujo:  "Let's go to the side now."

4         Playa:  "Yeah."

5         Brujo:  "No, man, let them come and kill.  Let them

6    come and feel the pressure."

7         Playa:  "For them two (unintelligible) with the

8    chavalas, dude."

9         Brujo:  "They need to stick the knife in."

10:12AM 10   Q.   CW-1:  "Yeah, man."

11   A.   Brujo:  "To stick the knife in and see what happens."

12   Q.   Duke:  "That's right."

13   A.   Casper:  "Let me tell you something."

14   Q.   CW-1:  "There you can see who has balls."

15   A.   Casper:  "About the clique, the Eastside clique, homie."

16        Brujo:  "If you have love for the barrio, you will

17   show your balls there."

18        Casper:  "No, look, I'm going to tell you something,

19   homie.  We need the new generation of the Eastside, homie, and

10:13AM 20   thanks to the wisdom that we have gained over the years, homie,

21   we have to pass it along, dude.  So that the new Eastside

22   clique can come and not, not think badly that we're going to

23   fuck them over, because shit we are Maras and the fuckers here

24   will fuck it up.  We're always (unintelligible)."

25   Q.   Duke:  "The clique has to continue grow."

1   A.   Casper:  "But what I am trying to say is that you guys are

2   going to be the next generation.  Fuck, here, the majority of

3   us here, in five years we will be over 40, in another 5, we'll

4   be 45 until (unintelligible)."

5   Q.   Duke:  "Hey, it needs to keep growing, homie."

6   A.   Playa:  "Let's be clear on that."

7   Q.   Duke:  "I'm almost 40, homie.  Let the clique continue to

8   grow, homie."

9   A.   Playa:  "Casper."

10:14AM 10        Casper:  "Seriously everything will end up in the

11   hands of the new generation."

12   Q.   Duke:  "That's true, homie."

13   A.   Playa:  "Casper, Casper."

14        Casper:  "Who will make it easier?"

15        Playa:  "That's why I'm telling you the deal with that

16   homeboys, they don't drop the line, you understand?"

17        Brujo:  "(Unintelligible), throw signs for our gang

18   look because our, (unintelligible)."

19   Q.   Duke:  "No, no, no, man."

10:14AM 20   A.   Brujo:  "The one thing that is with me, what did he say to

21   me?  God willing, God willing, homie, they want to arrest me or

22   kill me for being with you out on the streets.  I'll fucking go

23   out on the streets with you and we did it.  We did it the right

24   way, (unintelligible)."

25   Q.   Duke:  "And it's going to be done, dude."

1    A.   Brujo:  "And there it is."

2    Q.   Duke:  "One way or the other, whatever, it's going to

3    done, understand?"

4         Unidentified male:  "That's right."

5    A.   Casper:  "Yeah, just remember that always, homie, what

6    we're teaching you right now, homie, and something else, homie,

7    is that a lot of people in this clique or in other cliques are

8    going to run to you with gossip that these guys here and these

9    guys there."

10:15AM 10   Q.   Animal:  "Uh-huh."

11   A.   Casper:  "They can tell you, hey, Muerto that Muerto is

12   doing this and doing that to me.  Never believe the gossip from

13   another person."

14   Q.   CW-1.  "Uh-huh."

15        Caballo:  "Come and ask this homie in person."

16   A.   Casper:  "There will always be, you'll have to listen to,

17   to several opinions so that you can make a decision about a

18   person.  Never, never make a decision.  Never think that

19   Chentino or me or Playa or Muerto or whomever, homie, that we

10:16AM 20   are fucking up if only one person speaks.  There always has to

21   be four people who speak, homie, when more than four people

22   make decisions regarding a person."

23   Q.   Duke:  "Have proof."

24   A.   Casper:  "There's something wrong there with that person,

25   understand?"

1    Q.    Muerto:  "Uh-huh."

2    A.    Casper:  "Never, never, never, let yourself be tricked,

3    homie."

4    Q.    Muerto:  "Don't justify."

5    A.    Casper:  "Because in this we're always some shit.  We

6    are -- we're like a nest full of was wasps, dude, and you're

7    never going to be okay with all the wasps, homie.  There will

8    always be one that's jealous or who will think."

9    Q.    Caballo:  "Or will want to sting you."

10:16AM 10   A.    CW-1:  "Uh-huh."

11   A.    Casper:  "Or they'll think or they'll try to fuck you

12   over."

13   Q.    Turning to page 17 now.  The middle of the page.

14   A.    Casper:  "You have to get ready to hit those guys in the

15   face who say, oh, the Everetts did the killing.  No, I did the

16   killing."

17   Q.    Duke:  "Look, you did.  It, you didn't do it for any

18   clique, you did it for the letters."

19         Animal:  "Yes."

10:17AM 20   A.    Playa:  "You will have to forgive me homie, but supposedly

21   the Everetts are trying to take credit for that murder, homie.

22   You know, that's the thing."

23         Casper:  "No, but look, Playa, and then they went to

24   loot the -- (unintelligible)."

25         Casper:  "Let it be heard on the streets."

           1            Playa:  "(Unintelligible)."

           2            Casper:  "Let it be heard on the streets and with the

           3     police that the Everetts did it, homie.  It's to our

           4     advantage."

           5     Q.   Animal:  "Right."

           6            Unidentified male:  "Yeah."

           7     A.   Casper:  "It's good for you and it's good for us.  What is

           8     good for us here is that when as a homeboy up for the Eastside,

           9     which you will be, you say, hey, there goes Animal, a homeboy

10:18AM 10     from the Eastside, dude."

          11     Q.   Caballo:  "And puff your chest out, dude."

          12            Animal:  "Yes."

          13     A.   Casper:  "And I'm the one that did it."  -- excuse me --

          14     "and I'm the one that did that hit, yeah.  With the Mara, guys,

          15     and if some civilian comes to ask you, hey, homie who did it,

          16     you say it was the Everetts.  It was the Everetts and put the

          17     blame on them.  That's good for you, dog."

          18     Q.   Duke:  "Hey, but at that time when you did that hit or

          19     whatever you weren't in in the Everett clique."

10:18AM 20            CW-1:  "You were on observation."

          21     A.   Brujo:  "He was not with the Mara yet."

          22     Q.   Duke:  "Right, so then what he did."

          23     A.   Playa:  "And why did he do this hit as a paro?  They told

          24     him that he was in the Mara?"

          25     Q.   Duke:  "No, well, that's right because what he did then

1  was not a killing from Everett, instead he did it, you know."

2          Animal:  "Yeah, I was a paro there."

3          Duke:  "For himself.  He did it there representing the

4  letters."

5          MS. LAWRENCE:  Let's go to page 19, please.

6  A.   Lobo:  "Focus on the room.  I'm also going to look for a

7  room."

8          Casper:  "People are going to ask you

9  (unintelligible)."

10:19AM 10          Lobo:  "If anything comes up, I'll call you tomorrow."

11  Q.   CW-1:  "Let's look at that one, that one over there."

12  A.   Lobo:  "We can go in one car early tomorrow and one of us

13  can get out and the other one gets in and we can just drive

14  like that to see what the deal is in Somerville and Chelsea."

15  Q.   CW-1:  "Yeah, and if not.  And that one, that one over

16  there is in good area because as long as this guy is hiding out

17  and we just go to pick him up."

18  A.   Lobo:  "Dude, there is only a girl there and the old lady.

19  That's all.  It's behind City Hall."

10:20AM 20  Q.   Caballo:  "Why were you doing hits with the Everetts, why

21  are you now with the Eastsides, it's a bunch of things there."

22  A.   Lobo:  "Is it 122?"

23  Q.   CW-1:  "On Ford Street?  No, it's on --"

24  A.   Lobo:  "You have to talk to those people, dude."

25          Lobo:  "No, it's on that street by the cemetery

1    down --"

2    Q.   Muerto:  "And don't -- don't lower your head, walk with

3    your head held high and don't give a shit about what

4    (unintelligible)."

5         CW-1:  "Is it on Marlborough Street?  No?"

6    A.   Lobo:  "No, it's further down from Marlborough.  The one

7    that goes through by here and then from the school it goes up."

8    Q.   Muerto:  "Let's go then."

9    A.   Lobo:  "All right then."

10:20AM 10   Q.   CW-1:  "Let's go see."

11   A.   Lobo:  "I'll give you a call.  I'm going to speak to her

12   clearly tomorrow and I'll give you a call tomorrow around 5 or

13   3 in the afternoon to see what's going on."

14   Q.   CW-1:  "You got it."

15   A.   Casper:  "Look, I spoke to Pantera.  Do you know who

16   Pantera is?"

17   Q.   Animal:  "Oh, yeah.  I know that homeboy."

18   A.   Casper:  "So I already talked to that guy right and I

19   spoke about you with that dude, homie, and supposedly he was

10:21AM 20   going to meet with the Everetts to clear that thing up, homie.

21   From the looks of it he didn't clear it up too well because

22   they kept calling you but now we talked about what we're going

23   to do, you know?  The thing that's going to happen is that we

24   will also have to pay these homies that money.  What the dude

25   told me is that because they are going to start bugging us

1    about that money."

2    Q.   CW-1:  "Yes."

3    A.   Casper:  "Sooner or later, because we were bugging Crazy,

4    remember?"

5    Q.   Muerto:  "And how much money is it?"

6         CW-1:  "Hold on, but --"

7    A.   Casper:  "300 bucks."

8    Q.   CW-1:  "But there's one thing."

9         Caballo:  "Yeah, that's true because these homies gave

10:21AM 10    those dudes some money."

11    A.   Casper:  "What money?"

12    Q.   Caballo:  "That those guys gave some money to Chucho,

13    Chucho from the Everetts, because Chucho from the Everetts was

14    going to leave and Chucho never left and --"

15         CW-1:  "For that same killing, you know, that this guy

16    here did.  Supposedly Chucho had heat on him."

17    A.   Casper:  "But did that come from your pocket or from the

18    clique?"

19    Q.   Caballo:  "From the pocket of these homies."

10:22AM 20         Animal:  "No from our pockets."

21    A.   Casper:  "Whose pockets?  Which, dude?"

22    Q.   Unidentified male:  "From this one."

23    A.   Casper:  "From this one and who else?"

24    Q.   Animal:  "I gave him 100 and --"

25         Unidentified male:  "The kid running around with us."

1    A.   Casper:  "Huh?"

2    Q.   Unidentified male:  "The kid running around with us."

3         Animal:  "I did gave him 10, David gave him 100, Luis

4    gave him 50, Sergio gave him 50 and Chamuco gave him 40."

5    A.   Casper:  "None of them are in the Everetts clique?"

6    Q.   Animal: "No."

7         Unidentified male:  "That's what I'm saying, doggie."

8    A.   Casper:  "Oh, well.  It's done."

9         Casper:  "Then that debt is paid up."

10:23AM 10    Playa:  "We gave money and they are still charging

11   us."

12        Playa:  Remember that I told you that if you were with

13   us, I told you that whatever happened to you would happen to

14   all of us."

15   Q.   Animal: "No, yes."

16   A.   Playa: "And I literally said this to you, didn't I,

17   dude?"

18        Casper:  "Hey, Animal, I hope, homie, it's not for

19   anything, homie, but this stuff that we're talking about right

10:23AM 20   now won't be, dude, because homie you want to fix the problem

21   with them and I don't know if it is from the heart that."

22   Q.   Duke:  "For sure, homie."

23        Animal:  "No, but it is from the heart, homeboy."

24   A.   Casper:  "All right."

25        MS. LAWRENCE:  Let's turn to page 23.

1    A.    "Hey homie, let's jump this guy in now.

2    (Unintelligible)."

3          MS. LAWRENCE:   32.2.   It's a clip of a video recording

4    of a different part of this meeting.   Trooper Estevez, we're

5    going to play this now.

6          (Video played.)

7    Q.    Trooper Estevez, what did we just see there?

8    A.    That's the 13-second jump in of Animal into the Eastside

9    Locos Salvatrucha clique to become a homeboy.

10:25AM 10    Q.    And did you understand -- it's in the transcript, but did

11   you hear in Spanish anything that was said of interest to you?

12   A.    At the end once the beating was done, he was approached

13   and told, "Welcome to La Mara."

14   Q.    And did you see any actions taken by any of the

15   individuals after the jump-in that was significant?

16   A.    Yes, they all threw up the MS-13 hand sign, someone threw

17   up the MS-13 hand sign.

18   Q.    After this meeting on January 8, 2016, what happened next

19   in the investigation?   Well, did the investigation conclude

10:26AM 20   shortly after this meeting?

21   A.    Yes.

22   Q.    And what happened?

23   A.    There was a take-down of the investigation and all the

24   people that were charged were -- well, some of them were

25   arrested, some of them were arrested later on.

1    Q.   And when approximately was that that the arrests were

2    made?

3    A.   The initial arrest?

4    Q.   The initial arrest and the take-down.

5    A.   The exact date escapes me, but I believe it was

6    January 16th; is that correct?

7            MS. LAWRENCE:  All right.  No further questions at

8    this time.  Thank you.

9            THE COURT:  We might as well take our break now.

10:26AM 10            THE CLERK:  All rise.

11            (A recess was taken.)

12            THE CLERK:  Thank you.  You may be seated.  Court is

13    now back in session.

14            THE COURT:  Mr. Murphy, cross-examination.

15            MR. MURPHY:  Thank you, your Honor.

16                       CROSS-EXAMINATION

17    BY MR. MURPHY:

18    Q.   Good morning, Mr. Estevez.  My name is the Marty Murphy

19    and I represent Herzzon Sandoval.

10:41AM 20    A.   Good morning, sir.

21    Q.   Let me ask you, since you began working on this

22    investigation, at the very outset, you actually picked CW-1 up

23    at the airport?

24    A.   Yes.

25    Q.   And when was that, sir?

1    A.    I believe it was on August 2013.

2    Q.    And as of that time, sir, how long had you been a trooper?

3    A.    Six years.

4    Q.    And, sir --

5    A.    I'm sorry, as of that time?

6    Q.    As of that time.

7    A.    Five years.

8    Q.    Five years.  Thank you, sir.  Now, you said on direct

9    examination earlier in the week that CW-1 had a personal car

10:42AM 10   that he used to give folks rides, correct?

11    A.    Yes.

12    Q.    And that he posed as a gypsy cab driver, correct?

13    A.    Correct.

14    Q.    And that was in a car that was actually supplied by the

15    FBI, correct?

16    A.    The car wasn't supplied by the FBI.  He used his money to

17    buy it.

18    Q.    And did the money that he get from -- to buy that car, was

19    that supplied by the FBI?

10:42AM 20   A.    Oh, he was paid.  Yes.

21    Q.    He was paid by the FBI, he used the money the FBI gave him

22    to buy the car, correct?

23    A.    I suppose.

24    Q.    Now, sir, CW-1 had a phone that the task force had what

25    was known as a consensual Title III on, correct?

1    A.    Yes.

2    Q.    And a consensual Title III just means that CW-1 agreed

3    that the FBI could record all the calls that he made and all

4    the calls that were made to him, correct?

5    A.    Yes.

6    Q.    And during the investigation, CW-1 had a second phone,

7    correct?

8    A.    Yes.  Yeah, we allowed him to have a personal phone, a

9    second phone, so he can contact family and make personal calls

10:43AM 10    on it.

11    Q.    Right.  And those were the rules he was supposed to

12    follow, correct?

13    A.    I mean, that was his phone, it was his personal phone.  We

14    also had a pen register on that phone.

15    Q.    And that recorded -- and what a pen register does is

16    record the phone numbers that are called by the phone?

17    A.    Correct, it's almost like when you get the bill at the end

18    of the month.  It has all the calls you made with the telephone

19    numbers that you made.

10:44AM 20          THE COURT:  I don't think they send bills like that

21    anymore.

22    Q.    In the old days when they used to send bills like that?

23    A.    Correct.

24    Q.    And so that allowed you to know the numbers that CW-1

25    dialed and the numbers that dialed him, correct?

1    A.    Yes.

2    Q.    But it didn't allow you to record those conversations,

3    correct?

4    A.    Correct.  It was his personal phone.

5    Q.    It's fair to say, though, that CW-1 decided which phone he

6    was going to use whenever he placed a phone call, correct?

7    A.    Yes.  I mean, he had two phones, one was for what I would

8    call his work, which was for contacting the members, the MS-13

9    members and having conversations and the other one was his

10:44AM 10   personal phone that he used to contact his family and whoever

11   he wanted to contact that was on a personal matter.

12   Q.    But it was up to him to decide which phone to use?

13   A.    Right.

14   Q.    And he told you that he was going to use the personal

15   phone for only personal phone calls, correct?

16   A.    I mean, that's what I had known it was for.  You know, I

17   didn't have that conversation with him.  I didn't give him the

18   phones.

19   Q.    But you were relying on him to use the work phone for work

10:45AM 20   calls, correct?

21   A.    That's what it was for.

22   Q.    And to make sure that he didn't use the personal phone for

23   work calls, too, correct?

24   A.    Yes.

25   Q.    And you had no control of whether he gave the personal

1    phone to people that he wanted to talk to that were involved in

2    criminal activity, correct?

3    A.    No.

4    Q.    Now, there was a recording device that was installed in

5    CW-1's car, correct?

6    A.    Yes.

7    Q.    And it was up to CW-1 to decide when to turn it on and

8    when to turn it off, correct?

9    A.    Yeah, he would turn it on when he had members in the car

10:46AM 10   and he was able to collect evidence and when he had time to.

11   Sometimes the situations were fluid and they would jump in the

12   car and -- you know, it was kind of a little bit of process to

13   turn the recorder on, so if he had people in the car maybe it

14   wasn't safe for him to turn it on.

15   Q.    Fair enough, sir.  But you would agree that it was up to

16   him to decide when to turn it on, correct?

17   A.    Yes.

18   Q.    The task force wasn't doing that remotely, correct?

19   A.    Correct.

10:46AM 20   Q.    And you were relying on him to decide what conversations

21   should be recorded and what conversations shouldn't be,

22   correct?

23   A.    Of course.  I mean, we weren't in the car with him at the

24   time.

25   Q.    And you didn't regularly conduct surveillance of him,

1    correct?

2    A.    We did when we knew in advance we had something planned.

3    There was a clique meeting or there was going to be a

4    controlled buy of narcotics, but when he was on his own time,

5    he was on his own time.

6    Q.    Right.  And on a routine basis, day-to-day, you were not

7    following him around unless there was something planned?

8    A.    Correct.

9    Q.    Now, one of the things that CW-1 did after he was set up

10:47AM 10    with the gypsy cab was to listen to individuals who came into

11    the cab to talk about crimes they committed, correct?

12    A.    Correct.

13    Q.    And his role in that situation was simply to keep people

14    talking, correct?

15    A.    Yes.

16    Q.    But CW-1, Pelon, also did things proactively, correct?

17    A.    Yes.

18    Q.    And he worked with the members of the task force to decide

19    how to approach those situations where he was going to do

10:47AM 20    something proactively, correct?

21    A.    Correct.

22    Q.    So, for example, we've had heard evidence in this case

23    about the so-called drug protection details, right?

24    A.    Yes.

25    Q.    And you participated in each of those drug protection

1    details, correct?

2    A.    I did.

3    Q.    And you worked closely with CW-1 to set those up, correct?

4    A.    We worked all as a task force, yes.

5    Q.    The task force worked closely with CW-1 to set those up?

6    A.    Correct.

7    Q.    And I think to state the obvious, the FBI really had no

8    reason to want to take drugs from its evidence locker, from

9    Boston to New Hampshire, right?

10:48AM 10    A.    I don't understand the question.

11    Q.    Well, there was no reason that the FBI needed to have

12    drugs that were safe in its evidence locker taken to

13    New Hampshire, correct?

14    A.    Correct.

15    Q.    Those drugs were safe in the FBI evidence locker?

16    A.    Correct.

17    Q.    And where is that?  Is that in Chelsea?

18    A.    I have no idea.

19    Q.    Okay.  But the FBI agents that you were working with

10:48AM 20    retrieved the drugs and brought them to Chelsea, correct?

21    A.    Yes.

22    Q.    And they arranged for them to be transported to

23    New Hampshire, correct?

24    A.    Yes.

25    Q.    And, sir, the FBI agents and the task force members who

| | |
|---|---|
| 1 | were involved were actually like actors, correct? |
| 2 | A.   Actors? |
| 3 | Q.   Sure, they were playing a role.  You played a role, for |
| 4 | example, in a number of these. |
| 5 | A.   I played one role, yes.  I made a telephone call. |
| 6 | Q.   And you pretended to be someone you were not, correct? |
| 7 | A.   Correct. |
| 8 | Q.   So the FBI got the drugs out of the evidence locker, |
| 9 | brought them to New Hampshire and Pelon, CW-1, was pretending |
| 10:49AM 10 | to play a part, too, correct? |
| 11 | A.   Right. |
| 12 | Q.   And in those situations, he was pretending to play the |
| 13 | part of a drug dealer, correct? |
| 14 | A.   Courier. |
| 15 | Q.   Courier? |
| 16 | A.   Yes. |
| 17 | Q.   And that was a role that he had some experience with in |
| 18 | real life? |
| 19 | A.   Yes. |
| 10:49AM 20 | Q.   And you were playing a role in one of them, you said? |
| 21 | A.   Yes. |
| 22 | Q.   And what role were you playing? |
| 23 | A.   I made the phone call acting as the drug dealer. |
| 24 | Q.   And when people went to pick up the drugs, was that at the |
| 25 | Kowloon parking lot in Saugus? |

1    A.    Yes.

2    Q.    And were there people there playing the role of

3    individuals delivering the drugs to Pelon?

4    A.    Yes, undercover officers.

5    Q.    And so they were essentially acting the part of drug

6    dealers, correct?

7    A.    Yes.

8    Q.    And there were people in New Hampshire on the receiving

9    end -- undercover agents, correct?

10:50AM 10   A.    Correct.

11   Q.    And they were, you know, essentially acting out a role as

12   well, correct?

13   A.    Yes.

14   Q.    They were acting out the role of receiving the drugs?

15   A.    Right.

16   Q.    And there were video recordings that were set up for these

17   transactions, correct?

18   A.    Correct.

19   Q.    And still photographs taken, correct?

10:50AM 20   A.    Yes.

21   Q.    And it was essentially -- Trooper, this may be before your

22   time, but it was like an episode of *Candid Camera* where

23   everybody but the people who were involved in the drug

24   transaction knew what was really going on, correct?

25   A.    Well, they knew what was going on.  They thought they were

1    transferring a large quantity of drugs from one drug dealer to

2    another one.

3    Q.    Well, you'd agree, sir, that everybody who was working

4    with law enforcement knew that these were the FBI drugs and

5    they were being brought to New Hampshire solely for the purpose

6    of making a case, correct?

7    A.    Well, we knew, yes.

8    Q.    But none of the other people did, of course, correct?

9    A.    Right, they thought that they were protecting drugs.

10:51AM 10           MR. IOVIENO:  Objection.  Motion to strike.

11           THE COURT:  I'll let it stand in context.

12   Q.    Now, so that was one kind of occasion when CW-1 helped you

13   do some things that were proactive, correct?

14   A.    Correct.

15   Q.    And there were other kinds of things that he did that you

16   worked with him to do proactive things, correct?

17   A.    Right.

18   Q.    So, you testified on your first day of direct examination

19   about events that took place on May 12, 2015, correct?

10:51AM 20   A.    Okay.

21   Q.    That was a stabbing that took place in Highland Park in

22   Chelsea, do you recall that?

23   A.    Yes, I do.

24   Q.    In that case, you recall, sir, from your work on the task

25   force that Muerto was with Pelon, CW-1, correct?

```
 1    A.    Yes.

 2    Q.    And they got a call from some individuals who were at a

 3    park in Chelsea, correct?

 4    A.    Yes.

 5    Q.    And those individuals were members of the Eastside clique?

 6    A.    Yes, some were, some were from a different clique.

 7    Q.    And as a result of that call, sir, you know from your work

 8    on the task force, Pelon and Muerto were together, right?

 9    A.    Yes.

10    Q.    And Pelon or Muerto called another person, correct?

11    A.    Yes.

12    Q.    And who was that?

13    A.    He went by Mingo.  His real name is Domingo DeSol.

14    Q.    Domingo, correct?

15    A.    Yes.

16    Q.    And you've learned from your work on the investigation

17    that Pelon asked Domingo to get a knife and meet them, correct?

18    A.    Yes.  There was one version of it like that, yes.

19    Q.    And that was Muerto's version, correct?

20    A.    Yes.

21    Q.    And Muerto was a person that you interviewed in detail

22    about this, correct?

23    A.    Yes.

24    Q.    And that was in one of the meetings that you had with him,

25    correct?
```

```
 1    A.   Correct.

 2    Q.   And that was a meeting that you had with him when he was

 3    under an obligation to tell the complete and accurate truth,

 4    correct?

 5    A.   Correct.

 6    Q.   And after Pelon asked Domingo to bring the knife, Pelon

 7    and Muerto and Domingo went to the park, correct?

 8    A.   Yes.

 9    Q.   And an individual named Minor Ochoa was stabbed, correct?

10:53AM 10    A.   Yes.

11    Q.   Stabbed by Muerto, correct?

12    A.   One story, yes.

13    Q.   According to Muerto.

14    A.   According to Muerto, yes, he stabbed him.

15    Q.   And according to Muerto, when you met with him, he told

16    you that Pelon helped, right?

17    A.   Yes.

18    Q.   And you'd agree, sir, that that was proactive activity

19    that the task force members had not authorized, correct?

10:54AM 20         MS. LAWRENCE:  Objection.

21         THE COURT:  Overruled.

22    A.   Correct.

23    Q.   So, Muerto was out there -- pardon me, so Pelon was doing

24    some proactive work at the direction of the FBI, correct?

25    A.   Yes.
```

1    Q.   And the task force, and some proactive work that was on

2    his own, correct?

3    A.   Well, I mean, in that situation, it was difficult.

4    There's a few different versions of it, but, you know, Pelon at

5    the time, CW-1 was with other MS-13 members and he's an MS-13

6    member, and they believed him to be an MS-13 member and, you

7    know, if he were involved in a situation where there was a

8    violent act like that being committed and they didn't see him

9    acting, or trying to help, or make an attempt to help, that

10   would put his safety at risk, so when you say he helped,

11   there's different versions of how he helped.

12   Q.   Okay.  Well, you talked in detail to Muerto about it,

13   correct?

14   A.   I did.

15   Q.   And the government you know in this case has put Muerto on

16   the stand, correct?

17   A.   Yes, sir.

18   Q.   And what Muerto said is that he was in the car with Pelon

19   and that Pelon --

20            MS. LAWRENCE:  Objection, your Honor.

21            THE COURT:  Overruled.

22   Q.   And that they were going to --

23            MR. POHL:  Judge, may we approach?

24   Q.   -- get something to eat, correct?

25            THE COURT:  Yes.

1          (THE FOLLOWING OCCURRED AT SIDEBAR:)

2          MR. POHL:  I don't think it's proper for Mr. Murphy to

3     ask as to what Hernandez Miguel testified at during the trial,

4     how could he possibly know that?  And how would he be in a

5     position to comment on it?

6          THE COURT:  I guess it's fair that he didn't know what

7     was said at the trial, but I was also assuming it was a set up

8     to something.

9          Mr. Murphy, where are you going with this?  He

10:56AM 10   obviously can't comment on Muerto's credibility.

11          MR. MURPHY:  No, your Honor.  I was talking really

12     about authorized and unauthorized acts and --

13          THE COURT:  Where is that leading?

14          MR. MURPHY:  Well, first of all, I'm asking about

15     what -- this officer was present at Muerto's proffer when he

16     told about this, so --

17          THE COURT:  Well, you can ask about the proffer.

18          MR. MURPHY:  I'll make it clear about that.  The

19     answer, the question, your Honor, is that in terms of -- the

10:57AM 20   government has offered testimony through Muerto that it was

21     essentially Herzzon Sandoval, my client, arranged to get

22     Animal, Joel Martinez, back from New Jersey.

23          THE COURT:  Right.

24          MR. MURPHY:  I think I'm entitled to explore what the

25     government was doing to cause certain events to happen rather

 1    than what Mr. Sandoval was doing, and this is a lead-in to

 2    that.

 3         THE COURT:  I'm not sure I follow that.  In other

 4    words, first off, you can't impeach Muerto through prior

 5    inconsistent statements, or otherwise through this witness.

 6    It's not clear to me who you're impeaching or what you're

 7    establishing, and none of this has to do with Animal.  If I

 8    have my facts right, aren't we in Highland Park still?

 9         MR. POHL:  Yes.

10:57AM 10    THE COURT:  So I'm not following where you're going

11    with this.

12         MR. MURPHY:  First off, I think I should be allowed to

13    impeach Muerto through this witness.  He was there at the

14    proffer where he made statements inconsistent with his

15    testimony.

16         THE COURT:  Hasn't Muerto already been impeached with

17    his prior inconsistent statements?  I mean, what does this

18    witness add that isn't extrinsic evidence of a prior

19    inconsistent statement through a different witness when Muerto

10:58AM 20    himself testified, and I think he --

21         MR. MURPHY:  No, but he denied, your Honor, saying

22    those things.  He admitted that the statements said it, but he

23    denied saying those things.  He denied a number of those

24    things.

25         MR. POHL:  And then the proffer statements were read

 1    in, and that's --

 2         THE COURT:  And I think that's the way you do it.  You

 3    don't call another witness to impeach that.  I think you read

 4    in the prior inconsistent statements, which I think is what

 5    happened.  I mean, I'd have to take it on a

 6    question-by-question basis, but that's my memory of it.

 7         But --

 8         MR. LOPEZ:  Your Honor, with all due respect, there's

 9    two ways to put in an inconsistent statement.  One is

10:58AM 10    confronting the witness who said it, but also putting another

11    witness on the stand who was present when the inconsistent

12    statement was made.

13         MR. POHL:  But that -- you don't get to do it three or

14    four times, right?  You can do it one way or you can do it the

15    other way.  I don't think you can do it both ways.  And now

16    that the -- the point is to make sure that the witness'

17    inconsistent statement is before the jury.  That happened

18    through the witness.

19         MR. LOPEZ:  He --

10:59AM 20    THE COURT:  I allowed the proffer statement to be read

21    even though it was a 302 and it wasn't a statement.

22         MR. LOPEZ:  But then he said that's what the report

23    says.  He didn't say that's what I said.

24         MR. MURPHY:  Your Honor, given where we've stopped

25    with this witness, which he has just essentially given a long

1    explanation for why Pelon, you know, might or might not have

2    participated with the stabbing, I would like to ask one

3    question.  The FBI did not instruct or the task force did not

4    instruct Pelon to call Domingo to bring the knife that day and

5    then move on.  I think that would be fair, give where he has

6    left and then I'll move onto a different subject.

7               THE COURT:  Why don't we handle it that way.

8               (SIDEBAR CONFERENCE WAS CONCLUDED)

9               THE COURT:  Go ahead, Mr. Murphy.

11:00AM 10       MR. MURPHY:  Thank you, your Honor.

11   Q.    You'd agree, sir, that nobody from the FBI or the task

12   force instructed CW-1 to call Domingo and say bring a knife,

13   correct?

14   A.    Yes.

15   Q.    Now, sir, the stabbing of Irvin De Paz took place on

16   September 20, 2015, right?

17   A.    It sounds about right.

18   Q.    And it's fair to say that during the course of this

19   investigation.  There's been no evidence developed that anyone

11:00AM 20   from Eastside knew about that stabbing in advance, correct?

21   A.    Correct.

22   Q.    Now, you have determined however that Pelon, CW-1, did

23   know Joel Martinez before September 20, 2015, correct?

24   A.    I'm not sure.

25   Q.    Okay.  You don't know one way or the other whether he --

1    A.    I think he met him after that incident.

2    Q.    Okay.  Now, if we could go to, with the Court's

3    permission, Exhibit 103 for the witness.  And, Trooper Estevez,

4    have you seen this transcript before, Exhibit 103?

5              THE CLERK:  This is in evidence?

6              THE COURT:  Yes, it is in evidence.  You just want it

7    for the witness?

8              MR. MURPHY:  For the witness, if I may, first.

9    A.    Yes, I've seen it.

11:01AM 10   Q.    And do you recognize that as a conversation that took

11   place between Mr. Martinez, also known as Animal, and Pelon,

12   CW-1, on October 2, 2015?

13   A.    Yes.

14             MR. MURPHY:  If we could show it to the members of the

15   jury, please.

16   Q.    Do you know whether Mr. Martinez and Pelon, CW-1, had ever

17   spoken before October 2, 2015?

18   A.    I don't think so.

19   Q.    Now, Pelon says to CW-1 at the bottom of the page, and

11:02AM 20   "Hey, you just didn't take down any motherfucker, some idiot."

21             Did I read that correctly?

22   A.    Yes.

23   Q.    And Animal says, "No, a major culero."

24   A.    Correct.

25   Q.    And CW-1 says, "A major culero, I had already smashed his

1    head, dude, didn't they tell you?"

2    A.    Yes.

3    Q.    Did I read that correctly?

4    A.    Correct.

5    Q.    And in the course of your investigation, did you try to

6    learn whether CW-1 had, in fact, had a prior altercation with

7    Irvin De Paz?

8    A.    During these conversations with these MS-13 members, he

9    would often embellish and make things up to make himself sound

11:03AM 10    better and make himself sound like he's out there doing things.

11    He would often ask us about incidents that had happened

12    non-related in the area, and that way he could say that he saw

13    it, or he was there, or he would make things up from things

14    that he's heard on the news and things like that so they can

15    believe that when he talked to them that he was being active

16    out there, being proactive for the MS-13.

17    Q.    If we could turn to the next page, please.  About a third

18    of the way down, he says, "Scooby and I -- ask Snoopy.  I gave

19    him a fucking beating with Snoopy."

11:04AM 20          Did I read that correctly?

21    A.    Yes.

22    Q.    Are those real people that you know of from the course of

23    the investigation?

24    A.    Correct, I do.

25    Q.    So if CW-1 was concerned about verifying his credentials

1   to Mr. Martinez, is it fair to say that he had given them some

2   names that Mr. Martinez could check with?

3   A.   He did.

4   Q.   And if he hadn't done it, that is, if he hadn't beaten

5   Mr. De Paz and Mr. Martinez checked with those individuals,

6   Mr. Martinez would find out that CW-1 was lying, correct?

7   A.   I mean, there's a lot of people with the same nicknames

8   out there.  I don't know if Animal at the time knew who Scooby

9   or Snoopy were.  He could have just made it up on the fly, so

11:05AM 10   I'm not sure that's correct.

11   Q.   But you don't know.  You're just guessing.  You don't know

12   one way or the other, correct?

13   A.   I don't.

14   Q.   But it is true that CW-1 said that he had beaten

15   Irvin De Paz, correct?

16   A.   Correct.

17   Q.   And it is true that he told Mr. Martinez, Animal, if you

18   don't believe me, ask these two other people, correct, in

19   essence?

11:05AM 20   A.   That's what he said, yes.

21   Q.   And it's a fact, sir, is it not, that you don't know one

22   way or the other whether CW-1 had actually beaten up

23   Irvin De Paz before his stabbing by Joel Martinez?

24   A.   I don't.

25   Q.   Now, after this conversation, Mr. Martinez went to

1    New Jersey, correct?

2    A.    Yes.

3    Q.    And the FBI and the task force knew that he had gone to

4    New Jersey, correct?

5    A.    We had heard information from CW-1 that he had moved to

6    New Jersey.

7    Q.    Because he was in regular contact with CW-1, correct?

8    A.    Correct.

9    Q.    And CW-1 was calling him regularly, correct?

11:06AM 10   A.    Yes.

11   Q.    To stay in touch with him, correct?

12   A.    Correct.

13   Q.    And you had known by this point that Mr. Martinez had

14   confessed to the murder of Mr. De Paz, correct?

15   A.    We had the video, yes.

16   Q.    Now, was there a time when CW-1 went down to visit

17   Mr. Martinez in New Jersey?

18   A.    Yes.

19   Q.    And did you go with him?  Was there surveillance?

11:06AM 20   A.    I did not go with him.

21   Q.    Did you debrief him afterwards?

22   A.    I'm sure someone did.  I didn't.  I don't think I did

23   personally.

24   Q.    And when that debriefing took place, do you know whether

25   Pelon, CW-1, told the agents who debriefed them where

Mr. Martinez was living?

A.    I believe he did.

Q.    So the task force knew where he was living in New Jersey,
correct?

A.    I believe so, yes.

Q.    Now, at that point, sir, you knew that Mr. Martinez had
been involved in a murder, correct?

A.    Yes.

Q.    And you knew where he was living in New Jersey, correct?

11:07AM   A.    Yes.

Q.    Is it fair to say that at no time during this
investigation before Mr. Martinez was arrested, the members of
the gang task force give a photograph of Mr. Martinez to the
Boston Police to put in a photo array for a witness?

A.    That we never did?

Q.    Yes.

A.    Photo array?

Q.    Before Mr. Martinez' arrest as part of the big --

A.    The only evidence that this task force had developed was
11:07AM   the video evidence from the vehicle that CW-1 was driving, so
we had a picture from that particular video.  That's all we had
at that point.  So at this point, if we were to give that video
or that picture or take a picture of the video of the face and
put that in a photo book, it would, 1, identify that we had a
video, and I don't know what police department wouldn't ask for

1    that video at that point.

2           And that picture was also taken in a car, which I'm

3    sure that if that picture was shown, people would understand

4    that we had a car and Animal would be able to put that later

5    on, two and two together, that that was his conversation with

6    CW-1, and, again, it would put the safety of CW-1 at risk and

7    the safety of -- not the safety, but the entire case and all

8    the other individuals, the leaders that we were trying to get

9    to and the other members that we were trying to arrest with

11:08AM 10   time and identify at risk of them fleeing because, as you know,

11   MS-13 is a very transient gang, and --

12          MR. MURPHY:  Your Honor, I'm going to ask the witness

13   to cease the answer at that point.

14   Q.   Sir, your testimony is that's the only photograph you had

15   of Joel Martinez?

16   A.   Well, there was a video at the time.

17   Q.   And it's your testimony there was no other photograph that

18   the police had?

19   A.   That I knew of at the time, right after the confession,

11:09AM 20   that's the only evidence.

21   Q.   And you weren't here when --

22   A.   I'm sorry?

23   Q.   You weren't here when Special Agent Wood testified?

24   A.   I was not.

25   Q.   Now, did the task force conduct any investigation as to

 1   whether Mr. Martinez was in the country legally?

 2   A.   I'm sure we did.

 3   Q.   All right.  And do you know what the results of that

 4   investigation were?

 5   A.   I believe he was undocumented.

 6   Q.   And so you're aware, sir, that immigration authorities can

 7   pick up an undocumented alien at any time for any purpose?

 8   A.   Yes.

 9   Q.   And it's fair to say that the task force didn't request

11:10AM 10   that immigration pick up Mr. Martinez at any time after his

11   confession to murder on November 2, 2015, correct?

12   A.   That's correct, because the immigration system -- let me

13   finish the answer, sir.  I'm going to give you the reason why

14   that didn't happen, and that is because --

15   Q.   Please, sir.

16        THE COURT:  Hold on.  Do you want the reason why,

17   Mr. Murphy?

18        MR. MURPHY:  I think --

19   Q.   Let me ask you this.  If the immigration -- if he had

11:10AM 20   been -- if you had alerted the immigration authorities, they

21   could have deported him?  Yes or no, sir.

22   A.   Immigration has one job, and that's to round up

23   undocumented individuals and deport them.

24   Q.   Yes.

25   A.   And once they're in immigration custody --

1        THE COURT:  Hold on.  The question will be asked on

2   redirect why you didn't do that.

3   Q.   Now, after Pelon visited Mr. Martinez in New Jersey, Pelon

4   came back, correct?

5   A.   Yes.

6   Q.   And then he and the agents on the task force devised

7   another proactive plan, correct?

8   A.   Yes.

9   Q.   And that was for him and Muerto to go down to New Jersey

11:11AM 10   to bring him back, correct?

11   A.   Correct.

12   Q.   And that was something that the task force knew about,

13   correct?

14   A.   Yes.

15   Q.   And the task force knew that Mr. Martinez was back in the

16   Boston area, correct?

17   A.   Yes.

18   Q.   Because the task force knew that he was at odds with the

19   Everett clique, correct?

11:11AM 20   A.   Correct.

21   Q.   And that was because he owed money, correct, to the

22   Everett clique?

23   A.   There was a debt owed and there was some issues because

24   they didn't want to promote him to become a homeboy.

25   Q.   Because at one point he had been an 18th Street member, is

1    that correct, or hung around with 18th Street members?

2    A.   He first wanted to be promoted to become a homeboy, and

3    the reason they weren't doing that is because they had -- there

4    was information that they were saying that before becoming

5    MS-13, or hanging out with MS-13, he had 18th Street friends,

6    one of which he attacked also.

7    Q.   And so those were the things that he was at odds with the

8    Everett clique about, correct?

9    A.   Yes.

11:12AM 10    Q.   And the -- and you knew that he was at odds with the

11    Everett clique, correct?

12    A.   Yes.

13    Q.   And so the plan was to try to see whether he could be

14    introduced to members of the Eastside clique, correct?

15    A.   Correct.  We wanted Animal to come back and stay in Boston

16    because obviously we had pending charges on him, and we didn't

17    want him to be in New Jersey where -- like, again, they're very

18    transient, they could disappear, go to a different state and

19    then we'd lose them, so we had to get him back to Boston so we

11:13AM 20    could keep an eye on him and keep him here.

21    Q.   Okay.  And because you wanted to introduce him to members

22    of the Eastside clique, correct?

23    A.   That was the idea.

24    Q.   That was the idea, correct?

25    A.   For Mako to introduce him, yes.

1    Q.   Now, you said you wanted to keep an eye on him, correct?

2    A.   Correct.

3    Q.   What exactly did you do to keep an eye on Joel Martinez

4    between the time he came back and the time that he was jumped

5    into Eastside on January 8th?

6    A.   Well, he was in close contact with CW-1 and CW-1 was

7    reporting on him constantly.

8    Q.   He committed at least one stabbing, correct?

9    A.   That is correct.

11:13AM 10    Q.   And he may have committed a second, correct?

11    A.   Correct.

12    Q.   After he was brought back here?

13    A.   Yes.

14    Q.   And while you were keeping an eye on him, correct?

15    A.   Well, again, he was reporting on Animal at the time.

16    Again, we couldn't have made the arrest on Animal because it

17    would have, again, put CW-1's safety at risk and the integrity

18    of the case at risk.

19    Q.   Your decision, you'd agree, to bring him back from

11:14AM 20    New Jersey back to Boston?

21    A.   The task force's decision, yes.

22    Q.   Now, you testified about a meeting that took place on

23    January 8, 2016 of the Eastside clique?

24    A.   Yes.

25    Q.   And that was the meeting that -- where Mr. Martinez,

1    Animal, was jumped into the clique, correct?

2    A.    Yeah, he was jumped in because of the homicide.

3    Q.    And we've heard the tape, correct?

4    A.    Yes.

5    Q.    And you'd agree, sir, that he was jumped in after that

6    homicide was completed, correct?

7    A.    Yes.

8    Q.    After the fact, correct?

9    A.    Yes.

11:15AM 10    Q.    And he was arrested shortly thereafter, correct?

11    A.    Yes.

12    Q.    And you testified earlier that you have no evidence from

13    the task force that anyone from the task force knew of

14    Mr. Martinez' participation in the murder of Mr. De Paz before

15    it took place, correct?

16    A.    Yes.

17    Q.    So, jumping him in and all the other statements that were

18    made.  And in that meeting -- sorry, your Honor.  In that

19    meeting, in addition to jumping him in, they also agreed to

11:15AM 20    help him find a place to stay, correct?

21    A.    Yes.

22    Q.    And hide him from the police, correct?

23    A.    Correct.

24    Q.    And all of those things were things that they did, you'd

25    agree, almost three months after Mr. De Paz' murder?

1    A.    Yes.

2    Q.    And they were all done, you'd agree, after the fact?

3    A.    Yes.

4          MR. MURPHY:  May I have a moment, your Honor?

5          THE COURT:  Yes.

6          MR. MURPHY:  No further questions, your Honor,

7    thank you.

8          THE COURT:  All right.  Mr. Iovieno.

9          MR. IOVIENO:  Thank you, your Honor.

11:16AM 10                    CROSS-EXAMINATION

11   BY MR. IOVIENO:

12   Q.    Good morning, again.

13   A.    Good morning, sir.

14   Q.    You testified that the video that you identified here on

15   your prior testimony, there are a number of people present

16   inside that garage, right?

17   A.    For the Animal beating?

18   Q.    Yes.

19   A.    Yes.

11:16AM 20   Q.    And the camera didn't catch all the people that were

21   present at that meeting, right?

22   A.    I don't know.  It's a long video.  It probably did.  It

23   maybe missed one or two people, I don't know.

24   Q.    Okay.  But the camera was focused at periods of times up,

25   and then it moved down because CW-1 was moving up and down?

1    A.    Yes.

2    Q.    Okay.  And you understand that there were conversations

3    that were occurring overlapping each other, right?

4    A.    Yeah, there was a lot of people talking.

5    Q.    A lot of people talking at once?

6    A.    Yes.

7    Q.    And there was a lot of people talking off camera?

8    A.    Yes.

9    Q.    And you didn't identify everybody who was in that meeting,

11:17AM 10    did you?

11    A.    Again, there might have been one or two people that

12    weren't identified.

13    Q.    There could have been more than one or two people, right?

14    How many people were there?

15    A.    I'm not sure.  I have -- I'm sure there's a list of people

16    that were there from a debrief with CW-1 which usually happens.

17    Q.    But you don't know how many people?

18    A.    Not off the top of my head.  No, I don't.

19    Q.    And, again, from your testimony previously, you identified

11:18AM 20    another individual who was identified as Lobo, correct?

21    A.    On the video?

22    Q.    No, you identified in your investigation another person

23    named Lobo, right?

24    A.    It wasn't another person.  They just had the wrong name.

25    It was early in the investigation.  Are you taking about the

1    name that was different?

2    Q.   It was Jose Argueta Rodriguez.  It was another person

3    named Lobo, correct?

4    A.   It's not another person.  It's the same person with a

5    different name.

6    Q.   You said the other day it was another person?

7    A.   You said -- I never said it was a different person.  You

8    said is this the person you identified as Lobo, and I said yes.

9    Q.   You identified another person identified as Lobo in the

11:18AM 10   drug protection detail of December 14th as a target, did you

11   not?

12   A.   I'm not sure I understand.

13   Q.   You don't remember your testimony from the other day?

14   A.   I'm not sure I understand the question, sir.

15   Q.   Did you or did you not testify that the target of the

16   investigation for the December 8, 2014 drug protection detail

17   identified another individual by the name of Lobo?

18   A.   I don't know.  I don't think so.  I don't know.

19   Q.   You don't think so, or you just don't remember?

11:19AM 20   A.   I don't remember.

21           MR. IOVIENO:  Thank you.

22           THE COURT:  Mr. Lopez.

23                       CROSS-EXAMINATION

24   BY MR. LOPEZ:

25   Q.   Trooper Sanchez.

1    A.   Estevez.

2    Q.   Estevez.  The transcripts that you've reviewed, have you

3    reviewed them as you were listening to the tapes?

4    A.   In the past, yes, I have.

5    Q.   And did you have any role in identifying who the speakers

6    were?

7    A.   On which transcript?

8    Q.   On any of the transcripts.

9    A.   Did I have a role?

11:19AM 10    Q.   Yes.

11    A.   In identifying who the speakers were?

12    Q.   Yes.

13    A.   You'd have to be more specific.  I've listened to a lot of

14    transcripts and videos.

15    Q.   There's been testimony in this case that it was Muerto who

16    identified the speakers in the transcripts that the government

17    is offering?

18    A.   Correct.

19    Q.   Is that what your understanding is?

11:20AM 20    A.   I believe so, yes.

21    Q.   So you did not have a role with identifying the speakers

22    in the transcripts that have been presented in this case,

23    correct?

24         MS. LAWRENCE:  Objection, your Honor.

25         THE COURT:  Overruled.

1    A.    In this final transcript?  No.

2          MR. LOPEZ:  Thank you.

3          MR. NORKUNAS:  Nothing, Judge.

4          THE COURT:  Redirect.

5                        REDIRECT EXAMINATION

6    BY MS. LAWRENCE:

7    Q.    Trooper Estevez, why didn't you tell the immigration

8    authorities to arrest Animal on administrative immigration

9    charges in the fall of 2015?

11:20AM 10   A.    So through our time with this investigation, immigration

11   has, like I said, one job, and that's to deport undocumented

12   immigrants from the country.  Once that process is started,

13   once they have that person in custody -- I know through the

14   investigation, because it happened to us before, once that

15   person is in custody with them, it's about a two to three-week

16   turnaround before they're on the plane, and we know through the

17   investigation that MS-13 members who have committed crimes and

18   know that they're possibly pending charges against them would

19   expedite their deportation out of the country, so they're not

11:21AM 20   charged with those crimes, and they're forced to stay here in

21   jail.

22          So once they're in custody, they can waive their right

23   to -- I believe it's like an immigration trial, or I don't know

24   exactly what the process is, but they waive that right, and

25   they're swiftly on the plane back home to wherever they're

1    from.

2           In that case, we would have, again, lost Animal to

3    El Salvador, or I believe he's Salvadorean, to his country of

4    origin, and the murderer would have been gone.

5    Q.   You said that happened to you before the investigation?

6    A.   Yes.

7    Q.   Was there a particular individual you were referring to?

8    A.   Smiley/Danger.

9    Q.   And you explained who that was, but can you remind the

11:22AM 10   jury how he's related to this investigation?

11   A.   He was involved in a homicide that occurred in Lawrence,

12   Massachusetts where an individual by the name of Fantasmo was

13   murdered.

14   Q.   And Trooper Estevez, was CW-1's safety the only reason you

15   didn't immediately arrest Animal once you heard him confess on

16   tape?

17   A.   No.  Again, it was a very large case with a lot of moving

18   parts.  There were a lot of targets, and instead of, as we say,

19   maybe putting a Band-Aid on the problem and arresting Animal

11:22AM 20   right away and not being able to get to the leaders and the

21   leadership here in Massachusetts who are kind of, you know, the

22   person that works the puppets from behind the scene.

23           MR. LOPEZ:  Objection, your Honor.

24           THE COURT:  I'll strike that piece of it.

25           MR. MURPHY:  Objection, your Honor.

1   A.   We needed to get to the leadership --

2          MR. MURPHY:  Objection, your Honor.

3          THE COURT:  I think the topic of why the investigation

4   wasn't taken down immediately was raised, and I'll let him

5   explain it.  I just don't want you to characterize individuals

6   or their roles, but go ahead.

7   A.   Again, we knew that there was a lot of different cliques,

8   a lot of different crimes being committed by these cliques, a

9   lot of different charges, a lot of violent acts that we were

11:23AM 10   doing, and we were trying to identify the majority of the

11   clique leaders and establish good cases against them, so we can

12   take down the entire organization here in Massachusetts and try

13   to create a void of MS-13 here for a while and stop the violent

14   acts that we were having.

15          THE COURT:  Let's stop there.

16   Q.   Trooper Estevez, you were asked some questions about the

17   drug protection details.  Just to be clear, the person that you

18   saw and identified as Lobo on surveillance during the

19   December 8, 2014 drug protection detail is the same person you

11:24AM 20   identified as Lobo here in this courtroom, correct?

21   A.   Correct.

22   Q.   Okay.

23          MS. LAWRENCE:  I have nothing further, your Honor.

24          THE COURT:  Mr. Murphy.

25

RECROSS-EXAMINATION

BY MR. MURPHY:

Q.   Trooper, you were working -- there was a Homeland Security

agent detailed to the task force, correct?

A.   Yes.

Q.   And who was that person?

A.   They change, but the last one was Agent Flynn.

Q.   And having a Homeland Security person assigned to the task

force allows you to work closely with immigration, correct?

11:24AM A.   Correct.

Q.   And you testified about Danger/Smiley being deported,

correct?

A.   Yes.

Q.   Did you know that Danger/Smiley had gone into immigration

custody before he was deported?

A.   No.

Q.   So it wasn't a case where you would have requested that

immigration take a person into custody, correct?

A.   Correct.

11:25AM Q.   And you don't know, you did not have an experience in this

case of having a person go into immigration custody and having

law enforcement say please keep him in the country, correct?

That did not happen in this case, correct?

A.   That we had somebody arrested by immigration and tried to

keep him?

1    Q.   And that you tried to keep him, correct?

2    A.   I don't remember.

3    Q.   And you know for a fact, sir, given immigration's

4    cooperation with law enforcement that if you had made that

5    request, Mr. Martinez would not have been immediately deported;

6    isn't that true, sir?

7    A.   I don't know for a fact.

8    Q.   You don't know one way or the other?

9    A.   I believe that they need a reason to hold him and to keep

11:25AM 10    them, and if he waives his right of whatever it is to see a

11    Judge, an immigration Judge, I believe that he's entitled to

12    his swift deportation out of the country.

13    Q.   And it's your testimony that a request from law

14    enforcement would not have been enough to keep him?

15    A.   I don't know that to be true.

16    Q.   You're guessing one way or the other, correct?

17    A.   I believe that they would need more.

18    Q.   But you don't know, sir, correct?

19    A.   Correct.

11:26AM 20    Q.   Because that's not something that you have ever tried in

21    your experience to do?

22    A.   To do what?

23    Q.   To try to have a person arrested on an -- in an

24    immigration custody and have law enforcement keep him there,

25    correct?

1    A.    Yeah.  We've done that.

2    Q.    You have done that?

3    A.    Yeah.

4          MR. MURPHY:  I have no further questions, thank you.

5          THE COURT:  Anything else?

6          MR. IOVIENO:  No, your Honor.

7          THE COURT:  All right.  You may step down.

8          MS. LAWRENCE:  No, thank you, your Honor.  We're

9    finished.

11:26AM 10         THE COURT:  The government rests?

11         MR. POHL:  I'm sorry, your Honor.  Yes.  The

12   government rests.

13         THE COURT:  All right.  Why don't we take a break.

14         THE CLERK:  All rise.

15         THE COURT:  A break for the jury.

16         I'll see counsel at sidebar.

17         (THE FOLLOWING OCCURRED AT SIDEBAR:)

18         THE COURT:  First, before we get to the motions, I

19   want to express my appreciation to all of you for expediting

11:27AM 20  the case.  What could have been a very lengthy case, I think,

21   was streamlined, and I very much appreciate that.

22         Is there a defense motion?  I guess I'll take it one

23   at a time, Mr. Lopez.

24         MR. LOPEZ:  Yes, your Honor.

25         THE COURT:  Motion for acquittal?

1           MR. LOPEZ:  Yes, motion for acquittal.

2           MR. NORKUNAS:  I join in that motion for acquittal for

3     this defendant.

4           MR. MURPHY:  A required finding of not guilty.  I

5     guess I'm not going to ask all the way for acquittal.

6           MR. IOVIENO:  I join in that motion.

7           THE COURT:  All right.  Those motions are denied.

8           All right.  Will there be a defense case?

9           MR. MURPHY:  Your Honor, Mr. Sandoval will read a

11:28AM 10     stipulation to the jury, which I think hopefully we now have,

11     that will be Mr. Sandoval's defense.

12           THE COURT:  Okay.  He's not going to read it, you're

13     going to read it, though?

14           MR. MURPHY:  One of us will read it.  Ms. Rodriguez

15     has been the most effective lawyer in the courtroom.

16           THE COURT:  I'm prepared to make that finding.

17           MR. MURPHY:  I was planning to read it, yes.  It's

18     about two pages long.

19           THE COURT:  Okay.  And is that it?

11:28AM 20           MR. NORKUNAS:  I have two documents to be introduced.

21     One is his work authorization form, and I think we had an

22     argument relative to relevance the other day.  I'm not sure if

23     the government is still pressing that, and the second one is a

24     portion of the January 8th transcript, and the government

25     wanted to ensure that I had the right version because there had

1    been multiple drafts, three pages of that.

2           THE COURT:  Okay.  Why don't I take a look at the work

3    authorization.  Are you still objecting to the work

4    authorization form?  It's either yes or no, either you object

5    or you don't.  You can say you don't object with a grimace on

6    your face.  I accept that.

7           MR. POHL:  All right, with a grimace, yes.  Can I just

8    say this before you put it in?  I just want to make sure that

9    this is 100 percent clear.  The phone number that is -- that we

11:29AM 10  used to tie Cesar Martinez to the drug protection detail is on

11   that form, all right, so I want to make sure that Mr. Norkunas

12   understands that before he offers this.  But if that's the

13   position that Mr. Norkunas that he wants it, then with a

14   grimace I will allow it.

15          THE COURT:  All right.  If it's offered, I don't

16   understand the government to object, and the transcript, is

17   that an issue?

18          MR. POHL:  No, give us 30 seconds to work it out, but

19   I think not.

11:29AM 20         MR. LOPEZ:  Your Honor, I anticipate calling my

21   wife -- my client's wife for some brief testimony.  I also have

22   some --

23          THE COURT:  Is she here today?

24          MR. LOPEZ:  She's not here today.

25          THE COURT:  Okay.  How far away is she?

1         MR. LOPEZ:  She's working.  I don't know if I can get

2    to her.  She doesn't pick up her phone.

3         THE COURT:  Is this something that we could handle

4    Tuesday without really -- because otherwise what I was about to

5    say was I'd send the jury home, and we will -- when we're done

6    with this and have arguments and instruction on Tuesday and

7    tell the jury that they're likely to get the case on Tuesday,

8    but if we have 15 minutes of testimony --

9         MR. LOPEZ:  It's not going to be a long witness, and I

11:30AM 10   also have some Registry of Motor Vehicle documentation and some

11   other business records that I think we can just agree on.

12        MR. POHL:  We'll talk.  It is whatever it is.  I agree

13   with the calculus about getting the case to the jury on

14   Tuesday.

15        THE COURT:  What we'll do, as soon as the jury is

16   ready, we'll bring them in.  We'll accomplish what we can

17   accomplishing today, including Ms. Rodriguez reading the

18   stipulation clearly and effectively, and I'll tell the jury

19   what's going on and that they should be prepared to be here all

11:31AM 20   day Tuesday, and then I'll send them home, and then we'll talk

21   about logistics, including the charge conference, the length of

22   closings, that sort of thing.  Okay.

23        MR. POHL:  Thank you, your Honor.

24        (SIDEBAR CONFERENCE WAS CONCLUDED)

25        THE CLERK:  All rise for the jury.

1          (JURORS ENTERED THE COURTROOM.)

2          THE CLERK:  Thank you.  You may be seated.  Court is

3     now back in session.

4          THE COURT:  All right.  Ms. Rodriguez, are we starting

5     with you?

6          MS. RODRIGUEZ:  Your Honor, with the Court's

7     permission, I'd like to read a stipulation between the

8     United States and Herzzon Sandoval.

9          THE COURT:  All right.  I may have given you this

11:44AM 10     instruction, ladies and gentlemen.  A stipulation is sort of a

11     fancy legal word.  It just means something that the parties

12     agree on, facts that they agree are true, and it appears that

13     the government and Defendant Sandoval have agreed that whatever

14     is about to be read is true and you may accept it as true.

15          Go ahead, Ms. Rodriguez.

16          MS. RODRIGUEZ:  The United States and Herzzon Sandoval

17     hereby stipulate and agree to the following facts:

18          "On May 28th, 2013, CW-1, also known as Pelon, advised

19     agents that he participated in a telephone conference led by

11:44AM 20     MS-13 member "Little Donkey," who was incarcerated in the

21     Ciudad Barrios Prison in El Salvador."

22          The parties discussed the MS-13 leadership's need for

23     money from MS-13 cliques based in the United States.  CW-1

24     advised agents that others present for the call included

25     "Blacky," incarcerated in Cuidad Barrios, formerly a leader of

 1    the Virginia Program in the United States, which is now called

 2    the East Coast Program; "Sicano" from Chalatenango,

 3    El Salvador; "Delinquente" from the Psycho Locos Salvatrucha

 4    TLS clique in Massachusetts, Noe Perez Vazquez, a/k/a "Crazy,"

 5    from the Everett Locos Salvatrucha ELS clique in Massachusetts;

 6    "Pacho," from the East Boston Salvatrucha EBS clique in

 7    Massachusetts, and "Scrappy," or "Little Scrappy," from Kansas

 8    City, Missouri."

 9           "On November 15, 2013, CW-1 advised agents that

11:45AM 10    Herzzon Sandoval, a/k/a, Casper, and Jose Hernandez-Miquel,

11    a/k/a "Muerto," spoke with MS-13 leaders in El Salvador who

12    wanted to make Muerto the leader of MS-13's Eastside Loco

13    Salvatrucha ESLS clique.  Additionally, MS-13 wants to make a

14    rule requiring members of the gang to send money to other MS-13

15    members who are imprisoned."

16           "On February 7th, 2014, CW-1 advised agents that

17    Herzzon Sandoval, a/k/a "Casper," talked about the shooting of

18    an MS-13 member named Tecolote and instructed the members of

19    ESLS to not go anyone alone and to travel in groups of two or

11:46AM 20    three."

21           "CW-1 also spoke with Jose Hernandez-Miguel, a/k/a

22    "Muerto," who said that Noe Perez Vazquez, a/k/a "Crazy," knew

23    about the meeting that ESLS had the previous week at the auto

24    garage in Everett.  Muerto told CW-1 that he was going to tell

25    Casper about this because Casper wants to keep the ESLS

1    meetings a secret from MS-13 in El Salvador."

2        "CW-1 said that MS-13 leaders in El Salvador want the

3    United States based MS-13 cliques to follow the rules set by

4    MS-13 leadership in El Salvador.  For example, if an MS-13

5    member in El Salvador breaks two rules in one year, he will be

6    shot with a shotgun in the leg."

7        "MS-13 in El Salvador also extorts money from local

8    businesses.  Casper said that he does not want to follow those

9    rules because the police are more active in the United States."

11:47AM 10        "On February 8th, 2014, CW-1 advised agents that the

11    ESLS clique hung out yesterday at the garage in Everett

12    drinking and talking about MS-13 in El Salvador.

13    Herzzon Sandoval, a/k/a "Casper," and Edwin Guzman, a/k/a

14    "Playa," talked about MS-13 members Simpson and Crazy getting

15    beaten up in El Salvador."

16        Casper said he wanted to talk to the other clique

17    leaders in the Boston area about no longer sending money to

18    MS-13 in El Salvador because they do not know where the money

19    is going.  Casper said he wanted the money sent by ESLS to

11:48AM 20    El Salvador to go to deported ESLS clique members.

21        "On April 22nd, 2014, CW-1 advised agents that

22    Herzzon Sandoval, a/k/a "Casper," was angry that MS-13 member

23    Tremendo was acting like he's in El Salvador.  Casper made this

24    statement in connection with Tremendo's alleged involvement in

25    the recent shooting of an 18th Street gang member:  'Casper

1    told members of ESLS that Tremendo is stupid.'"

2          "CW-2, also known as "Clacker," advised agents that he

3    was a paro of an MS-13 clique, not the Eastside

4    Locos Salvatrucha clique, CW-2 and his clique committed

5    racketeering acts in furtherance of the MS-13 enterprise,

6    including robberies.  CW-2 also advised that when his clique

7    leader was incarcerated, he participated with others in his

8    clique and an individual from a different clique in a large

9    number of robberies without telling the acting clique leader."

11:49AM 10          Thank you, your Honor.  That's all.

11          THE COURT:  All right.  Thank you.

12          All right.  Mr. Norkunas.

13          MR. NORKUNAS:  Your Honor, I would have two documents

14    that I would be introducing on behalf of Mr. Martinez.

15          THE COURT:  Okay.

16          MR. NORKUNAS:  And I believe by agreement with the

17    first one, it could be Exhibit Number 232.

18          THE COURT:  What is 232?

19          MR. NORKUNAS:  This would be a copy filed by my

11:50AM 20    client, Cesar Martinez, in 2008.  It's a Department of Homeland

21    Security form, an application for his employment authorization,

22    and that shows where he was living at that time in 2008.

23          THE COURT:  All right.  It's admitted, 232.

24          (Exhibit No. 232 received into evidence.)

25          MR. NORKUNAS:  And if I could just show the cover

1    page, Judge.

2              THE COURT:  Yes.

3              MR. NORKUNAS:  And it bears the signature of the

4    defendant at the bottom, and it shows a listed home address of

5    20 Summer Street in Revere, Mass. for 2008.

6              THE COURT:  All right.  And for the final version,

7    I'll ask you to black out that social security number.

8              MR. NORKUNAS:  And there's an alien registration

9    number.  I would do both.  I think I'd be compelled to do that,

10   Judge, yes.

11             THE COURT:  Thank you.

12             MR NORKUNAS:  And the other would be an excerpt from

13   the transcript -- portions of which have already been

14   introduced -- of January 8, 2016.  I would be introducing two

15   additional pages, Judge, and I would -- I don't have it here,

16   but I would add to a cover sheet to that showing that, and I

17   believe that would be Exhibit 233.

18             THE COURT:  All right.  It's admitted, 233.

19             (Exhibit No. 233 received into evidence.)

11:51AM 20       MR. NORKUNAS:  And I would just show that, but not

21   read that, Judge, to the jury.

22             THE COURT:  All right.

23             MR. NORKUNAS:  At this point in time.  And that would

24   showing conversations, again, portions of which have already

25   come in to the jury by the various participants.  That's page

1   40 -- what is listed as page 40 and then page 41 as well.  That

2   would bear the number 233, Judge, and I will add a brief cover

3   sheet for that.

4           THE COURT:  All right.  And make sure the government

5   agrees with the cover sheet before --

6           MR. POHL:  Thank you.

7           MR. NORKUNAS:  I would have no other.

8           THE COURT:  All right.  Other than Mr. Lopez' witness,

9   any other evidence today?

11:52AM 10           MR. IOVIENO:  No, your Honor, not from us.

11           MR. LOPEZ:  Your Honor, some of the documentary

12   evidence will come in through the witness, so could I reserve

13   my right to admit that on Tuesday?

14           THE COURT:  Yes.

15           MR. LOPEZ:  Thank you, your Honor.

16           THE COURT:  All right.  Ladies and gentlemen, before I

17   forget, I should have done this this morning, and I forgot.

18   There was a media report last night on NPR, National Public

19   Radio, either about this case or about MS-13.  Did any of you

11:52AM 20   hear it or were you otherwise exposed to it?  All right.

21   Everyone is shaking their head.  All right.  Thank you.

22           The good news is we are way ahead of schedule.  The

23   evidence is almost closed.  We have a little bit that we're

24   going to do on Tuesday morning.  I think Mr. Lopez has a

25   witness who I think will probably be fairly short and I expect

1        that we'll proceed to the closing arguments and to the jury

2        instructions on Tuesday.

3               That means you need to be prepared to be here all day

4        on Tuesday.  I don't know how long this is going to take to do.

5        I think we have a lot of ground to cover.  We're going to try

6        to do all of that in one day.  You should be prepared to be

7        here all day, that is, until 5:00 every day until you render a

8        verdict, so it may spill into Wednesday and beyond.  It's

9        really kind of -- once you get the case, it's up to you.  You

11:53AM 10   can take as much time as you think you need, or if you don't

11       need much time, you can do that, too.  It's entirely up to you.

12       There's no pressure on you whatsoever, but that is the

13       anticipated schedule so I'm going to let you go for the day.

14              Again, we're going to start up Tuesday morning with

15       what I think is going to be a relatively short defense witness,

16       maybe some exhibits, proceed from there into the government

17       closing, defense closing, the government rebuttal, my

18       instructions, and I expect you will get the case on Tuesday.

19              You don't need to worry about lunch.  We'll bring you

11:54AM 20   lunch whenever you need to stay all day, so you don't have to

21       pack anything, but I do think, again, if you don't get the case

22       on Tuesday, you'll get it on Wednesday.  I think that's clearly

23       our timetable at this point.

24              So, remember my instructions.  It's a three-day

25       weekend because of President's Day.  Please take extra care not

1    to expose yourself to any media reports or to discuss the case

2    among yourselves or with anyone else.  We're almost there and

3    way ahead of schedule.

4         I do want to express my appreciation to you, to the

5    lawyers for streamlining the case.  The case could have taken

6    much longer to try and the lawyers made a lot of efforts to

7    streamline it, which I very much appreciate.

8         So with that, I'll let you go.  Have a good weekend

9    all and we will see you Tuesday morning.

11:55AM 10         THE CLERK:  All rise.

11         (JURORS EXITED THE COURTROOM.)

12         THE COURT:  All right.  First off, who's closing for

13   the government?

14         MR. POHL:  I'll be closing, your Honor.

15         THE COURT:  How long do you expect to take?

16         MR. POHL:  I guess I had thought that all of us would

17   have an hour, but I'm happy to go shorter if the Court is

18   inclined to do that.

19         THE COURT:  I'll give you an hour if you want.  Again,

11:56AM 20   like the openings, if you say you want an hour and it's an hour

21   and five minutes, I'm not going to cut you off, but I don't

22   want an hour and a half or two hours.  In other words, within

23   reasonable bounds.

24         MR. POHL:  And, obviously, part of that would be

25   reserved for rebuttal, but, yes.

1          THE COURT:  Yes.  We'll talk about rebuttal in a

2     moment.

3          MR. POHL:  Yes, thank you.

4          THE COURT:  Do we know the order of closing arguments?

5          MR. IOVIENO:  We discussed it briefly.

6          THE COURT:  Mr. Iovieno, how long do you expect to be.

7          MR. IOVIENO:  40 minutes.

8          THE COURT:  40, all right.  Mr. Norkunas.

9          MR. NORKUNAS:  Probably closer to 30, but I would just

11:56AM 10     say 40 for scheduling.

11          THE COURT:  Mr. Murphy.

12          MR. MURPHY:  I'd say I'd hope to get it to 30, but I'd

13     like to reserve 40.

14          THE COURT:  Mr. Lopez.

15          MR. LOPEZ:  Since I've gone over with other things,

16     I'll say 45 minutes, but I will work very hard to make it 30.

17          THE COURT:  Okay.  Obviously, I'm going to give

18     everyone a lot of latitude.  I'm going to, as a practical

19     matter, listen to what your colleagues are saying.  You don't

11:57AM 20     have to repeat every, in other words, if it's already been said

21     twice, it doesn't need to be said a third time, but I'll leave

22     it up to you.  Again, I'm not going to interrupt you if you're

23     within reasonable bounds.

24          I will allow government rebuttal.  I usually say it

25     should be two or three minutes.  You may have more to rebut

1    here, but the main point is it is true rebuttal, it is not a

2    second bite at the apple but a chance to respond to arguments

3    and that either you couldn't fairly anticipate or were not

4    appropriate for you to address in your argument, and, you know,

5    let's say 5 or 10 minutes is going to be the order of magnitude

6    here, okay.

7              MR. POHL:  Thank you, your Honor.

8              THE COURT:  My jury instructions are going to be on

9    the order of 60 or so pages unless we cut a bunch of things

11:58AM 10   out.  Again, everyone is going to have it in writing, but it's

11   going to take some time to deliver.  I may break that up, and

12   if it has to spill over Wednesday, it does.  We'll just see how

13   all of this goes out.  I, obviously, prefer we get everything

14   done Tuesday, but we'll see how it goes.

15             In terms of the charge conference, here's my schedule.

16   I have a civil motion argument at 2:00, I think, or 2:15 with

17   lawyers from out of town that I'm reluctant to postpone, and I

18   have a meeting between 4:00 and 5:00.

19             What I propose to do is to have my clerk something

11:58AM 20   like that to all of you probably as a .pdf by e-mail the

21   current draft jury instructions and the verdict form, and we

22   can reconvene either at 3:00 or we can try to get going on it

23   at let's say 1:30 if you think that would be more sensible, and

24   we'll just go until we get it done.

25             I should add it will be in final form or at least

```
 1    nearly final form.  We're going to be scrubbing it for typos.

 2    I will permit anyone in their closing to read from my charge

 3    because you'll have it in writing.  To say I expect

 4    Judge Saylor will instruct you X, and if you read it verbatim,

 5    I'll permit you to do that, not to go on for pages, but if you

 6    want to take something out of the instructions, you know, this

 7    is what a conspiracy is, whatever, I'll permit you to do that,

 8    again, within reason.

 9               Let me stop there.  First off, does it make sense, do

12:00PM 10    you have time to digest it and meet at 1:30, and do the clients

11    want to stay for what's really going to be a legal argument?

12               MR. IOVIENO:  Can I just have a moment, your Honor?

13               THE COURT:  Yes.

14               MR. LOPEZ:  Yes, your Honor, they would like to stay.

15               MR. IOVIENO:  My client would like to be excused.

16               MR. NORKUNAS:  Same, Judge.

17               MR. MURPHY:  Mr. Sandoval would like to stay.

18               THE COURT:  So we'll keep two of them, we'll keep

19    Mr. Murphy's client and Mr. Lopez's client, and my apologies to

12:00PM 20    the marshals, I have to get this done one way or the other, I'm

21    just going to do the best I can and get everybody in the van

22    and out of here, but the schedule is the schedule, and I don't

23    want to delay that any further.

24               MR. POHL:  Maybe that fact weighing on the scale tends

25    to suggest that maybe we should try at 1:30, you know --
```

 1          THE COURT:  We'll meet at 1:30 and just see if we can

 2     get anything done and then we'll break, and I'll try to

 3     expedite this motion hearing.  People have gotten on planes

 4     from wherever, and I just don't want to send them home.

 5          MR. IOVIENO:  The only thing if it's going to be by

 6     e-mail, I'm going to be forced to look at it on my phone.

 7          MR. POHL:  We'll help with that.

 8          THE COURT:  Or we can deliver.

 9          MR. NORKUNAS:  Mr. Murphy has just volunteered, Foley

12:01PM 10     & Hoag, we may be charged though.

11          THE COURT:  We can also bring paper copies to the

12     courtroom as well, you know, we have government printers that

13     are not as high speed as you have in your private practice, but

14     we'll try to accommodate as best we can.

15          MR. POHL:  All right.  Thank you, your Honor.

16          MR. NORKUNAS:  Thank you, your Honor.

17          (Whereupon, the hearing was adjourned at 12:02 p.m.)

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7              I do hereby certify that the foregoing transcript was

8    recorded by me stenographically at the time and place aforesaid

9    in Criminal Action No. 15-10338-FDS, UNITED STATES vs. HERZZON

10   SANDOVAL, et al., and thereafter by me reduced to typewriting

11   and is a true and accurate record of the proceedings.

12             Dated this 22nd day of June, 2018.

13                       s/s Valerie A. O'Hara

14             _____

15                  VALERIE A. O'HARA

16                  OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25