1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2


3
    UNITED STATES OF AMERICA           )
4                                      )
    vs.                                )  Criminal Action
5                                      )
    HERZZON SANDOVAL,                  )  No. 15-10338-FDS
6   EDWIN GUZMAN,                      )
    CESAR MARTINEZ,                    )
7   ERICK ARGUETA LARIOS,             )
                        Defendants     )
8


9

    BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
10


11
                        JURY TRIAL DAY 15
12


13
          John Joseph Moakley United States Courthouse
14                      Courtroom No. 2
                        1 Courthouse Way
15                      Boston, MA 02210

16                      February 20, 2018
                          8:22 a.m.
17


18


19


20


21


22


23                      Valerie A. O'Hara
                      Official Court Reporter
24       John Joseph Moakley United States Courthouse
                  1 Courthouse Way, Room 3204
25                      Boston, MA 02210
                  E-mail: vaohara@gmail.com

APPEARANCES:

For The United States:

    United States Attorney's Office, by CHRISTOPHER J. POHL, ASSISTANT UNITED STATES ATTORNEY, and KELLY BEGG LAWRENCE, ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200, Boston, Massachusetts 02110;

For the Defendant Herzzon Sandoval:

    Foley Hoag LLP, by MARTIN F. MURPHY, ESQ. and MADELEINE K. RODRIGUEZ, ATTORNEY, 155 Seaport Boulevard, Boston, Massachusetts 02210;

For the Defendant Edwin Guzman:

    Lawson & Weitzen, by SCOTT P. LOPEZ, ESQ., 88 Black Falcon Avenue, Suite 345, Boston, Massachusetts 02210

For the Defendant Erick Arueta Larios:

    THOMAS J. IOVIENO, ESQ., 345 Neponset Street Canton, MA 02021;

For the Defendant Cesar Martinez:

    Stanley W. Norkunas, 11 Kearney Square, Howe Building, Suite 202, Lowell, Massachusetts 01852.

    ROBERT M. SALTZMAN, ESQ., 1 Central Street, Suite 5, Stoneham, Massachusetts 02180.

ALSO PRESENT:  Gabriel Haddad, Spanish Interpreter
                 Carrie Lilley, Spanish Interpreter

1                          I N D E X

2    WITNESS                    DIRECT   CROSS   REDIRECT   RECROSS

3    EVELYN TORRES
        By Mr. Lopez              38
4       By Ms. Lawrence                    50

5    STEPHANIE AMADOR
        By Mr. Lopez              51
6       By Mr. Pohl                        58

7

8    EXHIBITS                              FOR I.D.   IN EVIDENCE

9      31.1                                              54
       234                                               42
10     236 through 240                                   66
       241.1                                             44
11     241.2                                             46
       241.3                                             47
12     242                                               57

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1

2          THE CLERK:  All rise.   Thank you.  Please be seated.

3    Court is now in session.

4          THE COURT:  All right.  Good morning, everyone.  We

5    have a revised draft of the jury instructions, which I'll have

6    the clerk distribute.  Don't forget one for the Judge.  In a

7    moment, I'll talk about what changes were made over the

8    weekend, but first I have the issue of the voir dire of the

9    jurors.

08:22AM 10          You'll recall at the end of the day on Friday,

11    basically Juror Number 5 wrote a note complaining about juror

12    Number 2, and the question is how do I handle it?  I've given

13    this some thought.  I'm a little concerned about if I voir dire

14    both of them, it will be obvious that 2 was accusing him.

15    Maybe I can't avoid that altogether.

16          I guess what I would propose to do is bring in Juror

17    Number 2 before the jury comes in, ask him about whether he has

18    either been discussing the case or attempting to discuss the

19    case with others, and then take it from there.

08:23AM 20          Do counsel have a particular suggestion as to how I

21    ought to handle this?  Again, one way I could handle it is

22    simply to discharge him.  We do have three alternates.

23          MR. POHL:  I appreciate the fact that you've given the

24    matter a lot of thought over the weekend.  I actually thought

25    that the better course given, frankly, the ambiguous nature of

1    the complaint is not start with Juror Number 2, start with

2    Juror Number 5.  I don't know what questions we're going to ask

3    Juror Number 2 unless we have a better understanding of exactly

4    what Juror Number 5's complaint is, and so I understand that

5    there's, you know, a difficulty if we pull Juror Number 5 out,

6    send Juror Number 5 back and then pull Juror Number 2 out, I

7    think it's going to be pretty apparent to Juror Number 2 sort

8    of when we do ask him questions where the source of the

9    complaint is.

08:24AM 10          THE COURT:  All right.  Which may do more harm than

11   good.  In other words, what Juror Number 5 complained of was

12   that he was attempting to discuss the case, not that he did.

13          MR. POHL:  Right.  I mean, that was my inclination was

14   to start with 5, and depending on what 5 says, I guess, I guess

15   it's an open question of whether you really need to talk to 2.

16   That was my --

17          THE COURT:  Let's assume 5 just repeats what was in

18   the note, you know, that raised the question do I need to talk

19   to 2?  Does anyone from the defense want to weigh in?

08:25AM 20   Mr. Norknuas.

21          MR. NORKUNAS:  Judge, I would confer with your

22   recommendation.  I think the human dynamics, we bring out 5, we

23   bring out 2, we've got some sort of antagonism, assuming they

24   both stayed.  If we bring out 2, he's going to have no idea

25   where it came from.

1          THE COURT:  He may have an idea.

2          MR. NORKUNAS:  Right.  I think that's the best way

3     because no matter what 5 would say, if 2 denies it, where are

4     you?  So I think that's the best way to do it, and I would ask

5     the Court to take that position.

6          THE COURT:  Anyone else?  All right.  I guess I'm

7     going to stick with my game plan.  There's no obvious way to

8     handle this, and I guess I'm going to start with Juror

9     Number 2, and if he denies it, we'll take it from there.  I'll

08:26AM 10    tell you that my inclination at that point would be to remind

11    everyone one more time of their obligations and leave it there.

12         This is a human process, and, of course, perfection is

13    too much to expect, but I also haven't heard any reports that

14    jurors are actually discussing the case before the evidence is

15    completed, so let's try that, and I think I want to do that

16    without the jury sitting there, so we'll have Lisa bring him in

17    as soon as he's available and do it at sidebar.

18         All right.  Turning to the evidence, there was a

19    motion I think from Mr. Lopez over the weekend concerning some

08:27AM 20    additional -- it's a motion to admit transcripts.  Well, let me

21    ask the government's position.  I don't have a problem with the

22    transcripts themselves, the question is foundation.

23         Ms. Lawrence.

24         MS. LAWRENCE:  Yes, your Honor, we do object to the

25    admission of the transcripts at this time.  There are a couple

1    of problems, as we see it.  1 is that the transcript which is

2    Exhibit B -- wait, A, I think is the longer one of the

3    January 8, 2016 jump-in of Animal.

4            THE COURT:  Yes.

5            MS. LAWRENCE:  The defense has offered an alternate

6    version essentially of the transcript with different speakers

7    designated, which fully complies with the Court's instructions

8    and direction that we could, in fact, do that, however, this

9    comes far too late, according to the Court's orders.

08:27AM 10       The government produced this transcript for the first

11   time in early December, produced two or three subsequent

12   revisions before trial.  Defense counsel for Mr. Argueta Larios

13   produced an alternate version on time on June 22nd.  The point

14   is it's just far too late at this point.

15           The other concern we have with this is that I

16   understand from speaking with Mr. Lopez and even what he's

17   filed with the Court is that he says that he only came to

18   understand these alleged misidentifications during the trial

19   testimony of Trooper Estevez when we read the transcript into

08:28AM 20   evidence, and he says that he gave the recording to a

21   translator, not the same translator he put on the witness list

22   but a different translator who then confirmed the

23   misidentifications.

24           That's a suspect -- we're suspicious of the basis for

25   the identifications, given Mr. Lopez' representation that she

1    confirmed them as opposed to listening to the recording on her

2    own without being told who the speakers were, but, in any

3    event, if the Court is inclined to admit this alternate

4    transcript, we would definitely ask that it be admitted clean

5    without the cross-outs indicating their changes to the jury.

6    It could just be an alternate transcript from which he could

7    argue, as opposed to telling the jury somehow by crossing it

8    out that the government's version is wrong.

9         THE COURT:  Mr. Lopez.

08:29AM 10         MR. LOPEZ:  Thank you, your Honor.  Your Honor, so

11   this particular transcript went through numerous iterations,

12   and it wasn't until shortly before the trial began that we

13   received a final, final transcript from the government, but

14   with respect to the timeliness, these changes were brought to

15   my attention during the trial by Mr. Guzman himself.

16         As you might recall that Muerto was the one who did

17   the identification of these speakers for the government, it

18   wasn't Ms. Huacuja, but it was Muerto, the government's

19   cooperating witness.

08:30AM 20         I wanted to verify that, and so I asked the woman who

21   worked for me last summer who listened to hundreds of hours of

22   tapes in this matter and became intimately familiar with the

23   voices of the individuals on these tapes, and I had her listen

24   to the tape on Sunday, and she confirmed, and she's here

25   prepared to testify, she confirmed that there were errors in

1      this transcript.

2            I made those changes, and I immediately sent them to

3      the government Sunday evening.  We discussed it yesterday, and

4      here we are.  It seems to me, your Honor, that given the fact

5      that the government is relying upon a cooperating witness, the

6      defense should have an opportunity to at least show the jury

7      that there are discrepancies as to who the speakers are.

8            As you may recall, early, early on this case, your

9      Honor, there was an allegation that Mr. Guzman was the one in

08:31AM 10  this particular recording that welcomed the Animal to the Mara.

11     That has been subsequently changed by the government to say no,

12     that wasn't Mr. Guzman, that was Caballo.  This transcript says

13     no, that wasn't Caballo, it was Duke.

14           THE COURT:  Caballo, Mr. Lopez, please, I beg you, not

15     Caballo.

16           MR. LOPEZ:  Caballo.  So, your Honor, I think that the

17     jury should be given this.  If the Court needs a foundation

18     from Ms. Amador, who was not on my witness list because I

19     didn't anticipate this particular issue, then she's here.

08:32AM 20  She's also here prepared to testify that she listened to the

21     other transcript that I'm seeking to admit and which is

22     contrary to what Muerto testified to under oath.

23           THE COURT:  All right.  It seems to me that there are

24     four different issues here.  One of them is the timing of it,

25     one is the accuracy of the translation, one is identification

1    of voices, and one is the form of it, which is crossing out of

2    names.

3            The timeliness of it is not optimal, but I think under

4    the circumstances, I'm prepared to overlook it.  That leads to

5    the two foundation questions, which is is this something that

6    someone who is familiar with the voices can testify as to, and

7    I think, well, it's perhaps marginal.  I think under the

8    circumstances I'm going to permit it, that is, I think

9    Ms. Amador, if that's her name, will have to testify and say

08:33AM 10   that she listened to hundreds of hours, and in her opinion,

11   these are the people who are, in fact, speaking or, you know,

12   in the case it's unidentifiable, and she can give that

13   testimony.

14           Obviously, she can be subject to cross-examination

15   that she wasn't there, and, you know, her familiarity is

16   limited to the recordings, but I think I'll allow that.

17   Presumably she can also testify as to the translation issues,

18   which I think is only in the second piece of this, right,

19   there's -- is there a dispute about translation?  It's not

08:34AM 20   clear to me.

21           MR. LOPEZ:  I don't believe there's a dispute, but I

22   haven't verified that with the government.

23           THE COURT:  All right.  Then in terms of crossing out

24   of names, I think having permitted the government to use this

25   and let it go to the jury, I think the next logical step would

1     save everyone the time and trouble and permit them to get the

2     crossed out version, so assuming Ms. Amador testifies,

3     indicates that she's listened to hundreds of hours of tapes,

4     she's familiar with the names, is a native Spanish speaker,

5     I'll permit it.

6          I don't know if the government wants to respond in any

7     way or whether that involves recalling a witness.

8     Ms. Lawrence, what's the government's view?

9          MS. LAWRENCE:  No, your Honor, I don't need to respond

08:35AM 10     to that.  I would just raise one issue on the recording.  It's

11     our outstanding from Ms. Amador was a summer associate at his

12     law firm last year in the summer of 2017.  I don't know whether

13     that implicates any attorney-client privilege issues with her

14     testifying about listening to the recordings or conversations

15     she had with Mr. Guzman, and I just want to alert everyone to

16     that and make sure it's on the record.

17          THE COURT:  If she testifies, for example, about

18     conversations with Mr. Guzman or Mr. Lopez about these issues,

19     that privilege will have been waived by her testimony, subject

08:35AM 20     matter privilege, meaning, you know, anything having to do with

21     that is opened up.

22          MS. LAWRENCE:  May I address the December 8, 2015

23     recording?

24          THE COURT:  Yes.

25          MS. LAWRENCE:  Not on the issue of the transcript

1    itself but simply the content and timing and presentation of

2    this?

3              THE COURT:  Yes, okay.

4              MS. LAWRENCE:  As you know, Muerto was on the stand

5    for a couple of days, and Mr. Lopez had him on

6    cross-examination for nearly three hours and had the

7    opportunity to confront him with this alleged prior

8    inconsistent statement.  He did ask him some questions about

9    the alleged incident, and Muerto's responses were fairly

08:36AM 10   unclear, he claimed he didn't remember it, but Mr. Guzman did

11   not confront him with his statement at that time, which would

12   have been the appropriate time to do that.

13             THE COURT:  All right.  So maybe I misunderstood.

14   Mr. Lopez, is the idea here is that this is an extrinsic

15   evidence of a prior inconsistent statement, that is, this short

16   transcript here?

17             MR. LOPEZ:  Yes, your Honor.  It's not -- well, it

18   could appear to be an inconsistent statement, but it's more of

19   a contradiction to his testimony in that he specifically denied

08:37AM 20   having any knowledge with respect to vandalism occurring at

21   Mr. Guzman's home.

22             This transcript indicates that, in fact, he did have

23   knowledge, and he did -- I mean, he admits that we took that

24   young kid, we gave him a royal red hat, and we gave him spray

25   so that he would go and put the chavala 18th Street sign.

1          I have photos, which I will introduce showing

2     Mr. Guzman's car was, in fact, vandalized, and she will further

3     testify that the house was also vandalized.  I don't have

4     photos of that, but I do have that.

5          Now, I have photos also of the individual who

6     committed these acts of vandalism.  He wasn't wearing a red

7     hat, but they spray painted the Number 18 on Mr. Guzman's car.

8          THE COURT:  But the question is it really is an

9     inconsistent statement, so why didn't you confront Muerto with

08:38AM 10   it?

11          MR. LOPEZ:  First of all, with respect to inconsistent

12     statements, I attempted to do that, and as you recall, I was

13     having some technical difficulties, and you kind of wanted me

14     to move along and finish my day, which I did, so I tried to get

15     just a general statement from him, which he refused to give to

16     me.

17          I didn't specifically confront him with this

18     statement, however, this also goes to his motives in this

19     matter and his bias with respect to Mr. Guzman.  Recall that at

08:38AM 20   this time, Mr. Guzman was refusing to participate in

21     gang-related activities, and it would be our position that

22     Pelon with Muerto's assistance were actually trying to get him

23     to do it and did this in order to get him to do something

24     against the 18th Street gang.

25          Now, granted, I understand that that's an argument

1    that I could potentially make to the jury, but the point is

2    that Muerto testified essentially, I don't know what you're

3    talking about, how could I know about this, I never heard

4    anything about this, and this tape clearly indicates that he

5    did know something about it and that he had a role in it, and I

6    think the jury could hear that because ultimately they have to

7    decide whether or not Muerto's testimony is credible in this

8    case.

9            THE COURT:  Ms. Lawrence.

08:39AM 10   MS. LAWRENCE:  Notwithstanding Mr. Lopez's failure to

11   confront the witness directly on the stand, if the Court were

12   inclined to let this in as extrinsic evidence of a prior

13   inconsistent statement or to impeach his credibility and show

14   bias against the defendant, the government would definitely ask

15   the Court to give a limiting instruction to that effect that it

16   can only be considered for its proper impeachment purposes.

17           THE COURT:  Only for impeachment purposes, not for the

18   truth of the matter asserted?

19           MS. LAWRENCE:  Correct, correct, and we contend that

08:40AM 20   it shouldn't be admitted for the reasons we've said, but if the

21   Court does admit it, we want to make sure that it's considered

22   properly by the jury just for that limited purpose.

23           THE COURT:  All right.  What I'm going to do here is I

24   think the government is correct that I ought to exclude this

25   because the witness was not confronted with it.  Under the

1    circumstances, nonetheless, because it's a criminal case, I'm

2    going to admit it subject to the limiting instruction that it's

3    offered or it may be considered solely for impeachment purposes

4    and not for the truth of the matter asserted, so that means

5    that at least based on this evidence that the defendant cannot

6    argue that this happened but rather that Muerto was not a

7    credible witness, so we'll handle it that way.  It is, as I see

8    it, extrinsic impeachment evidence.

9         Okay.  Anything else as to the evidence as opposed to

08:41AM 10   to the jury instructions or anything else?

11        Okay.  Turning -- yes, I'm sorry, Mr. Murphy.

12        MR. MURPHY:  With respect to the evidence, I just want

13   to inquire about the Court's practice with respect to the

14   stipulation.  Does the Court generally send those to the jury?

15        THE COURT:  Not typically, no.  It was read aloud.

16        MR. MURPHY:  We would request in this case that it be

17   sent to the jury.

18        THE COURT:  What's the government's view?

19        MR. POHL:  We would object.

08:41AM 20   THE COURT:  All right.  I guess I'm disinclined to do

21   it unless you have a case or something, Mr. Murphy.

22        MR. MURPHY:  I think it's a matter of the Court's

23   discretion your Honor.  I do think that there's a significant

24   amount of evidence that was presented quickly, and it would

25   help the jury understand better if they had the stipulation

1    with all of the other evidence.

2           THE COURT:  I guess I'm going to stick to my usual

3    practice and just leave it where it is.  Obviously, you can

4    argue from the stipulation.

5           MR. MURPHY:  Thank you, your Honor.

6           THE COURT:  All right.  In terms of the jury

7    instructions, you all have the current draft of the

8    instructions and the verdict form.

9           In no particular order, I have considered the issue,

08:42AM 10   and I'm not going to reverse field on the entrapment

11   instruction.  That is, I'm not going to give it.

12          MR. MURPHY:  For the record, may Mr. Sandoval be

13   permitted to join the request?

14          THE COURT:  Yes.

15          MR. NORKUNAS:  Also for Mr. Martinez has asked if he

16   would be allowed to join that?

17          THE COURT:  Yes.  So I will not give an entrapment

18   instruction.  The government proposed that I give a

19   supplemental instruction regarding co-conspirator acts and

08:43AM 20   statements, which I'm going to give in a modified form.

21          As an editorial aside, the government's proposal,

22   which appears to be based on a pattern instruction, uses both

23   the word "statements" and "declarations."  This is the kind of

24   thing that drives me crazy about jury instructions.  There's

25   absolutely no reason to use two different words there, but I am

 1    going to give a version of that.

 2         Mr. Guzman asked what he calls his fourth supplemental

 3    jury instruction concerning the general understanding about the

 4    crime.  If you turn to page 28, I've modified the last sentence

 5    in the top paragraph.  I'm not going to give the instruction

 6    that Mr. Guzman has requested because I don't think it's

 7    correct, but just to be clear, I've added some words there,

 8    that the government must prove that those were involved

 9    intended to agree and shared a general understanding about the

08:44AM 10    crime because the agreement is the critical point there, and so

 11    the government must prove an intent to agree.

 12         MR. LOPEZ:  Your Honor.

 13         THE COURT:  Yes.

 14         MR. LOPEZ:  On that point, in order to agree with this

 15    particular conspiracy, you also have to have the specific

 16    intent to commit those racketeering acts at the time of the

 17    agreement.

 18         THE COURT:  Well, I don't think that's right.  You

 19    have to intend to join a conspiracy with the intent and

08:45AM 20    understanding that someone else in the conspiracy intends to

 21    commit two racketeering acts.  So, again, if it's a conspiracy

 22    to rob a bank, you don't have to intend to rob the bank

 23    yourself, but you have to intend to join an agreement in which

 24    someone else is going to rob the bank.

 25         MR. LOPEZ:  You have to specifically intend that the

1    purpose of the conspiracy is to rob a bank?

2         THE COURT:  Yes, and the general understanding of the

3    crime would be that it's a bank robbery.  Now, whether it's the

4    Savings Bank X or Savings Bank Y, you don't necessarily have to

5    agree.

6         MR. LOPEZ:  Agreed, your Honor, but my understanding

7    of conspiracy law is that there's actually two different

8    intents at issue.  There is the intent to enter into an

9    agreement, and then there's a specific intent to commit the

08:45AM 10    crime alleged.

11         In this case, there had to be an intent to enter into

12    an agreement with others and with the specific intent that

13    racketeering activities would be the objective of the

14    conspiracy.

15         That's what the *Haldeman* case not with respect to

16    RICO, but that's how specific intent is explained in connection

17    with the conspiracy law.

18         THE COURT:  I think it's all one intent.

19    Ms. Lawrence, do you want to respond to this?

08:46AM 20         MS. LAWRENCE:  No, your Honor, I do think it's all one

21    intent, and I understand counsel's point that there is a

22    specific intent to agree to be part of the conspiracy, and

23    there also has to be an intent to agree that someone or one

24    member or another member of the conspiracy would commit the

25    racketeering acts.

1          As I understand this instruction on page 28, the point

2     of this is to say they have a general understanding of the

3     crime, meaning they understand that the RICO conspiracy, the

4     MS-13 conspiracy, will commit racketeering acts, and your other

5     instructions make very clear that they have to be -- they have

6     to know what type or types of racketeering acts they are, not

7     that there would be an attempted murder on a specific date or

8     there would be a murder on another specific date, or who the

9     victims would be, and I think that saying a general

08:47AM 10     understanding of the crime encapsulates that idea.

11          THE COURT:  All right.  I think this is standard

12     language, and I think the point needs to be made that you have

13     to agree -- you have to intend to enter into an agreement.  The

14     agreement has to be the specific agreement, in this case, to

15     commit racketeering in such-and-such a way, but you don't have

16     to agree to every detail of the agreement or every detail of

17     how the crimes are going to be committed.  You don't have to

18     agree in advance, yes, we're going to murder Irvin De Paz on

19     such-and-such a date, it's rather a general understanding that

08:48AM 20     others will commit a racketeering act, including murders or

21     assault with intent to commit murders, so I think this captures

22     the point, and I'm inclined to leave it as it is.

23          MR. LOPEZ:  Can you note my objection for the record?

24          THE COURT:  Yes.  Sandoval has.

25          MR. MURPHY:  Your Honor, with respect to robbery --

1          THE COURT:  Yes, I'm sorry.

2          MR. MURPHY:  -- then we withdraw that.

3          THE COURT:  Okay.  I think the way it's left now, just

4    to be clear, the indictment does charge robbery as racketeering

5    acts.  There's been no evidence as to robbery, at to these --

6    well, for all practical purposes, putting aside whatever Pelon

7    may have done, so that's out of the indictment.

8          That leads to a second point or a further point, which

9    is the description of the agreement charged in the indictment.

08:49AM 10    At page 34 is basically what the government submitted and what

11    the parties appeared to have agreed on.

12          My question here is normally we would list the members

13    of the conspiracy.  That's, you know, 50 names or so, which I'm

14    not inclined to do.  Some of the names never even came up, but

15    would it not be best to say that, well, for example, to

16    identify, among other persons, Muerto, Animal, Caballo, Brujo,

17    and, again, I apologize for using the street names, the other

18    persons who were specifically named in the indictment as

19    co-conspirators, which, again, helps put some flesh on the

08:49AM 20    bones of this agreement.

21          On the other hand, if the parties agree that's

22    unnecessary, we don't have to do it.  I'm not trying to either

23    help or hurt either side, I'm just trying to be accurate about

24    what we're describing here.

25          MS. LAWRENCE:  We would like to do that, your Honor.

1    We were focusing on the four defendants as you've been

2    describing throughout the instructions, but it would give the

3    jury a clearer picture of the scope of the indictment to

4    include at least those individuals that were identified by

5    witnesses during the trial.

6              THE COURT:  All right.  So the fifth superseding

7    indictment at paragraph 25 includes I think of people whose

8    names may have come up:  Crazy; Flaco; Casper; Playa; Lobo;

9    Brujo; Smiley, Danger; Animal; Vida Loca; Muerto; Caballo and

08:51AM 10    Tigre.  There may have been passing reference to some other

11    names, but I think I would propose to include those and make it

12    clear that it is among others.

13              MR. POHL:  I understand.  You had everybody on our

14    list, Judge, that we just hastily prepared.  One addition was

15    in the indictment, too, and it did mention briefly Jose'

16    Andrade, and there was one person who was not charged but whose

17    photograph was in the exhibits we discussed, which is

18    Vincentino and his correct name is --

19              THE COURT:  Well, the indictment doesn't charge that,

08:52AM 20    in other words, it says other persons known and unknown to the

21    grand jury.  I want to stick with the indictment because I

22    don't want to go beyond it.

23              MR. POHL:  That's fine.

24              THE COURT:  All right.

25              MR. MURPHY:  Your Honor, we understand the Court's

1    view, but we would object to this.  I think that we agreed to

2    this essentially as written as a piece, and I think that

3    singling out those names under the circumstances rather than

4    proposing what the government -- with going what the government

5    proposed essentially would cause the jury to place undue

6    emphasis on those individuals rather than others.  I don't

7    think it makes sense to list all of them.  I do think that

8    listing only the defendants and indicating that other persons

9    were also involved would be sufficient to alert the jury.

08:53AM 10          THE COURT:  Well, again, this is a substitute for

11   having the indictment go to the jury, which is normally what we

12   would do.  I'm concerned that the way it's drafted makes it

13   like this is a four-person conspiracy.  It doesn't say that,

14   but it's what the indictment says, it's the conspiracy charged

15   in the indictment, and I think that's, you know, I keep saying

16   it's got to be the agreement charged in the indictment, and I

17   think I need to describe that agreement, and so I'm inclined to

18   do that.

19          Let's see, what else?

08:54AM 20          MR. LOPEZ:  Your Honor, for the record, please note

21   Mr. Guzman's objection.

22          THE COURT:  Yes.  All right.  The government proposed

23   that I remove certain nonracketeering acts.  I think it was

24   accessory after the fact to murder, which I think we can remove

25   from that.  It's confusing because it's a RICO predicate, but

1       it's not a charged RICO predicate in this case.

2               MR. MURPHY:  Your Honor, I think that's really a

3       critical aspect of the defense here, and I think, Number 1,

4       there is a single District Court case, Judge Wolf's case that

5       describes it as a RICO predicate.  Number 2, it's not charged

6       as a RICO predicate in the indictment.

7               I assume that the government did that intentionally

8       because it did not want to include among the list of

9       racketeering acts an act that might result in conviction and

08:55AM 10      then reversal, and whether the Court includes a description of

11      bad act as not charged or whether it includes a description of

12      that act as not a racketeering act, I think, I personally am

13      indifferent to, but I think viewed in the centrality of the

14      Animal beating in this case and the fact that the government

15      apparently deliberately chose not to charge accessory after the

16      fact, that we should be entitled to a specific instruction that

17      accessory after the fact is not charged, at least as a

18      racketeering act in this case.

19              MS. LAWRENCE:  Your Honor, there were or there is

08:55AM 20      other authority for the position that it is a racketeering

21      predicate.  I didn't include the other cases because they

22      weren't from this circuit or this district and some of them are

23      unpublished.

24              I think even in the case that we did cite, Judge Wolf

25      noted that it was a serious question whether it is, in fact, a

1    racketeering predicate.  At the very least, the question is

2    unclear, and I believe it would be wrong, if not erroneous, to

3    charge the jury that it is not a racketeering act in this very

4    specific way.

5         THE COURT:  All right.  Here's what I'm going to do.

6    At the top of page 52, I'm going to say the following crimes

7    under federal and Massachusetts law do not qualify as

8    racketeering acts or are not charged as such in the indictment,

9    and then I'll put the paragraph back in.

08:56AM 10         MR. MURPHY:  Thank you, your Honor.

11         THE COURT:  Defendant Martinez' request for a change

12   in the withdrawal from the conspiracy instruction, I don't

13   think it's correct.  This is Document Number 1984, and so I'm

14   not inclined to give it, and then Defendant Larios has jury

15   instruction regarding a missing witness instruction, which

16   relates to, I guess, CW-1.

17         Mr. Iovieno, do you want to be heard on that?

18         MR. IOVIENO:  No, your Honor, I'll just rest on my

19   papers.

08:57AM 20         THE COURT:  Okay.  Does the government want to

21   respond?  Ms. Lawrence.

22         MS. LAWRENCE:  Yes, your Honor.  We've heard

23   throughout leading up to the trial and somewhat during the

24   trial about CW-1 and his availability, and I think the record

25   has been made clear at this point that the government has

1    always indicated his willingness to make him available, produce

2    him since he is although not in WITSEC, still under -- he's

3    trying to avoid being -- anyone knowing where he is.

4         THE COURT:  Whatever, I ordered the government either

5    to give the address so he could be subpoenaed or produce him,

6    and you agreed to produce him.

7         MS. LAWRENCE:  We agreed to that, so that's the state

8    of the record, so he is available to both sides.  We're not

9    going to have him -- give them the address, as the Court said

08:58AM 10   we did not have to, to let an investigator walk up to his front

11   door and knock, but they've never asked us to make him

12   available by phone to speak with him directly.  Had they done

13   so, we would have, and I think that's the state of the record

14   at this point.

15        I also would note as to the other part of the missing

16   witness instruction standard or showing, there's no evidence

17   that I'm aware of that he would be -- CW-1 would be so

18   overwhelmingly favorable to the government that it would

19   entitle the defense to give this instruction.

08:58AM 20        MR. IOVIENO:  May I respond briefly, your Honor?

21        THE COURT:  Yes.

22        MR. IOVIENO:  As far as his physical availability,

23   that was made known to us around the beginning of the trial,

24   just before the beginning of trial.  It was never made known to

25   us that he would be available to be interviewed.  In fact, it

1    was made known to us that he would not be available for an

2    interview, just physically to be able to be called as a witness

3    at trial, so I don't think that is a true statement as to his

4    availability.

5         I mean, legally I pointed out a case that

6    established -- First Circuit case talking about he's legally

7    unavailable, not physically.  I mean, I think to put a witness

8    on that you can't interview, that you can't talk to, I

9    certainly wouldn't do it, so that's why I believe he's legally

08:59AM 10   unavailable to the defense, and I'd request that the

11   instruction -- I understand what the Court ruled earlier.  I

12   just alerted the Court to some subsequent case law that I

13   found, and I renewed my request.

14        THE COURT:  All right.  I don't think the standard has

15   been met here.  This is kind of a peculiar iteration given the

16   fact that he had been kicked out of the program, but,

17   nonetheless will be made available by the government or would

18   be made available on request, and it's not -- well, it's not

19   clear to me that the standard has been met, and so I'm not

09:00AM 20   going to give the instruction.

21        All right.  Anything else on the jury instructions?

22   We've done some wordsmithing, hopefully not changing the

23   substance of it.  We were fiddling this morning with the

24   description of the drug offenses, which have changed slightly,

25   if you look at page 57 and thereafter.  Again, I don't think

1    they're wrong.  They're fairly straightforward common crimes,

2    it's just in the way the first draft they were described, they

3    weren't quite right.

4         All right.  Anything else, or shall I have juror

5    Number 2 brought down?  Mr. Murphy.

6         MR. MURPHY:  Your Honor, these are the ones that were

7    circulated on Friday.  It appears that the Court has not

8    concluded the conspiracy is not a corrupt instruction?

9         THE COURT:  That's correct, I did not.  I think my

09:01AM 10   instruction on page 28, mere similarity of conduct and mere

11   association suffices under the circumstances to address that

12   issue.

13        MR. MURPHY:  Thank you.  In case there may be some

14   kind of waiver later, note my objection.

15        THE COURT:  Yes.  Mr. Pohl.

16        MR. POHL:  Thank you.  I know this is probably the

17   third time we're going over this ground this morning, but I'm

18   not 100 percent sure that I understood what the Court's

19   decision was with respect to the accessory after the fact

09:01AM 20   language.

21        THE COURT:  Accessory fact, I am going to include that

22   language.  I'm going to change the description at -- what page

23   did I say it was on?  I'm sorry, what page?

24        THE CLERK:  52.

25        THE COURT:  The first sentence will now read:  The

1    following crimes under federal and Massachusetts law do not

2    qualify as racketeering acts or are not charged as such in the

3    indictment, and we'll go through and it will include accessory

4    after the fact.

5         MR. POHL:  Your Honor, I guess I'd urge you to

6    reconsider that along the lines of what Ms. Lawrence said.  The

7    only effect of listing that crime in the indictment would be

8    when it does implicate *Alleyne* factors to do so, and I think,

9    one of the reasons among the many others that were discussed

09:02AM 10    here today that it was not included in the indictment is

11    because they don't believe it would have triggered an issue in

12    this case, I don't believe given the guidelines and the

13    accessory after provisions, no matter -- I think particularly

14    in light of the criminal history of these defendants, you would

15    not gotten to above a 20-year sentence, so I don't think that

16    the simple fact that this crime was not listed in the

17    indictment is evidence of intent on the government to not

18    include it, and I don't think --

19         THE COURT:  Well, the government's intent isn't

09:03AM 20    relevant, the question is what does the jury have to find

21    beyond a reasonable doubt, and specific crimes having been

22    charged in the indictment, those are the ones the government

23    has to prove.

24         The only reason I give this instruction at all is,

25    frankly, it's confusing.  Massachusetts, you know, has managed

1    to create what appears to be the most confusing set of criminal

2    laws in the entire United States, and it's hard even for

3    lawyers to keep it straight, Judges certainly don't always keep

4    it straight, and the point there is to say here's what it is

5    and to make clear here's what it isn't.

6         I'm not trying to do anything more than that, and, you

7    know, suppose the only evidence were accessory after the fact

8    of murder, you know, that was the only evidence, presumably,

9    the government would lose, right, I mean, it's not charged as a

10   racketeering act, so that's the reason for that.

11        MR. POHL:  All right.

12        THE COURT:  Yes, Mr. Norkunas.

13        MR. NORKUNAS:  I did file a supplemental notice over

14   the weekend seeking to have, again, the withdrawal from the

15   conspiracy and looking to play out what I had orally presented

16   to the Court last week changing that there has to be in this

17   particular case, that the conspiracy would have to have a

18   beginning, middle and end, but in this case, where it was a

19   government informant and Agent Wood indicated he couldn't do

20   the October and December in his testimony unless Washington

21   gave him permission and his superiors gave him permission and

22   they signed off on an authorization plan, and, therefore, there

23   would have to have been an ongoing conspiracy that would run

24   from February through December and having those types of words

25   changed for the jury.

1          THE COURT:  Well, as I interpreted your request, which

2     is Number 1984, you're saying you can only withdraw from a

3     conspiracy while it's going on, which and you say once it had

4     ended -- there's two things.  First off, to the extent you're

5     saying that there is -- there are two conspiracies here rather

6     than one or some other variance, whatever you can argue that,

7     that's not what we're talking about.

8          MR. NORKUNAS:  Thank you.

9          THE COURT:  But, I mean, I guess it's technically true

09:05AM 10    that you can only withdraw from a conspiracy while it is

11    occurring, right, once it's over, you can't withdraw from it, I

12    mean, once it has achieved its ends, but it's confusing to me

13    the way you have framed it because it suggests that -- well,

14    you tell me.  You tell me what it is you're trying to achieve

15    here.

16          MR. NORKUNAS:  Well, that's the issue here, Judge,

17    what I was trying to do is instead of -- the government's

18    position is the conspiracy never stopped, that there was still

19    an ongoing activity, and it's clear from the testimony of

09:06AM 20    Agent Wood, there was not, they had no authority.  CW-1 was

21    only acting under the authority of the FBI to run these

22    efforts.

23          Once the February effort was concluded, Agent Wood

24    said he could not start up or go again unless there was a plan

25    submitted for a new activity, I'm saying a new activity, an

1   activity, and it was signed off and authorized by others and a

2   plan put into place.  Since the conspiracy had ended and Muerto

3   had said, you know, to Cesar, you're fired, he has -- he's out

4   of that conspiracy.

5        THE COURT:  Well, you can argue that the conspiracy

6   was over, that he was never a part of it, that it was a

7   different conspiracy, but we don't have the full confession to

8   authorities or a communication, you know, to his

9   co-conspirators he's abandoned the enterprise.  I mean, there

09:07AM 10   isn't any evidence of withdrawal.

11        MR. NORKUNAS:  Well, in this particular case, the

12   co-conspirators didn't really -- were not part of that

13   conspiracy at that time.  That would have had to have been

14   Muerto.  He's not charged with that, so the only person who

15   could have said I'm done with you would have been CW-1 and

16   Muerto.

17        THE COURT:  All right.  I'm going to leave the

18   instruction as it is.  Again, to the extent that you were

19   saying he was not a part of this conspiracy, this conspiracy

09:07AM 20   never existed, there were two separate conspiracies, all of

21   that I think is fair game, but withdrawal, the government --

22   you know, the defendant has the burden of showing he did

23   withdraw once the government has established it was a

24   conspiracy, and there's no evidence of withdrawal here.

25        Certainly, there's no evidence of withdrawal during

1    the time period of the conspiracy, whatever its end point is,

2    and so I think it's confusing to suggest that because the

3    government said it never ended and you say that the conspiracy

4    did end, that the defendant can only withdraw while the

5    conspiracy is ongoing, which may be technically true.  It's

6    confusing in context, whereas, you know, I'm giving the

7    instruction saying here's what it takes to prove withdrawal.

8          And either, you know, assuming the government has

9    proved the conspiracy, it's defendant's to prove withdrawal.

10   Anyway, I think this is right, I think it's standard language,

11   and I'm going to leave it where it is.

12         MR. NORKUNAS:  Note my objection, I'm arguing there

13   was a conspiracy, he was in it, and Muerto did say get out.

14         THE COURT:  Which I think is fair game and not

15   inconsistent with the instructions.

16         MR. NORKUNAS:  Thank you.

17         THE COURT:  Mr. Murphy.

18         MR. MURPHY:  Your Honor, before the jury is inquired

19   of, I think an outstanding housekeeping matter we have is the

09:09AM 20  threat assessment.  Before the defendant rests, I'd simply like

21   to inquire as to the status of that.

22         THE COURT:  I think I had directed that it be provided

23   under seal to counsel.  Do counsel want to pursue it further?

24   What do you want to do?

25         MR. MURPHY:  I have not seen it, your Honor.

1          THE COURT:  Well, you should have.

2          MR. POHL:  I'm sorry, your Honor, I'm happy to do the

3    that.

4          THE COURT:  All right.  Let's do that forthwith.  I

5    thought I had ordered.

6          MR. POHL:  Friday, you did, Friday, I think, actually

7    surprised all of us with the speed at which events have taken,

8    and no one has talked about it since, so I have no problem

9    getting that and giving it to counsel.  I apologize,

09:09AM 10          THE COURT:  My intent was to take it a step at a time,

11    and let's get that to you forthwith.  In fact, you can begin by

12    reading my copy to jumpstart the process a bit.

13          Lisa, make sure that's what's in the envelope before I

14    give it.

15          Okay.  Let's get Juror Number 2.

16          THE CLERK:  All rise.

17          (THE FOLLOWING OCCURRED AT SIDEBAR:)

18          THE COURT:  Mr. K, I called you to sidebar because I

19    had heard reports that you might have been either talking about

09:12AM 20    the evidence or the case or trying to engage others in the

21    conversation.  I'm sorry, to be so blunt about it.

22          THE JUROR:  No.

23          THE COURT:  And so that requires me to ask you whether

24    or not that's true.  I guess I'll put it to you, is it true,

25    did you try to get others discuss the case or discuss the case

1    with others?

2           THE JUROR:  No, not details about the case or anything

3    specific.  Again, what I told you last Friday, we had talked in

4    vagaries about it.

5           THE COURT:  I'm sorry?

6           THE JUROR:  In vagaries, the jury we had discussed but

7    nothing specifically about the case.

8           THE COURT:  Do you remember what it was you discussed?

9           THE JUROR:  Like I said, we had couple of us we would

09:13AM 10   talk overall, but we wouldn't discuss the details of the case,

11   and I definitely would not try to, as I've told you before,

12   it's a legal system, I take this very seriously.

13          THE COURT:  And I guess I want to ask, I'm not sure

14   what you mean vague things about the case.  Can you give me an

15   example?

16          THE JUROR:  So this is an incident where you had

17   raised your voice.

18          THE COURT:  Yes.

19          THE JUROR:  When we had gone up to the jury room, we

09:13AM 20   made a comment about that.

21          THE COURT:  But nothing since then?

22          THE JUROR:  No, nothing that would be directly about

23   the case.  We all talked about last week when we were told that

24   the case was speeding up, we did discuss that a little bit.  I

25   have not been trying to actively engaged or try to sway

1    anyone's opinion or discuss the details of the case at all.

2         THE COURT:  Can I get you to step aside, let me talk

3    to the lawyers.

4         THE JUROR:  Yes.

5         THE COURT:  All right.  Counsel, what do you want me

6    to do here?

7         MR. POHL:  I think he's indifferent.  What he's

8    described is the kinds of conversations that happened before

9    our voir dire when we had the discussions about safety issues

09:14AM 10   with the jurors.  He hasn't said anything since then.  I don't

11   think there's anything else to say.  I think he's indifferent,

12   and he should remain on the jury.

13        MR. LOPEZ:  I don't agree, your Honor.  I think he's

14   being intentionally vague.  He knows what you told him to do,

15   and he's not giving you the specifics you're asking for.  I

16   would ask that he be removed.

17        MR. POHL:  I mean, you asked him if he talked about

18   it, and he said no, I mean there's no other -- I mean, your

19   statement.

09:15AM 20        THE COURT:  One at a time.

21        MR. POHL:  Your statement suggests that you know that

22   there's something else to say, and the Court asked him a clear

23   question, he gave a clear answer, and he also made clear that

24   there was a break in behavior in the jury between the kinds of

25   things that maybe got discussed and safety issues were raised,

1      and I don't think there's anything else to ask on.

2              MR. LOPEZ:  I guess it's the same thing that you had

3      about Juror Number 5, you didn't believe her, and you wanted

4      her on.  I don't believe this guy --

5              MR. POHL:  The difference between Juror Number 5 and

6      this person is that there's a juror on the panel that everyone

7      credited who specifically said what she said, and she gave a

8      different account, so you believed that juror in every respect

9      except for the one respect.

09:15AM 10         THE COURT:  Anyone else want to be heard on this

11     issue?

12             MR. NORKUNAS:  Judge, I concur with Mr. Lopez.  I have

13     an uneasy feeling because it was not in a direct response, yes,

14     no, I'm not sure what that was, and I think in the context of

15     this case that's taken place over the past, perhaps just make

16     him an alternate if he's not taken off, if that's conceivable,

17     if not, just remove him.

18             THE COURT:  All right.  What I'm going to do is I

19     certainly understand the arguments, and arguably the most

09:16AM 20      prudent thing to do is simply to discharge him, but since the

21     parties don't agree with that, I'm not sure it has risen to

22     that level.

23             I think, I, again, while this may have been less than

24     quite perfect, I do believe that when one indicates that he has

25     not attempted to discuss or sway other jurors, and I'm going to

1    remind him or admonish him and leave him on the jury.

2         Mr. K.  Okay.  Thanks.  I just want to, I guess,

3    remind you or, you know, firmly instruct you that particularly

4    at this time where we may have arguments that are broken up

5    with breaks and it may spill over until tomorrow that it's

6    critically important discuss that the jury discuss nothing

7    about the case, okay, of any kind.

8         THE JUROR:  Yes, your Honor.

9         THE COURT:  Thank you.

09:17AM 10    THE JUROR:  Thank you.

11        (SIDEBAR CONFERENCE WAS CONCLUDED)

12        MR. POHL:  Can we have 30 seconds before the jury

13    comes in?

14        THE COURT:  Why don't we go line them up.  Do you need

15    30 seconds to get down the hall?

16        THE COURT:  Yes.

17        MR. POHL:  That's going to be more than 30 seconds.

18        THE CLERK:  All rise for the jury.

19        (JURORS ENTERED THE COURTROOM.)

09:24AM 20    THE CLERK:  Thank you.  You may be seated.  Court is

21    now back in session.

22        THE COURT:  Welcome back, ladies and gentlemen.  I

23    hope you enjoyed your three-day weekend.  As I indicated, we

24    have some evidence that needs to be completed before we get

25    into the closing arguments.

1          Mr. Lopez.

2          MR. LOPEZ:  Yes, your Honor.  Thank you.  The defense

3    calls Evelyn Torres.

4          EVELYN   TORRES, having been duly sworn by the Clerk,

5    testified as follows:

6                        DIRECT EXAMINATION

7    BY MR. LOPEZ:

8    Q.   Good morning.

9    A.   Good morning.

09:25AM 10    Q.   I'm going to ask you to speak up and speak into that

11    microphone.

12    A.   Absolutely.

13    Q.   Can you please tell the jury your name?

14    A.   Good morning.  My name is Evelyn Torres.

15    Q.   Please try to speak up.  Can you spell your last name?

16    A.   T-o-r-r-e-s.

17    Q.   What is your relationship to Edwin Guzman?

18    A.   He's my husband.

19    Q.   How long have you been married to Edwin?

09:25AM 20    A.   Thirteen years.

21    Q.   Since 2005?

22    A.   2005, yes.

23    Q.   Do you and Edwin have any children?

24    A.   We have two children.

25    Q.   And how old is your first child?

```
 1    A.    Twelve years old.

 2    Q.    And is it a boy or a girl?

 3    A.    Two girls.

 4    Q.    And how old is your second child?

 5    A.    Four years old.

 6    Q.    What city or town do you live in?

 7    A.    Revere.

 8    Q.    On what street?

 9    A.    Barrett Street.

09:25AM 10    Q.    And how long have you lived on Barrett Street?

11    A.    Five years.

12    Q.    And where did you live before Barrett Street?

13    A.    Pratt Street.

14    Q.    Who owns Pratt Street?

15    A.    My husband.

16    Q.    Do you know when he bought Pratt Street?

17    A.    2010.

18    Q.    And how long did you live on Pratt Street?

19    A.    We lived there like five years.

09:26AM 20    Q.    So from 2010 to 2015?

21    A.    Yes.

22    Q.    And since 2015?

23    A.    Until now, I still lived there.

24    Q.    You've lived at Barrett Street?

25    A.    Barrett Street, yes.
```

1   Q.   Now, how far is the Pratt Street home from the Revere

2   Police Station?

3   A.   Like two blocks.

4   Q.   Who currently lives at the Pratt Street house?

5   A.   The previous owners and our son with his mother.

6   Q.   And does Edwin also own -- does Edwin also own the Barrett

7   Street residence?

8   A.   Yes, sir.

9   Q.   And who else owns it?

09:26AM 10   A.   His mother.

11   Q.   And who currently lives at the Barrett Street residence?

12   A.   His mother, my two girls, I do, and a couple with two

13   children.

14   Q.   Now, directing your attention to June of 2012, was Edwin

15   employed?

16   A.   Yes, sir.

17   Q.   Where?

18   A.   He was working at Aramark -- Amtrak.

19   Q.   And how long did he work there for?

09:27AM 20   A.   He worked there a long time, like until he got employed in

21   2015.  He was like long.

22   Q.   Okay.  And did he work anywhere before FW Russell?

23   A.   Yeah, same, Amtrak.  The same, until he got employed at

24   FW Russell, yeah.

25   Q.   Now, directing your attention to 2010, did you say

1    something to Edwin about him going out to bars?

2    A.    Those are kind of big arguable time, in bars and drinking,

3    yeah.

4    Q.    And what did you tell him?

5    A.    That we could ended up.  He stop drinking.

6    Q.    And did you tell him -- what else did you tell him about

7    going to bars?

8    A.    That he have to get his mind together and all this stuff,

9    like we have get time for our family, and he did listen.

09:28AM 10   Q.    And so did he stop going to bars?

11   A.    Uh-huh.

12   Q.    Now, is Edwin an American citizen?

13   A.    He is.

14         MR. LOPEZ:  Your Honor, can I just show the Elmo for

15   the witness?

16         THE COURT:  Yes.

17   Q.    Do you know what this is?

18   A.    My husband.

19   Q.    And it looks like it's some type of certificate?

09:28AM 20   A.    His naturalization, yes.

21   Q.    His certificate of citizenship?

22   A.    Yes, sir.

23   Q.    And is this the original?

24   A.    Yes.

25         MR. LOPEZ:  Your Honor, I would move to admit it --

|    |    |    |
|----|----|----|
| 1  |    | MS. LAWRENCE:  Objection, relevance, your Honor. |
| 2  |    | MR. LOPEZ:  -- as Exhibit 234. |
| 3  |    | THE COURT:  I'll allow it.  Admitted, 234. |
| 4  |    | (Exhibit No. 234 received into evidence.) |
| 5  |    | MR. LOPEZ:  Can I show it to the jury? |
| 6  |    | THE COURT:  Yes. |
| 7  | Q. | Now, when did Edwin become an American citizen? |
| 8  | A. | 2001. |
| 9  | Q. | Do you remember the month? |
| 09:29AM 10 | A. | No, I'm not quite sure about the month. |
| 11 | Q. | Does it say November 16, 2001 at the bottom there? |
| 12 | A. | Yes.  I know it was in 2001. |
| 13 | Q. | Now, at some point, did Edwin receive a commercial |
| 14 |    | driver's license? |
| 15 | A. | He did, yeah. |
| 16 | Q. | And do you know why he -- why he wanted a commercial |
| 17 |    | driver's license? |
| 18 |    | MS. LAWRENCE:  Objection. |
| 19 |    | THE COURT:  Sustained.  Sustained in that form. |
| 09:29AM 20 | Q. | At some point, did he get a commercial driver's license? |
| 21 | A. | He did. |
| 22 | Q. | And do you know the reason he obtained that license? |
| 23 | A. | For a better life, for a better job, for a better -- |
| 24 |    | MS. LAWRENCE:  Objection. |
| 25 |    | THE COURT:  Overruled. |

1    Q.   Did he need a license in order to work for FW Russell?

2    A.   He did, he drives trucks.  Yes, sir.

3    Q.   And do you recall when he received that license?

4    A.   I'm sorry?

5    Q.   Do you recall when he received that license?

6    A.   Yes.

7    Q.   When?

8    A.   That was in 2012.

9    Q.   Now, directing your attention to the early morning hours

09:30AM 10   of July 26, 2015, do you recall something happening that

11   evening?

12   A.   Yes.

13   Q.   What happened?

14   A.   2015?

15   Q.   Yes, July 26, 2015.

16   A.   That's when he got his car vandalized.  I was sleeping,

17   and we heard this big bomb in our window.

18   Q.   Let me step back a second.  Do you recall something

19   happening on July 26, 2015?

09:31AM 20   A.   Yes, sir.

21   Q.   And you mentioned something about a car.  What I want you

22   to do is tell the jury what happened that night before you saw

23   the car.

24   A.   Oh, I was sleeping and I hear this big bang in our window.

25   I get up.  I quickly went to my daughter's room, and I see

1    everything was fine with them, and then my car alarm went on

2    very hard and very noisy, and then he told me to stay in the

3    living room, and then he opened the door, and it was the big

4    sign of two numbers in our door, the 1 and 8.  He said, "Call

5    the police."  I did call the police, and police came.  He came

6    outside, and he -- we noticed his car was painted, also, too.

7             MR. LOPEZ:  Now, for the witness only, your Honor.

8    Q.   Do you recognize what's been marked as Exhibit 241.1?

9    A.   Yes, sir.  I took that picture.

09:32AM 10   Q.   Is this a photograph?

11   A.   It's a photograph, yes.

12   Q.   And did you take this photograph?

13   A.   Yeah, I have it on my phone.

14   Q.   And do you remember what time you took this photograph?

15   A.   It was around 2:16, 2:18.  It was very early in the

16   morning.

17   Q.   And how do you know that?

18   A.   Because it's etched in my phone.  When you take a picture,

19   it says the time and date.

09:32AM 20            MR. LOPEZ:  Your Honor, can I move to admit this?

21            THE COURT:  All right, it's admitted, 241.1.

22            (Exhibit No. 241.1 received into evidence.)

23            MR. LOPEZ:  Show it to the jury?

24            THE COURT:  Yes.

25   Q.   Now, can you tell the jury what's in this photo?

| | |
|---|---|
| 1 | A.   Two numbers.  I start erasing it, but he says take a |
| 2 | picture of it because I wanted to clean it up.  I was just |
| 3 | scared, and it's 1 and 8. |
| 4 | Q.   And do you see the word "Escalade" in that photo? |
| 5 | A.   Yes. |
| 6 | Q.   And what kind of car did Edwin own in July of 2015? |
| 7 | A.   The black car, Escalade, Cadillac, yes. |
| 8 | MR. LOPEZ:  Just for the witness, your Honor. |
| 9 | Q.   I'm going to show you another photo that's been marked as |
| 09:33AM 10 | Exhibit 241.2.  Do you recognize that? |
| 11 | A.   Yes, sir. |
| 12 | Q.   And do you recognize the car in that photo? |
| 13 | A.   Yes, that's his car. |
| 14 | Q.   And do you recognize the person standing next to the car? |
| 15 | A.   No, sir. |
| 16 | Q.   Do you know how this photo was taken? |
| 17 | A.   He got cameras for -- |
| 18 | MS. LAWRENCE:  Objection, your Honor. |
| 19 | THE COURT:  Sustained. |
| 09:34AM 20 | Q.   Let me step back.  Is your home, is the Barrett Street |
| 21 | home equipped with outside cameras? |
| 22 | A.   Yes. |
| 23 | Q.   How many outside cameras? |
| 24 | A.   There's four. |
| 25 | Q.   Do you know whether or not this photo came from one of |

1    those outside cameras?

2    A.    Yes.

3    Q.    How do you know that?

4    A.    Because after he got his car like that, we went over the

5    cameras, and we see the tapes that this guy was doing that that

6    night.

7    Q.    And did someone take a photo of what was being shown on

8    the cameras?

9    A.    He did with his phone and I was next to him.

09:34AM 10    Q.    Okay.  And what did you do with that phone?

11    A.    I took his phone to Walgreens and I revealed them.

12    Q.    And is this one of the photos that you had made at

13    Walgreens?

14    A.    Yes, sir.

15          MR. LOPEZ:  Your Honor, at this point, I'd move to

16    admit Exhibit 241.2.

17          THE COURT:  All right.  It's admitted, 241.2.

18          (Exhibit No. 241.2 received into evidence.)

19          MR. LOPEZ:  And show it to the jury?

09:35AM 20          THE COURT:  Yes.

21    Q.    And, again, this photo shows Edwin's car?

22    A.    Yes.

23    Q.    And it shows a individual in what appears to be white

24    clothing standing next to it?

25    A.    Yes.

1   Q.   And that was taken the evening of July 25th -- 26, 2015?

2   A.   Yes.

3        MR. LOPEZ:  Your Honor, I have one more photo just for

4   the witness.

5   Q.   I show you what's been marked as Exhibit 241.3.  Do you

6   recognize this photo?

7   A.   Yes.

8   Q.   And was this photo created in the same way as the previous

9   photo?

09:35AM 10   A.   The same way, yes.

11   Q.   You took his phone to Walgreens and had it developed?

12   A.   Yeah.

13        MR. LOPEZ:  Your Honor, I'd move to admit this photo.

14        THE COURT:  All right.  It's admitted, 241.3.

15        (Exhibit No. 241.3 received into evidence.)

16        MR. LOPEZ:  Show it to the jury, please.

17   Q.   And is that a closer picture of the person that was at

18   your house that evening?

19   A.   Yes.

09:36AM 20   Q.   And, again, is that Mr. Guzman's car?

21   A.   It is his car, yes.

22   Q.   And can you tell what, if anything, the person is holding

23   in his hands?

24   A.   It was a paint bottle.

25   Q.   Okay.  And do you -- I take it -- well, strike that.  Was

1    there any other damage done to your home that evening?

2    A.    Just all the car when the guy throwed the brick on the

3    window, it banged my small car, my Honda, and that's it.

4    Q.    Just to be clear, you did not see anyone throw a brick,

5    correct?

6    A.    No.

7    Q.    What did you see when you went outside and looked at your

8    car?

9    A.    The two signs, the two paints, one in the door and the

09:37AM 10    other one was on the car.

11    Q.    So, are you saying that the door to your house was also

12    painted in a manner similar to Exhibit 241.1?

13    A.    Exactly the same.

14    Q.    And what about damage to your car?

15    A.    It was just a small dent.

16    Q.    Did you take photos of the damage to the house?

17    A.    No.  There was no damage to the house.

18    Q.    Did you take photos of the damage to your car?

19    A.    No, I didn't.

09:37AM 20    Q.    Were you able to clean off the "18" that was spray painted

21    onto Mr. Guzman's vehicle?

22    A.    Yes, with --

23    Q.    And after it was removed could you still see that it was

24    there?

25    A.    Yeah, it was damaged.  It was trash.

1  Q.  Now, I show you what's been marked as Exhibit 16.  Do you

2  see that tattoo?

3  A.  Yes.

4  Q.  Do you know how long Edwin has had this tattoo?

5  A.  When I got married with him, he had it already.

6  Q.  And how old was he when you were married?

7  A.  Nineteen years old.

8       MS. LAWRENCE:  Objection.

9       THE COURT:  Overruled.

09:38AM 10  Q.  So he's had it since at least the time he was married at

11  age 19?

12  A.  No, when he was with me, he had it before.  I don't know

13  when before.

14  Q.  Okay, but prior to him getting married?

15  A.  Yeah, he had it.

16  Q.  Now, do you recognize the name on that tattoo?

17  A.  Yes.

18  Q.  And what name is depicted in that tattoo?

19  A.  Marcelina.

09:38AM 20  Q.  And who is Marcelina?

21  A.  It's his grandmother.

22  Q.  And do you see a date -- I realize it's hard in this

23  picture, but do you see a date in this photo?

24  A.  5-3-92.

25  Q.  And what is the significance of 5-3-1992?

```
 1    A.    It's the day that she died.

 2    Q.    The day that Edwin --

 3    A.    His grandmother died.

 4          MR. LOPEZ:  I have no further questions, your Honor.

 5          THE COURT:  Cross.

 6                        CROSS-EXAMINATION

 7    BY MS. LAWRENCE:

 8    Q.    Ms. Torres, you testified that you were scared when you

 9    saw the 1 and the 8 painted on your house and on the car; is

10    that correct?

11    A.    Yes, ma'am.

12    Q.    And you were scared because you knew what the 1 and 8

13    stood for, right?

14    A.    I was just scared because my kids.

15    Q.    Because you knew that 1 and 8 symbolized something that

16    was scary, correct?

17    A.    Correct.

18    Q.    Okay.  And you said that Mr. Guzman stopped going to bars

19    after you told him to, correct?

20    A.    Correct.

21    Q.    But he didn't stop going to the garage in Everett, did he?

22    A.    I never know where he go out when he go out, I just know

23    he got out to relieve stress.

24    Q.    And he did go out on the weekends and late at nights,

25    correct?
```

```
 1    A.    Not as much often.
 2              MS. LAWRENCE:  No further questions, your Honor.
 3              THE COURT:  Mr. Lopez, anything further?
 4              MR. LOPEZ:  Yes, at this time, I would call --
 5              THE COURT:  I'm sorry.  You may step down.
 6              MR. LOPEZ:  -- Stephanie Amador, who I believe is just
 7    outside the door, your Honor.
 8              THE COURT:  All right.
 9              STEPHANIE AMADOR, having been duly sworn by the Clerk,
09:41AM 10    testified as follows:
11                        DIRECT EXAMINATION
12    BY MR. LOPEZ:
13    Q.    Good morning.
14    A.    Good morning.
15    Q.    Could you please state your name for the record?
16    A.    Stephanie Amador.
17    Q.    And can you spell your last name?
18    A.    A-m-a-d-o-r.
19    Q.    Directing your attention to the summer of 2017, did you
09:42AM 20    have a job that summer?
21    A.    Yes, I did.
22    Q.    And who did you work for?
23    A.    Lawson & Weitzen.
24    Q.    And what were you doing for Lawson & Weitzen?
25    A.    I was reviewing discovery for a case.  I speak Spanish,
```

1    and I was reviewing and helping to translate some of the

2    discovery.

3    Q.   And to be -- full disclosure, you were working with me?

4    A.   Yes.

5    Q.   And over the course of the summer, approximately how many

6    hours of audio and video recording did you listen to?

7    A.   It's hard to tell.  I was working from about April till

8    the end of August, at least 40 hours listening to audios and

9    videotapes.

09:43AM 10   Q.   So, fair to say hundreds of hours of audios and

11   videotapes?

12             MR. POHL:  Objection.

13             THE COURT:  Overruled.

14   A.   Yes.

15   Q.   And during that time, did you become familiar with the

16   voices of the individuals on the videotapes?

17   A.   Yes, I did.

18   Q.   And audiotapes?

19   A.   Yes.

09:43AM 20   Q.   And just to be clear, videotapes and audiotapes in this

21   case, correct?

22   A.   Yes.

23   Q.   Now, did I ask you to do something on Sunday?

24   A.   Yes.

25   Q.   What did I ask you to do?

```
 1    A.   To review an audio and video recording and to review who
 2    was speaking on that.
 3    Q.   And was it a particular date that I asked you to review?
 4    A.   Yes, I believe it was January 8, 2016.
 5    Q.   And specifically the government's excerpt of that
 6    particular recording?
 7    A.   Yes.
 8    Q.   And were you familiar with the people speaking on that
 9    video or audiotape?
10    A.   Yes.
11    Q.   And you became familiar based on your prior review?
12    A.   Yes.
13    Q.   And did you identify any errors in the identification of
14    the speakers on that videotape?
15    A.   I did.
16         MR. LOPEZ:  Your Honor, I'd like to show the witness
17    an exhibit.
18         THE COURT:  All right.
19         THE CLERK:  Document camera.
20    Q.   I show you the transcript.
21    A.   Yes.
22    Q.   And going to page 5, do you see on the bottom of that
23    page?
24    A.   Yes.
25    Q.   The original transcript had the name Playa?
```

```
 1    A.    Yes.

 2    Q.    And who did you believe in your opinion the speaker was?

 3    A.    Caballo.

 4    Q.    And on the next page, do you see the corrections you made

 5    on the next page?

 6    A.    Yes.

 7    Q.    And was that throughout the transcript that you made those

 8    corrections?

 9    A.    Yes, I did.

09:45AM 10    Q.    And that was based on your familiarity with the speakers?

11    A.    Correct.

12          MR. LOPEZ:  Your Honor, at this point in time I'd like

13    to introduce this as Exhibit 31A.

14          THE COURT:  Let's not make numbers and letters, how

15    about --

16          MR. LOPEZ:  This is the government's Exhibit 31, so

17    31.1 perhaps.

18          THE COURT:  Let's call it 31.1.

19          (Exhibit No. 31.1 received into evidence.)

09:46AM 20          THE COURT:  Ladies and gentlemen, let me again remind

21    you these are English language translations of Spanish language

22    recordings.  They've been translated for your ease of

23    understanding.  You'll recall I permitted the government to

24    give you transcripts that had the speakers identified.  This is

25    now a defense.  Their contentions as to the correct speakers
```

1    and what they say are the correct speakers are indicated on the

2    transcript.  Go ahead, Mr. Lopez.

3    Q.   And just going through this, the jury can review it, but

4    there were -- you made changes on page 5?

5    A.   Yes.

6    Q.   Page 6?

7    A.   Yes.

8    Q.   Page 7?

9    A.   Yes.

09:46AM 10    Q.   Page 8?

11    A.   Yes.

12    Q.   Page 9?

13    A.   Yes.

14    Q.   Page 10?

15    A.   Yes.

16    Q.   Page 11?

17    A.   Yes.

18    Q.   And so on?

19    A.   Yes.

09:47AM 20    Q.   And in your opinion the identities of the speakers that

21    you've identified are, in fact, those speakers?

22    A.   Yes.

23    Q.   Now, I also asked you to listen to another tape.  Do you

24    remember that?

25    A.   Yes.

```
 1            MR. LOPEZ:  Your Honor this is a brief tape, if I
 2     could just play it.
 3            (Video played.)
 4            THE COURT:  Anyway, the tape is in Spanish?
 5            MR. LOPEZ:  Yes, that's correct.
 6     Q.   Well, in any event, did you recognize the voice on that
 7     tape?
 8     A.   Yes.
 9     Q.   And did you prepare a translation?
10     A.   I did.
11     Q.   And --
12            MR. LOPEZ:  For the witness only.
13     Q.   I show you what's been marked as Exhibit 242.
14     A.   Yes.
15     Q.   Do you recognize that?
16     A.   I do.
17     Q.   And that's a translation that you prepared?
18     A.   Yes.
19     Q.   Turning over to the second page, there's a speaker
20     identified there?
21     A.   Yes.
22     Q.   And that is Muerto?
23     A.   Correct.
24            MR. POHL:  Objection.
25            THE COURT:  Well, before you get into the content
```

1    let's admit it.  All right.

2    Q.    And there's other speakers?

3    A.    Correct.

4    Q.    And you recognize those speakers from your familiarity

5    with listening to their voices, correct?

6    A.    Yes, I did.

7         MR. LOPEZ:  Your Honor, at this point I would move to

8    admit Exhibit 242.

9         THE COURT:  All right.  I'm going to admit it for a

09:49AM 10   limited purpose.  I will admit it, ladies and gentlemen, for

11   the purpose of whatever weight you choose to assign it in

12   determining the credibility of the witness identified as

13   Muerto.  In other words, as I understand, the defendant is

14   offering this to impeach Muerto and to say that he was not

15   credible.  You may consider it for that purpose and no other

16   purpose, and you may not consider it for the truth of anything

17   set forth in this excerpt, and my prior instructions concerning

18   the accuracy of the translations and so forth remains.

19        All right.  With that, it's admitted.

09:50AM 20        (Exhibit No. 242 received into evidence.)

21        MR. LOPEZ:  May I now read it to the jury?

22        THE COURT:  Yes.

23        MR. LOPEZ:  Muerto:  "That's why I'm telling you,

24   dude, I would like that.  That would be cool.  You see it was

25   pretty when we went to do that thing to Playa that day and the

1    motherfucker seemed to be distrusting of me.  Casper called me

2    and told me Playa wants to talk to you.  Oh, really?  Yeah.

3    There are some photos there, and it appears to you.  I said oh,

4    really?  Tell him to call me then, and I said what's up with

5    those photos?  And he said oh, no, something there and the

6    motherfucker did not want to tell me anything else.

7            I said that's cool then, tell him to call me, and he

8    better not try to accuse me of things, because then you guys

9    will see what's up.  No, man, he did not call me.  Nothing has

09:51AM 10   been heard about that.  We took that young kid, we gave him a

11   royal red hat, we gave him a spray so that he would go and put

12   the chavala 18 street sign, and he broke the glass from the

13   front windows, it was a huge rock.  And that dude still lives

14   at that house down the street.  Didn't he live in Revere?

15   Yeah, he lives in Revere."

16           No further questions, your Honor.

17           THE COURT:  Cross.

18                         CROSS-EXAMINATION

19   BY MR. POHL:

09:51AM 20   Q.   Good morning.

21   A.   Good morning.

22   Q.   I'm Chris Pohl.  I'm one of the prosecutors in the case.

23   I don't think you and I have met before.  Are you a law student

24   still, or are you a practicing attorney now?

25   A.   I'm a practicing attorney.

1    Q.   Okay.  You're not a linguist?

2    A.   No.

3    Q.   Okay.  And your testimony, as I understand it, is that

4    when you worked in the summer for Mr. Lopez, he had you listen

5    to some of the recordings in this case; is that correct?

6    A.   Correct.

7    Q.   And so after the summer, I think you said about August,

8    you stopped this project, correct?

9    A.   Correct.

09:52AM 10   Q.   And as I understood your testimony on direct, you haven't

11   listened to anything else since then until this past Sunday?

12   Is that right?

13   A.   Correct.

14   Q.   And one of the things that Mr. Lopez had you listen to was

15   this recording that he just played of a couple different

16   people, who you say Muerto and Caballo and Pelon, or a person

17   we've called CW-1.  Just so that we're clear, the date of this

18   recording, right, the recording was something that the

19   government produced to the defendants and that's one of the

09:53AM 20   things you listened to, right?

21   A.   Correct.

22   Q.   And the date was December 8, 2015, right?  That was the

23   date of the recording?

24   A.   I can't recall if it was January 8th or December 8th.

25        MR. POHL:  Can I have it for the witness.

1    Q.    It's not a trick question.  That's the date on it.  Does

2    that look right to you, December 8, 2015?

3    A.    Yes.

4    Q.    Okay.  All right.  So this recording was of a recording on

5    December 8, 2015, right?

6    A.    Yes.

7    Q.    Okay.  Have you ever met Muerto?

8    A.    No.

9    Q.    Have you ever met Caballo?

09:53AM 10  A.    No.

11   Q.    Have you ever met Pelon?

12   A.    No.

13   Q.    Are you a linguist?

14   A.    No.

15   Q.    Okay.  The last time you listened to any of these

16   recordings at all was the summer?

17   A.    Yes.

18   Q.    Until Mr. Lopez called you to come in on Sunday?

19   A.    Well, we've been going through some of the information

09:53AM 20  over there --

21   Q.    Not this one, right?

22   A.    Correct.

23   Q.    This one was Sunday?

24   A.    Yes.

25   Q.    And also just so I'm clear, this is an audio recording,

1    right?  There's no people in this, right?

2    A.   Yes, that's just an audio recording.

3    Q.   So you'd have to know Muerto and Caballo and Pelon's voice

4    to be able to get this, right?

5    A.   Yes.

6    Q.   Okay.  The last time you listened to any of these.  I

7    mean, I understand you may have been talking to Mr. Lopez, but

8    the last time you listened to any of these was the summer,

9    right?

09:54AM 10    A.   Yes.

11    Q.   And even when you listened them, right -- let me ask you

12    this.  When you listened to them, it was often the case that

13    many of the recordings at least back then didn't have

14    transcripts, right?

15    A.   Correct.

16    Q.   So you didn't know even from the government's perspective

17    who these people were that were talking?

18    A.   I recognized their voices.

19    Q.   You recognized Muerto and Caballo and Pelon and Casper and

09:54AM 20    Playa?

21    A.   I did.

22    Q.   Well, Playa, I get.  I mean, is it fair to say that the

23    only person in this case that you met personally would be

24    Playa?

25    A.   Yes.

1    Q.   Okay.  And on Sunday when Mr. Lopez had you come into his

2    office, one of the things that you reviewed was the -- I guess

3    what we've been calling the jump-in video from January 8, 2016.

4    And that was one of the videos you reviewed over the summer,

5    right?

6    A.   Correct.

7    Q.   But you didn't produce a transcript of that then, right?

8    A.   No.

9    Q.   And the recordings really long.  Would you agree with me

09:55AM 10   about that?

11   A.   Yes.

12   Q.   It's like an hour and a half?

13   A.   Yes.

14   Q.   And you know, we've produced an excerpt here, but the full

15   transcript of everything that gets said in that recording runs

16   for like 70 or 80 pages.  Would you agree with me about that?

17   A.   I didn't -- yes.

18   Q.   Okay.  All right.  And would you agree with me that it's

19   hard to tell who's speaking sometimes in that recording?

09:55AM 20   A.   At times, it is, yes.

21   Q.   Yeah.  A lot of times there's a video recorder on CW-1,

22   right?

23   A.   Yes.

24   Q.   And it moves up and down, it captures people speaking, but

25   you can't always see them speaking when they are speaking.

1    Would you agree with me about that?

2    A.    That's correct.

3    Q.    And would you agree with me that there are times when many

4    people are speaking at once?

5    A.    Correct.

6    Q.    All right.  And it's your testimony that on Sunday, you

7    had the opportunity to review that full recording, right, and

8    that you were able to make these changes on the fly and produce

9    this transcript?

09:56AM 10            MR. LOPEZ:  Objection.  Argumentative.

11            THE COURT:  I'll sustain it in that form.

12    Q.    It's your testimony that you were able, in a day, to

13    review that hour and a half long transcript with all of those

14    people talking and make the changes that you've made here

15    today?  Is that really your testimony?

16    A.    Yes.

17    Q.    Well, let me ask you this.  Did anybody help you make

18    those changes?

19    A.    No.

09:56AM 20    Q.    Did Mr. Guzman suggest to you what those changes should

21    be?

22    A.    No, he had --

23    Q.    Did Mr. Lopez tell you --

24            THE COURT:  Hold on.

25    Q.    Did Mr. Guzman -- did you have an understanding from

1    Mr. Lopez where to look on this transcript?

2    A.   He told me where to start looking.

3    Q.   Right.  He told you where to look, right?

4    A.   Yes, in terms of the time stamp.

5    Q.   And even then, right, even then when Mr. Lopez told you

6    where to look and you changed some of the things in the

7    transcript, there's an awful lot in this transcript where even

8    you have Mr. Guzman speaking, right?

9    A.   Correct.

09:57AM 10    Q.   Like the very end.  For instance, page 24, where you have

11    Mr. Guzman, Playa, actually doing the counting of beating in

12    Animal into MS-13; is that correct?

13    A.   I did not type that.  That was provided already.

14    Q.   Well, I don't understand what that means.  Does that mean

15    it's right or it's not right?

16    A.   I believe that that's correct.

17    Q.   Well, how do you know if it's right or not right?

18    A.   Just based on listening to the audios.

19    Q.   So which ones -- well, if you didn't confirm the whole

09:58AM 20    transcript, then what did you do?

21         MR. LOPEZ:  Objection, your Honor.  That's not what

22    she testified.

23         THE COURT:  Sustained.

24    Q.   So even in this transcript, the one that was printed --

25    that was reviewed by you, right, you have Playa counting "1, 2,

1    3, hold him, 3, 4, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13," right?

2    A.   Correct.

3    Q.   And then right after that someone says, "Welcome to

4    La Mara," right?

5    A.   Correct.

6              THE COURT:  Anything else?

7              MR. POHL:  No, thank you.

8              THE COURT:  Any redirect?

9              MR. LOPEZ:  No, your Honor.

09:59AM 10              THE COURT:  All right.  Thank you.  You may step down.

11    Is there any other evidence?

12              MR. LOPEZ:  Your Honor, I just have some other records

13    to submit that I've had premarked.  Exhibit 236, which is a

14    declaration from the custodian of the Massachusetts Registry of

15    Motor Vehicles detailing the cars that Mr. Guzman had

16    registered; a second declaration wherein a search was done by

17    the Registry of Motor Vehicles, and they could not locate any

18    Toyota registered in his name; a declaration of the custodian

19    of his employer with various W-2s for year -- for years 2012

10:00AM 20    through 2016; a certified copy of a quitclaim deed for

21    44 Barrett Street in Revere and a quitclaim deed certified

22    record for 15 Pratt Street in Revere.  I move that they be

23    admitted, your Honor.

24              THE COURT:  All right.  They're admitted.  So 236 and

25    237 are RMV records, right?

          1              MR. LOPEZ:  Yes, your Honor.

          2              THE COURT:  238 is the W-2s?

          3              MR. LOPEZ:  Yes, your Honor.

          4              THE COURT:  And 239 and 240 are the deeds?

          5              MR. LOPEZ:  Yes, 239 and 240 are the -- yes, the

          6       quitclaim deeds.

          7              THE COURT:  All right.  They're admitted.

          8              (Exhibit Nos. 236 through 240 received into evidence.)

          9              Anything else, Mr. Lopez?

10:00AM  10              MR. LOPEZ:  No, your Honor.  Mr. Guzman rests.

         11              THE COURT:  Mr. Murphy.

         12              MR. MURPHY:  Can we approach sidebar, your Honor?

         13              THE COURT:  Yes.

         14              (THE FOLLOWING OCCURRED AT SIDEBAR:)

         15              MR. MURPHY:  Your Honor, I'd be happy to make a record

         16       at length outside the presence of the jury at a later time, but

         17       I've read the redacted Threat Assessment.  Number 1, I would

         18       note that it is heavily redacted.  Number 2, the parts that are

         19       not redacted too clearly appear to be written by Special Agent

10:01AM  20       Wood based on the similarity between his language and his

         21       testimony.  Number 3, contrary to what Special Agent Wood

         22       testified, there does not appear based on the unredacted

         23       portions that I've read this morning to be any disclosure to

         24       the authorities that this was submitted to about CW-1's crimes,

         25       so I do think that this would have, if it was available at the

1    time of Special Agent Wood's testimony, have served as useful

2    cross-examination of him, so I'm about to rest, but I would

3    simply put on the record my objection of the failure of the

4    government to produce this as *Jencks*.

5         THE COURT:  Well, in terms of the timing of it, as

6    Jencks material, if it is Jencks material, it's producible

7    after he testifies on direct.  I was provided a copy in camera,

8    and the topic sort of didn't came up again, and then it came up

9    again on Friday, and I ordered it to be produced under seal,

10   which I understand didn't happen, but in terms of the relevance

11   of it, which I think is the real issue here, to the extent that

12   it's impeachment material for CW-1, I don't see how it's

13   particularly admissible since he wasn't testifying as a

14   witness, and the impeachment of the agent, you know, as to

15   whether or not CW-1 committed crimes he didn't know about, to

16   the extent it's relevant, certainly there was a lot of evidence

17   to that effect.

18        MR. MURPHY:  Your Honor, just to make the record

19   perhaps slightly clear, from my perspective, my memory is that

20   the agent testified in response to a question from Mr. Iovieno

21   that he filed an amended Threat Assessment that disclosed

22   CW-1's crimes.

23        This, at least, this version, at least the unredacted

24   portions do not, so I think it would be clearly impeachment

25   evidence of Special Agent Wood as to his credibility when he

 1    says he did something, and at least according to this document,

 2    he didn't.

 3              THE COURT:  Is there an amended Threat Assessment,

 4    Mr. Pohl?

 5              MR. POHL:  Judge, this is what I got from Washington.

 6              THE COURT:  All right.  Mr. Murphy, do you want a

 7    continuance?  What relief do you want here?

 8              MR. MURPHY:  I would simply like the Court to -- I

 9    mean, I think that this is -- given the heavy redactions here

10:04AM 10    and not knowing whether there is such a thing as a Threat

11    Assessment, given where we are in the trial, I do not seek a

12    continuance, but I simply want to register my objection before

13    resting to the government's failure to produce that as *Jencks*

14    material --

15              MR. IOVIENO:  I join that objection.

16              MR. MURPHY:  -- after Special Agent Wood testified and

17    after our specific requests.

18              THE COURT:  That objection is overruled.  Is there any

19    additional evidence?

10:04AM 20              MR. MURPHY:  No.

21              MR. IOVIENO:  No, your Honor.

22              MR. MURPHY:  May this be marked somehow?

23              THE COURT:  Yes, that was my copy, which I guess I

24    don't need anymore.

25              MR. POHL:  I'm happy to get another copy to mark it at

1    one of the breaks.

2              THE COURT:  Does it need to be filed under seal?

3              MR. POHL:  Probably.

4              THE COURT:  And we'll give it the next number,

5    whatever it is, G or H.

6              THE COURT:  All right.  Let me first off make my final

7    *Petroziello* finding, which is --

8              MR. POHL:  Thank you.

9              THE COURT:  As to those statements identified by the

10:05AM 10   government in its two *Petroziello* filings pretrial, to the

11   extent they were admitted at the trial, I do find that they

12   satisfy the requirements of Rule 801(d)(2)(e), that is, that

13   they were statements made in furtherance of the conspiracy, and

14   admit them as a final matter.

15             And then are there other motions for a directed

16   judgment of acquittal?

17             MR. IOVIENO:  Yes, your Honor, just for the record to

18   make it clear, the defendants objected to the *Petroziello*

19   finding at the close of all the evidence.

10:05AM 20             THE COURT:  Yes.

21             MR. LOPEZ:  Yes, for all of us.

22             MR. IOVIENO:  I would renew my motion for Rule 29 as

23   to both counts with respect to Mr. Larios.

24             THE COURT:  All right.  All four defendants are deemed

25   to have renewed their motions under Rule 29, and those motions

1    are denied.

2          Okay.  Do we need a break before closing?

3          MR. POHL:  Maybe five, ten minutes to set up the

4    equipment and test everything to make sure we're ready.  Is

5    that all right?

6          THE COURT:  Yes.

7          MR POHL:  Thank you.

8          (SIDEBAR CONFERENCE WAS CONCLUDED)

9          THE COURT:  Ladies and gentlemen, the evidence is now

10:06AM 10    closed.  We're going to proceed closing arguments.  The

11    government suggested a five-minute break to set up the

12    electronic equipment to make sure it's working, and why don't

13    we do that, and as soon as everything is ready to go, which

14    will either be in five minutes or not at all, we'll reconvene

15    and get started.

16          THE CLERK:  All rise.

17          (JURORS EXITED THE COURTROOM.)

18          (A recess was taken.)

19          THE CLERK:  All rise.

10:14AM 20          (A recess was taken.)

21          THE COURT:  All rise for the jury.

22          (JURORS ENTERED THE COURTROOM.)

23          THE CLERK:  Thank you.  You may be seated.  Court is

24    now back in session.

25          THE COURT:  All right.  Are we ready?

1          MR. POHL:  Yes, your Honor.

2          THE COURT:  Mr. Pohl.

3                    CLOSING ARGUMENT

4          MR. POHL:  Your Honor, counsel, ladies and gentlemen,

5     good morning.  On the evening of January 8, 2016,

6     Herzzon Sandoval, "Casper," Edwin Guzman, "Playa,"

7     Cesar Martinez, "Checha," and Erick Argueta Larios, "Lobo," and

8     other members of MS-13's Eastside Loco Salvatrucha gathered at

9     their home base, the garage in Everett.  It was an important

10:18AM 10    day.  It was a day that the clique jumped in Joel Martinez,

11    "Animal," and made him a homeboy or full member of MS-13.

12         Why did Casper and Playa and Lobo and Checha and the

13    other members of MS-13 want Animal jumped into MS-13?  After

14    three weeks of this trial, after hearing from agents and

15    cooperating defendants who are themselves members of MS-13 and

16    reviewing transcripts and receiving over 100 exhibits and

17    photographs, you know the answer to that question.

18         You know what MS-13 is, you know why it exists, and

19    you know what its mission is, and you know what its goals are.

10:19AM 20    You know that from Jose Hernandez Miguel.

21         In MS, all there is is violence.  There's nothing

22    else.  You learn violence in MS-13 because he was an MS-13 and

23    that's what MS-13 does, they bring you in for violence, and you

24    have to be in committing violence.

25         When you join MS-13, you know what it is that you're

1   joining, and what did Casper discuss about that, that when one

2   is jumped into MS-13, one is aware that one is jumped in to

3   kill or look for chavalas.  That's the main mission of MS-13,

4   to kill chavalas.

5       And finally you understand once you're jumped in what

6   it is that MS-13 directs its members to do because that's the

7   mission of the dudes of MS, which is to kill or stab rival

8   members.  Why?  Why is that the mission?  Because MS want to be

9   the only one.  It doesn't want any rivals.  It wants to control

10:20AM 10   everything.

11      That's what you learned during the course of this

12   trial, ladies and gentlemen.  That's what these defendants did.

13   To understand the significance of what Casper and Playa and

14   Lobo and Checha did that night when they jumped Animal in, you

15   need to go back to the murder on September 20, 2015 of

16   Irvin De Paz on Trenton Street in East Boston.

17      Now, it was at the very beginning of the trial.  You

18   saw what that neighborhood looked like.  You saw when that

19   murder happened.  You saw that it was house next to house, next

10:21AM 20   to house, next to small business, next to house.

21      There was people, cars.  When did the murder happen?

22   It was 5:00 in the afternoon in September.  It was broad

23   daylight.  You could not have picked a more public place or a

24   more public time to do a murder if you tried.

25      And on that day, Animal and other MS-13 paros were out

1    hunting 18th Street or chavalas, and they saw Irvin De Paz

2    wearing a red T-shirt and hunted him down on Trenton Street.

3    They chased him down on Trenton Street.  He goes out of view of

4    the camera.  A few seconds later, you see Animal and the other

5    man jogging back, wiping the knife off.  And you know what

6    happened with that knife, you saw the blood at the crime scene,

7    and you saw what Animal did to Irvin De Paz, and you know what

8    Animal had done in broad daylight on Trenton Street.

9                (Video played.)

10:22AM 10         Within a few weeks of that incident, the FBI, using

11   CW-1, was able to get a recording of Animal in CW-1's car, and

12   you heard what Animal said and what Animal did that day.  You

13   heard and saw the transcript, and you'll have an opportunity to

14   review that during your deliberations.

15         There's two things that you remember from the video

16   that you don't need the transcript for.  You remember Animal

17   with a sort of eerie proud calm in his voice talking about how

18   he thrusted the knife into the back of Irvin De Paz.

19                (Video played.)

10:23AM 20         And you also heard and saw the hand sign that

21   Irvin De Paz flashed as he got out of the car.  It's a hand

22   sign that you've become very familiar with during the course of

23   this trial, the M for MS-13.

24                (Video played.)

25         Jump ahead two months to December 6, 2015, right.  A

1    recording with Casper, right.  The call is in Spanish.  We

2    played it for you.  I think that's probably the only other time

3    aside from the Animal video that you just saw that the Spanish

4    recording was played for you, and you may have wondered why.

5           You know, ladies and gentlemen, there's been a lot of

6    transcripts in this case, and you can get an opportunity to

7    read them during your deliberations, but you can tell an awful

8    lot about -- even if you don't understand literally the words

9    that are being said, you can tell an awful lot about the tone,

10:24AM 10    about what is being in the conversation just by the tones of

11    the voice and the manner of exchange between the parties.  And

12    without even understanding the words as they're being spoken to

13    you, you learned a lot just by listening to that call.

14           You heard Animal essentially talking to Casper and

15    saying, "I'm from the barrio, I have heart, I want to be an

16    MS-13.  I am having problems with my own clique, I want to join

17    your clique," right?  I want to be part of the Eastside clique.

18    I want to follow you, and what does Casper say in response?

19    What did he say?

10:25AM 20           "Awesome, as I was explaining, homie, come by this

21    area, homie.  You will meet all of us, you will.  You will find

22    out how we think as a group, homie, and if your way of thinking

23    coordinates with ours, then it's great, then everything will be

24    solid and we will see what decisions we will make because it's

25    not only my decision, they all have to check you out, too, you

1       know."

2              And how does Casper finish the conversation?  By

3       saying, "Look, Everett, Eastside, it's all the same barrio,

4       MS-13.  The dude is going to the MS-13 barrio, homeboy, and we

5       belong to the MS-13."

6              Now, what do you learn from this conversation?  You

7       know, remember a couple of things about this conversation.

8       Remember the age difference between Animal and between Casper,

9       right?  There's a maturity difference, right?  When you are

10:26AM 10      listening to this transcript and you're listening to this

11      recording, it almost sounds like Casper is like a college

12      recruiter, right, and he is in the living room of somebody that

13      he's trying to recruit to get into his school, right?

14             "Look, Animal, you have a lot of talent, we know all

15      about the murder that you did, but I know that you're being

16      wooed by the Everetts.  There's been some sort of hard feelings

17      between you and them, but don't worry about a thing.  We would

18      love to have you," right?  "We, in Eastside, would love to have

19      you.  You don't have to decide right away, this is a big

10:27AM 20      decision, we want you to come over, hang with the guys, make

21      sure that the guys get a chance to meet you, and when we do

22      that, we will see if we're all on the same page.  We will make

23      sure that your way of thinking is coordinated with our way of

24      thinking.  And then if it is, then there's no problem, you're

25      in with us."

1          Interestingly enough, the very end of that transcript,

2   Casper finishes off by saying words to the effect of, "The

3   Everetts, I don't care about the Everetts.  That guy Animal is

4   coming into MS-13 with us, Eastside, and if the Everetts don't

5   like it, they can stuff it."  They want Animal because they

6   like what Animal brings to the table, and what Animal brings to

7   the table is murder and the willingness to commit murder on

8   behalf of MS-13 and on behalf of the Eastside clique.

9          Muerto and Tigre told you Casper was the leader of the

10:27AM 10   MS-13 Eastside clique, and the recordings and the clique

11   meetings tell you that Casper was the leader, but you see in

12   this sort of exchange all the things that makes Casper the

13   leader of the clique.  He's a thinker, he's a recruiter, he's a

14   decision-maker, he's a planner, he's a leader.

15          You can understand why he is the kind of person that

16   would end up running what Tigre described as the biggest MS-13

17   clique in Massachusetts.  From the testimony at trial, you also

18   know what it means when Casper says, "We need to make sure that

19   your way of thinking is coordinated with our way of thinking,"

10:28AM 20   right?

21          On the watch of Eastside members, Animal commits two

22   more stabbings in 2015.  He commits one with Tigre on

23   December 27, 2015.  Again, it's in broad daylight.  Tigre,

24   Animal and two young paros, Luis and David are out in Chelsea

25   looking for chavalas.  They break into groups this time.

1    Sometimes during the testimony during the trial we've heard

2    that they break into groups and they're on opposite sides of

3    the street.  And this one they ended up breaking into a group

4    but staying on the same side of the street, so as to not to

5    attract too much attention.

6          They see an 18th Street member, they chase him down,

7    he gets free, they chased him again, they beat him, kick him,

8    stab him.  And I think Tigre, during his testimony, even made

9    sort of an upward thrusting motion during his testimony to

10:29AM 10   describe how the 18th Street member was stabbed.

11          Tigre used an interesting word to describe that attack

12   that day.  He called it -- he said that Animal, David and Luis

13   were under observation, right?  And you know from all the

14   evidence that you've heard at this trial, you know what that

15   means.

16          Tigre, who's a senior homeboy with the Eastside

17   clique, is there to watch how these guys do, right?  How are

18   they going to react when they see an opportunity to attack

19   chavalas?  His job was to report his findings back to the

10:29AM 20   clique and specifically to Casper to tell everybody how they

21   did, and I think Tigre in his testimony said, "Why did you do

22   that, why did you report back to Casper?"  Tigre sort of

23   shrugged and gave this answer that may sound like the answer

24   was self-evident and obvious, and to you, after three weeks of

25   testimony, I think it is obvious.  "One has to tell the things

1    that one does to one runners," right?

2           And so Tigre was there to watch and make sure to see

3    what these guys were all about and to make sure that they were

4    people that were worthy of joining Eastside and worthy of

5    joining their clique.

6           A couple days later, Animal does another one with

7    Brujo, right?  There's a transcript, Exhibit 114, it will be in

8    your admitted binders.  And, you know, Brujo -- Animal tells --

9    is recorded saying, "Brujo and I just did an awesome hit, dog.

10   We were making some soup here with the Mara family dog, talking

11   about celebrating, dog."

12          Brujo says, "I struck the son of a bitch with a

13   knife."

14          Animal says, "I captured him and set him up for him,

15   and then the homeboy lunged at him with a blade, dog, for

16   real."

17          Right?

18          So when Casper says we need to make sure that your way

19   of thinking is coordinated with our way of thinking, you know

20   what he means, right?  You know what he means.  He means we

21   needs to make sure that you want to go out and hunt for

22   chavalas and attack them, right?  Animal did that.  He did that

23   with Tigre, he did that with Brujo.  They celebrated together

24   with the Mara family, and six days later, Casper and Playa and

25   Lobo and Checha jump Animal into the Eastside clique.

1            Now, you've seen the Animal jump-in video a couple

2      times during the trial.  I'm not going to play it again during

3      closing arguments now, but you can certainly watch it during

4      your deliberations.  I think you heard it first come from

5      Special Agent Wood, at the beginning of the case.  It was a

6      shocking thing to see the first time, right, but it was a

7      little devoid of meaning because you hadn't had any real

8      testimony from any of the cooperating defendants or any of the

9      other transcripts to understand exactly what you were watching.

10:32AM 10            Then you saw it again through Muerto, and Muerto

11      described the significance of what it means to be jumped into

12      MS-13, how important that is to your rebirth as a gang member,

13      as a member of the organization.

14            And Muerto also says that on the day of the Animal

15      jump-in, he describes who does what, including the fact that

16      that man, Playa, Edwin Guzman, is the man who counts for 13

17      seconds as Animal gets jumped in and made a full homeboy

18      because of the murder and because of the hits that he did with

19      Tigre and with Brujo.  But the full significance of the

10:32AM 20      jump-in, ladies and gentlemen, probably didn't come at the end

21      of the trial when you read excerpts of the transcript of the

22      meeting, right?

23            You know, transcripts are -- it's a hard way to

24      receive evidence, right?  It's much easier to watch people

25      testify on the stand or to watch videos.  And you got an

1    opportunity to read sort of parts of the transcript toward the

2    very end of the trial, but if you have any real question about

3    what happened that day and what these four men did that day and

4    how that event that day is a sign and signal of their

5    allegiance to MS-13, and during your deliberations take that

6    transcript out, it's Exhibit 31.  Read it from beginning to

7    end, right?  Read it together, right, because when you do that,

8    you will really understand what it is that that clique is doing

9    when they jump in and celebrate Animal as a new member of the

10:33AM 10   gang.

11         There are lots of things that are talked about

12   throughout the meeting, right, throughout the meeting, and the

13   meeting is a long time, the meeting goes a long time, but one

14   of the themes, right, that keep popping up from all the

15   different members:  Today is the day we're going to jump Animal

16   in, right?  We have to find a place for Animal to lay low.  We

17   should keep him out of MS-13 turf because that's where the

18   people are most likely to find him.  We have to hide this dude

19   so he won't be arrested.  It is our priority that this dude not

10:34AM 20   be locked up.

21         When MS-13 members ask who did the murder on Trenton

22   Street, the clique tells Animal you should tell them that you

23   did it and you're a member of the Eastside clique.  In other

24   words, when you're talking to other MS-13 members, all right,

25   that murder should be credited to us because MS-13 exists to

1   commit murders and attempted murders against its rivals and

2   when you jump in Animal, they want that credit for their own

3   clique for the organization, right.  So when the clique members

4   say, when you are talking to other MS-13 guys, you claim us and

5   you claim credit for the murder, and I think Caballo even says

6   at one point, "And puff out your chest when you do it, puff out

7   your chest when you do it."  That tells you everything you need

8   to know about this organization.

9   Puff our your chest when you tell them that you're the

10  one that hunted Irvin De Paz on Trenton Street and knifed him

11  to death, right, when you're talking to other people, though.

12  I think a lot of times in the transcript, they use the word

13  "civilians," which is telling.  They use the word "civilians."

14  When you're talking to civilians, you don't have to tell them

15  anything.  In fact, what you should do is blame the Everetts,

16  right, say they're the ones that did the murder.  Casper even

17  says at one point, "It's to our advantage if you do that.  It's

18  good for you and it's good for us."

19  One of the other themes during the meeting is in

20  addition to keeping you safe from the police, they talk about

21  the fact that they're going to square things away for the

22  Everett clique for him, right, so he can be safer in the

23  Eastside clique and not worry about having any other problems

24  with the cliques that he had formerly associated with.

25  Now, that's sort of the theme.  Those are the themes

1    that are discussed throughout the recording.  You'll see when

2    you read the full transcript, they pop up here, there, from

3    various different people, but the important thing is all four

4    of these men made a point of contributing something significant

5    to the conversation aside from the general themes and beginning

6    with Casper.  Casper is at the clique meeting, at the jump in

7    of Animal, right?

8           They're all -- let's be clear.  All four defendants

9    are at the jump-in meeting of Animal.  They are all celebrating

10:36AM 10    the fact that Animal is bring made a member -- a full member or

11    homeboy with the clique.  And what does Casper say when he's

12    talking to the group?  "Look, no, look.  I'm going to tell you

13    something, homie.  We need the new generation of the Eastside,

14    homie.  And thanks to the wisdom that we have gained over the

15    years, homie, we have to pass it along, dude, so that the new

16    Eastside clique can come and not think badly that we're going

17    to fuck them over, because, shit, we are Maras, and the fuckers

18    here will fuck it up, but what I am trying to say is you guys

19    are going to be the next generation."

10:36AM 20           Okay.  That is what is happening here, right.  You are

21    witnessing in this meeting something that happened in other

22    parts of the investigation, and it happened at the end.  They

23    are adding new members to continue to grow and strengthen their

24    MS-13 enterprise, right?  Animal is one, right.  And understand

25    from the testimony of Tigre, there are two more on deck.

1   You've got Luis and David, Animal's friends, who are out doing

2   hits on chavalas in December of 2015.  They're ready, they're

3   sort of in the pipeline getting ready to be approved.

4       All right.  In addition to Casper, you've got Playa.

5   Playa is also at the clique meeting, right?  What are the kinds

6   of things that Playa says during that clique meeting?  We have

7   to help this guy look for a room, if we could hide him for at

8   least a month in this house, that would be awesome.

9       You know, Playa, however, is the accountant and

10:37AM 10   looking after the clique's finances says, look, we have to get

11   Animal money to hide him, but we also have to be careful that

12   some of the money that we set aside doesn't just go all to

13   Animal.  We also have to make sure that we send it to

14   El Salvador, and Playa also recommends Animal to the clique.

15       This is one of the quotes that's in that passage.

16   "Look, I am quite relaxed here, dude."  This is Playa talking

17   about Animal.  "That dude has killed, dude, and, look, the

18   homie is taking it easy.  A lot of people found out about the

19   murder that guy did, and I ran into the guy walking around and

10:38AM 20   he's all calm.  Many of you know what I'm talking about,

21   right?"

22       Does that sound like somebody who is "calmado," to use

23   Mr. Lopez's phrase during the trial?  Does that sound like

24   somebody who is not an active part of MS-13?  Does that sound

25   like somebody who has sworn off and is not interested in

1    embracing what MS-13 is and what it is all about?  No.  No.

2         Guzman and Casper are ecstatic at the prospect of

3    having Animal jumped into the clique and of having other new

4    members jumped into the clique to grow and strengthen the

5    enterprise, and don't forget that Playa was the one, at the end

6    of the day, end of meeting, that actually jumped Animal into

7    the clique.

8         Who else was there?  Lobo.  What does Lobo do?  Look,

9    I mean, you've heard enough of the clique meetings and the

10:39AM 10  clique transcripts to understand that there's sort of a

11   hierarchy in terms of the total amount of time that people

12   speak.  Casper speaks a lot, Playa speaks some, and then

13   everybody else sort of chimes in throughout the transcripts,

14   and you'll see that in that transcript and some of the other

15   transcripts that you'll have during your deliberations.

16        Lobo is fully committed to make sure that Animal gets

17   to hide from the police and is not caught or brought to justice

18   for the murder.  "There's a room right now in Chelsea for 500

19   bucks.  I don't know if you guys are in agreement because I

10:39AM 20  know that girl, but I prefer not to tell her that this homie is

21   with the Mara, you know.  It's with a lady I know, a friend of

22   mine, who is going to kick out an old guy.  I'll go tomorrow if

23   you want.  I don't work tomorrow.  I'm not saying I can get it

24   for you for sure, but I'm telling you that I'm going to try,"

25   right?  That's what Lobo says about finding Animal a room and

1    finding him a place to stay so that the police don't know where

2    to catch him.

3           Lobo even talks to Animal about how he's going to find

4    a job, right?  He says, "How are you with garbage, bro?  I'm in

5    the garbage business."  Right?  They are willing to do and say

6    and offer the kind of support to Animal to make sure that he is

7    not captured by the police and to make sure he can continue to

8    do the murders and attempted murders that the enterprise wants

9    you to do.

10:40AM 10           What about Brujo?  Brujo tells the group about Animal.

11    "The homeboy did this thing with me twice in a short time.  He

12    did it with me, and that is some serious shit, man."  And he

13    compares Animal to some of the other guys that, you know,

14    people have talked about jumping in.

15           He's like, "Look, I don't know about some of these

16    other people, but the thing about Animal is I know he's the

17    real deal.  I know what he's done, and before we jump somebody

18    into the clique, we need to make sure they're the real deal,

19    too.  Let them come and kill, let them come and feel the

10:40AM 20    pressure.  They need to stick the knife in and see what

21    happens.  If you have love for the barrio, you will show your

22    balls there."

23           This is when Casper -- right after that is when Casper

24    launches into his speech about jumping in the next generation

25    of people into the Eastside clique.

1          And, finally, there's Checha who is also there.  And

2     you know, Checha doesn't speak that much during the jump-in

3     meeting.  I think the only things you need to remember about

4     Checha are, Number 1, everybody -- the whole meeting is about

5     the Animal jump-in.  Everybody knows why they're there and

6     everybody participates in the celebration at the end, right?

7     So there's no mystery about what is happening here.

8          And you know, Mr. Norkunas, I think, offered a portion

9     of the transcript that we didn't.  The portion of the

10:41AM 10    transcript for Mr. Norkunas just says that Checha has somebody

11    else in mind that he'd like to jump in first before they jump

12    in Animal, right?  It's hardly like Checha stormed out of the

13    meeting in protest, right?  Checha is there with Lobo and Playa

14    and Casper and all the other members of the Eastside clique

15    eagerly approving of Animal as another member of the Eastside

16    clique.

17          And all of this illustrates, ladies and gentlemen, the

18    essential reason why criminal conspiracies are so dangerous,

19    right, and that's all this case is.  You're going to hear a lot

10:42AM 20    about the Judge's instructions at the end of the case, about

21    racketeering conspiracy, conspiracy to distribute narcotics.

22    All this case is in a conspiracy, and when people ban together

23    in criminal conspiracies like the kind that was charged here,

24    the threat of harm is magnified.

25          All right.  When one person, Animal, does a murder,

1    he's one person, he's on his own, but when Casper and Playa and

2    Lobo and Checha and Muerto and Brujo and all of the other

3    members of the Eastside clique get together and agree, Animal,

4    we will help you, we will make sure you don't get caught by the

5    police, we will give you money, we will try to get you a job,

6    we will give you a place to stay, we will square things with

7    the Everetts so there's no problem with them, when you do that

8    it provides the Animals of the world with the support

9    structure.  It makes it safer for them to plan their crimes, it

10:43AM 10   makes it easier for them to actually commit their crimes, and

11   it makes it easier for them to escape justice for their crimes.

12          That, ladies and gentlemen, is basically the reason

13   that MS-13 exists, to help its members commit murders against

14   its rival and to evade responsibility for those murders.  That

15   is what Casper and Playa and Lobo and the rest of Eastside is

16   celebrating when they jump Animal in.

17          The fact that MS-13 -- excuse me, the fact that the

18   FBI succeeded in placing a cooperating witness into MS-13 is

19   remarkable, and the fact that you were able to see the secret

10:43AM 20   initiation ceremony for Animal is remarkable, but what you know

21   from all of the other evidence at trial is that as far as the

22   Eastside clique was concerned, the Trenton Street murder is not

23   unique, right, the clique has committed acts of violence on a

24   routine basis for years.  How do you know that?  Through the

25   testimony of Muerto and Tigre.

1          Both men described how they were recruited in MS-13,

2     both men described how Casper and Playa welcomed them into the

3     Eastside clique, both described in very similar ways the

4     mission of MS-13 to kill chavalas.  Both described how they

5     were taught what it means to be in MS-13 and both described

6     Eastside clique meetings where the MS-13 business was discussed

7     and both described attacks that they committed on behalf of the

8     MS-13 enterprise.

9          Let's start with Muerto.  It's a familiar story by

10:44AM 10   this point, born in El Salvador, coyote brings him to the

11    United States, ends up being, you know, meeting MS-13 members

12    in high school, hanging around with them, what Tigre would call

13    observation, being -- eventually committing significant acts of

14    violence, a stabbing, and being jumped into a clique in

15    California.

16         When he travels to Boston, his clique member in

17    California introduces him to Casper who even then, right, in

18    2004, right, which was the first time that Muerto comes to

19    Boston, even then, Casper introduces him as the runner of the

10:45AM 20   Eastside clique, and as Casper -- as Muerto comes back and

21    forth, he meets the other side of the Eastside clique finally

22    settling here in 2007, and the point of mentioning that, ladies

23    and gentlemen, is just to remind you that Muerto 's association

24    with these people is not some passing thing, right, it's not

25    some fleeting introduction, it's not a distant friendship, it

1    is a sustained regular contact over more than a decade, right?

2         Muerto told you he knows who these defendants are,

3    that they have been in MS-13 for as long as he's known them,

4    right, and that in many instances they have marked their own

5    bodies, they have marked their own bodies to show their

6    commitment and allegiance to the gang.

7         For instance, Muerto identified Casper's tattoos, MS

8    and ESLS, right?  He identified Playa's tattoos, MS-13.  He

9    identified Brujo's tattoo, ESLS.  And after everything that

10:46AM 10    you've heard during the course of this trial, ladies and

11    gentlemen, what person would dare mark their body with an MS-13

12    tattoo who is not fully committed to the mission of MS-13 and

13    the goals of the enterprise?  Who would dare do that?

14         As Tigre told you in his testimony, not just anybody

15    can get an MS-13 tattoo.  The person Muerto had known the

16    shortest time was Lobo.  I think he said he met him in 2013,

17    and he had still known him for years, as well, and said he hung

18    out with him all the time.

19         And one of the things that you have heard as

10:46AM 20    testimony, not that Lobo has a tattoo, but you had him captured

21    flashing the MS-13 sign in the photograph.  How does Muerto

22    describe the Eastside clique then when he first settles into

23    Boston, pretty much the same way as it was in 2016 right around

24    the time that the FBI charged the defendants in this case.

25         Playa and Muerto are in a car, an SUV, in 2008 in East

Boston.  Muerto sees a chavala wearing red walking down the

street in East Boston, Playa pulls over, and Muerto gets out

and chases the chavala, right, and so does Playa.  And what did

Muerto say when that happened?  "I got out of the car, and I

chased the chavala and I yelled at him, 'What's up?  This is

Mara Salvatrucha.'  So when the guy heard that, he tried to run

away under the bridges, and I chased him until I caught him,

and I smashed his face with the bottle.  He was on the floor

when Playa came and he also had a beer bottle, and he also

smashed it in the face, and we started kicking the guy, and the

guy was just trembling there.  So then we ran back to the car,

we went to Revere."

"Did you see the man on the ground after you and Playa

had smashed his face with beer bottles?"

"Yeah."

"What did he look like?"

"He was all bloody, he was covered in blood.  I just

saw the guy shaking."

Another day, later on after that, another attempted

murder in Maverick Square.  Muerto is with several other MS-13

gang members.  He's at Checha's house having a barbecue.  They

get a call, there's some chavalas on a bus near the Maverick

Square T-station, and they all go there, right?  They go

looking for the chavalas, the guy that they're initially

looking for don't get off the bus, but they're walking down the

1  street, I think separated on opposite sides of the street, and

2  they see another 18th Street gang member.

3  And what do they do?  They chase after him, they

4  tackle him, they assault him, they kick him.  Muerto has got a

5  baseball bat, Checha has got a machete, right?  And basically

6  the only thing that stops them from killing the guy is that

7  there's a taxi driver that starts honking the horn.  They run

8  back to Checha's house, they wait for the police presence to

9  die down.  And when Muerto wants to get out of East Boston, who

10:49AM 10  does he call?  He calls Playa, right?  Even then, even back in

11  2008, he calls Playa.  Playa sends a cab, he picks him up at a

12  car wash in Chelsea, and Playa takes him home.

13  Now, it's true that there aren't any audio or video

14  recording of those incidents, right, in 2008?  The FBI

15  investigation was years away from beginning, right?  You don't

16  have any transcripts of those incidents the way that you have

17  in some of the other murders and attempted murders that you

18  heard testimony of during the trial, but after three weeks of

19  this trial, you recognize those incidents as quintessential

10:49AM 20  MS-13 hits, just like the ones that the FBI did record in 2014

21  and 2015.

22  I think in Mr. Norkunas' cross-examining Muerto, and

23  he has sort of tone of incredulity in his voice, he was like,

24  you know, Muerto, do you mean to tell me that you and your

25  MS-13 associates are just out in Maverick Square in East

1    Boston, one of the biggest, busiest parts of East Boston where

2    the train station is, and you're just walking down the street

3    and the next thing you know, you attack an 18th Street gang

4    member with a baseball bat and a machete.  Is that really what

5    you mean to tell me?  And here's the thing, after the three

6    weeks of this trial, you know exactly what that sounds like.

7         All right.  There's nothing about that that's

8    surprising in the least, right, at all?  In fact, not only is

9    it not surprising for these guys, it's routine, right?  You

10   know, this sounds exactly like what Tigre described he did

11   right before the take down with David and Animal and Luis,

12   right?  They're out walking down the street, they divide up

13   into groups, so as not to draw too much attention.  They see a

14   chavala, they hunt him down, they kick him, they punch him,

15   they stab him.

16        And what does Tigre say at the end of that?  "We would

17   have finished the guy off, but there was too many people around

18   when we left, so we took off, but, I mean, when we took off,

19   that guy was in really bad shape," right?  That is

20   corroborated, right, but it sounds like exactly what they

21   talked about in 2008.

22        There's no difference, right?  The same thing -- do

23   you know what else it sounds like, besides the one that Tigre

24   described in the stabbing in Chelsea, it sounds like Trenton

25   Street, right?

1          Do you remember the video from Trenton Street?  There

2     are guys running down the street after the victim.  One on one

3     side of the street, one on the other side of the street, De Paz

4     gets stabbed right out of camera view.  A few moments later,

5     the two men that did the stabbing jog back, right?

6          This clique has been doing this for years, right, and

7     you have confidence in what -- in the testimony that you heard

8     because it is so similar to all of the other evidence that you

9     got during the FBI investigation.  Muerto and Tigre helped you

10:52AM 10  understand MS-13 as an organization.  Muerto and Tigre both

11    told you that Eastside met regularly, and it met whenever the

12    runners, Casper and Playa, wanted to call a meeting, right?  At

13    the meetings, the first order of business was to collect money

14    for the members.  The person who collected that money was

15    Playa, the second in command.

16          Why Playa?  As Tigre said, the person who collected

17    the money had to be trusted and was serious.  What was that

18    money for?  Muerto and Tigre told you, the money went to help

19    MS-13 members that were incarcerated here in the United States.

10:52AM 20  It went to help MS-13 members that were incarcerated in

21    El Salvador, it went to help the families of incarcerated MS-13

22    members.  The money also went for clique guns, right, like

23    this.  This is one of the clique guns that you heard testimony

24    about during the trial.  The Lobo gun, right?  Let's talk about

25    the -- Lobo's clique gun, as an example.

1          First, let's remember how the gun got to Lobo in the

2    first place, right?  Initially, Tigre says this is my gun,

3    right, I had it, I was drunk, I was waving it around, flashing

4    it, not giving it the proper respect, endangering my fellow

5    clique members, right?  And what happens, Casper took it away

6    from him.

7          Also, interestingly, Casper didn't take it away from

8    him without compensating him for it.  Casper used clique money

9    to pay Tigre to give the gun because this was not coming --

10:53AM 10   this was going from Tigre's personal gun to becoming a clique

11   gun, and Casper then gave the gun to Lobo.

12         Why did he give the gun to Lobo?  Why would the fact

13   that shots were fired at Lobo result in Lobo getting a gun?

14   Because if he had been shot at once, it could happen again, and

15   if he had a gun, then he could also shoot, right?

16         The guns that were presented in this trial, ladies and

17   gentlemen, are a sign and signal of MS-13's purpose.  As you

18   know from Muerto and Tigre, the clique weapons and the clique

19   ammunition are to be used by clique members to attack chavalas

10:54AM 20   and to defend rival cliques members against attacks.  That's

21   why the topic of clique guns came up so much during the clique

22   meetings, right?  They're important, right?  It's regularly

23   discussed, we got to make sure that we get our clique gun.

24         Sometimes it's discussed in connection with other

25   competing priorities.  We got to bring some guy back from

1    El Salvador, but remember we also got to buy a clique gun.

2    That's important, too.  Lobo wanted the gun both for

3    self-defense and to be able to use it in an attack if the

4    opportunity presented itself.

5            And when Checha -- according to Muerto, when Checha

6    saw chavalas that he wanted to shoot at, he calls Muerto, he

7    picked up clique ammunition from Muerto's house, and he's got

8    the guns and ammunition, and he goes off to do it.

9            The money also went to help pay for -- to bring MS-13

10:54AM 10   members who had been deported back from El Salvador to the

11   United States.  Muerto called this an obligation, right?  It's

12   if one of these homeboys is deported back to El Salvador, the

13   clique is obliged to bring him back, and, indeed, when Muerto

14   was deported in 2009, he had contact with the Eastside homeboys

15   when he was in El Salvador, and they helped pay the coyote to

16   bring him back.

17           Muerto describes how he had made it to the Mexican

18   border, needed extra money to get across to pay the coyote to

19   get across.  He called his sister.  There's a three-way call

10:55AM 20   between his sister and Playa and himself, right?  The amount of

21   money is discussed.  The next thing that happens is Playa gives

22   the money to the sister, and the sister wires the money to the

23   coyote for Muerto to be able to go across, right?

24           Based on the testimony that you've heard, you know

25   that MS-13 essentially makes a kind of bargain with its

1    members.  When you kill our rivals, we will support you, right?

2    And every time the Eastside clique met and circled up in that

3    garage and every time Playa went down the line and collected

4    $30 from this guy and $30 from this guy and counted how much

5    was owed and counted out what you owed from the last meeting

6    that you still haven't paid yet, every time he does that, that

7    money went to protect, to maintain, to defend, and to grow the

8    MS-13 enterprise, right?

9            Every time Playa sent one of the Eastside members,

10:56AM 10   including on several occasions Checha, right, to like a Western

11   Union or a MoneyGram to send that money to El Salvador, the

12   clique was doing its part to ensure that the MS-13 enterprise

13   continued to thrive.  And,.

14           Of course, at the end of every MS-13 meeting when gang

15   business is discussed, when money is received, when people are

16   disciplined, when reports of attacks have been reviewed, all

17   the meetings end in the same way.

18           (Video played.)

19           That is the way that all of the members of the clique

10:57AM 20   reaffirm that they understand why they are at the garage, why

21   they belong to MS-13, and why they support MS-13's mission.

22           So to be considered for membership in MS-13, you have

23   to commit an act of violence.  When you join MS-13, Muerto and

24   Tigre make it perfectly clear, you are fully aware that you are

25   committing yourself to a life of violence.  When you become a

1   member, you are beaten for 13 seconds, another act of violence,

2   and when you violate the rules of MS-13, you are, to use

3   Tigre's word, "corrected," and those corrections are not

4   gentle.

5         Tigre told you about the beating that the clique

6   administered to him because of his continued drinking and for

7   Master of not reporting to the clique meetings.  What does

8   Casper say about that?

9         Casper:  "This dude is getting a beating, too.  We had

10  ordered him to be on the wagon, and he failed, as you all know.

11  So I don't know what decisions you will make after you give

12  this dude the beating, if you will continue the same or what,

13  but that will be decided after the beating.  We will talk about

14  that subject because I will go over point by point, you know.

15  Master, you also have a beating, dude.  The dudes sentenced you

16  that for disappearing.  A fucking lot of time that we hadn't

17  heard from you, doggie.  Whenever one is out of touch, doggie,

18  for more than a month to two months, dude, then you fucked up."

19        The next thing that happens is that Tigre gets beat,

20  right?  And you heard the Tigre beating where you saw Tigre,

21  then you saw Tigre, right?  Not exactly a small guy.  I think

22  the beating of Tigre, once you've seen what Tigre actually

23  looked like, maybe that recording meant a little something more

24  to you, but after that beating came the beating of Master.

25        (Video played.)

1       "Casper, Lobo, Checha, you guys are the ones that are

2   going to beat him."

3       (Video played.)

4       Now, did you hear that?  Did you hear that?  After you

5   hear that, ladies and gentlemen, do you have any doubt in your

6   mind about these four defendant's commitment to MS-13 and what

7   it is and what it's all about.  The things they're willing to

8   do on behalf of the enterprise, the things that they're willing

9   to do to maintain the discipline of the enterprise, if they

11:01AM 10   have any question about or lack of commitment to what MS-13

11  stands for?

12      One of the other things that, you know, the important

13  point of all that, Negro, Rebelde, Playa beat Tigre.  Lobo,

14  Checha and another person end up beating Master.  Everybody in

15  the clique participates in this discipline process, and all

16  four of the defendants that are in this courtroom participated

17  in it in some way, shape or form.

18      All right.  Lobo was there, Playa was there, you heard

19  the audio recording identifying other people that participated

11:01AM 20  in it, all right.  Money also went to support the MS-13

21  programs, right.  You heard some talk about this during the

22  course of the trial.  Although, I think at the end of the day,

23  discussions about the programs didn't really end up amounting

24  to all that much during the trial.

25      You heard that around 2013, MS-13 started to try to

1   assert more control from El Salvador about programs and try to

2   sort of maintain more control over what the cliques were doing,

3   and you heard that the Eastside guys joined the East Coast

4   Program.  And then after, there was some grumbling about

5   joining the East Coast Program and about the fact that they

6   didn't like necessarily having to sort of get instructions from

7   other people, right, and the reason why is evident from this

8   Casper recording from October 24, 2015, right?

9         "There are many of us who have killed, homie, and we

11:02AM 10   deserve their respect," their being the MS-13 members in

11  El Salvador, right?  "We don't have to have them trying to

12  pilot us."

13        Now, does that mean that they stopped being part of

14  the MS-13?  Does that mean they stopped believing in the goals

15  of the organization?  Does that mean they didn't want to do

16  anything to further the organization?  No.  Instead of being in

17  the East Coast Program, they just found another program, the

18  Hollywood program, that they liked better, right?  And not only

19  that, they beat in -- they continued to discipline their own

11:03AM 20   members, and they jumped in new members right before the case

21  came down.

22        So there's been a lot of talk about during the early

23  stages of the trial, but at the end of the day, I don't think

24  it ended up mattering very much because MS-13 is all about one

25  thing, right?  As Muerto put it, "Even though we're different

1    cliques, we are all united under the same two letters," right?

2         So you heard some stuff at the beginning of the trial

3    about administrative things with programs and what that means.

4    At the end of the day, they were in the East Coast Program,

5    they griped about being in East Coast Program, they joined a

6    different program.  They certainly didn't get out of MS-13, and

7    the way that you know that, among many other ways, is that they

8    continued to look for and jump in new members.

9         One of the best illustrations about how MS-13 members,

11:04AM 10   regardless of their clique, work to achieve the goals of the

11   organization was the Vida Loca murder, right, and I just want

12   to talk about that for a few minutes, right?  Vida Loca is a

13   member of a clique, Chelsea Loco, right?  He gets into a fight

14   at a beer hall, right?  He loses the fight to a chavala, right?

15   The next day he's going back.  He wants revenge.

16        He calls Crazy who's a member of the Everett clique.

17   Where is Crazy?  Crazy is hanging out in the garage in Everett

18   with several other members of the Eastside clique.  Crazy has

19   got a gun.  Everybody recognized the gun as Crazy's gun.

11:04AM 20   That's a gun that Crazy always had.  Tigre was actually with

21   Crazy in Lawrence when Crazy bought it.

22        There's a discussion at the garage.  Vida Loca says,

23   "I want the gun brought over here.  I want to do this murder."

24   This is talk about whether this is a good idea or not.  Muerto

25   says, "I don't know.  It sounds like Vida Loca is drunk.  I

1    wouldn't do it."  Crazy says, "We're doing it."  Checha drives

2    Crazy with his gun and Brujo also armed with a gun over to a

3    beer hall.  Vida Loca goes in guns blazing and kills the

4    chavala and hits another man in the chest, right?

5         Later on that day, agents used CW-1 to record a

6    conversation with Crazy and Danger where it was clear that

7    Vida Loca did the murder and that Crazy got his gun back,

8    right?  And two days later, the FBI used CW-1 to help them

9    arrest Vida Loca before he was able to escape.

11:05AM 10         And Brujo.  Who is Brujo?  He's the guy that went to

11    back up Vida Loca and who went with Crazy, right?  It's this

12    guy right here.  Brujo is the same guy that was in the Animal

13    jump-in video in January 8, 2016, right, so the guy who says

14    let me them come and feel the pressure, they need to stick the

15    knife in and see what happens.

16         What does all that show?  It shows you that what

17    Muerto says about the cliques is right, right?  People

18    associate in different cliques, but they are all united under

19    the same letters.  This was three different cliques, right?

11:06AM 20    Chelsea, Everett, and Eastside, working in conjunction with

21    each other to commit a murder, to provide backup for that

22    murder, to provide transportation by Checha in the murder.

23         And you'll remember they ended up disciplining one of

24    the Eastside members, Chentino, for not doing enough at the

25    murder scene, right?  Chentino was there, right, sees the fight

1    with Vida Loca, sees Vida Loca lose, he doesn't do anything

2    about it.  According to the testimony, he's also there the next

3    night when the murder happens, right?

4         That can't be permitted.  When you are in MS-13, if

5    you see a chavala and you see an MS-13 attacking a chavala or

6    in a fight with a chavala, you have to do something about it,

7    and if you don't do something about it, you're getting a

8    beating or worse.  And who orders that?  Casper.  Right?

9    Casper.  Muerto and Tigre described that exactly the same way,

11:07AM 10  right?

11        That is a good example of why you should credit Muerto

12   and Tigre's testimony, right, they didn't always talk about the

13   same things, right, they weren't always present for the same

14   things, but when they did talk about the same things, they

15   described them in very similar ways.  They described how that

16   murder was done in the same way.  The way that they described

17   the murder ended up being corroborated by recordings that were

18   done without their knowledge.

19        And I think, more generally, it is a way that you can

11:07AM 20  be confident that the other parts of their testimony concerning

21   the 2008 beer bottle attack with Playa, or concerning the

22   machete attack in Maverick Square, or the Highland Park attack

23   that Muerto does, right?

24        They don't put themselves into these things and say,

25   you know, I really didn't want to do it, but Playa made me,

1   right?  I didn't really want to attack that chavala, but Playa

2   ordered me out of the car, or Casper said if you don't do it,

3   you're going to get a beating, right?

4          They were enthusiastic participants in these crimes,

5   right?  They said not only were they enthusiastic participants

6   in these crimes, these guys were enthusiastic participants with

7   them.  They never minimized their own role in the violence.

8   They never said I only hit him once with a beer bottle, but it

9   was really Playa who put him down in the street and tried to

10  kill him, right?

11         Muerto and Tigre were both perfectly consistent with

12  the fact that they were eager participants in these attempted

13  murders, right?  It's just that they also said that it was part

14  and parcel of their work in the gang and that other people that

15  were in the gang did it with them.

16         I want to jump ahead briefly, ladies and gentlemen,

17  because I think I'm about to be out of time and I'll sit down

18  and get another opportunity to talk with you in the rebuttal.

19         I want to talk very briefly about the protection

11:09AM 20  details and then talk about sort of the evidence that should

21  convince you beyond any reasonable doubt that these defendants

22  are guilty.

23         The first is -- let's talk just briefly about the

24  protection details.  I really don't think there's a lot to say

25  about the protection details.  They're very easy to understand

1    and the evidence against them is very straightforward, right?

2         Lobo and Checha could not have been clearer on their

3    calls, with -- the recorded calls and the transcripts that you

4    saw that they were willing, ready, and able to get paid to

5    transport what they thought was kilograms of cocaine -- that

6    was kilograms of cocaine from Massachusetts to New Hampshire,

7    right?

8         There's nothing about it that was difficult to

9    understand.  Muerto is the common denominator with all of these

11:09AM 10   deals.  When Checha does it, he has suggestions on the

11   transcript about how to do a good job with the protection

12   detail, and it turns out that Checha didn't do any of the other

13   protection details, it's too bad, right?  Checha was the only

14   one that was any good at it, right?  What do you know from the

15   Checha protection detail?  He spotted the cop on surveillance,

16   right?  He saw one of the officers in the truck with a front

17   license plate missing, right?  So Muerto and with -- and,

18   finally, the final detail, the 5 kilo detail you know from the

19   video itself.

11:10AM 20        (Video played.)

21        Uno, dos, tres -- right.

22        (Video played.)

23        Lobo and Lobo in the back seat getting the money, all

24   right.  And you know that the last drug protection detail is

25   for 5 kilos for a variety of reasons:

1          1, Muerto says, everybody always knew how much drugs

2      we were transporting.

3          2, that deal, unlike the other deals, was different,

4      right?  There was a lot of people at this deal, right?

5      Everybody knows that this is a bigger deal.  There's not just

6      one car for a follow car, there's two cars for surveillance.

7      There's multiple people from multiple cliques that are

8      participating in that protection detail, all right.

9          So all of them were willing to do it, all of them got

11:11AM 10     paid to do it.  Some of them did a good job at it.  Others went

11      along, but all of them were part and parcel of the conspiracy

12      believing that they were transporting kilograms of cocaine from

13      Massachusetts to New Hampshire.

14          So before I sit down, I just want to say one word

15      about the charge of racketeering conspiracy, all right.

16      Judge Saylor is going to give you very detailed instructions on

17      the law at the end of the case, and I don't want to spend a lot

18      of time on it now, but there's a couple of things that the

19      government has to prove beyond a reasonable doubt to convict

11:12AM 20     these defendants of that offense.

21          You have to prove that there was a conspiracy to

22      commit the crime of racketeering, which is to conduct the

23      affairs of an enterprise affecting interstate commerce through

24      a pattern of racketeering activity.  You have to prove that the

25      defendants knowingly and willingly agreed to participate in

1    that conspiracy, and you have to find that the defendants or

2    another member of the conspiracy agreed to commit at least two

3    racketeering acts, and that is so important, all right.  That

4    is so important.

5         We don't have to prove that these men did a murder or

6    an attempted murder for you to find them guilty, all right.  We

7    did prove it.  You don't have to find that to find them guilty,

8    all right.  You know that the evidence proves the first element

9    because you heard that each defendant was a member of MS-13.

11:13AM 10  MS-13 is an organized gang, membership requirements, rules,

11   ongoing criminal purpose.

12        Each defendant regularly attended clique meetings

13   where they discussed paying dues, they discussed the criminal

14   activities that they were participating in, they discussed

15   buying clique guns to attack clique rivals and to defend

16   themselves against rival attacks.  They jump in new members,

17   they punish people for beatings for failing to live up to the

18   rules of MS-13.

19        MS-13 is an enterprise.  You know that that enterprise

11:13AM 20  affected interstate commerce, right?  The Eastside clique

21   bought guns that moved in interstate commerce.  They called

22   El Salvador, they used telephones to communicate with each

23   other.  They sent money to El Salvador.  They sent money to

24   leaders in El Salvador, both for the program and to get their

25   own deported men back.

1    You know that the defendants knowingly and willingly

2    agreed to participate in this enterprise because you saw the

3    evidence of this trial, right?  You know that a person doesn't

4    become an MS-13 homeboy by accident, right?

5    You are a member when, as all four of these people

6    were, when they continued to participate in the affairs of this

7    enterprise, as all four of them did.  You have to make an

8    affirmative showing, and that's what showing up in the garage

9    and showing up at the clique meetings is all about.  Every time

11:14AM 10    there's a clique meeting, these guys reaffirmed I'm part of

11    this enterprise when they show up for these clique meetings.

12    And, finally, you need to know that they knowingly and

13    willingly agreed to join and that they knew, when they did it,

14    that somebody, not necessarily them, was going to commit two or

15    more racketeering acts.

16    Is there any doubt in your mind right now that these

17    guys knew that somebody in the MS-13 enterprise was going to

18    commit two murders or attempted murders?  Do you have any doubt

19    in your mind?  Do you?  If the answer to that question is no,

11:14AM 20    then this is a very simple case.

21    The answer should be no, right, right, because you

22    know what MS-13 is and you know what it's about.  You know what

23    the violence is.  You know what their goals are, you know what

24    their mission is, and not only that, you know what their sort

25    of desire is.  In this case, we actually proved that these

1    defendants regularly did do attempted murders and murders,

2    right?

3              You've got Checha trying to stab a chavala with a

4    machete at the Maverick Square T-station, you've got him

5    driving Brujo and Crazy to the murder scene, to help Vida Loca

6    commit that murder.  He gets clique ammo from Muerto to do a

7    shooting, and he beats Master for missing meetings.

8              With Lobo, when he got arrested and he believes CW-1

9    was an informant, he asked Casper for what?  A green light.  "I

11:15AM 10   want to kill that guy," right?  "I think he's a snitch.  Checha

11   and I have a plan to kill him."

12             Lobo tells Muerto when they're all arrested, "Look, if

13   Casper had only approved of my plan, that guy would have been

14   gone, and none of us would be here right now.  We wouldn't have

15   any of these problems," right?

16             Playa is along with Muerto when he breaks that beer

17   bottle over that man's head and leaves him gasping for air in

18   the street in East Boston.  He collects the money that enables

19   MS-13 to continue to thrive, he beats Tigre for violating

11:16AM 20   clique rules, and he's actually the one that counts Animal in

21   to the Eastside clique and welcomes him to La Mara.

22             And Casper is the one that is presiding over all of it

23   with his hand on the throttle, right?  He orders Chentino

24   beaten for not supporting Vida Loca during the murder.  He

25   calls the meetings where the gang's business is discussed.  He

1    gets the reports about violence committed by people that are in

2    his clique and that want to be in his clique.  He recruits new

3    members.  He helps jumps in the new members.  He jumps in the

4    MS-13's next generation.  Not just Animal, David and Luis, too,

5    so that the gang can continue to grow and thrive and flourish.

6           Ladies and gentlemen, the evidence I've just

7    highlighted is really just a fraction of the evidence that

8    you've heard in this case.  The legal elements I've just

9    described are really kind of a Reader's Digest version of what

11:17AM 10    Judge Saylor is going to give you in much more detail at the

11    end of the case.

12           But when you look at all of the evidence here that

13    you've seen and that you've heard and you apply the law as

14    Judge Saylor gives it to you, there is really only one verdict

15    that is consistent with the evidence.  There's only one verdict

16    that is consistent with the evidence, and that verdict is

17    guilty against Casper, against Playa, against Lobo, against

18    Checha on all counts.  Thank you.

19           THE COURT:  All right.  Thank you, Mr. Pohl.

11:17AM 20           All right.  Mr. Murphy.

21           MR. MURPHY:  Thank you, Your Honor.

22           THE COURT:  While he's getting set up, if anyone wants

23    to stand up and stretch your legs, that's fine.

24           MR. MURPHY:  May I proceed, your Honor?

25           THE COURT:  Yes.  Go ahead.

CLOSING ARGUMENT

1

MR. MURPHY:  It's easy to paint with a broad brush,

2

but in a case like this, a criminal case with charges as

3

serious as these, the facts matter, the details matter, and the

4

evidence matters.

5

I'd ask you if we could pull up Exhibit 97.  You saw

6

Exhibit 97 at the beginning of this case, and you know what it

7

depicts and who it depicts.  It depicts Joel Martinez,

8

"Animal," with his hand on a knife.  If we could go to

9

11:19AM 10

Exhibit 99.  Exhibit 99 depicts Joel Martinez wiping the blood

off a knife, the blood that you know came from a boy named

11

Irvin De Paz that he had stabbed three times only a few moments

12

earlier, who did not survive that assault.

13

But what else do you see if you look at 97 and 99?

14

You see a date, and the date is September 20, 2015.  What do

15

you know about September 20, 2015?  You know that as of

16

September 20, 2015, the evidence shows that Herzzon Sandoval

17

did not know who Joel Martinez was.  The evidence shows that he

18

never met Joel Martinez.  The evidence shows that he did not

19

11:20AM 20

know who Irvin De Paz was.  He had never met Irvin De Paz.

The evidence shows that on September 20, 2015,

21

Mr. Sandoval had nothing, absolutely zero to do with

22

Joel Martinez's murder of Irvin De Paz.  Nothing.  And if you

23

look at all of the evidence in this case, members of the jury,

24

all of the evidence the government has presented, what you'll

25

1    see is that that's a theme that cuts across all of the evidence

2    of the violent acts that the government has presented.

3         Mr. Sandoval never agreed to participate in any of

4    them, he never participated in any of them, and the evidence

5    will show that on those rare occasions when he heard about

6    them, he learned about them after the fact, and that's an

7    expression I'd ask you to remember because I'm going to return

8    to it later, after the fact.

9         If I may work with the document camera.  Now, Mr. Pohl

11:21AM 10   talked about most of these incidents in the course of the

11   trial.  I made a list of all of the crimes of violence that the

12   prosecution put some evidence of in the course of the trial.

13   And let me take a moment to walk through them with you now.

14        Let's start with the alleged Maverick Square incident.

15   I call it an alleged incident because apart from the testimony

16   that we heard from Muerto, there's no evidence that it ever

17   took place.  What did Special Agent Wood testify when he was

18   cross-examined by all of us, that in order to bring evidence

19   into court, even the FBI says we need corroboration.

11:22AM 20        He testified that he wouldn't even send an

21   intelligence report out to another FBI field office, never mind

22   bring it into a court of law, unless there was some backup and

23   there was some corroboration.  And there's absolutely no

24   corroboration that anything like that attack in Maverick Square

25   happened.

1          I'm sure other defense counsel will talk about it, but

2     there ought to be a police report of a visit to Checha's house

3     if something like that occurred.  You just heard about that

4     from Muerto, the man the government says you can trust, but who

5     lied on the stand, as you know, about whether he was a drug

6     dealer.

7          The government just said Muerto and Tigre, they didn't

8     always talk about the same things.  Well, one thing they didn't

9     talk about the same thing was whether Muerto was Tigre's drug

11:23AM 10     dealer.  Muerto says, "No, I never did that."  Tigre said, "I

11     used to buy cocaine from him all the time," so Muerto's word is

12     suspect.

13          And there's no evidence whatsoever that this alleged

14     Maverick Square incident ever happened, no credible, believable

15     evidence, but even if it did, is there any evidence that

16     Mr. Sandoval agreed to it?  No.  Is there any evidence that he

17     participated in it?  No.  Is there any evidence that he ever

18     even heard about it, that he had any knowledge?  No.

19          Then we have the alleged Heineken bottle attack.

11:24AM 20     Again, same thing, zero corroboration.  We have no way of

21     knowing other from the word of Muerto, who you know lied on

22     that stand, whether that happened at all, but even if it did,

23     is there any evidence that Mr. Sandoval agreed to it?  No.  Is

24     there any evidence that he participated in it?  No.  Is there

25     evidence that he knew about it?  No.

1          Now, we have the three drug protection details, and

2     I'm going in chronological order as best I can.  You heard even

3     Special Agent Wood acknowledge when I cross-examined him that

4     Pelon, CW-1, asked Mr. Sandoval whether he wanted to

5     participate, and he turned him down.  Mr. Sandoval said no to

6     these drug protection details.

7          You know from the evidence that these weren't clique

8     activities, they were activities that were conducted by a

9     number of different people that the money was not brought back

11:25AM 10    to the clique that was earned during the course of those drug

11    protection details and that these were events that were

12    orchestrated by the FBI but didn't have anything to do with the

13    operation of the Eastside clique.

14          Did Mr. Sandoval agree to do them?  Special Agent Wood

15    told you no.  Did he participate in them?  You know what the

16    evidence says.  The evidence says no.

17          Did he have knowledge of them?  Remember what the tape

18    said.  Remember what that audiotape that Mr. Norkunas offered

19    in evidence said.  What did Pelon say to the others in the very

11:25AM 20    first protection detail?  Don't tell Casper.  There's no

21    evidence that Mr. Sandoval knew anything about these.

22          The fatal shooting of Javier Ortiz in Chelsea on

23    December 14, 2014.  I'm going to ask you as you talk about that

24    event in your jury deliberations to focus really on the details

25    and not allow the government to paint with a broad brush.

1        Focus on what the evidence shows really happened.

2              Is there any evidence that Mr. Sandoval agreed that

3     anything ought to have happened to Mr. Ortiz?  There's no

4     evidence that he knew anything about the events of that day

5     before they occurred.

6              He was not at the garage when the call came in to

7     bring the gun.  He certainly never agreed that Vida Loca should

8     shoot Javier Servellon Ortiz.  Is there any evidence that he

9     participated?  Absolutely not.

11:27AM 10              Did he know?  The evidence shows that he learned about

11     it after the fact.  I'm going to use these initials, after the

12     fact, ATF.  Mr. Pohl argued that Chentino was disciplined for

13     failing to assist Vida Loca in the murder, but the evidence

14     shows that that's not what happened because the evidence shows

15     that Muerto didn't assist Vida Loca in the murder.  What the

16     evidence shows is that Vida Loca -- I'm sorry, the evidence

17     shows that Chentino was disciplined for what Chentino did the

18     day before when Vida Loca was in a fist fight, and let's look

19     at Exhibit 72, he sustained the bruise that you can see here,

11:28AM 20     he did not come to Vida Loca's aid in the fist fight the night

21     before.  That does not show that Mr. Sandoval agreed to engage

22     in a conspiracy that involved a racketeering act of murder.

23              The Chelsea park stabbing.  We spent a lot of time on

24     that on May 12, 2015.  That was Pelon and Muerto and Domingo.

25     Is there any evidence that Mr. Sandoval agreed to that?  The

answer is no.  Is there any evidence that he participated in

it?  No.  And any evidence that he ever even learned about it?

Think about the testimony.  No one testified that Sandoval was

ever told about that.  Again, the answer is no.

We've talked already about the September 20th

stabbing, fatal stabbing of Irvin De Paz.  No evidence that

Mr. Sandoval agreed to it, no evidence that he participated

and, again, he learned about that, as you can tell from that

December 6th tape from Pelon, from CW-1, five weeks after it

took place, after the fact.

The December 20, 2005 attack by Animal and Tigre on

Everett Street in Chelsea.  Did you notice that when Tigre

described that attack, he didn't say anything about a knife or

a stabbing?  He described it as being, as Animal using a chain.

And is there -- what did he say about having said anything to

Casper afterwards?  Of course, there's no corroboration for the

fact that he ever talked to Casper after that event about that

event.  No corroboration at all, but what did he testify on

July -- I'm sorry -- on February 15th in response to

Ms. Lawrence's questions?

"And when you informed Casper, what did you tell

Casper?"

"That we had beaten up a chavala on Broadway and

Chelsea."

Nothing about a stabbing.  He didn't testify about the

1    stabbing on direct, and he never said that he told Mr. Sandoval

2    about a stabbing.

3         The answer to that question, "Did Mr. Sandoval agree

4    to this?"  "No."  "Did he participate in it?"  "No."  Let's put

5    a question mark here, but if he did, we know it was after the

6    fact.

7         The January 26 attack on Chestnut Street.  Again,

8    there's no corroboration that that ever happened.  We didn't

9    hear anything about a call to the police.  We didn't hear any

11:31AM 10   police response, but there's certainly no evidence that

11   Mr. Sandoval knew.  There's no evidence that he participated,

12   and if there is any evidence that he heard about it, it was

13   only after the fact, and there is no such evidence.

14        Why does all this matter?  All of this matters,

15   members of the jury, because of what I expect Judge Saylor is

16   going to tell you about the case in his jury instructions.

17        Let me focus on four things that I expect Judge Saylor

18   will tell you.  I'm going to read the first three of them

19   directly and talk at length about the fourth one.  Although the

11:32AM 20   defendants are being tried together, you must give separate

21   consideration to each defendant.

22        Don't let the government paint with a broad brush.

23   Look at the evidence separately about what Mr. Sandoval did and

24   what he agreed to do.  There are other counts in the indictment

25   against other defendants who are not part of this trial, and

1       this is perhaps the most important instruction from our

2       perspective that we would ask you to pay careful attention to.

3              The government must prove beyond a reasonable doubt

4       that each defendant agreed to participate in the conspiracy and

5       that the conspiracy involved, or would involve, the commission

6       of two racketeering acts.

7              The Court will tell you that there are five specific

8       racketeering acts that the government has to prove beyond a

9       reasonable doubt, are the racketeering acts that Mr. Sandoval

11:33AM 10      agreed to participate in a conspiracy to commit:

11             Murder; armed assault with intent to murder; assault

12      with intent to murder; conspiracy to commit murder; and crimes

13      relating to drug trafficking and the distribution of controlled

14      substances.

15             If you do not find beyond a reasonable doubt, if the

16      government hasn't proved to you beyond a reasonable doubt that

17      what Mr. Sandoval signed up for was a conspiracy that would

18      involve the commission of those specific crimes, that means the

19      evidence will call for you to acquit Mr. Sandoval.

11:34AM 20             There's a crime in particular that I'd like to point

21      out to you that is not on that list of the five, that's not

22      charged as a racketeering act in this case, and that's the

23      crime of being an accessory after the fact to murder or

24      attempted murder.

25             If that's what you conclude from the evidence, it's

1    not sufficient, it's not enough to conclude that Mr. Sandoval

2    has been proved by the government guilty beyond a reasonable

3    doubt of a racketeering activity.

4        Now, what does the evidence show about what it was

5    that Mr. Sandoval really agreed to do?  Well, Mr. Pohl

6    mentioned that there was some evidence at the beginning of the

7    case about Mr. Sandoval's dispute with the MS-13 leaders in

8    El Salvador, and I want to talk about that because it will show

9    you what was at issue here.  It will show you what Mr. Sandoval

11:35AM 10   agreed was part of being in the Eastside clique of MS-13, and

11   it will show what he did not agree was part of being in that

12   MS-13 clique.

13       It will show you what he agreed to do and what he

14   refused to do, even to the point where the MS-13 leaders in

15   El Salvador wanted to take him out of the equation, to kill him

16   because he would not agree to MS-13's -- El Salvador's goals.

17       The evidence that you heard about this came from two

18   main sources.  The first was Special Agent Wood's testimony on

19   the stand.  If you remember, I cross-examined him at length

11:36AM 20   about what the leaders in El Salvador were trying to do.  He

21   testified that he had gone down there in 2015 and that the

22   MS-13 leaders in El Salvador were trying to centralize control,

23   were trying to make the cliques in the United States more like

24   MS-13 in El Salvador.

25       So that's one source of information on this chart.

1    It's the government's own witness.  The other source, the

2    stipulation that Ms. Rodriguez read at the end of the evidence

3    on Friday, facts the government has agreed to.

4         The first entry on this chronology simply sets the

5    stage.  It tells you that as of May 28, 2013, at the very

6    beginning of this investigation, CW-1 had a direct line into

7    MS-13 leadership in El Salvador.

8         At the beginning of February, 2014, CW-1 tells the

9    agent that MS-13 leadership wants the U.S. cliques to follow

11:38AM 10   MS-13 rules set by MS-13 in El Salvador.

11        And you'll see as we go through the chart that there

12   are really three main rules MS-13 in El Salvador is telling the

13   cliques here to follow:  Commit serious acts of violence;

14   collect rent, that is, extortion from local businesses; and pay

15   tribute to leaders in El Salvador so that we can take care of

16   our people in prison.

17        And the evidence will show that, as to each of those

18   requests, Mr. Sandoval said no, no, no, even when it meant that

19   his life was threatened.  So on February 7, 2014, CW-1 tells

11:38AM 20   the agents that MS-13 wants to extort money from local

21   businesses and to discipline clique rule infractions, not with

22   these beatings that you've seen, but by shock.  What does CW-1

23   tell the agents is Mr. Sandoval's position?  He does not want

24   to follow these rules.

25        As a matter of fact, CW-1 tells the agents that

1    Mr. Sandoval has told Muerto that he wants to keep the ESLS

2    meetings secret from MS-13 in El Salvador.  What kind of

3    conspiracy, what kind of agreement is that?

4         The next day, Pelon tells the agents that Mr. Sandoval

5    doesn't want the money sent to El Salvador, the tribute that

6    MS-13 in El Salvador is paying, he wants the money to go to

7    deported ESLS members.

8         Later in that very month, Mr. Sandoval tells -- CW-1

9    tells the agents that Sandoval is angry at another MS-13

11:40AM 10    member, Tremendo, from a different clique because Tremendo

11    committed a murder and is acting like he's in El Salvador.

12         The dispute continues into the next year.  In May of

13    2015, Pelon, CW-1, tells Bandito, another MS-13 leader in

14    El Salvador, that Bandito could ask any clique, the only ones

15    out on the street are him.  That is CW-1, Pelon, and Muerto.

16         On August 5, 2015, Pelon tells the agents that Dante,

17    an MS-13 leader in El Salvador, has ordered someone to

18    discipline Sandoval.  He's not with the program, he's not in

19    line.  And the agents take that warning so seriously that they

11:41AM 20    tell Mr. Sandoval that his life is in danger.  What kind of a

21    conspiracy is that?

22         And on September 5, 2015 in a recorded call that

23    Special Agent Wood testified about, you get a clear sense about

24    what this dispute was about between the leaders of MS-13 in

25    El Salvador and Mr. Sandoval.

1          Pelon, CW-1, actually gives Mr. Sandoval some advice

2     about how he would handle the dispute.  Calmly tell Gora, the

3     MS-13 leader in El Salvador, down there it's easy to kill and

4     it's easy to collect, but not here.

5          Sugar, another MS-13 leader on the call, gets on the

6     phone with Mr. Sandoval and when Mr. Sandoval says, "No, we are

7     not with the program, we are not with that program," he's again

8     threatened, "The barrio will be making decisions for ESLS and

9     not Casper and his members."

11:42AM 10          And this dispute continues until the very end of this

11    case.  At the Virginia meeting you heard about, Chucky, the

12    leader of the East Coast Program, and Sugar, the MS-13 leader

13    in El Salvador ask Pelon, CW-1, for a report.

14          And what does CW-1 say?  The old guy, Mr. Sandoval, is

15    pushing them down.  He's not with the program.  He's not

16    agreeing to MS-13 leadership's demands.  And what does the

17    leadership in El Salvador say, "Why don't you kill him?"  That

18    shows -- that evidence shows that Mr. Sandoval was not the

19    requirements that MS-13 leadership's demands made on his

11:43AM 20    clique.

21          And what you have to decide based on the evidence is

22    what he agreed to do, and this evidence shows that he did not

23    agree to be part of a clique that followed the rules laid down

24    by MS-13 in El Salvador, that he did not agree to be part of a

25    clique that agreed to participate in a conspiracy that involved

those five racketeering acts; murder, conspiracy to commit
murder; assault with intent to murder; assault, armed assault
with intent to murder; and drug trafficking.

Now, there were some crimes.  I said this in my
opening statement, there were some crimes that the ESLS clique
and Mr. Sandoval did agree to commit.  You heard about them.
You heard about their agreement to possess firearms illegally.
You heard a lot about the clique gun.

Remember, of course, that for all of 2015, from
January to December, there was no clique gun after it had been
taken away by Lobo, so ask yourselves how much of a priority
that could be, but in any event, as Judge Saylor told you
during the trial and as he will again tell you in his
instructions, possession of firearms or conspiracy to possess
firearms is not a racketeering act.  It doesn't count.

Agreeing to bring people into the country illegally.
Did this clique agree to that or did Mr. Sandoval agree to
that?  Yes.  Was that, in fact, one of the main reasons to
exist in the first place, but it's not a racketeering act.
It's not one of the five crimes that count, and Judge Saylor
will tell you the conspiracy to violate the immigration laws is
not a racketeering act.

The beat-ins and the beatings for discipline.  You
heard a lot about them in the closing.  They are not pleasant
to watch.  They're difficult to watch, but you have a job to do

1    here, and that is to evaluate the evidence on the charges that

2    the government has made.  And, again, I expect that Judge

3    Saylor will tell you that assault and battery, even assault and

4    battery with a weapon is not a racketeering act.

5         And as I said near the outset, there is one other

6    crime that I want to talk about that Judge Saylor will tell you

7    is not a racketeering act, and that's accessory after the fact

8    to murder and attempted murder.

9         I expect that Judge Saylor will tell you that a

11:47AM 10   perpetrator is guilty of the crime of being an accessory after

11   the fact to a murder or attempted murder if he or she:  1,

12   knows that another person has committed a murder or attempted

13   murder; 2, harbors, conceals, maintains, or assists that

14   person; and, 3, with the intent that that person shall avoid or

15   escape detention, arrest, trial, or punishment.

16        That's exactly what Mr. Sandoval did when it came to

17   Joel Martinez.  And if he were charged in this case with being

18   an accessory after the fact to murder or even  an accessory

19   after the fact to other crimes, like attempted murder, I

11:48AM 20   wouldn't have very much to say to you at all because the

21   evidence shows that that's what he did, but as Judge Saylor

22   will tell you, being an accessory after the fact, learning

23   about a crime after the fact, helping the person escape the

24   authorities after the fact is not a racketeering act.

25        And what the government has to prove beyond a

1    reasonable doubt is that Mr. Sandoval agreed to participate in

2    a conspiracy that would involve the commission of racketeering

3    acts, one of those five crimes.

4         Let me address quickly three other points.  The

5    blow-up that we saw during the government's closing from

6    Exhibit 28 at page 4.  I don't know whether we could see that.

7    Thank you.

8         The government blew up that paragraph, Casper -- thank

9    you.  And the government used that paragraph in its opening,

11:49AM 10   but do you remember Ms. Rodriguez's cross-examination of

11   Ms. Huacuja on this point?  What did she say?  She said that

12   the word in Spanish "pegado" -- and I won't pronounce that

13   correctly -- does not mean kill.

14        "There are many of us here who have killed," and that

15   she took that interpretation of the word, she placed that

16   meaning on the word because Muerto, the man who forgot that he

17   sells drugs, whose credibility I suggest you should place no

18   value on, he's the one who provided the interpretation of that

19   word for her.

11:50AM 20        Muerto, the same Muerto -- if we could go to page 6 of

21   that transcript.  Thank you -- who explains that he did about

22   four killings in El Salvador but came in here and said, just

23   bluffing, just boasting, not telling the truth.

24        Point 2, the second point.  You heard about green

25   lights, and you heard the testimony again from Muerto that

1    after the arrests in this case -- and this is hard to follow --

2    that Lobo told Muerto that before the arrests, after his gun

3    was taken, he asked Mr. Sandoval for permission to green light

4    Pelon, but that Mr. Sandoval said, "No, I need more evidence."

5         Well, does that make any sense to you at all?  Any

6    sense to you at all?  There's no corroboration for it, to

7    start.  It's just Muerto's word about what Lobo supposedly

8    told, him.  But if that were true for a whole year after the

9    gun was taken away from Lobo in January of 2015, Pelon, CW-1,

11:51AM 10  is coming to all these clique meetings and the others are

11   suspecting that he's an informant, is there ever a time when

12   he's put in the circle and asked questions?  Is there ever a

13   time when he's searched?  Is there ever a time when he is put

14   on the spot and asked whether he's an informant?  The answer to

15   that question you know is no, and that shows you that you

16   should give no credibility to that allegation at all.

17        What, in essence, is the government's argument in this

18   case?  It's not about anything Mr. Sandoval did or agreed to do

19   before the fact.  It's about MS-13, and the government paints

11:52AM 20  with a broad brush and tells you that what MS-13 is about is

21   all about violent assaults.

22        And sometimes, sometimes if the same line, if the same

23   story, if the same narrative is repeated over and over and over

24   again, it begins to carry the ring of truth, but let's break

25   that apart.  Let's look at what the evidence shows about it,

1    and let's start with the main thing that the government has

2    stressed from the very beginning of this case, that the price

3    of entry for getting into MS-13 is to commit, initially, a

4    serious violent crime like a stabbing, or later, murder.

5         The government paints with a broad brush because it

6    wants you to think that each one of those defendants,

7    Mr. Sandoval included, must have done that, even though there's

8    no evidence that they ever did.

9         Well, what's the evidence?  We heard from

11:54AM 10    Special Agent Wood, the government's expert on MS-13, that to

11    become a homeboy, someone would need to commit some kind of

12    violent crime, even killing, against rivals or suspected law

13    enforcement cooperators.

14         Well, we heard from two MS-13, members and what did

15    they tell you?  Tigre said he was drunk the first time he

16    became an MS-13 member when he was beaten in, that he'd never

17    met Mr. Sandoval before, and there's no evidence that he ever

18    committed a crime in order to get into MS-13, no evidence at

19    all.

11:55AM 20         And Muerto.  Mr. Pohl just said that he said in his

21    testimony that he stabbed the man during his evaluation period,

22    but remember what Muerto actually said.  That's what he said on

23    direct examination, the government elicited that information

24    from him, but what happened when he was subject to

25    cross-examination?

1          Mr. Iovieno pointed out that Muerto had said to the

2     FBI, all I did was get into school yard fights to get into

3     MS-13, and Muerto said I don't remember -- and by the time

4     Mr. Lopez cross-examined him the next day, he had admitted that

5     he never committed a serious violent assault other than school

6     yard fights before he was admitted to MS-13.

7          The idea that these men, and Mr. Sandoval included,

8     must have committed violent crimes to get into MS-13 in the

9     first place is one of those lines that gets repeated in the

11:56AM 10     course of a trial, but there's no evidence to back it up.

11          And what about Special Agent Wood's claim that MS-13's

12     policy is to kill cooperators, and if they're unable to kill a

13     cooperator, they kill their family members.  He said that

14     certainly, and you saw that scripted stage drama with Muerto.

15          Do you think that was a coincidence that he did that

16     at the very end of the day last Thursday after Mr. Pohl asked

17     him, what do you think will happen to you for testifying, or do

18     you think that was a practice rehearsed answer?

19          There's no evidence, not a shred of background that

11:56AM 20     that has happened, not in this courtroom, and the fact that

21     it's been trotted over and over again in the course of this

22     case is a little bit like the Exhibit 50, the gigantic machete

23     that we've seen elicited from Muerto on direct, testified it

24     was his, but only on cross-examination did he learn, did we

25     learn that it was a gift, it never left his bedroom.

1          And I'm going to ask you when you go back to the jury

2     room and deliberate, do not fall victim to the climate of fear

3     that the government has tried to create.

4          You have a lot to listen to today.  You've got three

5     more lawyers to hear from here, and then the government gets to

6     have the last word.

7          The government doesn't get to have the last word

8     because we're nice and we let them have the nice word, the

9     government has the last word because it has the burden of

11:58AM 10     proof, the burden of proving that Mr. Sandoval is guilty of the

11     crime of conspiracy to participate in a racketeering enterprise

12     through a pattern of racketeering activity, that is, through

13     racketeering acts, and it's their burden to do that beyond a

14     reasonable doubt.

15          On behalf of myself as counsel for Mr. Sandoval and on

16     behalf of Ms. Rodriguez, I thank you very much for your time

17     and attention, and I ask you when you go back to the jury room

18     to deliberate, think carefully about the evidence.  Put the

19     government's evidence to the test.  Ask what's the evidence of

11:59AM 20     Mr. Sandoval's agreement?  What's the evidence of

21     Mr. Sandoval's participation?  And what evidence is there that

22     he did anything in this case beyond violate the firearms laws,

23     conspire to violate the immigration laws and agree to act as an

24     accessory after the fact?

25          Unless the government proves that he's done more than

1    this, I respectfully suggest that you should mark your verdict

2    forms not proven, not guilty.  Thank you very much.

3            THE COURT:  All right.  Thank you, Mr. Murphy.  We

4    will take a break.

5            THE CLERK:  All rise.

6            (JURORS EXITED THE COURTROOM.)

7            (A recess was taken.)

8            THE CLERK:  All rise for the jury.

9            (JURORS ENTERED THE COURTROOM.)

12:18PM 10        THE CLERK:  Thank you.  You may be seated.  Court is

11   now back in session.

12            THE COURT:  All right.  Mr. Lopez.

13            MR. LOPEZ:  Thank you, your Honor.  May I proceed?

14            THE COURT:  Yes.

15                        CLOSING ARGUMENT

16            MR. LOPEZ:  Good afternoon, ladies and gentlemen of

17   the jury.  I want to start by thanking you for taking time out

18   of your busy lives to sit as jurors in this case.  I know it's

19   been a long trial, and the lawyers probably made it a little

12:18PM 20   bit longer that it had to be, and I'll take some responsibility

21   for that, but as jurors in this case, you are performing a

22   vital role in the American system of justice.  Jury service is

23   one of the highest obligations of citizenship, so I want to

24   thank you for your service.

25            This is the last time you will hear from Mr. Guzman in

1    this case.  We have no rebuttal.  The government has the last

2    word.

3              Now, you should know that as far as the facts in this

4    case, you and only you get to decide what the facts are.  That

5    is your solemn responsibility, and it is an awesome

6    responsibility.

7              In putting this case in your hands, Mr. Guzman is

8    relying on the oath you took that you would only decide this

9    case on the facts proven to you beyond a reasonable doubt and

12:19PM 10   nothing else, not whether you like the lawyers, not whether you

11   like Judge Saylor, not whether you like any witnesses, not even

12   whether you like Mr. Guzman.

13             You've taken an oath to decide the facts and to decide

14   them divorced from any personal emotions, opinions, and

15   feelings of your own, and I remind you that if you do not do

16   that, if you do not live up to your oath, you will have to live

17   with that fact for the rest of your lives.

18             Now, gang violence is a serious issue in this country.

19   It has been a serious issue for many years.  Prosecutors,

12:20PM 20   police, and special agents who investigate and prosecute

21   individuals involved in gang violence are performing an

22   important public service.

23             Mr. Guzman and I take no issue with legitimate

24   investigations.  We embrace them, we encourage them.  We want

25   to keep our children and our neighborhoods safe, as well.

1    However, investigating crime is one thing, charging an innocent

2    man is quite another.

3        Now, that you have heard all of the evidence, you have

4    not heard any evidence that Mr. Guzman agreed with anyone that

5    he would commit racketeering acts.  You've not heard any

6    evidence that Mr. Guzman agreed with anyone that they would

7    commit racketeering acts.  There was no evidence because it

8    never happened.

9        What happened in this case is that the FBI really

12:21PM 10   didn't investigate Mr. Guzman.  They didn't look into what type

11   of man he was, what his family and friends think of him, what

12   type of father he is, whether he was employed, whether he was

13   even an American citizen.

14       Now, we also know that the FBI didn't have complete

15   control over the criminal that they used to gather evidence who

16   was being being paid by the FBI while at the same time

17   committing crimes that the FBI didn't know about, but

18   Agent Wood admitted to you what he did.  He told you that he

19   was on a mission to take down MS-13.  He told you that he

12:21PM 20   believes that every person associated with MS-13 is violent.

21   He told you that he did not distinguish between individuals

22   based on their level of violence, or even if they were violent.

23   In his biased opinion, he told you that anyone associated with

24   MS-13 must be violent.

25       Well, we don't live in the black and white world that

1   Agent Wood lives in.  We live in a world that is gray, where

2   first impressions are not always accurate, where racial

3   profiling and stereotypes are not always accurate, where the

4   facts really do matter, where an apple is really an apple, so

5   let's talk about what we don't know first.

6        The Court will tell you that a conspiracy is an

7   agreement to commit a crime.  Now that you have heard all the

8   evidence, I ask you to ask yourselves, when did Mr. Guzman

9   enter into an agreement to commit a crime?  On what date did

10  that occur?  With whom did he agree?  What crime did he agree

11  to commit?  What did he agree to do?  What did the others agree

12  to do?

13       You have sat through three weeks of evidence, and you

14  cannot answer these fundamental questions with any certainty

15  because the government did not present you with evidence to

16  answer these important questions.  The absence of proof in

17  these critical issues is the achilles heel of the government's

18  case.  The absence to proof on these critical issues is

19  reasonable doubt, plain and simple.  The absence of proof on

20  these critical issues requires you to find Mr. Guzman not

21  guilty.

22       Now, at the beginning of this case, I told you that

23  the indictment alleges that each defendant agreed that a

24  conspirator would commit at least two acts of racketeering.

25  Now that you have heard the evidence, where did you hear that

1    Mr. Guzman agreed to commit a racketeering act?  Nowhere.

2    Where did you hear that Mr. Guzman agreed with someone else

3    that they would commit a racketeering act?  Nowhere.

4         I also told you that actions speak louder than words,

5    that what you do is more important than what you say, that what

6    you do reveals your true intentions.  Now that you have heard

7    all the evidence, you know that Mr. Guzman did not agree with

8    anyone to commit a racketeering act.  He did not agree that

9    anyone else would commit a racketeering act, rather, the

12:24PM 10   government's proof is something like this, some members of

11   MS-13 commit violent acts, therefore all members of MS-13

12   commit violent acts.

13        This is not logical, but this is what the government

14   is asking you to find as a fact.  The government says

15   Mr. Guzman was associated with MS-13 and some members of MS-13

16   commit violent acts, therefore, Mr. Guzman must be responsible

17   for the violent acts of others.

18        The government says that it does not have to prove to

19   you that Mr. Guzman committed any violent acts, but that

12:24PM 20   evidence would be helpful to the government if they proved that

21   he did, in fact, commit a violent act, but they did not in this

22   case, or that he was even aware of violent acts before they

23   occurred.

24        No, according to the government, Mr. Guzman's mere

25   association with MS-13 makes him responsible for the violent

1     acts of others.  Fortunately, that is not the law.

2          The Court will instruct you that mere association with

3     other persons, even persons involved in criminal activity, does

4     not by itself establish the existence of a conspiracy.  Now,

5     it's been said that a conspiracy is a crime involving two

6     intents.  The first intent involves two or more people agreeing

7     to commit a crime, but the second intent is that the person,

8     when they're making the agreement, must have a state of mind to

9     commit the crime at issue, in this case racketeering acts.

12:25PM 10          In this case, that means the government must prove to

11    you not only that Mr. Guzman agreed to commit a crime but that

12    when he did, he was agreeing to commit racketeering acts, and

13    you've heard no evidence to support that.  I submit to you that

14    after sitting three three weeks of testimony, you do not have

15    any evidence of what Mr. Guzman agreed to do when he became

16    associated with MS-13.

17          In law school, I had a professor who taught me to

18    think critically about facts.  He used to tell his students do

19    not swoop, do not jump to conclusions based on false logic.

12:26PM 20    Look critically at each fact and decide whether the evidence

21    proves a particular fact.  In this case, this means what did

22    Mr. Guzman agree to do?

23          Well, what did the government not tell you?  The

24    government did not tell you when Mr. Guzman became associated

25    with MS-13, the government did not tell you how Mr. Guzman

1    became associated with MS-13, the government did not tell you

2    what the rules of MS-13 were when Mr. Guzman became associated

3    with MS-13.  The government didn't even tell you when

4    Mr. Guzman was tattooed, the government did not tell you the

5    circumstances or the context for the tattoo.

6         Now you know that he received that tattoo before he

7    was married, that he was somewhere around 19 years of age, and

8    that he received it when he was a teenager when he was still a

9    kid.  And you now know that the name and the date on that

12:27PM 10   tattoo was the date of his grandmother's death, and the name

11   was the name of his grandmother.

12        Now, what else have you heard?  Well, you've heard

13   that he refused to participate in the protection details.

14   You've heard no evidence he was involved in any drug

15   trafficking, you didn't hear any evidence that he was involved

16   in any actual gun purchases, you didn't hear any evidence that

17   he participated in any violent acts during the time Pelon was

18   out there videotaping and audio taping, you heard no evidence

19   that Mr. Guzman had prior knowledge of the Highland Street

12:28PM 20   assault that Muerto and Pelon participated in, you heard no

21   evidence that Mr. Guzman had any prior knowledge of the murder

22   by Animal in September of 2015, you heard no evidence that

23   Mr. Guzman had any prior knowledge of the murder by Vida Loca,

24   you heard no evidence that Mr. Guzman had any prior knowledge

25   of the attempted murder by Animal in December 2015, or the

1    assault by Animal in early January 2016, but the government

2    wants you to ignore these important critical facts.  Don't do

3    it.  Don't allow yourself to accept the government's overreach

4    in this case.

5        What did the government prove Mr. Guzman did?  Well,

6    first, he attended meetings, he collected money, he counted

7    money, he kept an account of money, and he was at the beat-in

8    of the Animal, a beat-in that was planned and manufactured by

9    the FBI and executed by its undercover criminal.  That's it.

12:29PM 10        I submit to you that the government has placed far too

11   much emphasis on this single incident to prove this case, an

12   incident that they created as if the government was the

13   director of a movie.

14        The Court will instruct you that it is not enough for

15   the government to prove, without more, that Mr. Guzman simply

16   knew of or acquiesced in the conspiracy.  The fact that

17   Mr. Guzman merely happened to further the objectives of the

18   conspiracy, without more, is not sufficient.

19        So what did the government do?  Well, it tried to

12:29PM 20   prove that Mr. Guzman was involved in prior assaults, but I

21   submit to you that these prior alleged assaults are not

22   credible.  They're not believable.

23        First of all, these prior assaults are based on

24   Muerto's testimony.  A witness by means of his cooperation

25   agreement was incentivized or motivated to help the

1      government's case to receive the rewards of a shorter sentence

2      and a visa to remain in the United States.

3              You should not believe anything that came out of

4      Muerto's mouth.  Muerto's testimony reminds me of an old joke

5      which goes like this:  How do you know when someone is lying?

6      Easy, his mouth is moving.

7              I'm not going to go over all the lies and

8      inconsistencies because my time is limited, but I will remind

9      you of a few lies.  He lied about murders that he subsequently

12:30PM 10      said he didn't commit, he lied to you about his drug

11      trafficking, and he lied to you about whether or not he was

12      aware of the vandalism that occurred at Mr. Guzman's house.

13              But what else did he lie to you about?  Well, what

14      about the assault that he said took place under the bridge to

15      Winthrop?  He lied about the assault that he said took place

16      under the bridge that connects East Boston to Winthrop.  And,

17      ladies and gentlemen, it's not easy to catch someone in a lie,

18      particularly when the lie doesn't contain any details, and

19      you'll recall I was probing what else did he remember about

12:31PM 20      that other than what he testified to?

21              Well, he testified that Mr. Guzman allegedly was

22      involved in an assault under a bridge, but he couldn't tell you

23      much else about the incident.  But in 2016, he told the

24      government that at the time of the incident, Mr. Guzman was

25      driving a Toyota SUV and that the assault took place under a

1    bridge that connected East Boston to Winthrop.

2           And now you know because I've submitted Exhibit 236

3    and 237, which are in evidence, which establish that Mr. Guzman

4    did not have a Toyota, has never registered a Toyota SUV during

5    the relevant time period, and, in fact, had a registered

6    Infinity.

7           Now, you might recall when confronted with that,

8    Muerto tried to minimize, tried to bob and weave.  He tried to

9    say, well, I really don't know cars, but when he spoke to the

12:32PM 10   government initially, he didn't waffle.  He didn't say maybe

11   I'm wrong, he said a Toyota SUV, and now you have the

12   documentary evidence to show that he was lying.

13          Now, you also know that from Exhibit 227 that there's

14   water under the bridge that connects East Boston to Winthrop.

15   Remember his testimony about the bridge?  First, he said

16   bridges, then he described underneath the bridges, then he

17   described how he tackled the individual as he was approaching

18   underneath the bridge.  Well, unless he had scuba diving

19   equipment on, he wasn't over this bridge, but then he tried to

12:33PM 20   change his position again.  He said no, no, it was the bridge

21   to Revere.

22          But that's not what he told the government when he was

23   working under the terms of a proffer, when he was obligated to

24   tell the truth, and when he told them that it was under the

25   bridge from East Boston to Winthrop.

1           Well, this, ladies and gentlemen, is the only bridge

2      that connects East Boston to Winthrop, so we know that

3      Mr. Muerto is a liar and he lied about that alleged assault.

4           Now, he also lied about the alleged Maverick Station

5      assault.  Remember he said that he was involved in that assault

6      with a bat and that he -- afterwards, he called Mr. Guzman and

7      he said Mr. Guzman told him to take a cab, Mr. Guzman told him

8      that he would pay for the cab.  He testified that he took the

9      cab, he took the cab to a car wash in Chelsea, and he told you

12:34PM 10      this story with a straight face.

11           But when he initially told the government about this

12      alleged incident, he didn't mention any phone call to

13      Mr. Guzman on the night of the incident.  He didn't mention

14      anything about a cab, he didn't mention anything about

15      Mr. Guzman saying he would pay for it.  He didn't mention

16      anything about where Mr. Guzman picked him up, rather he told

17      the government he called Mr. Guzman the next day, and

18      Mr. Guzman picked him up at Checha's house.  That's what he

19      told the government.  He didn't say anything about -- he told

12:34PM 20      him about the attack, he described the attack, nothing, just

21      that he called him the next day to pick him up, and he picked

22      him up.

23           In short, ladies and gentlemen, his story about the

24      Maverick Station assault is not credible.  It's not believable,

25      he made it up to curry favor with the government.  What about

1   the Highland Park assault?  His story about the Highland Street

2   Park assault is also not believable.

3         Recall his testimony was that after the assault that

4   he and Pelon and others participated in, he claimed that he

5   drove to Mr. Guzman's house with Domingo or Mingo.  He

6   testified that Mr. Guzman gave him clothes, that Mr. Guzman

7   disposed of his other clothes, that Mr. Guzman was upset that

8   he brought Mingo to his house, but that's not what he told the

9   government when he was obligated to tell the truth under the

12:35PM 10   terms of his proffer.

11         What he told the government in 2016 was that he did

12   not tell Mr. Guzman about the Highland Park assault.  Now, he

13   also told others while he was at clique meetings that he had

14   committed up to four murders.  He said, well, one person I said

15   three murders, the other person I said four murders, and now

16   he's testified, oh, I didn't commit any of those murders.

17         Well, I don't know if he did or if he didn't.  All I

18   know is that Mr. Hernandez Miguel is a liar.  You should not

19   credit his testimony.  You should not accept anything that he

12:36PM 20   has told you about Mr. Guzman, and that includes anything that

21   he has said about the speakers in the transcripts, if they go

22   back into the jury room with you, because it's Muerto, out of

23   the mouth of Muerto that the speakers in those transcripts were

24   identified.  Well, once a liar, always a liar.

25         Now, unfortunately, the same is true of

1    Mauricio Sanchez or Tigre.  We know that Mr. Sanchez now has

2    some mental issues.  He admitted to having hallucinations,

3    anxiety, and taking mental health medications.  I didn't enjoy

4    cross-examining him with those issues, but you had to hear the

5    full story.  He also told you that he had a history of

6    substance abuse, a history of alcohol abuse, and you have to

7    think about that when you're evaluating his testimony about

8    what happened while he was in the throws of that abuse.

9          How good is his memory really when he's high on coke,

12:37PM 10    or how good is his memory when he's drunk and essentially

11    having an alcohol abuse problem?  But what type of person lies

12    about shooting his own mother to curry favor with others?  What

13    type of person claims that he's committed seven murders and

14    then testifies that he didn't commit any?  Can you believe

15    anything he said?  In a word, no.  So where does that leave us?

16    Well, where we began, the government's case, in a nutshell, is

17    Mr. Guzman has a tattoo, he attended clique meetings, he was

18    present when the Animal was beat in, no evidence that he ever

19    agreed to commit a racketeering act, no evidence that he ever

12:38PM 20    agreed with anyone else that they would commit a racketeering

21    act, no credible evidence that Mr. Guzman ever participated in

22    a racketeering act, no credible evidence that he knew or

23    authorized anyone to commit a racketeering act before it

24    happened.

25          Now, you've also seen some pictures about the

1    vandalism to Mr. Guzman's car in July of 2015.  Someone

2    vandalized Mr. Guzman's car.  I submit to you that it was done

3    at a time when Mr. Guzman was refusing to participate in

4    racketeering acts, and I submit to you that someone wanted to

5    try to motivate him to change his mind by making him believe

6    that an 18th Street member came to his home and not only

7    vandalized his car but vandalized his home when his mother was

8    there, his wife was there, and his children were there.

9           Now, to summarize, what we've heard is that Mr. Guzman

12:39PM 10   refused protection details, he had no involvement with drugs,

11   he had no involvement with gun purchases.  There were no

12   violent -- the government presented no violent acts by

13   Mr. Guzman during the investigation.  The prior assault under

14   the bridge in East Boston to Winthrop is not believable.  The

15   prior Maverick Station story is not believable.  He had no

16   prior knowledge of the Highland Street assault, no prior

17   knowledge of the murder by Animal, no prior knowledge of the

18   murder by Vida Loca, and no prior knowledge of the attempted

19   murder by Animal, and that brings me to reasonable doubt.

12:40PM 20   The absence of any evidence that Mr. Guzman agreed to

21   commit racketeering acts is reasonable doubt.  The absence of

22   any evidence that Mr. Guzman agreed with anyone else that they

23   would commit racketeering acts is reasonable doubt.  All the

24   inconsistencies and lies in this case is reasonable doubt.  The

25   false testimony by Muerto and Tigre is reasonable doubt.

1          The fact that the government's entire case rises and

2     falls on the testimony of witnesses that had something to gain

3     by helping the government is reasonable doubt.  Muerto, Tigre

4     and Pelon.  The fact that the government imbedded an informant

5     who was also off committing crimes right under the FBI's nose

6     is reasonable doubt.

7          As you deliberate in this matter and review all the

8     evidence and lack of evidence, think about the other important

9     decisions you have made in your life, the decision to get

12:41PM 10     married, buy a house, have children, just to name a few.

11          What level of confidence did you need in your

12     decision-making to convince you that your decision was correct,

13     that your decision was beyond a reasonable doubt?

14          The Court will instruct you that you may not convict

15     Mr. Guzman if you decide that it is probable, even strongly

16     probable that he is guilty.  A good barometer for reasonable

17     doubt is to think about the other important serious decisions,

18     life-changing decisions that you have made in your life.

19          If the government has not convinced you beyond a

12:42PM 20     reasonable doubt that Mr. Guzman is guilty, then you must find

21     him not guilty because he is entitled to the presumption of

22     innocence up until you find that the government has proven its

23     case beyond a reasonable doubt, and if the government hasn't,

24     you must acquit.  The law requires you to acquit.

25          Now you have the power and obligation to act.  We told

1    you at the beginning of the trial that we're going to ask you

2    to do something that no one else has been able to do for

3    Mr. Guzman.  We're going to ask you to protect him, to protect

4    him under our Constitution.

5         We are asking you not to leave him at the mercy of the

6    government any longer.  We are asking you to give him his life

7    back.  That, ladies and gentlemen, is the great calling of the

8    jury and the great function of an American jury.  That's what

9    you're here to do today, to do justice.  We urge you to live up

12:43PM 10   to your oath.  We beg you.

11        The Reverend Martin Luther King once said, "The time

12   is always right to do what is right."  We beg you to have to

13   the courage to do what is right, to have the courage to do

14   justice, to have the find to courage Mr. Guzman, an innocent

15   man, not guilty because the only verdict that's just in this

16   case is a not guilty verdict.

17        Thank you for your time.

18        THE COURT:  All right.  Thank you, Mr. Lopez.  All

19   right.  What we're going to do now is take our break for lunch.

12:43PM 20   Let's make this as close to 45 minutes as we can.  Your lunch

21   should be waiting up there unless you ate it at the last break,

22   all the more reason to make this short, but certainly the

23   lawyers and I will want to eat something, so let's try to

24   convene as close to 1:30 as we can make it.

25        THE CLERK:  All rise.

1        (Whereupon, the hearing was adjourned at 12:43 p.m.)

2

3                    C E R T I F I C A T E

4

5    UNITED STATES DISTRICT COURT )

6    DISTRICT OF MASSACHUSETTS ) ss.

7    CITY OF BOSTON )

8

9        I do hereby certify that the foregoing transcript was

10   recorded by me stenographically at the time and place aforesaid

11   in Criminal Action No. 15-10338-FDS, UNITED STATES vs.

12   HERZZON SANDOVAL, et al., and thereafter by me reduced to

13   typewriting and is a true and accurate record of the

14   proceedings.

15        Dated this 22nd day of June, 2018.

16                    s/s Valerie A. O'Hara

17        _____

18             VALERIE A. O'HARA

19             OFFICIAL COURT REPORTER

20

21

22

23

24

25