UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA                    CRIMINAL NO: 15-10338-FDS

v.

ERIC ARGUETA LARIOS

ERIC ARGUETA LARIOS'S  SENTENCING MEMORANDUM AND REQUEST FOR EVIDENTIARY HEARING

## I.      INTRODUCTION

Defendant, Eric Argueta Larios ("Larios") submits this Memorandum in support of his sentencing.  Larios was convicted, following a trial, of conspiring to commit racketeering in violation of 18 U.S.C. 1961 (d).  Larios was acquitted of conspiracy to distribute cocaine, 21 U.S.C. §846.  The advisory sentencing guidelines sets the base offense level for racketeering conspiracy at level 19 or, "if greater, the offense level applicable to the underlying racketeering activity."  U.S.S.G. §2E1.1.  Probation has concluded that the preponderance of the evidence supports the conclusion that Larios is accountable, for guideline purposes, for five separate crimes:

1.      Conspiracy to Distribute Cocaine;

2.      Conspiracy to Murder CW-1;

3.      Accessory After the Fact to the Murder of Irvin De Paz;

4.      Accessory After the Fact to December 27, 2015 Attempted Murder;

5.      Accessory After the Fact to January 1, 2016 Attempted Murder.

1

Probation calculated Larios combined adjusted offense level at 39, with a Criminal History Category II, which places the advisory guideline range above the twenty year statutory maximum of 18 U.S.C. 1961 (d).  Larios has objected to Probation's calculation of both the Offense Level as well as Larios' Criminal History Category II.  Neither the evidence at trial, nor the law, supports the Probation Department's conclusion that these five offense are attributable, under a proper relevant conduct analysis, to Larios for the purposes of calculating his advisory guideline range.  Probation's determination of Criminal History Category II is also in error.

To the extent that the court and the government intends to rely on evidence not produce at trial to support probation's conclusion, Larios requests that the court conduct an evidentiary hearing to determine, as the law requires, the credibility of any evidence that the government contends supports the conclusion that Larios is accountable, for guideline purposes, for the five separate crimes.  Larios requests that the court determine that the correct advisory guideline range is 19 and the correct Criminal History Category is I, for an advisory guideline range of 30-37 months.

II.    GUIDELINE CALCULATION ARGUMENTS

     1.    **Relevant Legal Standard.**

 Probation's description of the offense conduct merely parrots the government's version of the offense that the government provided to probation.  The offense conduct in the PSR does not reflect the probation department's independent investigation or the testimony at trial, which refutes some of the conduct relied upon by probation.

To ascertain Mr. Larios's responsibility for the activity set forth in these paragraphs, courts look to the doctrine of relevant conduct described in U.S.S.G. § 1B1.3.  The Guidelines

include as relevant conduct in the cases of jointly undertaken criminal activity all (1) reasonably foreseeable acts and omissions of others (2) in furtherance of (3) the jointly undertaken criminal activity. *United States v. Spotted Elk*, 548 F. 3d 641, 673-674 (8th Cir. 2008). Although these elements closely mirror the requirements for conspiracy liability, the Guidelines, on one hand and conspiracy liability, on the other are not the same. *Id.* Commentary to the Guidelines shows that while the emphasis in substantive conspiracy liability is the scope of the entire conspiracy and foreseeability in light of that scope, the emphasis under relevant conduct § 1B1.3 is the scope of the individuals undertaking and foreseeability in light of that undertaking, rather than the scope of the conspiracy as a whole. *Id.* The court must make an individual assessment of the Defendant's role in the undertaking not simply impute the entire activity by members of the enterprise on the Defendant. Application Note 2 provides in relevant part:

> "..the scope of the activity jointly undertaken by the defendant ("the jointly undertaken criminal activity") is not necessarily the same as the scope of the entire conspiracy, and **hence relevant conduct is not the same for every participant**. Conduct of others that was not in furtherance of criminal activity jointly undertaken by the defendant or was not reasonably foreseeable in connection with that criminal activity is not relevant conduct under this provision." (emphasis added).

Probation conducted no individual assessment of Mr. Larios' role in the undertaking and foreseeability in light of the scope of Larios' involvement in the offense conduct. Simply attributing all acts committed by various MS-13 members, some who were not even known to Larios, without any regard to his individual role in the undertaking is improper Under relevant conduct principles Mr. Larios' undertaking must be ascertained from the point he joined the

criminal conduct and with his limited and low level role considered.  Probation's position attributing to Larios certain violent acts committed by other MS-13 members as relevant conduct does not include a proper analysis under relevant conduct but simply attributes the entire activity by members of MS-13 to Mr. Larios.

Furthermore relevant conduct is a forward looking concept.  It is not appropriate to rely upon what the defendant learned about his co-conspirators' activities only after the events alleged to be relevant conduct.  Rather, the issue is whether, based on what he knew before the events, the defendant should have foreseen the with a "fair degree of certainly" that activity.  Most of the offense conduct involved criminal acts committed by others that Larios perhaps, but very rarely even, became aware of subsequent to the commission of that activity.

The burden of proving the essential elements of each alleged instance of relevant conduct is on the government.  Defendant does not agree that the standard of proof on relevant conduct is by a preponderance of the evidence[1].  Due Process requires that where relevant conduct dramatically increases the potential sentence, proof by "clear and convincing" standard is required.  *United States v. Staten*, 466 F. 3d 708, 717-720 (9th  Cir. 2006).  The offense conduct probation attempts to attribute to Larios dramatically attempts to increase his sentence from Level 19 (30-37 months) to Level 39 (262-327 months), a nineteen year increase.

---

[1] Defendant is fully aware that the court has applied the preponderance of the evidence standard in every sentencing held in this case.  Defendant is not to be deemed waiving his objection that a beyond a reasonable doubt standard should apply and preserves his objection to the Court's use of a preponderance of the evidence standard.  *Rita v. United States*, 551 U.S. 338, 352-53 (2007); *United States v. Gurley*, 860 F. Supp. 2d. 95,99 (D. Mass 2012); *United States v. Digiorgio*, 193 F. 3d 1175, 1177-78 (11th Cir 1999) quoting *United States v. McKinley*, 995 F. 2d 1020, 1926 (11th Cir, 1993)

Secondly, the guideline base offense level for Racketeering Conspiracy is Level 19.  The jury returned a general verdict.  Any fact that increases the sentence exceeding the maximum authorized by the jury verdict must either be admitted by the defendant or proven beyond a reasonable doubt. *United States v. Digiorgio*, 193 F. 3d 1175, 1177-78 (11th Cir 1999) quoting *United States v. McKinley*, 995 F. 2d 1020, 1926 (11th Cir, 1993) [2]

The conspiracy to murder and the two accessory after the fact of murder crimes probation has attributed to Larios increases his Base Offense Level 20 levels from Level 19 to Level 39 beyond the statutory maximum.  This perceived relevant conduct accounts for an extremely disproportionate part of Larios sentence that overshadows his punishment and has become "tail that wags the dog".  *United States v. Gonzalez*, 857 F. 3d 46, 59-60 (1st Cir. 2017) citing *United States v. Lombard*, 72 F. 3d 170, 176 (1st Cir. 1995).  In this case the sentencing judge must find facts to impose a sentence greater than the range of Level 19 which is the relevant maximum sentence based on the jury's general verdict for Sixth Amendment purposes. *Rita v. United States*, 551 U.S. 338, 352-53 (2007); *United States v. Gurley*, 860 F. Supp. 2d. 95,99 (D. Mass 2012).

Based on the evidence the government offered at trial, the government cannot show that the conduct Probation described as "relevant conduct" satisfies the standard.  To the extent

---

[2]  Because in *Digiorgio* the jury's general verdict did not indicate which of the charged predicate acts it believed Defendatns had committed, the district court was required to "find beyond a reasonable doubt that the defendant conspired to commit [a] particular object offense. and sentence Defendants accordingly.  Larios recognizes the First Circuit's prevailing standard in determining sentencing factors is by a preponderance of the evidence, which differs from the 11th Circuit. *United States v. Carrozza*, 4 F. 3d 70, 80-81 (1st Cir 1993).  Those factors here increases Larios and drives the Base Offense Level 20 levels up from Level 19 to Level 39 a disproportionate amount beyond the statutory maximum and Due Process consideration requires a heightened standard.  Larios is not to be deemed waiving this objection.

Probation's  guideline calculation relies on evidence not offered at trial, Larios requests an

evidentiary hearing to test the credibility of any witnesses the government intends to call to

present evidence supporting the applicable sentencing cross-reference or enhancement.

###    2.    The Government Has Failed to Offer Evidence Sufficient to Attribute Any Conspiracy to Distribute Cocaine to Larios

Larios was not aware of any activity involving the drug protection details prior to

December 8, 2014.  The prior drug "protection details" by others on January 21, 2014 and

October 17, 2014 did not refer to him or concern his own conduct or any conduct by a co-

conspirator that was reasonablely foreseeable to Larios.  Larios was not aware of this conduct

because it was committed outside the scope of the charged conspiracy for personal gain.

The conduct forming the December 8, 2014 drug protection detail was also unrelated to

the Racketeering Conspiracy charged in the indictment as the trial testimony indicated that this

activity was entered into and committed by individuals for their own person gain and unrelated to

involvement with the MS-13 enterprise[3].  Participants were instructed not to mention this

conduct to ESLS leadership, specifically Defendants Guzman and Sandoval, leaders of ESLS.

Specifically exhibits at trial of the December 8, 2014 consensual recordings support the separate

nature of this activity[4]:

CW-1:    Fine, but don't tell Casper about this thing, or anything because last time I told the dudes and they told me some shit that the were going for sure, and at the last minute they cancelled on me.  **(Exhibit 1 )** ...

------------------

[3] Mr. Larios was acquitted at trial of the charged drug conspiracy and the absent of specific jury interrogatories simply leaves Mr. Larios not guilty of the charged conduct contained in these paragraphs, No reason for the acquittal can be inferred from the general jury verdict for the acquittal.

[4] The attached exhibits referencing recorded conversations are excerpts from government exhibits admitted at trial.

| | |
|---|---|
| CW-1: | Oh, oh, the one that we are going–Yeah, man.  That's a huge fucking responsibility, man.  But, nah like I tell Crazy....Crazy want to...You know what I mean? **The Mara is one thing, and this business is another. (Exhibit 2, p. 9)** .... |

-------------------

| | |
|---|---|
| CW-1: | Do you know what I mean? I can tell, uh...Player [Defendant Guzman] over here but they aren't going to know where I'm going to uh pick it up or who I'm going to give it to. |
| Caballo: | Yeah |
| CW-1: | And I'm never going to tell him.  If he isn't here with me, he's not going to find out. |
| Caballo: | Of course not. |
| CW-1: | And I'm not going to tell him– |
| Caballo: | Not the way he cheats, no, no, you can't – |
| CW-1: | No, no if he's not here with me, he not going to find out.  I can tell you that much.  And he can get made at me and , and |
| Caballo: | **No. Its that this deal is a separate deal now, homie.  This deal ....no one has to –This is like our, our private life now, homie**.  (Exhibit 2, p. 13).... |

---------------------

| | |
|---|---|
| Cabello: | Another thing about the deal, is not to tell everyone, because uh they– |
| CW-1: | No, no, no.  And you know...  **(Exhibit 2, p. 11)**.... |

   To the extent any conspiracy existed it was a separate uncharged conspiracy, isolated criminal activity between individuals outside the scope of the charged Racketeering Conspiracy entered into for their own personal gain.  The conduct therefore lacks any vertical relatedness or nexus to the charged enterprise and also lacks any horizontal relatedness to any other relevant conduct act probation has offered against Larios.

To prove a pattern of racketeering activity the evidence must show that the racketeering predicates are related and that they amount to or pose a threat of continued activity. *United States v. Pinson*, 860 F. 3d 152, 161 (4th Cir. 2017). "The pattern of activity should be interpreted to prevent the application of RICO to the perpetrators of 'isolated' or 'sporadic' criminal acts". *United States v. Minicone*, 960 F. 2d 1099, 1106-1108 (2nd Cir. 1992) (applying relatedness challenges to both a RICO  1962 ( c) substantive charge and a RICO conspiracy under 1962 (d)).  The concept of relatedness embodies two different concepts.  The racketeering acts must "be related to each other ("horizontal" relatedness), and they must be related to the enterprise ("vertical" relatedness). *Id.*

The December 8, 2014 drug protection detail was created by the government as a reverse sting operation. Participants were selected by the FBI because they appeared to be associated with various MS-13 cliques but the activity was satellite activity conducted for the participants' own personal gain and was not created or organized by any MS-13 leadership[5].  The activity was undertaken to enrich each individual member with $500 and none of this money was given or shared with any MS-13 clique.  No tribute was paid to any clique and participants were told to keep this activity quiet and not to inform MS-13 leadership of this activity.

CW-1 instructed the Lobo not to tell Sandoval because on past occasions it appeared to CW-1 that if Casper (Sandoval) was made aware of the activity he would put a stop to it.
**(Exhibit 1)**  CW-1 specifically describe the drug activity as separate from 'Mara' activity.
**(Exhibit 2, p. 9)**  Such personal activity was not in furtherance of any MS-13 conspiracy but was

---

[5]  FBI reports indicated that "Jose Argueta Rodriguez" was identified as "Lobo" and that individual was not an MS-13 member.  **( See Exhibit 3 )**

undertaken for personal financial gain.  The December 8th drug protection detail lacks both

horizontal relatedness to any other relevant conduct and any vertical relatedness to the activities

of the MS-13 enterprise[6].

Defendant further objects that the offense conduct described in these paragraph were

created, orchestrated and conducted to entrap Mr. Larios into the commission of unrelated drug

activity for the sole purposes of attempting to create an MS-13 criminal conspiracy event and

manipulating his potential guideline sentence by increasing the weight of the alleged drugs.  This

amounted to sentence manipulation.  Defendant relies on the argument set forth in pp. 26-31 of

this Memorandum for this argument as if set out in full herein.

**3.     The Government Has Failed to Offer Evidence Sufficient to Attribute Any
       Conspiracy to Murder CW-1 to Larios**

The information probation relies upon is based on unreliable hearsay from unreliable

cooperating witness hoping to gain favor with the government.  The weight of the evidence does

not support a finding that Larios entered into any conspiracy to murder CW-1.

Larios was arrested for this Indictment on January 29, 2016 and has been held at various

institutions including Wyatt.  Defendants were initially isolated from one another during the early

part of their detention and Larios had no contact with any co-defendant during the first few

weeks of that detention.  The Indictment alleged that the RICO conspiracy ended up through and

including January of 2016 and the drug conspiracy ended in December of 2014. **( Indictment ¶¶**

**25 and 30 (b).**  The government cannot prove that any of the alleged conversations occurred

---

[6]  This explains why the government choose to indict the participants in the drug
protection details with both a §1962 (d) conspiracy and with an additional §864 drug conspiracy
given the separate nature of the activity.

from the date of Larios's arrest (January 29, 2016 ) through the final two days of the end of January, the date the indictment alleged the conspiracy ended. **("...through the end of January 2016...", Indictment ¶25)**

The statements, even if attributable to Larios, amount to nothing more than idle chatter amongst defendants being detained or mere conjecture by a CW trying to increase his value to the government.  However it is undisputed that any perceived statements or evidence was obtained after Larios and the defendants had been arrested for this offense and related to concealment of the criminal activity charged in the indictment.  The statements were not made during and in furtherance of any criminal conspiracy for which Larios had been arrested for. To the extent these statements are accurate, a fact the defendant disputes, it involved statements made by Larios, after his arrest and while he was in custody.

Furthermore, solicitation or a desire by one person is insufficient to constitute a conspiracy.  The government must prove a mutual understanding between two or more people to cooperate to commit the unlawful act.  The offense conduct, again to the extent it is credible, is that Larios discussed  potentially killing a CW-1 to another defendant, Sandoval, or requested  a "green light" on CW-1 that was soundly rejected.  There is no indication that any such statement was part of the original plan or conspiracy charged in the indictment either the independent drug conspiracy under § 846 or a § RICO conspiracy under 1962 (d).  The intended co-conspirators were assumably Sandoval[7] who did not agree and arguably Mr. Caesar Martinez who was acquitted of any racketeering conduct. There was never any agreement and there can be no conspiracy based on only one person's illusory desire.

---

[7] Probation did not include this act as attributable to Mr. Sandoval further demonstrating the lack of any agreement to support a conspiracy.

The conduct does not support the existence of any conspiracy but are only statements of one individual made while in custody expressing a desire in an effort to conceal evidence covering up the past criminal activity and nothing more than idle bravado chatter amongst detainees.  There is no indication that any other member agreed or pursed this issue such that the co-conspirators were in any way said to be acting together.  On the contrary, there is every indication that there never was any agreement between two of more people constituting a conspiracy.  A conspiratorial agreement is the key to the existence of a conspiracy.  *United States v. Marino*, 277 F. 3d 11, 30 (1st Cir. 2002).

Furthermore the burden of persuasion is on the government and not one contemporaneous recording following the January 28, 2015 firearm arrest does "Lobo" appear to accuse or even allude to CW-1 being an informant or cast suspicion upon him in any manner.  The recordings of February 8, 2015 is a meeting where Larios (Lobo) has to explained himself about his firearm arrest. **(Exhibit 4, pp. 15-23 )**   Both Lobo and CW-1 are present at the meeting which at times becomes confrontational when CW-1 accuses Lobo of being careless and caviler with the firearm.  **(Exhibit 4, p. 21)**  Certainly at this point if Lobo had any suspicion about CW-1's role in his arrest he would have mentioned it, or at minimum allude to his suspicions, at the meeting particularly when CW-1 becomes confrontational with him and chastises him about his conduct inside the restaurant.  However there is no such allegation or statement made by Lobo at anytime casting suspicion on CW-1.

Equally compelling is that subsequent to Larios' firearm arrest in January of 2015, CW-1 was not restricted or excluded in any manner from any ESLS activity.  This fact demonstrates at

all times CW-1 had successfully infiltrated ESLS and was never restricted from access to the inner working of the clique following Larios's arrest.   CW-1 was never in jeopardy of being accused of being an informant by anyone.

The contemporaneous recordings and events subsequent to Larios' firearm arrest indicates that there is no truth to the cooperating witnesses statements and belie their self serving accusations.   If CW-1 had been under any remote suspicion he would not have continued to gain the access he had to bring down the clique.   CW-1 would have been *persona non grata* and avoided at every occasion or, at the very least, distanced from clique activity and he surely was not.   There is no indication from the contemporaneous recordings or FBI reports that any such suspicion fell upon CW-1 by Larios.   The government's cooperating witnesses are simply not credible and the government has not met its burden of proof.

### 4.      The Government Has Failed to Offer Evidence Sufficient to Attribute Any Accessory After the Fact to the Murder of Irvin De Paz to Larios

Larios did not know Joel Martinez "Animal" in September of 2015 and did not meet him until the January 8, 2016 clique garage meeting.   At the January 8th meeting, Larios was present and first became aware of Joel Martinez and heard conversations at some point during the meeting about Martinez's involvement in the murder of Irvin De Paz.   Larios played no role in securing Martinez's appearance at this meeting nor did he have any prior knowledge of the reason for the meeting.   Larios was only present at the meeting and was not in the car ride over to the meeting where there were discussions between CW-1, "Animal" and "Muerto" that touched upon Animal's involvement in the De Paz murder.

At some point during the early part of the meeting, Larios briefly mentioned that he knew a woman with a spare room.  **(Exhibit 4, p.27)**  At this time Animal's involvement in the murder had not been disclosed or detailed to members like Larios who simply were present at the meeting and played no role in securing Animal's appearance or discussions with him prior to the meeting[8].  **(Exhibit 4 pp. 25-27 )**  Based on the transcript, Larios could not have been aware when he spoke about an available room that "Animal" had in fact murdered anyone.  The only information provided was the police were looking for Animal and he needed  place to stay.  **(Exhibit 4, p. 26)**  At that point Larios mentioned a possible available room.  At that point no information was supplied placing Larios on notice that Animal had committed any murder or why the police were looking for him. **(Exhibit 4, pp. 25-27)**  An accessory after the fact must know of the completed crime before offering assistance.  See. *United States v. Hiram*, 54 F. 2d 4, 6 (9th Cir. 1965); *United States v. Patriarca*. 912 F. Supp 596, 628 (D. Mass 1995).

The government also attributes an off handed remark by Larios commenting "are you good with garbage". **(Exhibit 4, p. 33 )** This assumably refers to working as a trash collector which at the time Larios was not so employed nor did he have the ability to offer any assistant to Martinez in securing such employment.  This is the extent of Larios' interaction and conversations about Joel Martinez.  This was the only time Larios had met with Martinez. **(Exhibit 4 )**   Larios did not offer any assistance nor did he secure the room for Joel Martinez.

---

[8]  The transcript indicates that the meeting began at the bottom of page 25. **(Exhibit 4)**

### A.    Accessory After the Fact Reference is Inapplicable in RICO Conspiracy Cases.

The definition of "racketeering activity" is limited to a highly particular and clear list of crimes set by the RICO Act.  See, 18 U.S.C. § 1961 (1).  RICO is aimed at addressing conduct, and this conduct must specifically meet the definition and meaning of the statute.  To conclude otherwise would simply create too much discretion in defining what constitutes "organized crime" and punish defendants under guidelines for crimes RICO does not permit.  See, *Zurkowsky v. Gov't Dev. Bank (GDB),* 52 B.R. 1007, 1011 (D.P.R. 1985) (RICO "must be strictly adhered to because the statute is relatively specific one, designed to accomplish certain Congressional intent") (quoting *Ralston v. Capper*, 569 F. Supp. 1575, 1579 (E.D. Mich. 1983) ("Where the RICO statute itself defines the offense, there is no reason to allow courts to impose additional definitions according to their own conceptions of what 'organized crime' is or is not.").

While Congress has chosen to include numerous predicate offense in the statue the definition does not include accessory after as one such predicate for RICO purposes.   Any act involving murder does not include activity associated with assisting or aiding the perpetrator in avoiding apprehension for a crime that was committed three months earlier.  The act of murder had already been committed by another person.  An accessory after the fact does not aid in the commission of the underlying offense and does not share the same criminal intent to commit a violent act.  *United States v. Innie*, 7 F. 3d 840, 852 ( 9th Cir. 1993).  Any act involving murder by its plain meaning suggests a shared criminal intent for the act of murder.

14

Once completed acts related to the murder have ended[9].  The acts of concealing from authorities and safeguarding the suspect is not an act involving murder but is an act of assisting and obstructing in the apprehension of a fugitive who happened to have committed murder as opposed to any other crime.  Larios conversations at the January 8th meeting took place over three months after the murder of Irving De Paz.  This activity was not "closely related" to the murder.  These were only statements made at a meeting where nothing of substance was offered by Larios that could be construed as avoiding or preventing apprehension by authorities of a known fugitive.

### B.        The Court Should Rely on the Guideline's "Harboring" Limitation

The government's evidence about Larios's conduct as an accessory after the fact to Martinez's murder of Irvin De Paz is based solely upon Larios' attendance at the January 8, 2016 clique meeting where Martinez was "jumped in".   No evidence was offered that Larios knew Martinez prior to January 8th nor did Larios play any role in securing or transporting Martinez to the meeting nor did Larios ever speak to Martinez prior to January 8, 2016.

All of Larios' comments at the meeting were remarks offering illusory and vague possibilities about housing, prior to being informed about Animal's role in the De Paz murder.  The comment about "are you good with garbage" was a remark made with no substantive meaning behind it.  Larios had no authority to provide any work to Martinez and Larios was in no position to offer any assistance.  These were simply comments by a subservient low level member of a street gang hoping his comments were received as merely participating in a dialog

---

[9]  For this reason, under the Guidelines, accessory after the fact of murder is not an act of violence as there is no shared intent.  *Innie, id.* at 852.

15

with his superiors. There was no real substance to any of Larios' comments and they were made

to gain favor within the group not to assist Martinez with anything. The statements were

consistent with the bragging and bravado by a junior low level member participating in the

conversation in an effort to gain recognition and credence from the group.  In reality Larios was a

minor member with no authority or ability to assist in any manner.

Because Larios' role in commenting at the meeting consisted solely of a humourous

remark suggesting possible work and an available room that was summarily dismissed, the

appropriate cross reference for guideline purposes is U.S.S.G. 2X3.1 (a)(3)(B), and the

appropriate base level offense is 20.  In this situation Larios only commented briefly of perhaps

an available room in the area and, in passing, a light remark about "being good with garbage".

To the extent any of these comments can be construed as offering assistance to "Animal" they are

strictly limited to "harboring" and the appropriate guideline is U.S.S.G. 2X3.1 (a)(3)(B), which

sets the base offense level at 20.

Larios is not similar to Sandoval who was in an leadership role who arranged for

Animal's presence at the meeting and counseled and directed the conversations both prior to and

during the meeting in an effort to assist Animal.  This is not a situation like in *United States v.*

*Greig*, where Catherine Grieg was found to have done much more over a long period of time to

assist James Bulger avoid apprehension. 717 F. 3d 212, 215-217 (1st Cir. 2013).  Larios was

present at a meeting where options related to "Animal" were discussed.  When Larios mentioned

a possible room no information had been relayed to him that Animal had committed any murder.

This was the first time and last time Larios ever associated with "Animal" and Larios offered

nothing of substance to Animal.

16

**5.     The Government Has Failed to Offer Evidence Sufficient to Attribute Any Accessory After the Fact to December 27, 2015 and January 1, 2016 Attempted Murders to Larios**

Probation determined that two attempted murders committed by Joel Martinez ("Animal") in Chelsea constituted relevant conduct for Larios.  Larios adopts the legal challenges made by his co-defendant Herzzon Sandoval in his sentencing memorandum (Document 2758 pp. 5-13 as if set out in full herein[10].  Larios understands that the court has already made a legal ruling with respect to these issues as it related to Sandoval's sentencing.  Larios is not to be deemed waiving these arguments and legal challenges that the evidence was insufficient to establish that these acts were "attempted murders" as opposed to assaults.  Assaults,  even extreme violent assaults are not one of the enumerated offenses under § 1962 (d) and inclusion of such conduct for the purposes of offense conduct or a sentencing factor for a conviction under 18 U.S.C. §1962(d ) is improper.

Larios separately argues that the acts by "Animal" on December 27, 2015 and January 1, 2016 were not reasonably foreseeable to Larios.  Larios did not know "Animal" and never associated with him until he attended the January 8, 2016[11].  It was only at that point did Larios

---

[10]  Larios also adopts and joins in any common arguments made by his Co-Defendant Edwin Guzman in his memorandum filed on November 9, 2018, Document 2813.  Specifically Larios joins in the alternative arguments advanced in footnotes 102 and 106 concerning the offense level calculation.

[11]  Contrary to the government's position, no one at the meeting described in detail any stabbings committed by Animal.  Animal was described as being involved in some "...serious hits..." with Muerto and Brujo and that is the extent of the knowledge relayed to members in attendance at the January 8, 2016 meeting. **(Exhibit 4, p. 40)**  Perhaps others knew more but the issue is whether Larios knew that Animal had committed additional attempted murders on December 27th and January 1st.  This is insufficient proof  to justify a 20 year maximum sentence.

become familiar with "Animal" and his claim that he was responsible for the De Paz murder in September of 2015. Larios was never informed of any stabbing or attempted murders committed by "Animal" on December 27th and January 1st . At the January 8, 2016 meeting there were no conversation that Larios was present for indicating, in any detail, sufficient for anyone to conclude that Martinez had also engaged in attempted murders on December 27th and January 1st.

The recordings of the January 8, 2016 meeting fully support that the criminal acts were not discussed in detail and openly with the members in attendance, so as to place them on notice that any attempted murders had occurred. At the meeting the only additional comments about these two incidents were made by Brujo. This was the extent of the information relayed to members at the meeting of the December 27th and January 1st

| BRUJO: | Huh?  The Homeboy did that thing with me |
|---|---|
| CW-1: | Hold on |
| BRUJO: | Twice in a short time, he did with me and that was some serious shit, man |
| CABALLO: | That's why I'm telling you, look. |
| CW-1: | He did another one with Tigre, doggie  **(Exhibit 4, p. 40)** |

Perhaps others such as Muerto, CW-1 and Sandoval who had previous interactions and conversations with Animal knew more but that is not the issue as it relates to Larios who only attended the meeting and had no other prior or subsequent interactions with Animal.   While "knowledge of a co-conspirator's activity is not enough for liability under § 1B1.3 ..."[12], the government cannot even prove that Larios knew about the attacks or even knew about the nature or severity of the attacks simply because he was present at the January 8th meeting.  The issue

---

[12] *United States v. Laboy*, 351 F. 3d. 578, 583 (1st Cir. 2003)

was never discussed sufficiently at the meeting to hold one accountable as an accessory solely by virtue of being present at the garage meeting[13].  Larios had no further interaction with "Animal" after the meeting. An accessory after the fact must know of the completed crime before offering assistance.  See *United States v. Hiram*, 54 F. 2d 4, 6 (9th Cir. 1965); *United States v. Patriarca*. 912 F. Supp 596, 628 (D. Mass 1995).

## 6.    Larios is Entitled to a Minimal Role Reduction

Larios entitled to a four (4) level reduction adjustment in his Base Offense Level as his role was minimal under §3B1.2 (a).  A minimal participant role is intended to cover a defendant who is plainly amongst the least culpable of those involved in the conduct of the group. *Schetz v. United States*, 901 F. 2d 85, 87 (7th Cir. 1990).  The Defendant's lack of knowledge or understanding of the scope and structure of the enterprise and activities of others is indicative of a role as a minimal participant. *Id.*  A defendant's lack of personal involvement or knowledge of the activities of others warrants a minimal role reduction. *See e.g. United States v. Patriarca*, 912 F. Supp. 596, 628 (D. Mass. 1995) and case cited therein.

Larios qualifies for such an reduction given the allegations in the conspiracy and his limited culpability.  Larios was low level member who acted at the behest and at the will of the leadership of ESLS.  Larios actions were limited to attending meetings and bragging about exploits that were pure fiction.  Larios was directed how, where and in what manner to attend meetings.  Larios had no knowledge of Joel Martinez's criminal activity until after the January 8, 2015 meeting.  Larios did not even know Martinez until he attended this January 8th clique meeting.

---

[13]  Certainly Animal had more detailed conversations with CW-1, Muerto and Sandoval prior to the meeting where the nature of the criminal activity was discussed but Larios was not present for those conversations, nor is there any evidence that he was made aware of those conversations.

Defendant's role was that of a controlled underling who acted out of fear of physical harm and was too afraid to challenge or object to the activities of the MS-13 leadership. Although a minimal participant role reduction is used infrequently it is appropriate in this case and a four (4) level reduction should apply.   The court has routinely applied a leadership enhancement to many of the defendants in this case.  Fairness dictates a 4 level reduction be given to Larios for a minimal participant into the affairs of the enterprise.

### 8.    Criminal History Category

Probation assigned two additional criminal history points.  Those additional points should not be added because the offense in ¶ **131** does not qualify as a criminal justice sentence that Larios was under during any part of the relevant conduct.  Larios was placed on probation until August 5, 2014 for the Operating Under the Influence offense in ¶ **131**.

Under USSG §4A1.1(d) a defendant who commits any part of the relevant conduct while under any criminal justice sentence including probation two points are added.  This applies to a defendant whose probation is not terminated at its expiration date due to the existence of a **violation warrant**. (emphasis added) *See, Commentary Note 4*.  The violation warrant essentially prevents the term of probation from terminating[14].  A sentence to pay a fine, by itself, is not included as a criminal justice sentence.

A review of the docket sheet for the offense in ¶ **131** clearly indicates that at the probation termination date of August 5, 2014, a date that no probationer needs to physically report to state court,  Larios owed court costs in the amount of $285. **(Exhibit 5 )**  The court issued a "Default"

---

[14]   In response to the objection the probation simply ignores that the State court did not issue an "violation" warrant and only a Default issued.

but did not issue violation warrant. There is no violation warrant that appears on the court docket

nor would there be a probation violation warrant absent a probable cause finding that the

defendant had an ability to pay the outstanding monies due and failed to do so.  A default warrant

is not a probation violation warrant. The court pre-set bail as commonly done in state court for

the amount of monies due ($285)[15].  On February 3, 2015, Larios appeared in court and the case

was terminated and discharged.

Under USSG §4A1.1(d) there was no violation warrant that was outstanding and Larios

was not under a criminal justice sentence after August 5, 2014.  In addition this situation is

similar to a sentence to pay a fine or a probationary period where money is due that under USSG

§4A1.1(d) the guidelines do not treat as a criminal justice sentence warranting two additional

criminal history points. *See, Commentary Note 4.*

The relevant conduct alleged by probation includes the following:

| | | |
|---|---|---|
| 1. | Accessory after the murder of Irving De Paz | January 8, 2016; |
| 2. | Attempted murders by "Animal" | December 27, 2015 and January 1, 2016: |
| 3. | Conspiracy to murder CW-1 | Sometime after January 28, 2015 (date of Larios Firearm arrest) |
| 4. | Drug Conspiracy | December 8, 2014. |

No part of the relevant conduct probation attributed to Larios occurred prior to August 5,

2014 and no violation warrant issued extending the sentence in **¶ 131** rendering it an existing

---

[15] The precise figure of the pre-set bail of $285 as opposed to a round number supports
this common practice.

criminal justice sentence under USSG §4A1.1(d)[16].  Two additional criminal justice points

should not be added.  Larios has a Criminal History Category I.

To the extent the court overrules this objection, a Criminal History Category II

substantially exaggerates Larios's criminal history based solely on his inability to pay court costs

and therefore overreprsents the seriousness of his criminal history.  A downward departure is

warranted under U.S.S.G. §4A1.3(b).

III.    MR. LARIOS  SENTENCE AFTER CONSIDERATION OF THE FACTORS SET
        FORTH IN 18 U.S.C. § 3553 (a)

The statutory maximum of 20 years is far greater than necessary in this case to satisfy the

goals of sentencing.  Larios requests that the court impose a sentence of incarceration that is

much shorter than recommended by the Guidelines and that the court accept the term of

imprisonment of 30-37 months.

Although the Sentencing Guidelines are the starting point and the initial benchmark for

federal sentencing, a court should consider all the § 3553(a) factors to determine if they support

the sentence requested by a party. *Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 596 (2007).

The court must ultimately impose a sentence that is sufficient but not greater than necessary to

accomplish the goals of sentencing, including "to reflect the seriousness of the offense," "to

promote respect for the law," to provide just punishment for the offense," "to afford adequate

deterrence to criminal conduct," and "to protect the public from further crimes of the defendant"

18 U. S. C.  §3553 (a) (2); *Kimbrough v. United States*, 552 U.S. 85, 128 S. Ct. 558, 570 (2007).

---

[16]  If the court were to adopt probation's position, the only activity that this would relate
to is the December 8, 2014 drug conspiracy conduct.  As argued in this objection that activity
was not related to the charged Racketeering Conspiracy and Mr. Larios was acquitted of this
conduct at trial.

Section 3553 (a) (1) requires the Court to consider the nature and circumstances of the offense and the history and characteristics of the defendant when imposing a sentence.  It is worthwhile to note that "when out side by side, the Guideline provisions and statutory provisions under section 3553 (a) often contradict on another." *United States v. Myers,* 353 F. Supp. 2d. 1026, 1028 (S.D. Iowa 2005), 2005 U.S. Dist. LEXIS 1342 (S.D. Iowa Jan. 26, 2005) (*United States v. Ranum*, 353 F. Supp. 2d. 984, 986 E.D. Wis. 2005),  2005 U.S. Dist. LEXIS 1338 (E.D. Wis. Jan. 14, 2005)).  For example, under the Guidelines, courts are generally prohibited from considering the defendant's age ( § 5H1.1), education and vocational skills (§ 5H1.2. socio-economic status (§ 5H1.10), or lack of guidance as a youth (§ 5H1.12).  Section 3553 (a) (1), however, requires a Court to consider these factors, as they compose the "history and characteristics" of a particular defendant and are necessary components to an individualized sentence.  As explained more fully below, a sentence much shorter than recommended by the Guidelines is appropriate after consideration of those factors prohibited under the Guidelines but included under the section 3553 (a) analysis.

*Personal History and Characteristics of the Defendant*

Sections 3553 (a) (1) requires the court to consider the history and characteristics of the defendant.  Larios is 33 years old with an extremely limited education.  Larios left school after the 8th grade in El Salvador.  Prior to the 8th grade, Larios was never actively involved nor compelled by others to attend school on a regular basis.  Larios' formal education was quite limited.  Larios' father abandoned the family when the defendant was 10 years old.  Larios has sporadic contact with his father but he had no male role model during his childhood.

During his teenage years the family struggle to make ends meet and Larios, while living in El Salvador, lacked the normal family nurturing, adult male supervision and any normal guidance for a young boy was essentially non-existent.  Faced with mounting pressure and threats from violent gangs and factions in El Salvador, Larios looked for a better life in the United States.   Larios at age 20, entered the United States and lived in Virginia before ultimately settling in the Boston Area.

 Although Larios physically left El Salvador his psychological make up was scarred by the violence he witnessed.  Larios' decision making process particularly his attachment to ESLS although ill advised and illegal, is the product of a combination of Larios' lack of guidance as a youth, his psychological make up as well as his life experiences in EL Salvador.  Those experiences exposed Larios to youth violence in El Salvador that was common place in his environment.   Larios in a bizarre and perverted sense received the attention and admiration in the local group (ESLS) and older members provided him the guidance and protection that he so lacked as a youth.  That guidance involved exposure to some illegal activity but it was that nurturing and protection that Larios lacked as a youth that he found in the ESLS structure.

It is certainly no excuse for Larios' criminal conduct but there is a rational explanation as to why Mr. Larios gravitated toward this illegal and harmful activity.  That rational stems largely from a child who had no positive youthful experiences, exposed to violent street gangs at a young age and the feelings of abandonment from a father who left a 10 year old boy.  As a result Larios entered adulthood surrounded in El Salvador with violence, angry, depressed and eager to prove to those who had told him otherwise that he was relevant.  Larios found no future in the dangerous environment that El Salvador offered a young man. Larios left El Salvador and found

himself alone in a foreign country poorly educated with limited ability to succeed in this foreign environment without assistance and guidance from others.  Associating with other young men from El Salvador with common experiences and those who shared the same culture and language seemed quite normal.

In the United States, Larios was faced with decisions and issues for any young male from El Salvador regarding affiliating with criminal elements that are much more prevalent for those individuals from Central America living together in inner city neighborhoods.  The fact remains that living in these type of neighborhoods is certainly different then growing up in a suburb of Boston such as Wellesley or Hingham.  Decisions are made at a young age with no parental guidance that involve personal safety and survival on these streets.  Young males from El Salvador are confronted with this dilemma at an early age and generally, as in this case, lack the necessary parental guidance, education, psychological make up and common sense to avoid the pitfalls of gang activity.

Larios was not immune from these pressures and the nature and circumstances of this offense is partially a product of that violent culture, dangerous background and environment.  Notwithstanding these obstacles and challenges, Larios appears to be a loving and caring father, brother and son who supports and cares for his family, including three children.

At trial significant evidence was presented that Larios did not have a major role in the ESLS organization.  Larios was a subservient low level member who did not participate in any murders, attempted murders, beating or assaults of rival gang members.  It appeared that Larios may have gained knowledge of these activities after that activity had occurred but he had no personal involvement in any violent activities.   Perhaps Larios' role and reputation inside the

25

clique is best described by CW-1 in the December 8, 2014 recording stating "....this guy Lobo just likes to drink..."  **(Exhibit 2, p. 69)**

The Guidelines prohibit a court from consider these factors.  However section 3553 (a) (1), requires a Court to consider these factors, as they compose the "history and characteristics" of a particular defendant and are necessary components to an individualized sentence.

*General and Specific Deterrence/Public Protection*

The nature and circumstances of the offense also warrants a sentence that is lower than the advisory GSR.   Larios recommended sentence is sufficient to deter future criminal conduct and protect the public.  Larios will be removed from the United States following completion of his sentence and there is evidence that MS-13 leadership has threaten to kill Larios. These factors make future criminal conduct by Larios highly unlikely.

*Unwanted Sentence Disparities*

The court must also consider the "need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct" 18 U.S.C. § 3553 (a) (6).  Larios has a very minor criminal record and, at this point, only one defendant, Sandoval, has received the statutory maximum sentence solely for a RICO conspiracy rather than predicate crimes.  The justification for that sentence was perhaps the Sandoval's leadership role and the efforts Sandoval played in recruiting "Animal" into ESLS, a role Larios did not share.

*Respect for the Law and Provide Just Punishment*

Section 3553 (a)(2) requires the court to also consider the need for the sentence imposed to take into consideration four (4) specific factors.  These four (4) factors are as follows: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just

punishment for the offense; (B) to afford adequate deterrence to criminal conduct; ( C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educations or vocational training, medical care or other correctional treatment in the most effective manner.

Larios submits that a sentence based on probations's calculation would be substantially unreasonable and onerous.  Section 3553 (a)(2)(A) requires the Court to impose a sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense.  A sentence substantially below the statutory maximum is sufficient to satisfy the ends of punishment in all the circumstances present here.

In this case the government instigated the criminal conduct in order to enlarge the scope and scale of criminal activity.  In essence the government created the criminal offenses that probation has used to calculate Larios's relevant conduct.  The government did so with the sole purpose of ensnaring Larios into criminal activity to fit within the RICO rubic providing a guideline basis for an extremely harsh sentence.  The First Circuit has described this as "sentencing factor manipulation".  Those cases recognize that in certain circumstances, the government's instigation of the criminal conduct at issue may serve as mitigation, and reduces a defendant's advisory guideline range.  This Court summarized the cases in its opinion in *Beatty v. United States*, 2012 U.S. Dist. LEXIS 147967 (Oct, 15, 2012):

Sentencing-factor manipulation occurs 'where government agents have improperly enlarged the scope or scale of the crime.' *United States v. Montoya*, 62 F. 3d 1, 3 (1st Cir. 1995) (emphasis in the original).  A [defendant] 'must show that "the agents overpowered the free will of the defendant and caused him to commit a more serious crimes than he was predisposed to commit" *United States v. Jaca-Nazario*, 521 F. 3d 50, 58 (1st Cir. 2008) (quoting *United States v. Barbour*, 393 F. 3d 82, 86 (1st cir. 2004)0.  When sentencing-factor manipulation occurs the sentencing court may ignore the transaction in computing relevant conduct or depart downward

from the guideline sentence and statutory minimums. *Id.*  A [defendant] must prove sentencing factor manipulation by a preponderance of the evidence. *West v. United States*, 631 F. 3d 563, 570 (1st Cir. 2011).  A [defendant] seeking to show sentencing factor manipulation bears a high burden and must show that agents engaged in 'extraordinary misconduct'. Id. At 570 (quoting *United States v. Fontes*, 415 F. 3d 174, 180 (1st Cir. 2005).  A claim of sentencing factor manipulation requires more that a 'showing that the idea originated with the government to that the conduct was encouraged by it, or that the crime was prolonged beyond the first criminal act, or exceeded in degree or kind than the defendant than done before.'  *Montoya*, 62 F. 3d at 3-4 (internal citations omitted) (noting that a defendant is not often helped by arguing over the number or size of the transactions when 'the extent of the crime is more likely to be a matter of opportunity that if scruple').

The FBI engaged in extreme misconduct its desire to ensnare defendants like Larios, low level members of ESLS.  The FBI through its use and control of CW-1 played a significant role in creating the criminal conduct probation attributes to Larios and uses to increase his Offense Level from 19 to 39.  It is those criminal acts created and orchestrated by the government that causes Larios' advisory guidelines to greatly exceed the statutory maximum.  Failing to take the government's role in the events leading to (1) the December 8, 2014 drug protection detail, (2) the Accessory After the Fact to the Irvin De Paz murder and (3) the Accessory After the Fact to the December 27th and January 1, attempted murders by Joel Martinez into account would make Mr. Larios' sentence substantially unreasonable and grossly disproportionate to his role in the overall conspiracy.   The relevant facts are these:

- no evidence that Larios participated in any act of violence of was even aware of any act of violence prior to its commission by any MS-13 member.

- The government instructed CW-1 to create an illusory drug protection detail and pretended to escort 5 Kilos of cocaine.  There was no evidence presented at trial that the drugs were even real.  There amount was chosen was based on the impact that amount would have on the sentencing guidelines and was far more than the FBI previously used.

28

- The government's introduction of CW-1 into Massachusetts itself created unauthorized criminal conduct that would not otherwise have occurred, CW-1, with full knowledge by the FBI, engaged in a series of robberies as many as 30 or 40 gypsy cab drivers in Chelsea and Everett (one such robbery involved a stabbing) set in motion the events that led to the stabbing in Highland Park Chelsea on May 12, 2015, where CW-1, at minimum, held down the victim as others stabbed him.  The government knew about CW-1's unauthorized activity as early as December 2015.

- Despite (1) knowledge that Joel Martinez was subject to deportation proceedings and subject to ICE arrest, and (2) Martinez had confessed to CW-1 on a recording to the murder of Irving De Paz, the FBI permitted CW-1 to transport Martinez to New Jersey and kept him in that location until the plan to exposed him to members of ESLS was hatched.   This was during a period of time where Agent Jeffery Woods testified at trial was very stressful because the government was preparing indictments.

- At the direction of the FBI , and despite the fact that the FBI knew that Joel Martinez had confessed to the murder of Irving De Paz, terminated the Boston Police Departments Homicide investigation and had CW-1 drive Martinez back to Massachusetts for the sole purpose of having CW-1 introduce Martinez to the members of ESLS in order to associate with those members to implicate them as being accessories after the murder.

- As part of the FBI plan, CW-1 encouraged Martinez to commit further violent acts and others to commit violent crimes after returning from New Jersey in an effort to increase ESLS members including Larios' guideline offense level by introducing Larios to Martinez and attempting to expose those criminal acts at the meeting to attendees, including Larios, that Martinez had committed on December 27th and January 1st.

Larios was not an ESLS leader nor did he know of or was he aware of Joel Martinez's criminal activity until he was introduced to him at the January 8, 2016 clique meeting. Late in the garage meeting Larios became aware of Martinez's claims that he had murdered De Paz in September of 2015. Larios was never aware of any other criminal activity amounting to attempted murders committed by Martinez. Nevertheless probation does not hesitate and attributes Larios with being an Accessory after the Fact to the murder of Irving De Paz, a murder that occurred over three months earlier, and being an Accessory After the attempted murders committed by Animal on December 27th and January 2, solely by Larios presence and participation in limited conversations at the garage meeting on January 8, 2016, where the only activity openly discussed was the De Paz murder[17].

Introducing Martinez was a plan orchestrated with the desired FBI goal of exposing low level members such as Larios to Martinez and his criminal exploits in order to increase the base offense level under relevant conduct for the RICO conspiracy charge. FBI chose not to arrest Martinez and counseled CW-1 to actively encourage Martinez to commit further violent offenses

---

[17] After Lariuos made a comment about a spare room.

all with the desired government goal of increasing and implicating defendants like Larios who, prior to being exposed to Martinez, were minor and tangential participants in the affairs of the enterprises with minimal exposure for a RICO Conspiracy[18].

Agent Jeffery Woods testified that it was very stressful during the time prior the defendants' arrests (January 2016) as the government was preparing the indictments.  It is clear that it was stressful partially because the government realized, as it related to ESLS members and low level defendants like Larios, they needed more qualifying racketeering acts.  It was during this time (December/January 2016) just prior the arrests that the introduction of "Animal" to ESLS plan was launched.

The plan was designed to expose ESLS members to "Animal" and have him openly discuss his criminal activity, with the assistance of CW-1 of course.  The government could then characterize those members present at the meeting, for sentencing guideline purposes under a 1962 (d) conspiracy, as now being accessories after Animal's criminal activity.  In order to ensnare these low level type defendants the FBI resorted to sentence manipulation by improperly expanding the scope and scale of the criminal activity that would qualify as RICO relevant conduct.  On these facts imposing a statutory maximum sentence to Larios would be substantially unreasonable and grossly disproportionate.

---

[18]  Prior to this meeting Larios had only been implicated in the December 2014 drug protection detail and nothing else that would qualify as a RICO type activity.

IV.    DEFENDANT'S RECOMMENDED SENTENCE

Given the facts as stated above, a sentence of incarceration below and advisory guideline range is appropriate in this case.   Defendant submits that a 30-37 month sentence would be appropriate.  Such a sentence would provide punishment and would not be overly harsh in light of the factors set forth in this memorandum.

Respectfully submitted,
The Defendant,
Eric Argueta Larios,
By his attorney,

*Thomas J. Iovieno*

Thomas J. Iovieno, BBO#553361
Law Office of Thomas J. Iovieno
345 Neponset Street
Canton, MA 02021
Phone: (617) 464-3300
Fax: (781) 562-0787

Dated: November 12, 2018

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on November 12, 2018.

*Thomas J. Iovieno*