UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.        )<br>)<br>14.   ERICK ARGUETA LARIOS,  )<br>      a/k/a "Lobo,"         )<br>      Defendant            ) | Cr. No. 15-10338-FDS |

## SENTENCING MEMORANDUM OF THE UNITED STATES

On February 26, 2018, after a month-long trial, a jury found the defendant, Erick Argueta Larios, also known as "Lobo," and his co-defendants, Herzzon Sandoval, also known as "Casper," and Edwin Guzman, also known as "Playa," guilty of racketeering conspiracy, in violation of 18 U.S.C. §1962(d).[1] Argueta Larios was an established "homeboy," or full member, of the Eastside Locos Salvatrucha clique, or ESLS, one of the largest MS-13 cliques in Massachusetts; while Sandoval and Guzman were the leaders—the "First Word" and "Second Word," respectively—of the clique. Argueta Larios actively participated in the gang's criminal activities: he regularly attended clique meetings and paid dues that were used to further the MS-13 criminal enterprise; he participated in a 13-second beating of an ESLS member who was being punished for not attending meetings; he carried the ESLS clique gun to engage in and defend against attacks by rival gang members; he and other MS-13 members provided security what they believed to be a five-kilogram delivery of cocaine; he sought permission to kill a cooperating witness posing as an ESLS member whom Argueta Larios believed had provided information to law enforcement that led to Argueta

---

[1] The jury found Argueta Larios not guilty on Count 3, which charged him with conspiracy to possess with intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. §846.

Larios's gun arrest; and Argueta Larios, together with his fellow ESLS members, worked to protect and promote an MS-13 gang member who assassinated a fifteen-year-old boy in East Boston. Argueta Larios's actions demonstrated fidelity to MS-13's core mission to kill rivals and control territory through violence. He was an active, mature, and respected member of MS-13 who has neither shown remorse nor accepted responsibility for the violence that he and his fellow gang members inflicted on others in furtherance of the MS-13 mission. For the reasons set forth below, the government requests that the Court sentence Argueta Larios to the maximum sentence permitted by law: 240 months in prison and three years of supervised release.

I. **The Probation Office Correctly Calculated the Guidelines Sentencing Range.**

In its Presentence Investigation Report ("PSR") dated November 9, 2018, the United States Probation Office correctly concluded that Argueta Larios's Guidelines sentencing range ("GSR") is 292 to 365 months, based on a total offense level ("TOL") of 39 and a criminal history category ("CHC") of II. PSR ¶¶93-128, 131-134. Specifically, Probation concluded, by a preponderance of the evidence, that Argueta Larios was responsible for conspiracy to distribute cocaine, conspiracy to murder CW-1, and accessory after the fact to an MS-13 murder and two attempted murders committed by Joel Martinez, also known as "Animal," and members of his clique. PSR ¶¶94-120. Contrary to Argueta Larios's objections, these determinations are correct as a matter of law and fact.

A. **Conspiracy to Distribute Cocaine**

Argueta Larios objects to Probation's finding that the December 8, 2014 five-kilogram cocaine protection detail was attributable to and reasonably foreseeable by him within the scope of the MS-13 racketeering conspiracy. Argueta Larios's objections, which focus on

evidence that some of the participants in the drug protection detail sought to hide their participation from others in the gang to keep the profits for themselves, are largely beside the point. Notably, Argueta Larios does not deny his knowing participation in the December 8, 2014 drug protection detail. Moreover, the evidence presented at trial, which included recordings that captured Argueta Larios on tape agreeing to participate and accepting a $500 payment after the delivery; photographs of Argueta Larios participating in the delivery along with five other MS-13 members; and the testimony of a cooperating witness, Jose Hernandez Miguel, also known as "Muerto," who was present for the transaction, and an FBI Task Force Agent, MSP Trooper Brian Estevez, who surveilled the transaction, easily prove by a preponderance of the evidence that Argueta Larios knowingly engaged in a conspiracy with his fellow MS-13 members to deliver five kilograms of cocaine on December 8, 2014. Evidence that certain members of the cocaine conspiracy wanted to protect their role, and thus their profits, from others in the gang does not prevent a finding that their criminal conduct was within the scope of the charged racketeering conspiracy. There was ample evidence that several MS-13 gang members, including members of ESLS, distributed drugs; and that some cliques, like the Everett Locos Salvatrucha, routinely engaged in drug trafficking in furtherance of the racketeering conspiracy. While the ESLS leaders did not specifically encourage drug trafficking as a way to generate profits for the clique, ESLS members were required to contribute personal funds—whether earned through legitimate sources or drug trafficking—to fund the gang's operations. Selling drugs for money that eventually ended up in the ESLS coffer, where it was used to buy guns, pay legal fees, and bring deported gang members back into the United States, was well within the scope of the MS-13 racketeering conspiracy.

Thus, to the extent the December 8, 2014 drug protection detail conspiracy is considered a predicate racketeering act—as charged in the indictment and supported by evidence at trial—it is attributable to Argueta Larios as part of the offense of conviction. To the extent it is considered a separate conspiracy agreed upon and executed entirely by MS-13 gang members—as also charged in the indictment and supported by a preponderance of the evidence—it is attributable to Argueta Larios as relevant conduct to the offense of conviction, notwithstanding his acquittal on the separate conspiracy count. *See, e.g., United States v. Watts*, 519 U.S. 148, 157 (1997) ("We therefore hold that a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has be proved by a preponderance of the evidence."); *United States v. Cox*, 851 F.3d 113, 121 (1st Cir. 2017) (same). Either way, Probation properly held Argueta Larios responsible for the cocaine conspiracy in calculating his GSR.

  **B. Conspiracy to Murder CW-1**

Probation also properly held Argueta Larios responsible for conspiring to murder CW-1. Argueta Larios contends the evidence does not support Probation's finding, but he is wrong. At trial, Hernandez Miguel ("Muerto") testified that, while he was detained with Argueta Larios at Wyatt in early 2016, Argueta Larios told him that Argueta Larios had asked Casper, the leader of ESLS, for a "green light" to kill CW-1, whom they knew as "Pelon." PSR ¶54; Trial Transcript Day 8 at 9-10. Argueta Larios told Muerto that he believed Pelon was a "snitch" and had tipped off the police the night Argueta Larios was arrested with a gun. PSR ¶54; Trial Transcript Day 8 at 10-11. Argueta Larios said that he and ESLS homeboy Cesar Martinez, also known as "Checha," had devised a plan to kill Pelon and had everything ready to commit the murder. PSR ¶55; Trial Transcript Day 8 at 11. Argueta Larios asked

4

Casper for the green light after he was released from jail for his gun arrest at the end of January 2015. *Id.* Argueta Larios told Muerto that Casper refused to give the green light until he was sure that Pelon was, in fact, cooperating with the police. PSR ¶55; Trial Transcript Day 8 at 12. Argueta Larios further explained that he had not told Muerto about his and Checha's plan to kill Pelon earlier because Argueta Larios knew that Muerto was Pelon's best friend, and that if he and Checha had told Muerto about their plan to kill Pelon at that time, Muerto would have interfered and tried to stop them. *Id.*

Muerto's testimony establishes by a preponderance of evidence that Argueta Larios conspired with Checha in early 2015 to murder CW-1. That Casper refused to grant Argueta Larios's request for a green light and that Argueta Larios did not murder CW-1 does not absolve Argueta Larios of criminal liability for conspiracy, which was complete at the time he agreed with Checha to kill CW-1. Nor does it matter that Argueta Larios did not publicly reveal his suspicions about CW-1 during ESLS clique meetings—for one thing, if he was planning to murder CW-1, he would not want CW-1 to know about it; for another thing, if he aired his suspicions, CW-1's allies, including Muerto, likely would have defended CW-1 and defeated the plan. Muerto testified credibly at trial on a wide array of matters, as the Court is aware, and his testimony on this particular point is corroborated by evidence establishing MS-13 rules for dealing with suspected informants. Namely, MS-13 kills informants to achieve and maintain control; and when the suspected informant is an MS-13 member, gang members must obtain permission—referred to as a "green light"—from MS-13 leaders, supported by some proof, before killing him. The conspiracy to kill CW-1 adhered to these rules: Argueta Larios suspected that CW-1, whom he knew as ESLS homeboy Pelon, was a police informant; Argueta Larios made a plan with Checha to kill CW-1; and before he

executed his murder plan, Argueta Larios asked his clique's leader, Casper, for permission to kill CW-1. Casper, too, followed MS-13 rules, telling Argueta Larios that he needed more proof that CW-1 was an informant before he could issue a "green light."

Argueta Larios's trial conduct adds further support for finding that he previously conspired to kill a suspected informant. While Muerto was on the witness stand testifying, on February 7, 2018 (Trial Day 7), Argueta Larios made an intimidating hand motion toward him. A Deputy U.S. Marshal stationed in the courtroom saw the threatening gesture and described it as "multiple up and down pulling motions with his right index finger similar to the action made when you pull the trigger of a firearm." PSR ¶57. For these reasons, Probation's finding that Argueta Larios conspired to murder CW-1, and its application of a two-level enhancement for obstructing justice, should be upheld.

### C.    Accessory After the Fact to Murder and Attempted Murder

Probation correctly determined by a preponderance of the evidence that Argueta Larios was an accessory after the fact to one murder and two attempted murders committed by Animal in furtherance of the MS-13 racketeering conspiracy. Argueta Larios's main objection to these three groupings seems to be that he did not meet Animal and did not know about his violent crimes until the ESLS clique meeting on January 8, 2016, when Animal was jumped into the ESLS clique as a homeboy. While Argueta Larios may not have played the same role as ESLS clique leader Casper in recruiting Animal to join ESLS and did not participate in the attempted murders with Animal (as ESLS members Luis Solis Vasquez, also known as "Brujo," and Mauricio Sanchez, also known as "Tigre," did), Argueta Larios was a knowing and willing participant in the January 8, 2016 clique meeting where ESLS members discussed Animal's murder and attempted murders and devised a plan to hide

Animal from law enforcement, protect him from retribution by rival gang members, and promote him to homeboy for his violent crimes. It is clear from the transcript of the January 8 clique meeting that everyone in attendance, including Argueta Larios, was aware of Animal's stellar "resume," as it were—that he had killed one rival gang member and attempted to kill two others—and were in favor of accepting him into ESLS and making him a homeboy to burnish ESLS's legacy and groom its next generation of violent killers. Argueta Larios participated in the conversation, offering to help find Animal a place to live where he could avoid police and rival gang scrutiny and a job so he could pay clique members back for the financial assistance they would provide to keep him in hiding. Notably, Argueta Larios did not once question Animal's presence at the ESLS clique meeting, voice any objection to helping him avoid police detection and prosecution for his crimes, or dispute his promotion to homeboy. This evidence is more than sufficient to establish that Argueta Larios was an accessory after the fact to Animal's murder and two attempted murders.

      As Probation noted in the PSR, this Court has already ruled, in the context of co-defendant Herzzon Sandoval's (Casper's) sentencing, that accessory after the fact to murder and attempted murder are acts involving murder and therefore constitute racketeering activity under the RICO statute. The government adopts the legal arguments on this point set forth in its sentencing memorandum filed in connection with Sandoval's sentencing and submits that the Court's legal ruling as to that defendant is now the law of the case. The government further adopts its legal and factual arguments regarding the "harboring" limitation set forth in USSG §2X3.1(a)(3)(B), and maintains that, for the same reasons that Sandoval's conduct exceeded merely harboring a fugitive, Argueta Larios also cannot avail himself of the Guidelines' "harboring" limitation. While Argueta Larios did not contribute as many comments to the

discussion as Sandoval or others, he was present while the plan to hide, protect, and promote Animal was discussed, offered to contribute what he could (a place to stay and a job), and never voiced objection; importantly, Argueta Larios was poised to reap the benefits from Animal's induction into the clique just as much as Sandoval and his fellow ESLS members.

## II.     A 20-Year Sentence is Appropriate Based on the Statutory Sentencing Factors.

Probation carefully, reasonably, and correctly calculated Argueta Larios's GSR in this case, and the PSR accurately sets forth his sentencing accountability for the criminal conduct he personally engaged in as a member of the MS-13 racketeering enterprise. Viewed in light of the statutory sentencing factors, a similar picture emerges: Argueta Larios's willful and enthusiastic participation in the violent MS-13 criminal conspiracy and the lack of any significant mitigating factors warrants a substantial sentence. A Guidelines sentence of 240 months, which is also the statutory maximum sentence permitted by law, is an appropriate and reasonable punishment for this defendant.

*First*, the nature of the offense is well known to the Court, who presided over the trial of Argueta Larios and his three co-defendants, as well as the trials of six of his co-conspirators; is chronicled in the PSR; and is set forth in some detail above. The mission of MS-13 is control, and violence is the means to that end. The MS-13 gang members charged in this case committed numerous murders and attempted murders in furtherance of that mission, and each defendant, including Argueta Larios, embraced the gang's violent ethos. Indeed, MS-13 would not achieve its mission without a dedicated roster of members who are ready, willing, and able to inflict violence on rivals, police informants, and their own wayward members. To that end, every member of MS-13 helps foster the gang's culture of fear and contributes to the wanton violence the gang inflicts on its rivals and the communities in which it operates.

Argueta Larios, who joined MS-13 at age 13 while living in El Salvador, played his part in the gang's reign of terror. Argueta Larios, who is now 34 years old, became a homeboy with ESLS sometime in 2013. He regularly attended ESLS clique meetings, paid his dues, beat ESLS members who broke gang rules, and actively engaged in gang-related activities. For example, after he was targeted and shot at by rival gang members, Argueta Larios took possession of the ESLS clique gun in January of 2015. Not content to lay low, Argueta Larios carried the gun with him to a local restaurant, where he showed it off to other members of his clique. Unfortunately for Argueta Larios, one of those clique members was CW-1, who alerted law enforcement; Argueta Larios was arrested, the gun was seized, and he was ordered to replace the lost firearm by members of his clique. Suspecting that CW-1 had tipped off the police, Argueta Larios conspired with fellow ESLS homeboy Checha to kill the informant, just as MS-13 requires its members to do. Argueta Larios also showed no hesitation when asked by CW-1 to join him and four other MS-13 members in protecting a five-kilogram shipment of cocaine. He similarly voiced no objection when his clique recruited and promoted Animal to homeboy for murdering a young rival gang member and attempting to murder two others. And Argueta Larios actively joined in the plan to hide Animal from law enforcement to protect him from prosecution for his crimes. In no sense was Argueta Larios a "minimal participant" in the MS-13 racketeering conspiracy.

*Second*, Argueta Larios's personal history and characteristics reveal little, if anything, to mitigate his criminal conduct. Although he grew up poor in El Salvador, he enjoyed a close and loving relationship with his mother and was not subjected to any form of physical, emotional, or substance abuse as a child. He joined MS-13 at age 13 in El Salvador, maintained his ties to the gang when he came to the United States illegally at age 20 or 21,

and earned a promotion to homeboy with ESLS in 2013. The FBI's investigation of MS-13 that led to the indictment in this case covers only three years of his nearly 20-year membership with MS-13, but it produced compelling evidence of Argueta Larios's role in and enduring commitment to this violent transnational street gang.

*Finally*, Argueta Larios has never expressed remorse or accepted responsibility for his criminal conduct. Instead, he places blame on the gang and its leaders, while minimizing his role, as an active member, in maintaining the gang's status and fostering its culture of fear. Argueta Larios was not a leader, it is true, but without committed homeboys like him willing to fight for the cause, the gang would never achieve its violent mission "to control everything." The evidence at trial established beyond a reasonable doubt that ESLS was a powerful force in the larger MS-13 criminal enterprise, and Argueta Larios was a long-time, willing participant in the senseless violence perpetuated by the gang generally and his clique specifically.

### III. Conclusion

Whether viewed as a variance from the correctly calculated GSR of 292 to 365 months or in light of the statutory sentencing factors, a 20-year sentence is an appropriate and reasonable punishment for Argueta Larios. The government recognizes that this sentence is the same as that imposed on Sandoval, the undisputed leader of ESLS, and the same as that requested for Guzman, his second in command. In the context of the MS-13 criminal enterprise, equivalent sentences for leaders and soldiers does not result in unwarranted sentencing disparity. The ability of MS-13 to achieve its mission depends on the actions of all of its members, and all members of the MS-13 criminal conspiracy must be held accountable for criminal conduct committed by them and their fellow gang members. Argueta Larios has

spent nearly 20 of his 34 years in the service of MS-13, fully devoted to its success as a violent criminal organization. He has earned the maximum punishment allowed by law.

For these reasons, the government requests that the Court sentence Argueta Larios to 240 months in prison. While he will face deportation at the conclusion of his sentence, as with similarly situated defendants, the government requests that the Court place Argueta Larios on supervised release for three years.

        Respectfully submitted,

        ANDREW E. LELLING
        United States Attorney

By:    */s/ Kelly Begg Lawrence*
        Kelly Begg Lawrence
        Christopher Pohl
        Glenn A. MacKinlay
        Kunal Pasricha
        Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify the foregoing document was filed through the Electronic Court Filing (ECF) system on November 14, 2018 and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing.

        */s/ Kelly Begg Lawrence*
        Kelly Begg Lawrence
        Assistant U.S. Attorney